STEVEN M. WEINBERG (SBN 235581)
smweinberg@holmesweinberg.com
MICHAEL SALVATORE (SBN 281118)
msalvatore@holmesweinberg.com
HOLMES WEINBERG, P.C.
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265
Telephone: (310) 457-6100
Facsimile: (310) 457-9555

ROBERT L. MEYLAN (SBN 144031)
rmeylan@mdjalaw.com
SHAUNT T. AREVIAN (SBN 237698)
sarevian@ mdjalaw.com
BENEDETTO L. BALDING (SBN 244508)
bbalding@ mdjalaw.com
MEYLAN DAVITT JAIN & AREVIAN LLP
444 S. Flower Street, Suite 1850
Los Angeles, California 90071
Telephone: (213) 225-6000
Facsimile: (213) 225-6660

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBEFILL INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>ELEMENTS SPIRITS, INC. and KIM BRANDI,<br><br>Defendants. | Case No. 10-CV-2034 CBM (PLAx)<br><br>**DEFENDANT ELEMENTS SPIRITS, INC.'S MOTION IN LIMINE # 4 TO EXCLUDE THE REPORTS AND TESTIMONY OF BRUCE ISAACSON**<br><br>[Filed concurrently with Declaration of Shaunt T. Arevian in Support of Elements' MILs #1-5 and [Proposed] Order]<br><br>Date:    October 29, 2013<br>Time:    2:30 PM<br>Place:   Courtroom 2 |

*ELEMENTS' MIL #4*

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1 **TO THE COURT, THE PARTIES, AND THEIR ATTORNEYS OF**

2 **RECORD:**

3     **PLEASE TAKE NOTICE** that October 29, 2013 at 2:30 p.m., or as soon

4 thereafter as counsel may be heard by the above-entitled Court, Defendant

5 Elements Spirits, Inc. will and hereby does move in limine to exclude evidence and

6 testimony from Plaintiff Globefill, Inc.'s survey expert, Bruce Isaacson. This

7 motion is made following the conference of counsel under Local Rule 7-3 on

8 Friday, September 20, 2013.

9     This motion is based on the Notice of Motion and Motion, the

10 accompanying Memorandum of Points and Authorities, the Declaration of Shaunt

11 T. Arevian in support of Elements' MILs #1-5, all pleadings and submissions on

12 file in this action, and upon such other matters as may be presented to the Court at

13 or before the time of the hearing.

14

15 DATED: October 1, 2013     MEYLAN DAVITT JAIN & AREVIAN LLP

16                               HOLMES WEINBERG, PC

17

18                         By: /s/ Steven M. Weinberg
                              Steven M. Weinberg

19                               Attorneys for Defendant
                              Elements Spirits, Inc.

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................ ii

I.    INTRODUCTION ............................................................................................ 1

II.   ARGUMENT ................................................................................................... 2

    A.    The Court Should Preclude Dr. Isaacson From Offering Evidence Or Testimony On Topics Outside His Expertise Or Which Are Speculative. ............................................................................................ 2

    B.    Dr. Isaacson's "Squirt" Survey Is Unreliable And Should Be Excluded. ....................................................................................................... 8

        1.    Dr. Isaacson's Undisclosed Eveready Survey Is The Proper Survey Methodology For Globefill's Trade Dress. .................... 9

        2.    Dr. Isaacson's Lineup Survey Is Methodologically Unsound Because It Was Not Conducted According To Accepted Principles, And Therefore Unreliable And Inadmissible. ........ 12

            a.    The Lineup Survey Did Not Replicate Marketplace Conditions Because It Did Not Display KAH Tequila As It Is Sold At The Point Of Sale. .............................. 12

            b.    The Lineup Survey Did Not Employ A Control Designed According To Accepted Principles. ............... 14

            c.    The Lineup Survey Is Nothing More Than A Matching Game That Created Demand Effects As A Result Of Its Overly Suggestive Nature. ........................ 16

            d.    The Lineup Survey Did Not Poll The Relevant Universe And Is Therefore Unreliable. ........................... 18

    C.    Even if the Court Does Not Exclude the Isaacson Lineup Survey, Its Application is Limited ................................................................... 19

III.  CONCLUSION ............................................................................................... 20

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

*ELEMENTS' MIL #4*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

## TABLE OF AUTHORITIES

Page(s)

### CASES

AMF Inc. v. Sleekcraft Boats,
    599 F.2d 341 (9th Cir. 1979) .................................................................. 19

Avila v. Willits Env'tl Remed'tn Trust,
    633 F.3d 828 (9th Cir. 2011) ................................................................... 3

California ex rel. Brown v. Safeway, Inc.,
    615 F.3d 1171 (9th Cir. 2010) ................................................................. 6

Daubert v. Merrell Dow Pharmaceuticals,
    509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) ............................... 2, 8

E & J Gallo Winery v. Proximo Spirits, Inc.,
    2011 WL 5922090 (E.D. Cal. Nov. 28, 2011) ......................................... 11

Earp v. Cnty. of Tulare,
    2012 WL 1076217 (E.D. Cal. Mar. 29, 2012) .......................................... 3

Hokto Kinoko Co. v. Concord Farms, Inc.,
    810 F. Supp. 2d 1013 (C.D. Cal. 2011) .................................................. 10

Kumho Tire Co., Ltd. v. Carmichael,
    526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d 238 (1999) .............................. 2

Lust v. Merrell Dow Pharmaceuticals, Inc.,
    89 F.3d 594 (9th Cir.1996) .................................................................... 3

Pecover v. Elec. Arts Inc.,
    2010 WL 8742757 (N.D. Cal. Decl. 21, 2010) ........................................ 3

Reinsdorf v. Skechers U.S.A.,
    2013 WL 454828 (C.D. Cal. Feb. 6, 2013) ........................................... 8, 18

Simon Property Group L.P. v. mySimon, Inc.,
    104 F. Supp. 2d 1033 (S.D. Ind. 2000) ........................................... passim

Storie v. Duckett Truck Center, Inc.,
    2007 WL 4454297 (E.D. Mo. Dec. 14, 2007) ......................................... 3

## __TABLE OF AUTHORITIES__, cont'd.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

Page(s)

Sunbeam Corp. v. Equity Industries Corp.,
   635 F. Supp. 625 (E.D. Va. 1986)...............................................................8, 17

THOIP v. Walt Disney Co.,
   690 F. Supp. 2d 218 (S.D.N.Y 2010)......................................................8, 13, 18

THOIP v. Walt Disney Co.,
   788 F. Supp. 2d 168 (S.D.N.Y. 2011)...............................................................18

Tokidoki, LLC v. Fortune Dynamic, Inc.,
   2009 WL 2366439 (C.D. Cal. July 28, 2009) .....................................8, 13-14, 18

Trouble v. Wet Seal, Inc.,
   179 F.Supp.2d 291 (S.D.N.Y.2001) ...................................................................5

Tyco Thermal Controls LLC v. Redwood Industrials,
   2010 U.S. Dist. LEXIS 47019 (N.D. Cal. 2010)..................................................2

United States v. Finley,
   301 F.3d 1000 (9th Cir.2002) ............................................................................2

Walnut Creek Manor, LLC v. Mayhew Ctr., LLC,
   622 F. Supp. 2d 918 (N.D. Cal. 2009) ...............................................................2

Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,
   254 F.3d 706 (8th Cir.2001) ..............................................................................3

White v. Ford Motor Co.,
   312 F.3d 998 (9th Cir. 2002) .............................................................................3

### __STATUES__

FEDERAL RULES OF EVIDENCE
   Rule 401...............................................................................................4
   Rule 402...............................................................................................4
   Rule 702.........................................................................................*passim*

*ELEMENTS' MIL #4*

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Elements Spirits Inc. ("Elements") respectfully submits that the testimony, surveys, and reports prepared by Plaintiff Globefill Inc.'s ("Plaintiff" or "Globefill") survey expert, Dr. Bruce Isaacson, should be excluded for several reasons.

First, Dr. Isaacson improperly attempts to offer expert testimony on topics for which he lacks sufficient expertise.  Specifically, Dr. Isaacson, who has admitted in deposition that he is neither an expert on beverage alcohol marketing nor consumer purchasing behavior as it relates to the consideration and purchase of alcoholic beverages, dedicates much of his testimony on the <u>Sleekcraft</u> factor issue of whether tequila and vodka are proximate, competitive and commercially related.  His testimony, which is based on little more than visits to liquor stores and various articles he found on the Internet, is lay testimony, and not based on "scientific, technical, or other specialized knowledge" as required by FRE 702.

Second, Dr. Isaacson's conclusions regarding how consumers will purchase or consider purchasing premium tequila and premium vodka, and how these products will be merchandised in the marketplace and similar issues are entirely speculative.

Third, Dr. Isaacson's two "Squirt" surveys are irreparably flawed and must be excluded for many reasons, including that the use of the Squirt methodology was improper, the specific lineup methodology employed was nothing more than a guessing game creating an improper demand effect, the control used was improper, and it tested an improper universe.

Fourth, even if some weight is to be given to the survey, by Dr. Isaacson's own admission, his survey is limited to a very specific situation – where a consumer who knows of Crystal Head Vodka or encounters it for the first time in

- 1 -

1   a liquor store immediately goes to the tequila aisle and encounters only KAH

2   Blanco.  It thus does not apply where a consumer encounters KAH Blanco and

3   one or more of the other three KAH tequila products either off-premise (for

4   example, in liquor stores) or in any on-premise environment (places like

5   restaurants and bars where spirits are consumed).

## II.    ARGUMENT

### A.    The Court Should Preclude Dr. Isaacson From Offering Evidence Or Testimony On Topics Outside His Expertise Or Which Are Speculative.

10      The test for admissibility of expert testimony under Daubert v. Merrell Dow

11  Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993), and

12  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L.Ed.2d

13  238 (1999), is whether the opinion the expert seeks to offer is "relevant and

14  reliable." Walnut Creek Manor, LLC v. Mayhew Ctr., LLC, 622 F. Supp. 2d 918,

15  926 (N.D. Cal. 2009). "This determination 'entails a preliminary assessment of

16  whether the reasoning or methodology underlying the testimony is scientifically

17  valid and of whether that reasoning or methodology properly can be applied to the

18  facts in issue.'" Id., citing Daubert, 509 U.S. at 592, 113 S.Ct. 2786. See also Tyco

19  Thermal Controls LLC v. Redwood Industrials, 2010 U.S. Dist. LEXIS 47019

20  (N.D. Cal. 2010).   Here, Dr. Isaacson's testimony and conclusions regarding the

21  relationship of vodka and tequila, how they are sold and marketed, and consumer

22  purchasing behavior related thereto fail to meet this standard.

23      It is black letter law that for an expert to offer testimony on a particular

24  topic, he or she "must have sufficient expertise" in that topic.  See, e.g., United

25  States v. Finley, 301 F.3d 1000, 1007 (9th Cir.2002) ("[Rule 702] consists of three

26  distinct but related requirements: (1) the subject matter at issue must be beyond the

27  common knowledge of the average layman; (2) the witness must have sufficient

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); <u>Avila v. Willits Env'tl Remed'tn Trust</u>, 633 F.3d 828, 839 (9th Cir. 2011) (upholding exclusion of expert's testimony on effect of burning solvents in the chrome-plating process because expert, although holding degrees in chemistry, did not specialize in metal working industry); <u>White v. Ford Motor Co.</u>, 312 F.3d 998, 1008-1009 (9th Cir. 2002) ("A layman, which is what an expert witness is when testifying outside his area of expertise, ought not to be anointed with ersatz authority as a court-approved expert witness for what is essentially a lay opinion."); <u>see also</u> <u>Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.</u>, 254 F.3d 706, 715 (8th Cir.2001) . Further, it is the offering party's burden to establish that its expert possesses sufficient expertise to testify on a particular topic. <u>See</u> <u>Lust v. Merrell Dow Pharmaceuticals, Inc.</u>, 89 F.3d 594, 598 (9th Cir.1996).

Following this well settled precedent, numerous courts have precluded experts from offering evidence or testimony beyond their expertise. See, e.g., <u>Pecover v. Elec. Arts Inc.</u>, 2010 WL 8742757, *5-7 (N.D. Cal. Decl. 21, 2010) (excluding video game executive from offering opinions on (1) video game consumer motivation analysis; (2) cost/revenue analysis; (3) statistical analysis; and (4) data evaluation and interpretation because all were outside the expert's expertise); <u>Earp v. Cnty. of Tulare</u>, 2012 WL 1076217, *4 (E.D. Cal. Mar. 29, 2012) (excluding nurse's testimony on the cause of plaintiff's injuries because such causation testimony was outside the nurse's expertise); <u>Storie v. Duckett Truck Center, Inc.</u>, 2007 WL 4454297, *8 (E.D. Mo. Dec. 14, 2007) (excluding testimony on value of used cars by expert who owned body and mechanic shop for 16 years on grounds testimony was outside the expert's expertise).

Dr. Isaacson opines throughout his Rebuttal Report ("Initial Reply and Additional Survey Submitted by Dr. Bruce Isaacson in Response to the Reports of

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1  Hal Poret, John Kennard, and Philip Johnson, Dkt. No. 170 (the "Isaacson Rebuttal

2  Rpt.") on issues as to which he admits having no expertise.  (Declaration of Shaunt

3  T. Arevian in Support of Elements' MILs #1-5 ("Arevian Decl."), Ex. G)  These

4  opinions do not satisfy the qualification requirements of Federal Rule of Evidence

5  702, are irrelevant under Rule 401, and inadmissible under Rule 402.

6    Specifically, Dr. Isaacson admits that he is not an expert in the alcoholic

7  beverage industry or in the marketing or sale of spirits (Arevian Decl., Ex.H at

8  46:20-23), or consumer behavior as it applies to the purchase of beverages alcohol

9  (Id. at 46:24-47:5).

10    Notwithstanding these admissions of non-expertise and no relevant

11  experience beyond that of a lay person, Dr. Isaacson's Rebuttal Report is replete

12  with alleged opinions on the proximity, competitiveness and relatedness of vodka

13  and tequila, and how consumers purchase them, topics that are outside of his area of

14  expertise and experience and which, as shown below, are subject to exclusion.

15    Dr. Isaacson addresses these issues under the "framework" of what he refers

16  to as the "Four P's."  (Arevian Decl., Ex.G at ¶¶17-50.)  His use of the Four P's

17  here, and his "analysis" of the product similarity Sleekcraft factor under that rubric,

18  however, are not based on his expertise or any professional experience but instead

19  on his excludable lay personal observations and conclusions.  For example, under

20  the First and Second P's ("place" and "product") his attempt to show that vodka and

21  tequila are sold in the same kinds of stores and as products that are similar and

22  related are primarily based on his observations walking through a few liquor stores

23  and (incomplete) quotes and (mis)interpretations of newspaper articles[1] and

---

[1] For example, Dr. Isaacson quotes from an article in *The New York Times*, which he suggests shows that tequila and vodka are substitutable, one of Plaintiff's themes regarding similarity.  However, what the article actually shows is that different kinds of spirits, and not just vodka and tequila, can be used for a variety of cocktails that share some other ingredients and have different names. (Arevian Decl., Ex. G at ¶24 n. 3.)  Similarly, the *Los Angeles Times* article to which he refers does not equate vodka and tequila but instead shows how spirits like

*(continued...)*

incorrect speculation.[2] He also tries to prove this relationship through some third party data – but completely fails to provide any evidence that tequila and vodka are any more or less related than are any spirits or other alcoholic beverages (including wine or beer).[3] What he in any event and significantly fails to provide is any evidence that people who purchase a premium vodka would purchase a premium tequila. And even if he tried to introduce such evidence, because he is not an expert in these areas, areas which a jury is equally qualified to assess, his testimony must be excluded. See Malletier v. Dooney & Bourke, Inc., 525 F.Supp.2d 558, 570 (S.D.N.Y.2007); Trouble v. Wet Seal, Inc., 179 F.Supp.2d 291, 303 (S.D.N.Y.2001) (on matters where a jury can make a determination on its own, expert testimony should be excluded);

Dr. Isaacson's testimony regarding the third "P," "Price," is entirely based on lay observations – a liquor store website. And his conclusion, that "it is reasonable to expect that a consumer willing to buy a product in the super premium category for one type of spirit, may also consider other spirits in that category"

---

(...continued)
tequila are making headway in the spirits world, following the lead of vodka and scotch. (Id.)

[2] By way of one example, Dr. Isaacson surmises that "the variety of Kah that is likely best-selling is Blanco; Crystal Head and Blanco are both completely clear in color." (Arevian Decl., Ex. G at ¶23.) First, Dr. Isaacson's surmise is wrong – the evidence in this case is that KAH Reposado is the best-selling variety. Second, the color of these spirits is beside the point – all of the KAH bottles are opaque so that the color of any of them is not seen at the point of purchase or in marketing materials.

[3] Indeed, the Kennard Report to which Dr. Isaacson refers in his Rebuttal Report, Arevian Decl., Ex. G at ¶32) shows that there is no particular relationship between vodka and tequila than with any other spirit, and that vodka and tequila are neither competitive nor substitutable. (See Preliminary Expert Report by John V. O. Kennard In Opposition to Plaintiff's Motions for Summary Judgment and Preliminary Injunction (hereinafter, the "Kennard Rpt") at 9-17, Dkt No. 165-6.) Mr. Kennard, in sharp contrast to Dr. Isaacson, has been a senior executive in the beverage alcohol industry for 30 years, and has had senior level responsibility for a number of major spirits brands.

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1  (Arevian Decl., Ex. G at ¶38) is not based on any expertise in alcoholic beverage

2  consuming behavior or beverage alcohol marketing (he admits having none);

3  instead, it is pure speculation, and thus excludable for that reason as well.

4  <u>California ex rel. Brown v. Safeway, Inc.</u>, 615 F.3d 1171, 1181 fn. 4 (9th Cir. 2010)

5  ("An expert's opinions that are without factual basis and are based on speculation or

6  conjecture are inadmissible at trial ...."). Dr. Isaacson's testimony regarding the

7  fourth "P," "Promotion," suffers from the same disability. His observations are

8  based not on any expertise, but on his interpretation of what he viewed on lay

9  websites (for example, Amazon.com and BevMo.com). (Arevian Decl., Ex. G at

10 ¶¶39-50.)

11         Other examples of Dr. Isaacson's non-expert and speculative testimony

12 include the following:

13         (a)    "My understanding is that goods are proximate if

14                they are "similar in use and function" and "would be

15                reasonably thought by the buying public to come from

16                the same source if sold under the same mark." I believe

17                that vodka and tequila would be considered proximate by

18                this definition, and must be considered competitive if

19                considered through market analysis." (Arevian Decl.,

20                Ex. G at ¶18.)

21         (b)    "KAH and Crystal Head are relatively new

22                brands; as they grow, they will be increasingly found in

23                the same retailers." (Arevian Decl., Ex. G at ¶21.)

24         (c)    "Although I did not visit on-premise locations,

25                such as bars, clubs or restaurants, in my store checks, it is

26                reasonable to expect that tequila and vodka might be

27                merchandised together." (Arevian Decl., Ex. G at ¶22.)

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

- 6 -

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1    Element's Objections to each of these filed in connection with Plaintiff's

2    Motion for Summary Judgment were sustained by the Court in its Tentative

3    Rulings. (Arevian Decl. Ex. L.)

4         Dr. Isaacson engaged in other speculative and non-expert conclusions that

5    should be excluded, including the following:

6              (a)    "If nearly two-thirds of tequila drinkers also drink

7                   vodka, it is highly likely that some shopping trips will

8                   involve purchases of both vodka and tequila. It is also

9                   highly likely that tequila drinkers will attend to stimuli

10                  that involve vodka, because for nearly two-thirds of

11                  tequila drinkers, vodka is a relevant beverage."

12             (Arevian Decl., Ex. G at ¶33.)

13    This is speculative and incomplete – the issue is not whether people may or

14    may not purchase vodka and tequila on the same trip but whether or not people who

15    buy premium vodka are also likely to purchase premium tequila. These are issues

16    involving consumer purchasing behavior of alcoholic beverages as to which Dr.

17    Isaacson has admitted having no expertise.

18             (b)    "It is reasonable to expect that a consumer willing

19                  to buy a product in the super premium category for one

20                  type of spirit, may also consider other spirits in that price

21                  category." (Arevian Decl., Ex. G at A ¶38.)

22    Here again, there is no "scientific, technical, or other

23    specialized knowledge" supporting this conjecture and for that reason

24    it should be excluded.

25         In other words, Dr. Isaacson's testimony on the issue of the proximity,

26    relatedness and competitiveness of premium tequila and premium vodka and what

27    consumers may do or be willing to do when it comes to purchasing premium spirits,

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1   is not based on "the expert's scientific, technical, or other specialized knowledge"

2   required by Federal Rule of Evidence 702 because he has admitted that he has none

3   in the beverage alcohol industry or consumer behavior in the purchase of such

4   products.

5   **B.**   **Dr. Isaacson's "Squirt" Survey Is Unreliable And Should Be**

6        **Excluded.**

7        Survey evidence is reliable and admissible where it is conducted according to

8   accepted principles of survey design.  See Daubert v. Merrell Dow Pharms., Inc.,

9   509 U.S. 579, 589 & n. 7, 113 S. Ct. 2786, 125 L.Ed.2d 469 (1993) (explaining the

10   trial judge's prerogative to "ensure that any and all scientific testimony or evidence

11   admitted is not only relevant, but reliable"); see also FRE 702; Reinsdorf v.

12   Skechers U.S.A., 2013 WL 454828, *10 (C.D. Cal. Feb. 6, 2013) (excluding survey

13   which did not comport to accepted principles).

14        Although minor technical flaws in a survey typically go to weight,

15   fundamental methodological irregularities bearing on reliability, on the other hand,

16   require exclusion of the survey evidence.  See, e.g., Reinsdorf, 2013 WL 454828

17   at*10 (improper survey universe, coupled with other faults, rendered survey

18   inadmissible); see also Tokidoki, LLC v. Fortune Dynamic, Inc., 2009 WL

19   2366439, *14 (C.D. Cal. July 28, 2009) (finding Dr. Isaacson's survey inadmissible

20   to show a likelihood of confusion because of methodological flaws); THOIP v.

21   Walt Disney Co., 690 F. Supp. 2d 218, 231 (S.D.N.Y 2010) (excluding comparative

22   array survey which did not reflect actual marketplace conditions); Sunbeam Corp.

23   v. Equity Industries Corp., 635 F. Supp. 625, 635 (E.D. Va. 1986) (rejecting overly

24   suggestive array survey); Simon Property Group L.P. v. mySimon, Inc., 104 F.

25   Supp. 2d 1033, 1052 (S.D. Ind. 2000) (excluding survey that employed improper

26   controls against guessing).

27

28

- 8 -

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1  Dr. Isaacson's comparative array survey methodology (the "Lineup Survey")

2  is so riddled with material defects that it is totally unreliable and must be excluded.

3  Among the myriad methodological flaws – which include the failure to replicate

4  marketplace conditions, the use of improper controls against guessing, the creation

5  of demand effects in a matching game, and an improper universe – one stands

6  above all:  Dr. Isaacson's decision to employ a comparative array methodology

7  (also called a "Squirt" survey) instead of the gold-standard Eveready survey.  This

8  decision speaks volumes as it was made only after an undisclosed Eveready survey

9  he ran showed no confusion.

10  **1.**     **Dr. Isaacson's Undisclosed Eveready Survey Is The Proper**

11          **Survey Methodology For Globefill's Trade Dress.**

12  Although his Rebuttal Report was devoid of all mention of it, Dr. Isaacson

13  conducted an Eveready survey concurrently with his Lineup Survey. (Arevian

14  Decl., Ex.M.)  The Eveready survey purportedly was cancelled because it showed

15  no confusion.   (Arevian Decl., Ex. H (Eveready survey showed "little confusion")

16  and 97:16-21 (regarding decision to cancel Eveready survey); Ex. I at 33 [Expert

17  Report of Hal Poret, dated May 2013, Dkt No. 165-3 ("Poret Rpt.")], ("Dr.

18  Isaacson's Eveready Survey showed 0% confusion").)  After deciding not to

19  continue with the Eveready, Dr. Isaacson invented an "awareness" survey

20  specifically designed to show that the Crystal Head trade dress was not well enough

21  known for an Eveready.  As shown below, the Eveready format was the proper

22  methodology for this case – indeed, it has been used before by Dr. Isaacson in

23  analogous cases to this – and the trumped up "awareness" survey was nothing more

24  than afterthought subterfuge for Plaintiff's reliance on the improper Lineup

25  methodology.[4]

26  _____

[4] Curiously, Dr. Isaacson stopped the Eveready survey two weeks before he
27  started the Awareness study.  (Arevian Decl., Ex. M.)

28

The Eveready model is the "gold standard" for strong marks.  See Swann, Jerre B., "Likelihood of Confusion Studies and the Straightened Scope of Squirt," 98 The Trademark Reporter, 739 (May-June 2008), (attached as Arevian Decl., Ex. I, cited in the Isaacson Expert Report (Dkt. No. 131-3) (hereinafter "Isaacson Rpt."), ¶30, n. 5). Plaintiff has argued before this Court that its Crystal Head trade dress is a strong mark, and successfully so, in that the Court preliminarily has found the trade dress to be a strong mark.  (Order Denying Plaintiff's Motion for a Preliminary Injunction, Dkt. 126 at 9 ("The Court finds that the skull-shaped bottle is conceptually and commercially strong…").)

"A mark is 'strong' if it is memorable and if the public would likely associate it with the mark's owner."  Hokto Kinoko Co. v. Concord Farms, Inc., 810 F. Supp. 2d 1013, 1029-30 (C.D. Cal. 2011) (applying Sleekcraft strength of mark factor in likelihood of confusion analysis) (citing Brookfield Comm., Inc. v. West Coast Entm't Corp., 174 F.3d 1036, 1058 (9th Cir.1999)).  Globefill alleges exactly this type of strength throughout its Second Amended Complaint, Dkt No. 53 ("SAC"). For example, Globefill alleges that there has been sufficient exposure of its alleged trade dress to the public that the trade dress serves as a source identifier.  (See SAC, ¶14).  Globefill also alleges that its trade dress is strong as a source identifier also because: (a) the trade dress is "widely publicized in association with the famous actor and entertainer, Dan Aykroyd, who has been the centerpiece of [promotion]" (SAC, ¶17); (b) there was extensive media coverage including radio and television interviews with Mr. Aykroyd concerning the trade dress (SAC, ¶19); (c) Globefill's product is sold in 47 states (SAC, ¶21); (d) Mr. Aykroyd conducted 45 promotional signings where 750-1500 people attended (Id.); (e) Globefill's website received 535,000 visits in one month (SAC, ¶22); and, (e) Mr. Aykroyd appeared as a keynote speaker at an industry trade show (SAC, ¶23).

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

- 10 -

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1    Courts – and Dr. Isaacson himself – have considered precisely such

2    allegations to justify use of the Eveready format.  For example, in E & J Gallo

3    Winery v. Proximo Spirits, Inc., 2011 WL 5922090 (E.D. Cal. Nov. 28, 2011), the

4    court considered the very same question – whether the Eveready survey format, or a

5    lineup survey format was appropriate. Id. at *4.  The court found that the Eveready

6    format was proper to determine likelihood of confusion with the counter-claimant's

7    trade dress, in part, because of counter-claimant's strength *allegations* that: (a)

8    substantial sums had been expended on promotion and advertising to create source

9    identification; and, (b) the counter-claimant's trade dress had secondary meaning.

10   Id. at *6-7.  Globefill's allegations are even more specific than those in Gallo.

11       Also telling is that Dr. Isaacson recently relied on the same strength

12   allegations to justify application of the Eveready survey format to test likelihood of

13   confusion.  In Akiro LLC v. House of Cheatham, Inc., case number 12-CV-5775

14   (JSR), currently pending in the United States District Court for the Southern District

15   of New York ("Akiro"), Dr. Isaacson employed an Eveready survey based on

16   allegations in the plaintiff's complaint that: (1) its mark was famous and inherently

17   distinctive; (2) its mark had earned good-will; (3) the mark was advertised and

18   promoted at trade shows with "audio spots" and public relations, and; (4) the mark

19   was promoted in magazines and on television.  (Arevian Decl., Ex. K at ¶¶23-24.)

20   Globefill alleges the same type of notoriety for its trade dress with one exception –

21   here, a world-famous film actor advertises Crystal Head Vodka at trade shows, does

22   public relations, and promotes the mark on network television.

23       Under both Dr. Isaacson's reasons for using an Eveready in Akiro, and court

24   decisions as in Gallo, supra, Eveready is the appropriate survey here.[5]   Plaintiff's

25

26   ---
     [5] The Isaacson Eveready survey results are consistent with those in Elements'
     expert's Eveready survey – no confusion.  (See Phillip Johnson Rebuttal of the
27   Isaacson Survey, Dkt No. 165-4 (hereinafter "Johnson Survey").)

28

- 11 -

1  attempt to hide behind the Awareness study, which as earlier noted was not run

2  until it became clear that the Eveready study was not showing confusion, is in any

3  event of no comfort -- the results of the Awareness survey show there is sufficient

4  brand awareness for use of the Eveready format.

5       The Eveready format is appropriate where the senior mark is in the minds of

6  consumers.  (Arevian Decl., Ex. J at ¶6.)  The results of Dr. Isaacson's Awareness

7  survey show that Globefill's trade dress is in the minds of a substantial percentage

8  of the relevant consuming public – 46%.  This number alone is enough to warrant

9  use of the Eveready format. (Arevian Decl., Ex. I at 30-34).  Coupling this 46%

10  awareness of Globefill's trade dress with Globefill's allegations and judicial

11  admissions of strength, the Eveready, and not the Lineup survey, was the proper

12  methodology here.

13       Accordingly, the Lineup Survey was not the proper survey methodology

14  according to accepted principles and should be excluded by this Court.

15       **2.** **Dr. Isaacson's Lineup Survey Is Methodologically Unsound**

16            **Because It Was Not Conducted According To Accepted**

17            **Principles, And Therefore Unreliable And Inadmissible.**

18       Aside from employing the wrong survey format generally (which alone

19  requires exclusion), Dr. Isaacson's Lineup Survey is unreliable because it does not

20  comport to generally accepted survey principles on marketplace conditions, controls

21  against guessing, eliminating the demand effect bias, and universe.  These defects

22  are fatal.

23       **a.** **The Lineup Survey Did Not Replicate Marketplace**

24            **Conditions Because It Did Not Display KAH Tequila As It**

25            **Is Sold At The Point Of Sale.**

26       The cornerstone of a survey's reliability is its ability to simulate the "actual

27  marketplace conditions in which consumers encounter the parties' products so as to

28

*ELEMENTS' MIL #4*

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1    be a reliable indicator of consumer confusion." THOIP, supra, 690 F. Supp. 2d at

2    232 (where the court excluded survey evidence which did not replicate marketplace

3    conditions for sale of actual products tested); see also Tokidoki, supra, 2009 WL

4    2366439 at *9 (finding fault in Dr. Isaacson's survey where accused product was

5    not shown as displayed in the marketplace). The Lineup Survey does not replicate

6    actual marketplace conditions and is therefore unreliable in at least three respects.

7            First, the marketplace is such – and the pictures attached to the Isaacson

8    Report show – that KAH is virtually always displayed in liquor stores with its four

9    varieties (Blanco, Reposado, Anejo and Extra Anejo), in some combination, as a

10   single, colorful, unit in the marketplace and at the point of sale. (Arevian Decl., Ex.

11   J at Page ID Nos. 2508-2523; Ex. I at 16.) "This variety of colorful looks could

12   certainly be a factor that would prevent a consumer from making a connection to

13   the clear Crystal Head bottle." (Arevian Decl., Ex. I at 17.) Dr. Isaacson, however,

14   displayed KAH Blanco alone among the other tequilas in his survey. (Arevian

15   Decl., Ex. J at ¶¶ 60-61.) By failing to replicate these marketplace conditions, Dr.

16   Isaacson biased the survey by "depriving respondents of significant marketplace

17   context that is highly relevant to perception of the product and its source." (Arevian

18   Decl., Ex. I at 17.)

19           Second, the Lineup Survey failed to replicate the marketplace conditions in

20   which consumers encounter Crystal Head vodka and KAH tequila. Under the

21   Lineup survey, a consumer is shown the Crystal Head bottle, and then shown three

22   tequila bottles, one of which is the KAH Blanco bottle. This is not even close to any

23   version of the marketplace. As shown in the "Isaacson Report", tequila and vodka

24   products are not shelved together, and consumers shopping in liquor stores are not

25   just exposed to vodka and tequila, but are exposed to many other spirit types.

26   (Arevian Decl., Ex. J at Page ID Nos. 2517 & 2523 (showing vast nature of spirits

27   sections of retail stores); Ex. I at 15 ("[a]s Dr. Isaacson's own photos show, it is

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

- 13 -

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1   extremely likely that a consumer shopping trip that involves exposure to Crystal

2   Head and KAH will also involve exposure to a large variety of other vodka

3   products and other types of alcohol").)  Dr. Isaacson's survey, however, is premised

4   on the mistaken and unreliable assumption that a consumer will see Globefill's

5   Crystal Head vodka (in isolation at that), and then immediately be exposed to

6   Elements' KAH Blanco tequila, a scenario that has no counterpart in the real world.

7   (Arevian Decl., Ex. I at 8; 10-15.)[6]

8        Dr. Isaacson's failure to replicate marketplace conditions as to how KAH is

9   displayed, how consumers actually encounter premium vodka and premium tequila,

10   and which tequilas are sold side-by-side with KAH renders his Lineup Survey

11   unreliable.

12          **b.**    **The Lineup Survey Did Not Employ A Control Designed**

13               **According To Accepted Principles.**

14        The Lineup Survey is unreliable also because it employed inadequate

15   controls to filter out guessing, also known as survey noise.  "A control should be as

16   close to the allegedly infringing design as possible without itself being infringing,

17   so that one can accurately gauge the noise level – the people who are prone to

18   guessing or yea-saying."  <u>Tokidoki</u>, <u>supra</u>, 2009 WL 2366439 at *8 (where the

19   court, in excluding Dr. Isaacson's survey criticized the control because it was so

20   different from the accused design that it could not pick up all of the survey noise)

21   <u>Id</u>.  Likewise, the court in <u>Simon</u>, <u>supra</u>, found a control (which made no mention of

22   the name "Simon") was so different from the accused products (the "mySimon"

23   mark, the web address www.mysimon.com, and a character named "Simon") that it

24

25

26

27

28

---

[6] Dr. Isaacson admitted that his Lineup survey does not test for confusion in any circumstance other than a consumer who knows of or first encounters Crystal Head vodka in a liquor store and then immediately encounters KAH Blanco, and only KAH Blanco.  See discussion <u>infra</u>. (Arevian Decl., Ex. H at 179:17-181:22.)

did not test for legal confusion – and excluded the survey for that independent reason. Simon, supra, 104 F. Supp. 2d at 1048.

Dr. Isaacson's Lineup Survey controls are inadequate and do not conform to accepted principles because neither control shares the defining characteristic of the KAH bottle – its Calaveras/skull motif. (Arevian Decl., Ex. J at Ex. 3 (picture of Control 1 at Page ID No. 2526, and picture of Control 2 at Page ID No. 2527); Ex. I at 6-13 (detailing the problems with Dr. Isaacson's controls and the result of such problems on the Lineup Survey).) Utilizing a control with a skull theme would eliminate the bias present in surveys that "consumers are prone to make associations between products based solely on the concept of a skull, even if the overall trade dress is not at all similar." (Arevian Decl., Ex. I at 9.) Dr. Isaacson's results are of no value without a control that retained some concept of a skull to test the tendency of the survey to cause respondents to make such superficial connections in the absence of trade dress similarity. (Id. at 18-19.)

The need for a proper control containing skull conceptual elements is necessary here because unlike in the usual trade dress case where the trade dress cannot be referred to with a common name, but usually is a combination of graphic features having no name, here the shape of the Plaintiff's bottle can be identified as a "skull." The shape of a skull is a common one in the human experience, and is easily identifiable by this single word. Thus, a proper control would have to weed out the people who were choosing the KAH Blanco bottle because it too could be identified as a kind of skull rather than because they deemed it confusingly similar to the Crystal Head trade dress. A control that has no skull elements fails to test whether the alleged confusion is attributable to the concept of a skull or to real

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

- 15 -

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1    confusion. Because Dr. Isaacson's control has no skull-like elements or features, it

2    failed its purpose.[7]

3        Dr. Isaacson's failure to employ controls that at all reference skull imagery

4    does not conform to accepted principles of survey design, and the Lineup Survey is

5    therefore unreliable.

6        **c.**    **The Lineup Survey Is Nothing More Than A Matching**

7        **Game That Created Demand Effects As A Result Of Its**

8        **Overly Suggestive Nature.**

9        Dr. Isaacson's Lineup Survey design is methodologically unsound and

10    unreliable for the additional reason that it is a mere matching game – where

11    respondents did nothing more than match skull to skull. The conspicuously

12    suggestive array of spirits shown to respondents produced a "demand effect" which

13    biased the results by suggesting the "correct" answer was the only skull in the

14    lineup. See Simon, supra, 104 F. Supp. 2d at 1048 (explaining the demand effect

15    generally).

16        Dr. Isaacson's Lineup Survey first exposed respondents to Crystal Head

17    vodka, and then exposed respondents to a lineup of four other spirits including

18    KAH Blanco. (Arevian Decl., Ex. G ¶¶60-61.) The lineup of four spirits was

19    highly leading as the KAH bottle was the only one that shared a skull motif with

20    _____

21    [7] In his Rebuttal Report, Dr. Isaacson states that in his rebuttal survey - which
       suffers from the same improper lineup format and other infirmities as the initial
22    survey -- he used a new control, a Jose Cuervo bottle with certain skull elements.
       He claims that he used this bottle because it was identified in the Poret Report as
23    a control that could have been used, and that Elements' counsel had stated during
       deposition that this bottle would be a good control. (Arevian Decl., Ex. G at 27.)
24    Quite contrary to Dr. Isaacson's implication, however, Mr. Poret never stated that
       this Jose Cuervo bottle would be a proper control – the bottles he suggested as
25    controls are shown on page 20 of his Report and do not include the Jose Cuervo
       bottle. Further, Element's counsel is not a survey expert, so his opinion as to
26    what would or would not be a good control is quite beside the point, and certainly
       not a basis for Dr. Isaacson's having chosen as a control a bottle not identified by
27    a real expert, Mr. Poret, as a proper control.

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1  Crystal Head.  Thus, respondents who had just been exposed to a skull and then

2  immediately are shown a lineup with only one skull-shaped product naturally would

3  easily be led to guess that the "right" answer was the only skull shaped product in

4  the lineup.  Dr. Isaacson's survey thus created an impermissible matching game

5  designed in a manner that respondents naturally, in trying to be right, matched a

6  skull to a skull. This was made even easier than in most trade dress cases since a

7  common name could be attached to both product configurations – a skull. It's no

8  wonder, then, that exposure to the KAH bottle resulted in the high levels of

9  purported gross confusion of between 56.2% and 58.7%, respectively, the stated

10  reason for "confusion" was the skull shape.  (Arevian Decl., Ex. G at ¶¶78-79, 81,

11  Table 3.)

12      A faulty lineup served as the basis for exclusion of a similarly suggestive

13  survey in Sunbeam, supra, 635 F. Supp. at 634.  The Sunbeam court rejected the

14  survey results as unreliable to establish likelihood of confusion, because the

15  accused product in the survey stood out like "a bearded man in a lineup with four

16  clean-shaven men."  Id. at 635.  The court further observed that "[w]hen a survey

17  question begs its answer it is not a true indicator of the likelihood of consumer

18  confusion."  Id.

19      Similarly, in Simon Property Group L.P. v. mySimon, Inc., supra, the district

20  court rejected highly suggestive surveys where the accused product was the only

21  product in the displayed array that at all related to the "Simon" characteristic of

22  plaintiff's mark.  Simon, 104 F. Supp. 2d at 1051 (footnote omitted).  The court

23  found the survey to be "highly suggestive and leading" because the "correct"

24  answer was perfectly obvious.  Id.  The court went on to note that such survey

25  formats "test nothing more than the memory and common sense of a respondent

26  which show nothing probative or relevant about possible consumer confusion."  Id.

27

28

1    Likewise, the court in <u>THOIP v. Disney</u>, supra, excluded plaintiff's
2  likelihood of confusion survey because the accused product displayed in the
3  comparative array was clearly more similar to the plaintiff's product than any other
4  shirt in the array. <u>THOIP</u>, supra, 690 F. Supp. 2d at 237. In a later proceeding, the
5  court described the plaintiff's survey as "slanted" and that it "test[ed] nothing more
6  than the memory and common sense of a respondent." <u>See</u> <u>THOIP v. Walt Disney</u>
7  <u>Co.</u>, 788 F. Supp. 2d 168, 183 (S.D.N.Y. 2011) (footnote and internal citations
8  omitted).

9    The same principle that demanded exclusion in <u>Sunbeam</u>, <u>Simon</u>, and <u>THOIP</u>
10  applies here. Dr. Isaacson's Lineup Survey is highly leading, biased, and nothing
11  more than a matching game where respondents were asked to match skull to skull.
12  It does not comport with sound methodology and is blatantly improper. See <u>J.</u>
13  <u>Thomas McCarthy</u>, TRADEMARKS AND UNFAIR COMPETITION, § 32:170,
14  32-383 (4th ed. 2013) (hereinafter "McCarthy") ("[a] professional survey expert
15  will use standard procedures to ensure that the survey was administered in such a
16  manner as to minimize error and bias.") (footnote omitted). The Lineup Survey is
17  also unreliable for this reason.

18    **d.    <u>The Lineup Survey Did Not Poll The Relevant Universe</u>**
19    **<u>And Is Therefore Unreliable.</u>**

20    Dr. Isaacson's Lineup Survey also is unreliable and inadmissible because the
21  universe is not properly defined. <u>See</u> <u>Tokidoki</u>, supra, 2009 WL 2366439 at *9
22  (finding Dr. Isaacson's survey was unreliable as a measure of confusion because it
23  excluded a significant portion of the relevant universe of respondents.) See also
24  <u>Reinsdorf</u>, supra, 2013 WL 454828 at *10 (finding demographically flawed survey
25  polled an irrelevant universe and was unreliable).

26    An improper and over-inclusive universe that includes persons whose
27  perceptions are not relevant skews a survey's results, making it unreliable. See
28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

*ELEMENTS' MIL #4*

1    McCarthy, § 32:161, 32-348 (4th ed. 2013) (explaining effect of irrelevant survey

2    respondents).  Here, the Lineup Survey results are skewed and unreliable because

3    they include the perceptions of irrelevant consumers.  (Arevian Decl., Ex. I at 29-30

4    (specifically outlining defects in the Lineup Survey's universe, and the effect on

5    survey results).)  "[W]hen the goods are expensive, the buyer can be expected to

6    exercise greater care in his purchases."  AMF Inc. v. Sleekcraft Boats, 599 F.2d

7    341, 353 (9th Cir. 1979).  The perception of consumers that are willing to purchase

8    a $30.00 bottle of tequila, but not a $40.00 bottle of tequila (i.e. a product that is

9    33% more expensive) are irrelevant and skew the survey results because the over-

10    included consumer's lack of attention may have led to confusion.  Dr. Isaacson's

11    Lineup Survey is unreliable for this additional reason.

12    **C.    Even if the Court Does Not Exclude the Isaacson Lineup Survey, Its**

13    **       Application is Limited**

14         As Dr. Isaacson admits, his Lineup survey does not test for confusion in any

15    circumstance other than when a consumer who knows of or first encounters Crystal

16    Head vodka in a liquor store then immediately encounters KAH Blanco, and only

17    KAH Blanco.  (Arevian Decl., Ex. H at 179:17-181:22.)  Accordingly, it does not

18    apply to any of the following situations:

19         • Any on-premise environment, such as a bar or restaurant;

20         • Any off-premise environment, like a liquor store, where a consumer

21           encounters alcoholic beverages other than tequila immediately after

22           encountering a bottle of Crystal Head vodka;

23         • Any off-premise environment where a customer with an awareness of

24           Crystal Head vodka prior to entry encounters any alcoholic beverages

25           other than tequila immediately after entering the store; and

26         • Any off-premise environment where a consumer encounters more than

27           one type of KAH tequila displayed together.

28

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

HOLMES WEINBERG PC
30765 Pacific Coast Highway, Suite 411
Malibu, California 90265

1    In other words, the only situations in which Dr. Isaacson's lineup survey

2    could be used as a measure of confusion are in the following two artificial and

3    highly unlikely scenarios: (1) in which a consumer without knowledge of Crystal

4    Head vodka walks into a liquor store, sees a bottle of Crystal Head vodka, and then

5    immediately encounters (without looking at any other spirits or other alcoholic

6    beverages), a bottle of KAH Blanco (and no other types of KAH tequila), or (2) in

7    which a consumer with an awareness of Crystal Head vodka walks into a liquor

8    store and immediately encounters a bottle of KAH Blanco (and no other types of

9    KAH tequila).  There is of course no evidence in this case that either scenario has

10   occurred or will occur.

11                              **III.    CONCLUSION**

12   For all of the foregoing reasons, Elements respectfully requests that the

13   Court, as the gatekeeper for expert testimony, exclude Dr. Isaacson's testimony and

14   reports in their entirety.  Should the Court determine that the lineup survey is

15   admissible, Elements requests that it be given no more utility than that which Dr.

16   Isaacson has admitted:  limited to the two highly unlikely scenarios described

17   above.

18

19   DATED:  October 1, 2013            MEYLAN DAVITT JAIN & AREVIAN LLP

20                                      HOLMES WEINBERG, PC

21

22                                      By: /s/ Steven M. Weinberg

23                                          Steven M. Weinberg
                                            Attorneys for Defendant
24                                          Elements Spirits, Inc.

25

26

27

28