# EXHIBIT K

EXHIBIT K

# Exhibit G

Case 2:10-cv-02034-CBM-PLA Document 215-10   Filed 10/04/13   Page 3 of 61   Page
Case 1:12-cv-05775-JSR   Document 45-12   Filed 02/26/13   Page 2 of 60   Page
ID #:6113

Mercedes Colwin
Email: mcolwin@gordonrees.com
Michael J. Vollbrecht
Email: mvollbrecht@gordonrees.com
Ryan Sestack
Email: rsestack@gordonrees.com
Gordon & Rees LLP
90 Broad Street
23rd Floor
New York, NY 10004
Telephone: 212.269.5500
Facsimile: 212.269.5505

Attorneys for Defendant

HOUSE OF CHEATHAM, INC., and
ROBERT H. BELL

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AKIRO LLC,<br><br>             Plaintiff,<br><br>       v.<br><br>HOUSE OF CHEATHAM, INC., and<br>ROBERT H. BELL,<br><br>             Defendants | **Case No.  12-CV-5775 (JSR)**<br><br>**EXPERT REPORT SUBMITTED BY<br>DR. BRUCE ISAACSON** |

EXHIBIT K

Case 2:10-cv-02034-CBM-PLA Document 215-10 Filed 10/04/13 Page 4 of 61 Page
Case 1:12-cv-05775-JSR Document 145-12 Filed 02/26/13 Page 3 of 60
ID #:6114

1.      I have been retained by attorneys at the law firm of Gordon & Rees in the above litigation. This report provides the results of a confusion survey I conducted measuring whether relevant consumers are likely to believe that hair care products from Aunt Jackie's come from, or are somehow connected to, Miss Jessie's.

2.      The statements herein, except as otherwise stated, are based on my personal knowledge; I have formed the opinions expressed based on my consideration of the information I have reviewed in this matter, my expertise, and my experience. I reserve the right to supplement this report in light of the ongoing discovery in this matter.

## OVERVIEW OF THE CONFUSION SURVEY

3.      My confusion survey used an Eveready format, in which respondents are exposed to a junior mark to see whether it is confused with a well-known senior mark. In my confusion survey, respondents saw either a bottle of Aunt Jackie's "Curl La La" Defining Curl Custard or Aunt Jackie's "Knot On My Watch" Instant Detangling Therapy, and were then asked questions to see whether they confused the Aunt Jackie's product as coming from or somehow connected to Miss Jessie's.

4.      Separate groups of respondents saw one of two control products, which were "Curl Defining Cream" from Jane Carter Solution, or "The Great Detangler" from Taliah Waajid. The two controls were selected as similar products, made by companies that have names that sound like people, and targeted at the same types of consumers as Aunt Jackie's, but without the elements identified in the Complaint as objectionable to Miss Jessie's.

5.      The survey interviewed representative women who, among other criteria, use curl defining creams or hair detanglers at least weekly, and plan to purchase those products within the next 90 days. Each respondent saw one hair care product, and then answered a series of questions which measured different types of confusion. The survey was consistent with generally accepted principles for Eveready studies and for litigation surveys.

6.      As described in this report, the survey provides three measures for confusion:

- 1 -

EXHIBIT K

Case 2:10-cv-02034-CBM-PLA SR Document 215-10   Filed 10/24/13   Page 5 of 61   Page
ID #:6115
Case 2:12-cv-05775-JSR Document 45-12   Filed 02/26/13   Page 4 of 60

i.  Confusion as to Source:  The survey asked respondents who makes the hair care product they saw in the interview.  The survey also asked respondents whether they are aware of any other products or brands put out by the company or person who makes that product;  those answering yes were asked what products or brands are put out by that company or person.

ii.  Confusion as to Sponsorship or Approval:  The survey asked respondents whether they think that whoever makes that product is sponsored or approved by another company or person. Those answering yes were asked what company or person sponsored or approved whoever makes the product they were shown.

iii.  All Measured Confusion:  All measured confusion provides a sum for confusion as to source and as to sponsorship or approval.

7.     Confusion between Aunt Jackie's and Miss Jessie's was low for all products measured. Counting all questions in the survey, only 1.8% of respondents were confused between Aunt Jackie's Curl La La and Miss Jessie's.  Similarly, only 0.9% of respondents were confused between Aunt Jackie's Knot On My Watch and Miss Jessie's.  There was no confusion between either of the control products and Miss Jessie's.

8.     After reviewing certain background information, I will discuss the survey and my findings in detail.

**MY QUALIFICATIONS**

9.     I am the owner and President of MMR Strategy Group ("MMR"), a marketing research and consulting firm, and am an expert in research, surveys, and marketing.

10.    For approximately 35 years,[1] MMR has provided marketing research and consulting, consisting primarily of the design, execution, and analysis of thousands of surveys, as well as expertise related to marketing and strategy.  Our experience includes many surveys used in intellectual property litigation and false advertising matters.  Our clients have included well-known organizations, such as:

---

[1] Until approximately November, 2009, the firm was known as Marylander Marketing Research.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

- Farmers Insurance Group
- Goodyear Tire & Rubber Company
- Cigna Health Insurance
- Several regions of the American Automobile Association
- Nestlé USA, Inc.
- Smart & Final Stores

11.    In addition, over our history, my firm has served such well-known organizations as Alberto-Culver, Hewlett-Packard, Ore-Ida Foods, The Hollywood Bowl, the UCLA School of Public Health, Universal Studios, Denny's, Jack in the Box, and many other organizations, encompassing thousands of studies.

12.    My firm's practice, and my personal research and consulting activities, include extensive activities related to retailers and consumer products. My firm and I both have many years of experience in these areas, encompassing many hundreds of studies.

13.    I received a Bachelor of Science degree in engineering from the Technological Institute at Northwestern University in 1985, and Master of Business Administration and Doctor of Business Administration degrees from the Harvard Graduate School of Business Administration in 1991 and 1996. At Harvard, I received my MBA with highest distinction as a Baker Scholar and was a Dean's Doctoral Fellow, writing publications on marketing and strategy, including best-selling teaching materials.

14.    I have taught marketing and strategy for executive groups and executive MBA programs, and, for my research, I have won awards from institutions including The Institute for the Study of Business Markets at Penn State University and Harvard University.

15.    In terms of professional experience, I have been a marketing and strategy consultant at The Boston Consulting Group, Senior Vice President at a publicly traded data processing company that is now a division of Intuit, Division President at a media services company, and Vice President responsible for marketing and strategy at a national financial services company. I also served as the West Coast Practice Leader of Monitor Executive Development, a division of Monitor Group, an international strategy consulting firm, where my responsibilities included

- 3 -

EXHIBIT K

Case 2:10-cv-02034-CBM-PLA   Document 215-10   Filed 12/24/13   Page 7 of 61   Page
Case 2:12-cv-05775-JSR   Document 45-12   Filed 02/26/13   Page 6 of 60
ID #:6117

1  developing curriculum and serving as lead faculty for executive education programs in marketing

2  and strategy.

3  16.    I am a member of the American Marketing Association and the Marketing Research

4  Association. My firm is a member of the Council of American Survey Research Organizations

5  and the International Trademark Association. I am also on the editorial board of the *Journal of*

6  *Business-to-Business Marketing*, and am a member of *The Trademark Reporter* Committee at the

7  International Trademark Association. I regularly consult with clients regarding marketing,

8  research, and strategy, and also address conferences and groups on the same issues. My public

9  speaking includes addressing law firms and bar associations on the use of research and surveys in

10  litigation. I have authored or co-authored articles published in the *Intellectual Property Law*

11  *Newsletter* of the American Bar Association, Intellectual Property Law Section; *Intellectual*

12  *Property, Intellectual Property Magazine, Quirk's Marketing Research Review*, and other

13  publications.

14  17.    Over my career, I have personally designed, overseen, and analyzed numerous research

15  studies. I have also provided expertise in marketing, strategy, and consumer behavior to many

16  clients in a variety of industries on topics such as consumer products, segmentation, consumer

17  behavior, and retail. A copy of my curriculum vitae and litigation expert witness experience is

18  attached as Exhibit 1.

19

20  **COMPENSATION AND MATERIALS REVIEWED**

21  18.    The compensation charged by my firm in this matter includes $60,000 for the confusion

22  survey described in this report, including all activities up to the production of an expert report.

23  After this expert report, I charge $600 per hour, with daily rates for testimony.

24  19.    For purposes of this report, I have gathered and/or reviewed a wide variety of materials,

25  including the following:

26      i.    The Complaint filed by the Plaintiff, and the Answer filed by the Defendants.

27      ii.   Marketing materials from Aunt Jackie's including a print ad, a presentation

28          entitled "The New Natural," advertising budgets, and in-person research conducted

- 4 -

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02034-CBM-PLA Document 215-10 Filed 10/04/13 Page 8 of 61 Page
Case 2:12-cv-05775-JSR Document 45-10 Filed 02/26/13 Page 7 of 60 Page
ID #:6118

1         by Aunt Jackie's on hair care habits.

2       iii.     Emails from Aunt Jackie's providing information in response to my questions, as

3             well as emails describing the activities to develop the "Aunt Jackie's" name.

4       iv.     Websites relevant to this matter, such as those belonging to Aunt Jackie's

5             (www.auntjackiescurlsandcoils.com), Miss Jessie's (www.missjessies.com), and

6             other companies (such as Taliah Waajid, Jane Carter Solution, Uncle Funky's

7             Daughter, Mixed Chicks, and others).

8       v.     The results of web searches on terms such as "hair detangler," "curl defining

9             cream," "leave-in hair detangler," "hair care and Hispanic women," and other

10             terms.

11       vi.     Products from a variety of companies, including Miss Jessie's, Aunt Jackie's, Jane

12             Carter Solution, Taliah Waajid, and others.

13       vii.     Research on demographics from the U.S. Census Bureau, located at their

14             "American Factfinder" website (http://factfinder2.census.gov).

15   20.     In addition, I consulted published literature and cases relevant to the issues and theories in

16 this matter, the most relevant of which are cited in this report. I also rely on my knowledge in

17 fields such as surveys, consumer behavior, and marketing.

18   21.     The next section describes the confusion survey I conducted.

19

20   **METHODOLOGY FOR THE CONFUSION SURVEY**

21   22.     My confusion survey measured the likelihood of confusion between hair care products

22 from Aunt Jackie's, and any product or other type of connection with Miss Jessie's. All aspects

23 of the survey were designed and carried out by me or under my supervision.

24   23.     As mentioned earlier, my hair care study used the Eveready format, which is the preferred

25 method to test confusion versus a well-known mark. In the Complaint, the Plaintiff clearly

26 indicates that Miss Jessie's is well-known. For example:

27       i.     Paragraph 1 describes the Miss Jessie's trademark as "famous and inherently

28             distinctive."

- 5 -

EXHIBIT K

ii.   Paragraph 2 discusses the "well-established and widely acknowledged fame of the MISS JESSIE'S Mark," as well as the "hard-earned and well-deserved good will" of that mark.

iii.  Paragraphs 12 through 15 review the "considerable financial investment (and other valuable resources)" Miss Jessie's has invested in marketing, advertising, and promotion, including "numerous" trade shows, placement in "highly popular, nationally recognized" magazines, "numerous billboards strategically placed," audio spots, and public relations. According to the Complaint, these efforts have been "continuing, uninterrupted, cost-intensive and far-reaching."

iv.   Paragraphs 15 through 17 state that the Miss Jessie's mark has "achieved national fame and recognition," been recognized by popular magazines, featured on NBC's *Today Show*, and gained a "huge and ever-increasing following and fan base."

24.   The wide-spread recognition described in the complaint makes an Eveready design the best choice to measure confusion in this matter. As one source has stated, "With respect to commercially strong marks, therefore, the Eveready format is a relevant, reliable and objective test of likelihood of confusion."[2] Professor McCarthy has referred to Eveready as a "now-standard survey format."[3]

25.   My understanding is that four products from Aunt Jackie's are involved in this matter: "Oh So Clean!" moisturizing shampoo, "Knot On My Watch" instant detangling therapy, "In Control" moisturizing conditioner, and "Curl La La" defining curl custard. My survey focused on two products from Aunt Jackie's: Curl La La curl definer and Knot On My Watch hair detangler. I selected these products for the following reasons:

i.   Of the four, these two have the highest sales (measured since July, 2012).

---

[2] Jerre B. Swann, "Likelihood of Confusion," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. By Shari Seidman Diamond and Jerre B. Swann, American Bar Association: Section of Intellectual Property Law, 2012, p. 62-63.

[3] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, database updated March 2009. § 32:174, "Tests of properly conducted survey—Survey formats—*Eveready* confusion format"

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

ii.    The four products include two products in bottles and two in tubs.  This selection includes one of each type of container.

iii.   Paragraph 3 of the Complaint may reference Curl La La as the Aunt Jackie's product that allegedly has a similar label design and label color as Miss Jessie's Curly Pudding.

26.    My confusion survey interviewed women who were representative of customers and potential customers for relevant hair care products, and were qualified by these criteria:

i.     Age:  Respondents were interviewed in three age group, including 18 to 34 years old, 35 to 54, and 55 years and older.  I distributed interviews within those three groups to approximately match the population of African-American women in the United States.[4]

ii.    Race:  Aunt Jackie's estimates their customers as 90% African American, 5% Hispanic, and 5% other.  Of respondents interviewed, 81% identified themselves as African American, 13% as Hispanic,[5] and 7% as Caucasian.  The percentages add up to more than 100% because a respondent could select more than one race.

iii.   Product Usage:  Respondents were asked about their usage of four hair care products.  To qualify, respondents had to use "curl definer or curl defining cream"[6] or "leave-in hair detangler"[7] at least weekly.

---

[4] Demographic data is from the U.S. Census Bureau at their American FactFinder website at http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml).  The Defendants describe their average consumer as women age 18-54.  I included the older age group because it is possible that older women may also purchase these products.

[5] As shown by Exhibit 10, a number of websites discuss the types and brands of products involved in this matter as products used by Hispanic women.

[6] This phrasing was selected after considering a variety of products.  For example, the Miss Jessie's label refers to their curl definer as "CURLY PUDDING" and "CURL CREMES."  The Aunt Jackie's label calls their product "DEFINING CURL CUSTARD" and "Curl à la Crème."  The label for Jane Carter Solution refers to their product as "curl defining cream."   The remainder of this report refers to this type of product as "curl definer" or "curl defining cream."

[7] The Aunt Jackie's label refers to their product as "knot on my watch" and "INSTANT DETANGING THERAPY."  The Taliah Waajid product is called "THE GREAT Detangler."  Some, but not all, detangling products can be rinsed-out.  The phrase "leave-in" distinguishes this product from other types of detangling creams and items.  The remainder of this report refers to this type of product as "hair detangler."

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02034-GBM-RNA   Document 215-10   Filed 10/01/12   Page 11 of 61
Case 2:12-cv-05775-JSR   Document 15-10   Filed 02/26/13   Page 11 of 60
Page ID #:6121

iv.  <u>Product Purchase</u>:  To qualify, respondents had to think they are likely to purchase either curl defining cream or leave-in hair detangler in the next 90 days.

v.  <u>Occupation</u>:  Respondents could not work in any occupations that would give them unusual knowledge, such as advertising or public relations, marketing research, or a company that produces or distributes hair care products.

27.  Respondents were also qualified along other criteria, such as not participating in any surveys about hair care during the past three months, and having their eyeglasses or contact lenses if they normally wear them to shop.

28.  Respondents qualified for the survey on curl definer if, in addition to the other qualifying criteria, they used curl definer at least weekly and expected to purchase it in the next 90 days. Similarly, respondents qualified for the survey on hair detangler if, in addition to the other criteria, they used hair detangler at least weekly and expected to purchase it in the next 90 days.

29.  The confusion survey was conducted in 13 interview facilities, all located in shopping malls throughout the United States.  The percentage of interviews in each region of the United States approximately matched the percentage of the total population of African-American women 18 years or older represented by that region.

30.  In research such as this, a control product is used to remove what Professor McCarthy calls "general background noise."[8]  Responses to surveys may be affected by factors such as respondent's pre-existing impressions, general expectations, or plain guessing; a control allows the researcher to remove the influence of such factors.[9]

31.  A control product is typically designed to be similar to the test product, but to remove elements under dispute so their effect can be measured.  For the Curl La La product, I selected as a control a product called "Curl Defining Cream" from Jane Carter Solution.  For Knot On My Watch, I selected as a control a product called "The Great Detangler" from Talia Waajid.  The

---

[8] *McCarthy on Trademarks and Unfair Competition*, by J. Thomas McCarthy, updated March, 2009, 32:187.

[9] Shari Seidman Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, National Research Council, 2011, page 398.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-JSR   Document 215-10   Filed 10/01/12   Page 12 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 1 of 60
Page ID #:6122

1    two controls[10] have numerous similarities to the matched Aunt Jackie's test products:

    i.   <u>Product</u>:  Both controls are the same types of products in the same types of containers as the matched Aunt Jackie's products.

    ii.  <u>Companies</u>:  Like Aunt Jackie's and Miss Jessie's, both controls are from companies that have names that sound like individual people.  Also, both are from companies identified by management at Aunt Jackie's as competitors.

    iii. <u>Graphics</u>:  Like Aunt Jackie's, the two controls feature label designs with relatively simple and clean graphics.

    iv. <u>Marketing</u>:  Like Aunt Jackie's, the controls feature African-American women in their marketing, and are marketed for natural hair.

32.    Exhibit 2 provides pictures of the test products and the control products.

33.    My confusion survey used a mall-intercept format, where interviewers with paper-and-pencil screeners located consumers in the concourse of the mall.  Aunt Jackie's is primarily sold at retail, so in-person interviewing matches the primary means of sales and also allows respondents to view and touch an entire bottle, just as if they were at retail.

34.    Respondents who agreed to participate were taken to an interviewing facility where they were interviewed by a professional interviewer who typed their answers into an online questionnaire. As shown by Exhibit 3, interviews were conducted at 13 shopping malls, including locations in each region of the country:[11]

South:       Washington DC; Spartanburg, SC; Atlanta, GA; Dallas, TX; Charlotte, NC; Tallahassee, FL; Houston, TX

Northeast:   Philadelphia, PA; New York, NY

Midwest:    Chicago, IL; St. Louis, MO

West:       Los Angeles, CA; San Francisco, CA

35.    Prior to fielding, a supervisor at each location participated in a phone briefing with my

---

[10] As described later, the levels of confusion for the Aunt Jackie's test products measured in the survey were low even before accounting for the controls.  These low measurements, in hindsight, make the controls unnecessary because the controls do not affect the conclusions of the survey.

[11] These regions match geographic regions established by the U.S. Census Bureau.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA  Document 215-10  Filed 10/01/13  Page 13 of 61
Case 1:12-cv-05775-JSR  Document 15-12  Filed 02/20/13  Page 13 of 60
Page ID #:6123

1  firm regarding the research design and methodology.  Each survey location received detailed

2  written instructions for interviewers and supervisors, which are presented in Exhibit 4. The survey

3  and screening questionnaires are shown in Exhibit 5.[12]

4  36.    After qualification, respondents who agreed to participate were taken to an interviewing

5  facility in the mall.  Respondents were randomly assigned to either a test cell or a control cell.

6  37.    At the beginning of the survey, respondents were given this instruction:

7       "For each of my questions, if you don't know or don't have an answer, please don't guess.

8       Just tell me you 'don't know' or 'don't have an answer' and we'll go on to the next

9       question."

10  38.    Respondents were then shown the product and read this instruction:

11       "Here is a product that you may or may not have seen before.  You may hold and examine

12       it, just as you would if you were at a retail location thinking of buying a product such as

13       this.  Take as much time as you would normally when buying such a product."

14  39.    Respondents could then handle and examine the product, just as if they were in a retail

15  store.  After they examined the product, it was placed on the table and they were asked questions

16  to measure the same types of confusion as identified by the Plaintiffs in the Complaint.

17  40.    The first series of questions measured confusion as to source.  Question 2 asked, "Who do

18  you think makes or puts out this product?"  Question 3 asked, "What makes you think that?

19  Anything else?"

20  41.    Question 4 asked, "Are you aware of any other products or brands put out by the company

21  or person who makes or puts out this product?  You may answer yes, no, or you don't know or

22  have no opinion."  For those who answered yes to Question 4, Question 5 asked, "What other

23  products or brands do you think are put out by the company or person who makes this product?

24  Any others?"  Question 6 asked, "What makes you think that?  Anything else?"

25  42.    The next set of questions measured confusion as to sponsorship or approval.  Question 7

26  asked, "Do you think that whoever makes or puts out this product is sponsored or approved by

---

[12] The survey questionnaire was administered by interviewers and not seen by respondents.
Exhibit 5 contains programming instructions that were not visible to interviewers.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02034-GPM-PJA   Document 215-10   Filed 10/01/12   Page 14 of 61
Case 2:12-cv-05775-JSR   Document 15-12   Filed 02/20/13   Page 9 of 60
Page ID #:6124

1   another company or person, <u>is not</u> sponsored or approved by another company or person, or, you

2   don't know or have no opinion?"  For those who answered yes, <u>Question 8</u> asked, "What other

3   company or person do you believe sponsored or approved whoever makes the product I showed

4   you?"  <u>Question 9</u> asked, "What makes you think that?  Anything else?"

5   43.     The types of confusion measured by my survey have been measured by other confusion

6   surveys and are discussed in a number of respected sources.[13]  Also, the phrasing of questions in

7   my confusion survey is relatively standard for Eveready surveys. My survey questions mostly

8   asked about the "company or person," reflecting that the products in this matter are made by

9   companies with names that sound like individual people, such as Aunt Jackie's or Miss Jessie's.

10  Phrasing similar or identical to "company or person" has been used in other confusion surveys.[14]

11  44.     The fielding of the confusion survey included a number of quality control measures, such

12  as the following:

13          i.      The confusion survey was conducted by trained interviewers, who typed

14                  respondents' answers directly into an online questionnaire.  Computer-assisted

15                  interviewing ensured that correct branching logic was followed in the survey.

16          ii.     All bottles were marked on the bottom with a code number identifying the product

17                  intended for that particular cell.  Respondents were asked to read the number on

18                  the bottom of the product they were given; their answer confirmed that the product

19                  they saw was correct for that cell.

20          iii.    The confusion survey was pre-tested.  Seven interviews were conducted in

21                  Palmdale, California, under the observation of a staff member from MMR, who

22                  made sure that the interviews could be properly conducted and that the respondents

---

23  [13] For example, the "sponsored or approved" language used in my survey is discussed in

24  "Likelihood of Confusion Studies and the Straightened Scope of Squirt," by Jerre B. Swann, *The Trademark Reporter*, May-June 2008, p. 742.  The language is also mentioned in *McCarthy on*

25  *Trademarks and Unfair Competition*, previously cited.

26  [14] For example, Gallo Winery v. Gallo Cattle Company involved a survey asking "What individual, organization, or company…" (Ninth Circuit, 967 F.2d 1280, decided 1992).  Similarly,

27  a survey in Wuv's International, Inc. v. Loves Enterprises, Inc., 208 U.S.P.Q. 736 (D. Colo 1980) used a question, "What company or person do you believe owns or operates this restaurant?"  See

28  also Essie Cosmetics v Dae Do International 808 f.supp.952 1992.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02034-GBM-JRA   Document 215-10   Filed 10/31/12   Page 15 of 61
Case 1:12-cv-05775-JSR   Document 45-12   Filed 02/26/13   Page 40 of 60
Page ID #:6125

1    could understand the questions.

    iv.    Qualifying responses to the confusion survey were hidden among other, non-
qualifying responses. This reduced the chances of a respondent guessing which
responses would qualify or not qualify for the survey.

    v.    Survey questions included "don't know" options to discourage respondents from
selecting other responses that may not accurately represent their opinions.

    vi.    After the interviews, a separate validation survey was conducted by an
independent firm, Interviewing Service of America (ISA), of Van Nuys,
California.

45.    The validation questionnaire is included as Exhibit 6.  Consistent with accepted practices, the validation interview confirmed that the interview actually took place and also confirmed key qualification criteria.[15]  In total, 249 (54%) of all respondents were validated, meaning that the validation interviewer reached the respondent and confirmed key criteria.  The percentage of interviews validated is well above that of guidelines, which recommend validation of 10% to 15% of interviews.[16]

46.    From the original base of 460 interviews completed, 20 (4%) were removed because of questionable responses or lack of validation, leaving 440 respondents in the final database.  This database provides sufficient size to be considered reliable for analysis.

47.    The next section describes the findings from my analysis of the survey data.

## FINDINGS FROM THE SURVEY

48.    To analyze the data from the confusion survey, I examined the verbatim responses to see whether they indicated that respondents either confused the products they saw during the survey with a product from Miss Jessie's, or mistakenly thought that the products they saw came from a

---

[15] See J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, Updated March, 2009, 32:170. Or see Paco Sport, Ltd., v. Paco Rabanne Parfums, U.S. District Court, S.D. New York. No. 96 Civ. 1408(JES). Feb. 17, 2000.

[16] Shari Seidman Diamond, "Reference Guide on Survey Research" from *Reference Manual on Scientific Evidence*, 3rd Edition, Federal Judicial Center, National Research Council, 2011, p. 412.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/12   Page 16 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 16 of 60
Page ID #:6126

1   company or person that was somehow connected with Miss Jessie's.

2   49.     Exhibit 7 provides all responses to all questions for all respondents.  Verbatim responses

3   from the open-ended questions were assigned codes reflecting the themes inherent in the

4   comments, and the codes are listed in Exhibit 8.  Some verbatim responses may reflect more than

5   one theme, in which case they were assigned more than one code.  The coding was performed by

6   staff at MMR under my direction, and I personally checked codes for all responses.

7   50.     Exhibit 9 presents cross tabulation tables from the data analysis. The cross tabulations

8   describe results by region (Table 1 of Exhibit 9), gender (Table 2), age (Table 3), and race (Table

9   4), showing that the demographics of the respondent base matches the targets described earlier.

10   51.     The remainder of this section summarizes key results regarding confusion between Aunt

11   Jackie's and Miss Jessie's.  The survey measured two types of confusion:

12           i.    Confusion as to source:  The percentage of respondents who referred to Miss

13                 Jessie's in response to Question 2 or Question 5.

14           ii.   Confusion as to sponsorship or approval:  The percentage of respondents who

15                 referred to Miss Jessie's in response to Question 8.

16   52.     Question 2 asked respondents who they think made or put out the hair care product.  The

17   data for Question 2 are summarized below in Table A below, for all four products measured.

18   >>

19   >>

20   >>

21   >>

22   >>

23   >>

24   >>

25   >>

26   >>

27   >>

28   >>

- 13 -

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/12   Page 17 of 61
Case 1:12-cv-05775-JSR   Document 15-10   Filed 02/20/13   Page 17 of 60
Page ID #:6127

**Table A: Confusion as to Source from Question 2**[17]

| Q.2  Who do you think made or put out this product? | Curl Defining Cream | | Hair Detangler | |
|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Test (Aunt Jackie's) | Control (Taliah Waajid) |
| Miss Jessie's | 0.9% | 0.0% | 0.0% | 0.0% |
| Aunt Jackie's | 64.5% | 0.0% | 58.9% | 0.9% |
| Jane Carter/Jane Carter Solutions | 0.0% | 56.3% | 0.9% | 0.0% |
| Taliah Waajid/Black Earth | 0.9% | 0.0% | 0.0% | 51.9% |
| Dr. Miracle | 0.9% | 0.0% | 0.9% | 0.0% |
| African Pride | 0.9% | 0.9% | 0.0% | 0.9% |
| Carol's Daughter | 0.9% | 1.8% | 0.0% | 0.0% |
| Revlon | 1.8% | 1.0% | 2.7% | 0.0% |
| Dark & Lovely | 0.9% | 0.9% | 0.9% | 0.9% |
| African-American/black person | 2.7% | 1.8% | 1.8% | 4.7% |
| Other | 11.8% | 14.3% | 12.5% | 22.6% |
| Don't know/No opinion | 15.5% | 24.1% | 21.4% | 17.9% |

53.     As can be seen in Table A, among respondents who saw the curl defining cream, the percentage mentioning Aunt Jackie's was 65% and 59% in the two test cells, versus 0% and 1% in the two control cells. The percentage of respondents mentioning Miss Jessie's was very low, with a single respondent mentioning Miss Jessie's in response to the curl defining cream, and no respondents mentioning Miss Jessie's in response to any other product. The single respondent who mentioned Miss Jessie's was respondent 25, who said "Miss Jessie or Carols Daughter."

54.     Respondents who saw Aunt Jackie's mentioned other brands, such as Dr. Miracle, African Pride, Carol's Daughter, and Revlon. Many of the other brands mentioned, such as Dr. Miracle, African Pride, Carol's Daughter, and Dark & Lovely are marketed at least in part to African Americans.

55.     Some respondents mentioned an unspecified African-American or black person in their

---

[17] Based to all respondents.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-JRA   Document 215-10   Filed 10/01/12   Page 18 of 61
Case 2:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 18 of 60
Page ID #:6128

verbatim answers.[18] These included comments such as "something an African American made" (respondent 20), "a black person" (respondent 65), "Some African American company or an African person" (respondent 106), "an African black lady as a specialist" (respondent 165), "An African American puts this product out" (respondent 193), "African Americans" (respondent 243), or "I don't know but I think it's made by a black person" (respondent 411). While these answers do not mention specific brands, they are reasonable answers to a question asking who made the product, particularly when the product shows a company name that may be African American, or a picture of a person who may be African American.

56.    Confusion as to source was also measured in Questions 4 and Question 5. Question 4 asked whether the respondent was aware of any other products or brands put out by the company or person who makes this product. The data from Question 4 are summarized in Table B below.

**Table B:  Confusion as to Source from Question 4**

| Q.4  Are you aware of any other products or brands put out by the company or person who makes or puts out this product? | Curl Defining Cream | | Hair Detangler | |
|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Test (Aunt Jackie's) | Control (Taliah Waajid) |
| Yes | 8.2% | 8.0% | 9.8% | 4.7% |
| No | 81.8% | 76.8% | 78.6% | 79.2% |
| Don't know/no opinion | 10.0% | 15.2% | 11.6% | 16.0% |

57.    As can be seen in Table B, the vast majority of respondents in all cells stated that they were not aware of any other product or brands. The specific percentage saying no ranges from 77% to 82%, while the percentage answering yes to this question was only 5% to 10 %.

58.    The follow up question, Question 5, asked those who answered yes what other products or brands are made by the company or person who makes the product they saw. The data from Question 5 are summarized in Table C below.

>>

>>

---

[18] Verbatim responses are listed in this report as typed by interviewers, with some capitalization adjusted to match this report.

- 15 -

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/12   Page 19 of 61
Case 1:12-cv-05775-JSR   Document 45-12   Filed 02/26/13   Page 19 of 60
Page ID #:6129

## Table C:  Confusion as to Source from Question 5[19]

| Q.5  What other products or brands do you think are put out by the company or person who makes this product? | Curl Defining Cream | | Hair Detangler | |
|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Test (Aunt Jackie's) | Control (Taliah Waajid) |
| Miss Jessie's | 0.9% | 0.0% | 0.0% | 0.0% |
| Aunt Jackie's | 0.9% | 0.0% | 1.8% | 0% |
| Shampoo/conditioner/other hair care product | 4.5% | 6.3% | 6.3% | 3.8% |
| Other | 1.8% | 1.8% | 0.9% | 0.9% |
| Don't know/No opinion | 0.0% | 0.0% | 0.9% | 0.0% |

59.    As Table C shows, very few respondents mentioned specific brands in response to this question.  Of the brands mentioned, 1% of respondents who saw Aunt Jackie's curl defining cream mentioned Miss Jessie's in response to this question, as did 2% of respondents who saw Aunt Jackie's hair detangler.  These three respondents said "Curl La La Gel" (respondent 179), "House of Cheathem, Inc" (respondent 228), and "Aunt Jackies shampoo" (respondent 449).

60.    Only 1% of respondents who saw Aunt Jackie's curl defining cream mentioned Miss Jessie's in response to this question.  This represents one respondent, who said, "Miss Jessie's Hair Products just like it." (respondent 371).  No respondents in any other cell mentioned Miss Jessie's in response to this question.

61.    For all cells combined, 23 respondents gave responses related to shampoo, conditioner, and other hair care products, without any brand specification.  Examples are: "shampoo and conditioner" (respondent 8), "Hair gels/hair color\hair grease\shampoo" (respondent 55), "gel and mouse" (respondent 74), "you know like shampoo or conditioner or mouse other leave in hair products for the African community" (respondent 84), "shampoo and conditioner and also hair grease" (respondent 184), "Relaxers, oil sheens, hair jams and gels. hot oil treatments" (respondent 271), and "hair relaxers and other hair care products" (respondent 334).  Although

---

[19] Based to all respondents.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/12   Page 20 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 9 of 60
Page ID #:6130

they do not mention specific brands, these are reasonable answers to a question asking what other products or brands are put out by the company that makes the hair care product they were shown.

62.     The final set of questions asked about confusion as to sponsorship or approval.  Question 7 asked whether whoever makes or puts out the product is sponsored or approved by another company or person.  The data from Question 7 are summarized in Table D below.

**Table D:  Confusion as to Sponsorship or Approval from Question 7**

| Q.7 Do you think that whoever makes or puts out this product… | Curl Defining Cream | | Hair Detangler | |
|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Test (Aunt Jackie's) | Control (Taliah Waajid) |
| Is sponsored or approved by another company or person | 23.6% | 23.2% | 23.2% | 29.2% |
| Is not sponsored or approved by another company or person | 27.3% | 20.5% | 24.1% | 16.0% |
| Don't know/no opinion | 49.1% | 56.3% | 52.7% | 54.7% |

63.     As can be seen in Table D, for each of the four products, only 23% to 29% thought that the product they saw was sponsored or approved by another company or person. The percentage who thought the product was sponsored or approved does not appear to be higher for respondents who saw the Aunt Jackie's test products than for those who saw the two control products.

64.     Confusion as to sponsorship or approval is measured by the percentage of respondents who both believe that the makers were sponsored or approved by someone, and mentioned Miss Jessie's in Question 8 as the source of the sponsorship or approval.  Question 8 asked respondents who they think sponsored or approved whoever makes the product they saw.  The results from that question are summarized below in Table E.

>>

>>

>>

>>

>>

- 17 -

Case 2:10-cv-02024-CBM-RNA   Document 215-10   Filed 10/01/12   Page 21 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 20 of 60
Page ID #:6131

| Table E:  Confusion as to Sponsorship or Approval from Question 8[20] | | | | |
|---|---|---|---|---|
| **Q.8.  What other company or person do you believe sponsored or approved whoever makes the product I showed you?** | **Curl Defining Cream** | | **Hair Detangler** | |
| | **Test** (Aunt Jackie's) | **Control** (Jane Carter) | **Test** (Aunt Jackie's) | **Control** (Taliah Waajid) |
| Miss Jessie's | 0.0% | 0.0% | 0.9% | 0.0% |
| Aunt Jackie's | 3.6% | 0.0% | 3.6% | 0.0% |
| Jane Carter/Jane Carter Solutions | 0.0% | 1.8% | 0.0% | 0.0% |
| Taliah Waajid/Black Earth | 0.0% | 0.0% | 0.0% | 8.5% |
| Dr. Miracle | 0.0% | 0.9% | 1.8% | 0.0% |
| African Pride | 0.0% | 0.9% | 0.0% | 0.9% |
| Carol's Daughter | 0.0% | 0.0% | 0.9% | 0.9% |
| Revlon | 0.9% | 0.9% | 0.0% | 0.0% |
| Olive Oil | 0.9% | 0.0% | 0.9% | 0.9% |
| Other | 7.3% | 10.7% | 8.0% | 11.3% |
| Don't know/No opinion | 10.9% | 9.8% | 8.0% | 7.5% |

65.      As can be seen in Table E, no respondents who saw Aunt Jackie's curl defining cream, and a single respondent who saw Aunt Jackie's hair detangler, were confused as to sponsorship or approval with Miss Jessie's.  Respondents who saw the various products did mention a number of other brands, including Dr. Miracle, African Pride, Carol's Daughter, Revlon and Olive Oil.

66.      The next section summarizes my conclusions from the survey data.

\>\>

\>\>

\>\>

\>\>

---

[20] Based to all respondents.

- 18 -

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RJA   Document 215-10   Filed 10/01/12   Page 22 of 61
Case 1:12-cv-05775-JSR   Document 5-12   Filed 02/26/13   Page 21 of 60
Page ID #:6132

**DISCUSSION AND CONCLUSIONS**

67.     My confusion survey measures two different types of confusion between Aunt Jackie's and Miss Jessie's:  confusion as to source, and confusion as to sponsorship or approval.

68.     Table F below provides a summary measure reflecting all confusion questions.  The table excludes double counting by counting each respondent only once, even if they mentioned Miss Jessie's in more than one question.

**Table F:  Summary of All Measured Confusion[21]**

| Type of Confusion | Defining Curl Cream | | | Hair Detangler | | |
|---|---|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Net | Test (Aunt Jackie's) | Control (Taliah Waajid) | Net |
| Confusion as to source (Question 2, who makes or puts out the product) | 0.9% | 0.0% | 0.9% | 0.0% | 0.0% | 0.0% |
| Confusion as to source (Question 5) | 0.9% | 0.0% | 0.9% | 0.0% | 0.0% | 0.0% |
| Confusion as to sponsorship or approval (Question 8) | 0.0% | 0.0% | 0.0% | 0.9% | 0.0% | 0.9% |
| All measured confusion | 1.8% | 0.0% | 1.8% | 0.9% | 0.0% | 0.9% |

69.     As shown in Table F, the gross level of all measured confusion between Aunt Jackie's and Miss Jessie's is 1.8% (before the control) for curl definer.  The matched control cell measurement is 0.0%, so the net level of all measured confusion for curl definer is 1.8% (after the control).

70.     The gross level of all measured confusion between Aunt Jackie's and Miss Jessie's is 0.9% for hair detangler.  The matched control cell confusion is 0.0%, so the net level of all measured confusion is 0.9% for hair detangler.

71.     My understanding is that the measured level of confusion required to find a significant likelihood of confusion depends on the matter.  Professor McCarthy, surveying a variety of cases, suggests that, "Generally, figures in the range of 25% to 50% have been viewed as solid support for a finding of a likelihood of confusion."  He also states that, "Figures below 20% become

---

[21] Tables F and G exclude double counting.  If a respondent mentioned a brand in one question, she was not counted as confused more than once, even if she mentioned the brand in subsequent questions.

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/12   Page 23 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/20/13   Page 22 of 60
Page ID #:6133

1   problematic because they can only be viewed against the background of other evidence weighing

2   for and against a conclusion of likely confusion."[22]  My experience is that the net measurements

3   for likelihood of confusion in Table F are below levels that are typically considered significant.

4   72.    To put these measurements in perspective, Table G summarizes all measured confusion for

5   brands mentioned by respondents other than Aunt Jackie's and Miss Jessie's.  As with Table F,

6   Table G summarizes confusion across questions 2, 5, and 8.

### Table G:  All Measured Confusion for Other Brands
### (Excludes Aunt Jackie's and Miss Jessie's)

| Total confusion for other brands mentioned in Questions 2, 5, and 8 | Curl Defining Cream | | Hair Detangler | |
|---|---|---|---|---|
| | Test (Aunt Jackie's) | Control (Jane Carter) | Test (Aunt Jackie's) | Control (Taliah Waajid) |
| Jane Carter/Jane Carter Solutions | 0.0% | N/A | 0.9% | 0.0% |
| Taliah Waajid/Black Earth | 0.9% | 0.0% | 0.0% | N/A |
| Dr. Miracle | 0.9% | 0.9% | 2.7% | 0.0% |
| African Pride | 0.9% | 1.8% | 0.0% | 0.9% |
| Carol's Daughter | 0.9% | 1.8% | 0.9% | 0.9% |
| Revlon | 2.7% | 0.9% | 2.7% | 0.0% |
| Olive Oil | 0.9% | 0.0% | 0.9% | 0.9% |
| Dark & Lovely | 0.9% | 0.9% | 0.9% | 0.9% |

18   73.    As can be seen in Table G, a number of other brands were mentioned, also at low levels,

19   but about as often as Miss Jessie's.  The brands listed in Table G may have been mentioned

20   because they were top of mind for consumers, or because they have similarities with the types of

21   brands, products, or packages in the survey.  No matter the reason, Table G shows that the

22   products tested from Aunt Jackie's, Jane Carter, and Taliah Waajid bring to mind other brands as

23   often as or more often than Miss Jessie's.

24   74.    In my opinion, none of the levels of confusion for Miss Jessie's in Table F, or for other

25   brands in Table G, are sufficiently high to be considered significant.

---

27   [22] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition,
Updated March, 2009, 32:188 "Likelihood of confusion—Percentage figures in the cases—
28   Evidence of a likelihood of confusion".

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 10/01/13   Page 24 of 61
Case 1:12-cv-05775-JSR   Document 15-12   Filed 02/26/13   Page 23 of 60
Page ID #:6134

1   I declare under penalty of perjury under the laws of the United States that the foregoing is true and

2   correct to the best of my belief.

3

4   Executed in Encino, California, on February 4, 2013.

5

6

7

8   _____
    Dr. Bruce R. Isaacson

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Expert Report of Dr. Bruce Isaacson
Case No 12-CV-5775 (JSR)

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA Document 215-10 Filed 10/01/13 Page 25 of 61
Case 2:12-cv-05735-JSR Document 5-12 Filed 02/20/13 Page 206 of 60
Page ID #:6135

```
              ##                      ##
               #                       #                              #
    ####      ### #     ####      # ###      ####     #####    # ###    ####     #####
   #     #    #    ##   #      #   ##   #    #     #   #           ##    #    #    #      #
   #####     #      #####   #      #     #####   #        #     #####   #
   #     #   #      #     #  #  #     #  #     #          #      #     #   #
   #    ##   #      #   ##  ##    #   #    ##   #    #    ##   #     #    ##    #   #
    ### ##   ####      ### #### ###      ### ##     ###     ## ###    ### ##    ###
```

Job : 64
Date: 2/25/2013
Time: 9:43:05 AM

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA   Document 215-10   Filed 10/01/12   Page 26 of 61
Case 1:12-cv-05795-JSR   Document 15-12-10 Filed 02/26/13   Page 28 of 60
Page ID #:6136

**Exhibit 1:**
**Dr. Bruce Isaacson CV and Testimony Experience**

EXHIBIT K

Case 2:10-cv-02034-GBM-RJA Document 215-10 Filed 10/01/12 Page 27 of 61
Case 2:12-cv-05795-JSR Document 15-12-10 Filed 02/26/13 Page 28 of 60
Page ID #:6137

## MMR STRATEGY GROUP
*Creating growth through customer insight.*™

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • Fax (818) 464-2399 • www.mmrstrategy.com

# DR. BRUCE R. ISAACSON, DBA, MBA

**Summary of Qualifications**

- Expertise in surveys, marketing, and strategy.
- Experience in intellectual property matters.
- Doctorate and MBA, Harvard Business School; Bachelor of Science in Engineering, Northwestern University.

---

*MMR Strategy Group, Encino, CA*                          2005 - Present
**PRESIDENT**

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.

- MMR helps commercial clients grow by using marketing research and consulting to develop marketing and sales strategies. **MMR's commercial clients** have included Farmers Insurance Group, Smart & Final, Alberto-Culver, Nestle USA, Sega Entertainment USA, Cigna, Oreck, The Goodyear Tire & Rubber Company, The Coca-Cola Company, and other companies.

- MMR surveys and testimony provide evidence for intellectual property litigation and claim substantiation. **MMR's legal clients** have included Baker & Hostetler, Munger, Tolles & Olson; Farella, Braun + Martel; Shook, Hardy & Bacon; Baker & McKenzie, and other firms.

- As President, I design studies, manage research projects, and provide consulting for clients. I have conducted hundreds of surveys during my career.

- I regularly provide surveys, testimony, and rebuttals for intellectual property litigation and claim substantiation matters. I have experience with a wide variety of authorities, including Federal Court, the Trademark Trial and Appeal Board, and other venues as well.

- I frequently speak and write on topics relating to marketing, surveys, and strategy.

---

## Education

- Doctor of Business Administration in Marketing, **Harvard Business School**, 1995. Awarded Dean's Doctoral Fellowship.

- MBA with High Distinction, **Harvard Business School**, 1991. Graduated in top 5% of class as a Baker Scholar.

- Bachelor of Science in Engineering with focus on Regional Development, Northwestern University Technological Institute, 1985.

EXHIBIT K

Case 2:10-cv-02024-GPM-RJA  Document 215-10  Filed 10/01/12  Page 28 of 61
Case 2:12-cv-05795-JSR  Document 15-10  Filed 02/26/13  Page 2 of 60
Page ID #:6138

**Prior Professional Experience**

*Fairview Company, Calabasas, CA*                                     2002 - 2004
**MANAGING DIRECTOR**

- **West Coast Practice Leader of Executive Development for Monitor Group.**
  Designed and managed marketing and strategy executive education programs.  Developed
  curriculum, served as lead faculty on programs for Fortune 100 clients.

- **Consulted with clients in technology, software, and financial services.**
  Provided consulting services in marketing and strategy.


*Intuit/Digital Insight, Calabasas, CA*                              2001 - 2002
**SENIOR VICE PRESIDENT FOR PRODUCTS, MARKETING, AND ALLIANCES**

- **Managed business lines for $130 million provider of outsourced banking
  services/software.**
  Directed marketing, strategy, alliances, mergers, acquisitions, resellers, and pricing for 9
  business lines.  Managed $29 million budget and staff of 40.

- **Built product management and strategy functions.**
  Set priorities for $22 million R&D budget.  Directed $51 million acquisition and post-
  merger conversion of 150 new clients.


*Move, Inc., Westlake Village, CA*                                    1999 - 2001
**PRESIDENT, HOME SERVICES**

- **Founded home services division for software/services provider to real estate industry.**
  Directed business unit for new division.  Built alliances with associations including
  National Association of Homebuilders and American Institute of Architects.


*PHH Corporation* **(NYSE: PHH),** *Mortgage Division, Mount Laurel, NJ*    1997 - 1999
**VICE PRESIDENT, MARKETING**

- **Directed marketing for $26 billion outsourced mortgage services division.**
  Company provided private label loans and loan servicing for customers and partners,
  including Wells Fargo, USAA, Coldwell Banker, Century 21.  Served on 14-member
  Executive Committee.  Managed $14 million budget and 60 people in marketing, research,
  public relations, advertising, strategic planning, business development and e-commerce.

- **Created collateral for selling, processing, and closing loans distributed to 750,000
  customers annually.**
  Redesigned sales materials used by 150-person sales force.  Created point-of-sale materials
  and placed in 1,600 real estate offices nationwide.  Negotiated co-marketing deals.

- **Built online platform to originate, close and service mortgages.**
  Created co-branded system used by 1,400 partners to originate $700 million in mortgages
  in 2000.  Integrated system with more than 2,000 sales and customer service reps.

EXHIBIT K

Case 2:10-cv-02034-GBM-JRA Document 215-10 Filed 10/01/13 Page 29 of 61
Case 1:12-cv-05735-JSR Document 15-12 Filed 02/20/13 Page 28 of 60
Page ID #:6139

**Boston Consulting Group, Chicago, IL**                                      1995 to 1997
**CONSULTANT**

- **Consulted in marketing, strategy and distribution for $1 billion international strategy consulting firm.**
  Designed and rolled out database marketing program for international supermarket chain.
  Developed purchasing strategy for $3 billion consumer goods company.
  Evaluated market strategy for $800 million division of paper goods company.


**Harvard Business School, Cambridge, MA**                                    1991 to 1995
**DEAN'S DOCTORAL FELLOW**

- **Developed and implemented multi-year research project analyzing buyer-supplier alliances.**
  Authored 14 publications including best-selling case studies and articles in distribution, sales, supplier management, purchasing, branding, new products. Taught in Babson College Executive MBA program.


**E&J Gallo Winery, Modesto, CA**                                            1990
**MBA INTERN**

- Summer intern at global winery. Developed packaging strategy, distribution and retailer incentive programs for the wine cooler category.


**Long Wharf Trading Company, Danvers, MA**                                  1986 to 1989
**PRESIDENT & CO-FOUNDER**

- **Co-founded company manufacturing high quality sewn products for advertising premiums.**
  Directed 30 employees. Clients included banks, universities, corporations, schools and museums. Company was featured with full-page story in *Inc. Magazine*.


**Parsons Corporation/Barton-Aschman Associates, Evanston, IL**              1985 to 1986
**ASSOCIATE CONSULTANT**

- **Conducted strategic and operations planning for public transportation systems at global construction and regional planning company.**
  Received *President's Award* for outstanding initiative and performance.

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA Document 215-10 Filed 10/01/13 Page 30 of 61
Case 2:12-cv-05735-JSR Document 15-12 Filed 02/26/13 Page 29 of 80
Page ID #:6140

## Honors, Appointments, Affiliations

- Member, American Marketing Association (AMA)

- Member, Counsel of American Survey Research Organizations (CASRO)

- Member, International Trademark Association (INTA)

- Member, Marketing Research Association (MRA)

- Editorial Board, *Journal of Business-to-Business Marketing,* 1994 – present

- Member, *The Trademark Reporter* Committee, International Trademark Association, 2010 - present

- Policy Advisory Board, Joint Center for Housing Studies at Harvard University, 1999 - 2001

- Winner, Doctoral Dissertation, Institute for Study of Business Markets, Penn State, 1994

- George S. Dively Award for Innovative Research, Harvard Business School, 1993

- George F. Baker Scholar, Harvard Business School (top 5% of class), 1991

- Dean's Doctoral Fellowship, Harvard Business School, 1993 -1995

**MMR**

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA   Document 215-10   Filed 02/20/13   Page 31 of 61
Case 2:10-cv-05795-JSR   Document 15-12   Filed 10/01/12   Page 30 of 60
Page ID #:6141

<u>**Selected Speaking Engagements**</u>

Frequent speaker at industry conferences and client events on topics relating to marketing and strategy, including:

- Moderator (planned) for round table discussion entitled, "Using Survey Evidence for Claim Substantiation", International Trademark Association Annual Conference, upcoming May, 2013.

- Panelist (planned) for multi-day conference entitled, "Advertising Claims Support: Case Histories and Principles", conference hosted by The Institute for Perception, upcoming April, 2013.

- Moderated round table discussion entitled, "Replicating Marketplace Conditions in Trademark Surveys", International Trademark Association Annual Conference, 2011.

- Moderated round table discussion entitled, "The Use of Surveys in Intellectual Property Litigation", International Trademark Association Annual Conference, 2010.

- Faculty on panel at expert forum entitled, "Litigating & Resolving Advertising Disputes", American Conference Institute, June, 2010.

- "The Use of Online Surveys in Intellectual Property Litigation". Presentation to the National Advertising Division (NAD) Annual Conference, October, 2009.

- "The Death of the Focus Group: Non-Traditional Research to Create Deeper Customer Insight." Presentation to American Marketing Association Annual Marketing Research Conference, September, 2008.

- "Understanding Your Customer and Making Tough Strategic Choices," International Restaurant & Foodservice Show of New York, March, 2008.

- "Measuring Consumer Attitudes and Behaviors in Intellectual Property Litigation," Continuing Legal Education (CLE) seminar presented to audiences including:

  - Orange County Bar Association, November 2007.
  - Baker Botts, LLP, March, 2008.
  - Amster, Rothstein & Ebenstein LLP, March, 2008.
  - Fulwider Patton, LLP, March, 2008.

- "Understanding Today's Customers and Making Tough Choices – Lessons Learned From Starbucks," Western Foodservice & Hospitality Expo, August, 2007.

- "What Can We Learn from Customer Satisfaction Studies?" Real Trends Marketing & Technology Expo, September, 2006.

EXHIBIT K

Case 2:10-cv-02034-GMN-RJA Document 215-10 Filed 10/01/13 Page 32 of 61
Case 1:12-cv-05795-JSR Document 15-12 Filed 02/26/13 Page 3 of 30
Page ID #:6142

## Publications and Works in Process

**The Quantity of Presidential Polls and the Quality of Marketing Research.** *Green Book Blog*, October, 2012.

**Playing Nice With Legal: How Research Can Help Keep Marketing Claims in Compliance.** *Quirk's Marketing Research* Review, January, 2013.

**Three Critical Questions to Evaluate Intellectual Property Surveys.** *Intellectual Property Today*, September, 2012. Co-authors Professor Jonathan Hibbard and Professor Scott Swain.

**Asking the Right Questions (in Litigation Surveys).** *Intellectual Property Magazine*, October, 2012.

**Conducting Litigation Surveys in an Online World.** Manuscript in process with co-author, planning to submit for publication to *The Trademark Reporter*.

**Why Online Consumer Surveys Can Be a Smart Choice in Intellectual Property Cases** (with Professor Jonathan Hibbard and Professor Scott Swain). Intellectual Property Law Newsletter of the American Bar Association, Intellectual Property Law Section, May 2008.

**Bose Corporation: The JIT II Program (A), (B), (C), and (D)** (with Professor Roy Shapiro). Harvard Business School cases 9-694-001, -002, -003, and –004.

**Bose Corporation: The JIT II Program Teaching Note.** Harvard Business School teaching note 5-695-017.

**Buyer-Supplier Relationships: Antecedents, Management and Consequences.** Harvard Business School doctoral dissertation, 1996.

**Goodyear: The Aquatred Launch** (with Professor John Quelch). Harvard Business School case 9-594-106. Best seller.

**Goodyear: The Aquatred Launch Teaching Note** (with Professor John Quelch). Harvard Business School teaching note 5-595-016.

**Industrial Marketing** (with Professor V. Kasturi Rangan). In *AMA Management Handbook, Third Edition*, edited by John J. Hampton. New York: Amacom Books, 1994, pp. 2-101 to 2-108.

**Managing Buyer-Supplier Relationships.** Preface to *JIT II: Revolution in Buying and Selling*, edited by Lance Dixon and Anne Millen Porter. Newton, MA: Cahners Publications, Inc., 1994

**Philip Morris: Marlboro Friday (A) and (B).** Harvard Business School case 9-596-001 and –002.

**Scope and Challenge of Business-to-Business Marketing** (with V. Kasturi Rangan). Harvard Business School class note 9-594-125.

**Vistakon: 1 Day Acuvue Disposable Contact Lenses** (with Alvin J. Silk and Marie Bell). Harvard Business School case 9-596-087.

**What is Industrial Marketing?** (with Professor V. Kasturi Rangan). Harvard Business School class note 9-592-012.

EXHIBIT K

Case 2:10-cv-02024-GBM-JSA   Document 215-10   Filed 10/01/13   Page 33 of 61
Case 2:12-cv-05795-JSR   Document 45-12-10   Filed 02/26/13   Page 32 of 60
Page ID #:6143

**Blogging and Commentary**

I regularly write posts and white papers at MMRStrategy.com. Selected materials include:

**Litigation**

- "How to Measure False Advertising in a Litigation Survey" (November, 2012)

- "Using Surveys to Estimate Damages in Patent Infringement Matters" (October, 2012)

- "Apple vs. Samsung: Litigation Surveys as Evidence" (August, 2012)

- "What is the Theory Behind Your Lanham Act Survey?" (June, 2012)

- "Keyword Infringement Surveys: The New Frontier in Measuring Likelihood of Confusion" (June, 2012)

- "The Challenge of Replicating Marketplace Conditions in Intellectual Property Surveys" (May, 2012)

**Marketing and Marketing Research**

- "Sizing the Potential of a New Market or New Product" (white paper)

- "MaxDiff vs. Conjoint: Which is Better to Measure Consumer Preferences?" (white paper)

- "Ten Best Practices to Improve Your Concept and Product Tests" (white paper)

- "Using Choice-Base Market Segmentation to Improve Your Marketing Strategy" (white paper)

- "What Your Tracking Study Should Measure About Your Customers" (white paper)

- "Using Customer Journey Maps to Improve Your Customer Experience" (white paper)

- "How to Improve Your Usage and Attitude Study" (June, 2012)

- "Five Pitfalls of Market Segmentation and How to Avoid Them" (May, 2012)

**Claim Substantiation**

- "Critical Research Steps and Core Principles of Claim Substantiation" (white paper)

- "How Many Industries are Affected by Claim Substantiation?" (June, 2012)

- "Lessons in Claim Substantiation from the Pom Wonderful Decision" (May, 2012)

- "How Claim Substantiation Differs from Traditional Marketing Research" (May, 2012)

EXHIBIT K

Case 2:10-cv-02024-GBM-RBA   Document 215-10   Filed 10/01/12   Page 34 of 61
Case 1:10-cv-05795-JSR   Document 15-12   Filed 02/26/13   Page 39 of 60
Page ID #:6144

### Selected Courses Taken in MBA and Doctoral Programs

- <u>Economics and Finance</u>, including topics such as Managerial Economics;  Financial Reporting and Accounting;  Business, Government, and the International Economy;  Corporate Finance;  Product Costing;  Microeconomic Theory.

- <u>Marketing and Strategy</u>, including topics such as Marketing;  Marketing Foundations Readings;  New Products;  Marketing Implementation;  Service Management;  Research Issues in Marketing;  Buyer Behavior;  Industrial Marketing and Procurement;  Industry and Competitive Analysis;  Communications.

- <u>Sociology and Psychology</u>, including Organizational Behavior;  Human Resources;  Social Behavior in Organizations;  Readings in Administration (two courses);  Management Policy and Practice.

- <u>Statistics</u>, including Statistical Inference;  Social Network Analysis;  Applied Data Analysis;  Analyzing Covariance Structures.

- <u>Research Methods and Research Design</u>, including Doctoral Research Seminar;  Research Design and Measurement;  Design of Field Research in Organizational Behavior;  Intervention Research and Action Science.

**MMR**

EXHIBIT K

Case 2:10-cv-02034-GPM-PMA Document 215-10 Filed 10/01/12 Page 35 of 61
Case 4:12-cv-05735-JSR Document 19-12 Filed 02/20/13 Page 30 of 50
Page ID #:6145

## Dr. Bruce Isaacson Litigation Expert Witness Experience
### January 2013

Cases in which Dr. Bruce Isaacson has testified as an expert, including written expert reports or testimony at deposition or trial, in the past four years.

**Globefill Incorporated v. Elements Spirits, Inc. and Kim Brandi**
U.S. District Court, Central District of California

**Sun Pacific Group v. Paramount Group**
American Arbitration Association, Commercial Arbitration Tribunal

**Nicholas J. Gianino, Arnold Lee, and Lori Risman v. Alacer Corporation**
U.S. District Court, Central District of California

**Bruce Lee Enterprises, LLC v. A.V.E.L.A. Inc. and Leo Valencia, Urban Outfitters, Inc. and Target Corporation**
U.S. District Court, Southern District of New York

**FLIR Systems, Inc. v. Sierra Media, Inc. and Fluke Corporation**
U.S. District Court, District of Oregon, Portland Division

**Brian Graifman v. Trend Micro, Inc.**
U.S. District Court, Northern District of California, San Jose Division

**Chameleon Chair, Inc v Richwood Imports and Hall's Rental Services**
U.S. District Court, Central District of California

**Luxco, Inc. v Consejo Regulador Del Tequila, A.C.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board

**Codonics, Inc. v. Datcard Systems, Inc.**
U.S. District Court, Northern District of Ohio

**Kristin Wells and Kimberly Nguyen v. Abbott Laboratories, Inc., EAS, Inc., et al**
Superior Court of the State of California for the County of Los Angeles

**Wham-O, Inc. v. Manley Toys, Ltd, et al.**
U.S. District Court, Central District of California, Western Division

**Nutro Products, Inc. v. Sergeant's Pet Care Products, Inc.**
U.S. District Court, Middle District of Tennessee, Nashville Division

**Clinique Laboratories, LLC v. Absolute Dental Cheyenne Inc.**
U.S. Patent and Trademark Office, Trademark Trial and Appeal Board

**Hansen Beverage Company, d/b/a Monster Beverage Company v. CytoSport Inc.**
U.S. District Court, Central District of California

**James and Mary Jordan et al v. The Scott Fetzer Company**
U.S. District Court, Middle District of Georgia

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA    Document 215-10    Filed 10/01/12    Page 36 of 61
Case 1:24-cv-05793-JSR    Document 5-12    Filed 02/26/08    Page 36 of 60
Page ID #:6146

**Honestech, Inc., v. Sonic Solutions**
U.S. District Court, Western District of Texas, Austin Division

**Richard Dominguez v. UAL Corporation and United Airlines, Inc.**
U.S. District Court, District of Columbia

**JIPC Management, Inc. v. Incredible Pizza Co., Inc. and Incredible Pizza Franchise Group, L.L.C.**
U.S. District Court, Central District of California

**Larry Flynt and LFP Video Group v. Flynt Media Corp, Jimmy Flynt, and Dustin Flynt**
U.S. District Court, Central District of California

**Sara Lee Corporation v. Sycamore Family Bakery, Inc., and Leland Sycamore**
U.S. District Court, District of Utah

**Luv n' Care, Ltd and Admar International, Inc. v. Walgreen Co. and Kmart Corp.**
U.S. District Court, Southern District of New York

**Luv n' Care, Ltd and Admar International, Inc. v. Royal King Baby Product Co., Ltd.**
U.S. District Court, Eastern District of Texas, Marshall Division

**High Voltage Beverages, LLC v. The Coca-Cola Company**
U.S. District Court, Western District of North Carolina

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA   Document 215-10   Filed 10/01/12   Page 37 of 61
Case 1:12-cv-05775-JSR   Document 15-12-10   Filed 02/20/13   Page 38 of 60
Page ID #:6147

**Exhibit 2:**
**Product Photogrpahs**

Case 2:10-cv-02024-GBM-RLA   Document 215-10   Filed 10/01/12   Page 38 of 61
Case 1:12-cv-05725-JSR   Document 15-12-10   Filed 02/26/13   Page 37 of 80
Page ID #:6148

**Aunt Jackie's Knot On My Watch**
**Instant Detangling Therapy**







**Front**          **Side 1**          **Side 2**

Exhibit 2, Isaacson Expert Report                                        Page 1

EXHIBIT K

Case 2:10-cv-02024-GBM-RLA Document 215-10 Filed 10/01/12 Page 39 of 61
Case 1:12-cv-05795-JSR Document 15-12 Filed 02/26/13 Page 38 of 60
Page ID #:6149

# Aunt Jackie's Curl La La
# Defining Curl Custard



**Front**



**Top**



**Side 1**



**Side 2**

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA   Document 215-10   Filed 10/01/12   Page 40 of 61
Case 1:12-cv-05775-JSR   Document 15-12-10   Filed 02/26/13   Page 39 of 60
Page ID #:6150

# Taliah Waajid
# The Great Detangler

      

**Front**         **Side 1**         **Side 2**

EXHIBIT K

## Jane Carter Solution
## Curl Defining Cream



**Front**



**Top**



**Side 1**



**Side 2**

EXHIBIT K

Case 2:10-cv-02024-GPM-PLA   Document 215-10   Filed 10/01/13   Page 42 of 61
Case 1:12-cv-05735-JSR   Document 15-12-10   Filed 02/26/13   Page 24 of 60
Page ID #:6152

**Exhibit 3:**
**Confusion Survey Interview Locations**

## Confusion Survey Interview Locations

| Market | Location |
| --- | --- |
| Atlanta, GA | Perimeter Mall |
| Charlotte, NC | Eastridge Shopping Centre |
| Chicago, IL | Fox Valley Mall |
| Dallas, TX | Valley View Mall |
| Houston, TX | Greenspoint Mall |
| Los Angeles CA | Antelope Valley Mall |
| New York, NY | Kings Plaza Mall |
| Philadelphia, PA | Franklin Mills Mall |
| St. Louis, MO | St. Louis Mills Mall |
| San Francisco, CA | Southland Mall |
| Spartanburg, SC | Westgate Mall |
| Tallahassee, FL | Tallahassee Mall |
| Washington, D.C. | Spotsylvania Towne Centre |

EXHIBIT K

Case 2:10-cv-02024-GBM-PLA   Document 215-10   Filed 10/01/12   Page 44 of 61
Case 1:12-cv-05775-JSR   Document 5-12-10   Filed 02/20/13   Page 43 of 60
Page ID #:6154

**Exhibit 4:**
**Confusion Survey Instructions for Interviewers and Supervisors**

Case 2:10-cv-02034-GBM-JRA   Document 215-10   Filed 20/01/13   Page 45 of 61
Case 1:24-cv-05795-JSR   Document 15-12   Filed 02/26/13   Page 4 of 60
Page ID #:6155



**MMR STRATEGY GROUP**
*Creating growth through customer insight.*™

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • Fax (818) 464-2399 • www.mmrstrategy.com

Study #509-004
Hair Care Study
January 2013

### INTERVIEWER INSTRUCTIONS

#### OVERVIEW
MMR Strategy Group is conducting a nationwide consumer survey about hair care product. Interviewers will administer a screener a representative sample of females ages 18 and older at your mall to identify whether they are eligible for the survey. To be eligible, the person must currently use and plan to purchase certain hair care products. Individuals also must satisfy other eligibility criteria which are outlined later in this document.

Individuals will be screened for eligibility at the mall, and eligible survey respondents will be taken to an interviewing room where they will be shown <u>one</u> package and then asked several questions about it. Eligible survey respondents who complete the survey will be given a cash incentive.

This is a four-cell study; each respondent will see and evaluate ONE product. Each product has a label on the bottom with the product code on it. Products and product codes are described later in this document.

#### BRIEFING
All personnel involved in the study must attend a personal briefing before working on this project. At the briefing, your supervisor will read through the Interviewer's Instructions along with you. All interviewers must do **at least one Practice Screener <u>and</u> one Practice Interview with another interviewer (including Practice Verification Page and Practice Certification Page) during the briefing.** The practice screeners and practice verification and certification pages are printed on colored paper.

On the questionnaire URL, select "Practice" on the first page to begin a practice interview. Only select "Live" for actual live interviews.

All Practice Screeners and Practice Interviews must be monitored and reviewed by the supervisor—and have any problems cleared up—before actual interviewing begins. It is your responsibility to be sure that you completely understand:
1. How to administer the paper screener
2. How to enter the screener responses
3. How to administer the main questionnaire
4. How and when to display the product
5. How and when to fill out the verification page
6. How and when to fill out the certification page

> Each interviewer is to read his/her Interviewer Instructions and <u>sign them</u>. Each interviewer's signed instructions are to be stapled to his/her practice screener, practice verification page and practice certification page and returned at the end of the study.

#### SCREENING FOR ELIGIBILITY AND CONDUCTING INTERVIEWS
A representative sample of females age 18 or older at your mall will be screened for eligibility. Your supervisor has been provided with quotas.

**Approaching Potential Respondents** – You should approach and screen shoppers in a systematic manner (e.g., either every shopper or every nth shopper) until each quota group is filled. If you approach a group of shoppers, you should only screen and qualify one person in the group for the survey. You must screen for this project only. You may not "double screen" or "piggyback." For example, if the individual has been screened for another study, he/she is ineligible for this one. Also, if the individual lives in the same household as another person who was interviewed for this survey, he/she is not eligible.

### DO NOT INTERVIEW ANYONE WITH A HEARING, LANGUAGE OR SIGHT DISABILITY

---

Exhibit 4, Isaacson Expert Report

**EXHIBIT K**

Case 2:10-cv-02024-GBM-JFA Document 215-10 Filed 10/01/12 Page 46 of 61
Case 2:10-cv-05795-JSR Document 15-10 Filed 02/20/13 Page 48 of 60
Page ID #:6156

- **Screening Forms** – If someone you are screening is not eligible for this study, erase the responses and reuse the screener. All completed screening forms will be sent to MMR Strategy at the end of the study.

- **Interviewing Hours and Interviewing Quotas** – Your supervisor will assign your interviewing hours. Interviews will be conducted on different days at different times of the day, with most of the interviews being conducted in the evenings or weekends. A supervisor must be on site during all interviews. We have requested that each interviewer assigned to the project complete a similar number of interviews with eligible survey respondents. Give all completed interviews to your supervisor, even if you inadvertently complete more than the target number of interviews overall or for a particular quota group.

## SCREENER AND QUESTIONAIRE ADMINISTRATION

Your supervisor has been provided with the screening forms (for you to use to determine whether an individual is eligible for the survey), verification and certification pages (for respondents who complete the survey), and bottles of product. The bottles should remain covered with the cloths we provided when interviews are not being conducted.

Interviewer instructions are **CAPITALIZED AND PRINTED IN BOLD** on the screening form and survey program. Follow these instructions carefully. Do <u>not</u> read words in **BOLD CAPITAL LETTERS** to the survey respondent. Read each question in the screening form and questionnaire exactly as written and allow respondents as much time as he/she needs to answer before proceeding to the next question. Do <u>not</u> change the wording of any question, and ask only the questions included on the screening form and questionnaire. Do <u>not</u> "probe" for additional answers except when instructed to do so in the questionnaire (e.g., when the questionnaire instructs you to ask for "Any other reasons?")

You should not interpret specific items or instructions in the screening form or questionnaire. If asked to do so, you should indicate that you do not want to bias respondents' answers in any way. You may offer to reread a question and ask the survey respondent to use his/her best judgment. If you repeat a question, be sure to repeat the entire question.

## RECORDING ANSWERS
When you record answers on the screening form and questionnaire, be sure that you record a respondent's entire answer. <u>Always record a survey respondent's exact words and do not omit any words or part of a respondent's answer.</u> If necessary, you may ask a respondent to repeat his/her entire answer to ensure that you have recorded it accurately.

<u>Do not paraphrase</u> or use abbreviations when recording answers. For example, a survey respondent may say "No, nothing else" when asked the question "Any other reasons?" If this occurs, record the survey respondent's exact words (e.g., do not write "nfi" to indicate no further information). Use proper punctuation and capitalization when recording verbatim answers. However, do <u>not</u> use parentheses when you record a survey respondent's answers. If you make an error on the screener or certification forms, you may cross something out with a single line, but do <u>not</u> erase or "white out" anything.

## INTERVIEWER RESPONSIBILITIES AT THE END OF EACH INTERVIEW
At the end of each interview, review the screening form to ensure the following: (a) all applicable questions in the screening form, verification page and certification page were asked, (b) the person who was interviewed is eligible for the survey based on his/her answers to the screening form, and (c) you accurately recorded answers on the questionnaire and screening form and legibly recorded answers on the screener, (d) you covered the bottle with the cloth we provided.

## VERIFICATION
We are requesting a telephone number from each survey respondent for verification purposes and your supervisor must verify that it is a working telephone number. Do not accept a pager number. For quality control purposes, MMR Strategy will attempt to contact by telephone <u>all</u> persons who were interviewed to confirm their participation.

## CONFIDENTIALITY
Survey respondents' answers should be kept confidential at all times.

## QUALITY CONTROL
You will be monitored throughout data collection to ensure that you follow the survey instructions, properly administer the screening form and the questionnaire, and record answers completely and accurately. If you have any questions or problems, contact your supervisor immediately and he/she will contact MMR Strategy.

EXHIBIT K

Case 2:10-cv-02024-GBM-JRA   Document 215-10   Filed 10/01/12   Page 47 of 61
Case 2:12-cv-05795-JSR   Document 15-10   Filed 02/28/13   Page 48 of 60
Page ID #:6157

## QUOTA ASSIGNMENT/QUOTA LINK
Your quota will be assigned by your supervisor.  A quota link will be emailed to your location to help keep track of completes by age and race.  Everyone working on this project should have access to the quota link.  Check the quota link before recruiting to ensure that you complete the full quota.  The questionnaire link will terminate a respondent if a quota has been filled.

## PRODUCTS AND PRODUCT CODES
The products included in the test are:
Cell 1, Product code 31: Aunt Jackie's Curl La La
Cell 2, Product code 32: Jane Carter Curl Defining Crème
Cell 3, Product code 33: Aunt Jackie's Knot on My Watch
Cell 4, Product code 34: Taliah Waajid The Great Detangler

## ADMINISTERING THE SCREENER AND QUESTIONNAIRE
### Screener
You will be screening for respondents from the mall floor to be interviewed.  Qualified respondents are females age 18 or older who:
- Q.         Are female
- QA.        Are age 18 or older who meet the age quota
- QB.        Selected African-American/Black or Hispanic as their race
- QC.        Have not participated in a hair care study in the past 3 months
- QD.        Use curl definer/curl defining crème and/or leave-in hair detangler least once a week
- QE.        Are likely to purchase curl definer/curl defining crème or leave-in hair detangler in the next 90 days
- QF.        Not employed in a sensitive industry
- QG/H.      Have eyeglasses/contact lenses with them if needed
- QI.        Are willing to participate

### Main Questionnaire
- Escort the respondent into the facility.
- Bring respondent into the interview room.  Open the Questionnaire URL.
- Select "Live" for live interviews.  Select "Practice" if you are conducting a practice interview.
- Select your market.
- Read the interviewer introduction and click "Next"
- **Electronic Screener**
- Select the responses to Q.A - Q.I from the paper screener.  The program will assign the cell number.  If covered bottle or jar is not in the room, excuse yourself and get the right package.  With the top of the product closed and the entire product completely covered, place the product in front of the respondent.
  - **On each screen, verify that you have selected the correct response before clicking the "Next" button.** <u>**NON-QUALIFYING RESPONSES WILL TERMINATE THE SURVEY AND THE RESPONDENT ID# WILL NO LONGER BE VALID.  YOU ARE NOT ALLOWED TO GO BACK IN THE SURVEY.**</u>
- **Main Questionnaire**
  - Remove the cloth covering the product.  Display the product with the top closed and the front facing the respondent.  Instruct respondent to examine the product.  They may pick it up to examine it and they may open the top to see or smell the product.  Do not, however, allow them to touch the product.  <u>Do NOT specifically instruct the respondent to open or not open the product.</u>
  - After respondent finishes examining the product, place product on table with the top closed and the front of the bottle or jar facing the respondent.  The respondent may not pick up the product again.
  - Note that the order of certain responses will rotate. You must read the question and responses exactly as shown on the screen.

## VERIFICATION AND CERTIFICATION PAGES
At the end of main questionnaire, the interviewer and respondent must fill out the verification and certification pages.

On the verification page, record the respondent's telephone number, name, and other contact information.  The respondent ID is already printed on this page.

On the certification page:
1. Respondent reads and signs the appropriate space
2. Interviewer reads and signs the appropriate space
3. Staple the completed certification page to the back of the screener

If the respondent refuses to sign, his/her initials are acceptable.

EXHIBIT K

Study #509-004
Hair Care Study
January 2013

## INTERVIEWER BRIEFING VERIFICATION FORM

**Interviewer Name (Please Print):** _____

**Interviewer Signature:** _____

**Date of Briefing:** _____

**Company:** _____

**Location:** _____

EXHIBIT K

Case 2:10-cv-02024-GPM-RJA Document 215-10 Filed 10/01/12 Page 49 of 61
Case 1:24-cv-05795-JSR Document 5-12 Filed 02/20/18 Page 48 of 60
Page ID #:6159



**MMR STRATEGY GROUP**
*Creating growth through customer insight.*™

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • Fax (818) 464-2399 • www.mmrstrategy.com

Study #509-004
Hair Care Study
January 2013

## SUPERVISOR INSTRUCTIONS

### OVERVIEW

MMR Strategy Group is conducting a nationwide consumer survey about hair care. Interviewers will administer a screener to a representative sample of females age 18 and older at your mall to identify whether they are eligible for the survey. To be eligible, the female must use and plan to purchase certain types of hair care products, and must also satisfy a variety of other eligibility criteria.

Individuals will be screened for eligibility at the mall, and eligible survey respondents will be taken to an interviewing room where they will be shown <u>one</u> bottle and then asked a series of questions about it. Eligible survey respondents who complete the survey will be given a cash incentive.

### PRODUCTS AND PRODUCT CODES

This is a four-cell study; each respondent will see and evaluate ONE product. Each bottle or jar has a label on the bottom with the product code on it. The products included in the test are:

Cell 1, Product code 31: Aunt Jackie's Curl La La
Cell 2, Product code 32: Jane Carter Curl Defining Crème
Cell 3, Product code 33: Aunt Jackie's Knot on My Watch
Cell 4, Product code 34: Taliah Waajid The Great Detangler

### INTERVIEWER EXPERIENCE

<u>STAFFING</u>: Each interviewer working on this study should not complete <u>fewer than 5 interviews</u> or <u>more than 10.</u>

- You will need <u>experienced</u> interviewers. Do not use any inexperienced or "new" interviewers.
- The interviewers should familiarize themselves with the stimuli before starting the interview.
- Interviewers who exhibit problems with survey administration or validation will be asked to stop working on the study and all completed interviews from the problem interviewer will be discarded.

### BRIEFING

All personnel involved in the study must attend a personal briefing. You may schedule more than one training session if necessary to accommodate the schedule of staff working at your mall (e.g., if different staff work on weekends).

At the briefing, read through the Interviewer's Instructions along with the interviewers. Read it completely while reviewing the material with the interviewers. All interviewers must do **at least one Practice Screener and one Practice Interview (including Practice Verification and Certification Pages) with another interviewer during the briefing.** The practice screeners, practice verification and certification pages are printed on gold paper.

On the questionnaire URL, select "Practice" on the first page to begin a practice interview. Only select "Live" for interviews with respondents.

**If you are the supervisor and you will conduct interviews for this study, you must also complete a practice interview and return it to MMR.**

All practice screeners and practice interviews must be monitored and reviewed by the supervisor—and have any problems cleared up—before actual interviewing begins. It is your responsibility to be sure that each interviewer completely understands:

7. How to administer the paper screener
8. How to enter the screener responses
9. How to administer the main questionnaire
10. How and when to display the product
11. How and when to fill out the verification form
12. How and when to fill out the certification page

Exhibit 4, Isaacson Expert Report

EXHIBIT K

Case 2:10-cv-02024-GBM-JRA Document 215-10 Filed 10/01/13 Page 50 of 61
Case 2:12-cv-05725-JSR Document 15-12 Filed 02/20/13 Page 49 of 60
Page ID #:6160

> **Each interviewer is to read his/her Interviewer Instructions and <u>sign them</u>. Each interviewer's signed instructions are to be stapled to his/her practice screener, practice verification page and practice certification page and returned at the end of the study.**

## DATA COLLECTION PERIOD AND INTERVIEWER QUOTAS
Interviewing will begin immediately after the training is completed and will be conducted over the next several days. Interviews should be conducted on different days and at different times of the day, with most of the interviews being conducted in the evenings or weekends. Each interviewer assigned to the project should complete a similar number of interviews with eligible survey respondents.

## SCREENING FOR ELIGIBILITY
A representative sample of female shoppers at your mall will be screened for eligibility. Interviewers should screen female adults of all ages (age 18+). Interviewers should approach and screen shoppers in a systematic manner (e.g., either every shopper or every nth one). When an interviewer approaches a group of shoppers, the interviewer should only screen and qualify <u>one</u> person in the group for the survey. If an individual has been screened for another survey being conducted at your mall, he/she is not eligible for this survey. Also, if an individual lives in the same household as another person who was interviewed for this survey, he/she is not eligible to be interviewed. If a person does not qualify during the screening process, please erase the responses and reuse the screener.

## SCREENER AND QUESTIONNAIRE ADMINISTRATION
You have been provided with screeners and two bottles/jars of each of the four products. The bottles/jars should be covered with the cloths provided when interviews are not being conducted. The interview will be conducted online by an interviewer.

The interviewer will bring the respondent into the room and will enter the screener responses into the program. The program will assign the cell. The products may be kept in the interviewing room, with the tops closed and the entire product completely covered, or the products may be kept in another room in the facility. If the product is not in the room, the interviewer will excuse him/herself, get the assigned product, and bring it into the interviewing room with the top closed and the entire product completely covered. At the beginning of the main interview, the interviewer will be instructed to uncover the product and allow the respondent to pick up the bottle or jar to examine it. **(The respondent is allowed to open the package to see or smell the product; however DO <u>NOT</u> SPECIFICALLY INSTRUCT THE RESPONDENT TO OPEN OR NOT OPEN THE PRODUCT.)**

When the respondent is finished looking at the product, the interviewer should place it on the table with the top closed and the front label facing the respondent; the respondent <u>cannot</u> pick up the product again.

Interviewer instructions are printed in **BOLD CAPITAL LETTERS** on the screening form and in the online survey. You should monitor interviewers to ensure they follow these instructions. Interviewers should <u>not</u> read words in **BOLD CAPITAL LETTERS** to the survey respondent. They should read each question in the screening form and the online questionnaire <u>exactly as written</u> and allow the survey respondent as much time as needed to answer before proceeding to the next question. Interviewers should <u>not</u> change the wording of any questions, and they ask <u>only</u> the questions included on the screening form and questionnaire. Interviewers should <u>not</u> probe for additional answers except when instructed to do so in the questionnaire (e.g., when the questionnaire instructs the interviewer to as for "Any other reasons?")

Interviewers should <u>not</u> interpret specific items or instructions in the screening form and questionnaire. If asked to do so, the interviewer should indicate that he/she does not want to bias sample member's responses in any way. The interviewer may offer to reread a question and ask the survey respondent to use his/her best judgment. If the interviewer repeats a question, he/she should repeat the entire question.

## RECORDING ANSWERS
When interviewers record survey respondents' answers to open-ended questions, they should record a survey respondent's exact words and not omit any words or part of a respondent's answer. If necessary, an interviewer may ask a respondent to repeat his/her entire answer to ensure that the answer was accurately recorded.

<u>Interviewers must not paraphrase</u> or use abbreviations when recording answers. For example, a survey respondent may say "No, nothing else" when asked the question "Any other reasons?" If this occurs, the interviewer should record the survey respondent's exact words (e.g., he/she should <u>not</u> write "nfi" in indicate no further information). Interviewers should use correct punctuation and capitalization when recording verbatim answers. However, they should <u>not</u> use parentheses when recording survey respondents' verbatim answers.

EXHIBIT K

Case 2:10-cv-02024-GBM-JRA   Document 215-10   Filed 20/01/12   Page 51 of 61
Case 2:12-cv-05735-JSR   Document 15-12   Filed 02/20/13   Page 508 of 60
Page ID #:6161

## SUPERVISION AND SUPERVISOR QUALITY CONTROL

A supervisor must be on site during all interviews and there should be ongoing monitoring throughout the study to ensure that the screening forms and questionnaires are administered according to the Interviewer Instructions and the instructions in the survey.  An on-site supervisor should review completed screening forms to ensure the following:

    a.   All screening questions were answered;
    b.   Each person who was interviewed about the bottle is eligible based on his/her answers in the screening form;
    c.   All applicable items in the screening form were asked, and the interviewer accurately and legibly recorded the respondent's answers on the survey materials;
    d.   The verification form was completed and signed;
    e.   The interviewer signed the certification form.

After the on-site supervisor has completed his/her review and ensured that the interview was conducted properly, he/she should sign the certification form.

## VERIFICATION PAGE

We must have a telephone number from each survey respondent for verification purposes, and a supervisor must verify that this is a working telephone number.  Pager numbers are not acceptable.  For quality control purposes, MMR will attempt to contact by telephone all persons who were interviewed to confirm their participation.  Email the verification pages to MMR every day.  Staple completed verification page to back of the screener.

## CERTIFICATION PAGE

At the end of the main questionnaire, the interviewer and respondent must fill out the certification page.
1. Respondent reads and signs the appropriate space
2. Interviewer reads and signs the appropriate space
3. Staple the completed certification page to the back of the screener

If the respondent refuses to sign, his/her initials are acceptable.

## DAILY REPORTING

A log of completed interviews should be e-mailed to Debbie Lesnick (dlesnick@mmrstrategy.com) daily. Also, email the verification form to Debbie every day.  The fax number is 818-464-2399.

## SHIPPING INSTRUCTIONS

Please keep all materials until instructed to return them to MMR.  Do not dispose of any unused materials.  When instructed, please send back all completed materials in the original packaging via FedEx.  We will provide you with our FedEx number.  Include all completed screeners, verification forms, certification forms, practice screeners, and product to:
Debbie Lesnick
MMR Strategy Group
16501 Ventura Blvd., Suite 601
Encino, CA 91436

## VALIDATION

You are not to phone validate, MMR will independently validate each interviewers work.

## SCHEDULE

Interviewing begins on Wednesday, January 23 and must be completed by Sunday, January 27.  We MUST complete this on Sunday.

## STUDY MANAGEMENT

This study is being managed by Debbie Lesnick at MMR Strategy Group. If there are any questions or problems please contact her directly:

**Office:  (818) 464-2404  Cell:  (818) 635-7237  Fax:    (818) 464-2399  dlesnick@mmrstrategy.com**

---

EXHIBIT K

Case 2:10-cv-02024-GBM-RNA Document 215-10 Filed 10/01/13 Page 52 of 61
Case 2:12-cv-05795-JSR Document 15-12 Filed 02/20/13 Page 3 of 60
Page ID #:6162

Study #509-003
Hair Care Study
January 2013

## SUPERVISOR BRIEFING VERIFICATION FORM

**Supervisor Name (Please Print):** _____

**Supervisor Signature:** _____

**Date of Briefing:** _____

**Company:** _____

**Location:** _____

EXHIBIT K

Case 2:10-cv-02024-GMM-PLA Document 215-10 Filed 10/01/12 Page 53 of 61
Case 1:12-cv-05795-JSR Document 15-12-10 Filed 02/26/13 Page 52 of 60
Page ID #:6163

**Exhibit 5:**
**Confusion Survey Screener and Main Questionnaire**

Case 2:10-cv-02034-GMN-RJA Document 215-10 Filed 10/01/12 Page 54 of 61
Case 1:12-cv-05795-JSR Document 5-12 Filed 02/20/13 Page 53 of 60
Page ID #:6164

MMR Strategy Group
Study #509-004
January 2013
FINAL

**RESPONDENT ID #**

Hair Care Study
Screener EV

| NOTE: Fill Out This Section After Respondent Qualifies | |
|---|---|
| Location | **Cell** |
| | Cell 1 .........................................☐ |
| | Cell 2 .........................................☐ |
| | Cell 3 .........................................☐ |
| | Cell 4 .........................................☐ |

**SIGHT SCREEN FOR AFRICAN AMERICAN/BLACK OR HISPANIC FEMALES 18 YEARS OF AGE OR OLDER**

Hello, I'm _____ on behalf of MMR, a nationwide market research organization. We're conducting a survey and I'd like to ask you a few brief questions. We are doing this for research purposes only and are not selling anything. We are only interested in your opinions.

**NOTE: DO NOT CONTINUE INTERVIEW IF RESPONDENT HAS A HEARING, LANGUAGE OR OBVIOUS VISUAL PROBLEM.**

GENDER: RECORD BY OBSERVATION

Female ☐ (CONTINUE)

Male ☐ (TERMINATE

A. Please tell me which of the following groups includes your age? (READ LIST) (RECORD ONE RESPONSE)

Under 18 years...........☐ **(TERMINATE RESPONDENT. RECORD TERMINATION & TALLY. ERASE AND RE-USE SCREENER)**

18 to 34 years ............☐ **(CONTINUE IF QUOTA NOT FILLED; OTHERWISE TERMINATE & TALLY. ERASE AND RE-USE SCREENER )**

35 to 54 years ............☐ **(CONTINUE IF QUOTA NOT FILLED; OTHERWISE TERMINATE & TALLY. ERASE AND RE-USE SCREENER )**

55 years and over ......☐ **(CONTINUE IF QUOTA NOT FILLED; OTHERWISE TERMINATE & TALLY. ERASE AND RE-USE SCREENER )**

| **Terminate Q.B: Under 18 years** | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| **Terminate Q.B: Over Quota 18 to 34 years** | | | | | | | | | | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| **Terminate Q.B: Over Quota 35 to 54 years** | | | | | | | | | | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| **Terminate Q.B: Over Quota 55 years and over** | | | | | | | | | | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

Exhibit 5, Isaacson Expert Report

Page 1

EXHIBIT K

Case 2:10-cv-02034-GBM-JSR   Document 215-10   Filed 10/01/12   Page 55 of 61
Case 1:24-cv-05795-JSR   Document 15-10   Filed 02/20/18   Page 50 of 50
Page ID #:6165

**B.** Please tell me which of the following best describes your ethnicity.  You may choose one response or more than one.  **(READ LIST)  (ALLOW MULTIPLE RESPONSES.  "DON'T KNOW" AND "PREFER NOT ANSWER" SINGLE RESPONSE )**

African American or Black..... ❑ **(CONTINUE IF QUOTA NOT FILLED; OTHERWISE TERMINATE & TALLY.  ERASE AND RE-USE SCREENER )**

Hispanic ................................ ❑ **(CONTINUE IF QUOTA NOT FILLED; OTHERWISE TERMINATE & TALLY.  ERASE AND RE-USE SCREENER )**

Caucasian or White.............. ❑ **(IF ONLY CHOICE, TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY ERASE AND RE-USE SCREENER)**

Asian ................................... ❑ **(IF ONLY CHOICE, TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY ERASE AND RE-USE SCREENER)**

Other ................................... ❑ **(IF ONLY CHOICE, TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY ERASE AND RE-USE SCREENER)**

Don't know ........................... ❑ **(TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY ERASE AND RE-USE SCREENER)**

Prefer not to answer............. ❑ **(TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY ERASE AND RE-USE SCREENER)**

**[MUST CHOOSE "AFRICAN AMERICAN OR BLACK" AND/OR "HISPANIC" IN Q.B TO CONTINUE; OTHERWISE TERMINATE & TALLY.  ERASE AND RE-USE SCREENER]**

| Terminate Q.B:  Respondent not African American or Black or Hispanic | | | | | | | | | | | | | | | | | | | |
|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

**C.** Have you participated in any surveys about hair care products during the past 3 months?  You may answer yes, no, or you don't know. **(RECORD ONE RESPONSE)**

Yes  .......................... ❑ **(TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY.  ERASE AND RE-USE SCREENER.)**

No    .......................... ❑ **(CONTINUE)**

Don't know ................. ❑ **(TERMINATE RESPONDENT.  RECORD TERMINATION & TALLY.  ERASE AND RE-USE SCREENER.)**

| Terminate Q.B:  Yes | | | | | | | | | | | | | | | | | | | |
|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| Terminate Q.B:  Don't know | | | | | | | | | | | | | | | | | | | |
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

EXHIBIT K

Case 2:10-cv-02034-GPM-JPA Document 215-10 Filed 10/01/12 Page 56 of 61
Case 4:12-cv-05735-JSR Document 15-12 Filed 02/20/13 Page 58 of 60
Page ID #:6166

D.  Which of the following types of hair care products do you use at least weekly? For each product I read, you may answer yes, I use it at least weekly; no, I do not use it at least weekly; or you don't know.  (READ LIST)  (RECORD ONE RESPONSE FOR EACH)

|  | Yes | No | Don't Know |
|---|---|---|---|
| Moisturizing shampoo | ❑ | ❑ | ❑ |
| Curl definer or curl defining crème | ❑ | ❑ | ❑ |
| Hair spray | ❑ | ❑ | ❑ |
| Leave-in hair detangler | ❑ | ❑ | ❑ |

**[MUST RESPOND YES TO "CURL DEFINING PRODUCT" OR "LEAVE-IN HAIR DETANGLER" IN Q.D TO CONTINUE; OTHERWISE TERMINATE & TALLY.  ERASE AND RE-USE SCREENER]**

| Terminate Q.D:  Respond "No" or "Don't Know" to both "Curl Defining Product" and "Leave-in Hair Detangler" | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

E.  Do you think you are likely to purchase any of the following types of hair care products in the next 90 days? You may answer yes, no, or you don't know.  (READ LIST)  (RECORD ONE RESPONSE FOR EACH)

|  | Yes | No | Don't Know |
|---|---|---|---|
| Moisturizing shampoo | ❑ | ❑ | ❑ |
| Curl definer or curl defining crème | ❑ | ❑ | ❑ |
| Hair spray | ❑ | ❑ | ❑ |
| Leave-in hair detangler | ❑ | ❑ | ❑ |

**[MUST RESPOND YES TO "CURL DEFINING PRODUCT" OR "LEAVE-IN HAIR DETANGLER" IN Q.E TO CONTINUE; OTHERWISE TERMINATE & TALLY.  ERASE AND RE-USE SCREENER]**

| Terminate Q.E:  Respond "No" or "Don't Know" to both "Curl Defining Product" and "Leave-In Hair Detangler" | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

**[MUST RESPOND YES TO "CURL DEFINING PRODUCT" IN Q. D AND Q.E AND/OR YES TO "LEAVE-IN HAIR DETANGLER" IN Q.D AND Q.E TO CONTINUE; OTHERWISE TERMINATE]**

EXHIBIT K

Case 2:10-cv-02024-GBM-JSA Document 215-10 Filed 10/01/12 Page 57 of 61
Case 2:10-cv-05755-JSR Document 15-10 Filed 02/20/13 Page 58 of 60
Page ID #:6167

F.    Do you or does anyone in your household work in any of the following industries? You may answer yes, no, or you don't know. **(READ LIST) (RECORD ONE RESPONSE FOR EACH)**

| | Yes | No | Don't Know |
|---|---|---|---|
| 1. Advertising or public relations | ❑ | ❑ | ❑ |
| 2. Marketing research | ❑ | ❑ | ❑ |
| 3. A company that produces or distributes hair care products | ❑ | ❑ | ❑ |

**[MUST RESPOND NO TO F1, F2, AND F3 TO CONTINUE; OTHERWISE, TERMINATE & TALLY. ERASE AND RE-USE SCREENER.]**

| Terminate Q.F: Security screen F1 or F2 or F3 "Yes" or "Don't Know" | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

G.    Do you usually wear eyeglasses or contact lenses when you shop? **(RECORD BELOW)**

Yes ............................❑ **(CONTINUE TO Q.H)**

No...............................❑ **(SKIP TO Q.I)**

H.    Are you wearing your contact lenses or do you have your eyeglasses with you today? **(RECORD BELOW)**

Yes ............................❑ **(CONTINUE TO Q.I)**

No...............................❑ **(TERMINATE RESPONDENT. RECORD TERMINATION & TALLY. ERASE AND RE-USE SCREENER.)**

| Terminate Q.H: No | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

I.    I've asked you these questions to see if you are eligible for a very brief interview. Since I have something to show you, I'd like you to come with me into the interviewing facility. It will only take about 10 minutes of your time and I think you will find it interesting. For your time, we will give you $ ___ upon completing the survey. Will you participate in this survey? **(RECORD BELOW)**

Yes ............................❑ **(CONTINUE)**

No...............................❑ **(TERMINATE RESPONDENT. RECORD TERMINATION & TALLY. ERASE AND RE-USE SCREENER.)**

| Terminate Q.I: No | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 |

**END OF SCREENER. ESCORT RESPONDENT TO INTERVIEWING AREA**

**[IF "YES" TO "CURL DEFINER" IN Q.D AND Q.E RANDOMLY ASSIGN RESPONDENT TO CELL 1 OR CELL 2 AS NEEDED FOR QUOTA.**

**IF "YES" TO "LEAVE-IN HAIR DETANGLER" IN Q.D AND Q.E RANDOMLY ASSIGN RESPONDENT TO CELL 3 OR CELL 4 AS NEEDED FOR QUOTA.**

**IF "YES" TO BOTH "CURL DEFINER" AND "LEAVE-IN HAIR DETANGLER" IN Q.D AND Q.E RANDOMLY ASSIGN RESPONDENT TO CELL 1, 2, 3, OR 4 AS NEEDED FOR QUOTA.]**

Exhibit 5, Isaacson Expert Report                        Page 4

Case 2:10-cv-02024-GBM-RNA Document 215-10 Filed 10/01/12 Page 58 of 61
Case 4:12-cv-05735-JSR Document 15-12 Filed 02/26/18 Page 57 of 60
Page ID #:6168

## Verification Information

Q.103  Would you please tell me what your telephone number is?  A supervisor will call you in the next week or so to verify that you participated in this interview and that you received your $___.  Other than that, nobody will contact you.

a.  Telephone number?  Home  (_____) _____

Cell  (_____) _____

b.  And your name?  _____
                                         **First Name**        **Last Name**

c.  And the city and state where you live?  _____
                                           **City**             **State**

d.  The best time for a supervisor to reach you?  _____
                                         **Best Time**

e.  Respondent signature:  _____

f.  Those are all my questions.  Thank you very much.

**RESPONDENT ID #** _____

EXHIBIT K

Case 2:10-cv-02024-GBM-RJA Document 215-10 Filed 10/01/12 Page 59 of 61
Case 1:24-cv-05795-JSR Document 15-12 Filed 02/26/18 Page 58 of 60
Page ID #:6169

# Certification Page

**At the completion of the interview, the interviewer must complete Q.104 to Q.105 below.**

Q.104  Record Date of Interview: _____

Q.105  I hereby certify that the information contained in this questionnaire is a true and accurate record of this respondent's comments as they were given to me.

| _____ | _____ | _____ |
|---|---|---|
| **Interviewer Name** | **Interviewer Signature** | **Date** |

**Now hand the completed screener and verification page to your on-site supervisor to inspect the documents and complete Q.106 below.**

## ON-SITE SUPERVISOR:

Q.106  I hereby certify that I have:

    a.  Reviewed the screener for completeness ...................................................................... ❑

    b.  Checked the respondent's ID for age............................................................................ ❑

    c.  Checked the verification page for completeness............................................................ ❑

    d.  Handed the respondent a $__ token of appreciation ...................................................... ❑

    e.  Had the respondent sign the certification page ............................................................ ❑

    f.  Ensured that the interviewer has filled out and signed Q.104-Q.105.................................. ❑

    g.  Ensured that the product was correct........................................................................... ❑

    h.  Checked that the screener is attached to the verification and certification pages ................. ❑

| _____ | _____ | _____ |
|---|---|---|
| **Supervisor Name** | **Supervisor Signature** | **Date** |

## RESPONDENT:

Q.107  **Please Read and Sign**

I acknowledge that I was interviewed on the date. During this interview, I was shown a hair care product and asked some questions. The answers I have given are truthful expressions of my opinions.

| **#** | _____ | _____ |
|---|---|---|
| **Respondent Id #** | **Respondent Signature** | **Date** |

EXHIBIT K

Case 2:10-cv-02034-CBM-RNA Document 215-10 Filed 10/01/12 Page 60 of 61
Case 4:12-cv-05758-JSR Document 15-12 Filed 02/26/13 Page 59 of 60
Page ID #:6170

MMR Strategy Group
Study #509-004
January 2013
Final

Hair Care Study
Main Questionnaire

Respondent ID #

| Location: | ID # | Cells and Products |
|---|---|---|
| Philadelphia, PA | 51 | Cell 1 ..........................................☐ |
| New York (Brooklyn), NY | 52 | Cell 2 ..........................................☐ |
| Chicago (Aurora), IL | 53 | Cell 3 ..........................................☐ |
| St. Louis, MO | 54 | Cell 4 ..........................................☐ |
| Washington DC (Fredericksburg) | 55 | |
| Spartanburg, SC | 56 | |
| Atlanta, GA | 57 | |
| Dallas, TX | 58 | |
| Charlotte (Gastonia), NC | 59 | |
| Tallahassee, FL | 60 | |
| Houston, TX | 61 | |
| Los Angeles (Palmdale), CA | 62 | |
| San Francisco (Hayward), CA | 63 | |

(GO TO ROOM WHERE THE PRODUCT IS ALREADY DISPLAYED. MAKE SURE THE PRODUCT MATCHES THE CELL ASSIGNED. NO OTHER PRODUCTS SHOULD BE VISIBLE IN THIS ROOM. READ TO RESPONDENT:)

For each of my questions, if you don't know or don't have an answer, please don't guess. Just tell me you "don't know" or "don't have an answer" and we'll go on to the next question.

WHEN READY CONTINUE WITH Q.1A.

Q.1A    Here is a product that you may or may not have seen before. You may hold and examine it, just as you would if you were at a retail location thinking of buying a product similar to this. Take as much time as you would normally when buying such a product.

Q.1B    Please look at the bottom of the bottle.  What number is on the bottom of the bottle?

Cell 1:  31    ☐

Cell 2:  32    ☐

Cell 3:  33    ☐

Cell 4:  34    ☐

(IF NUMBER DOES NOT MATCH ASSIGNED CELL, TERMINATE AT Q.100.)

(AFTER RESPONDENT FINISHES EXAMINING THE PRODUCT, PLACE PRODUCT ON TABLE WITH THE TOP CLOSED AND THE FRONT OF THE BOTTLE FACING THE RESPONDENT.  DO NOT ALLOW RESPONDENT TO HANDLE THE PRODUCT FOR THE REST OF THE INTERVIEW.)

Exhibit 5, Isaacson Expert Report

EXHIBIT K

Case 2:10-cv-02034-GPM-PMF Document 215-10 Filed 10/01/12 Page 61 of 61
Case 1:21-cv-05775-JSR Document 15-12 Filed 02/28/13 Page 61 of 60
Page ID #:6171

**Q.2** Who do you think makes or puts out this product? **(RECORD VERBATIM RESPONSE. CONFIRM SPELLING IF NECESSARY.)**

> [blank box]

**Q.3** What makes you think that? **(PROBE)** Anything else? **(RECORD VERBATIM RESPONSE)**

> [blank box]

**Q.4** Are you aware of any other products or brands put out by the company or person who makes or puts out this product? You may answer… **(READ ANSWER CHOICES SLOWLY, RECORD ONE RESPONSE BELOW)**

**[ROTATE ANSWER YES/NO CHOICES BELOW WITH DON'T KNOW ALWAYS LAST:]**

| | | |
|---|---|---|
| Yes, | ❑ | **(ASK Q.5 AND Q.6)** |
| No | ❑ | **(SKIP TO Q.7)** |
| Or, you don't know or have no opinion | ❑ | **(SKIP TO Q.7)** |

**Q.5** What other products or brands do you think are put out by the company or person who makes this product? **(PROBE)** Any others? **(RECORD VERBATIM RESPONSE)**

> [blank box]

**Q.6** What makes you think that? **(PROBE)** Anything else? **(RECORD VERBATIM RESPONSE)**

> [blank box]

**Q.7** Do you think that whoever makes or puts out this product… **(READ ANSWER CHOICES SLOWLY, RECORD ONE RESPONSE BELOW)**

**[ROTATE ANSWER "IS"/"IS NOT" CHOICES, WITH DON'T KNOW ALWAYS LAST.]**

| | | |
|---|---|---|
| <u>Is</u> sponsored or approved by another company or person, | ❑ | **(ASK Q.8 AND Q.9)** |
| <u>Is not</u> sponsored or approved by another company or person, | ❑ | **(SKIP TO Q.10)** |
| Or, you don't know or have no opinion | ❑ | **(SKIP TO Q.10)** |

**Q.8** What other company or person do you believe sponsored or approved whoever makes the product I showed you? **(RECORD RESPONSE VERBATIM. CONFIRM SPELLING IF NECESSARY)**

> [blank box]

EXHIBIT K