UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

HONORABLE CONSUELO B. MARSHALL, U.S. DISTRICT JUDGE

GLOBEFILL, INCORPORATED,          )
                                  )
                    PLAINTIFF,    )
                                  )
          vs.                     ) No. CV 10-2034-CBM
                                  )
ELEMENTS SPIRITS, INC., ET AL., )
                                  )
                    DEFENDANTS.   )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

LOS ANGELES, CALIFORNIA

TUESDAY, JUNE 13, 2017

10:05 A.M.

_____

*SANDRA MacNEIL, CSR 9013, RPR, CRR, RMR*
*Official Court Reporter, U.S. District Court*
*255 East Temple Street, Room 181-F*
*Los Angeles, CA  90012*
*213.894.5949*

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                    APPEARANCES OF COUNSEL

 2

 3    FOR PLAINTIFF, GLOBEFILL INCORPORATED:

 4                    BERG AND ANDROPHY
                      BY:  MICHAEL M. FAY, ATTORNEY AT LAW
 5                         JENNY H. KIM, ATTORNEY AT LAW
                      120 WEST 45TH STREET
 6                    38TH FLOOR, TOWER 45
                      NEW YORK, NEW YORK  10036
 7                    646.766.0073

 8                    BIRD MARELLA BOXER WOLPERT NESSIM
                      DROOKS LINCENBERG RHOW, PC
 9                    BY:  HERNAN D. VERA, ATTORNEY AT LAW
                      1875 CENTURY PARK EAST
10                    23RD FLOOR
                      LOS ANGELES, CALIFORNIA  90067-2561
11                    310.201.2100

12

13    FOR DEFENDANT, ELEMENTS SPIRITS, INC.:

14                    CRAVATH SWAINE AND MOORE, LLP
                      BY:  THOMAS G. RAFFERTY, ATTORNEY AT LAW
15                    ONE WORLDWIDE PLAZA
                      825 EIGHTH AVENUE
16                    NEW YORK, NEW YORK  10019
                      212.474.1000
17

18    FOR DEFENDANT, KIM BRANDI:

19                    MILLER JOHNSON LAW OFFICES
                      BY:  JON B. MILLER, ATTORNEY AT LAW
20                    427 C STREET
                      SUITE 410
21                    SAN DIEGO, CALIFORNIA  92101
                      619.232.0086
22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1              LOS ANGELES, CALIFORNIA; TUESDAY, JUNE 13, 2017

2                           10:05 A.M.

3                           - - - -

4

5         THE CLERK:  Item No. 1, civil case 10-2034, Globefill,

6    Incorporated versus Elements Spirits.

7         Counsel, state your appearance at the lectern, please.

8         MR. FAY:  Your Honor, Michael Fay for the plaintiff,

9    Globefill.  I have with me Jenny Kim and Hernan Vera as well.

10        THE COURT:  Good morning.

11        MR. VERA:  Good morning, Your Honor.

12        MS. KIM:  Good morning.

13        MR. MILLER:  Good morning, Your Honor.  Jon Miller for

14   defendant Kim Brandi.

15        THE COURT:  Good morning.

16        MR. RAFFERTY:  Good morning, Your Honor.  Tom Rafferty

17   on behalf of Elements.

18        THE COURT:  Good morning.

19        The matter before the Court today, we're treating this as

20   a motion for an order of disgorgement of profits, attorney's

21   fees and costs, and also plaintiff's request for a permanent

22   injunction.

23        I do recall that when we were here last, there was some

24   discussion about a trial, a bench trial, on the disgorgement of

25   profits.  But we have not treated this as a trial, so I don't

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    know what you intended, whether you were thinking that this

2    would be a hearing where testimony would be offered and should

3    be treated as a trial, or whether you intended it to be only a

4    motion.  So after we parted the last time, suddenly things just

5    started being filed.  So the calendar treats it as plaintiff's

6    motion for an order for disgorgement of profits and plaintiff's

7    request for a permanent injunction.

8         So the papers that have been filed have been read.  The

9    exhibits that were attached have been reviewed.  I think I

10   issued a minute order indicating that the parties should bring

11   certain things with them today, because I have questions about

12   those things, but the first -- my first concern was whether the

13   parties expected to submit on the papers and evidence offered

14   in support thereof in the request for disgorgement of profits

15   and the request for permanent injunction.

16        MR. FAY:  Yes, Your Honor, that's the intent of the

17   plaintiffs, Globefill.

18        THE COURT:  Okay.

19        And the defendants also expected the same, that this would

20   be a hearing, like a hearing on a motion as opposed to

21   presentation of evidence?

22        MR. RAFFERTY:  At least Elements did, Your Honor.

23        THE COURT:  Okay.

24        MR. MILLER:  Yes, Your Honor.

25        THE COURT:  Then I'm going to start first with the

```
 1   permanent injunction, and I have some questions about that, and
 2   then we'll go to the disgorgement of profits.
 3        So for the permanent injunction, I don't believe that the
 4   parties have actually addressed some of the factors that the
 5   Court -- on which the Court would be required to make findings.
 6   So if you think otherwise, then you can identify for me where
 7   this was addressed if it's supported by evidence and you can
 8   identify the exhibits.  If you are referring to things that may
 9   have been received into evidence during the trial or arguments
10   made during the trial, then you may identify that for the
11   Court, too.  So those factors are:  The Court must find
12   irreparable injury; the Court must also find availabilities of
13   remedies at law are inadequate to compensate for the injury;
14   the Court must do a balancing of the hardships; and the Court
15   must address the public interest.  Now, these are findings that
16   the Court would typically make before the Court issued a
17   permanent injunction, but I don't believe that the parties have
18   addressed these in their papers, so that would be my starting
19   place.
20        And plaintiff's counsel is standing at the lectern, so why
21   don't I permit you to be heard first, and then I'll let the
22   defendants address this.
23        MR. FAY:  Yes, Your Honor.  Thank you.
24        As to the issue of irreparable injury, Your Honor, I
25   think the full transcript of the trial here demonstrates that.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    The ability to prove damages from the intentional copying

2    of the Crystal Head Vodka bottle is exceedingly difficult,

3    and the Ninth Circuit has recognized that that's the case.

4    Nonetheless, the testimony of Globefill's witness showed that

5    it had a significant impact on our ability to operate as a

6    business, that distributors and retailers were confused about

7    the bottles.  We showed through the testimony of our expert,

8    Dr. Isaacson, that there was substantial likelihood of

9    confusion.  And yet trying to prove actual damages is

10   difficult.  How do you show, every time a bottle of KAH Tequila

11   is sold, what is the monetary impact on a small company like

12   Globefill?  It's not easy to do, and you're not required to do

13   it.  So the only relief that Globefill can have here is the

14   relief of telling KAH Tequila to stop, telling them to stop

15   selling a product that they intentionally copied from our

16   product.

17       We can't -- the standard for lost profits is reasonable

18   certainty.  In these types of situations, reasonable certainty

19   is exceedingly difficult.  And again, Globefill's not some sort

20   of billion-dollar company.  It's a small company with a single

21   product.  Trying to put together some sort of econometric model

22   to show lost sales based on KAH Tequila, it's just not

23   possible.  But, at the same time, the jury found infringement,

24   and it found willful infringement, and the witnesses who

25   testified for Globefill talked about the difficulties they have

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    in the marketplace dealing with a product that is a quick

2    follow on their product, a product which, it appears,

3    substantially similar to their product, that people think is an

4    extension of their product, that confuses consumers in the

5    alcohol beverage industry.

6        The only way to give Globefill any relief for this willful

7    infringement is to enjoin further conduct.  Stop -- tell

8    Elements, No, you're not allowed to license, assign.  Whatever

9    you're doing with this willfully infringing product, stop.

10   Otherwise, there is no relief.  Otherwise, we can't.  We

11   didn't -- as Your Honor knows, there is no damage case in

12   this -- at trial, because it's impossible to show.

13       All right.  That goes to the question of whether there

14   would be an adequate remedy at law, what would it be.  There is

15   no adequate remedy at law here.  You can't make us whole.

16   Furthermore, the Ninth Circuit tells us in the *Playboy* decision

17   that you're supposed to take away all the economic incentive

18   here.  You're supposed to render the situation neutral.

19   Elements should not be able to retain any benefit of its

20   intentional copying of our product.  Well, let's say Your Honor

21   decided to simply grant us disgorgement.  They would have a

22   huge economic incentive remaining:  Just keep selling the

23   product.  So I don't get to keep my profits for the last seven

24   years, but I get all the profits in the future.  I mean, that's

25   not an adequate remedy at law.  You can't help us here by

1     simply giving us disgorgement of past profits.  We need both.

2     If you want to abide by the Ninth Circuit's directives in

3     *Playboy*, we need both.  Take away the economic benefit from the

4     past and stop the economic benefit in the future.

5          Weighing the equities.  We have a defendant that took our

6     bottle, made a cast of it, and then made their bottle.  Tweaked

7     it a little bit.  And as the one case that we cite in our

8     papers, from New Jersey, says it would be stupid for them not

9     to tweak it a little bit.  The whole purpose of intentional

10    copying is, Let's intentionally copy enough to fool the

11    consumer but make enough tweaks to potentially fool the

12    judicial system.  That's exactly what they did, right?  So

13    that's on one side.  On the other side is this small company,

14    one product, that -- Your Honor heard it, all the efforts, all

15    the efforts that Globefill employees went through to market

16    this product, the launch here in California, the bus trips to

17    all those cities, Dan Aykroyd signing 100,000 bottles.  This

18    is, you know, American entrepreneurship at its best.  This is a

19    company that came up with an idea, developed a product, and

20    went out there and sold it, in good faith.  And then someone

21    comes along and intentionally copies it.  The balance of the

22    equ- -- I would submit, Your Honor, there are no equities on

23    Elements' side.  All the equities are on Globefill's side.

24         This is exactly what the Lanham Act is intended to stop,

25    to stop this kind of conduct, this kind of unfair competition,

1  where a party comes in and says, Look, this beverage alcohol

2  product, this skull-shaped vodka bottle, it is doing well, it's

3  getting a lot of press, people seem to like it, let's do a

4  quick follow, let's make one exactly like it, we'll tweak it a

5  little, fill it with tequila, we don't have to market.  There

6  was no evidence that KAH Tequila was marketed at all.  They

7  didn't have to.  We did all the work for them.  They quickly

8  follow us into the marketplace.  If the Lanham Act doesn't stop

9  this, then it's a hollow statute.

10      So there is absolutely irreparable injury here.  There's

11  no adequate remedy at law, and the balance of the equities are

12  vastly in favor of Globefill.

13          THE COURT:  Okay.  Thank you.

14      Defendants wish to be heard on the factors, the four

15  factors for which the Court must make findings to support the

16  issuance of a permanent injunction?

17          MR. RAFFERTY:  Your Honor, just briefly.  Tom Rafferty

18  on behalf of Elements.

19      I don't know whether Mr. Miller will rise for Ms. Brandi,

20  but from Elements' perspective, this is sort of an interesting

21  place that the plaintiff has put themselves in.  This case,

22  when it was originally filed before Your Honor, had a request

23  for damages.  Plaintiff then never took any steps to prove up

24  any damages.  Plaintiff didn't ask for a jury instruction

25  seeking damages, and in fact, it's probably because the

1    plaintiff knew full well that they had suffered no damages,

2    that the -- you know, if you look back at -- Mr. Fay mentioned

3    Dr. Isaacson.  Dr. Isaacson's testimony at trial was that he

4    had done the Eveready study, the gold standard of confusion

5    studies, and it had shown no confusion, so he went off and did

6    some different study.  So this is an odd position, because our

7    principal objections, as Your Honor is aware, to the injunctive

8    relief sort, had to do with the scope of the injunction and the

9    specificity.  And I can address those when Your Honor wants to

10   hear it, but on the irreparable injury here, they didn't try to

11   prove that they were injured, so how is their injury

12   irreparable?  They didn't bother.  They could have asked for a

13   jury instruction.  They could have put on a case that said,

14   Here are the sales that we've lost.  Instead, what they relied

15   upon was a request for equitable relief, for disgorgement of

16   Elements' profits, not a recovery of lost profits by Globefill.

17       And that sort of ties into the availability of remedies as

18   well.  I mean, we, Elements, have submitted to the Court a form

19   of injunction that we'd be prepared to live with pending an

20   appeal, and that injunction would prevent any sales of tequila

21   in KAH calavera bottles in the United States permanently, if it

22   stayed in place, and our view -- by the way, there have been no

23   imports of KAH Tequila into the United States since the trial,

24   and there won't be.  We're not gonna do that.  Elements is

25   committed to going through the process without creating any

1   additional damage.  So the availability of remedies here, this

2   is -- I was puzzled throughout the trial by their -- they talk

3   sometimes about what the kind of 60,000-foot perspective was on

4   how they'd been injured, but they made no effort to prove it

5   up, and they made no effort to submit it to the jury, and no

6   one prevented them doing that except themselves.

7       On the balancing of the hardships, Your Honor, just for

8   point of personal privilege, I got involved in these cases back

9   in November of last year, and my first involvement was to go

10  before Judge Pregerson on a summary judgment motion in the

11  Iconic case.  So I knew very little.  What I learned, I learned

12  from reading the record of the first trial before Your Honor,

13  reading the discovery materials in the Iconic case and in this

14  case, and the one thing that struck me was that the -- we

15  tried, when we came into this, to say to prior counsel, Baker

16  and Hostetler, Do you want to have some additional open

17  discovery?  We'd like to take some more discovery.  There was

18  no willingness on their part to do that.  There were a handful

19  of other depositions that were taken after Mr. Berg and Mr. Fay

20  came into the case.  So we were basically living on a frozen

21  record.  If we had to go back and look at this again -- Mr. Fay

22  said, Well, you know, if you copy the bottle and you make some

23  tweaks in it -- well, that's not the *Sleekcraft* test, Your

24  Honor.  The *Sleekcraft* test says they have to be similar.  They

25  have to be likely to cause confusion.  You can look at somebody

1    else's product and take it and tweak it, and if it doesn't

2    cause confusion, it's not a violation of the Lanham Act.  We're

3    past that.  But that's where we start from, and so I -- you

4    know, in the balancing of the hardships here, I'm not sure how

5    they declare that the balancing of the hardships are entirely

6    in their favor.  They say now they're a small company and --

7    Elements is a teeny, tiny company, Your Honor.  It has nothing

8    at this juncture.

9         And finally, on the public interest front, Your Honor, I

10   think the public interest issue can't be separated from the

11   issue of the extraterritoriality of the injunction that

12   defendant -- that the plaintiffs are proposing and that

13   defendants object to.  And I could deal with that, or I could

14   wait until Your Honor has questions on it.

15             THE COURT:  All right.  No, that's fine.

16             MR. RAFFERTY:  Thank you, Your Honor.

17             THE COURT:  Brandi's counsel wish to place anything on

18   the record concerning the findings that the Court must make in

19   order to issue the injunction?

20             MR. MILLER:  No, Your Honor.

21             THE COURT:  Okay.

22        Plaintiffs wish to respond?

23             MR. FAY:  Yes.  Just very briefly, Your Honor.

24        The public interest here is written into the Lanham Act

25   and the thousands of cases that have interpreted it.  You're

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    not allowed to copy somebody's trademark and go out into the

2    marketplace and try to make money from it.  And the fact that

3    we can't put a reasonably certain number on the damage you did

4    is not material.  The Lanham Act stands for that proposition.

5    What about the small guy on the corner with the brand-new

6    product, now all of a sudden someone across the street is

7    selling it.  What, he has to wait?  He has to wait five years

8    until he can actually come up with some kind of, like,

9    reasonably certain model of his damages?  No.  He can go to

10   court and stop it.

11       There was a request for damages in the beginning of this

12   case, and counsel looked at that issue and said this -- we

13   cannot prove this issue.  We can't show in a dollar amount what

14   it is they've done to us.  But what we can show is they've hurt

15   us.  We can show that they're using our product, they're

16   confusing people.  We met the *Sleekcraft* factors.  The jury

17   found likelihood of confusion.  That's it.  That's all we had

18   to show.  We didn't have to tag on a dollar amount to that.

19       Jonathan Hemi, in his testimony, said -- testified this

20   has had a significant impact on us; it's had a significant

21   impact on our relationship with our distributors and retailers,

22   confusion in the marketplace.  Globefill had evidence about the

23   confusion on the Internet about the product.  These are the

24   things that the Lanham Act is meant to prevent.  There's your

25   public interest.  If there's no injunction here, why would

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   anyone not just go out and immediately copy a trademark?

2   Particularly in a situation where it might be difficult to put

3   together a damage model, it might be difficult to show lost

4   sales.  Why not just go out and do it?  Once again, what did

5   the Ninth Circuit tell us in *Playboy*?  Get rid of all the

6   economic incentive.  That won't happen here unless an

7   injunction issues.  If an injunction doesn't issue here, they

8   will have plenty of economic incentive to go forward.  And then

9   what?  What does Globefill do?  We have to wait until some

10  point in the future where the damages to our product are

11  definitive enough that it can actually be presented to the

12  jury?  That's not required by the Lanham Act.

13          Thank you, Your Honor.

14          THE COURT:  My next questions will be based on the

15  proposed injunctions that the parties provided and whether or

16  not, if the Court in fact does issue a permanent injunction,

17  the proposed injunction is the one that you are requesting.  I

18  raise that because I think the plaintiff, in briefing this, has

19  taken a different position on some of these issues than what

20  was actually in the injunction itself.  So for that reason, I

21  asked you to bring the injunctions with you, and so I have

22  plaintiff's injunction before me now.

23          So my first question of the plaintiff's counsel would be,

24  is this the injunction you're requesting the Court to issue, or

25  are you requesting a modification, different language?  And if

1  so, what changes should be made?

2       MR. FAY:  The only language that we suggested could be

3  changed to be in line with both the Lanham Act and with case

4  law, Your Honor, is in Section 1b.  The defendants have --

5  defendant Elements, to be specific, have --

6       THE COURT:  Excuse me.  You're referring to 1b, so

7  that's on page 2 of your proposed injunction.

8       MR. FAY:  Correct.  Correct, Your Honor.

9       THE COURT:  All right.

10       MR. FAY:  And you'll see there's a sentence -- under

11  what's being precluded, it says manufacturing, distributing,

12  marketing, selling, or offering for sale any goods which are

13  packaged in a trade dress that is similar.  And the defendants

14  have objected to that word, "similar," saying it's too broad.

15  Of course, counsel just referred to the *Sleekcraft* factors as

16  requiring a showing that two products are similar, so, you

17  know, but nonetheless, if it would make things a little better,

18  what we have suggested in our papers is that could be changed

19  to substantially similar or a colorable limitation.  The phrase

20  "colorable limitation" is actually in the Lanham Act, so I

21  can't imagine that the defendants would have a problem with

22  that.  So that's the only place where we've suggested that

23  maybe there could be some new language.  That phrase,

24  "colorable limitation," is actually in Section 1114(1)(a).

25  Otherwise, this is -- this is the injunction that we would

1    propose.

2        I'm certainly willing to discuss, you know, the various

3    issues that defendants have raised as to other parts of the

4    injunction if you would like, Your Honor.

5        THE COURT:  Not at this point, but let me ask some

6    additional questions.

7        MR. FAY:  Okay.

8        THE COURT:  So I'm not sure what plaintiff's position

9    is on whether or not defendants should be permitted a period of

10   time to sell off its goods.  So this expression, "sell off," is

11   used in the papers by both the defendants and by the plaintiff,

12   so the Court is assuming that plaintiff believes that that

13   should be one of the alternatives, that defendants be given an

14   opportunity to sell that property that has been determined to

15   be infringing.

16       What is plaintiff's position on that?

17       MR. FAY:  Yes.  I mean, we have a 60-day period for

18   them to sell off or to do whatever they need to do to be in

19   compliance.  They have suggested a nine-month period.

20       THE COURT:  And not focusing so much on how much time,

21   but what did plaintiffs envision that the defendants would do

22   if the Court includes that language in the injunction,

23   "sell off"?

24       MR. FAY:  Yeah.  Well, if you read defendants' last

25   set of papers and if you go back to the trial, honestly, it --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    there really isn't a sell-off concept here.  The way -- in the

2    United States.  The way that the alcohol beverage industry

3    works in the United States is, everything's sold.  So the

4    minute a bottle of KAH Tequila comes into the United States,

5    although I do believe it's an affiliate of Elements that

6    imports the bottle, but if it's sold to an independent

7    distributor or if it's sold to an independent retailer, that

8    independent distributor and that independent retailer owns that

9    bottle.  And we're not trying to enjoin those people, and they

10   obviously have the right to sell off their product.  If it's an

11   independent, not affiliated with distributor or retailer, we're

12   not trying to reach them.  We're only trying to reach Elements

13   and its affiliates.  Therefore, honestly -- counsel just said

14   that there's been no imports of KAH Tequila into the

15   United States.  I don't even know what kind of sell-off issue

16   there would be, then, other than with respect to foreign sales

17   there might be some sell-off issues.  In the United States, I

18   don't even see how there is a sell-off issue.  There may be --

19   because other countries have different ways of doing it.  There

20   may be affiliates of Elements and FINOS and SPI and Amber who

21   have KAH Tequila on their shelves somewhere in other countries,

22   and they should be granted like a short, short sell-off period.

23          THE COURT:  So when plaintiffs make reference to

24   "sell off," you were referring to selling the product in other

25   countries, the product that's already in other countries, that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   they be given an opportunity to sell that?

2          MR. FAY:  Actually what we said, Your Honor, is they

3   should be given an opportun- -- some period of time, we said 60

4   days, to comply with the permanent injunction.  And if that

5   included some amount of selling off, so be it.  I mean,

6   honestly, I doubt there's any selling off that needs to be

7   done.  I think it really comes down to how much time should the

8   defendants have to get into compliance with this permanent

9   injunction.  I don't see any sell-off concept here.  I really

10  don't.  This isn't a situation where you have a retailer --

11         THE COURT:  Why did plaintiffs even use that language?

12  That's --

13         MR. FAY:  We did --

14         THE COURT:  -- why I'm asking.

15         MR. FAY:  Yeah, we did use that language.

16         THE COURT:  As you briefed it -- you didn't include it

17  in your proposed injunction, but as you briefed the issues, and

18  the Court reviews the briefs going back and forth between the

19  parties, it does appear that the plaintiffs were also agreeing

20  that there should be some period of time for sell-off.  So the

21  mere fact that you use that reference, what is it that you had

22  in mind that the defendants would do during this period?

23         MR. FAY:  The only thing we had in mind, Your Honor,

24  is that they would get into compliance with the permanent

25  injunction.  That's the only thing.  Honestly, we don't -- and

1    I think in our papers we said we don't even understand what

2    they're selling off, but -- but just some period of time to get

3    into compliance with the permanent injunction.

4           THE COURT:  All right.  So I'd like to hear from the

5    defendants, then.

6      So if we look at the defendants' injunction, or proposed

7    injunction, defendants do reference -- and I'm looking now at

8    page 3, or really it's labeled page 2 of your injunction, and

9    it's in Section 4, and it makes reference to a certain amount

10   of time that you have to sell off.  So maybe defense counsel

11   could explain to the Court, what is that process?  What did you

12   have in mind doing?  I'm not focusing so much on how much time

13   you should have to do it, but what is it that you're doing?

14          MR. RAFFERTY:  Well, Your Honor, it's a two-pronged

15   problem, which Mr. Fay may have solved one of the prongs at the

16   podium.  There are -- apparently there is some KAH Tequila in

17   the bottles that's in inventory, it's warehoused, in the

18   United States, that predates the trial, that hasn't yet

19   switched hands, and then there are -- there's KAH Tequila

20   that's been sold off to distributors and retailers.  Mr. Fay I

21   think said pretty clearly that they don't anticipate that any

22   injunction the Court might enter would reach the retailers or

23   distributors who are currently in possession of KAH Tequila in

24   the bottles that the jury found to be infringing.  So our --

25   that was -- so one step was, we wanted some time for those

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    people to sell off where they didn't have a threat hanging over

2    their head that they could be hauled into court.

3              THE COURT:  "Those people," you mean --

4              MR. RAFFERTY:  Distributors and retailers.

5              THE COURT:  And retailers.  And I'm focusing more on

6    just Elements and Brandi, the defendants in this case.

7              MR. RAFFERTY:  Okay.  And that's the part two,

8    Your Honor.  So whatever other inventory there is that is still

9    under the control of Elements, we had proposed a three-month

10   period where we could just remove that from the marketplace,

11   take it out of the country.  The tequila is still good tequila.

12   We know we can't sell the bottles back into the United States

13   in that form, but we might do something else with the tequila.

14   And, you know, throughout the trial Globefill took great glee

15   through its witnesses in saying that they had no problem if we

16   marketed something else other than an alcoholic beverage in the

17   calavera bottles, so there's no good reason just to destroy the

18   bottles.  So our proposal in paragraph 3 of our order was to be

19   able to remove anything that was in Elements' possession,

20   custody or control in the United States, from the

21   United States, and then provide them with whatever assurance

22   they need that that's been done.  And then we had another

23   period that dealt with the sell-off by third parties, but I

24   think that's off the table now, so we don't have to worry about

25   it.

1      THE COURT:  So your reference to "sell off," you were

2  referring to third parties who may have the product?

3      MR. RAFFERTY:  Yes.  We're perfectly happy to remove

4  the product from the United States.

5      THE COURT:  So you were not referring to the

6  defendants in this case having some time period where they

7  could sell the product that's in your custody.

8      MR. RAFFERTY:  Well, we did have a two-step process,

9  Your Honor, where we could sell whatever we could sell in the

10  six months, which appears to be the kind of normal period of

11  time, the stuff that's already here, and whatever couldn't be

12  sold, we'd have to get out at the end.

13      THE COURT:  And to whom would you be selling it?

14      MR. RAFFERTY:  Well, to distributors and retailers.

15  To distributors who then sell them further on to retailers.

16      THE COURT:  In the United States.

17      MR. RAFFERTY:  In the United States.  But presumably,

18  if the Court opposed that, we'd be prepared to, to the extent

19  we're able, to remove that inventory from the United States

20  market.

21      THE COURT:  So counsel made reference to maybe there's

22  product in storage, and so those are some questions that the

23  Court wants to ask as well, because I don't know and

24  understand.  Do you have product in warehouses in the

25  United States?  And if so, what's the amount of product and how

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   many warehouses in various states within the United States?  So
 2   this is important to the Court as we look at how much time
 3   should you have to do whatever it is you're going to be doing.
 4   So I don't really have an understanding, and I don't think that
 5   we have any testimony in this record as to product, where it
 6   is, if it's in storage, where in the United States, one
 7   location, several locations, and even the volume of product.
 8          MR. RAFFERTY:  Well, Your Honor, I'm now gonna be
 9   dealing in third-level hearsay.
10          THE COURT:  Okay.  So your answer maybe to my question
11   is, you don't believe you've given the Court any evidence of
12   that, and maybe you don't really have that information at this
13   point.
14          MR. RAFFERTY:  Right.  My current understanding is
15   that it's a single location and that it's a relatively
16   substantial quantity of cases, but I also understand, from a
17   call I had, that that could be removed from the United States
18   if that were the alternative.  I mean, we're not inclined to
19   break the bottles and let the tequila run down the drain.
20          THE COURT:  And you're correct, the Court understands
21   that during the trial there was testimony that the plaintiffs
22   didn't object to the bottles being used if they contained
23   something else, not an alcoholic beverage.  So one thought may
24   be that the bottles wouldn't be destroyed, but the content of
25   the bottles would be removed from the bottles.  So maybe
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    counsel can address, what would that process be?  What do you

2    have in mind what you would do?  If you're not destroying the

3    bottles, you're just removing the content of the bottles,

4    what's that process?

5        MR. RAFFERTY:  Well, I believe, Your Honor, that

6    process would be simply taking the bottles back, shipping them

7    back to Mexico, to the distillery, to recover the tequila.

8        THE COURT:  And are you thinking that in the warehouse

9    that there are some bottles that are just empty bottles, they

10   do not have tequila, or all of them would have tequila in them?

11       MR. RAFFERTY:  My understanding, Your Honor, is the

12   bottles are currently, for the last several years,

13   manufactured, the bottles themselves, in Mexico.  They were

14   originally manufactured in China.  You might remember that

15   testimony.  And so, no, I do not believe that there are any

16   empty calavera bottles in warehouses in the United States.

17       THE COURT:  So if the bottles are manufactured in

18   Mexico, then are the bottles -- is it your understanding they

19   are then shipped to the U.S. and then placed in -- if it's a

20   single warehouse, placed in the -- stored in the warehouse?

21       MR. RAFFERTY:  My understanding is, the bottles are

22   manufactured in Mexico.  They are turned over to Tequila de

23   FINOS, which is the distillery.  The distillery fills the

24   bottles, packages them and ships them into the United States to

25   a distributor ultimately, and the distributor then sells them

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    on to retailers.

2          THE COURT:  So if there are bottles in the warehouse

3    in the possession and control of the defendants -- and when I

4    use the word "defendants," I'm talking about the defendants in

5    this lawsuit, Elements and Brandi, that if the Court did in

6    fact issue a permanent injunction, that you would -- these

7    defendants would just remove the alcohol from the bottles and

8    then ship the bottles back to Mexico?  Is that --

9          MR. RAFFERTY:  I think we'd have to ship the entire

10   thing back to Mexico.  We have to have someplace to put the

11   contents.

12         THE COURT:  So the process would be to take the

13   bottles that are in storage that contain an alcoholic beverage,

14   and they would be shipped to Mexico.

15         MR. RAFFERTY:  Your Honor, to some extent, there's

16   planning involved in this, and the thought was that they would

17   be sent back to the distillery that originally bottled them.

18   It would sell its tequila to a variety of people other than

19   Elements and KAH.

20         THE COURT:  And that is someplace in Mexico?

21         MR. RAFFERTY:  Yes.  They're all in Tequila, Your

22   Honor.

23         THE COURT:  Okay.  So without knowing whether or not

24   there's more than one storage facility in the U.S., and without

25   knowing the content, it would be difficult for the Court to

know what is a reasonable amount of time for you to ship those

bottles back to Mexico.

MR. RAFFERTY:  Your Honor, I've heard this number, and

I'd like to have enough leeway to write you a letter if I find

out that I'm --

THE COURT:  No, I'm probably going to ask for some

evidence in the form of a declaration or something.

MR. RAFFERTY:  Okay, that's fine, but I've heard the

number 80,000 bottles, thereabouts.  The trouble with the way

they measure, they measure in cases, but the number of cases

varies as the size of the bottle varies, and so some boxes have

eight bottles, some boxes have more.  So I've heard that

number, but I'd like to have the Court's indulgence so that I

can confirm that.  And I've only heard one location.

THE COURT:  So if we thought that was true, let's

assume that one location, about 80,000 bottles, how much time

are you thinking it would take to do that shipment and --

MR. RAFFERTY:  We asked for three months, Your Honor,

and I think, you know, it's a question of you have to arrange

for -- you know, there's going to be some interesting dilemma

with getting through the border.  This was tequila from Mexico

that was originally permitted into the United States.  We're

now going to have to get it out of here.  This is not something

that I think people do on a daily basis.  So we put three

months in our proposed form of order, from the end -- when we

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    thought they were still objecting to the sell-off by

 2    distributors and retailers, we said three months after the

 3    sell-off for those people ended we would get the rest of the

 4    stuff out of here.  And so I think if we could have three

 5    months from the entry of the order to remove that material from

 6    the United States, that would be something we would aspire to

 7    achieve.

 8              THE COURT:  And is it the defendants' position that

 9    you may consider removing the alcoholic beverage from the

10    bottles and keeping the bottles in your warehouse in the U.S.,

11    or --

12              MR. RAFFERTY:  No.  No, Your Honor.

13              THE COURT:  No.

14              MR. RAFFERTY:  My understanding is that we would have

15    to send the full bottles back to a facility like a distillery

16    that has the capacity to do in reverse what they did going

17    forward at the outset.

18              THE COURT:  All right.  Thank you.

19         Does Brandi's counsel have anything to add to that?

20              MR. MILLER:  Just a little, Your Honor.

21         The evidence at trial was, and there's no dispute about

22    this, that Kim Brandi was terminated from Elements in April of

23    2011.  I think a fundamental problem with these permanent

24    injunctions is she's going to be enjoined from something she's

25    not doing.  So I would just simply suggest that -- and she
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    doesn't have any bottles of KAH Tequila.  I have one at my

2    house just because I've been involved with this for seven

3    years.  But for over six years she's been out of the business,

4    not selling.  There's no evidence that she was selling.  So she

5    doesn't have to be enjoined from anything.

6              THE COURT:  So you're suggesting that the injunction

7    shouldn't apply to her?

8              MR. MILLER:  Correct.

9              THE COURT:  She shouldn't be included?

10             MR. MILLER:  Yes, Your Honor.  Thank you.

11             THE COURT:  All right.

12        Could I hear from the plaintiffs?  So again, plaintiffs'

13   comment on defendants' response to the Court's inquiry, that

14   the defendants think that what they would do to comply with an

15   injunction, if one were issued, is ship the bottles with the

16   alcoholic beverage to Mexico.

17             MR. FAY:  That is fine, Your Honor.  I think there was

18   some confusion about the six-month period.

19             THE COURT:  The question of how long, the Court will

20   decide.

21             MR. FAY:  Yeah, three months is fine.  We asked for 60

22   days.  Ninety days is -- we're not going to quibble over a

23   month.  And then the bottles would be shipped back to the

24   distributor and then emptied.  With that -- you know, with that

25   understanding, is they have 90 days to get them back to Mexico,

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   empty the bottles of tequila, and then, you know, they can keep

2   the bottles and potentially use them down the road.  We asked

3   for some sort of showing that they were going to do that, but

4   with the representation they're not going to fill them again

5   with any kind of alcoholic beverage, we would be fine with

6   that.

7              THE COURT:  And then Brandi's counsel has raised the

8   question of whether it's proper to have the injunction be

9   against Brandi as well, since she was terminated in 2011.

10             MR. FAY:  Your Honor, I think absolutely so.  I mean,

11  although the --

12             THE COURT:  What would be the basis for that?

13  Normally, if we thought that activity had been discontinued,

14  either the business was -- the entity was not in business any

15  longer or wasn't engaged in that activity any longer, that

16  courts often would not issue a permanent injunction.  So as to

17  Brandi, maybe counsel can explain why you think the injunctive

18  relief should also be against her.

19             MR. FAY:  Well, Your Honor, in the years since she was

20  fired from Elements, she has tried to go to market with at

21  least two different kinds of skull-shaped bottles, one of which

22  did not come into the trial.  Globefill made an application to

23  bring the evidence into the trial, but last year, I believe in

24  November of 2016, Ms. Brandi tried to trademark --

25             THE COURT:  I'm going to stop counsel for a moment.

```
 1    So if we're not having a trial on these issues, the evidence

 2    would only be that evidence that's a part of this record now.

 3    So if something did not come into evidence, then the Court has

 4    no evidence to support that request.

 5             MR. FAY:  It's a public record, Your Honor.  You could

 6    take judicial notice of it.  I mean --

 7             THE COURT:  I haven't been asked to do that and

 8    normally would not do that on my own.

 9             MR. FAY:  Okay.  Well, we could resubmit it.  It's

10    been submitted to Your Honor.  Your Honor excluded it from the

11    trial, but it certainly could be reconsidered on this

12    application.  I mean, Miss Brandi was the one who created the

13    bottle, and she has demonstrated over the last seven years a

14    tendency to try to go back to market with similar bottles.  If

15    counsel is right and she has no intention of doing anything,

16    why not?  I mean, what's the harm of an injunction that says

17    you can't market this, you can't market a KAH Tequila bottle or

18    anything similar?  What's the harm?

19             THE COURT:  Well, the other part of the question is,

20    why issue an injunction to preclude someone from doing

21    something that they're not doing?  But what is it that you're

22    saying that the Court could consider, even though it was the

23    subject of a motion in limine and the Court precluded at trial?

24    Was it the application?

25             MR. FAY:  Right.  It was an application for a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    trademark on a clear bottle, skull-shaped bottle, and the
2    application was initially rejected by the PTO based on its
3    similarity to the Crystal Head Vodka bottle.  Your Honor, I can
4    find out what the docket number on that was.
5          THE COURT:  And if I need you to do that, I'll so
6    order.  But any further response, then, on the argument that's
7    been made now as to the nature of the injunction, what it is
8    that Elements would be doing if the Court issued it, and the
9    application to Brandi?
10         MR. FAY:  No, Your Honor.  I think what counsel for
11   Elements has said works for us.  Ninety days, ship the bottles
12   back to the distillery, empty them of tequila.  That is -- that
13   would work for us.
14         And I have nothing further on Ms. Brandi, other than, to
15   our knowledge, she remains a shareholder of Elements.  She may
16   have been fired, but she still has an equity interest in
17   Elements, and she has shown a tendency to try to go to market
18   with bottles that are decidedly similar to Crystal Head Vodka.
19   So we believe this injunction should issue as to her as well.
20         THE COURT:  All right.  Anything further from the
21   defendants on the injunction?
22         Probably what I'm going to do is to order the parties to
23   file with the Court another proposed injunction, and I will
24   probably also order that you meet and confer about the language
25   that should be in that injunction.  You may be able to agree
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   once the Court makes its findings and orders a permanent

 2   injunction.  You may be able to agree to the language.  But to

 3   the extent you're in disagreement, you'd be permitted to

 4   comment on that.  That's probably what I'll do.

 5       And I think both counsel want to put something on the

 6   record on this?

 7            MR. RAFFERTY:  Your Honor, I guess from Elements'

 8   point of view, the most troublesome aspect --

 9            THE COURT:  I'll ask you to go to the lectern.

10            MR. RAFFERTY:  Oh, I'm sorry, Your Honor.

11            MR. FAY:  Yeah, I would just say, Your Honor, that we

12   are prepared to address some of the other issues that Elements

13   has raised, and I think --

14            THE COURT:  About the injunction?

15            MR. FAY:  Yes, Your Honor.

16            THE COURT:  Okay.

17            MR. FAY:  Well, I'm just saying I think what counsel

18   was probably trying to get to was the scope of the injunction.

19            THE COURT:  Oh, and I really don't have questions on

20   that.

21            MR. FAY:  Okay.  All right.  Thank you, Your Honor.

22            THE COURT:  Okay.  So something else on this

23   discussion about, if the Court should issue an injunction, what

24   that process would be in complying with it.  And the Court

25   understands that what defense counsel has indicated, that you

 1    would ship the bottles with the content to the company in

 2    Mexico.

 3            MR. RAFFERTY:  That's right, Your Honor.

 4        Your Honor, I just need to make the record that the

 5    injunction that plaintiff has proposed is a worldwide

 6    injunction.  We think --

 7            THE COURT:  It's not the injunction that the Court

 8    would issue.  I will --

 9            MR. RAFFERTY:  Okay.  Your Honor, I was --

10            THE COURT:  I'll make some findings today so that you

11    will know the scope of the injunction before you leave.

12            MR. RAFFERTY:  That's fine.

13            THE COURT:  And then, as I said, the Court would

14    probably order, then, that based on the findings that the Court

15    has made, that a new injunction be prepared and proposed to the

16    Court, either separate or jointly.

17            MR. RAFFERTY:  Then I won't try Your Honor's patience.

18            THE COURT:  Okay.  Anybody else want to put anything

19    else on the record concerning the injunction now, just based on

20    the discussion that we've had?

21        Just one more thought.  So plaintiff's counsel said

22    shipping the bottles to Mexico, that's fine, they don't object

23    to that.  Emptying the bottles that are shipped to Mexico of

24    the tequila that now is contained in those bottles, defendants

25    agree to that as well?  That that's what you would expect to

1    occur in Mexico?

2            MR. RAFFERTY:  Well, Your Honor, if Your Honor orders

3    what we believe is the appropriate scope of injunction, which

4    is a U.S.-only injunction, what happens to those bottles when

5    they get to Mexico, there's a trademark in Mexico in favor of

6    those bottles, which we believe is valid, and it's Mexican law,

7    and so I -- you know, I don't know why we would have to agree

8    to empty them simply because we made the mistake of sending

9    them here.  The question is, if there isn't an injunction that

10   goes beyond the territorial United States, then those bottles

11   are just, they're bottles of tequila that can be sold in some

12   jurisdictions and not others.  And that's typical of trademarks

13   throughout the world, Your Honor.

14           THE COURT:  All right.  Plaintiffs have anything, any

15   further comment?  I raised that only because I think

16   plaintiff's counsel included the thought that not only would

17   the bottles be sent back to Mexico, but that they would be

18   emptied of the liquid that they now contain.

19           MR. FAY:  Well, Your Honor, obviously we think

20   Elements should be told to stop infringing completely.  I mean,

21   they're a California company.  I don't see why they can't be

22   just told, Stop, no matter where you're going to sell these

23   bottles.  But if Your Honor decides to limit the injunction to

24   the United States, then I guess, yes, if they're shipped back

25   to Mexico and they're going to try to sell them somewhere else,

```
 1   you know, we would submit that's inconsistent with the law
 2   we've cited in our brief, but so be it.
 3           THE COURT:  Okay.  All right.  So we can now go to the
 4   disgorgement of profits.  And I will not be inviting any
 5   discussion on attorney's fees and costs today.  So we will
 6   discuss now the plaintiff's motion for disgorgement of profits.
 7       So I'm unclear as to what I'd look to first to determine
 8   the profits and also the expenses.  And what's been provided to
 9   the Court, and I have Exhibit C, which was an attachment to a
10   declaration offered by plaintiffs, and it's entitled "Elements
11   Profit & Loss as of January 27th, 2011."  It may be that
12   Elements could answer these questions better, but it's unclear
13   to me what period this profit and loss statement actually
14   covers.  It says as of January 27, 2011, but I don't know where
15   the starting point is.  It's also unclear, as to the expenses
16   that are listed on the exhibit, whether these expenses are all
17   expenses of Elements or whether Elements has some other
18   business that's conducted, say, out of the offices, for which
19   some of these expenses could be attributed to a different
20   business.  So just unclear to the Court as to what I'd do with
21   the profit and loss statement as of January 27, 2011.
22           MR. RAFFERTY:  Your Honor, my understanding is that
23   this represents the sales of KAH Tequila.  This was prepared,
24   prior to any involvement that I had in this matter, by
25   predecessor counsel, but --
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Sales for what period?

 2              MR. RAFFERTY:  I believe it goes through 2011.

 3              THE COURT:  Starting when?

 4              MR. RAFFERTY:  At the beginning.

 5              THE COURT:  The beginning being when?

 6              MR. RAFFERTY:  Well, I don't have a date, Your Honor.

 7     The beginning being the agreement between FINOS, the supplier,

 8     and Elements.  And that agreement, Your Honor, I'd have to find

 9     the citation, but it's in the record.  That agreement tells you

10     an awful lot, because, essentially, Elements doesn't have a --

11     what you would call a complicated, robust business.  Elements,

12     when they were sued at the outset by Globefill, essentially had

13     no capacity to either defend itself or to continue in business,

14     so they went out and sought some outside investment.  They

15     succeeded in getting that from Mr. Cabo and FINOS, and there is

16     an agreement between Elements and FINOS pursuant to which FINOS

17     would provide a number of services.  FINOS would produce the

18     tequila, would bottle it, would ship it, would arrange for the

19     sales, and would also advance whatever costs were necessary.

20     And at the time, there were several lawsuits.  It was just not

21     the Globefill lawsuit.  There was another lawsuit with a prior

22     shareholder, Mr. Vilela.  And the agreement, which I'll get you

23     the citation for if I have a minute, the agreement provided

24     that FINOS would advance those funds out of the sales and that

25     ultimately FINOS would be reimbursed for those down the road,
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   so that Elements had no entitlement -- Elements had a

 2   percentage royalty rate in exchange for the transfer of its

 3   trademarks so FINOS could sell the KAH Tequila, but Elements

 4   only received revenue from FINOS to the extent that revenue

 5   exceeded the cost that FINOS had incurred both in the

 6   production, of shipping, as well as in the advancement of legal

 7   fees.

 8             THE COURT:  Yes, and the Court understands that there

 9   was this agreement, and the parties have provided that to the

10   Court.  So my question wasn't focused so much on that, but

11   more on, I made reference to this exhibit that's entitled the

12   "Profit & Loss Statement as of January 27, 2011."  So counsel

13   believes that that represents sales and expenses from the date

14   of the agreement through January 27, 2011?

15             MR. RAFFERTY:  No.  That actually represents the

16   sales.  It doesn't represent all the expenses.  Elements --

17             THE COURT:  But it's entitled "Profit & Loss."  So

18   this document that I'm looking at, it's Exhibit C that was

19   attached to --

20             MR. RAFFERTY:  I think it was Mr. Fay's declaration,

21   Your Honor.

22             THE COURT:  No.  I think the -- well, that's not the

23   Exhibit C that I was referring to.  There is another Exhibit C

24   that's attached to Mr. Fay's declaration.  It's docket number

25   594-1.  And so that document starts off with a letter and then
```

```
 1    includes some calculations, I believe, that represent royalties

 2    to Elements.  So I have that document, but I also have another

 3    document, and this one, Exhibit C, is actually attached to a

 4    different declaration.

 5             MR. RAFFERTY:  It's attached to Mr. Denning's

 6    declaration, Your Honor.  I have it in front --

 7             THE COURT:  Yes, that's correct.  So it is that one

 8    that, I assume, that Elements' position is that this document

 9    shows not only the profits but also the expenses for some

10    period of time?

11             MR. RAFFERTY:  Yes, Your Honor.

12             THE COURT:  Okay.

13             MR. RAFFERTY:  And I apologize.  I was answering based

14    on Mr. Fay's Exhibit C, which happens to be Mr. Neufeld's

15    letter with a series of -- so this -- yes, this is the -- this

16    is, as best as we could discover, the profit and loss statement

17    that accurately reflects the financial experience of Elements

18    in this matter.  We don't have anything else.

19             THE COURT:  Okay.  So the product is -- these expenses

20    represent this product that's in issue at this trial?

21             MR. RAFFERTY:  Right.  And that is the only product

22    that Elements had any connection to during this period of time.

23             THE COURT:  So as we look at the expenses that are on

24    this sheet, and they're just the typical expenses that we would

25    expect would be incurred, these are the expenses incurred by
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1     Elements for the product in issue?

2              MR. RAFFERTY:  Yes, Your Honor.

3              THE COURT:  And the period for the profit and loss

4     statement, since you were looking at a different Exhibit C,

5     what is the period that that covers?

6              MR. RAFFERTY:  This is as of January 27, 2011.

7              THE COURT:  Commencing the date of the royalty

8     agreement?  The licensing agreement?

9              MR. RAFFERTY:  Oh, this was on an accrual basis, so

10    this is taking forward KAH's experience, and the net income, as

11    you can see at the bottom, is in a negative number.

12             THE COURT:  Okay.  Thank you.

13         So now I think plaintiffs had some comments.  So I have

14    before me the two documents that have been referenced.  They're

15    both identified as Exhibit C.  The one that's docket number

16    594-1, it shows various figures with invoices and so forth, and

17    the other one is also Exhibit C, attached to a different

18    declaration, entitled "Elements Spirits Profit & Loss as of

19    January 27, 2011."  So you heard defense counsel's response,

20    and I'm prepared to hear from the plaintiff.

21             MS. KIM:  Your Honor, I think Mr. Rafferty's response

22    to Your Honor's questions on the purported profit and loss

23    statement make it pretty clear that Your Honor should not

24    consider this profit and loss statement in deducting any costs

25    from Elements and/or any of Elements' affiliates' sales.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Mr. Rafferty just told Your Honor that this was prepared by

2   predecessor counsel.  This wasn't even prepared by anyone with

3   personal knowledge of Elements' costs and expenses.  Anybody, a

4   CEO, maybe even Federico Cabo, perhaps, or Mr. Owens, both of

5   whom testified at the first trial.  And I note, Your Honor,

6   that in Exhibit A to Elements' opposition, not an Exhibit A to

7   a declaration, but Exhibit A to the brief itself, they actually

8   go through this purported profit and loss statement, and when

9   they go through the cost of goods, they reference a $225,000

10  number.  They don't include that 21,000 number right underneath

11  this, because it actually says Agava 99.  What is Agava 99?

12  Nobody knows, because no one testified to it.

13      What they could have done, is that they could have

14  attached all of these exhibits to an affidavit from somebody at

15  Elements who actually had personal knowledge of these

16  documents.  They did not do so.  And I know that's something

17  that came up again and again during the trial, was that there

18  needed to be somebody who had personal knowledge of the

19  document to lay the proper foundation for these documents so

20  that they could be authenticated.  I mean, basically what we

21  have here is representations of predecessor counsel of what the

22  costs and expenses were of Elements, maybe for KAH, maybe not.

23  Not really sure.  If you go through Exhibit A to Elements'

24  brief, they don't include all of these costs and expenses as

25  costs and expenses.  I don't know why they do that or don't do

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    that.  I don't know who wrote those exhibits.  I don't know if
2    it was Mr. Rafferty or his associates.  I also know that, you
3    know, Mr. Denning, who is also an associate at Cravath and
4    Elements' counsel, is the one that attached all of these
5    exhibits.  He doesn't have personal knowledge of all of these
6    documents.  I mean, honestly, all of the other exhibits to
7    Mr. Denning's declaration regarding these purported costs and
8    expenses, I actually went through those.  I couldn't even
9    understand -- I couldn't really understand any of the invoices
10   or any of the other documents themselves.  All I had was
11   Mr. Denning and whoever wrote Elements' brief word for it, and
12   that should not be sufficient to constitute evidence.  And in
13   fact, the Ninth Circuit has held, Your Honor, that where
14   defendants have not provided sufficient actual proof and
15   authenticated evidence of costs of goods and expenses, they
16   should just be disregarded by the Court, and plaintiff should
17   be awarded the entire sales from the infringing product with
18   respect to disgorgement.  And here we assert, Your Honor, those
19   sales that we have shown through Elements' admitted own books
20   and records, $13.4 million.
21           THE COURT:  All right.  Thank you.
22       Defendants?
23           MR. RAFFERTY:  Your Honor, just briefly on -- I want
24   to make sure that --
25           THE COURT:  So plaintiff's counsel's position, as
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1  you've heard it, is that even the profit and loss statement

2  that the Court referenced, or the document from which the sales

3  figures appear, have not been properly authenticated, and

4  therefore, the Court can't consider them as evidence in the

5  case.  Now, if you think otherwise, then tell me where they

6  were authenticated.

7          MR. RAFFERTY:  Okay.  So two things, Your Honor.

8  First, when I refer to the document prepared by predecessor

9  counsel, I was talking about the letter that Mr. Fay attached

10 as Exhibit C to his declaration.

11         THE COURT:  The letter dated October 7th?

12         MR. RAFFERTY:  November 3rd, 2015, from Mr. Neufeld.

13 This was Exhibit C to the Fay declaration.  It's document

14 594-1.

15         THE COURT:  Well, what I'm looking at --

16         MR. RAFFERTY:  You're looking at Exhibit C --

17         THE COURT:  The same document, document 594-1, there

18 is a letter, a cover letter, dated October 7, 2015.  That's not

19 what counsel's referencing?

20         MR. RAFFERTY:  No.  What I was referencing was --

21 well, there are two letters.  There's a letter of October 7th

22 and a letter of November 3rd in Mr. Fay's exhibit.

23         THE COURT:  And so which letter were you referencing?

24         MR. RAFFERTY:  I was referring to both letters,

25 Your Honor.  Those were prepared by predecessor counsel, and --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   the cover letter.  And the October 7th letter is from

2   tequila -- is from FINOS, and that's what attaches the various

3   schedules.  These are just business records, Your Honor.

4   They're the books and records of FINOS.

5          THE COURT:  Well, normally the Court would have some

6   testimony to that effect, a declaration from someone

7   representing what they are.  If they were documents used at

8   trial, then of course the Court could rely upon the trial

9   testimony that laid the foundation for the documents, but I

10  think in this case I don't have either.

11         MR. RAFFERTY:  Well, the only person I know of who

12  could authenticate these now is Mr. Cabo.  Mr. Cabo was on

13  plaintiff's witness list, and at the end of the trial they told

14  us that Mr. Cabo was available, was getting ready to come, and

15  they told us that they weren't calling him.  So Mr. Cabo didn't

16  appear at this trial.  He was deposed.  He was asked questions

17  about the financial records.  So we could provide an affidavit

18  if that's what's necessary.  These are the books and records.

19  We produced them, Your Honor.  You know, they're the ledgers of

20  FINOS that show what FINOS did for Elements.  I don't know how

21  much more authentication we can do than get someone from FINOS

22  to say here are the books and records.

23         THE COURT:  No.  I think it's whoever prepared these

24  figures.  Generally that's what the Court would expect to

25  have --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1          MR. RAFFERTY:  Yes.

2          THE COURT:  -- from somebody that can tell the Court

3    what they represent and so that I would know what to do with

4    them.

5          But at this point, it appears that the Court really

6    doesn't have any evidence, and what I'm looking at are the

7    expenses that the defendants would ask the Court to deduct from

8    the profits that the Court determines would be appropriate.

9    And so the document with the expenses, I think, and I believe

10   it's the one that you wish to have the Court consider, is the

11   document that we referred to earlier, the profit and loss

12   statement as of January 27th, 2011.  But where is the

13   foundation for the document that the Court could rely upon to

14   determine what the expenses should be?  That's what seems to be

15   missing.

16         MR. RAFFERTY:  Okay.  Your Honor, we could provide

17   that.  You know, the way this process worked -- Your Honor, in

18   fact, asked the question this morning, were we going to have an

19   evidentiary hearing or were we going to have an argument on the

20   papers?  Since I lost the trial and this is sort of their

21   motion, I was following the dance.  And if I have to, I'm

22   perfectly happy to submit a declaration from Mr. Cabo, however

23   the Court wants to proceed, but these -- as I understand it,

24   these are the books and records.  There are no others.

25         THE COURT:  All right.  Anything else that you wish to

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   put on the record just concerning what is the evidence that the

 2   Court should consider for purposes of determining the expenses?

 3           MR. RAFFERTY:  Well, Your Honor, if we were going to

 4   go down that road, I mean, among the -- you know, I hate to

 5   sort of surface this, but I haven't been paid, okay?  The

 6   expenses for -- you know, it's a painful topic to raise, but

 7   the idea that -- whether you considered these specific

 8   expenses, we were asked to provide them, we did.  There's --

 9   Elements has no money.  Elements has an 8% royalty rate right

10   from FINOS, assuming that the 8% exceeds what FINOS had to

11   outlay in defense of this matter, and it just isn't there.  You

12   know, it's the old blood from a stone.  There's no profit to be

13   had.  There is only loss right now.  And at this juncture,

14   given that we can't sell the tequila in the largest market that

15   they were selling it in, there's unlikely to be any profit in

16   the future.

17       I think Mr. Miller wanted to --

18           THE COURT:  Yes, Mr. Miller?

19           MR. MILLER:  I think a lot of the difficulty,

20   Your Honor, stems from the fact that, really, Brandi and

21   Elements are not selling the product, so these are the sales

22   figures of others.  What's frustrating to my client in terms of

23   the, quote, disgorgement of profit, is the fact that -- in

24   fact, that Vilela action that's mentioned at page 9 of

25   Elements' brief, there was a Vilela lawsuit up in Ventura
```

1    County, which was a derivative action, to get, you know, the

2    shareholders of Elements to be paid something for all the

3    sales, and there was none.  And the accounting -- there was an

4    accounting actually made in that action, and the judge said,

5    Look, there's no judgment rule.  You know, there's no -- the

6    money doesn't get to Elements until other things are taken care

7    of.  So the uncomfortableness we all are feeling now is the

8    fact that the people -- you know, the importer of the product

9    isn't here in the courtroom.  The distillery that profited

10   isn't here in the courtroom.  We have the entity that held the

11   IP rights at 8%, subject to these limitations, and we have the

12   ex-CEO of the company who's none of the above.  So --

13           THE COURT:  Well, I do have a few questions about this

14   unrelated state court action.  So the parties reference it in

15   the papers, and there is some argument concerning the Trademark

16   Assignment and Royalty Agreement and that that agreement was

17   the subject of an unrelated state court action.  It's not clear

18   to the Court.  Where was -- in what court was that action, who

19   were the parties to that action, and did the Court in fact make

20   some determination or finding as to the validity of this

21   agreement?  And if so, no one's given me that.  So there's kind

22   of talk about there being such.  Interesting, the reference to

23   the action, it's Cal. Super, June 26, 2014.  There's no such

24   court.  Unless we're talking about California Supreme Court.

25   But I assume we're talking about a superior court, but I don't

```
 1   know what superior --

 2              MR. RAFFERTY:  We are --

 3              THE COURT:  -- court we're talking about, so maybe you

 4   can clear that up and --

 5              MR. MILLER:  Yeah, I was part of that action for a

 6   while.  I wasn't at the trial, because Ms. Brandi was

 7   dismissed.  But Mr. Vilela was a shareholder of Elements.  He's

 8   the plaintiff, and he sued all of the above.  He sued Elements,

 9   FINOS, Mr. Cabo, the importer, Worldwide Beverages, and the

10   main distributor at the time, which was --

11              MR. RAFFERTY:  Your Honor, if --

12              MR. MILLER:  -- Drinks America.

13              MR. RAFFERTY:  -- this might help, it's a very short

14   opinion.

15              THE COURT:  Well, it won't help me now.  It would have

16   helped me earlier, but no one gave it to me.  But maybe counsel

17   can -- the question that the Court has, there's some suggestion

18   in the argument that the court made some determination or

19   findings about this agreement between Elements and FINOS, and

20   that's really my question.  Did the court do that, and what did

21   the court say about it?

22              MR. MILLER:  It did.  It did, Your Honor.  I can read

23   from this, from the --

24              THE COURT:  Well, maybe you can just read it to

25   yourself and tell me, and then if I need it, then I'll order
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    that it be filed.

 2              MR. MILLER:  Okay.  I've --

 3              THE COURT:  So at this point I haven't considered it,

 4    because it wasn't provided to me.  It's just some argument.

 5    But if counsel wishes to address the Court's concern, did the

 6    court, the -- and I guess it was a superior court.  So was it

 7    Ventura or was it L.A., or what superior court?

 8              MR. MILLER:  It's Ventura superior court.

 9              THE COURT:  Okay.  And did the court in fact make a

10    finding or holding on the validity of the Trademark Assignment

11    and Royalty?

12              MR. MILLER:  Yes.  It specifically identifies the

13    royalty assignment and the fact that attorney's fees will be

14    offset against it and finds that to be a proper exercise of the

15    business judgment rule.

16              THE COURT:  Okay.

17              MR. MILLER:  Thank you, Your Honor.

18              THE COURT:  Plaintiffs, I don't know whether you've

19    seen this agreement or not or -- not the agreement, but whether

20    you've seen this judgment or order by the court and whether you

21    would agree that the representation made by Mr. Miller is some

22    finding by the court that would be appropriate for this Court

23    to consider as far as the Trademark Assignment and Royalty

24    Agreement is concerned.

25              MS. KIM:  Your Honor, we haven't seen the judgment.
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Defendants haven't provided to us.  It hasn't been filed.  So

2   I'm not exactly sure in what context the judge made that

3   ruling, so I can't advise Your Honor as to whether or not we

4   think it's appropriate to consider with respect to this motion

5   or not.  Based on the short portions that were quoted in the

6   brief, I think that basically what they were trying to

7   determine was whether or not the trademark -- entering into the

8   Trademark Assignment and Royalty Agreement was within the

9   business judgment rule.  That is obviously not at issue here,

10  Your Honor.  What we're talking about here is whether or

11  not it's a related party transaction.  What we assert,

12  Your Honor -- and we actually have proof of this that's in the

13  record.  Exhibit 510, which was not objected to by defendants

14  and which was sent back to the jury, is a stock purchase

15  agreement from June 2010 where Elements is acquired by Timothy

16  Owens.

17      Timothy Owens, by the way, Your Honor, is Mr. Cabo's son's

18  father-in-law, and Mr. Cabo actually financed Mr. Owens to

19  purchase that 51% stake in Elements.  So when they entered into

20  this Trademark Assignment and Royalty Agreement in October of

21  2010, it was an agreement between Mr. Cabo and Mr. Cabo, which

22  is basically a related party transaction.  Because of that, we

23  think that this is a complete sham when it comes to the

24  disgorgement of profits.  They did this, Your Honor, months

25  after we had filed this infringement action, and they did that

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1   so that they could make these arguments now and say, Hey,

2   Elements, we're broke, we hired Cravath Swaine & Moore for the

3   second trial.  Maybe Mr. Rafferty's doing this pro bono.  I

4   doubt it.  I'm sure he will get paid at some point.  You know,

5   FINOS -- so after FINOS enters into this Trademark Assignment

6   and Royalty Agreement, in 2016 they get acquired by the Amber

7   Beverage Group, which is a subsidiary of SPI, which --

8               THE COURT:  I'm going to stop counsel for a moment.

9   So you should argue only those things that are supported by

10  evidence in the record.  So I'm sure historically both sides

11  have a lot of information that has never been presented to this

12  Court.  It's not evidence, it's not a part of the record.  So

13  the Court can't consider any of that in deciding these issues.

14  So I just wanted to make sure you are focusing on evidence

15  either provided in support of the motions that are before the

16  Court today or evidence that was provided at trial, so that we

17  could identify that evidence.

18              MS. KIM:  Well, these assertions were actually made by

19  defendants' counsel in a motion in limine.  So these are

20  admissions by defendants.  I can provide you with a docket

21  number.  It's 465.  And they actually set forth the entire

22  structure, how FINOS was acquired by Amber and how Amber is a

23  subsidiary of the SPI Group.  General counsel of the SPI Group

24  sat through the entire second trial, and now Elements is

25  sitting here saying, We have no money, please don't disgorge
```

1  anything from us, you know, we're broke.  And we think that

2  that's an absolute sham, Your Honor.  We think it's a total

3  related party transaction in order to avoid judgment.  All of

4  these actions were done after we filed this lawsuit against

5  Elements for trademark infringement, and now that the jury has

6  come back and found willful infringement, Elements is throwing

7  up its hands saying, We have no money, go somewhere else.  So

8  the options that we present to Your Honor in our briefing is,

9  you know, please enter a judgment for disgorgement of profits

10  for $13.4 million against Elements, and if they tell us, We

11  don't have any money, we will take the necessary action to

12  enforce that judgment, either bring actions against affiliates

13  and related parties, and the plaintiffs will do that on their

14  own, or Your Honor can also add FINOS as an additional judgment

15  debtor.

16          THE COURT:  Which I will not do.  So we've discussed

17  this previously, but the Court's not so inclined.

18          MS. KIM:  Okay.  That's fine, Your Honor.

19          THE COURT:  All right.  I do have a question

20  concerning about data requested and when it was requested by

21  the plaintiffs.

22      So did the plaintiffs request profit data or documents for

23  2016, and when was that request made?  Was it during discovery

24  pretrial?  Or was it a request made either subsequent to the

25  trial in support of these motions?

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              MS. KIM:  It was a request that was made pretrial,
 2    Your Honor, to the best of my knowledge.  I believe it was
 3    after we were hired as new counsel for the second trial.  We
 4    requested additional profit and loss data for 2016, and we
 5    received none.
 6              THE COURT:  Okay.  But you didn't file a motion to
 7    compel.
 8              MS. KIM:  At that time, Your Honor, I mean, we were
 9    doing pretrial prep, so I think that we thought that we would
10    be able to function that way.  However, defendants have made
11    the representation that Elements made no profits in 2016,
12    although, again, I would like to see exactly what they mean,
13    because if FINOS made profits from the sales of KAH Tequila, we
14    do think that that is basically -- that should be considered as
15    part of the profits made from the sale of KAH Tequila as a
16    related party.
17              THE COURT:  Okay.  So this next question is really for
18    the defendant, so this has been discussed here.
19         What is Elements' explanation for its contention that it
20    had no profits in 2016?  What should the Court rely upon to
21    make such a finding, to the extent that that's necessary?  And
22    so I'm looking at evidence, not just argument.  So hopefully
23    counsel will --
24              MR. RAFFERTY:  No, no.  Sometimes, Your Honor, the
25    interesting conundrum one is faced with when proving a
```

1  negative.  There were no sales, so, you know, a set of books

2  and records that shows revenue, they're just not there.

3          THE COURT:  Well, the question is, you say there were

4  no sales.  What is the evidence that the Court could rely upon

5  or cite to that there were no sales?  What are you relying on?

6          MR. RAFFERTY:  We have no evidence of any sales.  If

7  we need a declaration to that effect -- we went back.  They

8  asked us for 2016.  We went back and asked the client, Give us

9  what documents you have for 2016.  And the answer came back, We

10  have none.  We're not -- we're essentially in standdown holding

11  mode until we get an answer from the Court as to whether we can

12  continue to do this, selling tequila into the United States.

13          THE COURT:  All right.  My next questions are just

14  based upon how the Court could calculate profits as to Brandi.

15      Did plaintiff's counsel wish to respond to defense

16  counsel's statement?  I think the statement is, We have no

17  evidence, but --

18          MS. KIM:  No, Your Honor.

19          THE COURT:  -- none has been provided to the Court.

20          MS. KIM:  We're fine with that.

21          THE COURT:  Okay.  Brandi's profits.  What are -- and

22  this is a question for the plaintiffs.  What is your position

23  as to what Brandi's profits are from the sale of the KAH

24  Tequila in the United States from 2010 to the time that she

25  separated from the company in April of 2011?

```
 1            MS. KIM:  Your Honor, we haven't been provided with

 2    any of that information.  We do know that Miss Brandi and

 3    Elements entered into a settlement, I believe of the Iconic

 4    litigation, and I do believe that also concerned the Trademark

 5    Assignment and Royalty Agreement.  And we would submit to

 6    Your Honor that whatever Miss Brandi received as a settlement

 7    of that, because it was definitely something that was related

 8    to the sale of KAH Tequila, would be something that we would

 9    seek recovery of.  But of course we don't know that

10    information.  We actually asked defendants for it several

11    times, and I believe that we made a motion in limine seeking

12    defendants to -- seeking this information from defendants, and

13    I believe that motion in limine was decided against us.

14            THE COURT:  So would you agree that the Court at this

15    point has no evidence, no document, nothing that the Court

16    could reference, to make any findings in support of Brandi's

17    profits from 2010 to the time that she separated from the

18    company, 2011?

19            MS. KIM:  Your Honor, Miss Brandi didn't separate from

20    the company.  She was terminated as CEO of the company, but she

21    maintained --

22            THE COURT:  Well, that's what I'm referencing as

23    separated from the company.  So you would say she didn't

24    separate, but she was terminated.

25            MS. KIM:  Well, no.  I would say that she's still a
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

 1   49% owner, Your Honor.  She's still a 49% owner of Elements.

 2   So whatever Elements and/or FINOS made from the sale of KAH

 3   Tequila, she should held liable for that amount as well.

 4            THE COURT:  And I have evidence to support such a

 5   finding?

 6            MS. KIM:  Yeah.  That's Exhibit 510, Your Honor, which

 7   is a stock purchase agreement, and that shows a 51% ownership

 8   being sold to Timothy Owens, and the 49% remains with

 9   Ms. Brandi.  Also, Mr. Cabo testified to that several times

10   during the first trial.

11            THE COURT:  And so I believe your answer to this

12   question is "yes."  The question is, did Brandi have profits

13   after 2011?  Your position is she did.  The exhibit that would

14   support that would be Exhibit 510?

15            MS. KIM:  Yes.  And I mean, if Your Honor wants, I can

16   also provide you trial testimony cites for the first trial,

17   where Mr. Cabo actually testified that Miss Brandi still

18   retained a 49% interest, and that was in 2013.

19            THE COURT:  Okay.  One other question just concerning

20   Ms. Brandi.  The question is this:  Did Brandi receive any

21   portion of the gross sales of KAH Tequila in the United States

22   or a portion of the 8% royalties earned by Elements -- that's

23   Elements' position -- under the agreement with FINOS?  And

24   again, what is the evidence to support that one way or the

25   other?

1      So, Mr. Miller, do you want to take a stab at that first?

2  The question is, did Brandi receive any -- and so, better

3  stated, is there any evidence to support a finding by the Court

4  that Brandi received any portion of the gross sales or the 8%

5  royalties earned by Elements pursuant to the agreement with

6  FINOS?

7           MR. MILLER:  None whatsoever, Your Honor.

8           THE COURT:  And then since that is Brandi's counsel's

9  position, what is the plaintiff's position?  And again I'm

10  looking for evidence.  So what I've found in these papers is,

11  lot of papers, lots of arguments, but very little reference to

12  the supporting evidence.  So I'll let counsel respond to that

13  question.

14           MS. KIM:  Your Honor, we haven't seen any evidence

15  from defendants regarding that point.  However, I think we

16  would submit that Ms. Brandi profited just as Elements

17  profited.  And under Section 1117(a), all plaintiffs are

18  obligated to do is to show sales for the infringing product,

19  and it is up to defendants to show that the defendants didn't

20  profit from them or to claim costs and deductions.  And as

21  Mr. Miller just said, they have no evidence with respect to

22  that.  Accordingly, we should be entitled to all of the sales

23  in a calculation for disgorgement.

24           THE COURT:  All right.  Anything else?  Those are all

25  the questions.  I have some findings that I'll place on the

```
 1    record, but anything else that either side wishes to place on

 2    the record concerning the requests for permanent injunction or

 3    the motion for disgorgement of profits?

 4         Plaintiffs can address that first, and then I'll let -- if

 5    you have anything else.  And maybe you don't.  Maybe you feel

 6    that it's been adequately discussed here.

 7              MR. FAY:  Yes, Your Honor.  The only thing we would

 8    add is that we feel that under the Ninth Circuit's decision in

 9    Trader Joe and the Timberlane factors, that an injunction as to

10    Elements here in California should tell them to stop

11    infringing, with no limitations on scope.

12              THE COURT:  Okay.

13         Counsel?

14              MS. KIM:  Your Honor, as to that point, I know that

15    Mr. Miller said that Elements is just an IP company that holds

16    a license to this trademark.  If that's so, Your Honor, that

17    profit and loss statement that was attached as Exhibit C to the

18    Denning declaration, if we turn to that, Your Honor, and that

19    again --

20              THE COURT:  I have it before me.

21              MS. KIM:  Yeah.  Mr. Rafferty says is the books and

22    records of Elements.  I'm wondering why an IP company -- and

23    this goes through January 27, 2011.  That purported Trademark

24    and Assignment Agreement was November -- was October of 2010.

25    I'm wondering why, if they're just a licensing company, why
```

1    there are all these expenses for selling and marketing.

2            THE COURT:  Okay.

3        All right.  Defendants wish to place anything else on the

4    record?  You can respond to counsel.  She wonders why.  But you

5    can also address anything that you have not already addressed

6    in opposition to the motions.

7            MR. RAFFERTY:  Your Honor, unless you have any further

8    questions of me, I would just say that the Vilela decision is

9    at 214 Westlaw 8114366.  It's published there.  I don't think

10   it's published anywhere else.  Thank you.

11           THE COURT:  Could you give me the cite again, please?

12           MR. RAFFERTY:  Sure.  I can hand it to you.  I can

13   hand my copy to your clerks, if they can --

14           THE COURT:  Well, defendants indicate that they don't

15   have it, either, so I think it would have to be provided to the

16   court in a way that defendants would also have a copy.

17       And my law clerk is telling me we don't have access to

18   that cite.  So it would have to be provided to the Court in a

19   form of an exhibit.

20       So I can ask defendants -- I mean the plaintiffs here,

21   counsel says he has it, he'd like to give it to us now.  Any

22   objection?

23           MR. FAY:  No objection, Your Honor.

24           THE COURT:  Okay.

25           MR. RAFFERTY:  I have one that I highlighted,

```
 1    Your Honor, and --

 2            THE COURT:  So if you can give me a clean copy, you

 3    can leave it with the clerk, and you should provide a copy to

 4    the plaintiff as well.

 5            MR. RAFFERTY:  Can I send a letter this evening with

 6    copies for the --

 7            THE COURT:  That is probably a faster way to do it,

 8    but --

 9            MR. RAFFERTY:  Okay.  I will copy Mr. Fay and

10    Miss Kim.

11            THE COURT:  Okay.

12            MR. FAY:  Thank you, Your Honor.

13            THE COURT:  All right.  So I'm assuming that there's

14    no additional argument that either side wishes to place on the

15    record for either the request for a permanent injunction or

16    disgorgement of profits, and so the Court will make some --

17    these are tentative findings.  The difficulty that I had with

18    the motions that were before the Court and the arguments of

19    defendants is a lack of evidence.  So these are just

20    tentatives.  The Court will go back to try to find some of

21    these things that you've referenced today to see if this helps

22    and if it would support the tentatives.

23        So I start first with, assuming that the Court is going to

24    issue a permanent injunction, the scope of the injunction will

25    be limited to the United States.  The permanent injunction is
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

59

```
1    also limited to the skull-shaped calavera trade dress for KAH
2    Tequila.  And so there's been some suggestions here as to what
3    the language should be.  Plaintiffs use "similar."  Plaintiff's
4    counsel today suggested we could track the language that's used
5    in the statute.  The concern that the Court has about this is,
6    if there are other proceedings, post proceedings -- contempt is
7    what we typically see -- or some other proceeding about a
8    violation, will these words be meaningful in a way that we will
9    know what to litigate?  So, "similar," clearly just too broad,
10   too vague, but counsel suggests look at the statute itself and
11   try to use that language.  So that's what the Court would do; I
12   would use the language in the statute.
13        Next, the permanent injunction will be limited to the
14   defendants in this lawsuit, their officers, agents, servants,
15   employees, attorneys, and persons in active concert or
16   participation with them as set forth in Federal Rule of Civil
17   Procedure 65(d).  It would not include other parties such as
18   FINOS, as the plaintiffs have requested.
19        And the Court, based upon the statements that you've made
20   here today, the Court would make a determination as to what
21   period of time is necessary for the defendants to comply with
22   the Court's order.
23        I will also require that the defendants certify to the
24   Court, once the injunction is issued, and that'll be a part of
25   the injunction, that you have done whatever the injunction
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

60

1     requires you to do.

2          As to the disgorgement of profits, the tentative that the

3     Court would make at this point, if the Court were granting that

4     motion, I would make a finding that the Court lacks

5     jurisdiction to order disgorgement of profits for the

6     nonparties, and that would be FINOS.  Based on the evidence

7     that the Court has been given so far, the Court would find that

8     the gross sales of KAH Tequila would be $871,536.86 for

9     Elements from 2010 to 2015.  Now, that is taking the -- looking

10    at the royalty agreement, the 8%, and then also deducting those

11    expenses that are contained in the exhibits that we've

12    referenced here.  But if the Court has no evidence supporting

13    the foundation for any of those exhibits, then the Court would

14    have no evidence as to the expenses and therefore could not

15    make any deduction therefor.

16         I believe there is sufficient evidence to support the

17    agreement, the royalty agreement; however, I have not looked at

18    this decision by the state court, and so I'm not sure what the

19    Court will do with that decision in terms of this whole issue

20    of the royalty agreement.

21         The Court makes no findings at this point on attorney's

22    fees and costs, but will include that in its order.

23         So what the Court will order tentatively from the bench,

24    but I will put this in a written order, if I feel that I need

25    something more from the parties, then I will order that that be

61

1    provided or that citations be provided to anything that you

2    rely upon that was evidenced at trial or was included in any

3    previous order, such as motions in limine that might have been

4    issued by this Court.

5        The Court will likely order that the parties meet and

6    confer if the Court issues an injunction and attempt to provide

7    the Court with one injunction that would satisfy both sides,

8    but if unable to do so, then you each would provide a proposed

9    injunction.  And the reason I would include that is, it's clear

10   that the original proposed injunction from the plaintiffs is

11   certainly not the injunction that the plaintiffs are asking the

12   Court to issue now.  Some changes would have to be made.  The

13   proposed injunction that the defendants provided the Court,

14   some adjustments would have to be made to that as well.  So I

15   think the Court needs a different injunction to work from for

16   purposes of actually issuing one.

17       That's all I have at this point.  I've just given some

18   tentative findings, tentative rulings, but the matter is deemed

19   submitted.  The Court may ask you to provide more evidence, and

20   if I wish to have more, I'll provide that in the form of an

21   order to you, being very specific as to what I need so that you

22   don't give me too much information, information that I don't

23   need.  And if I request additional information, then of course

24   I will not rule on either of the motions that are pending until

25   I receive that additional information.  And it's helpful --

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
1    would be helpful to the Court that you not argue these

2    positions.  I mean, you've argued them in the papers that you

3    filed.  You've argued them again here.  Some of them were

4    argued at trial.  But I'm looking now for just evidence that

5    supports what you wish to have the Court do.

6          We're in recess now.  Thank you.

7            MR. FAY:  Thank you, Your Honor.

8            THE CLERK:  Please rise.

9          This court is in recess.  This court is adjourned.

10

11           (Proceedings concluded at 11:39 a.m.)

12

13                          --o0o--

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1                        *CERTIFICATE*

2

3      *I hereby certify that pursuant to Section 753,*

4 *Title 28, United States Code, the foregoing is a true and*

5 *correct transcript of the stenographically reported proceedings*

6 *held in the above-entitled matter and that the transcript page*

7 *format is in conformance with the regulations of the*

8 *Judicial Conference of the United States.*

9

10 *Date:  June 14, 2017*

11

12

13

14                */S/ SANDRA MACNEIL*

15             *Sandra MacNeil, CSR No. 9013*

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA