```
 1                    UNITED STATES OF AMERICA
                   UNITED STATES DISTRICT COURT
 2                 CENTRAL DISTRICT OF CALIFORNIA
                         WESTERN DIVISION
 3
                             - - -
 4              HONORABLE CONSUELO B. MARSHALL,
             UNITED STATES DISTRICT JUDGE PRESIDING
 5                           - - -

 6
   GLOBEFILL INCORPORATED, a      )
 7 Canadian corporation           )
                                  )    CERTIFIED COPY
 8              PLAINTIFF,         )
                                  )    CV 10-2034 CBM
 9 VS.                            )
                                  )
10 ELEMENTS SPIRITS, INC., a      )
   California corporation, and    )
11 KIM BRANDI, an individual,     )
                                  )
12              DEFENDANTS.        )
   _____)
13

14

15                      TRIAL DAY TWO
                REPORTER'S TRANSCRIPT OF PROCEEDINGS
16                WEDNESDAY, MARCH 15, 2017
                        A.M. SESSION
17                 LOS ANGELES, CALIFORNIA

18

19

20

21
                 SHERI S. KLEEGER, CSR 10340
22              FEDERAL OFFICIAL COURT REPORTER
                312 NORTH SPRING STREET, ROOM 402
23               LOS ANGELES, CALIFORNIA 90012
                     PH:  (213)894-6604
24

25
```

```
 1

 2

 3   APPEARANCES OF COUNSEL:

 4   ON BEHALF OF PLAINTIFF:
             BERG & ANDROPHY
 5           BY:  DAVID BERG, ESQUIRE
                  ZENOBIA HARRIS BIVENS, ATTORNEY AT LAW
 6                MICHAEL M. FAY, ATTORNEY AT LAW
                  3704 TRAVIS STREET
 7                HOUSTON, TEXAS  77002-9550

 8           BERG & ANDROPHY
             BY:  JENNY H. KIM, ATTORNEY AT LAW
 9                120 WEST 45TH STREET, 38TH FLOOR
                  NEW YORK, NY  10036
10
             BIRD, MARELLA, BOXER, WOLPERT, NESSIM, DROOKS,
11           LINCENBERG & RHOW, P.C.
                  BY:  HERNAN D. VERA, ESQUIRE
12           1875 CENTURY PARK EAST
             23RD FLOOR
13           LOS ANGELES, CALIFORNIA  90067-2561

14   ON BEHALF OF DEFENDANT:
             CRAVATH, SWAINE & MOORE LLP
15           BY:  THOMAS G. RAFFERTY, ESQUIRE
                  KEITH R. HUMMEL, ESQUIRE
16           825 EIGHTH AVENUE
             NEW YORK, NY  10019
17
             MILLER JOHNSON LAW OFFICES
18           BY:  JON B. MILLER, ESQUIRE
                  427 C STREET
19                SUITE 410
             SAN DIEGO, CA  92101
20

21

22

23

24

25
```

```
 1

 2                          I   N   D   E   X
        WITNESS            DIRECT     CROSS   REDIRECT  RECROSS
 3      ALEXANDER, John     69       119,148    149
        HEMI, Jonathan     155       214,235    236
 4
                       E   X   H   I   B   I   T   S
 5                     PAGE                      NUMBER
                       82-7                      243
 6                     593                       244
                       618                       244
 7                     1140                      245
                       1141                      245
 8                     1142                      245
                       1246                      252
 9                     764                       269
                       765                       269
10                     616                       271
                       616-2                     271
11                     616-62                    271
                       615                       272
12                     620                       272
                       617                       272
13                     574                       272
                       574-A                     272
14                     575                       273
                       618                       273
15                     618-4,5                   273
                       618-28,30                 273
16                     579                       273
                       352                       274
17                     463                       274
                       553                       274
18                     562                       274
                       520                       274
19                     544                       275
                       593                       275
20                     45                        287
                       164                       288
21                     167                       288
                       168                       288
22                     169                       288

23

24

25
```

1

E   X   H   I   B   I   T   S

2

(CONTINUED)

3              473                288
               474                289

4              475                289
               499                289

5              719                289
               620                289

6              618                289
               574-A              290

7              1129               290
               1115               290

8              113                290

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    LOS ANGELES, CALIFORNIA; WEDNESDAY, MARCH 15, 2017

 2                      A.M. SESSION

 3                        - - -

 4

 5

 6            THE CLERK:  CV 10-2034-CBM:  Globefill

 7    Incorporated versus Elements Spirits, Incorporated, et

 8    al.

 9            Counsel, state your appearances.

10            MR. BERG:  Individual names of our lawyers

11    again?

12            We are here for the plaintiff and ready,

13    Your Honor.

14            THE COURT:  It is a matter of what you want

15    on the record.  So if you want the court reporter's

16    transcript to show your names, of course, then you have

17    to state the names.  If you don't think that is

18    important, then you don't have to do that.

19            MR. BERG:  We do want the names, Your Honor.

20            We have Jenny Kim, Mike Fay, Zenobia Bivens,

21    David Berg and, of course, Hernan Vera.

22            THE COURT:  Thank you.  Good morning.

23            MR. HUMMEL:  Good morning, Your Honor.

24            Keith Hummel for Elements Spirits.  With me

25    is my partner Tom Rafferty and my colleague Rebecca
```

```
 1   Rettig.
 2                  THE COURT:  Good morning.
 3                  MR. MILLER:  Good morning, Your Honor.
 4                  John Miller for Kim Brandi.
 5                  THE COURT:  Good morning.
 6                  The matter before me now is the matter we
 7   left from last night.  So I said I would rule on it this
 8   morning, and I will do so.
 9                  I think most of our jurors are here.  So if
10   all are here after we complete the Court's either
11   questioning or ruling on the matter that's outstanding,
12   I will just stay on the bench and the clerk will just
13   bring the jury into the box.
14                  So it may be that we will not have another
15   break between now and when we actually start
16   presentation in the presence of the jury.
17                  So the outstanding matter that's left over
18   is the plaintiffs' ex parte application for
19   reconsideration of the Court's order denying the motion
20   to amend the joint exhibit list to add Brandi's 2016
21   trademark application.
22                  It is a motion for reconsideration.  It
23   doesn't pass the rule re motions for reconsideration.  I
24   don't think there is anything new.
25                  The Court listened to argument last night.
```

```
 1    And so it may be that the arguments could -- may have
 2    focused a little bit on things that weren't in the
 3    papers.  But basically, there is nothing new in this
 4    motion.
 5               The Court also considers the manifest in
 6    justice.  And the Court finds that that is not such and
 7    does the balancing, as I said in the previous order that
 8    I issued, to permit this amendment of the exhibit list.
 9               Having said that, counsel also identified
10    that one of the purposes for adding this exhibit to the
11    list is for -- to assist the Court in deciding questions
12    that are reserved for the Court and not for the jury.
13    So I'm referring to the disgorgement of profits and or
14    attorney fees, the amount of profits and whether
15    attorney fees may be deducted for any profits.
16               Those are not jury questions.  Those are
17    Court questions.  And so counsel may, when we get to
18    those issues, outside the presence of the jury, ask the
19    Court again for this permission.  So I am inclined to
20    consider this exhibit for those purposes.
21               So it will not be -- this exhibit will not
22    be presented to the jury.  It won't be added to the
23    witness -- to the exhibit list for purposes of an
24    exhibit that goes to the jury.  But the Court may
25    consider it for purposes that are not before the jury.
```

1          So that's the Court's ruling on that motion

2    that was left outstanding.

3          I want to raise with you just a couple of

4    things that I'm uncertain about.  One is, there are

5    additional filings I think that were probably filed late

6    yesterday.  The first document is the deposition

7    designation for a Gilberto Sanchez Escarcega.

8          So what I don't know, I'm not clear on, is

9    this a witness whose deposition will be used in lieu of

10   the witness being here at trial?  If that is the case,

11   then obviously the Court needs to read the parts that

12   have been designated, the objections to those parts, and

13   advise the parties of the Court's ruling before this

14   deposition is read.

15         So the first question is:  Deposition in

16   lieu of live witness testimony from this witness.  And

17   then the second question would be, if that first is

18   answered, yes, when would you expect to read?

19         So whoever is offering this can speak first.

20         MR. HUMMEL:  So Keith Hummel for Elements.

21         Mr. Sanchez Escarcega is only on our witness

22   list.  It is not on plaintiffs' original witness list.

23         THE COURT:  And live witness or deposition

24   in lieu thereof?

25         MR. HUMMEL:  It is going to be a deposition

1    in lieu thereof.

2              THE COURT:  So you have already designated

3    the portions of the deposition by just following the

4    local rule, marking those in some way for the Court to

5    read, correct?

6              MR. HUMMEL:  That's correct, Your Honor.

7              I believe what we submitted to you was the

8    entire set of designations from both parties.

9              I understand that Your Honor prefers to have

10   testimony from one witness at one time, rather than

11   breaking it up into two sections.

12             THE COURT:  I see what you mean.  So if both

13   sides were to call that witness as their witness, yes,

14   my preference would be to have all of the witness'

15   testimony rather than one party call the witness and

16   then the other side call the witness again in another

17   day or two.  That is my preference.

18             So I should understand that his testimony

19   will be presented by deposition.  And the objections

20   that have been filed are objections to the portions of

21   the deposition that had been designated?

22             MR. HUMMEL:  That's correct, Your Honor.

23   And our position is that since this is our witness, he

24   should be -- his testimony should be played in our case.

25             THE COURT:  Okay.  So that was my next

1   question.  When would you expect this witness would be

2   called so that I will read the designated portions, be

3   prepared to rule on the objections, all before you are

4   ready to read the deposition so that you will know what

5   to read?

6           MR. HUMMEL:  Luckily we have this on video

7   tape.  So there's a transcript.  But there's also the

8   videotape to play to the jury.

9           THE COURT:  Same thing, the question is

10  when?

11          MR. HUMMEL:  To answer your question of

12  when, Your Honor, I don't have the full extent of when

13  the plaintiffs are going to be done with their case.  In

14  fact, I don't have an official designation even of the

15  witnesses who are being called tomorrow.

16          But I would expect that if we are sitting

17  tomorrow, and Mr. Berg takes up next Tuesday, you know,

18  the earliest that we would get to Mr. Escarcega would

19  probably be on Friday of next week.

20          THE COURT:  Of next week?

21          MR. HUMMEL:  So you have time, Your Honor.

22          THE COURT:  Right.  So we will, every day at

23  the end of the day, go over the witnesses to be called

24  for the next day, the exhibits to be used, just as we

25  did last night.

```
 1              But I looked at those emails that were

 2   addressed last night, and it appeared to me what the

 3   parties were agreeing to, is you would have 24 hours'

 4   notice.

 5              If that is the understanding of both sides,

 6   regardless of who may be presenting evidence, then that

 7   is something that you need to do.  The opposing side

 8   within 24 hours or whatever period of time that it might

 9   be, should know the identity of witness, the exhibits to

10   be used.  And then when the Court asks that, we don't

11   have to spend half the night here, because you will just

12   simply tell me, the other side has it already, and these

13   are the names and these are the exhibits.  So that's

14   what I expect will happen.

15              I am concerned, if it's true, that the

16   plaintiffs who may be calling witnesses tomorrow, one or

17   two, that the defendants don't know who that second

18   witness will be.

19              MR. HUMMEL:  And the exhibits, Your Honor.

20              THE COURT:  And the exhibits to be used as

21   well.

22              And then because I am not here on Friday,

23   tomorrow -- or tonight probably -- probably this evening

24   I will be looking at who are the witnesses to be called

25   on Tuesday, the exhibits to be used with those witnesses
```

1    and so forth.  Because we won't have time to do this

2    before Tuesday.

3              Tomorrow we will have a short session to

4    accommodate at least one witness, possibly two.  But I

5    will not have time to stay and go through the exercise

6    of who are the witnesses and the exhibits to be used.

7    So I will expect that you will have already done that

8    for Tuesday's witnesses.  So I raise that question and

9    expect that you tell me that's been covered.

10             So anything further for defense counsel on

11   either the issue I raised or just your concern about, do

12   you know which exhibit is going to be used with which

13   witness tomorrow?

14             MR. HUMMEL:  I am very concerned that I

15   don't know which exhibits are going to be used tomorrow.

16             THE COURT:  Let me hear from plaintiffs'

17   counsel.

18             First, do you wish to address the document

19   that I referenced, and that is, the deposition

20   designations for the witness whose deposition will be

21   presented to the jury?

22             MS. BIVENS:  Yes, Your Honor.  Plaintiffs

23   are happy to withdraw our designations if the

24   designations that were filed by Elements are the

25   designations that we made.  And we can work that out

```
1    with the Elements' counsel if it's okay with the Court.
2              THE COURT:  So does that suggest -- and
3    something to talk about -- maybe there are no objections
4    to the designated part, so there is nothing for the
5    Court to read in advance.  So maybe you can have that
6    conversation and just let me know.  Obviously, I don't
7    need to read it if I don't need to read it.
8              MS. BIVENS:  Yes.
9              THE COURT:  And then for exhibits that will
10   be used with either one or two witnesses who will be
11   called tomorrow, you may make a statement for the record
12   concerning that.
13             MS. BIVENS:  Yes, Your Honor.  We sent them
14   about 20 minutes ago, the demonstrative that will be
15   used for Christina Cappellini, as well as the exhibits.
16   And also we sent the exhibits that will be used for
17   David Brown.
18             THE COURT:  About 20 minutes ago?
19             MS. BIVENS:  Yes.
20             THE COURT:  So we want to do better than
21   that.  And I need counsel to tell me, if your
22   understanding is 24-hours' notice to the other side,
23   name of witness and exhibits to be used, then that's
24   what you need to honor.
25             MS. BIVENS:  Okay.
```

```
 1              THE COURT:  So when I ask, you'll be able to
 2    tell me "We've done that already."  And I shouldn't hear
 3    anything to the contrary for the other side.  If your
 4    agreement is not 24 hours, then it is whatever you have
 5    agreed to.
 6              But as I said, when I ask today that
 7    question after the jury leaves, it looks like everybody
 8    will be prepared to respond to me.  But the 24-hours'
 9    notice is generally what I see in the civil cases.  So I
10    think 24 hours is good.  It seems to me there are enough
11    lawyers here that you can make that happen.
12              But if your understanding is something
13    different, then you can just indicate to the Court.
14              MS. BIVENS:  Yes, Your Honor.  We received
15    the exhibits from defendants yesterday morning, so we
16    just followed suit.  That was 24 hours.
17              THE COURT:  Let's don't follow suit.  Let's
18    have counsel meet and discuss this.
19              MS. BIVENS:  Okay.
20              THE COURT:  Whoever is responsible for doing
21    this, let those two people meet, one from each side,
22    come to some understanding as to when things are going
23    to be disclosed and honor that.
24              Then we don't need to have a lot of
25    discussion about it.  It works for both of you because
```

```
 1    obviously you want to know in advance so you can
 2    prepare.
 3              MS. BIVENS:  Yes, Your Honor.  Thank you for
 4    clarifying.
 5              THE COURT:  And then there is one more
 6    filing, I believe.  No.  They seem to relate to the same
 7    thing.  So one is the deposition designations, and the
 8    other one is the index of plaintiffs' deposition
 9    designation and defendants' counter designations and
10    objections thereto.
11              So at this point, it looks like there are
12    objections.  So I would order counsel to meet and confer
13    and see if you can't resolve that.
14              What parts of the deposition does each side
15    designate to be read?  And if -- and whether there are
16    any objections thereto.
17              If there are no objections, then the Court
18    doesn't need to be involved in it.  If there are, then I
19    need to rule.
20              MS. BIVENS:  Yes, Your Honor.  We will work
21    with the other side to clarify the designation
22    objections.
23              THE COURT:  Okay.  I'll just ask the clerk,
24    are all of our jurors here?
25              THE CLERK:  No.  We are missing one.
```

```
 1              THE COURT:  Are there any other matters that
 2   you wish to raise with the Court?  Apparently we are
 3   missing one juror.  If not, I'll let you take a break.
 4   If so, I will listen.
 5              MR. HUMMEL:  Your Honor, I don't know --
 6   sorry.  Keith Hummel for Elements.
 7              I don't know when the proper time for Your
 8   Honor to consider this issue, but when we received the
 9   designation of the order of witnesses from Globefill,
10   they included a witness that was not on their joint --
11   it was actually not on the witness list from the joint
12   exhibit list.  It was not a witness who was disclosed in
13   any of their Rule 26 disclosures; essentially a
14   surprise, new witness, Ms. Elise Lichtman.
15              And we would move to have that name stricken
16   and her testimony not permitted given the egregiously
17   late disclosure of her.  She has never been deposed.
18   She was not identified as a witness or a person of
19   knowledge of the Globefill claims or defenses in this
20   case.
21              THE COURT:  All right.  So the proper time
22   to consider it and for the Court to rule on it, is
23   sometime prior to the witness being called.  So I will
24   ask plaintiffs first, just when would you plan to call
25   this witness if the Court should allow?
```

```
 1              MS. BIVENS:  Your Honor, we are calling the

 2   witness Elise Lichtman as a rebuttal witness.

 3              THE COURT:  And so then the question would

 4   be whether it really constitutes rebuttal.  So when the

 5   time comes, and the plaintiffs announce that they wish

 6   to call the witness as a rebuttal witness, I will

 7   require them to make a proffer.  If the Court finds it

 8   to be rebuttal, and it goes to -- it -- if the Court

 9   finds that it in fact is rebuttal, then the Court may

10   allow the witness to be called, and our rules make room

11   for that.  So that discussion can be held when we get to

12   that point of rebuttal.

13              But I would require the proffer, and then

14   the Court will rule on whether the witness can be

15   called.  So I don't think we need to discuss it any

16   further at this point.

17              MS. BIVENS:  Thank you, Your Honor.

18              THE COURT:  Are there other matters that

19   either side thinks may come up today?  If you have any,

20   I will let you raise them.

21              If not, I was just going to ask, are there

22   any exhibits that will be used today to which there are

23   objections?  There might not be any.  We discussed this

24   a little bit last night.

25              But if there are no exhibits that you plan
```

```
 1    to use today to which there are objections, then I would
 2    deem all the exhibits admitted.
 3            If I haven't already done so, you may
 4    publish them.  You don't have to go through the exercise
 5    of first marking them and then offering them, those
 6    steps that we normally would go through.  They should
 7    already be marked.  If no objections, they're deemed
 8    admitted, and you may use them in the manner which you
 9    wish.
10            Counsel.
11            MR. HUMMEL:  Your Honor, I just have a
12    housekeeping issue, I have the bottles which we
13    discussed yesterday in a box over here.  And I am
14    wondering where to place them.  Or if I would hand them
15    to the jury during openings, how we would handle that
16    mechanically.
17            THE COURT:  Well, I think last night we said
18    the actual getting it to the jury would be done by the
19    courtroom deputy.  So you would actually give them to
20    her.  So you can ask her where does she want them.  And
21    you can tell her how you would refer to them so that
22    she'll know when.  Or you may even say, We would like to
23    have the jury examine them.  And then she will know
24    which one, and she'll give it to the jury.  So it's for
25    the convenience of the clerk, just so she'll have it.
```

 1   And you might ask her, Where should it be?

 2             MR. HUMMEL:  Great.  Thank you.

 3             MR. BERG:  I also have a question about how

 4   to get the bottle to the jury.  I just have two of the

 5   bottles.  I want to hold them myself for a while.

 6             How do I get them to the deputy so it can be

 7   taken to them?

 8             THE COURT:  You walk around like you did

 9   yesterday when we had all those sidebars or -- again,

10   ask the clerk.  She will tell you the most effective way

11   to get it to her.  You may even say, "I would like to

12   have the jury examine these."  When you say that, she'll

13   probably walk up to you, you give them to her and she'll

14   take them over to the jury.  Just that simple.

15             MR. BERG:  Thank you.

16             THE COURT:  Anything else?

17             MR. HUMMEL:  Nothing else.

18             THE COURT:  If there is nothing else for the

19   Court if we are still missing one juror, then we can

20   take a short break.

21             MR. BERG:  No.  Nothing else.

22             MR. HUMMEL:  Nothing.

23             THE COURT:  Okay.  Thank you.

24             THE CLERK:  Please rise.  This court is in

25   recess.

```
 1                    (RECESS TAKEN.)

 2                    (JURY PRESENT.)

 3

 4                    THE CLERK:  CV 10-2034-CBM:  Globefill

 5    Incorporated versus Elements Spirits, Incorporated, et

 6    al.

 7                    THE COURT:  Appearances, please, just for

 8    the jury.

 9                    MR. BERG:  Yes.  David Berg for Globefill

10    accompanied by our colleagues:  Zenobia Bivens, Mike

11    Fay, Jenny Kim; and, of course, John Alexander and Danny

12    Aykroyd.

13                    MR. HUMMEL:  Keith Hummel for Elements

14    Spirits.  With me is Thomas Rafferty and Rebecca Rettig.

15                    THE COURT:  Good morning.  Good morning to

16    the panel.  Sorry.

17                    MR. MILLER:  John Miller for Kim Brandi.

18                    THE COURT:  Next time I will let you go

19    first for the defense side.

20                    Good morning, panel.  We are actually

21    starting about an hour late.  So we will probably try to

22    make up that hour today.  Because what I'm trying to do

23    is to get at least five hours of the jury in the box

24    listening to testimony.  Otherwise, it takes us longer

25    to get the case presented to you.
```

1           Not unusual on the very first day to have a

2    little stumble.  I realize that you are not accustomed

3    to coming to this courthouse.  So it may take a little

4    bit longer to travel here and there could be traffic

5    issues and personal issues.  But I will ask again today

6    before you leave whether the eight o'clock start is

7    actually good for everyone.

8           So it's something that you may be thinking

9    about.  If it isn't good, if you've decided, I can't be

10   there to start at eight o'clock, then I would adjust the

11   time so we don't have some jurors here waiting and

12   others jurors trying to get here.

13          But we are ready to start now.  You are

14   going to hear the opening statement of counsel.  It is

15   often described as an outline or road map.  So it is

16   addressing what each side believes the evidence will be

17   in the case, based upon their preparation of the case.

18          Now, of course, the statement they will be

19   making to you is not evidence.  Remember, the lawyers

20   are not witnesses to what happened that caused the

21   lawsuit to be filed.

22          So they are not testifying.  They are not

23   under oath.  They are simply making a statement to the

24   jury.

25          I have placed some time limits on it, so

1   they would like to be able to make a longer statement,

2   but I'm anxious for you to actually hear the evidence

3   that will be given by witnesses who will be testifying

4   and exhibits that may be received.

5           You will hear an opening statement from each

6   side.  And then after that, the Court will give some

7   preliminary instructions to the jury.  And the first

8   witness will be called.

9           So our break will be proximately two hours

10  from now.  If anyone needs a break sooner, it is just a

11  matter of raising your hand or indicating to me in some

12  way that you need me to consider why your hand may be

13  raised.  And then we can take an earlier break if we

14  have to.  But trying to manage the trial in a way that

15  you will be sitting for approximately two hours, then

16  we'll have a short break and then you'll come back and

17  sit for an additional two hours with maybe another

18  break, depending on what time that happens to be.

19          So at this point, we are going to commence

20  and plaintiffs' counsel may make the opening statement.

21          MR. BERG:  Thank you, Your Honor.

22          Good morning, everyone.

23          Good morning, counsel.

24          Are we passing out some things to the

25  jurors?  I'll just wait.

```
 1              THE COURT:  They are note tablets.  But what
 2   I would suggest is you don't need to take notes on these
 3   opening statements because as I said this isn't
 4   evidence.  So you might just want to listen.  But you
 5   are permitted to take notes, and I give you an
 6   instruction concerning that later.
 7              MR. BERG:  Your Honor, may I ask the Court
 8   deputy to give me a five-minute warning at 15 minutes?
 9   Would that be appropriate?
10              THE COURT:  When you have five minutes left?
11              MR. BERG:  Yes, ma'am.  At 15.  I think we
12   said 20?
13              THE COURT:  Yes.
14              MR. BERG:  Yes, ma'am.
15              THE COURT:  I have a little digital clock
16   and so I will tell you, you have five minutes left.
17              MR. BERG:  Thank you.
18              Ladies and gentlemen, this is the Crystal
19   Head Vodka bottle.  It was the first bottle in the
20   history of this country, first skull-shaped bottle ever
21   to contain alcoholic beverages to be sold in the
22   marketplace.
23              Never happened before.  We know it never
24   happened before because this man and this man, my
25   clients, John Alexander, Danny Aykroyd, made sure we
```

1    were not infringing on someone else's bottle selling

2    alcohol.

3              I want you to remember that it came to

4    market it September of 2008.   September of 2008.

5              Now, I'm going to tell you how this bottle

6    came to be.   It came to be from these two friends right

7    here.   They've known each other, at that point, in

8    either late 2005 or early 2006, they can't remember

9    exactly, on a snowy evening.   And the two of them were

10   talking.

11             And Danny was talking about a new business

12   he was in.   Danny, the actor, is also a businessman, as

13   you will find out.   Danny had gone into the wine and

14   spirits business, and he will talk to you about that in

15   length when he testifies later on in the trial.

16             But Johnny had an idea.   Johnny is a

17   wonderful artist.   I'm going to brag on him a bit.   His

18   works are carried in -- have been acquired by the Museum

19   of Modern Art, the Los Angeles County Museum and the

20   Smithsonian, among many.

21             But he also has a side to him that is very,

22   very interesting.   He thought for a long time -- and

23   we'll tell you why later.   He thought for a long time

24   that a skull would make a great vessel to sell alcoholic

25   beverages in.   Johnny wanted to sell tequila.   But Dan,

1   for reasons related to a relationship with a friend who

2   was also in the tequila business, said no, he wanted to

3   see pure vodka in the bottle.

4          And that's when they began, late 2005, early

5   2006, doing the really hard work it took to bring this

6   bottle to market.

7          One of the things that cements their

8   friendship is that these guys both come from working

9   class backgrounds, where they learned a great deal about

10  hard work and developed a great work ethic.

11         Danny was a postal carrier.  At 14 he worked

12  for the railway as warehouseman.  We'll tell you more

13  about that.

14         Johnny worked in the oil fields in south

15  Texas where he's from.  Not in his family oil fields, I

16  can tell you that.  They were just oil fields, where he

17  did contracting work and built roads of wood so that

18  they could bring the heavy equipment across.

19         These are not guys who came from anything

20  but working class backgrounds who came to a certain

21  point in their life and poured that work ethic into

22  building and making this bottle.

23         Johnny was very particular about what the

24  bottle would look like.  He drew sketch after sketch

25  after sketch.  He was absolutely determined that it

1    would be original.  Because that is what an artist does.

2    An artist does not want to copy someone else.  Someone

3    with integrity in their work, as Johnny has, doesn't

4    want to copy someone.

5              Danny went about the business of -- he

6    advised, they conferred about what the bottle should

7    look like -- and we'll go into detail about that.  And

8    that took quite some time.  Danny shopped around the

9    world for the right bottle maker.  The right bottle

10   maker was in Italy, Bruni, which used crystal that comes

11   from Slovenia.

12             MR. AYKROYD:  Slovenia.

13             MR. BERG:  The answer to that question is

14   Slovenia.

15             And -- that's the one the joys of

16   representing Danny and John.

17             In any event, this was the product.  It came

18   to market in 2008 in September.  These guys hoped to

19   sell 5,000 cases the first year.  There was so much

20   press, and it was Danny's celebrity, they sold

21   5,000 cases within the first few weeks.  It was huge,

22   game-changing hit, spectacular, lots of press.

23             Two years later, two years later in November

24   or December of 2010, this bottle came out KAH Tequila.

25   There are three different bottles, but I am going to

1      show this one for right now.  I am going to ask the

2      courtroom deputy to pass them around so you can see

3      them.

4              So how is it that never before had there

5      been a skull-shaped bottle selling alcoholic beverages,

6      and along comes another one that is skull shaped, that

7      has sculpted features, defined features, a tilted

8      spout -- and that's a story in and of itself.  It's a

9      very expensive decision put a titled spout on a bottle.

10     And we don't know other bottles with titled spouts.  It

11     would be ever so much easier to make a bottle that the

12     liquor poured in this way straight down.  That's how the

13     machinery works.  Odd coincidence.

14             So what happened between 2008 and 2010?  We

15     believe that Ms. Brandi, Kim Brandi or Kimmy Brandi, as

16     I heard her called, had the opportunity and motive to

17     copy our bottle and bring the bottle to market that

18     was -- that infringed on our trade dress, as the Judge

19     called it yesterday, the skull-shaped bottle.

20             Let me show you what I mean.  There is a

21     magazine called Beverage Industry News.  This is the

22     issue, if you look at your screens, that came out in

23     February-March of 2009.  Now, our bottle had been on the

24     market for six months.  This was an insert in that

25     magazine.  It was a feature story about new products.

1    Kim Brandi was the editor and chief of this magazine.

2    Kim Brandi was able to see our bottle.  I don't know if

3    she'll deny seeing it.  I think we can show you by

4    what's called the preponderance of the evidence that she

5    had to have seen it.

6              And so it was that that was the first step.

7    And remember there was huge press within the beverage

8    industry, because it was Danny.  And Danny was out going

9    from city to city often with Johnny.  I think they went

10   to 35 states.  Danny went to 35 states and countless

11   cities that we will talk about within the first year and

12   a half.  This was not easy.  This has hard work to try

13   to make this a success.

14             Now, let me tell you about what Ms. Brandi's

15   motive was.  She founded a company called Elements.

16   Elements owns KAH Tequila.  There are three more

17   bottles -- there are other bottles, too, in different

18   colors, but I just wanted you to see the example -- and

19   I'm going to -- I was going to ask the courtroom deputy

20   to circulate these to the jury, but she seems to have

21   disappeared.

22             THE COURT:  Well, I will ask someone on my

23   staff to just pick up the bottles that you wish the jury

24   to examine.

25             MR. BERG:  Yes, ma'am.

```
 1              THE COURT:  So at this point, to aid counsel
 2   in his opening statement, he would like for the jurors
 3   to see the bottles that he is addressing.  Those will be
 4   passed among you.  We'll start with the first juror to
 5   be seated.
 6              You can make the examination of the bottle
 7   and then just pass it on to the next juror.
 8              MR. BERG:  What we will tell you is, that
 9   they just painted our bottle.  There are differences.
10   If you are going to do a knockoff of someone else's
11   product, you don't make it exactly the same.  So there
12   are some differences.  And we agree with those -- that
13   there are differences.
14              But what you have to understand about the
15   bottle that Juror No. 3 just passed, the KAH Tequila
16   bottle, is it is a cheap knockoff made, you will not be
17   surprised to learn, in China.
18              Danny went all over the world to find
19   really, I think, probably the best glass company
20   conceivable for this bottle, Bruni in Italy.
21              And that bottle was made in China.
22              Now, let me tell you about something that
23   happened.  Let me bring you forward in time.  So our
24   bottle has been on the market since 2008.  It's going
25   great guns.  Nobody had seen anything like these sales,
```

1  even more than some of the really big, skyrocketing

2  vodkas.

3          Here is what happened.  There is something

4  called the Las Vegas Restaurant and Bar Trade Show.

5  It's one of the biggest in the industry every year.  All

6  the vendors, all the consumers, the people who buy and

7  sell alcohol come there to see what's new on the market,

8  what's old on the market.

9          Well, Kim Brandi decided that she was going

10  to -- not release her bottle.  Her bottle didn't come

11  out until fall, until November-December, 2010.

12          But she decided she was going to show the

13  world, the liquor world her bottle.  And so she created

14  a magazine.  She had been in the publishing end of the

15  business.  I told you she was editor and chief of

16  Beverage Industry News.  She created her own magazine

17  called Liquid Living.

18          There will be evidence, ladies and

19  gentlemen, we intend to prove, that she called a woman

20  by the name of Lucillia Crowe at a company called

21  Infinium.  Infinium is Globefill's importer.  Globefill

22  is made in Canada, in Newfoundland.  You have to have an

23  importer.  They have hundred of brands in Newfoundland.

24          There is going to be testimony from Ms. Crow

25  that Kim Brandi called her and said, We have a vacancy,

 1   a spot in our magazine.  An empty spot because another

 2   vodka -- I think it's called Ciroc -- dropped out.

 3   Would you send an ad for Crystal Head Vodka?  I think

 4   Ms. Brandi will try to deny that.

 5            Let me show you what that was about.  This

 6   magazine, Ms. Brandi and her then colleague passed out

 7   to everybody in this convention that they could find.

 8            This is the magazine cover.  If you can see,

 9   the highlight on the first page -- or the front page is

10   KAH Tequila.  The back page has three -- all three of

11   her bottles of KAH Tequila.  There is a three-page

12   spread on KAH Tequila in her magazine.  She is promoting

13   it.  She is coming to market.

14            Then there is another page with three of her

15   bottles.  And now we are going to find out where the ad

16   that our that Infinium innocently sent to Liquid Living

17   Magazine came out.

18            This is the centerfold, ladies and

19   gentlemen.  Next to Kim Brandi's picture -- she's on the

20   left, and that is her cofounder on the right.  Next to

21   her picture is Crystal Head Vodka, an attempt to

22   piggyback on all of our hard work.  An attempt to

23   exploit the time, money and energy that these two men

24   and others, like Jonathan Hemi over here, the managing

25   director of the company, others who put in to make this

1    a success.  This was an attempt, we think, intentionally

2    to confuse the consumer, the ordinary consumer, the

3    people at that show and other shows that she went to, we

4    think this was an attempt, we think the evidence will

5    clearly show it was an attempt to create confusion about

6    the source of KAH Tequila and Crystal Head Vodka, an

7    attempt to make it appear that KAH Tequila was part of

8    our family of products.

9            That's why we are here in this courtroom, to

10   fight, to defend what was a distinctive,

11   one-of-a-kind -- the bottles have disappeared.  One of

12   the lawyers is probably drinking it.  You have a

13   distinctive, one-of-a-kind bottle that's just never been

14   done before.

15           It deserves the protection of a Court.  It

16   deserves the protection of reasonable men and woman who

17   can look at the evidence and make a significant decision

18   about whether or not Kim Brandi and Elements have

19   infringed on our trade dress, the skull bottle, as Her

20   Honor told you yesterday, about the source, to create

21   confusion about the source of the bottle, because they

22   are confusingly similar.

23           There are differences in the bottle, we

24   readily concede that.  One is painted, one isn't

25   painted.  Ours isn't painted.  They've got three painted

1    bottles.

2            But this is not a case about someone walking

3    into a liquor store wanting to buy KAH Tequila and

4    buying instead a bottle of Crystal Head Vodka, or

5    someone wanting to buy a bottle of Crystal Head Vodka

6    and buying a bottle of tequila.  It is not a case about

7    the dissimilarities.  I mean, one is painted, one isn't.

8    It's a case about the similarities.

9            That's what the defendants have to explain

10   to you.  How was it that two years after we came out

11   with Ms. Brandi's exposure -- she had been in the liquor

12   industry, in publication mostly, for more than two

13   decades when we came out with our bottle.  They have to

14   explain to you, how did these similarities occur?

15           You've got the same skull shape, never been

16   done before.  You've got that tilted head; about the

17   same size; and these defined features.

18           I heard secretary Clinton say, You're in the

19   campaign when you see a turtle on top of a fence post.

20   It didn't get there by accident.

21           This is not a series of coincidences.  The

22   proof in this case -- we intend to prove that the bottle

23   was copied with an intentional -- with the intent to

24   infringe on our trade dress.

25           After the trade show in Las Vegas, Danny and

1   John had their lawyers send what is called a cease and
2   desist letter.  It was a letter that you'll see in the
3   evidence when the time comes that told Ms. Brandi -- I
4   mean, by the time the show was over, we knew all about
5   KAH Tequila -- KAH Tequila in Liquid Living Magazine.
6           THE COURT:  Counsel has five minutes.
7           MR. BERG:  We sent a cease and desist letter
8   to Ms. Brandi courteously asking her not to go to market
9   with her bottle.  Now, she obviously knew about our
10  bottle.  She put it in her magazine.  She had the cease
11  and desist order.
12          Let me tell you one other coincidence.  Do
13  you know who the keynote speaker was at that Las Vegas
14  convention?  It was Danny.  Danny Aykroyd was there to
15  talk about Crystal Head Vodka and talk about the
16  business that he was trying to make a success and was
17  being successful.
18          So all these coincidences tell you that she
19  went into the sale and marketing of her product, which
20  came out later that year, in November of 2010,
21  intentionally, with full knowledge of our bottle, and
22  with the intent to make it appear that KAH Tequila was
23  part of our family of products or vice versa.
24          And now, all over the country, when you go
25  into a liquor store you will see these two bottles side

1    by side.  Usually you see tequila over on one side,

2    vodka over on another, scotch here, bourbon there.  You

3    see them elsewhere.  You see them separated.

4            Now we're going to show you evidence of

5    those bottles sold side by side and the confusion even

6    among the retailers about whether or not KAH and Crystal

7    Head are manufactured by the same company.

8            It is kind of an identity theft.  It is not

9    like stealing your credit card.  But it is borrowing all

10   the hard work that it took to put this together.  All of

11   the time, energy and money.

12           It is a simple matter.  It's in King James,

13   Exodus 20:  Thou shall not steal.  Thou shall not covet

14   thy neighbor's property.  It is simple matter of doing

15   what's right and doing what's wrong.

16           In closing, I want to tell you, and I'm

17   really not trying to ingratiate myself to you, what you

18   do is really important.  Every lawyer in this courtroom,

19   every person in this courtroom believes in the 7th

20   Amendment right to this jury trial.  It has probably

21   never been as important to underscore the importance of

22   your role, probably in the history of our country.

23           You are the sole judges of the facts.  Her

24   Honor will instruct you on the law.  It will be your

25   decision.  It is in your hands as to the facts of this

1    case.  We think the evidence will lead you to the

2    conclusion that I suggest to you today, that KAH

3    Tequila, the bottles that you looked at, are a knockoff

4    of our very beautiful bottle, Crystal Head Vodka.

5                Thank you.

6                THE COURT:  The defense will now make its

7    opening statement.

8                MR. HUMMEL:  I just have to organize my own

9    props.

10               Good morning, ladies and gentlemen of the

11   jury.

12               As I introduced myself before, I am Keith

13   Hummel.  I represent Elements Spirits.  You met my team.

14   Later today, throughout this trial, they are going to be

15   standing at this podium addressing you and addressing

16   witnesses as we go through this.

17               This is the Crystal Head Vodka.  I will

18   start the same way Mr. Berg did.  No one is disputing

19   that Crystal Head Vodka has rights on this bottle.

20               But I want to be absolutely clear about

21   something.  Elements Spirits and Kim Brandi never copied

22   this bottle.  They have never sold a product in this

23   bottle.

24               Crystal Head's position is that anyone --

25   you'll hear this throughout the trial -- that anyone who

1  sells an alcoholic beverage in any bottle that looks

2  like a skull in any way infringes their trade dress.

3  That is a very broad statement.

4        And we know in this country if you have

5  rights to a trade dress, you are entitled to those

6  rights.  But you are not entitled to keep other unique

7  products off the market.  And that's what this trial is

8  about.

9        Mr. Berg addressed a lot of his parts of the

10 facts.  It will come as no surprise to you that we

11 disagree with the conclusions he reaches from the

12 evidence that he chose to show you.

13       But throughout the trial, you are going to

14 hear Ms. Brandi talk about those items.  And you will

15 hear the fact that none of those conclusions that

16 Mr. Berg has drawn are based in reality or in fact.

17       But what I want to talk about is the fact

18 that there are two companies here that achieved two

19 different products in two completely different ways with

20 two completely different inspirations.

21       Essentially we have two products that are a

22 result of two very different paths.

23       The KAH Tequila brand -- and the word is

24 KAH, K-A-H.  The KAH Tequila brand was the invention of

25 Kim Brandi.  Kim Brandi is sitting right here in the

1   courtroom today.  And you will hear from Ms. Kim -- from

2   Ms. Brandi when she takes the witness stand.

3           But for today Ms. Brandi, has to rely on me,

4   and Elements has to rely on me to provide a summary of

5   what the evidence is going to show here from our

6   perspective.

7           Ms. Brandi is going to be -- the evidence is

8   going to show that Ms. Brandi is the driving force

9   between KAH -- behind KAH Tequila.  It was her idea.  It

10  was her creation.  And it was her dream to bring that

11  product to market.

12          And she did it independent of what the

13  Crystal Head Vodka folks were doing, what Mr. Aykroyd

14  was doing, and what Mr. Anderson was doing.

15          You will see from Ms. Brandi that she drew

16  upon her Mexican-American heritage in designing her

17  product.

18          She has extensive, as Mr. Berg said,

19  extensive experience in the beverage industry.

20          But what he didn't tell you is that she

21  started as a bartender and she worked her way up in the

22  industry to a publisher, to a designer.

23          And as many people do in that industry, you

24  get the idea to create your own type of liquor brand.

25  And she had that idea.

1          And the idea that she had which sparked when

2      she worked on a thing called the -- if I get the word

3      right -- Spirits of Mexico Festival in 2006.  And she

4      started learning all about tequila.  Tequila is a unique

5      product that is only made in one province of tequila.

6      It is extensively drunk in Mexico and also in this

7      country.

8          She learned how it was made.  It is made

9      from agave, a plant.  She learned how it is distilled.

10     She learned the certifications you need.  She learned

11     all about tequila.

12         And then she had her idea.  What if I make a

13     tequila with the Day of the Dead celebration themes?

14     What is the Day of the Dead?  The Day of the Dead is an

15     ancient Mexican celebration.

16         It is now celebrated around the time the

17     Catholics celebrate All Souls Day and All Saints Day.

18     And it is a celebration of the life of the deceased

19     loved ones.  And it is celebrated by visiting the graves

20     of the deceased.  And it is celebrated by preparing

21     gifts and bringing them to the graves.

22         There are certain images associated with the

23     Day of the Dead that Ms. Brandi wanted to use:  Death,

24     similar to the grim reaper; the devil; skeletons.  She

25     wanted to put them on a tequila bottle.  She thought she

1    had a great idea.

2              I'm going to marry the Day of the Dead

3    celebration, the uniquely Mexican holiday, with tequila,

4    the uniquely Mexico product.

5              What does she do?  She started designing a

6    bottle.  She was going about, trying to figure out what

7    kind of bottle to make.  She was going to put it in a

8    black bottle with the characters on it.

9              She took her kids one day, the evidence will

10   show, to Venice Beach.  If you've been to Venice Beach,

11   you know that there are people selling all sorts of

12   stuff out there.

13             And there was a big crowd gathered around a

14   bunch of tables.  And on those tables piled high were

15   these little calaveras.  Calaveras are caricatures

16   cartoons, most of a skull, that are prepared out of

17   sugar during the Day of the Dead celebrations.

18             And she had her essentially eureka moment.

19   What if I take these calaveras -- which, by the way,

20   were selling like hot cakes.  People were paying 20

21   bucks for these little painted calaveras by these

22   artists.  What if I married the calaveras to the Day of

23   the Dead celebration?  That's what she started to do.

24             She didn't go find a bottle, Crystal Head

25   Vodka.  What she did was she bought little calaveras.

1  She bought a pile of those, and you'll see pictures of

2  them at her kitchen table, to come up with this design,

3  the bottle -- she had to then figure out what art work

4  to put on it.  And she did.  She put on the skeleton.

5  Death.  Diablito, the little devil.

6          Now, Mr. Berg in his opening, said there

7  were other bottles, but all he showed you were these.

8  Why?  Because he thinks these look the same.

9          But this case here is about all of these

10 bottles.  And does this trade dress -- when these

11 bottles are displayed next to each other in the store,

12 do they create the impression of their own trade dress,

13 or are they confusingly similar to that?  We believe the

14 evidence will show absolutely no possibility of

15 confusion.

16          To finish with what Brandi will tell you.

17 She had to find a bottler.  She had to find a producer

18 of premium tequila.  She had to find a name.  She chose

19 KAH.  KAH is an ancient Mayan name.  It means "life."

20          Consistent with the theme, Day of the Dead,

21 calaveras, tequila, Mexican, life.  Day of the Dead

22 celebration being a celebration of life.

23          This took months and months and months.  If

24 Ms. Brandi had simply bought this bottle and copied it,

25 that could have been done instantaneously.  You make a

few alterations and you're done.

But just like the path that Mr. Alexander and Mr. Aykroyd and the others at Globefill took, it took a long, long time.  The evidence will show that it took Ms. Brandi a real long time.

She founded Elements so that she could market the KAH Tequila.  And everything seemed to be going well.  It seemed like her dream was going to be realized.

And then, boom, out of the blue, Globefill sends what Mr. Berg calls a cease and desist letter.  A cease and desist letter is either a politely or impolitely worded letter that says:  Stop what you are doing or we are going to sue you.

And Globefill waited all of one week -- I think it was even less than a week -- and sued Ms. Brandi, and put everything into turmoil for her. Delayed the introduction, as you will hear from her, of her tequila bottle, delayed her dream while she found a way around this lawsuit.

This started in a kitchen table.  It didn't start in an artist's loft.  It wasn't a world renowned artist that did this.  This was one person and one person's dream.  And that person is in the courtroom, and you will hear extensively from her.

```
 1              The issue here, though, is likelihood of
 2   confusion.  And as you hear the evidence from all the
 3   witnesses, I want you to keep a few things in mind about
 4   whether there is truly any likelihood of confusion in
 5   the eyes and minds of an ordinary consumer who is
 6   exercising his or her common sense, because you don't
 7   have to throw common sense out.
 8              Would a person considering everything about
 9   these bottles be confused between the two, between the
10   source or origin of them?
11              And there are a couple of things I want you
12   to think of as you hear the evidence.  First, the two
13   brands used completely different marketing themes.
14              You heard, and you will hear, that KAH is
15   associated with the Day of the Dead, closely associated
16   with the Day of the Dead, a uniquely Mexican
17   celebration.
18              This skull is based on a completely
19   different theme.  It is based on something called "The
20   legend of the 13 crystal skulls."  Which Mr. Berg did
21   not mention in his opening, but you will hear
22   extensively about in this trial.
23              The legend, which I didn't know anything
24   about until I started working on this case, is that
25   aliens or star children, whatever you want to call them,
```

1    placed 13 crystal skulls thousands of years ago around

2    the world.  And that they were used by shamans to see

3    into the future for their tribes.

4              That's the basis for this head.  In fact,

5    Mr. Aykroyd, when he saw Mr. Alexander's drawings,

6    thought that this looked like one of the -- the drawing

7    looked like one of the skulls something called the

8    Mitchell-Hedges skull.

9              So the marketing campaign around Crystal

10   Head has been purity, purity, purity.  Glass is pure.

11   The vodka is pure.  There are no -- allegedly no

12   impurities in it whatsoever.

13             The whole idea was a Canadian product.  And

14   there's a box, which you'll see.  There's a box that

15   tells the story of the insert, which tells the story of

16   the 13 crystal skulls.  And it talks all about the pure

17   waters of Newfoundland and the grain that's used from

18   Canada to make the vodka.  So clarity, purity, all

19   playing off the legend of the 13 crystal skulls.

20             The tequila is made in four different

21   colors.  And is marketed under the Day of the Dead

22   celebration.

23             Two, there are different liquids here.  We

24   have the vodka from Canada, clear.  We have tequila,

25   which is made from the agave plant in Mexico.

1          There is no cross-over between the products.
2    Crystal Head does not make a tequila.  KAH does not make
3    a vodka.  There is no cross-over.
4          And I'm sure many of you have been to a
5    liquor store or a grocery store or some other store that
6    sells different liquors, and the liquors are actually
7    sold in different locations, in the vast majority of
8    places, the evidence will show.
9          The vodka, logically enough, common sense
10   will tell you, is placed in the vodka section.  The KAH
11   Tequila is placed in the tequila section.
12         The evidence will show that when someone
13   goes to shop for their favorite vodka, if it be Crystal
14   Head, they are not going to get confused if it's not
15   there and wander over to the tequila aisle and pick up
16   this because they think it's their own vodka.
17         There is not any possibility of confusion
18   here.  It defies common sense.  And there may be
19   instances where during Halloween the store may place a
20   bunch of products, these and others, bottles with
21   skeletons on it.
22         But consumers are -- they use common sense.
23   They know that if there is a display in the beginning of
24   the store with Halloween-themed products, that not all
25   of those products are made by the same producer.  It is

1    just common sense.

2              Then, finally, you are going to hear a lot

3    of witnesses; but, unfortunately, the bottles, although

4    they have mouths, can't talk.

5              You are going to see and touch these

6    bottles.  You are going to look at intricate details of

7    them.

8              Crystal Head -- and just to point out a few

9    of them, which are obvious to you sitting in the jury

10   box.  Crystal Head Vodka is clear.  The KAH Tequila

11   bottles are opaque.  The Crystal Head bottle has no

12   decoration, sticking with its theme.  The KAH Tequila

13   bottles are highly decorated.

14             Just look at the Resposado.  The Resposado

15   has the diablito.  It has burning eyes.  It has teeth

16   that are painted on.  It has decoration on this side.

17   Actually has all sorts of decorations on it.  The others

18   are equally decorated.

19             The texture of the bottles, as you felt

20   them, two of them, is very different.  This is meant to

21   be an anatomically correct skull.  And there will be

22   testimony about that.  There are teeth.  There are

23   temples.  There are eye sockets.

24             This is meant to be a caricature, calaveras.

25   It has cheeks that you would never see in a skull.  It

```
 1    looks completely different.  It is flatter.  It's

 2    shorter.

 3              These are different bottles.  They are very

 4    different bottles.  Which create a very different

 5    impression to the consumer of alcohol beverages.  Don't

 6    get me wrong.

 7              THE COURT:  Counsel has four minutes.

 8              MR. HUMMEL:  Yes, Your Honor.  I'm almost

 9    done.

10              Don't get me wrong, these are works of art.

11    This is not a cheap knockoff.  These are works of art.

12    They are works of art that should be able to co-exist

13    with each other.  Because consumers are not going to be

14    confused about it.

15              They are works of art, but they are very,

16    very, very different works of art.

17              And I think you will see that as you hear

18    the evidence in the time that we spend with each other.

19              That concludes my remarks.  I don't know if

20    Mr. Miller has anything to add to that.  But, you know,

21    I want to also in advance thank you for your time.

22              At the conclusion of this trial, I'm going

23    to be standing up here at this podium again, but this

24    time I'm going to -- you will have heard all the

25    evidence, and I'm going to demonstrate to you that what
```

1  I just told you, the stories that I just told you, which

2  as the Court told you are not evidence, are absolutely

3  true and are backed up by the evidence that you will

4  have seen throughout this trial.

5          And I want you to hold me and everybody else

6  in courtroom to that standard.  And then I will ask you

7  to render a verdict for any client, Elements Spirits.

8  Thank you very much.

9          THE COURT:  Defense has two minutes left.

10          MR. MILLER:  Thanks for that.

11          MR. BERG:  Sorry.

12          MR. MILLER:  Well, I have 98 seconds.  I

13  thank you all again, as everybody has, for your service.

14          Yesterday was a tough day for all of us, and

15  you guy all toughed through it.  At least, I think, from

16  this point on, it will be a little more interesting.

17  And I hope we can move through it as quickly as

18  possible.  I do.

19          I'm John Miller.  I represent Kim Brandi.

20  Kim Brandi is not a thief.  The evidence is going to

21  show that her efforts to create the KAH Tequila brand

22  were as painstaking and it took as long at the efforts

23  made in the creation of this other fine product.  These

24  are good products.  They developed simultaneously.  One

25  I think is an amazing piece of folk art, and one is very

1    interesting from an anatomical standpoint.

2            You are going to -- you will meet Kim

3    Brandi.  You learn very quickly that she is not a thief.

4    That is all I have to say right now.  Thank you.

5            THE COURT:  Now that the jurors have heard

6    the opening statements by both sides, I will be reading

7    to you some preliminary instructions that will give you

8    guidance as you serve as jurors in the case.

9            After all the evidence has been presented

10   and the closing arguments by counsel, I will read

11   instructions of law.  During the course of presentation

12   of evidence, I may read some of the instructions to help

13   you follow the evidence that's being given and

14   understand what the law requires or what the law says

15   about the legal issues that will ultimately be

16   determined as the jury finds the facts.

17           You are now the jury in the case.  It is my

18   duty to instruct you on the law.  It is your duty to

19   find the facts from all the evidence in the case.  To

20   those facts, you will apply the law as I give it to you.

21   You must follow the law as I give it to you whether you

22   agree with it or not.  And you must not be influenced by

23   any personal likes or dislikes, opinions, prejudices, or

24   sympathy.

25           That means that you must decide the case

1   solely on the evidence before you.  You will recall that

2   you took an oath to do so.  At the end of the trial, I

3   will give you final instructions.  It is the final

4   instructions that will govern your duties.

5          Please do not read into these instructions

6   anything that I may say or do that I have an opinion

7   regarding the evidence or what your verdict should be.

8          When a party has the burden of proving any

9   claim by a preponderance of the evidence, it means you

10  must be persuaded by the evidence that the claim is

11  probably true than not true.

12         You should base your decision on all the

13  evidence, regardless of which party presents it.

14         You must decide the case as to each

15  defendant separately.  Unless otherwise stated, the

16  instructions apply to all parties.

17         What is the evidence?  The evidence that you

18  are to consider in deciding what the facts are consists

19  of:  One, the sworn testimony of any witness; two, the

20  exhibits which are admitted into evidence; three, any

21  facts to which the lawyers have agreed; and four, any

22  facts that might -- that I may instruct you to accept as

23  proved.

24         Some things are not evidence.  And this

25  instruction helps -- gives you guidance as to what those

 1   things may be.  In reaching your verdict, you may

 2   consider only the testimony and the exhibits received

 3   into evidence.

 4           Certain things are not evidence, and you may

 5   not consider them in deciding what the facts are.  I

 6   will list them for you.  Number one:  Arguments and

 7   statements by lawyers are not evidence.

 8           So you just heard the opening statements by

 9   the attorneys, and that's not evidence.

10           The lawyers are not witnesses.  What they

11   have said in their opening statements may -- and in

12   their closing arguments, and at other times is intended

13   to help you interpret the evidence but is not evidence.

14           If the facts, as you remember them, differ

15   from the way the lawyers have stated them, it is your

16   memory of them that controls.

17           Two, any questions or objections by lawyers

18   are not evidence.  Attorneys have a duty to their

19   clients to object when they believe a question is

20   improper, under the rules of evidence.

21           You should not be influenced by the

22   objection or by the Court's ruling on it.

23           Number three, testimony that is excluded or

24   stricken or that you are instructed to disregard is not

25   evidence and must not be considered.

1              In addition, some evidence may be received

2     only for a limited purpose.  When I instruct you to

3     consider certain evidence only for a limited purpose,

4     you must do so, and you may not consider that evidence

5     for any other purpose.

6              Number four, anything that you may see or

7     hear when the Court is not in session is not evidence.

8     You are to decide the case solely on the evidence

9     received at trial.

10             So it may be that if you were in common

11    areas of the courthouse, you may see parties in this

12    case or the attorneys talking, that's -- if you overhear

13    their conversation, that's not evidence because we are

14    not in session.

15             So this instruction gives you guidance.  In

16    session means that you are in the box, the Judge is on

17    the bench, and the lawyers are at their tables.  That

18    means we are in session.

19             So anything else that you may see or hear

20    when we are not in session is not evidence in the case,

21    even if you think it may be related to the case.

22             And I ask that you bring that to my

23    attention.  So if you overhear something, you see

24    something, you have some confusion, well, is that

25    something we should consider?  Is it evidence?  You will

1   tell the courtroom deputy.  She will relay that to me,

2   and I will speak with you if it is necessary.

3             Some evidence may be admitted only for a

4   limited purpose, and that does happen in some trials.

5   And when it does occur, the Court gives an instruction

6   to the jury as to the purpose for which this evidence

7   has been received, and you must follow that limiting

8   instruction.

9             Evidence may be direct or circumstantial.

10  Direct evidence is direct proof of a fact; such as

11  testimony by a witness about what that witness

12  personally saw or heard or did.

13            Circumstantial evidence is proof of one of

14  more facts from which you may find another fact.

15            You should consider both kinds of evidence.

16  The law makes no distinction between the weight to be

17  given to either direct or circumstantial evidence.  It

18  is for you to decide how much weight to give to any

19  evidence.

20            There are rules of evidence that control

21  what can be received into evidence.

22            When a lawyer asks a question or offers an

23  exhibit into evidence, and the lawyer on the other side

24  thinks it is not permitted by the rules of evidence,

25  that lawyer may object.

1           If I overrule the objection, the question

2     may be answered or the exhibit received.  If I sustain

3     the objection, the question cannot be answered and the

4     exhibit cannot be received.

5           When I sustain an objection to a question,

6     you must ignore the question.  You must not guess what

7     the answer might have been.

8           Sometimes I may order that evidence be

9     stricken from the record, and that you disregard or

10    ignore that evidence.  That means that when you are

11    deciding the case, you must not consider the stricken

12    evidence for any purpose.

13          In deciding the facts in the case you may

14    have to determine which testimony to believe, which

15    testimony not to believe.

16          You may believe everything a witness says or

17    part of it or none of it.  In considering the testimony

18    of any witness, you may take into account, number one,

19    the opportunity and ability of the witness to see or

20    hear or know the things testified to.

21          Number two, the witness' memory.  Number

22    three, the witness' manner while testifying.  Number

23    four, the witness' interest in the outcome of the case,

24    if any.  Number five, the witness' bias or prejudice, if

25    any.  Number six, whether other witnesses contradicted

1    the witness' testimony.  Number seven, the

2    reasonableness of the witness' testimony in light of all

3    the evidence.  And number eight, any other factors that

4    bear on believability.

5              Sometimes a witness may say something that

6    is not consistent with something else he or she said.

7    Sometimes different witnesses will given different

8    versions of what happened.  People often forget things

9    or make mistakes in what they remember.  Also, two

10   people may see the same event or remember it

11   differently.

12             You may consider these differences.  But do

13   not decide that testimony is untrue just because it

14   differs from other testimony.

15             However, if you decide that a witness has

16   deliberately testified untruthfully about something

17   important, you may choose not to believe anything that

18   witness said.

19             On the other hand, if you think the witness

20   testified untruthfully about some things but told the

21   truth about other things, you may accept the part you

22   think is true and ignore the rest.

23             The weight of the evidence as to a fact,

24   does not necessarily depend on the number of witnesses

25   who testify.  What is important is how believable the

1   witnesses were and how much weight you think their

2   testimony deserves.

3           Let me say a few words about your conduct as

4   jurors.  First, keep an open mind throughout the trial.

5   Do not decide what the verdict should be until you and

6   your fellow jurors have come completed your

7   deliberations at the end of the case.

8           Second, because you must decide this case

9   based only on the evidence received in the case and on

10  my instructions as to law that applies, you must not be

11  exposed to any other information about the case or the

12  issues it involves during the course of your jury duty.

13          Thus, until the end of the case or unless I

14  tell you otherwise, do not communicate with anyone in

15  any way.  Do you not let anyone else communicate with

16  you in any way about the merits of the case or anything

17  to do with it.

18          This includes discussing the case in person,

19  in writing, by phone, or electronic means, via email,

20  text messaging or any Internet chatroom, blog, Website

21  or application, including but not limited to Facebook,

22  YouTube, Twitter, Instagram, LinkedIn, Snapchat or any

23  other form of social media.

24          This applies to communicating with your

25  fellow jurors until I give you the case for

```
1   deliberation, and it applies to communicating with
2   everyone else, including your family members, your
3   employer, the media, or the press.  And the people
4   involved in the trial.
5           Although you may notify your family and your
6   employer that you have been seated as a juror in the
7   case, and how long you expect the trial to last, but if
8   you're asked or approached in any way about your jury
9   service or anything about this case, you must respond
10  that you have been ordered not to discuss the matter and
11  report that contact to the Court.
12          Because you will receive all the evidence
13  and the legal instructions you properly may consider to
14  return a verdict, do not read, watch or listen to any
15  news or media accounts or commentary about the case or
16  anything to do with it.
17          Although I have no information that there
18  will be news reports about the case, do not do any
19  research, such as consult in dictionaries, searching the
20  Internet or using other reference materials.
21          And do not make any investigation or in any
22  other way try to learn about the case on your own.  Do
23  not visit or view any place that is discussed in the
24  case.
25          Do you not use Internet programs or other
```

devices to search for or view any place discussed during the trial.

Also, do not do any research about the case, the law, or the people involved, including the parties, the witnesses or the lawyers until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media, turn away and report it to me as soon as possible. So if it's print material, I instruct you to bring it in with you, if you read something, even though inadvert. Do not show it to any of the jurors. And do not discuss it with them.

You would give it to the courtroom deputy. She would give it to me. I would review it and question you if I think necessary.

These rules protect each party's right to have this case decided only on the evidence that has been presented here in court. Witnesses here in court take an oath to tell the truth. And the accuracy of their testimony is tested through the trial process.

If you do any research or investigate outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete or misleading information that has not been tested by the trial

1    process.

2              Each of the parties is entitled to a fair

3    trial by an impartial juror.  And if you decide the case

4    based on information not presented in the court, you

5    will have denied the parties a fair trial.

6              Remember, you have taken an oath to follow

7    the rules.  And it is very important that you follow

8    these rules.

9              A juror who violates these restrictions

10   jeopardizes the fairness of these proceedings, and a

11   mistrial could result, that would require the entire

12   trial process to start all over again, including jury

13   selection.  If any juror is exposed to any outside

14   information, please notify the Court immediately.

15             If there are any news media accounts or

16   commentary about the case or anything to do with it, you

17   must ignore it.  You must not read, watch, listen to any

18   news media account or commentary about the case, or

19   anything to do with this.

20             The case must be decided by you solely and

21   exclusively on the evidence that will be received in the

22   case, and on my instructions as to the law that applies.

23             If any juror is exposed to any outside

24   information, please notify me immediately.

25             I urge you to pay close attention to the

1   trial testimony as it is given.  During deliberations

2   you will not have a transcript of the trial proceedings.

3   So even though we have a reporter here taking down every

4   word, it may be transcribed, it may not; but that

5   transcript would not be available to the jury.

6           You will be relying on your memory, and any

7   notes that you may take.

8           If you wish, you may take notes, and that's

9   why we gave you the note tablets, to help you remember

10  the evidence.

11          If you do take notes, please keep them to

12  yourselves until you go to the jury room to decide the

13  case.

14          Do not let notetaking distract you.  When

15  you leave, your notes should be left in the courtroom.

16  No one will read them.  They will be returned to you the

17  next day.

18          And then when you go in to deliberate after

19  the end of the case, all the evidence is in, arguments

20  have been made, instructions have been given, then you

21  may take the note tablets with you.

22          There should not be any other notes in those

23  notebooks, because we are supposed to destroy those

24  after a jury is excused.  So if you find any notes, then

25  you need to bring that to the Court's attention.

1          Whether or not you take notes, you should

2    rely on your own memory of the evidence.  Notes are only

3    to assist your memory.  You should not be overly

4    influenced by your notes or those of other jurors.

5          And notetaking is like taking notes

6    anywhere, this is not different.  So if you attend a

7    lecture or if you are work and someone is giving you

8    information, you may take notes.  But here remember,

9    observing the witness' demeanor on the witness stand may

10   be something that is important to your fact-finding

11   function.

12          If you are not observing the witness because

13   you are busy taking notes, that may be distracting, then

14   you don't have that observation to consider during your

15   deliberations.

16          A question that's commonly asked is whether

17   the jurors are permitted to ask questions during the

18   presentation of evidence.  And the answer to that is

19   yes, you are permitted to ask questions.  This

20   instruction gives you guidance as to how that will be

21   done.

22          You will are allowed to propose written

23   questions after the lawyers have completed their

24   questioning of each witness.  You may propose questions

25   in order to clarify the testimony.  But you are not to

express any opinion about the testimony or argue with

the witness.  If you propose any questions, remember

that your role is that of a neutral fact finder, not an

advocate.

Before I excuse each witness, I will offer

the opportunity to write out a question on a form

provided by the Court.  Do not sign the question.  I

will review the question with the attorneys to determine

if it is legally proper.

So sometimes jurors may ask a question and

none of us have the answer to that question, because

this is a real situation that occurred.  It is not a

play that someone has written or a book that someone has

written.  So it could be that the answer will be, We

don't know.

Other times jurors may ask questions about

things that are not relevant, have nothing to do with

the issues in this case, you are just curious.  And the

answer to that may be:  Not relevant.

And then there are times that jurors will

ask a question, and the Court and the parties know that

another witness is going to testify to that subject,

that is the subject of your question.  So that answer

may be, there will be a witness called later and that

witness will explain.

1            However, since you are the fact finders, as

2    you are listening to testimony, you may think of a

3    question that you would like to have answered.  So you

4    are permitted to put that question in writing and pass

5    it up.  And if we can answer it, we will do so.  As I

6    said, if another witness is going to testify on that

7    subject, that may be the instruction or the response the

8    Court will give.

9            Witnesses are sometimes excused after they

10   give their testimony.  That's means they are free to

11   leave.  They are not here in the courthouse.  They may

12   go to work, home, whatever they would typically be

13   doing.  So if you wait to ask your questions after the

14   witness has been excused or during deliberations, it

15   maybe that that witness is no longer available to answer

16   that question.  So we may not be able to give you an

17   answer because the witness has now left.  That's why the

18   Court will wait before the Court excuses a witness to

19   respond to any question that you may have.

20           There are some proposed questions that I

21   will not permit or I will not ask in the wording that's

22   been submitted by the jury.  This might happen either

23   due to the rules of evidence or other legal reasons, or

24   because the question is expected to be answered later in

25   the case.

1           If I do not ask a proposed question, or if I

2    rephrase the question, do not speculate as to the

3    reasons.  Do you give undue weight to questions you or

4    other jurors propose.  You should evaluate the answers

5    to these questions in the same manner that you evaluate

6    all of the evidence.

7           By giving you the opportunity to propose

8    questions, I am not requesting or suggesting that you do

9    so.  It will often be the case that a lawyer has not

10   asked a question because it is legally objectionable or

11   because a later witness may be addressing that subject.

12          So if you have a question, what we ask you

13   to do is not to identify yourself.  Don't say "This is

14   from Juror No. 1," or don't put your name on it.  You

15   pass it down to the end of the jury box.  That juror,

16   Juror No. 8, would hold up the paper.

17          Hopefully we are all paying attention and

18   we'll notice there's a question.  The courtroom deputy

19   will take it.  I will read it, discuss it with the

20   lawyers before the witness leaves, and then try to

21   respond to your question.

22          From time to time during the trial it may be

23   necessary for me to talk with the attorneys out of the

24   hearing of the jury, either by having a conference at

25   the bench when the jury is present in the courtroom or

1    by calling a recess.

2              Please understand that while you are

3    waiting, we are working.  The purpose of these

4    conferences is not to keep relevant information from

5    you, but to decide how certain evidence is to be treated

6    under the rules and evidence and to avoid confusion and

7    error.

8              Of course, we will do what we can to keep

9    the number and length of these conferences to a minimum.

10   I may not always grant an attorney's request for a

11   conference.  Do not consider my granting or denying a

12   request for a conference as any indication of my opinion

13   of the case or what your verdict should be.

14             Now, you saw some of this yesterday when we

15   were selecting the jury, we went to sidebar and talked

16   to jurors.  I do try to minimize these conferences.  As

17   a matter of fact, I try not to have sidebars.  And

18   that's one of the reasons for the hours that you will be

19   working.

20             When the jury is excused for the day, then

21   the Court will meet with counsel to discuss anything

22   that may come up the following day, so that the Court

23   can rule on those things if necessary or give guidance

24   to the lawyers.  That way we can avoid sidebars.  So

25   that when you are in the box, you are actually listening

1    to testimony that's being given by the witnesses.

2              So last night after you left we continued to

3    work here to try to settle things that would be

4    presented to you today in the form of evidence.

5              Trials proceed in the following way.  First,

6    each side may make an opening statement.  And you've

7    heard that.  The opening statement is not evidence as I

8    indicated.  It is simply an outline to help you

9    understand what that party expects the evidence will

10   show.  A party is not required to make an opening

11   statement.  But in this case, you did hear from both

12   sides.

13             The plaintiff then presents evidence.  So

14   the plaintiff goes first, and counsel for the defendant

15   may cross-examine any witness who were called by the

16   plaintiff.  Or in some instances, the defendant was

17   planning to call that same witness, so the defendant

18   will conduct its examination.  So the jury gets to hear

19   all that is being offered, all the evidence is being

20   offered through a particular witness.  So that we don't

21   have to call the witness back next week or some other

22   day.  You should hear it while the witness is on the

23   stand.

24             After evidence has been presented and both

25   sides have rested, closing arguments will be made by the

1    attorneys and the Court will then instruct you on the

2    law.

3              So the last thing that you will hear will be

4    instructions of law, the case will then be given to the

5    jury so that you can retire to deliberate.

6              That completes the read of the preliminary

7    instructions.

8              We will take our morning break probably an

9    hour from now.  Why don't we stand and stretch before we

10   start the presentation of evidence.

11             THE CLERK:  So it appears the jury would

12   like to take the break now.

13             THE COURT:  Why don't we take the morning

14   break at this time.  The break will be 15 minutes.  So

15   during that time take care of personal needs.  But also

16   for those of you who want coffee or something that may

17   be available to you in the jury room, this would be time

18   to do it.

19             When you come back, we will be sitting and

20   in session for two hours.  We are in recess now.

21   15 minutes.

22             (15-MINUTE RECESS.)

23             THE COURT:  Thank you.  You may be seated.

24   The first witness may be called.

25             MR. BERG:  Your Honor, I call John Alexander

```
 1    to the stand.
 2              THE COURT:  The witness will come forward.
 3    This is the witness box.  The clerk will administer the
 4    oath.
 5              Will you be using exhibits with the witness?
 6              MR. BERG:  Pardon me, ma'am?
 7              THE COURT:  Will you be using exhibits with
 8    the witness?
 9              MR. BERG:  Yes, I will.
10              THE COURT:  And those have been identified
11    so the counsel knows which?
12              MR. BERG:  We identified them together.
13              THE COURT:  They are all deemed admitted?
14              MR. BERG:  Yes, Your Honor.
15              THE COURT:  I believe last night.
16              So you may use them since they are in
17    evidence.
18              MR. BERG:  Thank you.
19              And I will be asking the deputy clerk to
20    pass the exhibits to the witness at a point.
21              THE COURT:  Exhibits meaning the containers
22    that are at issue?
23              MR. BERG:  Yes.  Thank you.
24
25                   JOHN ALEXANDER,
```

1    Called as a witness herein, having been first duly

2  sworn on oath, was examined and testified as follows:

3         THE CLERK:  Have a seat.  State and spell

4  your name for the record.

5         THE WITNESS:  My name is John Alexander,

6  J-O-H-N, A-L-E-X-A-N-D-E-R.

7         MR. BERG:  My I proceed?

8         THE COURT:  Counsel may proceed.

9

10              **DIRECT EXAMINATION**

11  BY MR. BERG:

12    Q.  Mr. Alexander, introduce yourself to the jury

13  again, if you will, and tell them where you were born.

14    A.  My name John Alexander.  And I was born near the

15  Louisiana-Texas border, down in the Gulf Coast, in the

16  town of Beaumont, Texas.

17    Q.  I would like now just to go through your

18  education if we might.  Where did you attend high

19  school?

20    A.  I went to public school in Beaumont, Texas to --

21  1 through 10.  And then I went to high school also in

22  Beaumont, Texas.

23    Q.  Is that where you graduated, same city?

24    A.  Yes.

25    Q.  Did you get any graduate education, college

1   education?

2       A.   Upon graduation from high school, I went

3   immediately to a small university in my home town, Lamar

4   University.  And then --

5       Q.   Did you -- after you graduated -- well, tell us

6   what degree you had at Lamar.

7       A.   I got a bachelor of arts degree in -- officially

8   it's commercial art, but the major thrust of it was

9   painting and drawing.

10      Q.   Did you have a particularly inspiring professor

11  there?

12      A.   Yes, I did.  My -- the future of my career, the

13  trajectory that I went on after graduating from

14  university was set in motion by a very good professor

15  who was an academician who taught art in a very

16  old-fashioned way, learning how to draw from models and

17  skulls and skeletons and still lives.  Before you could

18  move up to the next level, you had to become proficient

19  in that.  It was a very academic style of education that

20  he instilled in me.  That was what I think made it

21  possible for me to go on and continue to have a career

22  in art.

23      Q.   Did you go immediately -- I know went to graduate

24  school.  Did you immediately go to graduate school?

25      A.   As soon as I graduated from Lamar University, I

1    went -- I taught high school for two years at Port

2    Neches-Groves High School, a suburb of Beaumont, between

3    Beaumont and Port Arthur.

4        Q.  What did you teach?

5        A.  I taught art classes.

6        Q.  And after you -- why did you not go into graduate

7    school immediately?

8        A.  Financially it seemed to make sense to get some

9    money together.  Also, I thought it was a wonderful

10   opportunity that was afforded to me to teach, and I

11   thought it would give me experience and help me as I

12   moved forward in my career.

13       Q.  After Port Neches High School, where did you go?

14       A.  I went to graduate school at SMU, Southern

15   Methodist University in Dallas, Texas.

16       Q.  What degree did you receive?

17       A.  A master of fine arts.

18       Q.  Can you tell the jury what your focus was there?

19       A.  Painting and drawing.

20       Q.  And after what -- you got a master's in fine

21   arts?

22       A.  Yes.

23       Q.  And after that, what was your next -- where did

24   you go next?

25       A.  As soon as I graduated, I moved from Dallas to

1    Houston, Texas, where I set up a studio in an old house.

2    I started my career there in Houston.

3          Shortly after I moved to Houston, I got another

4    opportunity.  Someone called me and asked me if I would

5    be a drawing instructor at the University of Houston.

6    And I said yes.

7          And that ended the painting and drawing.  I ended

8    up teaching at the University of Houston from 1971 to

9    1979.

10   Q.   Were you selling your paintings at that point?

11   A.   Just gradually over that period of time I sold

12   paintings, yes.

13   Q.   Let me take you back now, to give the jury an

14   idea of some of the work you did as a young man.

15         How would you describe the family you came from?

16   A.   Well, Beaumont was a -- what's written about is a

17   bleak Gulf Coast industrial town.  It was docks and

18   shipbuilding and refineries, and surrounded by these

19   very beautiful swamps and bayous -- what you think of as

20   traditional West Louisiana, East Texas bayous, what you

21   might call alligator country.

22         They were shipbuilding and refineries and -- my

23   father was a much older man.  He retired before I was

24   born and he retired from working as a construction man

25   primarily in the oil industry.  But he was construction

```
 1    engineer.  My mother was a clerk at a drug store and

 2    also a nurse.

 3       Q.  If I might interrupt for a moment, let's talk

 4    about your relationship with your father for a minute.

 5    Did that have any effect on your art career?

 6       A.  The fact that he was older allowed him -- and was

 7    retired, allowed him to spend time with me as a little

 8    boy.  So when I was growing up --

 9       Q.  Mr. Alexander, how old was your dad when you were

10    born?

11       A.  He was 68.

12       Q.  How many years did you have your dad?

13       A.  He died when I was 19 years old.

14       Q.  What happened in between that had an effect on

15    your art career?

16       A.  Well, he made -- he allowed me to become an avid

17    naturalist.  I loved being outdoors.  I loved to go in

18    the bayou country and fish, camp out.  We spent enormous

19    amounts of time because we had that opportunity to spend

20    in nature.  And he was a great naturalist and a very

21    avid believer in the outdoors.  And so he instilled that

22    in me.

23       Q.  How did that translate later into your painting?

24    What is your main kind of painting?

25                THE COURT:  We have two questions.  One,
```

1  please.

2           MR. BERG:  I'm sorry.

3  BY MR. BERG:

4     Q.  What is your main kind of painting?

5     A.  We'll, I'm primary known as a person who paints

6  kind of romanticized landscapes; bird life landscape,

7  birds in their natural environment, that kind of thing.

8     Q.  Let me ask you to tell the jury some of the jobs

9  that I mentioned earlier that you had as a young man.

10    A.  The first job I ever had was my mother -- I was a

11 teenager, early teens.  My mother was a clerk in the

12 drug store, as I said.  And I got a job on the delivery

13 truck delivering prescriptions.  And that went -- I got

14 another job that was better paying later delivering

15 parts for an electronic firm.  And then as I got older,

16 I went to work in the oil fields doing construction

17 work.

18    Q.  I take it those weren't the Alexander oil fields?

19    A.  No, they were not the Alexander oil fields.

20         But I would go out and -- into these drilling

21 platforms and stuff where we were building these roads.

22         Then I also had a job, brief job when I was in

23 high school, as a -- in the food industry, I peeled

24 shrimp for a catering firm that serviced banquets.  So

25 we just sat there for hours.  I don't know which just

1   was worse though, the shrimp paying job or the oil field

2   job.  But that's way I started out as a young worker.

3      Q.  Let me take you back up now to your move to

4   Houston.  You said you were there I think until 1979?

5      A.  '78, '79.  '78, I started spending a lot of time

6   in New York, but I still kept my job at the University

7   of Houston.  I was there in Houston, had presence in

8   Houston until the end of the '70s.

9      Q.  Let me break -- ask you to tell us, when you

10   moved to New York -- and to bring it to closer to home

11   here, when exactly did you move to New York?

12      A.  I moved completely -- I -- the place I live now,

13   I got in January of 1980.  But I sublet a place where --

14   from someone in '79.  But in 19 -- late '79, '80, I was

15   living there full time.

16      Q.  Is this when you met Dan Aykroyd?

17      A.  Yes.  Late '70s.

18      Q.  Do you remember exactly when you met Danny?

19      A.  Yes.

20      Q.  Under what circumstances did you meet him?

21      A.  Well, I met a young lady who worked at the

22   television show Saturday Night Live as a writer.  And

23   that -- I was very attracted to her and fancied her, I

24   guess.  And Dan, at that time was -- she was his

25   girlfriend.  And Dan was away making a promotion on the

 1   Blues Brothers movie.  And so I guess you could say I

 2   stole his girlfriend.  That's how we met.

 3       Q.  And did -- tell -- if you will, tell the jury the

 4   first time you actually met Dan.

 5       A.  I vividly remember, we were in a bar, the young

 6   lady and I.  And he'd come back to New York.  And

 7   somebody said Dan's up at the front of the bar and he

 8   would like to meet John.  I thought, Oh, this is not

 9   going to be good, because he's bigger than me and

10   younger.  But I said, Well, I have to meet him at some

11   point.  So I go introduce myself.  And it just was the

12   most amazing thing, we just became -- we just kind of

13   hit it off.

14       And instead of just, you know, being nasty about

15   it, we became friends.  And we've been good friends ever

16   since.

17       Q.  How would you describe the relationship, the

18   depth of the relationship?

19       A.  My relationship with Dan?

20       Q.  Yes.

21       A.  Well, it's grown over the years.  We became

22   friendly right off.  In fact, the then girlfriend and

23   him, and then he had another girlfriend, we all became

24   quite friendly with each other and socially.

25       And over the years, we just would do things.  We

1    would go on trips.  I would go to see him in Canada or

2    we'd go places, as couples often do.  And then as the

3    time went on and he got married and had kids, my family

4    and his family became even closer, we traveled together.

5    We've had a rather unique friendship actually for all

6    these years.

7        Q.   You mentioned family.  Are you a married man?

8        A.   Yes.

9        Q.   And do you have a son?

10       A.   Yes.

11       Q.   And where does he live?

12       A.   Los Angeles, California.

13       Q.   Are you happy about that?

14       A.   Well, I would be happy if he was close to home.

15   But I'm happy that he has got a job.

16       Q.   Let me take you -- during this period of time,

17   Mr. Alexander, 1980 to meet Dan, your relationship --

18       A.   '79.

19       Q.   '79.  Forgive me.

20            Did you continue your painting career?

21       A.   Yes.

22       Q.   And did you have a gallery, for instance, where

23   you sold your art?

24       A.   Yeah.  I had a number of galleries around that

25   sell my art.

1    Q.   Just give us an idea -- give us an idea of some

2    of the galleries that handled your art.

3    A.   Well, I've shown -- I've shown in Los Angeles for

4    many years, Melrose.  I think it's called Jan Turner

5    Gallery.  That gallery was there for 20 or more years.

6    And closed because of an illness to her.  I've shown at

7    another gallery her in Los Angeles on Robertson Street.

8    I've shown in Chicago, all over Texas, Boston,

9    Philadelphia.

10    Q.   What about New York?

11    A.   I have been showing my work in New York since

12    1977.

13    Q.   During this period of time, have museums acquired

14    your art?

15    A.   Yes.

16    Q.   Tell us -- will you tell us some of the museums?

17    A.   Well, I'm proud to say that there are museums in

18    this area that have my work.  San Diego Contemporary Art

19    Museum has maybe, I think, two pieces.  And the

20    Los Angeles County Museum of Art has a piece.  And MOCA,

21    Museum of Contemporary Art, here in Los Angeles has my

22    work.  And I have work in museums in Texas and Florida,

23    and New York, Washington, D.C. --

24    Q.   Tell us the name --

25    A.   -- a lot of smaller cities.

1    Q.  Tell us the name of the museum in New York and

2  the one in D.C.

3    A.  Well, the primary -- the museum that has my work

4  in the New York is the Metropolitan Museum.  And the

5  museum in Washington, D.C., is the Smithsonian Museum of

6  American Art.  And then also the -- there are a couple

7  of other museums in Washington that have my work.

8    Q.  Would the tell the jury where your last show was.

9    A.  My last show was -- ended in April -- of this

10  past April, in San Francisco.

11    Q.  And what -- which gallery was that?

12    A.  Called the John Berggruen Gallery.

13    Q.  Let me take you forward now in point of time to

14  the first discussion of the skull-shaped bottle.

15      Do you recall when that happened, when -- the

16  first discussion with Danny?

17    A.  Yes, I do.

18    Q.  Tell us about that.

19    A.  Well, we had kind of a thing we did.  He was

20  living in New York at the time.  His kids were in school

21  in New York.  And we would meet, at least once a month,

22  sometimes more often, but we had a restaurant,

23  seafood-oyster bar that we liked very much in lower

24  Manhattan.

25      And we'd go there in the afternoons.  And we

1    would have these big afternoon eating orchards and

2    talking about stuff.  It was the thing we did.

3         And one day we were there, and he started telling

4    me about Patron Tequila and his involvement in it.  I

5    wasn't -- it is something that he just got involved

6    with.  And he was very excited about his involvement in

7    it.  He had the distributorship of Patron.

8         And so we went back to my studio that night.  We

9    got very animated talking about all that.  And I said --

10   in passing, I had many, many years before that, many

11   years before, I had come up with an idea to do an

12   alcoholic beverage and use a skull as the vessel for an

13   alcoholic beverage.  And I don't know why it just

14   came -- it was something I thought of.

15        You see -- what they call them?  These bottles

16   that are -- decanters.  They call them decanters.  You

17   see an Elvis decanter bottle.  I've seen gun decanter

18   bottles.  And Mickey Mouse.  Whatever.  You see them

19   come and go.

20        And I thought, why hasn't someone done a

21   skull-shaped liquor bottle?  I mean, that seems like it

22   would be popular, a good idea.

23        So I mentioned it to a friend who was thinking

24   about into the liquor business, and he didn't think it

25   was that interesting of an idea.  I kind of scraped it.

 1   Never thought about it for many years.

 2     Q.  And did Mr. Aykroyd's discussion of his own

 3   business bring this memory?

 4     A.  It brought it back, yes, 100 percent.

 5     Q.  Was he referring to his distributorship in

 6   Canada?

 7     A.  The Patron business --

 8                THE COURT:  Wait, sir.

 9                MR. RAFFERTY:  Your Honor, I've been sitting

10   quietly, but this is now entirely leading.

11                THE COURT:  Yes, it is leading.  And I would

12   sustain the objection.  And Counsel may ask a

13   non-leading question.

14   BY MR. BERG:

15     Q.  What happened next?

16     A.  What happened next is we went back to my studio

17   and worked up some ideas.  And I began shortly after

18   that doing drawings to come up with the design for it.

19     Q.  And tell the -- if you will, did you have any

20   conditions about going into this venture?

21     A.  Because of the nature of what I did, I did not

22   want to do -- I was very clear that if we are going to

23   do something like this, because I was very nervous about

24   doing it, if we were going to -- if I was going to do

25   something like that, I wanted to make certain that we

1   did the due diligence and that there were no others that

2   existed.

3       Q.   What do you mean by due diligence, sir?

4       A.   Checking with patents, trademarks, seeing if

5   there's any in the liquor stores or in the liquor

6   industry.

7           MR. RAFFERTY:  Your Honor, this has just

8   crossed directly into an area that was the subject of a

9   motion before the Court.

10          THE COURT:  Well, I will ask you, maybe you

11  can just communicate with counsel, and he can ask a

12  different question.  And if necessary to discuss it, we

13  will.

14          MR. BERG:  If I might lead a bit, Your

15  Honor, to avoid the problem.

16          THE COURT:  Any objection to him leading --

17          MR. RAFFERTY:  Not if we avoid the problem,

18  Your Honor.

19          THE COURT:  All right.  Counsel.

20  BY MR. BERG:

21      Q.   Was any other bottle, skull bottle, skull-shaped

22  bottle found that was used to sell alcohol?

23      A.   No.

24      Q.   Would you tell the jury what the process was,

25  sir -- or was there a process in arriving at the

```
 1   skull-shaped bottle?
 2      A.   The process was a series of many, many drawings
 3   over a period of time to try to get the feeling and look
 4   of what we wanted to use to make this product.
 5           And my input was simply drawing of ideas as
 6   designs and -- with Dan's input and feedback a lot.  And
 7   we just simply worked -- I digitally worked up an idea
 8   that I thought was something that would be appealing and
 9   artistically pleasant to look at and something that the
10   consumer would want.
11           In this case, I'm not trying to make an art work,
12   I'm trying to make a product for consumers.  And I --
13   I've never done that in my career, ever.  And it was
14   very new to me.  So it was very difficult for me to come
15   up with this --
16      Q.   Did you --
17      A.   -- to make all that work together.
18      Q.   Did you run into particular issues in arriving at
19   the skull head bottle?
20      A.   Well, Dan and I from the beginning of this
21   project were very -- we did not want the skull to look
22   like a pirate or something threatening or scary because
23   we wanted it to be something that the consumer would
24   find appealing.
25                   So I tried very hard to make it something
```

1   that was not like what you would see on a biker's jacket

2   or -- the skull is used so much.  I wanted to try to

3   come up with something that was not part of that world,

4   but just something that was my own invention.

5       Q.  Did you arrive at your own invention, sir?

6       A.  Yes.

7       Q.  Did you have -- could you please tell us -- or

8   could you demonstrate for us some of the issues that

9   arose -- and we have --

10              MR. BERG:  Your Honor, at this time we do

11  have the blackboard.

12              THE COURT:  And that's fine.  I just don't

13  understand the question -- or what the witness is being

14  asked to do.

15  BY MR. BERG:

16      Q.  Did you have particular problems arriving at your

17  final drawings?

18      A.  Yes.

19      Q.  And could you describe, for instance, the first

20  issue that you had.

21      A.  Well, first of all, the proportions had to be a

22  certain -- I didn't realize that, but it has to be a

23  certain size.

24      Q.  Do you recall the size?

25      A.  750 milliliters.

```
 1      Q.  Did you ago through a process to arrive at the
 2   right size?
 3      A.  Yes.
 4             MR. BERG:  Your Honor, may Mr. Alexander
 5   demonstrate that process on the blackboard?
 6             THE COURT:  Yes.  Do you tend to ask him
 7   questions while he is away from the mic or are you
 8   asking that he conduct the drawing, return to the
 9   witness box, and then you will ask additional questions?
10   BY MR. BERG:
11      Q.  If it's possible -- he speaks loudly.  If we
12   could him a couple questions while he's there and pick
13   up his voice, I would appreciate it -- while he's at the
14   blackboard?
15             THE COURT:  Well, I did notice that this
16   morning apparently we do have a mic that's on a stand.
17   I don't know if the clerk intended to put that close to
18   him.
19             MR. BERG:  Oh, that's great.
20             THE COURT:  If we have that, then we may do
21   that.
22             But, yes, the witness may step down to
23   demonstrate as counsel has asked.
24             Now, the jury should understand what is
25   being placed on the board will not be an exhibit for
```

 1   you.  In other words, it is to aid the witness in his

 2   testimony so that you can understand how he went about

 3   creating the design.

 4          THE COURT:  Does the witness have in mind

 5   the question that counsel wishes you to demonstrate?

 6          THE WITNESS:  I think I understand what he

 7   is saying, Your Honor.

 8          THE COURT:  All right.

 9          MR. BERG:  Let me thank the Court for the

10   accomodation.

11          THE COURT:  So the witness will just be

12   drawing on the board at this point; am I correct?

13          MR. BERG:  Yes.  I will have a question once

14   he starts drawing.

15          THE WITNESS:  It will be very short.

16          THE COURT:  So you don't have to worry about

17   testifying until counsel asks you another question.

18          THE WITNESS:  I've never worked in a suit

19   before so it's a little...

20   BY MR. BERG:

21     Q.  What is the first issue you are going to

22   demonstrate?

23     A.  Proportion.

24     Q.  Please show me.

25     A.  So I am not technically --

1    Q.  Close to the mic, please.

2    A.  I'm not that technically skillful with computers

3   and computer graphics and stuff.  So my training is just

4   as a draftsman.

5        And so I didn't -- I couldn't understand how to

6   make it 750 milliliters or whatever.

7    Q.  So what did you do?

8    A.  So I went to the liquor store near me.  I know

9   someone who owns it.  And he let me get about 25 or

10  30 -- I don't remember the number, I did it more than

11  once -- random bottles from around the store, like

12  Drambuie and Crown Royal and any bottle that was not

13  conventional, but just odd shaped.  So I got a piece of

14  paper -- can you hear me?

15   Q.  Yes, sir, I can.

16   A.  I got a piece of paper, drawing paper.  And I

17  then I put a line across here.  And then I found the

18  middle of the paper and put a line there.  And so --

19  well, maybe I should make it bigger.  But this will

20  work.

21       So then I would put each bottle -- whatever the

22  shape of the bottle was -- on it.  This would be a Crown

23  Royal, this would be Drambuie.  I thought if I continued

24  to make these arbitrary lines, I traced around the

25  bottle with, let's say it is a Patron bottle.  I traced

1   around it with a pencil, thin lines, until I got a

2   schematic -- not a schematic, but a web of all these

3   different shaped bottles in this.  And within that, I

4   guess, how do you go -- how do you find the middle of

5   all that?  So I just took a guess and tried to get the

6   exact middle.  And in the middle of all that, like this,

7   became what I hoped was the proportions that we need.

8       Q.  Did it turn out to be --

9       A.  It turned out very close.  What I did was I took

10  these drawings like that, proportionate.  And then I

11  sent them to Toronto.  And they -- Dan showed them to

12  people in the liquor business --

13      Q.  Tell the jury what you mean when you said you

14  sent them to Toronto?

15      A.  That's where we were putting -- trying to put our

16  business together.

17      Q.  The intention at first was to put it together for

18  Canada or no?

19      A.  Well, we -- because Dan is Canadian, and he is --

20  Patron business was in Toronto -- or in all of Canada.

21  And he felt that he had access to the liquor industry.

22  People who could advise.  We were both very green when

23  we went into this.  We didn't know what -- he knew.  I

24  didn't know what I was doing.

25      Q.  What was the next issue you dealt with, sir?

1    A.  Well, the most problematic issue is the look, the

2    look of it.  Because just a little bit of variation here

3    or there could change everything.

4         What I did was, as I said a minute ago -- I'll

5    try to make this brief -- I tried to make it look

6    appealing, something that people would look at and count.

7    So how do you to that?  I mean, you don't want to -- you

8    want to make it something that's -- has some -- lack of

9    a better word, has a certain kind of feel to it.  That's

10   what happens in the design.

11        And so I worked very hard on that, because here

12   was one of the biggest problems -- and doing a skull,

13   you can have a skull that's, you know, thin and flat or

14   round.  Not every human skull is the same.  And I wanted

15   to find one that worked to my liking.

16        And so I would do drawing after drawing, usually

17   like this.  I would start off generally, I try to do it

18   big like this, in a very kind of abstract way.

19        And then -- and then I would begin to take that

20   part and then develop it, and make it into a much more

21   recognizable and so forth.

22        But each time I would do it, sometimes the eyes

23   would be smaller, sometimes the eyes would be bigger,

24   sometimes this went from here to here.  They change

25   constantly.  And it was a series of many, many of these.

1   And then Dan would come to my studio, and we would talk

2   to each other about, What do you think of this?  What do

3   you think of that?  Does that one work?

4         And then you have a problem that arose right off,

5   and that's this:  How do you get the liquid out of the

6   vessel?

7               So --

8   Q.  Let me ask you now, are you speaking of the spout

9   at this point?

10  A.  Yes.  I didn't really know at first.  I thought,

11  Well, you could do it this way.  The easiest way is for

12  me to hold the bottle like this and you put a thing like

13  this, tilt the bottle, pour it out.  Or you could have

14  had a little hole, whatever.

15        And then we tried -- this was something I really

16  tried to work with, is having it like this.

17  Q.  Was there any problem with that?

18  A.  To me it looked like a chimney or something.  It

19  just didn't look right.

20        So finally aesthetically, I came on the idea that

21  if you look at the side of the skull like this, this was

22  very important.  Aesthetically, I thought it looked good

23  like this, at an angle coming out the back.

24        Then you get into the problem of what you do with

25  the proportion.

```
 1          I'm sorry.  I can actually draw better than this.

 2     Q.   Are you trying to sell your art, sir?

 3     A.   You make it this high and this wide or skinny.

 4   So you may not notice it as much.  Well, no.  That

 5   starts to look ridiculous and cheap.

 6          So this proportion and the cap size and all that,

 7   this all became appealing to me.  With Dan's input, very

 8   much so, we just -- "we," because it was now -- I'm the

 9   artist.  But it really was a collaborative effort

10   between Dan and myself.  I sought his counsel and advice

11   all the way through it, every step almost.

12     Q.   How did you resolve the spout problem?  Is that

13   where the spout remained?

14     A.   Yes.

15                THE COURT:  Excuse me.  Two questions.  One

16   please.

17   BY MR. BERG:

18     Q.   How did you resolve the problem?

19     A.   It was just a look that we both thought was

20   appealing, from the side, the front, back.  And that's

21   what we settled on.

22     Q.   Perhaps you will have a seat.

23     A.   And the width and the height and the angle.

24     Q.   Were these anatomically correct skulls as

25   Mr. Hummel said?
```

```
 1      A.  No, they were not.  If I wanted to do an

 2  anatomically correct model, which is a real problem, I

 3  would just go to art supply store or medical supply

 4  store and get a plastic skull and make a mold of it.  I

 5  wanted it to be my original idea.

 6      Q.  And was it?

 7      A.  I'm very proud of it.

 8      Q.  Would you have a seat, sir.

 9      A.  Thank you for allowing me to do this.

10      Q.  Could you sign your name to it and sell any of

11  that, sir?

12      A.  No, not this seat.

13          That's called wishing.

14      Q.  If I might ask -- or I will wait until --

15              MR. BERG:  May I ask the deputy clerk,

16  Yolanda, would you please pass these bottles to

17  Mr. Alexander, No. 45.

18              If we could start there that would be

19  helpful.  Just that one for now.

20              This is deemed admitted already, Your Honor,

21  I believe.

22              THE COURT:  So I deemed admitted last night

23  all the exhibits that we discussed.

24              So is this marked as Exhibit 45?

25              MR. BERG:  It is marked as Exhibit 45.
```

1  BY MR. BERG:

2     Q.  Mr. Alexander, were you concerned or not about

3  how the bottle would come out?

4     A.  How it looked when it was finished?

5     Q.  Yes, sir.

6     A.  Very, very much so.  Because I knew that I had no

7  control over it in terms of the -- once it became a

8  liquid mold and fired in a kiln -- I'm a two-dimensional

9  artist.  And I had to create the illusion of depth.  I'm

10  not a sculptor.

11        So I was very worried what I found so likable

12  about my drawing and idea, would it translate to this?

13  I knew it wouldn't be the same.  This is class and that

14  was charcoal.  That was a flat, two-dimensional surface.

15  This is a three-dimensional surface and so forth.  But I

16  was very pleased the way it turned out, yes.  And I

17  signed off on it.

18     Q.  What was it you signed off on?

19     A.  The way it looked.  I liked it very much.

20     Q.  Do you know how the bottle or the drawings became

21  3D?  How you went from your two-dimensional to your 3D

22  bottle?

23     A.  Well, there was one point where I didn't.  And I

24  was asked by Dan -- very difficult for me to do, but he

25  asked me if I would make a mold, make a model.  And I

1    tried.  But it was very difficult for me to get the

2    look.

3           And then we -- I was told that we can -- there is

4    computer graphics that can take flat, two-dimensional

5    work, it is called a schematic, and break them --

6    convert them into a three-dimensional shape.

7       Q.  Were you capable of creating the schematics?

8       A.  No.  I have no knowledge in that world

9    whatsoever.

10      Q.  Did you ever see -- tell the jury where the

11   bottle is made.  What company makes the bottle?

12      A.  The bottle is made by Bruni Glass.  It is a

13   company out of Italy.  I think the bottle is actually

14   made -- I may be wrong, but I think it's actually made

15   in Kosovo or somewhere.  I don't know where it's exactly

16   made, where their factory is.  I heard of that.

17      Q.  Have you ever seen, either in person or

18   otherwise, or in video, have you ever seen the

19   production of the bottle?

20      A.  I have seen video of it.

21      Q.  When did you see video?

22      A.  Very early on.  We were sent a video from -- oh,

23   boy, the people in Toronto were sent a video of the

24   kiln, it's a big fiery -- red fiery furnace and had a

25   conveyor belt coming out of it.

1          The first bottle appeared was out in that intense

2     heat.  And then as it came out of the furnace, it began

3     to smoke and turn gray.  From orange to gray.  And then

4     as it went down the conveyor belt, it became clearer and

5     clearer until it cooled.  And then you saw it.  It was

6     rather dramatic.  That's the way I saw -- I saw that.

7     Q.  What was your reaction to the end product as it

8     got to the end of the --

9     A.  I was very pleased with it.  But they also --

10    there was a lot of tweaking that went on, you know, in

11    terms of -- I'm sure with Bruni.

12         Once I got in the -- my job, I felt was done,

13    which was doing the drawings.  And then I trusted Dan

14    and the people in Toronto to take care of it from there.

15    Because it is something that I felt comfortable that

16    they would do a good job with it.  And they assured me

17    that the schematics would work.

18    Q.  Now, I want to take you back if I can, and would

19    you explain to the jury what role or where -- strike

20    that.

21         Does the skull play a role in your paintings?

22    A.  Well, it has off and on throughout my career.

23    When I was a small -- I mean, a young teenager, I used

24    to draw hot rods and, you know, things like that.

25         And I would draw skulls on the door.  You know,

1   the skull's a very powerful image.  And it's been used

2   throughout history and art, going back to antiquity.

3        And I know about the skull use in art, going all

4   the way back to ancient cave paintings even.

5        And occasionally throughout my career the skulls

6   have appeared in the landscape or in the scenes.  It is

7   not primarily what I do.  But I've used them throughout

8   my entire artistic life.

9   Q.  Would you tell us what the basis is of your

10  knowledge of skulls, where you became familiar and so

11  on?

12  A.  Well, I don't know in early stages where I became

13  familiar with it.  But in reference to this vodka

14  bottle, I was -- I was in -- from the first idea -- I

15  think.  It came into my consciousness many years

16  before -- as I've said, before I met Dan.

17       And I was in -- I was aware of the skulls being

18  used in the Day of the Dead celebration, because in

19  Texas, it's much more -- you see it much more than you

20  do in other parts of the country.  I'm sure it's true

21  here in Southern California too.

22            And I remember going many years ago to

23  the -- this very emotionally moving festival in Oaxaca,

24  Mexico for the Day of the Dead, which is held every

25  year.  It's one of the most popular in Mexico.

1    Q.   Why did you go to Oaxaca?

2    A.   I wanted to see the Day of the Dead celebration

3  in Mexico in its entirety, as opposed to just seeing the

4  little alters that you see around in stores and things

5  you'd see.   It was very common to see the displays with

6  the skulls and the candy and the flowers, et cetera.

7         But the one in Oaxaca was particularly powerful.

8  And being an artist who is interested in that kind of

9  stuff, imagery, to see that -- the entire totality of

10  the those festivals, where the parades and music and the

11  grave yards decorated with mounds of flowers and candles

12  at night and the families are there.   There's a great

13  spirituality and a power to that.

14         As an artist, it's hard for it not to have a

15  profound effect on you.   And also, though, you would see

16  these skulls, little skulls as candies and cookies and

17  so forth.   And then you would -- even when I was

18  younger, you'd see that during the Day of the Dead

19  celebration, which is a completely different thing than

20  going and seeing it in Mexico, though, where you see the

21  drama of the entire thing.

22    Q.   Have you traveled to Mexico often?

23    A.   Yes.

24    Q.   And have you seen -- can you tell us any other

25  images you might have seen there, maybe other painters

1    and so on?

2       A.   I always have been influenced by other painters

3    in my work.   And I had a great fascination early on, all

4    through my career, of the Mexican muralists; from early

5    day Cordero.   And then also of course the great

6    Fruticola.   And great European painters often used

7    skulls, so I -- being a deep admirer of the history of

8    art, I was conscious and aware of the use of skulls in

9    painting throughout my entire adult career.

10      Q.   I would like to do now is ask Ms. Skipper to

11   perhaps bring the entire box.   I will read each exhibit.

12           Exhibit 772, KAH Blanco.   58, which is Extra

13   Anejo.   57 is KAH Anejo.   56 is Diablo.

14           THE COURT:   Would you like to have the

15   exhibits placed before the witness?

16           MR. BERG:   Yes, I --

17           And you would like to have the witness have

18   them all at the same time or individually?

19           MR. BERG:   Let's just start with two of

20   them.   That would be 772.   Just that one would be fine

21   for now.

22           THE COURT:   So the clerk will place before

23   the witness Exhibit 772.   So these exhibits are in

24   evidence.   And so this is an example of something that

25   the jurors will actually have in the jury room during

```
 1    deliberations so that you can examine them more closely.

 2             772 is before the witness.

 3   BY MR. BERG:

 4     Q.  Mr. Alexander, do you recognize Exhibit 772 to

 5   your right?

 6     A.  Yes.

 7     Q.  What is that?

 8     A.  It's a KAH tequila bottle.

 9     Q.  What is your reaction?  How do you feel when you

10   see that bottle?

11     A.  I feel that I was ripped off.

12     Q.  Can you tell us what you see about that bottle,

13   if anything, that makes you feel that way?

14     A.  Well, you have to understand that for

15   something -- I like the KAH bottle.  You have to

16   understand that there has to be a feeling to something.

17   It is the essence of it.  It is not -- you can break

18   things down to every little centimeter and this one's

19   got a little shape here and this one doesn't.  But the

20   truth is to me, when I first saw it, the first time I

21   saw it, Jonathan Hemi showed it to me.

22     Q.  Who's Jonathan Hemi?

23     A.  He works with our company.  He runs the company

24   in Toronto.

25             And I went, Whoa.  I mean, I thought, that's
```

1    really -- that's really rattling.  So it's the look.

2    It's not the detail.  It's the essence of what something

3    looks like.

4         And I know that this is hard to visualize, but if

5    you -- it is very clear in this room, when you are in a

6    courtroom like this with strangers and all the focus in

7    the world is on these bottles, and it is brightly lit,

8    and you've never seen them, it's shocking.

9         And the differences you pick up.  These eyes are

10   painted dark.  These are not.

11        But in the context, if you -- which I have to

12   think about and worry about in marketing this, this is

13   not where the tequila are seen -- or these bottles.

14   They are not seen in courtrooms.  They are seen in

15   liquor stores -- I mean, in liquor stores, around lots

16   of other liquor and crowded things, where there's

17   liquor, liquor, liquor this, and liquor that.  There's

18   easy confusion.  You see them very often, both products,

19   in bars, dimly lit bar lighting, on a shelf behind the

20   bar.  And I have -- I have been in many bars and looked

21   at the shelf from a distance and though, is that my --

22   and I don't have the greatest eyesight, but is that my

23   bottle or is that their bottle?  I mean, they are

24   extremely confusing in those context.

25        And in restaurants -- you see a lot restaurants

1   have them.  And it's -- the essence of what they look

2   like from a distance.  Sitting here like this picking

3   them apart --

4               THE COURT:  Excuse me for a moment.  The

5   witness may be beyond the scope of the question.

6   Counsel may want to ask another question.

7               THE WITNESS:  Sorry.

8               MR. BERG:  Yes, of course.

9   BY MR. BERG:

10     Q.  What in particular is similar -- pardon me.

11   Could I get some water, please.

12          What do you see that's similar between the two,

13   sir?

14     A.  Well, do you want me to go into point by point?

15     Q.  Yes.  That will be fine.  I'll walk you through

16   it.

17          Tell us first what you see that's similar.

18     A.  From here, if you look at the two like that, it

19   is -- it's this subtle curvature of the bottom of the

20   chin in both is to me almost identical.

21          The feeling, even though ours has teeth that are

22   three dimensional -- these teeth, which are basically in

23   the same configuration and about the same proportion

24   from top to bottom, they are not that way.  But there is

25   an illusion that was created by the person who painted

1   this, using these shadows and highlights along there,

2   that the teeth are three dimensional.

3        There is a clear feeling that -- and then on

4   other bottles it's more pronounced.  But the mouths to

5   me are very, very troubling.  And then the nose and the

6   proportions of the nose are shockingly similar to me.

7   And then the sockets of the eyes are almost the same

8   size.  And then the shape of the head here and the feel

9   of the head from this -- from this to this shockingly

10  alike.

11       And then you get on up to the top.  And the two

12  are almost identical.  There's a slight difference.  But

13  as I said, in context where you are seeing it at a

14  liquor store or in a bar, restaurant, in a lighted bar,

15  it's very -- the feeling is almost identical.  You

16  think, Oh, that's -- and then as you -- in a courtroom,

17  a sterile condition where it shouldn't even be, of

18  course you can break it down.

19       But when you're walking through a bar with your

20  mate or your friends and you look up on the bar and you

21  say, Oh, look that's Dan Aykroyd's or my product.

22    Q.  You have witnessed this personally?

23    A.  Many, many, many times.

24    Q.  Have you visited liquor stores where you saw the

25  bottles?

1    A.  Hundreds.

2    Q.  What is it that you saw?

3    A.  Well, I've seen -- early on.  We are talking

4 about when KAH first came out.

5    Q.  Do you remember the date when it first came out?

6    A.  I heard it earlier, but I forgot.

7    Q.  Would you accept November, December of 2010, sir?

8          MR. RAFFERTY:  Objection.

9          THE COURT:  Objection sustained.

10        Counsel's question will be stricken.

11        The witness is admonished not to answer the

12 question.

13        Counsel may ask another.

14 BY MR. BERG:

15    Q.  Did the KAH bottle come out after Crystal Head

16 Vodka came out?

17    A.  Yes.

18    Q.  Do you have any idea how long after?

19    A.  Couple of years.

20    Q.  Now, if I could ask Ms. Skipper to bring up

21 Mr. Alexander 58.

22        THE COURT:  And should the clerk remove the

23 two that are on the stand now or one of them?

24        MR. BERG:  If there's room there, I would

25 like to leave them there, Your Honor.

```
 1              THE COURT:  Exhibit 58 will be placed before
 2   the witness.
 3   BY MR. BERG:
 4       Q.   Have you ever seen 58 before?
 5       A.   No.
 6       Q.   What do you notice about that bottle, sir?
 7       A.   Well, I -- well, there is -- again, in the
 8   painting and the rendering of it, there are many things
 9   that create illusion of similarity.
10              But I'm struck by the use of these crystal-like
11   shiny objects that are attached to it, that reflect
12   light.
13              One of the key things in our marketing early on
14   when we were advertising, we used to say that our
15   product is filtered through Herkimer diamonds.  It's a
16   form of crystal that grows out of the ground that we use
17   to filter it.  That was part of our advertising
18   campaign.  The crystal, the filtration through the
19   quartz, the crystal quartz.
20              And there's just a -- kind of -- if you look at
21   ours -- and this is not painted, clearly, and this one
22   is, this reflects light and it makes it sparkle in
23   certain kinds of light, especially on bars.  And there
24   is a sparkly quality to this that I'd actually never
25   seen, more so than this.  It's got kind a shimmer to it,
```

1    much like hours.

2        Q.   And the shimmer comes from what, sir?

3        A.   The little crystal-like things like put on it.

4        Q.   And what is the name of your vodka?

5        A.   Crystal Head.

6        Q.   Do you remember about when Crystal Head came out?

7        A.   2006, I think.

8        Q.   Math was not your major, I take it?

9        A.   No.  I apologize to the Court.  But I'm really

10   not good at that.

11       Q.   Do you recall that it did come out?

12       A.   Yes.

13       Q.   You mentioned the marketing -- part of the

14   marketing involved the crystals; is that correct, sir?

15       A.   Yes.

16       Q.   Do you know the marketing that was used by KAH

17   Tequila?

18       A.   Not, not able to articulate that, no.

19       Q.   Does KAH Tequila celebrate Day of the Dead?

20       A.   Yes.

21       Q.   And is it your intention to demean Day of the

22   Dead in any way?

23       A.   Absolutely not.  I'm far from it.

24       Q.   When you first went out with Dan -- excuse me.

25            When the bottle first came out, did you

```
1    personally get involved in the marketing?
2       A.  Yes.
3       Q.  In what way?
4       A.  When we first started the idea of what we were
5    going to do, we had committed to the distillery I think
6    5,000 cases.  Again, my math can be off.
7            But we originally -- this was much better for Dan
8    or Jonathan, but this is what I was told.  We were
9    going --
10               THE COURT:  Well, wait just a moment.
11               So if the witness isn't testifying from his
12   own personal knowledge but what someone told him, it
13   might be better if we leave that inquiry to somebody
14   else.
15               MR. BERG:  Yes, Your Honor.  But these
16   are -- of course.
17               THE COURT:  Well, it could go to some other
18   issue in the case.
19               But it's just the way he started his answer,
20   Well, this is what I was told.  So maybe Counsel wants
21   to ask him a question.
22               MR. BERG:  I can cure that.
23   BY MR. BERG:
24      Q.  Tell us what you did to help market the bottle.
25      A.  We got a large truck, a large truck painted
```

1    black.  And we put -- it's very large.  It had a couch

2    inside, and a -- like the size of a bus, small bus.  And

3    we painted huge crystal heads around the bus, the sides

4    and back and front and on the door.  And Dan called it

5    the Crystal Head Mobile.  And we launched the product in

6    Miami, Orlando, New Orleans, Houston, Dallas, Las Vegas.

7         The reason we did that is because -- odd group of

8    cities.  But we -- Dan believed that -- there was a

9    House of Blues in each of those cities, and that we

10   could use the House of Blues as a place to have launch

11   parties.  So we launched it literally city by city.  We

12   started there.

13   Q.  Mr. Alexander, would you explain to the jury

14   what, if any, relationship Mr. Aykroyd has to the House

15   of Blues?

16   A.  Yes.  He has been involved with the business for

17   --  since its beginning.

18   Q.  Was he a founder of it, do you know?

19   A.  Yes.

20   Q.  Okay.  Go ahead.

21   A.  So we went to each city, and what we did in each

22   city, starting in Florida is we, as a company, we

23   invited the major bartenders, major restaurant owners,

24   chefs, liquor people from the region, and we would have

25   these big parties at these House of Blues.  And we would

1    invite everybody to it.

2         And large -- because of Dan's celebrity, huge

3    crowds would come.  And we would have this Crystal Head

4    night.  And we would serve food.  And Dan would get up

5    at each one and make a presentation.  And then he would

6    stay until well into the morning at each venue signing

7    autographs and photographs and signing bottles.

8         And that started.  By the time we got through

9    that tour, we pretty much got the -- the product was

10   pretty much gone.  We had to go back to the drawing --

11   nobody possibly could have imagined this thing would

12   take off like it did.  It just went from here to there.

13        So we got more product, and then --

14   Q.   Let me ask you, sir, was there any other sort of

15   press -- or, excuse me.  Was there any sort of marketing

16   other than when you described as Dan and you or Dan

17   alone went from city to city that you know of

18   personally?

19   A.   Yes.  He would be on the radio, on the cell phone

20   from city to city talking to radio stations.  And every

21   city we went to there would be people from NBC, ABC,

22   CBS, newspapers.  They would all come to these events.

23   So they became happenings.  It was like, every city we

24   went to, even small cities we would go -- and stop at

25   mom and pop liquor stores.  We would go from little

1  liquor stores owned by someone in small town to Costco

2  and Walmarts and everything in between.  And we

3  literally crisscrossed the country and Canada in this

4  truck over a period of time and marketed it in that way.

5        And then he would go around -- when we were in

6  any particular city, we would go around through the

7  night and we would go bar to bar.  Like it was -- it was

8  kind of bizarre.  Here we are, we just show up at bars.

9  And it was fun, to say the least.  The tour.

10        The first one was.  As the years went on, it got

11  more tedious.  But that first -- I remember that first

12  year.  It was one of the most fun things.

13        And that's how we built the business, on the back

14  of his celebrity and enticing people into these places

15  to -- for him to sign autographs.  I personally have

16  seen him sign tens of thousands of bottles, literally.

17        We would go into a city, just pick a city,

18  Phoenix, Arizona, and then at a signing at a big liquor

19  chain or at a Costco or Walmart, and there would be a

20  thousand people waiting in line and waiting there for

21  five hours to get in so he could sign the bottle for

22  them.

23        And he never faltered.  He signed every bottle.

24  And every person there got one.  And it was -- that is

25  the way that Crystal Head Vodka became the iconic brand

1    that it became.  And the nature of the uniqueness of

2    skull-shaped bottle as a vessel for the alcohol.

3                   MR. BERG:  May we take a very brief break,

4    Your Honor?

5                   THE COURT:  May we go off the record or

6    leave the courtroom?

7                   MR. BERG:  I would like very much to leave

8    the courtroom.

9                   THE COURT:  You may do so.

10                  We are going to take a break at this time.

11   This is not a time that we would be breaking.  But if

12   counsel needs to break early, we can do that.

13                  MR. BERG:  I don't want to do that to

14   everyone.  I can fight my way through it.

15                  THE COURT:  All right.  You can just step

16   out if you wish to.

17                  MR. BERG:  It's embarrassing.  Well, I'm 75.

18   I'm going.

19                  (RECESS.)

20                  THE COURT:  We are back on the record.

21   Counsel may continue.

22                  MR. BERG:  Let me express my gratitude, Your

23   Honor.  Thank you.

24   BY MR. BERG:

25     Q.  I would like to go back and revisit one issue you

1    mentioned, sir.

2         Would you pick up your bottle.  Would you talk

3    about the spout for just a moment.  You mentioned in

4    passing --

5              THE COURT:  Excuse me for a moment.  So what

6    is the question?

7    BY MR. BERG:

8    Q.  Tell us about the problems with the spout, if you

9    will.

10   A.  Well, one of the problems we encountered very

11   quickly was -- and the assembly lines to fill the

12   bottle, if you have the spout straight up, it goes down

13   the thing, and it can be done on an assembly line like a

14   conventional bottle, all bottles are like that.

15        Once we discovered -- once it was made in that

16   angle, the distillery put the alcohol -- the vodka into

17   the bottle, they had to do it by hand.  So each bottle

18   had to be hand-filled.  Very, very problematic in terms

19   of mass producing the bottles and getting the kind of

20   quantity we would need.

21        So after a while, what we did is we invested a

22   lot of money to have a special machine made that would

23   fill the bottles like this.  At that angle it was very

24   problematic to get the fluid into the thing.  So that

25   was one.

1    Q.  Do you know much money the company spent on that?

2    A.  You would have to ask Jonathan or Dan.

3    Q.  No problem.

4        Have you seen other bottles with the spout --

5    other than KAH Tequila, with a spout at an angle like

6    that?

7    A.  No.

8    Q.  I have --

9        MR. BERG:  I'm going to conclude now, Your

10   Honor.  But I want to ask Mr. Alexander to walk us

11   through a previously admitted exhibit, No. 124.

12   Plaintiff Exhibit 124.

13       THE COURT:  124 is actually on the monitors.

14   So for the jurors, you are able to see it.  The witness

15   may use that as well.  If you are not able to see it

16   well enough to answer the question that counsel asks,

17   I'm sure another exhibit can be provided.

18       Counsel may proceed.

19   BY MR. BERG:

20   Q.  Are you familiar this exhibit, sir?

21   A.  Yes.

22   Q.  And what is this?

23   A.  This is one of the many drawings that I did for

24   the preparation of the skull.

25   Q.  Can you describe this as an early or late

```
 1    drawing?

 2        A.  Later.  Much later.

 3        Q.  Let's keep going.  Next one.  And the same

 4    question?

 5        A.  Later.

 6                THE COURT:  What is the exhibit number, for

 7    the record, please?

 8                MR. BERG:  This is 174 -- excuse me, 124.

 9    My math is not so good either.

10                THE COURT:

11                You may continue.

12    BY MR. BERG:

13        Q.  Next.  Early or late, sir?

14        A.  Hard to say on that one.  It looks like it is

15    later though.

16                THE COURT:  This is also a part of 124?

17                MR. BERG:  Yes, it is Your Honor.

18                THE COURT:  All right.

19    BY MR. BERG:

20        Q.  Next.  Early or late?

21        A.  That -- these look like nearly the same time

22    frame.

23        Q.  Next.

24                And do you have -- this also, sir, early or late?

25        A.  Later.
```

1    Q.   So my question --

2    A.   Much later.

3    Q.   -- is what percentage of these drawings of yours

4    do these sketches represent?

5    A.   This?

6    Q.   Yes.

7    A.   In the total number?

8    Q.   Yes.

9    A.   Less than one percent.

10   Q.   Do you have any estimate of how many sketches you

11   did of the skull before it became finalized?

12   A.   Sketches?  Certainly over a hundred.

13   Q.   And who's Walter Hyde, if you'll tell us?

14   A.   He was a friend of Dan's that lived in Kingston,

15   Ontario.

16   Q.   And what role did he have --

17           MR. BERG:  Pardon me.  You can take that

18   down now, please.

19   BY MR. BERG:

20   Q.   What role did he have, if any, in bringing the

21   bottle to market?

22   A.   Well, when I would do drawings, I would send them

23   to Toronto.  And then when we realized that the way that

24   this was going to be made into three-dimensional form

25   was through the schematics, Walter helped with that.

1           And also Walter, when we were going back and

2   forth about the neck, he offered input, as Dan did.  As

3   I said, it was a real collaborative as to design.  One

4   was hexagon, one was round.  One was -- pardon me.  One

5   was skinnier.

6           And Walter's role in this was simply giving

7   input into how the neck was -- how to solve the neck

8   problem.

9       Q.  Is Walter still around?

10      A.  Tragically, no.  Walter died shortly after that

11  of an illness.

12      Q.  In addition -- you've mentioned Jonathan Hemi,

13  and Dan, of course.

14          Who else has been involved in the making of this

15  business?

16      A.  The business -- not the design?

17      Q.  Not the design, the business end.

18      A.  Well, the primary person is clearly Dan.  But

19  Jonathan Hemi is very, very, very instrumental, in fact,

20  he runs the company.

21          And early in the business, very early, there was

22  a man by the name of Andrew Stoddard who was a liquor

23  person in Toronto.  And he is was involved in the

24  company early on.  But he was not there about a year, if

25  I can remember correctly.

1      Q.   Who is Davey Brown?

2      A.   Oh, I'm sorry.  Davey Brown, who will be here

3    tomorrow, I think.  He is another partner.  And is very

4    involved with the company.  He was a postman in Toronto.

5    And he came to work with us to help do logistical stuff

6    and marketing stuff.  And he worked in the office with

7    Jonathan.  He also -- it's coming back clear to me.

8           Davey was -- in the early stages was involved

9    when we were trying to set up social media and answer

10   mail, internet mail.  And Danny -- I mean, Jonathan was

11   our liaison -- Davey Brown was our liaison to do all

12   that kind of work.  I didn't have the expertise, to say

13   the least, nor did I have the time.

14          I resumed after these drawings left.  And then --

15   with the exception of when we were on tour, I was very

16   much back involved in my painting career.  In fact,

17   right in the middle of all that I was putting a show

18   together for a retrospective at the Smithsonian.  It was

19   very problematic for me to put the time in like Dan and

20   Jonathan and Davey did, because of my other problems.

21     Q.   Did you neglect your art career when you were

22   promoting this?

23     A.   Very, very much so.  For at least a year and a

24   half.

25     Q.   What about Danny and his movie career?

```
 1                    THE COURT:  What's the question?

 2  BY MR. BERG:

 3     Q.  Did Danny also neglect his movie career during

 4  that time?

 5                    MR. RAFFERTY:  Your Honor, I object.

 6                    THE COURT:  Sustained.

 7                    THE WITNESS:  Oh.

 8                    MR. BERG:  You can't answer.

 9                    THE COURT:  You don't answer it.

10                    Counsel will ask another question.

11  BY MR. BERG:

12     Q.  Anyone else involved with Davey at the company?

13     A.  We had employees.  A person who became very much

14  involved in the company, and to this day does, is

15  Davey's, well, wife, mate, Martha.  And she was ran the

16  point of sale stuff, the -- you know, T-shirts,

17  marketing.  She was involved in that.  Very, very much

18  instrumental in everything, to say the least.

19     Q.  Is it a small company in terms of employees?

20     A.  Yes.

21     Q.  And do you have any idea how many employees there

22  are?

23     A.  Not counting the distributor types, but in our

24  office --

25     Q.  In your business, yes.
```

1   A.   I'd say under -- maybe a dozen or less.  I'm not

2   really sure.

3   Q.   Who is Martha Mendoza?

4   A.   She is -- as I just said, she is in charge of

5   point of sale and marketing and ordering product, and

6   communicating with people who were going -- if you were

7   going to do a -- what do you call it -- a shaker, let's

8   say, a Crystal Head shaker for ice or whatever with the

9   Crystal Head logo on it, she was instrumental in helping

10  design some of those things, and helping product

11  placement.  Those types of things.  Marketing stuff.

12  Q.   In how many countries is Crystal Head sold?  Or

13  at least would you name some of the countries.

14  A.   Well, it's certainly sold globally.  We are in --

15  I may be wrong on the number, but I think we have trade

16  dress in 70 countries, including the Far East.  We

17  have England, France, Germany, Scandinavia, South

18  America.  We are scattered around many parts of the

19  world.

20          MR. BERG:  Your Honor, I think I best

21  approach before I ask the next question.  I may be

22  trespassing on a --

23          THE COURT:  Maybe you can confer with

24  counsel off the record and avoid the approach.

25          (COUNSEL CONFER.)

```
 1            MR. BERG:  Your Honor, I think we need to
 2  confer with the Court.
 3            THE COURT:  If it is one of the motions in
 4  limine in issue, I don't have those before me.  So could
 5  you identify which motion it is for purposes of this
 6  discussion.
 7            MR. BERG:  Your Honor, I received a ruling.
 8  My associates and partners told me, no, I can't do that.
 9            THE COURT:  All right.  Counsel may proceed.
10  BY MR. BERG:
11     Q.  Mr. Alexander, I think that's all the questions I
12  have for you.
13        I pass the witness.
14            THE COURT:  Thank you.
15            Cross-examination?
16            MR. RAFFERTY:  With the Court's permission.
17
18                  **CROSS-EXAMINATION**
19  BY MR. RAFFERTY:
20     Q.  Good morning, Mr. Alexander.
21     A.  Good morning.
22     Q.  Again, I'm Tom Rafferty, and I think we met
23  yesterday.
24     A.  Yes, we did.
25     Q.  Mr. Alexander, you, in fact, have been painting
```

1   and drawing skulls from at least the early '70s?

2       A.   Yes.

3       Q.   And part of what you've done professionally is

4   paintings that include imagery of skulls?

5       A.   Yes.

6       Q.   Some of your works that are in the various

7   museums around the country are filled with skulls,

8   aren't they?

9       A.   Various forms of skulls, some of them, yes.

10      Q.   Some of them have many multiple skulls?

11               THE COURT:   Some of the museums?

12  BY MR. RAFFERTY:

13      Q.   Some of the pieces in the museums?

14      A.   Yes.

15      Q.   The individual pieces with multiple skulls.

16      A.   Yes.

17      Q.   And in fact some of the skulls in your paintings

18  that are hung in museums around the country have skulls

19  not only of humans but also of simeons (phonetic)?

20      A.   And other forms, yes, other animals.

21      Q.   And I think you -- I just want to be sure I

22  understood your testimony, every human skull is

23  different, isn't it?

24      A.   Certainly.

25      Q.   And so if you paint one person's skull and you

 1    paint somebody else's skull, there are going to be

 2    differences?

 3        A.   Yes.

 4        Q.   And the skulls that are in your paintings that

 5    are hung in museums around the country, are they the

 6    same skull or different skulls?

 7        A.   I would say that they are, what I would call

 8    stylized.  There's is no attempt in those to make it

 9    photographically.  They're an impression of things.  I

10    don't paint -- I'm not a realist painter.  So I if

11    paint -- if I was asked to paint your portrait, it would

12    be a struggle for me.  I could do my interpretation of

13    that and make it -- try to make it appealing to an

14    audience.  But I -- the skulls I use in my paintings --

15    or have used in my paintings, there's no attempt there

16    to make them look like realistic photographic skulls.

17    So, yes, they are all different types.

18        Q.   Okay.  And somebody could look at them and you

19    can discern differences between them?

20        A.   The different skulls?

21        Q.   Yes.

22        A.   Yes, for sure.

23        Q.   When you were creating the Crystal Head Vodka

24    bottle, the skull that's used in that bottle, you were

25    also trying to do something that was art and not simply

1    photography?

2        A.   Yes, well.  But -- yes, that is correct.

3        Q.   And so that's not really any particular skull,

4    that's your stylized impression of the skull?

5        A.   Yes.

6        Q.   Do you think that that is an abstract and

7    stylized impression?

8        A.   It is -- it's certainly based on the human skull,

9    but it is not a replica of the human skull.

10       Q.   And the skulls in your paintings, you talked on

11   your direct testimony about the essence of a skull or

12   the feeling of a skull.

13            Do the skulls in your painting, despite their

14   variation, all have the essence of a skull in your

15   judgment?

16       A.   No.

17       Q.   Some do, some don't?

18       A.   Yes, that would be accurate.

19       Q.   Now, you said that little variations can change

20   things altogether?

21       A.   Uh-huh.

22       Q.   So variations in the skulls of your paintings can

23   change the impression that one gets?

24       A.   In the paintings?

25       Q.   Yes.

1    A.  Yes.

2    Q.  Now, how long did it take you to go from the idea

3  that you testified you had with Mr. Aykroyd to the

4  process where the people were making schematics of your

5  drawings in order to create the molds to make the glass

6  bottles?

7    A.  That was over a year.

8    Q.  Are you sure about that, sir?

9    A.  No.  I'm very -- unfortunately I'm not good with

10  dates.

11    Q.  Do you recall ever testifying that the process

12  took about six months?

13    A.  I -- you mean the process of me drawing them?

14    Q.  Yes.

15    A.  That could be accurate.

16    Q.  So you are not sure as you sit here today how

17  long you spent working on this?

18    A.  I spent working on the back and forth on this

19  from the beginning concept all the way up until the

20  final drawings were sent off.  And, you know, I'd work

21  on them two or three days in a row or one day an all day

22  or one afternoon, then days would go by, we would -- I

23  would ship stuff to them for feedback.  It was an

24  organic type of process where everybody was --

25  everybody -- Dan and myself were involved in that.  And

1    it was a big chunk of time.

2        Q.  Over what period of time, can you remember?

3        A.  It was certainly a part of the year.

4        Q.  But you don't know what part of the year?  Could

5    have been half a year, three quarters of a year?

6        A.  No.  That doesn't come to my consciousness.

7        Q.  Now, you also mentioned that you are not

8    particularly good in your own judgment at sculpting?

9        A.  Sculpting?

10       Q.  Yes, sculpting.

11       A.  Well, I don't make sculpture.  It's not a thing

12   that I do.  I would not call myself a sculptor.

13       Q.  In connection with the development of the Crystal

14   Head Vodka bottle, you did make a sculpture?

15       A.  I made a clay sculpture, yes.

16       Q.  How long did it take you to make that sculpture?

17       A.  I don't know.  It took weeks, you know, couple

18   weeks, three weeks.  I don't remember.  But it was a

19   very clumsy attempt.  It was very problematic for me.

20       Q.  But Mr. Aykroyd asked you to do that and you did

21   it?

22       A.  Yes.

23       Q.  In your judgment -- and I don't know very much

24   about art -- does it take more or less time to do a

25   drawing than a sculpture?

1    A.   Well, I mean, a drawing can be made in minutes.

2  But to get a drawing the way you want it to look

3  sometimes can take a day.

4     I can work on a drawing for days on end before it

5  is finished.  It is -- it's difficult to set a time

6  limit on it, because each drawing is different.

7    Q.   And when you were -- when you were doing the

8  drawings that ultimately led to the creation of the

9  Crystal Head Vodka bottle, you were trying to -- you

10  were doing trial and error.  You got some you didn't

11  like, some you liked?

12    A.   Oh, yes.  The beginning ones morphed into

13  something else.  They changed.  I had an idea for this

14  as a concept.  But I hadn't -- I did not understand

15  visually exactly how I wanted it to look.  This became

16  part of a process.  Trial and error, let's say.

17    Q.   You actually had this idea many, many years

18  before you spoke to Mr. Aykroyd about it?

19    A.   Yes.  Several years before.

20    Q.   You, in fact, offered it to another one of your

21  friends?

22    A.   Briefly.

23    Q.   Was that friend Jimmy Buffet?

24    A.   Yes.

25    Q.   Mr. Buffet was going to put tequila --

1      A.   When I mentioned it to him, it dismissed

2    immediately.  He had no interest in it whatsoever.  I

3    knew that he -- we talked about him going into the

4    tequila business.  I said, I have an idea, why don't you

5    make a skull-shaped bottle.  And he went (indicating),

6    and he just dismissed it.  That was the last I brought

7    it up.

8      Q.   Let's met shift a little bit and ask you some

9    questions about -- what you mentioned, the proportion,

10   when you were drawing on the board.

11        Now, the drawings on the board, those are sort of

12   like the drawings, although having -- being done under

13   pressure with a lot of people watching you, the same as

14   the ones in Exhibit 124?

15     A.   Yeah.  Well, they are the same approach to

16   drawing, yes.

17     Q.   Exhibit 124 looks like a collection of pages from

18   a sketch book?

19     A.   Yes.

20     Q.   And how many -- did you keep one sketch book for

21   this project?

22     A.   No.  There were many more.  They weren't always

23   sketch books because I work -- they're sketch book pages

24   or pieces of paper.  I work on a wall.  I don't work

25   sitting down.

1      Q.   What was the approximate size of these when they

2   were in their original form?

3           Were they 8-by-12s?

4      A.   I was going to say 14, 11-by-14.  Some larger.

5      Q.   Did you ever do a very large rendering of the

6   Crystal Head Vodka bottle?

7      A.   Not that I remember, no.

8      Q.   Okay.  You talked a lot about getting the

9   proportion right.  One of the ways you went to get the

10  proportion rights, you went out and acquired a whole

11  bunch of liquor bottles of varying sorts?

12     A.   Yes.

13     Q.   And, in fact, if we turn through Exhibit 124, I

14  think there are some of sketches that you -- I think you

15  replicated a little bit.

16              MR. RAFFERTY:  And, Your Honor, I'm looking

17  at --

18              THE COURT:  There are numbers at the bottom.

19  Two sets of numbers.

20              MR. RAFFERTY:  Right.  Thank you, Your

21  Honor.

22              I was going to take us to page -- to page

23  ending in No. 7938.

24              THE COURT:  Sir, see if you can find that.

25              MR. RAFFERTY:  It is coming up on the

```
 1   screen, Your Honor?
 2           THE COURT:  Counsel is placing it on the
 3   screen.
 4           THE WITNESS:  Yes.
 5   BY MR. RAFFERTY:
 6       Q.  These are your sketches?
 7       A.  Yeah.  But it -- oh, I see it.
 8       Q.  And it seems to say -- if I can read it.  I
 9   really can't read the second one.  But it's the -- the
10   first bottle -- or the first word on the right-hand side
11   is Patron?
12       A.  Yes.
13       Q.  Then I can't read the second one.  Do you know
14   what that --
15       A.  Herradura, Don Julio, Crown Royal, Gin -- they
16   are just liquor names.
17       Q.  These are the bottles of different kinds of
18   alcohol you used to help you --
19       A.  Yes.
20       Q.  -- to create your bottle here?
21       A.  Yes.
22           THE COURT:  I will just advise the witness,
23   let counsel complete his question before you start to
24   answer.
25           THE WITNESS:  Sorry, Your Honor.
```

```
1              THE COURT:  All right.  Counsel.

2              MR. RAFFERTY:  Thank you, Your Honor.

3    BY MR. RAFFERTY:

4      Q.  Mr. Alexander, you talked about the problem with

5    placing the neck, I think you called it.  The spout is

6    what I would call it.  And I think you said one place to

7    put the spout in the skull was at the back.

8              But you couldn't fill that bottle, could you?

9      A.  No.  I was complete novice in terms of the -- the

10   technical aspects and the mechanics of it.  Mine was

11   just an idea, and I was trying to figure out how to make

12   the idea work in terms of its visual impact.

13             And in the very beginning I had no idea, in the

14   early stages, what was going to happen with that.

15     Q.  But every one of the bottles, I'll suggest to

16   you, and you can page through this if you want to, this

17   next page has got some more of your sketching.

18             Every bottle that you looked at had the spout on

19   top, didn't they?

20     A.  Yes.

21     Q.  Okay.  So then I --

22     A.  I'm sorry.

23     Q.  No, no.  I shouldn't cut you off.

24     A.  Well, just from a practical standpoint, it would

25   make sense that the bottle would have this top like a
```

1    conventional bottle sticking straight up.

2       Q.  In fact, from a practical standpoint, there is no

3    other option, is there?

4       A.  Yes.  We have another option.

5       Q.  Well, you have -- it's still on the top.  It's at

6    an angle?

7       A.  Yes.  But it is the angle.

8       Q.  But it's on the top.  And every other bottle we

9    looked at the spout was on the top?

10      A.  On the top.

11      Q.  If you could turn those three bottles you have

12   there sideways so you can look at the exhibits.  The

13   spouts on this bottle at the same angle?

14      A.  They are not at exactly the same angle.  But they

15   are very close.

16      Q.  Different angles, aren't they?  You can see that

17   by just looking at it?

18              THE COURT:  Wait just a moment.  Did the

19   witness answer?

20              They are different angles, aren't they?

21              THE WITNESS:  Slightly different.

22   BY MR. RAFFERTY:

23      Q.  The slight difference can be discerned by just

24   looking at it, can't it?

25      A.  Not if you just glance at it.  If you sat here

1   like this and you're focused on that angle, which we are

2   doing in a court of law, yes, you can find that there is

3   a difference.  If it's on a shelf at a bar in a club,

4   you don't notice that at all.  It's an angle -- that was

5   something particularly troubling to me when I saw the

6   KAH bottle, that -- it just seemed to me like it looked

7   like my bottle.

8       Q.  Now, I just want to ask you -- you have

9   Exhibit 58 which is the Extra Anejo, the black bottle

10   that's in front of you.

11      A.  Yes.

12      Q.  You said -- I'm not going to put words in your

13   mouth, but you mentioned the fact that the crystals that

14   are embedded in it are reflective?

15      A.  Uh-huh.

16      Q.  You also said you visited hundreds of liquor

17   stores and bars during this tour across the country in

18   the truck.

19      A.  Well --

20          THE COURT:  Wait just a moment.  There's no

21   question.

22          MR. RAFFERTY:  I'm in an awkward spot, Your

23   Honor.  I don't want to talk over the witness.

24          THE COURT:  Well it might be better to just

25   state a question than counsel saying -- trying to

```
1    interpret what the witness said.
2    BY MR. RAFFERTY:
3       Q.  In any of those visits, did you see that bottle?
4       A.  The KAH bottle?
5       Q.  The bottle with the crystal sparkle?
6       A.  No.
7       Q.  You never noticed it any of those visits?
8       A.  No.
9       Q.  So when you -- so today you said you hadn't seen
10   it before, but you're taken aback by the fact that it
11   sparkles.
12      A.  The first time I saw this bottle is today.
13      Q.  So in all those hundreds and hundreds of visits,
14   you never saw it before?
15      A.  Well, to be accurate, in all the -- in that
16   period of time we are talking about, KAH Tequila didn't
17   exist.
18      Q.  Have you seen it in a liquor store or bar between
19   the time that KAH came into the market or that bottle
20   came onto the market until today?
21      A.  No, I have not seen that bottle until today.
22      Q.  Even though it is sparkly and shiny?
23      A.  Yes.
24      Q.  Do you think you'd noticed it if you saw it in a
25   brightly lit liquor store?
```

1    A.   I would notice it as KAH bottle?

2    Q.   Uh-huh.

3    A.   Sure.  It's look like a KAH bottle to me.

4    Q.   You tell -- when you look at the KAH bottles, you

5    can tell that they're KAH bottles?

6    A.   That's the appearance that I get, yes.

7    Q.   Okay.

8    A.   Maybe somebody's copied KAH.

9    Q.   Now, you have an ownership interest in Globefill?

10   A.   Yes.

11   Q.   And what's the size of your ownership interest in

12   Globefill?

13   A.   20 percent.

14   Q.   Did you get that 20 percent in exchange for --

15   A.   My creating the bottle.  And also -- I also

16   worked and have worked throughout the history of the

17   company in the promotion of it.

18   Q.   So you have a financial stake in the outcome of

19   this case?

20   A.   Oh, yeah.

21   Q.   And at the time that Globefill sued Elements and

22   Ms. Brandi, were you also an owner?

23   A.   Yes.

24   Q.   Did you participate in the deliberations leading

25   up to that lawsuit?

1    A.  Only that I gave a deposition.

2    Q.  Did you -- I'm focused on the decision to bring

3  the lawsuit.  Did you have any role on that?

4    A.  No, I did not -- I was not certainly consulted.

5  Pardon me.  I was certainly consulted on it, but I

6  didn't -- I -- I -- lack of a better word, that's above

7  my pay grade.  I didn't -- I wasn't -- I didn't make the

8  final decisions on that.  I was enthusiastic that we

9  did.  I just wanted to stop it.  The cease and desist

10  letter I thought would do that.

11    Q.  You wanted to stop Ms. Brandi from selling her

12  KAH Tequila in the market?

13    A.  I did.

14    Q.  And at the time that you wanted to stop

15  Ms. Brandi from bringing her KAH Tequila in the market,

16  despite your humble beginnings which we heard a lot

17  about, you're quite well off, aren't you, sir?

18         MR. BERG:  Objection, Your Honor.

19  Materiality.

20         THE COURT:  Sustained.  As phrased,

21  sustained.

22         I sustained the objection.  So counsel will

23  ask another question.

24         MR. BERG:  Oh.

25  BY MR. RAFFERTY:

1    Q.   Do you have a home in Manhattan, sir?

2    A.   I have a loft that I rent in Manhattan.

3    Q.   Do you have a place out in the country outside of

4    New York?

5             MR. RAFFERTY:  Objection, Your Honor.  Same

6    materiality objection.

7             THE COURT:  Objection is overruled.

8    Counsel.

9             MR. RAFFERTY:  Do you have a house outside

10   of Manhattan?

11            THE WITNESS:  Yes.

12   BY MR. RAFFERTY:

13   Q.   At the beach?

14   A.   No.  It's near the beach.

15   Q.   What town is it in?

16   A.   Amagansett, Long island.

17   Q.   Is Amagansett, Long Island part of the Hamptons?

18   A.   Yes.

19   Q.   You've done quite well from the sale of your art?

20   A.   Well, I've made a living at it since my adult

21   life.

22   Q.   When you were enthusiastic about suing Ms.

23   Brandi, did anyone have any discussions about the

24   financial position that Ms. Brandi found herself in?

25   A.   I didn't know anything about Ms. Brandi other

 1    than the fact that KAH Tequila bottle I found deeply

 2    offensive because it looked like something that I

 3    invented as an idea as an vessel for alcoholic beverage.

 4    And she'd taken that idea that we had a trade dress on,

 5    and she -- as I said earlier, written me off, I thought.

 6        Q.   And you think that -- your testimony is that

 7    people looking at the Crystal Head Vodka bottle and the

 8    various KAH Tequila bottles would be totally confused as

 9    to which is which?

10        A.   No.  I don't think totally is an accurate word.

11    I think that there is enough confusion that it is -- it

12    creates a problem for us.

13          Just as a -- if I may add, as an artist who has

14    somewhat of a reputation, I mean at least I'm -- I'm

15    still around.  At my age, I still get shows.  And I

16    still have a career.  It is troubling to me that I'm

17    constantly asked wherever I go, these things are near

18    each other or not.  Oh, did you do that bottle?  Is that

19    yours?  Did you make that?  I'm asked that -- I get

20    asked that frequently.  It comes up very often.

21        Q.   Were you asked -- were any of those questions

22    posed after this lawsuit was filed?

23        A.   The question started being posed the second it

24    hit the marketplace.

25        Q.   Well, I'm trying to limit my time.

1          Was any posed to you after this lawsuit was

2     filed, after Elements and Ms. Brandi were sued?

3        A.   Yes.  I was asked as recently as last month.

4        Q.   Did write down the information from the person

5     that asked you?

6        A.   I made note of it.

7        Q.   Are any of those people coming to testify here?

8        A.   No.

9        Q.   And despite the fact that you are suing Elements

10    and Ms. Brandi, none of those people are going to tell

11    the jury -- confirm what you just said you were asked?

12       A.   These were people I met at an event.  And the

13    bottles were on the table.

14          This is one example that happens a lot.  But

15    people that -- it was an event actually honoring me.

16    But that -- people that were there as guests asked me.

17    They are not even people that I'm -- you know, I'm

18    not -- it's no one that I'm close to or friendly with.

19    People ask me that randomly.  "Is that your bottle?  Oh,

20    John, did you design that?"  That kind of thing.

21       Q.   What do you tell them?

22       A.   I said, "No, I didn't design it."

23            MR. RAFFERTY:  Your Honor, if I could ask

24    the deputy clerk to hand the witness Exhibits 56 and 57

25    which are the other two bottles.

1          THE COURT:  The clerk will place Exhibit 56

2     and 57 before the witness.

3     BY MR. RAFFERTY:

4        Q.  Mr. Alexander, I've now, I think, given you the

5     entire universe of KAH bottles.

6        A.  I was just going to say, I won't be able to sleep

7     tonight.

8        Q.  Well, that would make two of us.

9             The bottles that I've given you.

10            Let's just talk about the KAH bottles for a

11     moment.  Do you view those pieces as works of art?

12        A.  No.

13        Q.  They are not works of arts at all?

14        A.  No.

15        Q.  Not even folk art?

16        A.  When you use the term art, as I see it, I don't

17     think of -- I don't think this is a work of art either.

18     These are mass produced products for consumption.  And I

19     think of folk art -- I'm a huge fan of folk art.  And I

20     also find these quite attractive.

21            When you say the term art, A-R-T, associated with

22     it -- immediately my -- and I'm old school from the kind

23     of throw back to the 19th Century in terms of my art and

24     art making.  Art to me is about something that's much

25     different than commerce.  And so these are commercial

1     products.

2           And I was troubled as an artist, did I really

3     want to get into the commercial elements of this because

4     it is not something I've ever done.  I've never done

5     anything accept making singular pieces of highly

6     originally, I think, I hope, that are clearly works of

7     art that contain the spiritual quality of visual

8     attention or pleasant.  You know you can make an art

9     work that has to do with a sunset and a lake and a deer.

10    Or you can make an art work that has to do with some

11    kind of tragedy.  And there's all kinds of ways -- so I

12    think of folk art by a folk artist as something similar

13    to this, but it is an individual object.

14          I just think of these as a commercial product.  I

15    don't think of it as folk art, no.

16    Q.   Let's stick to the KAH Tequila -- the Crystal

17    Head Vodka bottle.  The drawings that you made, do you

18    consider those works of art?

19    A.   I'm sorry?

20    Q.   The drawings that you made that led to the

21    ultimate production of the bottle, were those works of

22    art?

23    A.   They just were schematic -- I keep using the word

24    schematic.  These were just studies for the product.

25          If I had wanted to make one of these into a --

1    what I would call an art work, I would have worked on it

2    much longer, perhaps.  I would have signed it and

3    photographed it.  It would have gone into a different

4    thing.

5         These drawings that I did, I was doing them

6    not -- this is where it was troubling to me.  I was not

7    doing these drawings to try to make art works.  I was

8    trying to use my talent as an artist to create this

9    commercial product, which is a skull-shaped bottle as a

10   vessel for alcohol.

11   Q.  Did you succeed in that?

12   A.  Well, we are in 70 countries.

13   Q.  No.  I'm talking about the artistic end.  Did you

14   succeed in -- as an artist, in creating a bottle that

15   you're proud of as an artist, not as a captain of

16   industry?

17   A.  The reaction to this bottle has been so

18   overwhelmingly positive that I'm actually rather proud

19   of the way it looks.  I must say that there was

20   tremendous trepidation and worry in the beginning

21   because I thought, this is not -- this is not good for

22   me.  But it -- because of my friendship with Dan and the

23   deep, long friendship, he was so enthusiastic about it,

24   he got me enthusiastic about it, that I just went into

25   it with both feet full blown.  But it is so off the

1    wall, not something I would normally do.

2        Q.  So you don't consider your bottle art?

3        A.  Others do.

4        Q.  Okay.

5            THE COURT:  Wait just a moment.  Do you

6    consider it art?  Is that Counsel's question?

7            MR. RAFFERTY:  That was my question.

8            THE COURT:  Try to answer that question if

9    you can.

10           THE WITNESS:  You could make the case, if I

11   was wanting to be very egotistical about it, that as a

12   successful artist everything I do is creative and

13   physical is art.

14   BY MR. RAFFERTY:

15       Q.  Do you believe that?

16       A.  I'm not that much of an egotistic.  But, yeah,

17   that's probably true.

18       Q.  And you don't view the four KAH bottles as art?

19       A.  These look to me -- no, I don't.

20       Q.  Someone painted on some of them, didn't they?

21       A.  Those are all mechanically done.  There's no

22   painting done on those by hand, I don't think.

23       Q.  Do you know?

24       A.  No, I don't.  I cannot answer that.

25       Q.  So if -- even if you did it mechanically, you'd

1    still have to have something to work off?  Someone's got

2    to do the original work, don't they?

3              THE COURT:  Counsel, couple of questions.

4    Which one?

5    BY MR. RAFFERTY:

6    Q.  You don't know whether they were handpainted or

7    painted by machine?

8    A.  I'm going to say that I think they were painted

9    by machine.

10   Q.  And in the instances which things are painted by

11   machine, how do you get there?  How do you get the

12   machine to do what you want it to put out?

13   A.  I think that the technical people are capable of

14   doing that do it.

15   Q.  Do they do it, as in your case, by taking a

16   drawing or a sketch and doing schematics that are then

17   used?

18   A.  I wish I could answer that.  I actually don't

19   know.

20   Q.  You just don't know?

21   A.  I don't.

22   Q.  So --

23   A.  But I think that in terms of art or not art, I

24   think that the KAH Tequila bottle is not only a rip-off

25   of my idea and my bottle and my invention, so to speak,

```
 1    which it is.  And this is not only a rip-off my bottle

 2    and my invention, but it's also in my opinion, it's

 3    stealing this from the Day of the Dead celebration,

 4    which is a very spiritual and reverential occasion.  So

 5    I don't -- I don't have anything else to say about that.

 6        Q.  So you believe that somehow the KAH Tequila

 7    bottles steal some idea or thought from the Day of the

 8    Dead?

 9        A.  It is very clear.  They state that.  I mean, you

10    stated.  But they were saying it here in the courtroom,

11    it's all about the Day of the Dead.

12        Q.  When you look at those bottles, do you think of

13    the Day of the Dead?

14        A.  Yes.

15        Q.  Okay.  When you look at the Crystal Head Vodka,

16    do you think of the Day of the Dead?

17        A.  Well, I can think that simply because I know that

18    much of the idea about using a skull like that came out

19    of a lot of exposure to Day of the Dead symbolism.  The

20    skull was being used that way.  But not as a vehicle for

21    alcohol.

22        Q.  When Crystal Head Vodka markets itself, does it

23    market itself as a results or a product of the Day of

24    the Dead?

25        A.  Not to my knowledge.
```

1     Q.   In fact, it markets itself as something that

2   flows from the legend of the 13 crystal skulls, doesn't

3   it?

4     A.   That was the -- at the earliest stages of our

5   company back in the beginning, that was the marketing

6   plan that we used to market it.

7     Q.   Marketing had nothing to do with the Day of the

8   Dead?

9     A.   No.

10     Q.   And it had everything to do with the legend of

11   the 13 crystal stones?

12     A.   No.  But I would like to think, and I hope I'm

13   right, that the marketing had to do with -- the success

14   of this had nothing whatsoever to do with the legend of

15   anything.  It had to do with the physical shape and the

16   feeling and the creativity that went into making this an

17   iconic thing that people would find appealing.  It had

18   no -- that is the way I feel.

19          MR. RAFFERTY:  And Your Honor, if I might, I

20   would like to have the deputy clerk pass -- publish to

21   the jury the actual bottles?

22          THE COURT:  And maybe you could identify

23   which one bottles you are talking about.

24          MR. RAFFERTY:  I would like to pass them

25   all, Your Honor.  Because I am going to try give them

```
1    each a voice.  Exhibits 45, 55, 56, 57, and 58.
2                THE COURT:  The clerk may circulate those to
3    the jury.
4                45, 55, 46, 57 and 58.  Am I correct?
5                MR. RAFFERTY:  You are, Your Honor.
6                So the 45 is the Crystal Head bottle.  55 is
7    the Blanco -- it's already on the -- there's a duplicate
8    on --
9                THE CLERK:  This is 55.
10               MR. RAFFERTY:  She can use either.
11               THE CLERK:  55.
12               MR. RAFFERTY:  45 is the Crystal Head
13   bottle.  55 is the Blanco, the white one.  56 is the
14   Resposado, the yellow.  57 is the Anejo, the black one.
15   And the other black one with the crystals is 58.
16               THE COURT:  The clerk should be circulating
17   five bottles.
18               THE CLERK:  Counsel, did you say 58?
19               MR. RAFFERTY:  Yes.
20               THE COURT:  45, 55, 56, 57, and 58.
21               MR. RAFFERTY:  Could we also circulate
22   No. 700?  I would like to give 700 to the witness.
23               772.
24               THE COURT:  700 and 772?
25               MR. RAFFERTY:  772.  I got the number wrong.
```

1    I apologize, Your Honor.

2              THE COURT:  772 is the exhibit to be placed

3    before the witness.

4              THE CLERK:  It is before the witness.

5              THE COURT:  Now, does Counsel wish to have

6    that circulated as well?

7              MR. RAFFERTY:  No.  That one can stay with

8    the witness.

9              THE CLERK:  Okay.

10             THE COURT:  I think the jurors have examined

11   the bottles.  And so the clerk may retrieve those.

12             Counsel, you may continue with your

13   examination.

14             MR. RAFFERTY:  Thank you, Your Honor.

15   BY MR. RAFFERTY:

16      Q.  Mr. Alexander, could you just take a close look

17   at Exhibit 772, which is still in front of you, the

18   Blanco bottle.

19      A.  Yes.

20      Q.  Can you tell me whether or not it is hand painted

21   or machine painted from looking at it?

22      A.  This one looks -- this one looks more hand

23   painted.

24      Q.  Okay.  So if it's hand painted --

25      A.  I'm not sure though.  There are parts of it that

1    look hand painted.

2        Q.   If it is painted, does it qualify as a piece of

3    art?

4        A.   No.

5        Q.   Now, the bottles themselves, the Globefill

6    Crystal Head bottle has a particulars stopper, doesn't

7    it?

8        A.   Yes.

9        Q.   And it identifies itself as Crystal Head Tequila

10   -- Crystal Head Vodka?

11       A.   The stopper?

12       Q.   No, not the stopper.  The bottle itself?

13       A.   Yes.

14       Q.   And the KAH Tequila bottles identify themselves

15   as KAH bottles on the stopper and on the neck?

16       A.   Yes.

17       Q.   And you see that by just looking at the bottle?

18       A.   If you carefully examine it, you can.

19       Q.   So if you picked it up to buy it, you could see

20   it?

21       A.   You certainly wouldn't know if you got it off a

22   bar or at a restaurant.

23       Q.   That wasn't my question, sir.

24       A.   Oh, sorry.

25       Q.   If you picked it up to buy it, you could see that

1    it was a KAH Tequila bottle?

2        A.   Yes.

3        Q.   And do you have any trouble recognizing the KAH

4    Tequila bottles versus the Crystal Head Vodka bottle?

5        A.   What do you mean?

6        Q.   Do you have any trouble when you -- they've been

7    passing them around today.  Do you know which are which?

8        A.   Sure.

9             MR. RAFFERTY:  I have no further questions

10   at this time, Your Honor.

11            THE COURT:  Redirect?  Oh, I'm sorry.

12   Mr. Miller.

13            MR. MILLER:  Just a smidge, Your Honor.

14            THE COURT:  Yes.

15

16                    **CROSS-EXAMINATION**

17   BY MR. MILLER:

18       Q.   Good afternoon, sir.

19       A.   Hi.  How are you?

20       Q.   We met earlier too.  I'm John Miller.  I

21   represent Kim Brandi.

22            I just want to ask you a couple follow-up

23   questions.  You were at an event recently when somebody

24   pointed to a KAH bottle on the table and asked if that

25   was your brand?

1    A.  Yes.

2    Q.  And where was that event?

3    A.  Dallas, Texas.

4    Q.  What kind of event was that?

5    A.  I'm sorry?

6    Q.  What kind of event was that?

7    A.  It was at a cocktail party dinner at someone's

8    house that was -- the party was for -- in my honor.

9    Q.  Which of the KAH bottles was it?

10   A.  I don't remember.  There actually were two or

11   three there.

12   Q.  Were there Crystal Head bottles on the table as

13   well?

14   A.  It was a bar.  It was a large bar.  And they were

15   both on the bar.  And then there were Crystal Head

16   bottles from the front of the bar, because they put them

17   there for me.  Because -- it was there for me.

18                MR. MILLER:  That is all I have.  Thanks.

19                THE COURT:  Thank you.

20                Redirect?

21                MR. BERG:  Just very briefly.

22                THE COURT:  All right.

23                   **REDIRECT-EXAMINATION**

24   BY MR. BERG:

25   Q.  Johnny -- or Mr. Alexander, you were asked about

```
 1   your ownership interest in Crystal Head?

 2       A.   Yes.

 3       Q.   And you invested your time and your effort in

 4   exchange for your ownership?

 5       A.   Yes.

 6       Q.   And what did you hope to accomplish by becoming

 7   an owner?

 8       A.   Well, I hoped that it would make money.

 9       Q.   And did you have a specific thought in mind about

10   your family?

11       A.   Yes.

12       Q.   Would you please explain to the jury what you

13   mean?

14       A.   Well, I'm not getting any younger.  And I've

15   noticed that, you know, it gets harder and harder at my

16   age to climb up on ladders and make paintings.

17       Q.   How old are you, sir?

18       A.   71.

19            And -- this morning.  I'm 76 now.  I've aged five

20   years today.

21       Q.   He said he's --

22       A.   I just hope the success of this company would

23   afford my family -- because the only thing we actually

24   have -- I'm mean, the way I make my living is painting

25   pictures.
```

```
 1           And there is -- there is not some huge inventory
 2    out there that they could use.  And that there would be
 3    some other source of income for my family so that when
 4    I'm no longer here that they wouldn't have to worry
 5    about selling my art or selling off the stuff that I've
 6    done and -- because it's extremely difficult to do.  I
 7    didn't want to burden my family with that.  And so I
 8    hoped that this would be a profitable venture.
 9       Q.  It was mentioned that you live in Amagansett.  Do
10    you have any particular involvement -- or have you
11    had -- in Amagansett in a civic way?
12       A.  Yes, I have, several civic ways.
13       Q.  Tell us what you have done.
14       A.  Well, we have been involved -- from a charitable
15    standpoint in a project called The Wounded Warrior
16    Project.
17       Q.  Is that you or the company?
18       A.  The company.  And me, too, to some extent
19    communitywise.
20           But I'm most proud of the fact that for 25 years
21    I'm an active volunteer fireman.
22       Q.  Are you still?
23               THE COURT:  Excuse me.  Is he still?
24               MR. BERG:  A volunteer fireman.
25               THE WITNESS:  Now, when I reached a certain
```

1    age, I stopped being active, because I didn't feel that

2    I was capable physically to do that kind of stuff.  And

3    it -- I was getting too old for it, so I retired.  But

4    I'm still part of the department.  I just don't make

5    ambulance and rescue calls and fires anymore.  I stopped

6    doing that.

7    BY MR. BERG:

8       Q.  One last area of questioning.  You were asked if

9    you were trying to stop Ms. Brandi from selling KAH

10   Tequila.

11        What is it you are asking her to do?  What are

12   you trying to keep her from doing?

13      A.  I'm trying to keep this bottle that I consider a

14   direct copy of my bottle as an idea, which we have trade

15   dress for, legally we have the right to a market alcohol

16   in a skull-shaped bottle.  It doesn't say, Clear

17   painted, red, green or blue.  It is alcohol in a

18   skull-shaped bottle.  And I would like to stop her from

19   doing it.

20      Q.  Do you want to stop -- would you have an

21   objection if she changed the bottle and sold tequila?

22              MR. RAFFERTY:  Your Honor, objection.

23              THE COURT:  Sustained.

24   BY MR. BERG:

25      Q.  Tell us whether or not you want to stop her from

1  selling tequila in any bottle?

2     A.   Oh, absolutely not.  I would wish her well.

3             MR. BERG:  Thank you.

4             Pass the witness, Your Honor.

5             THE COURT:  We've completed the examination

6  of this witness.  This is a logical break time.

7             The jurors may have questions of this

8  witness.  So if you do, this would be the time to write

9  them.

10            And then I would inquire of counsel, may be

11 witness be excused.

12            MR. BERG:  Yes.  But if they have questions.

13            THE COURT:  Well, No.  I'm asking now.  So

14 if they have questions, they would write them down and

15 send them.

16            But I think they have no questions.

17            So may the witness be excused?

18            MR. BERG:  He can.  I do think the witness

19 is going to stay as long as he can until he has to

20 attend to a personal matter, Your Honor.

21            THE COURT:  Any objection to the witness

22 being excused?

23            MR. RAFFERTY:  No objection, Your Honor.

24            THE COURT:  So the witness is excused.  That

25 means you may stay if you wish, but you dent have to.

```
 1              THE WITNESS:  Thank you all for your
 2   courtesy.  Appreciate it very much.
 3              THE COURT:  The witness is excused.
 4              So we do have one additional witness that we
 5   will be taking today so we are not going to recess as
 6   early as I thought.  We are going to let counsel
 7   complete their examination of that witness.
 8              So for that reason we'll take a longer break
 9   now.  Normally this would be 15 minutes.  But it will be
10   a little over 30 minutes.  Sufficient time for those who
11   want to get something to eat, hopefully to do that.
12              So the return time will be 1:00 o'clock.
13              So the jurors are excused now.  Come back at
14   1:00 o'clock and we'll hear the next witness.
15              Counsel are excused, and we will resume at
16   1:00 o'clock.  And I'm hoping we can complete that
17   second witness before we recess.  Thank you.
18              THE CLERK:  Please rise.  This court is in
19   recess.
20              (RECESS.)
21              THE COURT:  We are back on the record.  We
22   have our jury, and we are ready to go.
23              The next witness.
24              MR. FAY:  Plaintiff Globefill would like to
25   call Jonathan Hemi.
```

```
 1              THE COURT:  All right.  The witness may come
 2    forward.  And the clerk will administer the oath.
 3              THE CLERK:  You can step up to the witness
 4    stand.
 5
 6                   JONATHAN HEMI,
 7       Called as a witness herein, having been first duly
 8      sworn on oath, was examined and testified as follows:
 9              THE WITNESS:  I do.
10              THE CLERK:  Please have a seat.  State and
11    spell your name for the record.
12              THE WITNESS:  Name is Jonathan Hemi.
13    J-O-N-A-T-H-A-N, H-E-M-I.
14              THE COURT:  Counsel may proceed.
15
16                 DIRECT EXAMINATION
17    BY MR. FAY:
18       Q.  Good afternoon, Mr. Hemi.  Could you introduce
19    yourself to the jury, please.
20              THE COURT:  What is the question?  That is
21    so general and so broad.
22              MR. FAY:  Who are you; where do you live?
23              THE WITNESS:  I'm Jonathan Hemi.  I live in
24    Toronto, Ontario, Canada.  I'm the managing partner at
25    Globefill Incorporated.
```

```
 1   BY MR. FAY:
 2      Q.  Mr. Hemi, is Globefill Incorporated a plaintiff
 3   in this action?
 4      A.  We are.
 5      Q.  And you said managing partner, can you tell the
 6   jury what that entails?
 7      A.  So the managing partner basically is the
 8   equivalent of probably the president or CEO of a
 9   company.  So very involved in the day-to-day operations
10   of the company.
11          We have our staff, our head office in Toronto.
12   That's where some of our staff reside.  Involved in
13   budget, forecasting, the general running of the
14   corporation.
15      Q.  Okay.  You said you have some of your staff in
16   Canada.
17          Do you have staff anywhere else?
18      A.  We do.  We have a couple of people in the United
19   States.  One in Southern California.  We do have a few
20   people in Europe.  Total company's about 17 people.
21      Q.  What is the business of Globefill?
22      A.  So Globefill Incorporated is the makers of
23   Crystal Head Vodka.  And our job is to not only produce
24   and manufacture Crystal Head Vodka but to also sell it
25   globally, if possible.  And to market it like any other
```

1    alcoholic beverage brand.

2        Q.   Does Globefill manufacture any other spirit?

3        A.   We do not.

4        Q.   Do you manufacture any other vodka?

5        A.   We do not.

6        Q.   When did you start working at Globefill?

7        A.   I was actually hired in early December.  I was

8    made aware very early, mid-November was when --

9    mid-November 2007 is when I was actually first

10   introduced to everything.  And then by early December, I

11   had started.  So December 2007.

12       Q.   Mr. Hemi, why don't you describe that

13   introduction that you just mentioned?

14              THE COURT:  I'm not sure what the question

15   is.

16   BY MR. FAY:

17       Q.   Mr. Hemi, you just referred to the fact that you

18   were introduced to Globefill.

19       A.   Correct.

20              THE COURT:  And so what?

21   BY MR. FAY:

22       Q.   And so could you describe that introduction?

23       A.   Sure.  So back in November 2007, Dan Aykroyd had

24   a project that he wanted to work on.  It was Crystal

25   Head Vodka.  And I was one of the people he wanted me to

get involved in running the business and taking it from

the bottle and the concept to the actual commercial end

of the business, to build the business around this

product, to market it and to start running a business.

Q.   When did you officially become an employee of

Globefill?

A.   Early December.  2007.  I don't know the exact

date.

Q.   And once you started your employment with

Globefill, what did you do?

A.   Originally my job was vice president of sales and

marketing.  And originally it was to develop the

original marketing plan on Crystal Head Vodka to the

partnership.  And it was to help develop the -- help

develop the making of the vodka, as well as finalize the

bottle as well.  So the bottle was pretty much done.

But there was still some little tweaks left in the

manufacturing level that we needed to do.

Q.   When you started in December 2007 were you making

vodka?

A.   Not yet, we were not.

Q.   Where you producing bottles of vodka?

A.   We just had the fourth prototype bottle.  So

there were several prototypes that happened before this

to get to what you see today.  So we were given that

1    last prototype bottle.

2       Q.   Had you launched Crystal Head Vodka yet?

3       A.   No.

4       Q.   Was it your job to launch Crystal Head Vodka?

5       A.   It was.

6       Q.   So did you put together that market plan that you

7    mentioned?

8       A.   Yes, I did.

9       Q.   What went into that?

10       A.   So generally the way we would do any marketing

11    plan, we would research the market, which was North

12    America to start.  We would pull information from trade

13    publications, articles, magazines, and then get a

14    feeling of who our main competitors were going to be at

15    the time.  The category itself.  The price category, and

16    things like that.  You know, a SWOT analysis, what they

17    call, which is the strengths, weaknesses, opportunities,

18    threats.

19           And then from there, once we identify that, we'd

20    look to how we are going to enter that market.  What

21    would be the most efficient and productive way to enter

22    that market.  And from there, that's how we started

23    developing our marketing plan.

24       Q.   What market for vodka did you decide to try to

25    enter?

1     A.   We went into the super premiums and luxury vodka

2     market.

3     Q.   And what price point were you looking at?

4     A.   We were looking at approximately $50 a bottle,

5     retail.

6     Q.   And where did you intend to initially launch this

7     product?  Which part of the world?

8     A.   Specifically the United States.

9     Q.   Okay.  Now, could Globefill -- is Globefill a

10    Canadian corporation?

11    A.   It is.

12    Q.   Could Globefill sell Crystal Head Vodka directly

13    into the United States?

14    A.   No.

15         So the alcohol -- the alcohol beverage market in

16    the United States is what we call a three-tier system.

17         You need an importer, because it is -- it is --

18    you know, it is a controlled substance.  You do need an

19    importer with the proper licensing for the United

20    States.  And then that importer will sell to a state

21    distributor.  And that distributor will then be allowed

22    to sell to bars, retail stores, you know, restaurants,

23    things like that, before it even gets to the consumer.

24         So before you even see it, it's gone through

25    three other levels.

1   Q.   Okay.  Did you arrange for Crystal Head Vodka and

2   Globefill to have a relationship with an importer?

3   A.   I did.

4   Q.   What importer is that?

5   A.   I chose Infinium Spirits.

6   Q.   Why did you choose Infinium Spirits?

7   A.   Couple of reasons.  First of all they specialized

8   in premium spirits.  So there's a lot of importers that

9   carry a lot of different products.  And it's very hard

10  to be good at both.  Wine and spirits generally don't

11  mix as well.  So we chose one that was highly focused on

12  premium spirits.

13       Second reason why is, they were based in

14  California, which is the largest luxury vodka market

15  probably in the world.

16       And then the third reason is is to have an

17  adequate size sales team that could help us cover the

18  marketplace with distributors.

19  Q.   Prior to your employment at Globefill, did you

20  have experience in the spirits market?

21  A.   I did.

22  Q.   What was that experience?

23  A.   So I do own another company, it's a distribution

24  company I've owned since 1995 in the wine and spirits

25  industry.  And I probably launched about 15 or 16 other

spirit products into the United States, Canada, even

parts of Asia.

   Q.  Was that the reason you were hired by Globefill?

   A.  Yes, I believe so.

   Q.  And when did you first approach Infinium about

being an importer for Crystal Head Vodka?

   A.  We first approached them in about -- in

March 2008.

   Q.  So that's about four months after you were

employed?

   A.  Correct.

   Q.  Okay.  And what did you do?  What did you say to

them?

   A.  Well, we put -- the initial call was in February

once I knew we had everything ready to show.  The

marketing plan was signed off by then by the partners.

We determined the path we were going to take with the

liquid with the vodka itself.  And then we set up that

initial meeting.

      And I basically did a very similar presentation

to Infinium that I did for others.

   Q.  Did Infinium agree to be your importer?

   A.  Instantly, actually.  It's never happened to me

before.

   Q.  Were they excited about being your importer?

1     A.   Absolutely.

2     Q.   And as the importer, do they actually buy the

3   product from you?

4     A.   They do.  They actually take title.  They do have

5   to warehouse it.  And then they do have to resell it.

6     Q.   So they make a financial commitment to the

7   product?

8     A.   100 percent.

9     Q.   Now you have an importer.  It's March of 2008.

10   What happens next?

11     A.   The next thing is, we have an importer, and that

12   importer is now going to have to start selling to

13   distributors -- or at least presenting our brand to

14   distributors across the United States.

15          So that was the next stage, which was:  Develop a

16   plan with Infinium sales team to go and pitch our

17   product to the various distributors in the United

18   States.

19     Q.   Does Globefill today work with distributors in

20   the United States?

21     A.   We do.  We don't work directly with them because

22   there's a certain hierarchy as we're all familiar with.

23   You don't want to go above anyone's head.  So when we do

24   work with distributors or retailers even, we'll make

25   sure that we work through the Infinium team and with the

1    retailer.  We'll make sure that we work with that state

2    distributor.  They don't like you going and see Costco

3    direct or Beverages and More direct.  They feel kind of

4    out of the loop and -- I don't blame them.  So we

5    respect the hierarchy very much.

6        Q.  How many distributors in the United States

7    distribute Crystal Head Vodka?

8        A.  51.

9        Q.  One for each state.  And one state's got two?

10       A.  Well, Washington, D.C. is it's own.

11       Q.  I see.

12       A.  The 50 states plus D.C.

13       Q.  Okay.

14       A.  So by law a lot of the times you are only allowed

15   to have one.  In a lot of the states you can have only

16   one distributor in that state.

17       Q.  Okay.  What kinds of things did you do with

18   Infinium to assist the distributors that would

19   ultimately distribute Crystal Head Vodka?

20       A.  So one of the things -- well, we did a lot

21   things.  Besides being extra feet on the street, we also

22   had put together marketing plans, incentive plans for

23   these distributors and for the retailers as well.

24           And the reason why is, these distributors are

25   massive.  The average distributor will have about 10- or

```
 1   12,000 other products.  They are so big.
 2          So as you can imagine, you got to get some
 3   attention in there.  You've got to get their attention.
 4   And one of the ways that's commonly done for especially
 5   smaller brands like us is to develop some type of
 6   incentive program, some type of Dan Aykroyd plan program
 7   in some cases, things like that.
 8          Once we would do that with the distributors, we
 9   would do something similar with the key retailers.  So
10   things like bottle signings are a great way to engage
11   and get to develop a relationship with, you know, for
12   example, Binny's in Chicago, it was a large chain.  Or
13   the Beverages & More guys.  Mission Liquors.
14   Q.  Who buys Crystal Head Vodka from those
15   distributors?
16   A.  So once the distributors agree to purchase the
17   product, they bought -- physically do buy it from the
18   importer.  They will resell it to bars, hotels,
19   restaurants, retail stores.
20   Q.  And does Globefill on behalf of its product,
21   Crystal Head Vodka, do anything to assist those bars and
22   restaurants, liquor stores and hotels?
23   A.  Absolutely.  So with Infinium as well, we do have
24   to give them some credit.  So with Infinium as well, we
25   do help do things.  Like we do have our own brand
```

1   ambassadors, for example.  Where all they do is once the

2   distributor gets that product into, let's say, a

3   Denny's, we will send in either one of our people or one

4   of our brand ambassadors, and they will make sure that

5   those people are educated on our brand, aware of it, how

6   to price it properly, things like that.

7        Because distributors are really key to get you

8   into the market.  But a lot of times the execution is

9   not as good as it can be.  So they will drop off a

10  bottle, but that's about it most of the time.  So it is

11  really, really important to make sure -- especially with

12  a premium brand -- you know, $50 vodka, you've got to

13  explain, why is this $50.  Why should I be buying this?

14  How do I sell this to my customer.  So that's where we

15  come in.  Again, respecting the hierarchy, but we do do

16  that.

17  Q.  Then finally, what does Globefill do to reach

18  that ultimate consumer, the person who either buys a

19  bottle of Crystal Head Vodka or has a drink at a bar or

20  restaurant?

21  A.  So that's where we work with these retailers and

22  with these bars to start developing feature cocktails,

23  incentive programs, things like that, to help bartenders

24  and wait staff to recommend the product.  Making sure we

25  get it on the menu and we price it appropriately, not

1  too high, not too low.  Things like that.

2          And then a lot of relationship building.  We are

3  constantly out there building relationships.  We don't

4  have -- you know, we are 17 people globally.  We do not

5  have multimillion dollar budgets.  So we have to do a

6  lot of the ground work ourselves.  We can't just take up

7  billboard ads in 50 states or TV commercials from that

8  perspective.

9     Q.  Is marketing a product like Crystal Head Vodka,

10  is that a lot of relationships?

11     A.  It's all relationship, especially in our size.

12          Like I said, we don't have that ability or that

13  leverage that a bigger company would have with manpower

14  and with marketing dollars.

15     Q.  Okay.  Now you mentioned -- let's move on to the

16  vodka itself.  When you showed up in December of 2007,

17  had the vodka itself been decided upon?

18     A.  No.  It wasn't really finalized at that point

19  yet.

20     Q.  Did you then take steps to finalize, decide what

21  that vodka would be?

22     A.  Yeah.  So part of our marketing analysis was to

23  find out where we would fit in the marketplace.  And

24  based on that, we chose to be a pure vodka.

25          We found that none of the major big players in

1    the category -- some are going after smoothness.  Some

2    are going after, you know, other things.  But no one was

3    going after or attacking the purity angle.  And we

4    realized a lot of population didn't realize how many

5    additives are put in vodka.  Because people think, oh,

6    it's clear, it's tasteless, so they probably don't add

7    anything.  And we started developing our vodka we

8    realized, oh, geez, there's actually quite a bit of

9    stuff that can be put in here, and it's all okay.  There

10   is nothing against the law.

11        So we thought, this is a great opportunity for us

12   to start playing in that market, which would be the

13   purity market, no additives added to our vodka.

14        And that's kind of -- and from there, we started

15   developing different versions of Crystal Head to get it

16   taste the way we wanted it to taste.

17   Q.   Why would the manufacturer of vodka add anything

18   to it other than vodka?

19   A.   Well, it depends what they are going for.  But if

20   you add certain things to your vodka, you can go a

21   little cheaper on your grain and on your quality of

22   other ingredients.

23        So if you add some oils to it, it makes it a

24   little more slippery so you don't feel as much burn

25   going down.  In some of these products you can

1  actually -- if you actually pay attention to it, what

2  you're actually getting on your tongue is a little bit

3  of oil and it allows it to slide down without you

4  feeling as much heat.

5       So it is a great way to mask some of the poor

6  qualities of the grain.  And it is a great way to mask

7  some of the poor distillation processes and filtration

8  processes, because that's where your cost is, right.

9  Q.  Are there any such oils in Crystal Head Vodka?

10 A.  No.

11 Q.  Are there any additives of any sort?

12 A.  No.

13 Q.  How did you get from December of 2007 to having

14 what you thought, and the rest of the folks at Globefill

15 thought, was an acceptable no additive vodka?

16 A.  Well, the first thing we did is we bought

17 competitor products and tasted them.  Sounds like an

18 easy job.  But actually it's kind of hard to taste a lot

19 of people's vodkas.  And we got to learn about what we

20 liked and what we didn't like.

21      Once which found out what we liked, we then went

22 to our distillery that we used.  We use a government

23 distillery.  It's actually the last government owned

24 still in North America.  It's called the Newfoundland

25 and Labrador Liquor Corporation.  I just call them NLLC.

1       It's easy for me.

2              And we went to them saying, okay, we know what we

3       like.  Now we got to do it without additives, basically.

4       And that's when they kind of laughed at us.

5          Q.  Why did they laugh?

6          A.  They laughed at us.  They didn't laugh.  They

7       said, you're kind of kidding.

8              The reason why is, in order to do that, if you

9       take out all additives, it's pretty hard to get a really

10      smooth tasting vodka.  And they were right.  The first

11      few versions were not very good.

12             And then we realized we needed to upgrade things

13      like the grain and the filtration and how we distill it.

14      And how many times we distill it.

15             And then it started coming together.  As you add

16      cost to these things and increase your quality, you can

17      do it.  And not only can you do it, you can do it pretty

18      good.  Because we've won some of the biggest metals in

19      vodka now.

20         Q.  Do you know what the term mash means when it

21      comes to the distilling process?

22         A.  Yeah, I do.  So it's actually -- do you want me

23      to explain it?

24         Q.  Yes.

25         A.  So a mash is the step before you actually

```
1    distill.  So just very quickly, what they do is, you
2    take the grain or the corn.  We use what's called a
3    peaches and cream corn, which is a sweet corn, native to
4    Ontario, Canada and Ontario.  It's stuff that you can
5    barbecue with.  It's not cattle corn which some vodkas
6    are made from, maize.  Ours isn't maize.  And what they
7    do is you mix that with water.  You kind of make it into
8    almost like a cereal.  Then you add yeast to it.  And
9    then it creates the fermentation process which accesses
10   the sugars from these grains that will eventually
11   convert it to alcohol.
12          So once you have that mash done and you've added
13   the yeast to it, then you basically want to distill it.
14   And what distilling basically is is, in it's simplest
15   form, you're basically heating and cooling that mash to
16   remove impurities from the vapors.  And then when you
17   cool it, those vapors that were heated turn into a
18   liquid and that's the distillate.  That's the pure
19   alcohol.  That's at about 95 percent alcohol.  And then
20   you cut that with water.  Again, water is a key
21   component of the final quality as well of your vodka.
22   Because 60 percent of it is water.
23      Q.  Okay.  How many mashes or experimental mashes did
24   Globefill go through before they came upon the one that
25   they thought was right for their vodka?
```

1    A.   So we went through 20 versions, about, maybe 21,

2    I want guess about 20, there were a lot.  And like I

3    said, the first few were tough.  And then we started

4    making changes, adding dollars, making it more expensive

5    for us, but also at the same time producing a much

6    better quality vodka without the additives.

7    Q.   And finally, you decided upon this peaches and

8    cream corn, right?

9    A.   Yes.

10    Q.   And that was a unanimous decision by the various

11    principals of Globefill?

12    A.   It was.

13    Q.   Now, how many times is Crystal Head Vodka

14    distilled?

15    A.   That is another process.  We chose to distill it

16    four times.  We like four.  We like it -- you can

17    distill -- you can distill things a hundred times if you

18    want.  Every time you distill though, you start removing

19    flavors.  You are removing purities, but you start

20    stripping out flavors.  So you kind of have to be

21    careful.  If you do it too much it's going to taste like

22    water.

23        You really want to find that balance where it

24    allows you to remove as many impurities as you can

25    without stripping out every bit of flavor.  For us, it

1    was four.  For others, it might be something else.  We

2    choose to do it four, which is a lot.

3        Q.  So, again, you started at Globefill in December

4    of 2007.  By approximately what time had you made your

5    decision on the vodka that would go into your product?

6        A.  So by March, middle to the end of March, just

7    before we were ready to present to Infinium, we had our

8    first sample that we made that we were comfortable with.

9        Q.  Okay.  Now, is there anything else that goes into

10   selling a bottle of vodka?

11       A.  Oh, yeah, there's a lot.

12       Q.  Example, is there a bottle?

13       A.  Yeah, you need a bottle.  You need a bottle.  You

14   need a liquid.  You need great liquid, not just liquid.

15   You need great liquid.  You need a lot of hard work.

16   You need to do a launch.  There's a whole number of

17   things that you have to do, from a lot of relationships,

18   a lot of getting on the rode, a lot of traveling.

19       Q.  When you showed up in December 2007, I think you

20   said that you had -- or maybe you didn't.  But did you

21   have a prototype of a bottle?

22       A.  Yeah, we did.  It was the fourth and final

23   prototype of the bottle.  And that, like I said, was

24   95 percent the way you see it now.

25       Q.  Okay.  What did you have to do between December

1    of 2007 and the launch of Crystal Head Vodka to get that

2    bottle to the point where you could make thousands of

3    them?

4        A.  Well, first of all, we have to approve a final

5    bottle, and then make the mold.  And molds take a long

6    time.  Especially -- well, our mold takes a long time to

7    make.  So we did tweak the neck a bit and make it a

8    hexagonal shape neck.  It's hard to show you, because I

9    don't have it.

10           Then we increased the flange on the neck a little

11   bit.  Deepened the eye sockets a little more.  Gave a

12   little more definition to the teeth.

13           And from there, once we had the bottle, then we

14   had the vodka, we had the importer.  Now we had the

15   launch.

16                   MR. FAY:  Could I ask the clerk to give

17   Mr. Hemi Exhibit 45.

18                   THE COURT:  45?

19                   MR. FAY:  45, Your Honor.  It is that clear

20   bottle right there.

21                   THE COURT:  The clerk will place it before

22   the witness.

23   BY MR. FAY:

24       Q.  Okay.  Mr. Hemi, do you recognize that?

25       A.  I do.

1    Q.   Have you seen a few of those?

2    A.   Yes.

3    Q.   What is that?

4    A.   Bottle of Crystal Head Vodka.

5    Q.   Now, is that a difficult vodka to make --

6    difficult.

7         Is that a difficult bottle to make?

8    A.   It is.  You know, we want to Bruni Glass and

9    Bruni Glass is probably one of the best if not the best

10   bottle makers in the world.  And we went to -- they had

11   a factory in Slovenia.  It's a crystal factory in

12   Slovenia.  It's a specialty glass.  And actually a lot

13   of Eastern European countries are really great at making

14   specialty glass.

15        So this was probably the most difficult bottle

16   they had ever made in all their years.  I'm fortunate

17   enough to -- over the years, because of this bottle --

18   get to know the owners of Bruni Glass, because they were

19   so impressed.  They put this on their Website.  They are

20   proud to be able to accomplish something like this.

21   Q.   And there has been some testimony about the spout

22   on that bottle.  Did the spout cause any particular

23   difficulties for you?

24   A.   Yeah.  Anyone who has been in the industry,

25   especially as long as I have.  The first thing I didn't

1  like about it was the spout.  Not that I didn't like it.

2  It looks beautiful.  But when you are in the industry,

3  you are thinking about production, you are thinking

4  about costs, you are thinking about marketing, you are

5  thinking about a whole bunch of things that an artist

6  really isn't.  This was a problem.  But I lost that

7  battle.  My first loss.

8      Q.  Why is it a problem?

9      A.  Well, you know, I have been around bottle lines a

10  long time.  And I've worked with other distilleries.

11  The way that it -- it delaminates the ability to do mass

12  production.

13      So the way bottle lines work is, the bottles get

14  filled on a line.  And you basically have a filler.  And

15  that filler only goes straight up and down.  And the

16  problem with this bottle is -- you try to put something

17  straight up and down, it's going to chip it.  So what

18  happens is, you need to either make the bottle neck

19  straight, like that, or hand fill it, and then you have

20  to hand cork it.

21      When you are hand corking and hand filling, you

22  are also hand labelling.  So it becomes a lot more

23  expensive and a lot slower.

24      Q.  Did Globefill hand fill, hand cork and hand

25  label?

1     A.   Yes.  I even did nine myself.  Yes.  So your

2  standard automatic bottling line would have maybe two

3  people on the line.  We had 22 people with these to make

4  sure -- it wasn't pretty.  But on the factory floor we

5  had these steel tables.  And they had the labeling guy

6  with the special -- had held it like this.  You have the

7  corking guy with the -- you'd cork it by hand.  And we

8  would fill it.

9        And then we would, with hairdryers, use the heat

10  shrinker to tamper proof evidence, seal.  And then

11  packed by hand.  Yeah.

12        Thank God I only had to do nine.  But I needed to

13  understand it.

14     Q.   Now, does -- did Globefill do anything to ensure

15  the quality of that bottle?

16     A.   Yeah.  So, you know, being the most expensive --

17  or one of the most expensive vodkas to ever hit the

18  market, the consumer expects perfection.  And I don't

19  blame them.  I would too.

20        So the first thing we do -- quality starts at

21  every level, whether it's the liquid or the bottle, or

22  how we go to the market, or even the activations we do.

23  It has to be perfect.

24        So from a glass perspective -- first of all, we

25  chose Slovenia, which is not cheap.  A crystal company

1    is a lot more expensive than a normal glass factory.  So

2    the first thing we did was -- the Slovenian plant would

3    put bits of actual crystal in the sand when they would

4    melt, so that you get an extra clear glass bottle.

5    You'll see a lot of our bottles, they're a lot clearer

6    than other clear bottles.  And that's because of that

7    little bit of extra crystal.  Because there is usually

8    no crystal.  But they take bits of crystal and melt it

9    in there to give you just a slightly more clear bottle.

10   That's the first thing we did.

11            The second thing we did was -- because this

12   is such a hard bottle to make, the defect rates were

13   really high.  So our best day of production, four out of

14   ten bottles are no good, believe it or not.  It is a

15   complicated bottle to make with heat and stuff like

16   that.

17            If it cools down too fast it cracks.  The

18   base is heavier.  There's a whole bunch of things.  But

19   -- so on a good day, our best day, we get a four out of

20   ten, 40 percent rejection rate.

21            So what we have to do is we also have to

22   get -- hire teams of inspectors.  So as they came off

23   the line and started to cool, we would have people pick

24   up bottles that were no good and stick it back in the

25   furnace to melt it down and start again.

1           So those are two really key things -- three
2    key things:  Going to Slovenia, to an actual crystal
3    company, that was an added cost.  Having crystal bits
4    added to the whole process, more money.  Having to have
5    our own -- we call them -- reselection teams during
6    these times.
7           And then of course, because of this bottle
8    and the high defect rate, we can only make eight bottles
9    at a time -- bless you.  We can only make eight bottles
10   at a time, whereas your standard bottle can make 32.
11   You know, a wine bottle, you can do the 32-bottle mold.
12   We can do eight if we're lucky.  So it's a quarter of
13   the time as well.  And time is money, unfortunately.  So
14   it slows everything down.
15   Q.   What is the average rejection rate for bottles in
16   the spirits industry?
17   A.   So a standard bottle -- let's take the Grey Goose
18   bottle or something like that, where it's a very simple
19   shape bottle, probably about half a percent.  We are
20   probably about 80 to 90 times higher defect rate than a
21   standard vodka bottle would have.  And that's just on
22   our best day.
23          On our first day, while we are calibrating our
24   machines, you had 98 percent defect rate.  It is all
25   going into the garbage.

1           But on the second day you're starting to get

2    something.

3           And then on the third day, we're rocking and

4    rolling at 40 percent.  That's really -- that's our

5    goal.

6       Q.   How many people on the assembly line are

7    dedicated to looking at the bottles for defects?

8       A.   Where?  At the glass --

9       Q.   Yes.

10      A.   -- or at the factory?

11      Q.   At the factory?

12      A.   Okay.  Because we do actually have people at the

13   factory as well, because things slip by.

14          We usually have about -- teams of about --

15   because you can only do eight at the time, they are not

16   coming off as fast.  It's not like an assembly line.  We

17   will usually have about four or five people.  As they

18   cool, they have these gloves because the glass is still

19   hot.  They are doing these quick little inspections

20   checking it, looking up at the light, just in case.

21   Some stuff is very obvious where, you know, part of the

22   face is slid down a little bit or something like that.

23   That doesn't require much.  Those get picked up

24   beforehand.

25          And then our secondary inspection is actually

1    done at the NLLC.  Because we have so many people

2    touching this bottle.  We have 32 hands touching this

3    bottle.  So they've actually caught defects as well than

4    our reselection team hasn't.  Some of them are pretty

5    bad defects, so...

6        Q.  Okay.  Can you tell all of us again, what is

7    NLLC?

8        A.  It's the Newfoundland and Labrador Liquor

9    Corporation.  They're a government owned still, the last

10   in North America.  We chose them because they have

11   extremely high standards for testing.  More than I think

12   any distillery I've ever seen.  It literally tests every

13   batch of vodka.  And we laser coat every single bottle

14   every day so we can track any issues.  And they even do

15   sensory lab testing every single day.  So that's why we

16   chose them.

17       Q.  So NLLC makes the vodka?

18       A.  Yes.

19       Q.  And then it puts the vodka in the bottle?

20       A.  They make the vodka to our recipe.  So we came up

21   with the recipe and then -- as you know.  And then we

22   provided some testing.  And then they actually then do

23   the mixing of it.

24       Q.  And they do all the packaging too; is that right?

25       A.  Yes.  Well, we -- everything is bottled there as

1    well.

2        Q.  Does Crystal Head Vodka come in a box?

3        A.  It does.

4        Q.  And now NLLC put the bottle in the box?

5        A.  They do.

6        Q.  And any other kind of wrapping that goes on the

7    outside, they do that as well?

8        A.  Correct.  Even gift sets.

9        Q.  Now, going back once again.  You started December

10   of 2007.  When would you say that you had a bottle that

11   was ready for production of your vodka?

12       A.  So the bottle itself -- we made those

13   modifications pretty quick, because we knew what we

14   wanted.

15          So by January we had the prototype changes.  And

16   then we just have to go to Bruni to get it now made.

17          So the basic mold itself was made.  Which is

18   where most of the cost is -- not most of the cost, most

19   of the time is.

20          So we were ready to have bottles land in

21   Newfoundland probably I want to say April-May.  Took

22   about three months to make 30,000 bottles.

23       Q.  When you say May, you are talking about 2008?

24       A.  2008, May.

25       Q.  So in 2008 you had a bottle?

```
 1                  You have to say yes.

 2      A.   Correct, yes.

 3      Q.   In 2008 you had a vodka?

 4      A.   We did.

 5      Q.   In 2008 you had a marketing plan?

 6      A.   We did.

 7      Q.   And in 2008 you had a box?

 8      A.   We did.

 9      Q.   What next?

10      A.   Then it was time -- we also had an importer.

11   Then it was time to launch.

12      Q.   When was Crystal Head Vodka launched?

13      A.   It was launched September 23, 2008, in Anaheim at

14   the House of Blues.

15      Q.   Okay.  Was that an important event?

16      A.   It's huge.

17      Q.   Okay.  And why is it huge?

18      A.   Well, it's your first impression, right.  Like

19   you.  It's like people, you only get one chance to make

20   a first impression.

21           So this was our first time that we are going to

22   launch a bottle that no one had ever seen before.  Like

23   it wasn't just another vodka or a tequila or a rum.

24   This was something that was going to be a game changer.

25   It took glass making on a commercial level to a new
```

 1   level.  There was nothing even close to this before.  So

 2   it was a big deal for us.

 3        In our launch we had some trade media there.  We

 4   had Dan.  We had the distributor sales force in

 5   California there.  So we had about 200 sales people.  We

 6   also -- we had about a dozen trade media as well.  And

 7   then we also had a couple of key retail accounts there

 8   as well.  Because you want to make them feel like they

 9   are part of something before anybody else.  So that's

10   what we did.

11        And then we got up on stage and we presented our

12   vodka.  On -- when I say present, you know, Dan went up

13   on stage.  I think I got to introduce him.  Dan went up

14   on stage and he started talking about the vodka.

15        This is what our vodka is.  This is why you

16   should buy it.  These are the great things about our

17   vodka.  This is what no one else is doing.  And it was

18   huge.  And it went viral.  It literally went viral.

19   Q.   What do you mean by that, it went viral?

20   A.   Well, we had a very basic Website in 2008.  None

21   of us are huge really -- none of the partners.  Like I'm

22   considered high tech in our partnership, which is a

23   little scary.  But we had a Website with a web design

24   company called Mind Blossom.  And in the first four

25   days, since we -- when we launched it, our site was

1   knocked out.  It was down.  And the reason why is just

2   too much traffic.

3        And Mind Blossom had told me that in that week we

4   had more hits on our website than Toyota, in that four

5   days.  We had well over 100,000 hits.  And it caused us

6   to have to reevaluate what our Website needed to be.

7   And that's when we kind of knew we had something pretty

8   exciting as well.

9   Q.   You mentioned that at the launch -- first of all,

10  where in Anaheim was the launch?

11  A.   House of Blues.

12  Q.   House of Blues.

13       And why was the House of Blues chosen?

14  A.   The House of Blues, as we said before, Dan

15  Aykroyd is one of the cofounders of the House of Blues.

16  And it was a great venue.  They are these big music

17  halls.  Some of them are pretty cool actually.  It's a

18  great venue to launch.  You know, you got music.  You've

19  got vodka.  The owner is well known.  You can house

20  hundreds of people.  It was great way to introduce it.

21  Q.   Now, so you've launched in Anaheim?

22  A.   Correct.

23  Q.   One city in one country.  What comes next?

24  A.   Well, we knew we had something pretty big.  On

25  the way home from Anaheim to L.A., we found out that

1    there was one store called Hi-Time Liquors, which is a

2    well-known, independent store.  And they were the first

3    people to get Crystal Head.  And they actually bought a

4    whole pallet, which was insane.  Like could you imagine

5    buying 50 cases of $50 vodka for one store?  You just

6    don't do that.  They did.

7         And Dan and I -- Dan and I -- remember, Dan, we

8    -- I can't say that.

9         We went on the way home and we saw the display.

10   And Dan came by and shook everybody's hand and signed a

11   few bottles, which is where we got the idea of this

12   bottle signing actually.

13        Thank them for their business.  They showed us an

14   ad they'd taken out in Orange County Magazine that we

15   didn't even have to pay for.  And that was our very

16   first, I guess, sales call.  And then we made plans to

17   do five more cities for October.

18   Q.  And would it be fair to say you did many more

19   sales calls?

20   A.  Oh, yes.

21   Q.  What were those five cities that you went to

22   after Anaheim?

23   A.  So we did Orlando.  No actually we did six, I

24   guess.  I'm not good at -- I should be good at math.  We

25   did Orlando/Miami.  I count that as one.  Orlando/Miami.

```
 1    Then we did New Orleans.  Then we did Dallas/Houston.
 2    And then we ended in Las Vegas.  I want to say
 3    October 29th or 30th.
 4       Q.  So that was all over a period of about -- I'm
 5    better at math -- six weeks?
 6       A.  Well, we had to take a break first because now we
 7    knew -- like this thing -- you have to understand, our
 8    whole year's production we thought for all of North
 9    America was going to be 5,000 cases.  30,000 bottles.
10         After that launch, after it went viral.  After
11    the response we got from retailers and people, we
12    quickly realized we had a tiger by the tail.  We had to
13    do something and we had to start planning.  We just
14    couldn't hop -- so we needed two weeks to try to get
15    ourselves together.
16         And so in two 2 weeks we started, I think, I want
17    to say, October 8th and we ended on the 29th.
18       Q.  How long did it take you to sell out those
19    5,000 cases?
20       A.  Nine days.  And we could have sold more.  But we
21    limited everybody to just one bottle.  We had people
22    wanting to buy cases.
23         We sold out before we even got to Las Vegas.
24    There was only 50 cases left.  And Lee's Liquor, which
25    was a retailer there, bought all of it.  And then
```

1    rationed it out as Dan would sign them.

2      Q.  So you talk about going to these other cities,

3    and you talk about launching in these other cities.

4    What did that entail?

5      A.  They are very long days, actually.  There is a

6    cost as well.  We decided to go by bus.  Because it was

7    the most efficient way to move us all through there

8    quickly.  No airport issues.  You know, we did have

9    alcohol.  You don't have to go through all that stuff.

10           So we had to get buses, rent buses.  And what we

11   would do is, we had to get a PR company involved as

12   well, because we are moving.

13           And what we do is -- our days would start pretty

14   early actually.  We'd usually start -- we'd hit a big --

15   we'd hit two radio stations.  Usually we'd hit the two

16   biggest radio stations, usually a rock and roll one, and

17   a talk radio one or a pop or a rock and roll.

18           We'd start that at 7:30 in the morning.  Dan

19   would either go in or he'd call in from the road,

20   wherever we could manage it.  And then we'd go to the

21   distributor later that morning by about 9:30,

22   10:00 o'clock.  We'd meet the entire sales team.  We'd

23   do a whole product launch there with the sales team,

24   with Dan.  He'd then sign bottles for them, take

25   pictures with them.

```
 1          The Infinium person, along with myself or another

 2   one person on our team would then give them some

 3   incentive programs as well right away so we could make

 4   sure we got the distribution out.

 5          Then we'd usually have to have lunch with -- like

 6   a key retailer in that area, you know.  So we'd usually

 7   have lunch with them.  Then we'd have maybe half an

 8   hour, hour break.  Then we'd go to this crazy bottle

 9   signing that was supposed to last two hours but it never

10   lasted two hours.  It was always like four hours or

11   more.  Because people didn't just bring bottles, they

12   brought DVD's.  They brought Ghost Busters.  They

13   brought everything.  And Dan signed every single one of

14   them.  And shook everyone's hand.  And took pictures

15   with everybody.  And that's why it took four hours

16   instead of two.

17          And then after that we'd usually get back to our

18   hotel which we had not seen yet.  We'd wash up.  We'd

19   have to change.  And then we'd have to have dinner with

20   another customer or we'd have it with the owner of the

21   distributorship.

22          And then after that was done, we always had to

23   hit two or three night clubs, you know, to build some

24   relationships.  It's all part of the relationship

25   building.  Even if we didn't have product -- that much
```

```
 1    product to sell, we have to still do it, because that
 2    was going to come back later on.
 3         So that was our typical day.  Then we'd hop on
 4    the bus.  We'd sleep.  We'd hop on the bus, drive a few
 5    more hours and get to the next city.
 6    Q.  Who was driving that bus?
 7    A.  We had a driver.  But Dan does like to drive.
 8    Drivers can only drive so many hours in a day.  And
 9    sometimes we'd have to make up a lot of time.  So Dan
10    would put on the driver's hat.  He'd be driving this big
11    bus.
12    Q.  Now, we talked about maybe five or six cities
13    after Anaheim.  Was that all the cities you ever visited
14    in that bus?
15    A.  No.  So we ran out of product by the end of
16    October, as you know, just for those five cities.  And
17    what happened was is -- we had to get more bottles made.
18    And bottles take a long time to make, especially when
19    they're made in Europe.
20         And like I said, the defect rates, only making
21    eight at a time versus 32.  The earliest we could get
22    bottles was February 2009.
23         So what we did between the end of October and
24    February was, we didn't stop.  We had to continue doing
25    what we were doing.  Because the last thing you want to
```

1   do is have this great big splash and then go dormant, go

2   dark for four or five months and then you have to start

3   everything back.  We had some momentum.  So we continued

4   to do things.  We didn't have much product though.

5         We did continue to do media.  A lot unpaid -- Dan

6   was able to get a lot of unpaid media.  So that

7   continued throughout.

8         We still visited distributors to make sure.  We

9   still did shows, you know, to make sure that when we did

10   have the product we were ready to go.  And by

11   February 2nd -- because I was doing it -- we had a

12   42,000-case backlog before we even had -- ready to go

13   back into market.  And you don't get 42,000-case backlog

14   by doing nothing for those four months.  We just kept

15   going.

16         And then 2009 was our big year where we hit, I

17   want to say 65, 66 cities in about 25 or 26 states.  We

18   got a more official Crystal Head bus with decals on it

19   and everything like that.  I think we did about 118, 120

20   bottle signings.  We were on the road well over a

21   hundred days.

22   Q.  You've mentioned a couple concepts that I want to

23   ask you about.  You mentioned unpaid media.  What is

24   that?

25   A.  It is actually the best type of media, in my

1   mind, because I run the dollars.  I don't like to pay.

2   So I like it the best.

3        But it's actually -- it's media.  It's articles.

4   It's radio.  What Dan does.  It's TV.  It's things we

5   don't have to pay for.  It's beverage journals.  It's

6   NBC, Fox, Forbes.com where they're just talking about

7   our product.  It's Howard Stern on the radio

8   interviewing Dan.  It's Jimmy Fallon, Jimmy Kimmel, the

9   Today Show.  These are all things that we were on and

10  did.  And it doesn't get much bigger.  We were in People

11  Magazine, I think in Life.  There's a picture in Life

12  with Dan holding the bottle.  So that's unpaid media.

13    Q.  Did -- the celebrity of Dan Aykroyd, did it give

14  you access to unpaid media that you might otherwise not

15  have had?

16    A.  Yeah.  So as you can imagine -- I don't know how

17  you put a value --

18          THE COURT:  Excuse for a moment, but I think

19  the witness answered the question yes.

20          Did you have another question?

21  BY MR. FAY:

22    Q.  Was that important to you to have that access to

23  unpaid media?

24    A.  Yes.  Extremely important.  It's every brand

25  owner's dream, because, you know -- I think in the

1    18 months when we started we had over 3,000 unpaid

2    media.  Like between articles, interviews, TV, radio,

3    bloggers.  Like 3,000.  We had a book.  It looked like

4    an encyclopedia.  It's super important.  Because how do

5    you put a value on that?  In order to get that exposure,

6    you'd have to actually pay someone, or pay to get in an

7    ad or things like that.  Not only is it unpaid media not

8    paying, it's a third-party endorsement.

9         So it's not like -- you know, in an ad, of

10   course, it's going to be great, that ad.  We did it.  We

11   paid for it.  Why would we put something negative?

12        In this case, you have somebody else giving their

13   opinion.  And it's usually positive.  And in our case,

14   it was always positive.

15   Q.  You also mentioned the concept of trade media.

16   Why don't you explain to the jury what that is.

17   A.  Like most industries, you know, you have your

18   consumers and you have your trade.  Whether you're in

19   software engineering or anything like that.  You have

20   your software publications that only software guys read

21   or programmers read.

22        Just like us.  We have our trade media.  Stuff

23   like Imbibe Magazine, which is great for bartenders and

24   some of the trade.  Or Business [sic] Industry News, the

25   BIN magazines.  Those are read by distributors and

1    wholesalers.  Those are the things that -- that's how

2    the trade learns about things before the public learns

3    about things -- or learns about some of the challenges

4    or whatever before the public does.

5         So we hit a lot of trade.  The first step is

6    usually trade media.  And then you want to move into

7    consumer media.  And we did both.  We did a combination

8    of both.  Obviously in the four months that we were out

9    of product, we picked more trade media because you

10   really don't need the consumer to go out there and not

11   be able to buy the product.  So we did focus more on

12   interviews with Dan and on the trade.

13        But we very quickly moved into consumer media,

14   which is, you know, TV and things like that.

15   Q.   You used an acronym BIN.  What does that stand

16   for?

17   A.   Business [sic] Industry News.  So every state has

18   their version of a business industry news that the

19   distributors get and read.

20        And what it does is, they vary, different states.

21   But the BIN basically -- they publish -- so the

22   retailers get this.  And they're from the distributors.

23   The distributors get it too.  It literally publishes

24   every single product at the price point, the wholesale

25   price point for retailers to then go and order.

1        So they can see what distributor represents that

2   product, what the deal is that month on that product, on

3   that flavor, on that site, everything, and the price,

4   and then can go and order it.

5        And you can advertise on BIN.  And that's a great

6   way to get to the retailers and bars and restaurants

7   under new products or something.  Because, you know, if

8   you are a bar manager or something, you always want to

9   see what's new or -- especially if you're in a nightclub

10  or a food retailer.  They want to be on top of their

11  game.

12       They'll look in the new product section.  They'll

13  look at some ads.  They really don't need to look at the

14  price book.  They probably know it already.  Or their

15  distributor sales person is stopping by during the week

16  anyways.  But that's really key is, you know, to look at

17  the new products.  And it gives them ideas.  And that's

18  important too.  So BIN was a key thing.  And if you see

19  on our media list, we hit every single BIN in almost

20  every single state.

21  Q.  Now, getting around to the 65 cities that

22  visited, did you take the bus?

23  A.  I took of it some of the times.  I like to fly.

24  Not that I don't like a lot of time with my partners,

25  but also I sometimes go in there and set up in advance.

1    There's lot of setup you have to do before you go into a

2    bottle signing.  Like people think you just kind of show

3    up and everything is ready.  There's so much --

4                 THE COURT:  I think the witness has answered

5    the question.

6                 Another question, please.

7    BY MR. FAY:

8        Q.  Over the course of your visit to the 65 cities,

9    do you have an estimate of how many bottles Mr. Aykroyd

10   signed?

11       A.  I would say well over a hundred thousand.

12       Q.  And today, all way up to today, how many bottles

13   do you estimate Mr. Aykroyd has signed?

14       A.  A good quarter million.

15       Q.  Do you have an estimate of how many times

16   Mr. Aykroyd has appeared on radio or on TV in support of

17   this product, Crystal Head Vodka?

18       A.  Hundreds.  Hundreds.  Like we have over 4- or

19   5,000 media on this since the beginning, like unpaid

20   media.  It's huge.

21       Q.  Mr. Aykroyd is very into his product, correct?

22       A.  Yes, he is.

23       Q.  Now, you have been to 65 cities, you have a lot

24   media hits.  Could you stop?

25       A.  Oh, no, we can't stop.  No.

1     Q.   So after that, what have you done with Globefill

2   to continue to promote and market Crystal Head Vodka?

3     A.   So we still do bottle signings.  But we also

4   do -- some of the things I said before.  We constantly

5   are working with our distributors and our importer to

6   make presentations to big retail chains, to bars,

7   restaurants.  We have things like AMC Theaters.  We're

8   involved in those presentations.  We're always

9   developing specialized programs for our sales people to

10  execute on.  We've hired brand ambassadors to make sure

11  that we constantly are educating accounts, so they know

12  exactly what our product is.

13        You know, there's 700 vodkas in the market.  Why

14  buy us?  Right?  Like, you need to differentiate

15  yourself.  You need to taste people.  So we do tastings,

16  educational seminars.  The constant incentive programs.

17        Danny just did something six days ago in Florida.

18  At the strawberry festival he did two events.  So it

19  doesn't stop.  And it can't, because no other brand

20  stops.

21    Q.   Okay.  How about trade shows?  Do you go to trade

22  shows?

23    A.   We do trade shows.

24    Q.   Can you give me some examples of trade shows you

25  go to?

1       A.   So there's two types of trade shows.   There's the

2   actual trade shows that are just to the trade.   Those

3   are holiday buying programs, you know, things like that.

4           And then there's consumer shows where they get to

5   taste it.   And you guys are probably more familiar with

6   the consumer trade shows in your industry yourself.

7   Probably do your own trade shows as well.   So it's a

8   combination of both we'll do.   You know, we'll

9   probably -- right now about a hundred trade shows I'd

10  say, between the different states.   Holiday programs,

11  non-holiday shows.   Trade, consumer, bartender shows,

12  you name it, probably done about a hundred, maybe even

13  more.

14      Q.   How about social media?   Is Globefill active on

15  social media?

16      A.   Yes.   We are very active on social media.   We

17  have an actual dedicated person just for social media.

18      Q.   Do you do any specials through the year?

19      A.   Yes.   So like a lot of successful brands, I would

20  say, we make sure we do programs at specific times of

21  the year.   So Christmastime is always big.   So we will

22  do special gift sets with a gift with purchase in there,

23  whether it be a shaker, something most of you are

24  familiar with.   You'll see them all over the place at

25  Christmas.   Most of the big brands will do something

1    like that.  We do participate in that.  And we have for

2    years.

3          We'll do stuff at Father's Day.  We'll do some

4    little extra stuff.  Of course we'll do stuff at

5    Halloween because that is the beginning of the busy

6    season in our industry.  And so it does give us an

7    opportunity to get ahead of Christmas and get in there a

8    month or two before some of the bigger brands do.

9    Q.   Have you aggressively promoted Crystal Head Vodka

10   here in the Southern Cal area of the country?

11   A.   Well, yeah.  It was the first place we launched.

12         But Southern California is probably the

13   largest -- on a per-state basis, it is by far the

14   largest vodka market and luxury premium vodka market.

15   And even luxury spirit market I would say.  In the

16   United States if not the world.

17         So we chose this to be one of our grounds.  Our

18   own importer is based in Southern California.  Our best

19   sales are in Southern California.  Always have been.

20   From day one, California has been our number state in

21   sales in the entire United States.  Every year, every

22   quarter.

23   Q.   Okay.  Let's try to break this down a little bit.

24   Since the launch in September of 2008, how many times

25   would you say Globefill has contacted, met with

1    distributors of Crystal Head Vodka?

2        A.   Well, with Infinium, we like to go through the

3    hierarchy.  It's constant.  We have two full-time people

4    here doing that all the time.  We had brand ambassadors.

5    We have ourselves.  We have Dan.  Dan lives in Southern

6    California, so he's always doing things.  Hundreds of

7    times.  It's got to be hundreds.

8        Q.   And how about restaurants and bars?  Since the

9    launch in September of 2008, how many times would you

10   say that Globefill, someone from Globefill has gone to a

11   restaurant, a bar to promote your product?

12       A.   It's got to be 3-, 4,000 accounts we've seen.

13   Maybe more.

14       Q.   How about liquor stores -- or department -- I

15   mean, not department stores.  Grocery stores.  How many

16   times would you estimate that someone from Globefill has

17   gone and met with a liquor store owner or the manager of

18   a grocery store to promote Crystal Head Vodka?

19       A.   In the entire U.S.?

20       Q.   Yep.

21       A.   I don't know what big retailer we haven't

22   visited.  It's got to be about 8-, 900 stores, maybe

23   more.  Like, you know...

24       Q.   Okay.  Thank you.

25            Now, Mr. Hemi, did Globefill do anything to

1   register its bottle, its skull-shaped bottle and protect

2   it against copies?

3       A.  Yes, we did.

4               MR. FAY:  Can we -- your Honor, Exhibit 700.

5               THE COURT:  I would just ask Counsel, how

6   much longer do you expect to be?  You've been an hour

7   with the witness.

8               MR. FAY:  Ten minutes, Your Honor.

9               THE COURT:  Okay.  Thank you.

10  BY MR. FAY:

11      Q.  Mr. Hemi, do you recognize the exhibit we just

12  put up on the screen here?

13      A.  Yes.  That's one of our trademarks.

14      Q.  When you say one, does Globefill have more

15  trademarks than this one?

16              MR. RAFFERTY:  Your Honor, I object.

17              THE COURT:  Sustained.

18  BY MR. FAY:

19      Q.  What is your understanding of the purpose of this

20  trademark?

21      A.  This is a trademark for alcoholic beverages for a

22  skull bottle.  The shape of a skull bottle.

23      Q.  Is protecting Globefill's interests in that

24  skull-shaped bottle, is that important to you?

25      A.  It is extremely --

1              MR. RAFFERTY:  Your Honor, I object.  This

2  is completely leading.

3              THE COURT:  Sustained.

4              Counsel suggested the answer in your

5  question.

6  BY MR. FAY:

7     Q.  When you look at this trademark, Mr. Hemi, what

8  do you think?

9              THE COURT:  What do you think?

10 BY MR. FAY:

11    Q.  What do you think about this trademark?

12             THE COURT:  Could you ask another question,

13 please.

14 BY MR. FAY:

15    Q.  Why did you obtain this trademark?

16    A.  We obtained this trademark and others just

17 because we need it.

18             MR. RAFFERTY:  Your Honor.  We are now well

19 past what's reasonable.

20             THE COURT:  Sustained.

21             Answer will be stricken.  Jurors are

22 admonished to disregard.

23 BY MR. FAY:

24    Q.  Let's talk about this one.

25    A.  Sure.

```
 1              THE COURT:  If you ask a question the
 2   witness may be able to answer it without falling into
 3   areas that would be objectionable.
 4   BY MR. FAY:
 5     Q.  Why did you obtain this trademark?
 6     A.  We obtained this trademark to protect our rights
 7   and our bottle rights.  It was very clear early on
 8   that --
 9              MR. RAFFERTY:  Your Honor, we are getting
10   speeches and not answers.
11              THE COURT:  I would sustain the objection.
12   The witness tends to go beyond the question.  But that
13   might be because counsel is not controlling the
14   question.
15   BY MR. FAY:
16     Q.  Okay.  Just tell us why you got this trademark.
17              THE COURT:  And I think witness has answered
18   that question.  Is Counsel not satisfied with the answer
19   given?
20              MR. FAY:  No.  That's fine, Your Honor.  We
21   can move on.
22   BY MR. FAY:
23     Q.  Has Globefill taken actions over time to protect
24   that trademark, that trademark that we just looked at?
25   Just say yes or no.
```

1    A.   Yes.

2    Q.   Did Globefill take actions to protect that

3  trademark by filing this lawsuit?

4    A.   We did.

5    Q.   Prior to filing this lawsuit --

6         MR. RAFFERTY:  Your Honor, I object.  There

7  is no trademark at issue in this lawsuit.  That's

8  completely misleading for the jury.

9         THE COURT:  The objection's overruled.  But,

10  Counsel, try to keep your questions focused on the

11  issues here.

12         MR. FAY:  Yes, Your Honor.  We'll move on.

13  BY MR. FAY:

14    Q.   Mr. Hemi, are you familiar with KAH Tequila?

15    A.   I am.

16    Q.   How did you first become aware of the existence

17  of KAH Tequila?

18    A.   I first found out about a gentleman name Enrico

19  Caruso.  We were at the Nightclub and Bar Show

20  March 2010.

21    Q.   When did you first see a bottle of KAH Tequila?

22    A.   Well, I first heard about it in March 2010 with

23  the Liquid Living Magazine.

24         I didn't see a bottle until months, months later.

25    Q.   And what was your initial impression of the KAH

1    Tequila bottle?

2       A.   It looked like our bottle.  A cheaper version of

3    our bottle that was painted.

4           That's what it looked like to me.

5       Q.   Did you take any action to address that -- that

6    feeling you had or that reaction you had to the bottle?

7       A.   We did.

8       Q.   You mentioned that you learned about it in March

9    of 2010 from a magazine.  Right?

10      A.   Correct.

11      Q.   Can we put --

12           MR. RAFFERTY:  I think that mischaracterizes

13   what he said.

14           THE COURT:  That's always the problem when

15   counsel tries to characterize what the witness said.

16           Just questions now, please.

17   BY MR. FAY:

18      Q.   Okay.  When did you first learn about the KAH

19   Tequila bottle?

20      A.   March 2010.

21      Q.   And when did you first see it?

22      A.   Got to be several months later -- I don't know

23   the exact month.

24           THE COURT:  Let me ask, is Counsel asking

25   when did he first see the bottle; when did he first see

1   a picture of it?

2                   MR. FAY:  Well, that's what --

3                   THE COURT:  Wait just a moment.

4                   THE WITNESS:  I was going to say because --

5                   THE COURT:  Wait.  Wait.  Ask another

6   question.

7   BY MR. FAY:

8       Q.   When did you first see a picture of the bottle?

9       A.   In Liquid Living Magazine, the exhibit we have

10  here, March 2010 at the Nightclub and Bar Show.

11      Q.   Was Liquid Living Magazine available at that

12  trade show?

13      A.   It was.

14      Q.   Was it handed out to people who attended that

15  trade show?

16      A.   Yeah.  Free copies.

17      Q.   Was this the first time you saw either the actual

18  bottle or a picture of the KAH Tequila bottle?

19                  THE COURT:  "This" refers to?

20  BY MR. FAY:

21      Q.   This magazine.

22                  THE COURT:  Ask the question again, please.

23  BY MR. FAY:

24      Q.   Exhibit 618, this magazine.  Was this the first

25  time you saw a picture of the KAH Tequila bottle?

```
 1      A.   It was.

 2      Q.   Okay.  Can we go to the page?

 3           And in this magazine, there was also an

 4   advertisement for your product?

 5      A.   Correct.

 6      Q.   How did your advertisement get into this

 7   magazine?

 8      A.   The editor in chief.

 9                THE COURT:  If he knows.

10                MR. RAFFERTY:  Hearsay.

11                THE COURT:  If he knows.  Sustained.  The

12   objection will be sustained.

13   BY MR. FAY:

14      Q.   This -- these are two pages from that Liquid

15   Living Magazine.  Right?

16      A.   Correct.

17      Q.   Okay.  And on the right side is the Crystal Head

18   Vodka, correct?

19      A.   Correct.

20      Q.   On the left side -- who's that a picture of?

21      A.   Kim Brandi.

22      Q.   Can we go a little bit into the exhibit.

23           And if we look now, these two pages here,

24   Mr. Hemi, are these two additional pages from that

25   Liquid Living Magazine?
```

1    A.   They are.

2    Q.   And is this at least one of the pictures of the

3  KAH Tequila bottle you saw in this magazine on the

4  right?

5    A.   It is.

6    Q.   And is it your understanding that the editor in

7  chief and publisher of this Liquid Living Magazine was

8  the defendant Kim Brandi?

9           MR. RAFFERTY:   Your Honor --

10          THE COURT:   Sustained.

11  BY MR. FAY:

12   Q.   Does Globefill have any issue with the sale of a

13  tequila by Elements or Ms. Brandi?

14   A.   We do not.

15   Q.   What is your issue?

16   A.   My issue is she is using our bottle.  It is a

17  skull-shaped bottle.

18       I have no problem with her selling tequila or

19  KAH.  I just don't want it in our bottle.

20   Q.   Have you been contacted in your role as the

21  managing partner of Globefill by people asking you

22  questions about KAH Tequila?

23   A.   Yes, I have.

24   Q.   And what kind of comments have you received?

25   A.   General comments.  You know, off-the-cuff

```
1    comments in the sense of, Oh, I heard about your new
2    tequila.  Or, I love your new decorated bottles.
3          And that's immediately when I started saying, We
4    don't do a tequila.  We don't have decorated bottles.
5    It is that type of stuff that we get.
6          We even had some people in the trade that have
7    seen KAH in an airport, for example --
8                MR. RAFFERTY:  Your Honor.  This is all
9    hearsay.
10               THE WITNESS:  No.
11               THE COURT:  Wait just a moment.  I think it
12   goes beyond the question that's been asked.  I'll
13   sustain the objection.  And Counsel ask another
14   question.
15               MR. FAY:  Your Honor, could we be heard on
16   that hearsay point?
17               THE COURT:  No.  Hearsay is allowed for
18   certain purposes.  The Court realizes that.
19               MR. FAY:  Right.
20               THE COURT:  But I wants you to control the
21   witness more.
22               So ask the next question.
23   BY MR. FAY:
24      Q.  So have people contacted you in the spirits
25   industry to say that they were confused about KAH
```

1    Tequila and Crystal Head Vodka?

2        A.   Yes.

3        Q.   And have people contacted and said that they

4    thought that KAH Tequila was a product that Globefill

5    made?

6                MR. MILLER:   Your Honor, I'm going to

7    object.  Not only hearsay, but leading again.

8                THE COURT:   Quite leading.  Sustained.

9    BY MR. FAY:

10       Q.   All right.  Has the introduction of KAH Tequila

11   into the marketplace impacted your business?

12       A.   Yes, it has.

13       Q.   And how so?

14       A.   I would say it's impacted in several ways.  I

15   believe there were some lost sales.  I can't quantify

16   that.  Unless you ask every person who bought a bottle.

17               THE COURT:   We don't want the witness to

18   speculate.  So he believes something --

19               THE WITNESS:   I feel --

20               THE COURT:   Wait just a moment, sir.  But

21   apparently he doesn't really have evidence of that.  But

22   I'm sure there are other witnesses that will be called

23   that will have that.

24   BY MR. FAY:

25       Q.   Okay.  Anything else?

1    A.   Yeah.   Lot of time and money went into this case.

2  We've had to ask favors of some of our retail friends to

3  make sure that we are not placed right beside KAH.

4  Instead of -- you know, instead of asking favors for

5  bigger displays, we have to ask to make sure that we are

6  not put next to them to create more confusion.

7        We've been limited in our ability to market our

8  product and the product line extend our products.  If we

9  want to come out with a decorative bottle, that would

10  create even more confusion.  So it completely puts us in

11  a hole.  We can't expand our marketing or our portfolio.

12        And financially, you know, we have a small team.

13  And, you know, because of this, the cost of these cases,

14  our teams don't get the raises or bonuses that they

15  deserve.  This year they're not going to get any raise

16  or bonus, nobody.  And they work real hard.  We are a

17  pretty tight group.  And it is embarrassing.

18    Q.   Do you want to put KAH Tequila out of business?

19    A.   No.

20    Q.   Once again, what do you want?

21    A.   I just want them to stop using our skull bottle.

22    Q.   Mr. Hemi, did the manufacture of KAH Tequila ever

23  sue Globefill in Mexico?

24    A.   It did.

25    Q.   Okay.  And how did you first become aware of

1   that?

2      A.   So our distributor in Mexico contacted our

3   importer there, Monarch, and informed us that our goods

4   were raided in his warehouse and our goods were seized.

5      Q.   And to your knowledge, why were they seized?

6      A.   They were seized because Elements, the KAH

7   Tequila people, claimed that having our product in

8   Mexico was infringing on them.  And it would create

9   confusion and irreparable harm to their product if we

10  were allowed on the marketplace.  So essentially the

11  same thing we are arguing here.

12     Q.   What did Globefill do in response to that seizure

13  of this product?

14     A.   We hired attorneys and provided the Mexican

15  government with a reason why we are there.  And the main

16  reason was, we had a trademark in Mexico for our vodka.

17          MR. RAFFERTY:  Your Honor, I object.  You've

18  ruled on this.  Here we go again.

19          THE COURT:  The objection is sustained.

20  BY MR. FAY:

21     Q.   Did that lawsuit end to your satisfaction?

22          MR. RAFFERTY:  Your Honor, I object.

23          THE COURT:  Sustained.

24          Motion in limine No. 2.  Counsel is within

25  the scope of a motion that the Court has ruled upon.

1              MR. FAY:  Thank you, Your Honor.

2    BY MR. FAY:

3       Q.  Mr. Hemi, to bring it all together, have you

4    worked really hard to build this brand Crystal Head

5    Vodka?

6       A.  Yes, we all have.

7       Q.  You have a whole team there in Canada, correct?

8       A.  I do.

9       Q.  And you have employees here in the U.S.?

10      A.  We do.

11      Q.  And a few overseas?

12      A.  Correct.

13      Q.  And you have been at it now for how many years?

14      A.  Nine years.

15      Q.  And is that important to Globefill to protect its

16   brand?

17      A.  Extremely important.

18      Q.  Is that skull-shaped bottle an important part of

19   that brand?

20      A.  It is, yes.

21              MR. FAY:  Thank you.  Pass the witness.

22              THE COURT:  Cross?

23              MR. RAFFERTY:  If I may, with your

24   permission?

25              THE COURT:  Certainly.

```
  1            MR. RAFFERTY:  I would say 45 minutes at a

  2    minimum.

  3            THE COURT:  I just want to make sure that we

  4    can finish before we need to take another break.

  5    Counsel may proceed.

  6                       CROSS-EXAMINATION

  7    BY MR. RAFFERTY:

  8      Q.  Good afternoon, Mr. Hemi.

  9      A.  Good afternoon.

 10      Q.  My name is Tom Rafferty.  I think we -- we met a

 11    couple of days ago.

 12      A.  We did.

 13      Q.  Met a lot of people a couple of days ago.

 14          You talked a little bit about this free

 15    advertising that you got for free media, I think you

 16    called it?

 17      A.  Yeah, unpaid media.

 18      Q.  Unpaid media.  And one the magazines or

 19    publications that you talked about was this BIN?

 20      A.  Correct.

 21      Q.  Am I correct that BIN is some of the more very

 22    big, thick magazines that contain lots of whole page ads

 23    from different producers?

 24      A.  Correct.

 25      Q.  Some of the BINs are 2-, 300 pages?
```

1    A.   Yes.  Some could be that many pages.

2    Q.   You got this -- you were -- I think you said you

3  hit every BIN in every state?

4    A.   I believe we hit almost every BIN, yeah.

5    Q.   And is that typical for, you know, people trying

6  to promote their liquor brands to puts ads in the BINs?

7    A.   Correct, yeah.

8    Q.   So in any given BIN that you would have puts a

9  Crystal Head Vodka ad in, you would have expected to see

10 ads from your competitors?

11   A.   Correct.

12   Q.   The other vodka manufacturers?

13   A.   Not all of them, but yes.

14   Q.   And you would have also expected to see ads from

15 other kinds of alcoholic beverages by their

16 manufacturers or distributors?

17   A.   Correct.

18   Q.   So now you -- I want to clear up some things.  I

19 understand you -- the vodka that Crystal Head includes

20 in its bottles is made from you said something, sweet

21 cream corn?

22   A.   It's a variety of corn in Ontario.  In Chatham,

23 Ontario, actually, which is a town.  It's actually where

24 we get the corn from.  It is called peaches and cream

25 corn.

1 Q. Peaches and cream corn.

2  What's tequila made out of?

3 A. Agave.

4 Q. Does tequila and vodka have the same taste?

5 A. No.

6 Q. Now, have you ever from time to time been

7 concerned that Crystal Head Vodka bottle is a novelty

8 item that people might actually go and buy once and then

9 never buy again?

10 A. No, I don't think so.  No.

11 Q. You've never heard anyone at Crystal Head or

12 Globefill talk about the fact that there is a

13 possibility that people would buy the bottle once and

14 then just refill it?

15 A. With every unique bottle there is going to be

16 some type of group of people that collect bottles.  But

17 at 10 million bottles, I don't think we are a novelty.

18 Q. Now you talked a lot about the market that you

19 were entering into when Crystal Head Vodka was launched.

20 And I think, if I remember what you said, you called it

21 a super premium market?

22 A. Super premium and luxury.

23 Q. And who competes with you in that market?

24 A. In which market?

25 Q. In the super premium luxury vodka market?

1     A.   At the time I would say it would have been Grey

2     Goose.  It would have been Stoli Elit.  It would be

3     Belvedere.  It would have been Ciroc.  This is all at

4     the time.  It would have been Roberto Cavalli, those

5     types of brands.  Jean-Marc XO.

6     Q.   Those were typically your competitors?

7     A.   In that category.

8     Q.   And the category being the vodka category?

9     A.   The luxury category.

10    Q.   So not just any vodka, but a luxury vodka?

11    A.   Yeah.  Luxury and super premium.

12    Q.   And does Crystal Head Vodka have a preference for

13    where it likes its product to be placed in the sections

14    of a -- say a package store?

15    A.   Yes, it does, definitely.

16    Q.   Is part of it that you like to appear by the

17    other super premium luxury vodkas?

18    A.   Not necessarily.

19    Q.   Well --

20    A.   I'd really prefer to be in high traffic areas.

21    Q.   Do you also like to be next to Grey Goose, Ketel

22    One and Belvedere?

23    A.   Because they're high traffic areas, yes.

24    Q.   Okay.  But by high traffic areas, you mean lots

25    of people buy those other vodkas?

1    A.  Lots of people go right there.  So you want to be

2  visible to that area.

3    Q.  When you say "go right there," that's because

4  they're coming into the store and they know what they

5  want?

6    A.  I don't know if they know what they want.

7    Q.  But --

8    A.  I just know that we want to be in high traffic

9  areas.

10   Q.  So you'd like to be next to those high selling --

11 high volume selling super premium vodkas?

12   A.  If it's high traffic, we want to be there.

13   Q.  When you go into a package store or a liquor

14 store, depending on how you call it, there is usually a

15 vodka section; is that right?

16   A.  Correct.

17   Q.  And is there usually a separate section that the

18 tequilas are in?

19   A.  Correct.

20   Q.  And then a separate section for scotch whiskey

21 and...

22   A.  Correct.

23   Q.  And who decides where the bottles get placed in

24 these kinds of stores, the retail or the package stores?

25   A.  Usually it's a no-brainer.  Vodkas go with vodka.

1    Tequila goes with tequila.  Ultimately it's the decision

2    of the retailer.

3        Q.   When you say a "no-brainer," you mean it's just

4    common sense that the store puts the vodka in the vodka

5    section and the tequila in the tequila section and so on

6    and so forth for the have various different kinds of

7    alcoholic beverages?

8        A.   That's how it's usually done, yes.

9        Q.   You wouldn't normally expect to go into a store

10   and see vodka and tequila in the same section?

11       A.   Unless it's a very small store, I wouldn't.

12       Q.   You testified a little bit about when you first

13   learned that KAH was going to launch a tequila.

14           Did anyone at Globefill consider the possibility,

15   if you were concerned about confusion, of making a

16   public statement to say "That tequila has nothing to do

17   with us"?

18       A.   We did actually think about it.  But we decided

19   not to do it.

20       Q.   So you expressedly thought about putting out a

21   public statement saying that "This tequila has nothing

22   to do with us" and you decided not to do it?

23       A.   Correct.  There's a reason why.

24       Q.   Now, do the buyers of Crystal Head Vodka in your

25   experience have common sense?

1    A.  I'm assuming they have common sense.

2    Q.  Do you think they do?

3    A.  I hope so.

4    Q.  Have you ever told anyone under oath that you

5    believe that they did?

6    A.  I can't remember.  I'm sure I did.

7    Q.  Now, the Crystal Head Vodka bottles.  It's not

8    made from Slovenian crystal, is it?

9    A.  No, sir.  It's made in a Slovenian crystal

10   factory.  Where we take bits of crystal and add it into

11   the glass-making process.

12   Q.  But it's a glass bottle?

13   A.  Correct.

14   Q.  How do the customers of Crystal Head Vodka know

15   that the skull shape bottle they're buying isn't

16   actually a crystal skull shape?

17         It's called Crystal Skull [sic] Vodka?

18              THE COURT:  Did --

19              MR. RAFFERTY:  I'll withdraw it and try it

20   again.

21              THE COURT:  I was going to ask if the

22   witness understood the question.

23              So the question's been withdrawn.

24              MR. RAFFERTY:  The question must have been

25   bad then, Your Honor, so I'll try again.

1    BY MR. RAFFERTY:

2       Q.  Have you ever given any thought to whether or not

3    customers might believe that the Crystal Head Vodka

4    bottle was actually a crystal bottle?

5       A.  We've had people ask us that actually.

6       Q.  Do you -- is there any way for a Crystal Head

7    Vodka customer, other than asking you, to figure that

8    out?

9       A.  I don't understand.

10      Q.  Well, the bottle is labeled Crystal Head Vodka.

11      A.  Right.

12      Q.  Is it crystal like Waterford crystal or is it

13   glass?

14      A.  It's glass.

15      Q.  How is it that a customer knows that they are

16   buying a Crystal Head Vodka bottle that's not actually a

17   crystal bottle?

18      A.  Well, we don't state that it is not crystal.  We

19   are assuming they know it's glass.

20      Q.  And on what basis are you assuming they know it's

21   glass?

22      A.  I just assume.  It looks look a glass bottle.  It

23   doesn't sparkle like a crystal bottle.  We never really

24   thought about that.

25          We've had people ask us if it's a crystal bottle.

1   And always told them no, it isn't.

2       Q.   It doesn't sparkle like a crystal bottle?

3       A.   It doesn't.

4       Q.   Now, you have given testimony under oath in this

5   case a number of times?

6       A.   I would say so, yeah, couple times.

7       Q.   Do you recall, as you sit here today, ever being

8   asked about how customers would be able -- whether they

9   would or wouldn't be able to figure out if the bottle is

10  crystal or glass?

11      A.   I just don't remember.

12              MR. RAFFERTY:  Can we put up 115.

13              THE COURT:  Exhibit 115?

14              MR. RAFFERTY:  We are putting up testimony

15  given by Mr. Hemi on the 25th of April 2013.

16              THE COURT:  But is Counsel asking that it be

17  published?

18              MR. RAFFERTY:  I'm asking --

19              THE COURT:  You said to put it up.

20              MR. RAFFERTY:  If there's an objection, we

21  can show it on counsel's screen first.

22              THE COURT:  What's the reference, please?

23              MR. RAFFERTY:  115, line 7, through 115,

24  line 24.

25              THE COURT:  So I'll ask Counsel to read that

1    section, if you have that, and advise the Court whether

2    you have any objection that that be published.

3              MR. RAFFERTY:  I do, Your Honor.

4              THE COURT:  You do object?

5              MR. RAFFERTY:  Yes, Your Honor.

6              THE COURT:  Then if it can be made available

7    to the Court, I will take a look at it.

8              MR. RAFFERTY:  Can we put it on the Court's

9    screen?

10             THE COURT:  Not yet.

11             MR. RAFFERTY:  If Ms. Rettig could approach.

12             Your Honor, again, for the record, it's 115.

13             THE COURT:  Line 7.

14             MR. RAFFERTY:  Through 24.

15             And there are no objections to any of the

16   questions on the record.

17             THE COURT:  This is the deposition of

18   Jonathan Hemi that the Court is going to review.  The

19   date is April 25th, 2013.

20             Objection sustained.  It may not be read.

21             MR. RAFFERTY:  Thank you, Your Honor.

22   BY MR. RAFFERTY:

23      Q.  Mr. Hemi, you spoke about some people who

24   contacted you at various points in time, during your

25   direct.

```
 1          Are any of those people to -- did you take their
 2    names when they contacted you?
 3      A.   Regarding?
 4      Q.   Well, the people who contacted you, that you just
 5    testified to about confusion or alleged confusion, or
 6    whether you had introduced a new tequila line, those
 7    people.
 8      A.   Some of them I did, and a lot I didn't.  It
 9    depended on the comments.
10      Q.   Are any of the people that you spoke to coming
11    here to testify to this jury about what you said they
12    told you?
13      A.   Unfortunately not.
14      Q.   Some you them you didn't even bother to take
15    their names?
16      A.   No, some we didn't.
17      Q.   That included some who allegedly contacted you
18    after you filed this lawsuit and you didn't take their
19    names?
20      A.   Correct.  When you are at an event, you can't
21    just take people's names.
22      Q.   You could have asked them, couldn't you?
23      A.   Not if you don't know them well.  If you're at an
24    event and they make a comment like, Hey, I love your new
25    tequila; or, I saw your new bottles.  And you have
```

1  hundreds of people around you.  And I don't know them.

2  I can't just pull them aside and say, Can I take your

3  name and number.  That's not reasonable.

4      Q.  You never asked them that?  You never asked,

5  would you be willing to come and help us?

6      A.  No, I didn't.

7      Q.  Now, you also said that there were several

8  iterations of the bottle after you got to Crystal Head

9  Vodka -- or to Globefill?

10     A.  Correct.

11     Q.  At some point you -- I think you deepened the eye

12 sockets?

13     A.  Yeah.  So when we got the bottle, it was pretty

14 much almost done.  We just wanted to tweak it a little

15 bit to make it visually a little bit nicer.

16     Q.  Did you consult with Mr. Alexander about that?

17     A.  Yes.  But it was very quick decision.  So what we

18 did was we basically just outlined some of the things we

19 thought would work better for the product and go from

20 there.

21     Q.  And you -- one of the other things you did at

22 that time was you chiseled the teeth so they were

23 actually dimensional?

24     A.  No.  They were already chiseled.  So I just

25 wanted them a little bit more defined.  But they were

1  always there.

2      Q.   So when you say defined, if I'm understanding

3  you, what you wanted to do is to dig deeper into --

4      A.   Really just the middle one we needed.  So you had

5  the side.  But the problem with glass making is as you

6  get in close with the blow mold, you lose some detail up

7  here.  So I just wanted to make it consistent.

8      Q.   Did you consult with Mr. Alexander about the

9  chiselling of the teeth?

10     A.   Yes.  It was a whole partnership call on this.

11     Q.   Okay.  And you're a partner in that partnership?

12     A.   I am.

13     Q.   What's your financial interest in the Globefill

14  partnership percentage-wise?

15     A.   Oh, percentage.  Ten percent.

16     Q.   So you're a 10 percent owner of Globefill?

17     A.   I am.

18     Q.   Now, when Globefill launched the Crystal Head

19  Vodka, was there any reference to this legend of the 13

20  crystal skulls?

21     A.   Yes, there was.

22     Q.   And can you -- what was the legend of the

23  13 crystal skulls, as you understand it?

24     A.   So the legend of 13 crystal skulls were basically

25  there were these 13 crystal skulls that were placed

```
 1   around the world.  Only eight were in mankind's
 2   possession.  I think five are missing.  And the bottle
 3   that we made, as Dan has said before and -- reminded him
 4   of one of the -- one of the bottles of the Crystal
 5   Head's that had been found.
 6         And these Crystal Head's were said to have
 7   healing properties, spiritual properties, and they were
 8   used in ancient, you know, even in ancient Mayan and
 9   Mesopotamia as guidance for the future, for healing,
10   things like that.  That's my understanding.
11   Q.   Okay.  And that was part of the basis on which
12   Crystal Head Vodka was marketed, and is marketed through
13   this day, is in connection with the legend of the
14   13 crystal skulls?
15   A.   Not today, no.
16   Q.   You've stopped marketing on that basis?
17   A.   We stopped very quickly marketing on that basis
18   because, you know, at the end of the day, it takes away
19   from what we really have, which is a skull-shaped
20   bottle.
21         We don't want to -- you know, we can talk
22   about -- those are just marketing.  It's not -- it's
23   not -- it's really more than just the 13 skulls.
24         So quickly early on we actually changed the
25   website.  We -- within a year we changed the website,
```

1    and we kind of started to get away from the legend of

2    the Crystal Head's.

3        Q.   And when did that happen?

4        A.   It's been about, I want to say, 2010 or late

5    2009.  Once we started to redo our website then we --

6    the website had nothing to do with the Crystal Head's.

7        Q.   Now, is it your understanding that Globefill's

8    position is that any spirit product sold in any type of

9    skull bottle whatsoever would be confusing with your --

10       A.   It's my opinion -- it is my opinion that any

11   alcoholic beverage sold in a human skull-shaped bottle

12   would be infringing on our product.

13       Q.   And that doesn't -- it doesn't make any

14   difference, in your view, as to the differences between

15   that -- that allegedly infringing bottle and the

16   Globefill bottle itself?

17       A.   If it's in the shape of a skull, a human skull,

18   that's what our trademark is in.  And -- and the rest is

19   just decoration.  That's all it is.

20            You can paint my bottle, but essentially it's

21   still in the shape of a skull.

22       Q.   If it's the same bottle?

23       A.   Yeah.  You can paint it, you can put jewels on

24   it, but it's still a skull bottle.

25       Q.   And it's your opinion that the skull bottle in

1    your hands right now, the Globefill Crystal Head bottle,

2    is in exactly the same shape as the KAH Tequila bottles?

3        A.   No, it's not exact.  I've never said it's exact.

4    It's similar and it's in -- in my opinion, both bottles

5    are considered human skulls.

6        Q.   But the KAH Tequila bottles, you say they're

7    similar.  They're also different than the Crystal Head

8    Vodka bottle, aren't they?

9        A.   Yes, there's differences as well.  Yes.

10       Q.   Can you -- can you discern the differences by

11   looking at them?

12       A.   Well, sure.

13       Q.   Okay.  Do you think that an average customer

14   could discern the differences by looking at the

15   bottles?

16       A.   That they're different?

17       Q.   That they're different.

18       A.   Yes, I think they could tell that they're

19   different.

20       Q.   Now, do you know whether Globefill actually had a

21   trademark on its Crystal Head Vodka bottle prior to the

22   time it sued Elements and Kim Brandi?

23       A.   Do I know?

24       Q.   Yes.  Do you know?

25       A.   Yes.

1      Q.  You believe that Globefill had a trademark that

2   had issued on the Crystal Head Vodka bottle prior to the

3   time that you brought this lawsuit against Elements and

4   Ms. Brandi?

5      A.  We did.  We had four trademarks starting in 2006

6   we started filing.

7      Q.  Did you have a trademark on the bottle?

8      A.  We had applied for trademarks on the bottle.

9      Q.  I'm not asking if you applied for them, sir.  I

10  asked you if you had a trademark on the bottle that was

11  in force at the time that Elements and Ms. Brandi was

12  sued by Globefill?

13             THE COURT:  And let me ask the witness, do

14  you understand the question that's being asked?

15             Yes or no.

16             If you don't, I'll have counsel rephrase.

17  If you do, you may answer.

18             THE WITNESS:  Could you rephrase that?

19             THE COURT:  Do you not understand the

20  question as phrased?

21             THE WITNESS:  Well, I think --

22             THE COURT:  All you have to say is yes or

23  no.  Do you understand the question?

24             If you do, you have to answer it.  If you

25  don't, then I'll have counsel rephrase.

```
 1              THE WITNESS:  I believe I understand it.  I
 2   just don't want to get it wrong because I'm a little
 3   confused about -- can I --
 4              THE COURT:  Counsel, state the question
 5   again, please.
 6              Listen carefully, sir.
 7              THE WITNESS:  Okay.
 8   BY MR. RAFFERTY:
 9      Q.  At the time that this lawsuit was filed --
10      A.  Okay.
11      Q.  -- back in 2010, was there an issued trademark, a
12   trademark in force, on the Crystal Head bottle itself?
13      A.  No.  We had just -- we filed, but I don't think
14   we had it.  It wasn't -- what's next stage?  It
15   wasn't -- it was registered but it wasn't in force yet.
16      Q.  It hadn't issued, had it?
17      A.  We had registered it.
18      Q.  You filed for a trademark, but you didn't get it
19   yet?
20      A.  No.  But it takes time to get a trademark.
21      Q.  Right.  When did you file for the trademark in
22   connection with the date that this lawsuit was filed
23   against Elements and Kim Brandi?
24      A.  Our first trademark?
25      Q.  Yes -- no.  The trademark on the Crystal Head
```

```
1    bottle.
2              THE COURT:  That's the subject of this
3    lawsuit.
4    BY MR. BERG:
5       Q.  That's the subject of this lawsuit that's sitting
6    on the table in front of you.
7       A.  Our very first one was in 2009.
8       Q.  No, I'm asking you for the trademark that's on
9    that bottle.  When did you file for it?
10      A.  Can I ask a --
11             THE COURT:  If you don't understand -- no,
12   you can't ask.  But if you don't understand the
13   question, you can say you don't understand it.
14             THE WITNESS:  My understanding of this
15   question is that we have had -- we had trademarks for
16   the bottle starting in 2009.
17   BY MR. BERG:
18      Q.  Okay.  So -- so stop right there.  If that -- if
19   you want to finish, go ahead.
20      A.  That's -- that's my understanding.  Of the
21   trademark that I was shown, that was done in 2010, which
22   was after we saw the KAH bottle.
23      Q.  And after you sued Ms. Brandi?
24      A.  It could have been after.  It was after we saw
25   the KAH bottle.
```

1     Q.   Okay.  At the time you sued Ms. Brandi, you

2   didn't actually have the trademark on the bottle itself,

3   you -- you know that?

4     A.   We didn't have the trademark I was shown.

5          MR. FAY:  Objection, Your Honor.  This is

6   badgering.

7          THE COURT:  Overruled.

8          There's an exhibit number.

9          MR. RAFFERTY:  There's an exhibit --

10          THE COURT:  Wait.

11          MR. RAFFERTY:  -- in --

12          THE COURT:  Wait.  Wait.

13          MR. RAFFERTY:  -- 700.

14          Why don't we put it up on the screen if the

15   witness --

16          THE COURT:  Wait.  Wait just a minute.

17          The witness was shown an exhibit.  It has an

18   number on it.  I think that is what he is referencing.

19   So counsel may refer to that exhibit and ask the

20   question that you wish to ask of the witness.

21          MR. RAFFERTY:  It's always a problem when I

22   get around technology.

23     Q.   Okay.  This is the exhibit that you're referring

24   to?

25     A.   Correct.  This particular trademark, correct.

1    Q.   And this is a trademark that's for alcoholic

2  beverages, namely vodka, in Class 33?

3    A.   Correct.

4    Q.   Okay.  And it was filed on March 24, 2010.

5    A.   Correct.

6    Q.   Was that before or after you sued Ms. Brandi and

7  Elements?

8    A.   If it -- if it -- I think it was just after we

9  sent a cease and desist letter.

10    Q.   You sent the cease and desist letter on

11  March 18th?

12    A.   I believe we sent it -- yeah, I believe we sent

13  that before we had this one registered.

14    Q.   Right.  And then you sued four days later on

15  March 22nd?

16    A.   I don't know the exact date.

17    Q.   Okay.  But this registration came after that.

18          MR. FAY:  Objection, Your Honor.

19  Mischaracterizes the testimony.

20          THE COURT:  It's a question.  It's

21  cross-examination.  Overruled.

22          THE WITNESS:  Say --

23          THE COURT:  Do you have the question in

24  mind, sir?  Or would you like --

25          THE WITNESS:  Can you say it again?

1          MR. RAFFERTY:  Oh, certainly.

2     Q.   This trademark was applied for after you had

3    already sued Elements and Kim Brandi for allegedly

4    infringing the trade dress on your bottle?

5     A.   Correct.

6     Q.   Thank you.

7          THE COURT:  And just for the jury, this is

8    Exhibit 700.  And this exhibit is in evidence.

9          MR. RAFFERTY:  Your Honor, I'll pass the

10   witness to Mr. Miller, if he has questions.  Otherwise,

11   thank you Mr. Hemi for your time.

12          THE WITNESS:  Thank you.

13          THE COURT:  Mr. Miller.

14          MR. MILLER: :  Very little, Your Honor.

15          THE COURT:  It's cross.

16                    **CROSS-EXAMINATION**

17   BY MR. MILLER:

18    Q.   Good afternoon, sir.

19    A.   Hi, how are you?

20    Q.   I'm doing all right.

21          I'd rather be sailing.  But thank you for asking.

22    A.   Wouldn't we all.

23    Q.   What was the best year for sales in terms of

24   sales volume for Crystal Head?

25    A.   What was our last year's sales?

1    Q.   Best year for your sales.

2    A.   Best year sales would be either 2011 or 2012.

3  I'm not a hundred percent sure.

4         But the U.S. you're speaking specifically?

5    Q.   Yes.

6    A.   I want to say 2011.

7    Q.   All right.  So -- so the first full year that KAH

8  is being sold in throughout the United States, that was

9  your best year?

10    A.   It was our best sales year.

11         MR. MILLER:  No further questions.  Thank

12  you.

13         THE COURT:  Redirect?

14         MR. FAY:  Yes.  Very briefly, Your Honor.

15                  **<u>REDIRECT EXAMINATION</u>**

16  BY MR. FAY:

17    Q.   Mr. Hemi, do you remember when counsel asked you

18  about --

19         THE COURT:  Let's don't ask him if he

20  remembers.  Just ask the question that you have in mind.

21  BY MR. FAY:

22    Q.   Were you asked a question by counsel about --

23         THE COURT:  Not was he asked a question.

24  Just what's your question.

25  BY MR. FAY:

1    Q.   Did you decide to make a public statement about

2    KAH Tequila?

3    A.   No.

4    Q.   Okay.  Was there a reason why you didn't make

5    that statement?

6    A.   Yes.  There is a couple of reasons.

7    Q.   Okay.  Can you explain?

8    A.   The first reason is, is we felt by mentioning KAH

9    in the -- in our press release, it would only advertise

10   their product more.

11        Traditionally, big companies will not add

12   competitor products names to their press release.

13        And then the second reason is if it's not picked

14   up properly.  So on the media wire, sometimes they'll

15   pick up snippets of it.  They don't produce the whole

16   press release.  And you'll see that all the time,

17   especially in digital marketing.

18        It may actually create more confusion with

19   people.  It may end up coming out by saying that we --

20   we are KAH Tequila.  Or it could come out completely --

21   completely wrong.  So those were the two main reasons.

22   So we definitely had to stay away from that.

23             MR. FAY:  Okay.  Thank you.

24             THE COURT:  All right.  May this witness be

25   excused?

1              No objection by the defense?

2              MR. RAFFERTY:  No objection by the defense.

3              THE COURT:  Plaintiff?

4              MR. FAY:  Yes, Your Honor.

5              THE COURT:  If the jurors have any questions

6    about this witness' testimony -- since I will be

7    excusing the witness, he may not be able to you, this

8    would be the time to write those questions down and

9    submit them to the clerk.

10             So I think there are no questions.

11             The witness maybe excused.  You're free to

12   leave, sir.  Thank you.

13             THE WITNESS:  Thank you.

14             THE COURT:  We were hoping to complete those

15   two witnesses today, and so we've accomplished that.  So

16   I'm prepared to excuse the jury for the day.

17             So unless there's something that counsel

18   wish to raise with the Court that might involve the

19   jury, I will be excusing the jury at this time.

20             Nothing?

21             MR. HUMMEL:  Nothing.

22             MR. FAY:  Nothing, Your Honor.

23             THE COURT:  All right.  So you are excused.

24             Now, tomorrow is a short day for us.  But I

25   would like to start at eight.  But I do now that eight

```
 1   may be difficult for some of you, so I need to know that
 2   now, and I can then try to adjust the time.
 3               So I'm just asking the question, is eight
 4   still convenient for all the jurors?
 5               If anybody thinks it's not, you can either
 6   speak to the clerk about it or tell me now.
 7               I think most of you were here probably at
 8   eight.  But I know --
 9               A JUROR:  Eight is fine.
10               THE COURT:  So there's no one that's
11   objecting to our starting at eight.
12               All right.  So 8 o'clock tomorrow is the
13   return time.  Remember the admonitions that have been
14   given not to do any research, consult materials or
15   social media, or try to learn more about the case.
16               Everything that you will need to know about
17   this case in order for you to make the findings of fact
18   that are relevant so that you can apply the law that I
19   will give you will be given to you in this courtroom.
20   So it is not necessary for you to go outside of the
21   evidence here to try to learn more.
22               Jurors are excused.  And we'll see you
23   tomorrow morning at 8 o'clock.
24               THE CLERK:  Please rise.
25               (JURY EXITS THE COURTROOM.)
```

1          THE COURT:  You may be seated.

2          Jurors have been excused.  I know there are

3     some matters -- I believe there are -- that we need to

4     discuss that may be important for tomorrow:  examination

5     of witnesses and use of exhibits.

6          But we also need to discuss Tuesday, because

7     there won't be an opportunity for you to meet with the

8     Court before the 8 o'clock session on Tuesday.

9          I'm prepared to take a short recess about

10    15 minutes, give everybody a little break.  During this

11    time, counsel might meet and confer just to see are

12    there differences among you and can you resolve those.

13    And I will return to the bench and you will be able to

14    indicate to me the witnesses for tomorrow, or at least

15    the one witness that we thought, but possibly a second;

16    the exhibits to be used; and also a list of witnesses

17    for Tuesday and the exhibit to be used.

18          So we're in recess for about 15 minutes.

19          THE CLERK:  Please rise.  Court is in

20    recess.

21          (BREAK TAKEN.)

22          THE CLERK:  Please rise.  Come to order.

23    This Court is again in session.

24          THE COURT:  Thank you.  You may be seated.

25          So we can go off the record just for a

```
 1   moment.
 2                    (OFF THE RECORD.)
 3              THE COURT:  All right.  We can go on the
 4   record.  So general things to be discussed, but
 5   specifically let's talk about tomorrow's witnesses and
 6   the exhibits.  If you have already taken care of that
 7   and there are no issues for me to resolve, then you just
 8   might identify the who and the what, and then the same
 9   for Tuesday.  So we'll start there.
10              MS. BIVENS:  Your Honor, tomorrow we, the
11   plaintiff, plan to present Christina Cappellini and
12   David Brown.
13              THE COURT:  Okay.
14              MS. BIVENS:  And the parties -- correct me
15   if I'm wrong -- we have agreed to every exhibit except
16   for 1244 for Christina Cappellini.
17              MR. HUMMEL:  Yeah, for Brown I think there's
18   no issues.  For Christina Cappellini I think there's one
19   exhibit, and then there's some demonstratives.
20              THE COURT:  So let's take Brown first.
21              Time estimate for the direct and cross.
22              MS. BIVENS:  Thirty minutes for the direct.
23   Or --
24              MR. BERG:  Oh, it won't be long.
25   Thirty minutes at most, Your Honor.
```

```
 1                    THE COURT:  Okay.  And similar amount of
 2   time for the cross?  Or --
 3                    MR. CASTORIA:  Maybe a little bit shorter.
 4                    THE COURT:  Okay.  So I'll say same amount
 5   of time, about 30 minutes.
 6                    MR. CASTORIA:  Thank you, Your Honor.
 7                    THE COURT:  And what is the exhibit that's
 8   being used with witness Brown?
 9                    MS. BIVENS:  Where's the list that we gave
10   you of Brown?  I don't -- I think we're -- or are you
11   talking about Brown?
12                    THE COURT:  Brown.  That's what I asked, for
13   Brown.  Are there any exhibits that are not already in
14   evidence being used with Brown?
15                    MS. BIVENS:  No.
16                    THE COURT:  Okay.  And then the other
17   witness, if you will give me the name again, please.
18                    MS. BIVENS:  Her name is Christina
19   Cappellini.
20                    THE COURT:  Spell the last name.
21                    MS. BIVENS:  Okay.  C-A-P-P-E-L-L-I-N-I.
22                    THE COURT:  And the exhibits that you wish
23   to use with her, if any.
24                    MS. BIVENS:  All right.  For Christina
25   Cappellini it's 82-7.
```

```
 1                    THE COURT:  82-7.  Let me just take a look.
 2    I have my exhibit list here.
 3                    So it's Facebook postings on Crystal Head
 4    Vodka's Facebook page?
 5                    MS. BIVENS:  Yes, Your Honor.  And that was
 6    admitted during the last trial.
 7                    THE COURT:  Okay.  So no problem with that
 8    one, I assume.
 9                    MS. BIVENS:  No, Your Honor.
10                    THE COURT:  So I need to hear from the
11    defendant.  No objection?
12                    MR. HUMMEL:  There's no objection to that
13    one, Your Honor.
14                    THE COURT:  So I may deem that admitted for
15    this trial, if I have not already done so, correct?
16                    MR. HUMMEL:  Yes.
17                    THE COURT:  Okay.
18                    (EXHIBIT 82-7 ADMITTED.)
19                    THE COURT:  All right.  The next exhibit to
20    be used with this witness?
21                    MS. BIVENS:  593.
22                    THE COURT:  It's a reference to the Liquid
23    Living Magazine?
24                    MS. BIVENS:  Yes, Your Honor.
25                    THE COURT:  And objection to that one?
```

1          MR. HUMMEL:  No, Your Honor.

2          THE COURT:  And may I deem that one

3  admitted, unless it's already in?

4          So it's deemed admitted.  If it's been

5  admitted already, it's fine.  But if it hasn't then it

6  would be admitted as of today's date.

7          MS. BIVENS:  Yes, Your Honor.

8          (EXHIBIT 593 ADMITTED.)

9          THE COURT:  What's the next one?

10          MS. BIVENS:  Exhibit 618, which has already

11  been admitted.

12          THE COURT:  I'll deem that one admitted as

13  well.

14          (EXHIBIT 618 ADMITTED.)

15          THE COURT:  What else do we have?

16          MS. BIVENS:  Going to the 1100s,

17  Exhibit 1140.

18          THE COURT:  1140.  And that one deemed

19  admitted or there's an objection to?

20          MR. HUMMEL:  Which one is this?

21          THE COURT:  1140.

22          MR. HUMMEL:  No objection.

23          THE COURT:  Instagram posting.

24          MR. HUMMEL:  No objection.

25          THE COURT:  Okay.  Deemed admitted.

```
 1                    (EXHIBIT 1140 ADMITTED.)

 2                    THE COURT:  Okay.

 3                    MS. BIVENS:  Exhibit 1141.

 4                    THE COURT:  And that's a similar type of

 5     exhibit.  Is there an objection to that one?

 6                    MR. HUMMEL:  There's no objection, Your

 7     Honor.

 8                    THE COURT:  Okay.  That one is deemed

 9     admitted.

10                    (EXHIBIT 1141 ADMITTED.)

11                    MS. BIVENS:  Exhibit 1142.

12                    THE COURT:  And same type of exhibit.

13                    Objection?

14                    MR. HUMMEL:  No objection, Your Honor.

15                    THE COURT:  Okay.  Deemed admitted.

16                    (EXHIBIT 1142 ADMITTED.)

17                    MS. BIVENS:  Exhibit 1244.

18                    THE COURT:  So it seems to be a similar type

19     of exhibit, an Instagram posting.

20                    Any objection?

21                    MR. HUMMEL:  There is an objection to this

22     one, Your Honor.

23                    THE COURT:  Okay.  So let me hear the

24     objection.

25                    MR. HUMMEL:  Right.  So we would object to
```

1     this on the grounds of relevance.  On the grounds of 403

2     that it's unduly prejudicial.  There's also a lack of

3     foundation.

4              This Instagram post, or whatever it is, is a

5     picture of a Crystal Head Vodka bottle.  So Globefill's

6     bottle that some artist painted to resemble a KAH

7     Tequila bottle.

8              It has no relevance.  There's no issue of

9     confusion.  Someone took a bottle and painted it, you

10    know, their bottle and painted it to look like our

11    bottle.  It's obviously prejudicial to the extent

12    they're going to suggest that no -- well, I don't know

13    what they're going to suggest.  But it's certainly

14    prejudicial to us that someone painted this bottle.

15    It's offered for an issue of confusion.

16             THE COURT:  Okay.  So lack of foundation.

17    If that was the only issue, then I would expect -- and

18    if this comes up with other exhibits too -- that counsel

19    would lay that foundation with the witness who's being

20    called.  So you couldn't publish it until that

21    foundation is laid.

22             But the other issue, relevance and why it's

23    needed, since there are so many Instagram postings

24    already.  So I'll let counsel make that argument.

25             MS. BIVENS:  Yes, Your Honor.  You alluded

1   to the first argument that we have is that there have

2   been several other postings already admitted into

3   evidence in 2013 during this trial.  It is all relevant.

4   And Ms. Cappellini's testimony will explain further why

5   this is relevant.

6           The other issue is that this exhibit goes

7   straight to a point that plaintiff is making that people

8   relate the two bottles such that somebody would post on

9   their Instagram feed a picture of Crystal Head painted

10  like the KAH bottle.

11          THE COURT:  Well -- and I think one question

12  is can this witness do all of that?  And the Court would

13  have to determine the relevance.  I can't determine that

14  through this witness.  So I need to determine that first

15  so you'll know whether you can use it or not.

16          But this one, I think it would be helpful if

17  I had a proffer as to what she would be saying about

18  this posting.

19          Counsel is correct.  We have a lot, but it

20  doesn't mean that all of the postings come in.  And so

21  one question would be, do you even need this one?  This

22  one may be different from the others and unique in some

23  way.

24          MS. BIVENS:  It is.

25          THE COURT:  But why don't you make the

```
 1    proffer, and then maybe I can better understand why this
 2    one is one that you think should be received.
 3              MS. BIVENS:  Yes, Your Honor.
 4              So Christina Cappellini, as the Court will
 5    learn tomorrow, is the director of marketing at
 6    Globefill.  And she's been working in some capacity
 7    since 2009, and part of her job responsibilities is to
 8    monitor social media and to supervise the person at
 9    Globefill who's solely responsible for social media.
10              On October 17, 2016, less than months ago,
11    doing something she normally does, she forwarded to
12    Jonathan Hemi, who you heard testify just a while ago,
13    an Instagram post that she thought was brand confusion.
14    Because when she first saw this Instagram post, she
15    thought that it was a KAH bottle.
16              It's specifically KAH Anejo Anejo.  I think
17    it's like Exhibit 56.
18              She thought it was a KAH Anejo Anejo bottle,
19    and forward it to Jonathan tagged as Crystal Head Vodka.
20              Just a few weeks ago, as she was preparing
21    for trial in this case, Ms. Cappellini looked more
22    closely at the bottle and realized that the user was in
23    fact showing off the fact that she had a -- or he.  I'm
24    assuming TipseyBride had posted the Crystal Head bottle
25    painted as a KAH bottle.
```

```
 1            THE COURT:  So why would that be relevant
 2   here?  So it's not anyone associated with the case, I'm
 3   assuming, that that did the posting.  Is she attributing
 4   it to someone involved in the case?
 5            MS. BIVENS:  Right.  And so most of
 6   Ms. Cappellini's testimony speaks to the fact that
 7   social media has essentially become tainted with people
 8   who affiliate the bottle, take pictures of bottles
 9   together, because they think they're so similar and
10   related.  And they're posting pictures that create
11   the -- an environment where people can become confused
12   about the bottle, and have made it more difficult for
13   Crystal Head to market its product.
14            Those are two key issues in this case.
15            THE COURT:  And how do we know that someone
16   thought that they were similar and that's why it's
17   posted?
18            MS. BIVENS:  We're not -- we're not offering
19   them for the truth of what was posted, but the idea that
20   these kind of images online -- which we'll explain more
21   with the demonstratives, hopefully, tomorrow -- have
22   clouded the Instagram feeds of hashtag Crystal Head
23   Vodka and other hashtags related to Crystal Head.
24            THE COURT:  All right.  Anything else on
25   this one?
```

```
1              MS. BIVENS:  No, Your Honor.
2              THE COURT:  Okay.  Counsel wish to be heard
3    further?
4              MR. HUMMEL:  Yeah, Your Honor, there's
5    nothing in this document to suggest that the person who
6    posted it was confused about anything.  There's no
7    mention of KAH Tequila.
8              It happens to be painted in a way that is
9    similar to one of the KAH Tequila bottles.  But it's
10   also similar to the way Calavaras painted in other
11   situations.
12             So there's no -- there's no relevance to
13   this.  It doesn't show an instance of confusion in any
14   way.  And it's prejudicial to the extent that someone
15   else may have infringed their trade dress, if they think
16   so or not.  But it has nothing to do with an issue of
17   confusion between a bottle of KAH Tequila and a bottle
18   of Crystal Head.  This is -- the poster itself is saying
19   that it's a hand-painted Crystal Head Vodka bottle.
20             So it's -- there's a tremendous chance of
21   confusion here amongst the jurors who somehow will think
22   the whole theme here is we copied their bottle.  And
23   here is someone on the Internet who actually took the
24   bottle, hand painted it, not affiliated in any way with
25   KAH Tequila, and they're going to argue, obviously, that
```

1    this proves their point that it's the same bottle.

2              I think it's highly prejudicial and not

3    relevant.

4              THE COURT:  Well, I won't try to anticipate

5    what they're going to argue.

6              But does counsel have anything further?

7    I'll let you have the final word on this.  And the

8    Court's ready to rule.

9              MS. BIVENS:  Yes, Your Honor.  As far as

10   somebody being confused, the director of marketing at

11   Crystal Head Vodka was confused.  So this actually is

12   evidence of actual confusion.

13             THE COURT:  Okay.  What will she say about

14   her confusion?  She thought it was what?

15             MS. BIVENS:  She thought it was the KAH

16   Anejo Anejo bottle.

17             THE COURT:  And then at some time she

18   determined that it wasn't?

19             MS. BIVENS:  Yes.

20             THE COURT:  The objection will be sustained.

21   The Court finds that it's not relevant.  Whether or not

22   it creates the kind of confusion that defense counsel is

23   suggesting, not -- not sure.

24             But based on the proffer, I would sustain

25   the objection.

1              Are there any other exhibits to be used with

2  this witness, from the plaintiff?  Any other exhibits to

3  be used with this witness?

4              MS. BIVENS:  Yes.  1246.

5              THE COURT:  1246.

6              Any objection to this one?

7              MR. HUMMEL:  No objection.

8              THE COURT:  Okay.  And so the Court would

9  deem it admitted.

10             (EXHIBIT 1246 ADMITTED.)

11             THE COURT:  Next.

12             MS. BIVENS:  1281.

13             THE COURT:  1281.

14             1281, any objection?

15             MR. HUMMEL:  No objection.

16             THE COURT:  It will be admitted.

17              (EXHIBIT 1281 ADMITTED.)

18             MS. BIVENS:  1246 -- I said that one

19  already.  1283.

20             THE COURT:  1283.  Another posting.

21             Any objection?

22             MR. HUMMEL:  No objection.

23             THE COURT:  Deemed admitted.

24              (EXHIBIT 1283 ADMITTED.)

25             THE COURT:  Any other exhibits to be used

1    with the witness?

2              MS. BIVENS:  The defendants have offered

3    exhibits for cross-examination, and plaintiffs have no

4    objection, or have withdrawn all of their objections to

5    the defendants' exhibit.

6              THE COURT:  All right.

7              MR. HUMMEL:  Can we just clarify one point.

8              On 1281, I think it's just two pages from

9    that.

10             MS. BIVENS:  My understanding from counsel

11   is that we -- 1281, the entire exhibit.

12             THE COURT:  But I think counsel is asking

13   for guidance.  Could we pull up that exhibit just so

14   we'll know how many pages.

15             MS. BIVENS:  Your Honor, I think that they

16   are -- they have a disagreement about this.

17             MR. HUMMEL:  No, no, no.  The list here that

18   I have is 1281-1 and 1281-16.

19             THE COURT:  Well, on the Court's list, joint

20   exhibit list, I just have 1281.  Not broken down by

21   other numbers.

22             MS. BIVENS:  Can we have a second to confer,

23   Your Honor.

24             THE COURT:  Sure.

25             MS. BIVENS:  Thank you.

```
 1                  THE COURT:  Off the record.

 2                  (OFF THE RECORD.)

 3                  THE COURT:  Back on the record now?

 4                  MS. BIVENS:  Yes, Your Honor.

 5                  THE COURT:  All right.

 6                  MS. BIVENS:  The parties do not want to put

 7     into the record the entire Exhibit 1281.  We want to

 8     break it out by page number.

 9                  THE COURT:  So how many pages of the

10     exhibit?  And maybe you should show that to defense

11     counsel, because the Court just deemed it admitted.

12                  MS. BIVENS:  They've already seen it and

13     they agreed to the two pages, 1281-1 and 1281-16.

14                  THE COURT:  All right.  Does defense counsel

15     agree?  Apparently there are only two pages that they

16     wish to offer, and they are the two that plaintiff's

17     counsel has indicated.

18                  MR. HUMMEL:  Yes.

19                  THE COURT:  Okay.

20                  MR. HUMMEL:  Going to come back to this

21     exhibit in a minute.

22                  THE COURT:  Okay.  Do we need to return to

23     it for something?

24                  MR. HUMMEL:  Yeah, because there's more

25     pages that we've agreed between the two of us that we'll
```

```
 1    offer.  So --

 2                THE COURT:  Oh.

 3                MR. HUMMEL:  -- it's a big exhibit and broke

 4    it up into little pieces.  Sorry for the confusion, Your

 5    Honor.

 6                THE COURT:  All right.  Why don't we take a

 7    moment then, if we think that we can do it now, and just

 8    kind of straighten out which portions of this exhibit

 9    the Court should deem admitted.  Then both sides will

10    know what you can use.

11                Plaintiffs apparently had planned to use

12    only two pages, correct?

13                MS. BIVENS:  Yes.

14                THE COURT:  But I don't know how many pages

15    defendants are using, and so that would be the next

16    question that I would ask, that defendants identify the

17    exhibits that they plan to use in cross.

18                MR. HUMMEL:  Sure.

19                THE COURT:  So if it will help you, we can

20    go off the record to let you confer.

21                MR. HUMMEL:  No.  We've conferred.

22                THE COURT:  Okay.  So you're ready to

23    identify?

24                MR. HUMMEL:  Yes, Your Honor.

25                THE COURT:  All right.  So for
```

```
1    cross-examination, if we can just have a list of the

2    exhibits that defendant plans to use.  If there's no

3    objection, I will deem those admitted.

4              MR. HUMMEL:  My understanding, Your Honor,

5    is that there is no objection to any of these.

6              THE COURT:  Okay.  Let's have the numbers

7    just so we don't have any surprises tomorrow.

8              MR. HUMMEL:  Correct.

9              1143, Your Honor.

10             THE COURT:  Yes.

11             MR. HUMMEL:  1144.  1145.  1146.  1147.

12   1148.  1151.  1152.  1155.

13             And then we go back to Exhibit 1281.

14             THE COURT:  Which pages?

15             MR. HUMMEL:  2, 4, 6, 12, 17, 18 and 42.

16             THE COURT:  All right.  So now that we have

17   the numbers and the pages of 1281, any objection to

18   those being deemed admitted and defendant using them

19   with their cross-examination of this witness?

20             MS. BIVENS:  No, Your Honor.

21             THE COURT:  Okay.  They are all deemed

22   admitted.

23             ^(EXHIBITS 1144, 1145, 1146, 1147, 1148,

24             1151, 1152, 1155 and 1281 ARE ADMITTED.)

25             MR. HUMMEL:  Thank you, Your Honor.
```

```
1            THE COURT:  All right.  So I just want to
2    make sure on our timing.  So what is the time for the
3    direct examination of Christina Cappellini?
4            MS. BIVENS:  Approximately an hour.
5            THE COURT:  Well, if you remember, we only
6    have two hours tomorrow.  And it sounds like we'll use
7    one hour with David Brown.  So I just want to -- it's
8    close.  But today I think counsel, both sides, probably
9    used a little less time than you estimated.
10           So you expect an hour.  And -- but we
11   haven't left any time for cross, unless you were
12   including that in your hour's time estimate.
13           MS. BIVENS:  I wasn't.
14           THE COURT:  You were not.  So how much time
15   defense expect that you will need for cross?
16           MR. HUMMEL:  I don't know.  I wasn't
17   expecting the hour.  Forty-five minutes maybe, which is
18   going to be too much time.
19           THE COURT:  Yes, we won't have enough time
20   to finish this witness.  So yesterday when I raised the
21   question, I said if you have another witness that you
22   think you can complete in an hour, both direct and
23   cross, then we would have time for a second witness.
24           But this -- unless you are going to reduce
25   your time estimate -- and you are using a lot of
```

```
 1   exhibits with the witness Cappellini, so you may need
 2   the amount of time that you've estimated.
 3             So what's thinking on that?  Do you want to
 4   bring her, knowing that there would be only -- if David
 5   Brown takes an hour, or if you take an hour with David
 6   Brown, then you will only have one more hour tomorrow.
 7             MS. BIVENS:  Your Honor, can I have a moment
 8   to confer.
 9             THE COURT:  Sure.
10             MS. BIVENS:  Your Honor --
11             THE COURT:  Back on the record.
12             MS. BIVENS:  So just as far as timing goes,
13   the plaintiff expects to -- for Davy Brown to last only
14   15 minutes.  And Cappellini will last 45.
15             THE COURT:  All right.  So just so counsel
16   know, that's fine with the Court.  But I know you don't
17   want to have her have to return on another day, and I do
18   need to leave at ten tomorrow.
19             MS. BIVENS:  Yes, Your Honor.
20             THE COURT:  Okay.
21             All right.  We can go to Tuesday.
22             MR. HUMMEL:  Your Honor, there is one other
23   issue with respect to Ms. Cappellini.  There are some
24   demonstrative exhibits.
25             THE COURT:  Okay.  And you've exchanged
```

 1    those, or at least both sides have seen them, and

 2    there's an objection to all of them or some of them?

 3                MR. HUMMEL:  Well, yeah, I did see them

 4    today.  Although there is one slide which I guess hasn't

 5    been prepared yet, which I'm not sure how I'll react to

 6    it.  But I have not seen --

 7                THE COURT:  I think it can't be used.

 8    Counsel can prepare it and show it to you, and you have

 9    no objections, that's fine.  But if you have objections,

10    since we are settling all of that today, I would say if

11    there's any objection it just can't be used.

12                MR. HUMMEL:  Well, I have objections to

13    this, to this demonstrative --

14                THE COURT:  Okay. I just need to see the

15    demonstrative and hear what the objection is and --

16                MS. BIVENS:  I can show you.

17                THE COURT:  Okay.  Then I can see it.

18    Looking at the screen now.

19                MS. BIVENS:  Your Honor, before we start, I

20    want to make clear that we had to -- because of the

21    Court's ruling just now, we removed one slide, and we're

22    going to remove two more based on some testimony today.

23    So we're really only talking about one slide.

24                THE COURT:  Okay.  And would you identify

25    that one slide for counsel.  And if he has no objection,

1    then --

2              MR. HUMMEL:  This slide is the -- I do have

3    not an objection to this one, Your Honor.

4              THE COURT:  Okay.  Does it have a number

5    just for reference?

6              MS. BIVENS:  Oh, I'm sorry.

7              THE COURT:  What is the number?

8              MR. BERG:  Your Honor, with your permission,

9    I am supposed to meet a back doctor.  And I wonder if I

10   can be excused.

11             THE COURT:  Sounds important to me.  You may

12   be excused.

13             MR. BERG:  Thanks.

14             MS. BIVENS:  Exhibit 1142.

15             THE COURT:  1142.

16             And maybe counsel can just describe what it

17   is.  I mean, I can see it.  But to understand why you

18   think it's important to your case.

19             MS. BIVENS:  This is a demonstrative that

20   will explain to the jury how social media posting works,

21   and liking on social media, to give context to the

22   exhibits.

23             THE COURT:  So can't a witness do that

24   without this demonstrative?

25             MS. BIVENS:  No.

1          THE COURT:  I don't know.  But all of you

2    probably know.

3          MS. BIVENS:  Well, I've learned since being

4    on this case, no.  I think that a juror will need this

5    kind of context to understand social media, because if

6    you don't use it you don't know.

7          THE COURT:  All right.  Could I hear the

8    objection to it.

9          MR. HUMMEL:  Yeah, Your Honor.  This

10   demonstrative here implies that this particular photo

11   went to all of these unnamed individuals here.  It

12   doesn't bear any relation to reality.  It has no

13   foundation.

14          If Ms. Cappellini would like to testify

15   generally about what happens on social media, I don't

16   have a problem with that.  But to imply that this

17   picture went out to all these friends, to all this,

18   whatever this is supposed to be -- I'm not even sure

19   what it's supposed to be.  I object to this without

20   knowing what it's --

21          THE COURT:  Maybe plaintiff's counsel could

22   clear that up on your examination.

23          MS. BIVENS:  Absolutely.

24          THE COURT:  If it's just a demonstrative,

25   then I'm sure that you will make some inquiry of the

1    witness as to what it actually represents.

2            MS. BIVENS:  Absolutely.

3            THE COURT:  All right.  Objection overruled.

4    I will allow it to be used.  But I think --

5            MR. MILLER:  Your Honor --

6            THE COURT:  Oh, I'm so sorry.

7            MR. MILLER:  That's all right.  That's all

8    right.  I have kind of a continuing problem with the

9    words Crystal Head in the lower right-hand corner on any

10    exhibit or demonstrative evidence that shows both

11    products, because I think that can be a subliminal

12    attempt to create confusion.  There's just no reason to

13    have that heading like it's Court approved.

14            THE COURT:  So that heading probably doesn't

15    have anything to do with this exhibit --

16            MS. KIM:  Your Honor, we'll take it out.

17            THE COURT:  Okay.

18            MS. KIM:  It's just a standard footer, so

19    we'll take it out of everything.

20            THE COURT:  That's what I assumed.

21            All right.  And so defense counsel shall

22    just see it in the redacted form and be satisfied that

23    they have removed whatever it is that you found

24    objectionable.

25            So I won't do that and won't raise any

1    question about it.  So if any exhibit gets redacted in

2    some way, modified in some way, then it's the

3    responsibility of counsel who wants to use it to show it

4    to the other side in its redacted form or modified form.

5    And then if you still have an issue with the exhibit,

6    then you need to bring it to the Court's attention.

7    Otherwise, it will -- we will not have any further

8    discussion on it.  I'll assume that it's okay.

9              All right.  So have we taken care of the

10   demonstrative to be used with the witness?

11             MS. BIVENS:  Yes, Your Honor.

12             THE COURT:  All right.  So are we ready to

13   go to Tuesday?

14             MS. BIVENS:  Yes, Your Honor.

15             THE COURT:  So for Tuesday, first what I

16   need is the witnesses who will be called, the time

17   estimates and the exhibits to be used, and then if

18   there's any objection.

19             If there are no objections to the exhibits,

20   we'll deem them admitted now.  And if there's any

21   discussion about witnesses, then I'm sure it will be

22   raised.

23             So Tuesday I would expect that we would work

24   about five hours, as we did today.  Hopefully, we'll

25   start on time, eight o'clock, and we would recess the

1    jury.  I tell the jury no later than two, just to give

2    us 30 minutes just in case we need it.  But I don't have

3    any plans for next Tuesday so I could stand longer if we

4    needed to.

5            So while counsel's getting ready for this

6    discussion, just a couple things I want to bring to your

7    attention.

8            So today there was a motion in limine.  And

9    you probably all remember which one it was.  And it was

10   actually plaintiff's motion in limine, but it was also

11   plaintiff counsel that raised the subject, in the

12   Court's opinion.  So I think all counsel on both sides

13   need to review the motions in limine, the orders that

14   have been issued, so that you are not raising a subject

15   that the Court has either excluded or you don't forget

16   to raise one that the Court permitted you to raise.

17           But the one that I'm talking about is motion

18   in limine No. 2.  And it was plaintiff's motion,

19   in limine No. 2, to exclude evidence of plaintiff's

20   Mexican seizure response.

21           So the witness on the stand talked about the

22   seizure, which would be in violation of the order

23   because I granted the motion.  So it may be that what

24   you need to do is alert your witnesses as well.  So if

25   there's a subject matter that has been excluded or if

1  you're unclear about it, witnesses need to know this is

2  not a topic that you're permitted to raise.

3          So that's one of the reasons that a few

4  times today I said counsel needs to be more careful with

5  the questions.  Because when you have a witness like

6  this, all of this is knowledgeable to him.  I mean, he's

7  lived it, so he's prepared to tell the story not knowing

8  that maybe certain things have been excluded.  So just

9  wanted to raise that with you.  Pay attention to the

10  motions and the ruling on the motions and advise

11  witnesses to the extent they need to be advised.

12          Another topic that I want to raise -- and

13  this may come as a surprise to you.  So in the new

14  building, in chambers the Court can hear what is being

15  said in the courtroom, even when the Court is away, not

16  on the bench.  So if you are discussing things in the

17  courtroom, you need to turn away from the mikes or move

18  away from the mikes.

19          So today, I raised the question with my

20  staff, you know, I'm hearing a lot.  Why am I hearing

21  it?  So the answer is that the chambers are set up so

22  that anyone in chambers can actually listen to the

23  proceedings in the courtroom.  And that's fine.  But

24  then when we are not in session but counsel are still in

25  the courtroom discussing things, we can also hear your

```
 1    discussion.  So it may be that you don't wish to have
 2    the Court or the Court staff hear this discussion.  So
 3    just -- I raise that with you just so that you are
 4    aware.
 5              Another question that I was going to raise,
 6    the jury instructions that were used at the first trial,
 7    do you intend that those instructions will be used at
 8    this trial?  And maybe you've already gone over them.
 9    You have added some.  You may have taken some away.  So
10    you may have already considered this.  And I don't need
11    to raise it with you, but I wanted to raise it now
12    because we will get to jury instructions probably be
13    discussion that the Court will have with counsel will be
14    sometime next week.
15              So if it's a subject that you're already
16    paying attention to and have some thoughts on it, you
17    don't need to say anything more to me about it, but I
18    just wanted to raise it with you.
19              Counsel.
20              MS. KIM:  Your Honor, you know, we did file
21    joint court instructions.  We also filed separate for
22    the ones we didn't agree upon.  However, you know, I've
23    kind of gone through both sets, and I do think that
24    there is a lot of room for us to work with defendant.
25    And I think that there -- what we should do is probably
```

1    work with defendant, meet and confer, get as much

2    agreement as we can.  We'll file something again that's

3    joint with the exhibits.  We'll have an Exhibit A and B

4    for the ones that are still remaining, where we still

5    have a dispute, and then we can raise it with the Court

6    on Tuesday.

7              THE COURT:  All right.  So that would be

8    beneficial.  Because what I will do look, I will look at

9    what you've given me, and then I will prepare what I

10   call a court's set.  And that is the set that we will

11   use for settlement purposes just to have our

12   discussions.  And so I may use most of yours, but I may

13   put in some additional ones or I may feel that some are

14   not appropriate.  So that would be something that you

15   would need to know.

16             So if you're prepared to provide whatever

17   you have filed, based upon your best efforts to agree,

18   to the extent that you can -- I realize you can't always

19   agree, and I appreciate your trying to agree on these

20   things -- then if I have that by Tuesday, then I will

21   review them and be able to give you some indication as

22   to which of those the Court might use pretty early next

23   week.

24             The same with the verdict form.  And I

25   imagine that your comments would be the same.  You've

```
1   looked at the one from the first trial and you've put

2   something together that you think may be acceptable to

3   both sides.

4              MS. KIM:  Yes, Your Honor.  I think we can

5   work that out.

6              THE COURT:  Okay.  Very good.  So I'm ready

7   now to have you identify the witnesses for Tuesday and

8   the exhibits to be used.

9              MS. KIM:  Your Honor, Jenny Kim for the

10  plaintiff.  So on Tuesday we intend to call Raul Marmol.

11             THE COURT:  If you will just spell the last

12  name for the record, please.

13             MS. KIM:  M-A-R-M-O-L.

14             THE COURT:  And your time estimate for your

15  direct examination.

16             MS. KIM:  Forty-five minutes.

17             THE COURT:  And the cross.

18             MR. HUMMEL:  I think we'll reserve a similar

19  time, Your Honor.

20             THE COURT:  Okay.  Next.

21             MS. KIM:  And we don't anticipate using any

22  exhibits for Mr. Marmol.

23             THE COURT:  Thank you.

24             Any exhibits to be used by defense?

25             MR. HUMMEL:  Two, to which I understand
```

```
 1    there is no objection.
 2                THE COURT:  And would you identify them.
 3                MR. HUMMEL:  Absolutely, Your Honor.
 4                764 and 765.
 5                THE COURT:  764 and 765.
 6                No objection by plaintiffs?
 7                MS. KIM:  No objection.
 8                THE COURT:  I will deem those admitted.
 9                (EXHIBITS 764 and 765 ADMITTED.)
10                THE COURT:  And the next witness.
11                MS. KIM:  The next witness will be
12    Kim Brandi, Your Honor.
13                THE COURT:  And your time estimate.
14                MS. KIM:  Two hours, Your Honor.
15                THE COURT:  And defendants will be
16    conducting not only your cross-exam, if you have
17    cross-exam, but also direct exam.
18                Is that correct?
19                MR. MILLER:  Correct, Your Honor.
20                If it's all right with the Court, I'd like
21    to be the one who questions Ms. Brandi after they
22    complete their direct.
23                THE COURT:  Since you're representing her,
24    that seems right to me.
25                MR. MILLER:  And I'm expecting a pretty
```

```
 1   solid two hours too on what will be in response, plus

 2   what she would say independently, in accordance with

 3   Your Honor's wishes.

 4             THE COURT:  That's fine.

 5             MR. MILLER:  That's independent of what

 6   Elements may have.

 7             THE COURT:  So will Elements also be

 8   conducting some examination of Ms. Brandi?

 9             MR. HUMMEL:  Yes, I believe we will.

10   Obviously, it depends on what the course of the direct

11   or the cross or direct is going to be.  But we won't

12   cover the same ground.  Obviously.

13             I would say -- I would like to reserve

14   45 minutes just in case.  But it might be shorter.

15             THE COURT:  All right.  So if your time

16   estimates are correct -- hopefully they are not.

17   Hopefully you are overestimating -- two hours for the

18   plaintiffs.  Two hours for -- and 2 hours and 45 minutes

19   for the defendants.  So that is almost a full day, so

20   just something that you could keep in mind.  It's likely

21   that Ms. Brandi is going to be here anyway.

22             MR. MILLER:  She will be.

23             THE COURT:  So if we don't finish with her

24   on Tuesday, then we would just finish her examination on

25   Wednesday, and that's fine.
```

1          MR. MILLER:  She'll be here -- aren't we

2    dark Wednesday, I think?

3          THE COURT:  Wednesday, that's right.

4    Thursday would be the next day.  You're right.

5          MR. MILLER:  She'll be available on those

6    days, Your Honor.

7          THE COURT:  Okay.  Exhibits to be used with

8    Ms. Brandi for the plaintiffs.

9          MS. KIM:  Yes, one second, Your Honor.

10         We have, starting with Exhibit 616, 616-2,

11   and 6166-62.  It's my understanding that defendants have

12   no objection.

13         MR. MILLER:  Correct.

14         THE CLERK:  Could you repeat those exhibit

15   numbers.

16         MS. KIM:  Yes.  Exhibit 616, 616-2 and

17   616-62.

18         THE COURT:  No objection.  Those are deemed

19   admitted.

20         MS. KIM:  Thank you, Your Honor.

21         (EXHIBITS 616, 616-2 and 616-62 ADMITTED.)

22         THE COURT:  And then for the other

23   examination, whether it's cross or direct, do the

24   defendants expect to be using exhibits?

25         MS. KIM:  I think we have several more, Your

```
 1    Honor.
 2                 THE COURT:  Oh, you have more.  All right.
 3    I thought that was too easy.
 4                 Okay.  Continue.
 5                 MS. KIM:  615.
 6                 MR. MILLER:  No objection on that.
 7                 THE COURT:  Deemed admitted.
 8                 (EXHIBIT 615 ADMITTED)
 9                 MS. KIM:  620.
10                 MR. MILLER:  No objection on that.
11                 THE COURT:  Deemed admitted.
12                 (EXHIBIT 620 ADMITTED)
13                 MS. KIM:  617.
14                 MR. MILLER:  No objection on that.
15                 THE COURT:  Deemed admitted.
16                 (EXHIBIT 617 ADMITTED)
17                 MS. KIM:  574.
18                 MR. MILLER:  No objection on that.
19                 THE COURT:  Deemed admitted.
20                 (EXHIBIT 574 ADMITTED)
21                 MS. KIM:  574-A.
22                 MR. MILLER:  No objection on that.
23                 THE COURT:  Deemed admitted.
24                 (EXHIBIT 574-A ADMITTED).
25                 MS. KIM:  575.
```

1          MR. MILLER:  No objection on that.

2          THE COURT:  Deemed admitted.

3          (EXHIBIT 575 ADMITTED).

4          MS. KIM:  1275.

5          MR. MILLER:  Oops.  Yeah, objection on that

6     one, Your Honor.

7          THE COURT:  Okay.  I'll hear the objection

8     later.  Counsel may continue.

9          MS. KIM:  618.

10          MR. MILLER:  No objection.

11          THE COURT:  Deemed admitted.

12          (EXHIBIT 618 ADMITTED)

13          MS. KIM:  618-4-5.

14          MR. MILLER:  No objection to that, Your

15     Honor.

16          THE COURT:  All right.

17          (EXHIBIT 618-4-5 ADMITTED)

18          MS. KIM:  618-28-30.

19          MR. MILLER:  No objection.

20          THE COURT:  Deemed admitted.

21          (EXHIBIT 618-28-30 ADMITTED)

22          MS. KIM:  578.

23          MR. MILLER:  Objection to that one.

24          MS. KIM:  579.

25          MR. MILLER:  No objection to that.

```
 1              THE COURT:  Deemed admitted.

 2              (EXHIBIT 579 ADMITTED)

 3              MS. KIM:  773.

 4              MR. MILLER:  Objection to that one.

 5              MS. KIM:  352.

 6              MR. MILLER:  No objection to that.

 7              THE COURT:  Deemed admitted.

 8              (EXHIBIT 352 ADMITTED)

 9              MS. KIM:  463.

10              MR. MILLER:  No objection.

11              THE COURT:  Deemed admitted.

12              (EXHIBIT 463 ADMITTED)

13              MS. KIM:  553.

14              MR. MILLER:  No objection to that one.

15              THE COURT:  Deemed admitted.

16              (EXHIBIT 553 ADMITTED).

17              MS. KIM: 562.

18              MR. MILLER:  No objection.

19              THE COURT:  Deemed admitted.

20              (EXHIBIT 562 ADMITTED)

21              MS. KIM:  520.

22              MR. MILLER:  No objection.

23              THE COURT:  Deemed admitted.

24              (EXHIBIT 520 ADMITTED)

25              MS. KIM:  544.
```

```
 1                    MR. MILLER:  No objection.

 2                    THE COURT:  Deemed admitted.

 3                    (EXHIBIT 544 ADMITTED)

 4                    MS. KIM:  593.

 5                    MR. MILLER:  No objection.

 6                    THE COURT:  Deemed admitted.

 7                    (EXHIBIT 593 ADMITTED)

 8                    MS. KIM:  That's it for plaintiffs, Your

 9      Honor.

10                    THE COURT:  All right.  I'll hear then those

11      objections to those that have been identified to which

12      defense have objections.  I would be prepared to listen

13      to that now.

14                    So the first one is 1275?

15                    MR. MILLER:  Correct, Your Honor.

16                    THE COURT:  Okay.

17                    MR. MILLER:  Your Honor, this is a cease and

18      desist letter that was sent actually to me by counsel

19      for Elements that related -- or that actually resulted

20      in the Elements versus Brandi lawsuit which Your Honor

21      has ruled, for the most part, as being excluded by

22      in limine motion.

23                    THE COURT:  Which in limine motion?  The

24      number?

25                    MR. MILLER:  The number on it.  It's -- it's
```

1  a defense in limine motion to exclude evidence and

2  testimony regarding the lawsuit between the defendants

3  in this action.

4          THE COURT:  Somebody on my staff may be able

5  to find it, if it's necessary for me to review it.

6          You may continue.

7          MR. MILLER:  Your Honor has -- the ruling

8  might just be as easy.  I can read to Your Honor.

9          THE COURT:  And you don't have to.

10          MR. MILLER:  Oh, okay.

11          THE COURT:  You believe that the ruling on

12  the motion in limine would preclude the use of this

13  exhibit?

14          MR. MILLER:  There's also no relevance to

15  this litigation.  But it's -- this is specifically

16  the -- the -- the threat which culminated in the lawsuit

17  against Ms. Brandi filed by Elements, which was the

18  subject matter of that motion.

19          THE COURT:  And is this the lawsuit that is

20  before I think it's Judge Pregerson?

21          MR. MILLER:  It is.

22          THE COURT:  Okay.  It's not this lawsuit?

23          MR. MILLER:  Correct.  And it was

24  specifically -- the cease and desist letter was actually

25  specifically mentioned in the motion in limine as one of

```
 1    the prejudicial exhibits that were entailed by the

 2    motion.

 3              THE COURT:  Okay.  What do the plaintiffs

 4    say about that?  Do you believe it was the subject of a

 5    motion in limine?  If so, are you able to identify which

 6    motion?  And do you think it covered the -- this cease

 7    and desist letter?

 8              MS. KIM:  We're getting the docket number

 9    information for Your Honor.  But in the interim, Your

10    Honor's order on that motion actually said that we could

11    use information from this lawsuit when it contained

12    admissions from the defendants or their agents, and that

13    we could also use this evidence from this lawsuit and/or

14    relating to this lawsuit for impeachment purposes.

15              THE COURT:  So I will reserve ruling on this

16    one because I'll need to actually see the order.  And I

17    may even need to see the motion just to determine the

18    scope of it.

19              So as to 1275, the Court is reserving

20    ruling.  If the Court reserves ruing on an exhibit, that

21    means it cannot be used until the Court has so

22    instructed.  So counsel should not use an exhibit that

23    the Court hasn't actually ruled upon.

24              MS. KIM:  So the docket number the motion

25    in limine was 468.  And Your Honor's order was docket
```

```
 1    No. 517.
 2                 THE COURT:  Okay.  I'll take a look at that
 3    later.  So let's go to the next one, 618-4-5.
 4                 MS. KIM:  I don't think there was an
 5    objection to that, Your Honor.
 6                 THE COURT:  No objection?
 7                 MR. MILLER:  No, Your Honor.
 8                 THE COURT:  Oh, okay.  That's deemed
 9    admitted.
10                 THE CLERK:  What was that exhibit number?
11                 THE COURT:  It's 618-4-5.  That's deemed
12    admitted.
13                 The next one I think that's being objected
14    to is 578?
15                 MR. MILLER:  Correct, Your Honor.
16                 THE COURT:  So counsel may state the
17    objection.
18                 MR. MILLER:  Your Honor, this is a 38, I
19    think it is, page confidential private offering
20    memorandum.  That was not prepared by Ms. Brandi, and I
21    think it's irrelevant.
22                 THE COURT:  Okay.  Does plaintiff's counsel
23    wish to be heard?
24                 MS. BIVENS:  Yes, Your Honor.  If you look
25    at the offering memo, for example, at page 3031.
```

```
 1                    THE COURT:  So you're going to put it on the
 2   screen for me so I can look at it?
 3                    MS. BIVENS:  Of course, yes, Your Honor.
 4                    If you look at the bottom, this document
 5   contains things like this where it says each bottle's in
 6   the shape of a skull about the packaging, admissions
 7   about the packing of the product, the marketing appeal.
 8                    THE COURT:  And could you tell me it is a
 9   private offering by Elements?
10                    MS. BIVENS:  Yes, it's a representation to
11   potential investors.
12                    THE COURT:  And so again, what is the
13   purpose for it, the exhibit, using it with Ms. Brandi?
14                    MS. BIVENS:  Representations that she made
15   about the bottle, the packaging, and how the packaging
16   will be marketed.
17                    THE COURT:  And what -- where is there in
18   the exhibit that would indicate that she made these
19   representations?
20                    MS. BIVENS:  There are email exchanges that
21   we have also indicating that she was a part of creating
22   this document.
23                    THE COURT:  I'm probably going to need to
24   see those.  What is the question that you would be
25   asking her about this exhibit?  So make a proffer.
```

1          MS. BIVENS:  I mean, at this time -- first

2     of all, these are party admissions.  And we would be

3     asking her about how this statement came to be, how

4     this -- these representations came to be, why they were

5     put there.

6          THE COURT:  All right.  Defense wish to

7     comment any further?

8          MR. MILLER:  Well, all we've heard is in the

9     offer of proof is a statement not necessarily

10    attributable to Ms. Brandi and that the -- about the

11    shape of the bottle.  But there's -- the best I have

12    seen, maybe five or six or so iterations of the shape of

13    the lines, three-dimensional bottle shapes already in

14    evidence in the courtroom.  I don't -- it has -- it

15    doesn't have any significant probative value.  But

16    instead we've got -- we've got a 38-page document

17    talking about finances and financial needs and all

18    these -- a whole bunch of stuff that we haven't heard

19    anything about.  And we're going to have a jury leaping

20    through that because they want to establish what the

21    shape of the -- it's going to be in evidence?  That

22    doesn't make -- I don't think there's enough probative

23    value there at all to overcome the -- the -- the time

24    waste and prejudice that's going to be involved in this

25    entire exhibit being entered into evidence.

1        MS. BIVENS:  Your Honor --

2        THE COURT:  So could counsel indicate how

3   many pages and which pages you are seeking to use.

4        MS. BIVENS:  At this time, we can go through

5   the document.  I cannot at this time identify exactly

6   what parts we can use -- we would like to use.  But if

7   the Court would like us to work with counsel to redact

8   the parts that they find objectionable, we are willing

9   to do that.

10        THE COURT:  Well, my concern is this is

11   Tuesday, and we won't have time.  I mean, we'll be

12   discussing -- counsel would be attempting to use this

13   exhibit on Tuesday.  There won't be any time to discuss.

14   So I'm fine with counsel meeting and hoping to agree,

15   but then if you don't agree, you would be wanting to use

16   this exhibit, and I still have an objection to the

17   exhibit.

18        What I'm inclined to do now is to rule on

19   the use of this exhibit just based upon the arguments

20   that have been made.  I will still permit counsel to

21   confer.  Once you are able to identify the part of the

22   exhibit that you want, if counsel agrees to that, you

23   could use it, because you have an agreement there too.

24        So for 578, I'm going to sustain the

25   objection.  I don't see the relevance either.

1   Plaintiff's counsel says they're admissions by a party,

2   but I would need to have you identify those admissions.

3        It's not clear to me that what Ms. Brandi's

4   association is with this exhibit.  So I sustain the

5   objection at this point.  I will permit counsel to raise

6   it again.  Instruct you to meet and confer and see if

7   you can agree as to which pages if any of this exhibit

8   can be used.  And if you come to some agreement, then

9   you will advise the Court.

10        Let's go to the next exhibit.  It's 773.

11        MR. MILLER:  Correct, Your Honor.

12        773 it is -- you have it in front of Your

13   Honor, is a -- some kind of an invoice from a Chinese

14   bottler.  That invoice it's dated after Ms. Brandi

15   wasn't responsible for the financial aspect of Elements.

16   The objection is that it is hearsay.  It's going not be

17   properly authenticated since she did not generate of pay

18   the bill.  But it's -- I'm not sure what the relevance

19   is of it, how much they paid for bottles and when.  And

20   -- and 403, more prejudicial than probative.

21        THE COURT:  Maybe counsel can advise what is

22   this exhibit?

23        MR. MILLER:  You're asking me, Your Honor?

24        THE COURT:  No.  Plaintiff's counsel, since

25   plaintiff wants to use it.  What is 77 -- 773?  Maybe

```
1    you could also address the relevance, how you would

2    authenticate it, if it's not a document that can be

3    authenticated through the witness, and those issues.

4              MS. BIVENS:  Your Honor, we're happy to also

5    provide the payment and the emails relating to this

6    document.  But a lot of the issues in this case relate

7    to timing, and this dates when Ms. Brandi was ordering

8    bottles.

9              She at the time when the offering memo was

10   created, at the time this invoice was created, was the

11   CEO of the company, the founder of the company.  And if

12   to be complete we need to also add as an exhibit the

13   documents surrounding this, we're happy to do that.

14             THE COURT:  Right.  I think you're going to

15   have to do that first before it can be used.  And the

16   Court would need to know how do you associate this

17   document with her.

18             So the first question I ask is what is the

19   document?  So the name that appears on the document,

20   it's an invoice.  There is a date on the document as

21   well.  Whose invoice is it?

22             MS. BIVENS:  Okay.  As of June 2010,

23   Ms. Brandi, like I said, was the CEO of Elements.  But

24   also Fenos, a company owned by Federico Cabo, or

25   affiliated with Federico Cabo, was helping her pay the
```

1    bills, it appears.  And so we will be questioning

2    Ms. Brandi about this interaction, the timing of

3    ordering the bottles, which is key to the timing of her

4    coming to market.

5              THE COURT:  Well, and certainly it may be

6    appropriate to ask her those questions about ordering

7    the bottles, if you think she had something to do with

8    ordering the bottles.  And depending upon her answer,

9    you may or may not use this exhibit.

10             But the Court, at this point, would sustain

11   the objection to the use of 773.  Counsel may meet and

12   confer.  You may provide the other parts to this.  That

13   may satisfy defense counsel.  But you're going to have

14   to show that since you are offering it through

15   Ms. Brandi, it's either her document, not her document.

16   But there needs to be some relationship.

17             So I sustained the objection to 773.

18             The next exhibit is Exhibit 520.

19   Exhibit 520, defense counsel has an objection to that.

20             MR. MILLER:  Correct, Your Honor.

21             520 is, I don't think there's any -- there

22   will be any foundation for this.  This is a document not

23   prepared by Ms. Brandi.  As I understand it, I think may

24   have been prepared long after the actual date that it

25   has on it.  And I'm -- it's unfortunate that I didn't

1    know she was going to be a witness Tuesday until we

2    finished today and she -- and I allowed Ms. Brandi to

3    leave.  I would ask her, but I'm almost certain that

4    this is a document that was not prepared by Ms. Brandi.

5    In fact, that she disputes the -- the authenticity and

6    accuracy of this document.

7            THE COURT:  Plaintiff's counsel can be heard

8    now or the Court will reserve ruling on it, and we can

9    discuss it at another time.  But you would not be able

10   to use it with Ms. Brandi until the Court has had an

11   opportunity to rule on it.  But you may want to put

12   something on the record now as to what it is, what you

13   think it represents, and why is Ms. Brandi the witness

14   with whom you would seek to admit this document.

15           MS. KIM:  Your Honor, this is a transaction

16   detail for the KAH Tequila account, as my colleague

17   previously represented to the Court.  Ms. Brandi was the

18   CEO of KAH Tequila of Elements at the time, and we

19   believe that this document shows a very distinct

20   timeline of all the events that happened with respect to

21   the development of the KAH bottle, which is one of the

22   primary issues in this case.

23           Ms. Brandi has previously testified in her

24   depositions and at the prior trial about certain dates.

25   We believe that this document refutes those dates.  And

1    Mr. Miller has actually said that the timing of KAH

2    Tequila vis-à-vis the timing of the development of

3    Crystal Head was a coincidence, despite the overlap.

4    And we believe that this is one those documents that

5    would refute that theory of defendant's case.

6              THE COURT:  So you will attempt to lay the

7    foundation for this document through Ms. Brandi?

8              MS. KIM:  Yes, we absolutely will.

9              THE COURT:  And so if you're not successful

10   in doing that, then of course you won't be able to use

11   the -- the document won't be admitted through --

12             MS. KIM:  Of course, Your Honor.

13             THE COURT:  You may need somebody else.

14             MS. KIM:  Of course, Your Honor.

15             THE COURT:  So the foundation will have to

16   be laid first.  And if counsel is able to do that, you

17   can't publish the document.  But the document could be

18   placed in front of Ms. Brandi, and if the foundation is

19   laid, then the Court would allow the exhibit to be used.

20             So not received yet.  Reserve ruling until

21   the foundation is laid.

22             Let's see, the next one --

23             MR. MILLER:  I believe that's it.

24             THE COURT:  I think that's it.

25             All right.  Anything else that you think

1   needs to be discussed?  Because it may come up on

2   Tuesday.  Yes?

3                MS. KIM:  The defendants actually have

4   exhibits that they've identified for us that they plan

5   to use during Ms. Brandi's testimony.

6                THE COURT:  All right.  Why don't I have

7   those exhibit numbers and then see if there's any

8   objection.  And if not, I'll deem them admitted.

9                MR. MILLER:  All right.

10               THE COURT:  So would counsel identify the

11   exhibits that you would use for Ms. Brandi.

12               MR. MILLER: Yes, Your Honor.

13               Exhibit 45.

14               THE COURT:  45.

15               Any objection?

16               MS. KIM:  No objection.

17               THE COURT:  Deemed admitted.

18               (EXHIBIT 45 ADMITTED)

19               MR. MILLER:  Exhibit 55.

20               MS. KIM:  Your Honor, all of these exhibits

21   are the bottles, the physical bottles.  They've --

22   they're already in evidence, and we have no objection to

23   the physical bottles of the KAH Tequila or Crystal Head.

24   So we can just move on, I think.

25               THE COURT:  Yes.  And so those were deemed

```
 1    admitted either last night or -- and they were actually

 2    used today.  Or today they were deemed admitted, so we

 3    don't need to address those again.

 4                 MR. MILLER:  I think that's 55 through 58.

 5                 MS. KIM:  Yes.

 6                 MR. MILLER:  164.

 7                 MS. KIM:  No objection.

 8                 THE COURT:  Okay.  Deemed admitted.

 9                 (EXHIBIT 164 ADMITTED)

10                 MR. MILLER:  167.

11                 MS. KIM:  No objection.

12                 THE COURT:  Deemed admitted.

13                 (Exhibit 167 ADMITTED)

14                 MR. MILLER:  168.

15                 MS. KIM:  No objection.

16                 MR. MILLER: 169.

17                 MS. KIM:  No objection.

18                 THE COURT:  Those are both deemed admitted,

19    168 and 169.

20                 (EXHIBITS 168 AND 169 ADMITTED)

21                 MR. MILLER:  493.

22                 MS. KIM:  Objection.

23                 MR. MILLER:  I tried to go in order.

24                 473.

25                 MS. KIM:  No objection.
```

```
1              THE COURT:  All right.  473 will be deemed

2   admitted.

3              (EXHIBIT 473 ADMITTED)

4              MR. MILLER:  474.

5              MS. KIM:  No objection.

6              THE COURT:  Deemed admitted.

7              (EXHIBIT 474 ADMITTED)

8              MR. MILLER:  475.

9              MS. KIM:  No objection.

10             THE COURT:  Deemed admitted.

11             (EXHIBIT 475 ADMITTED)

12             MR. MILLER:  499.

13             MS. KIM:  Objection.

14             MR. MILLER: 719.

15             MS. KIM:  No objection.

16             THE COURT:  Deemed admitted.

17             (EXHIBIT 719 ADMITTED)

18             MR. MILLER:  620.

19             MS. KIM:  No objection.

20             THE COURT:  Deemed admitted.

21             (EXHIBIT 620 ADMITTED).

22             MR. MILLER:  618.

23             MS. KIM:  No objection.

24             THE COURT:  Give me that number again.

25             MR. MILLER:  618.
```

```
 1              MS. KIM:  That's already been deemed

 2   admitted, Your Honor.  It's the magazine.

 3              THE COURT:  If it's in evidence then we

 4   don't need to discuss it.

 5              MR. MILLER:  574-A.

 6              MS. KIM:  No objection.

 7              THE COURT:  Deemed admitted.

 8              (EXHIBIT 574-A ADMITTED)

 9              MR. MILLER:  1008.

10              MS. KIM:  Objection.

11              MR. MILLER:  1009.

12              MS. KIM:  Objection.

13              MR. MILLER:  1129.

14              MS. KIM:  No objection.

15              THE COURT:  Deemed admitted.

16              (EXHIBIT 1129 ADMITTED)

17              MR. MILLER:  1115.

18              MS. KIM:  No objection.

19              THE COURT:  Deemed admitted.

20              (EXHIBIT 1115 ADMITTED)

21              MR. MILLER:  1130.

22              MS. KIM:  No objection.

23              THE COURT:  Deemed admitted.

24              (EXHIBIT 1130 ADMITTED)

25              THE COURT:  Any other exhibits to be offered
```

```
 1   by defense?
 2               MR. MILLER:  I think that's it for all
 3   defendants.
 4               THE COURT:  For all defendants, all defense
 5   counsel.
 6               Then let's go back and look at the ones to
 7   which there's an objection.  493 is the first one.
 8               MS. KIM:  Your Honor, we can actually handle
 9   our objection to to all four of these documents at once.
10               493 and 1008 are the trademark application
11   for the word marks KAH and Day of the Dead that were
12   filed by defendants.
13               499 and 1009 are the trademark certificates
14   that were issued for those same word marks.
15               THE COURT:  All right.  Do you think that
16   there was a motion in limine as to this and the Court
17   has ruled on it.  Or --
18               MS. KIM:  There hasn't been a motion
19   in limine with respect to these specific word marks.
20   However, Your Honor specifically ruled, I believe it was
21   yesterday in court, that plaintiff's trademarks for the
22   word marks Crystal Head were not relevant to this
23   action.  And that was based on defendant's objection.
24               Defendants have actually stated today that
25   they don't think work marks are relevant to this action
```

1    because this is an action about bottles and the shape of

2    bottles.

3            Accordingly, we don't know why these word

4    mark trademark registrations and/or applications are

5    relevant to this action.  However, we are willing to

6    withdraw this objection if defendants are willing to

7    withdraw their objection to our word mark trademark

8    registration, and we can work it that way.

9            THE COURT:  All right.  Anything further

10   from the defendants before the Court rules?

11           MR. MILLER:  Yes, Your Honor.  We're not

12   willing to make that trade.  These are premarked

13   exhibits timely and included in the pretrial order

14   for -- as one major contrast between what's being

15   offered by counsel and what we're asking to introduce.

16           These go to the timeline, Your Honor, in

17   Ms. Brandi Ms. Brandi's -- Ms. Brandi set this company

18   up and -- and did most of this on her own.  It creates

19   the very timeline that counsel wants to -- to help that

20   we all want to establish with the jury.  And it shows

21   when things happened, Ms. Brandi taking control.  It

22   shows her progression in the creation of a brand that

23   counsel's acting like wasn't created until the end the

24   2010.

25           THE COURT:  Well, certainly she'll be able

1    to testify to that.

2           MR. MILLER:  She can authenticate all of

3    these.  They were her actions.

4           THE COURT:  All right.  Anything further

5    from the plaintiffs?

6           MS. KIM:  Yes, Your Honor.

7           As Your Honor just pointed out, you know,

8    Ms. Brandi can testify to that.  You know, there's no

9    reason for these trademarks to come in.  We think that,

10    honestly, the same argument regarding the relevance of

11    these word mark trademarks, which is that it would

12    establish a timeline for Ms. Brandi, would be an

13    applicable argument for why our word mark trademark

14    should come in, which honestly our first word mark

15    trademark was in 2006.

16           I don't really understand defense counsel's

17    point regarding how she just started this company by

18    herself and why that's applicable here.

19           However, like I said, you know, Your Honor

20    ruled that word mark trademarks are not applicable to

21    this action that concerns the shape of bottles.

22           THE COURT:  All right.  The objection is

23    sustained to 493, 499, 1008 and 1009.

24           All right.  Any other discussions that we

25    need to have in order to be ready for Tuesday?

```
 1              MS. KIM:  I think everyone's going to hate
 2     me for raising this, because I think people want to go
 3     home.  But I do think there is --
 4              THE COURT:  Well, it's only 4:40 -- oh, no.
 5     It's 5:47.  Oh, getting close to 6 o'clock.  All right.
 6              MS. KIM:  But I do believe there is a
 7     pending motion in limine on a motion to compel the
 8     settlement documents from the iconic litigation.  And I
 9     didn't know if Your Honor had an order prepared or if
10     you wanted to discussion that.
11              THE COURT:  When would this come up, with
12     what witness?  Is it going to likely come up on Tuesday?
13              MS. KIM:  It might come up with Ms. Brandi,
14     Your Honor.
15              THE COURT:  Okay.  All right.  So I do have
16     some notes on this one.  So I think it's premature.
17              The defendants have represented that the
18     settlement agreement has not been finalized.  And so if
19     it's not a final settlement agreement, it's premature.
20              Also, if it -- it's case over which Judge
21     Pregerson is presiding.  So I think a motion would have
22     to be made before Judge Pregerson first asking that the
23     settlement agreement be disclosed, if it's not already a
24     public document.  If he permits it to be disclosed, then
25     we have the question of whether this Court would find it
```

1    to be relevant.

2              So that's my position at this point that

3    it's premature.  But maybe there's something that I

4    don't know.  So let me hear.

5              MR. VERA:  Thank you, Your Honor.  Briefly.

6    It's my understanding that in that action there was a

7    protective order, and the parties went to the length of

8    having Globefill be a party to that.

9              What we would suggest, if Your Honor is

10   uneasy with production, for there to be an in camera

11   inspection of that, because we feel like we are simply

12   unable to properly impeach a party about her

13   credibility, given that we don't have the contents to

14   that.

15             And they've admitted in their opposition,

16   Your Honor, that the document exists, but one of either

17   five or six parties hasn't signed.  So if the relevant

18   parties have signed, if Ms. Brandi and Elements have

19   signed, then as to those parties there's an operative

20   agreement that provides for particular provisions.  We

21   don't know what those are.  We don't see any problem

22   with an in camera inspection of those.  And maybe that

23   would give some more guidance to Your Honor at that

24   time.

25             THE COURT:  Well, I'm surprised that you

```
 1    even want to use something that you haven't seen.  But I
 2    think you have to go to Judge Pregerson first.
 3           So if it is a document that's either under
 4    seal or confidential in some way, in other words, it's
 5    not public yet, not finalized yet, then I think the
 6    first motion would be before Judge Pregerson.  If he
 7    allows the parties to have the document so that you can
 8    review it and decide if it's relevant here, then this
 9    Court could rule on the relevance and I would be happy
10    to review it in camera.
11           But I still think it's premature at this
12    point.  So I won't be ruling on it today, and it can be
13    raised again.
14           MR. VERA:  Thank you, Your Honor.
15           MS. KIM:  Your Honor, just one point of
16    clarification on Exhibits 578 and 773.  I know that Your
17    Honor sustained defendant's objection on those exhibits
18    for Ms. Brandi, but, you know, you also instructed us to
19    meet and confer and maybe exchange documents, additional
20    backup documents we may have to show that, you know, Ms.
21    Brandi received and/or participated in the drafting of
22    these documents and had some background.
23           I just wanted to make sure that, you know,
24    if we can't make an agreement, it's something we can
25    raise if we decide to use these exhibits during our
```

1    direct of Ms. Brandi on Tuesday.

2              THE COURT:  Well, I think meet and confer

3    first.  But if you are -- if you can't reach an

4    agreement then the Court's ruling probably stands.  But

5    certainly you can raise it with the Court that you've

6    met and conferred and you have something further that

7    you wish to place on the record in support of the

8    documents.

9              MS. KIM:  Yeah, I think the only thing we'd

10   have further would be the additional documents that show

11   that Ms. Brandi had knowledge of these documents.

12             THE COURT:  All right.  So I think that a

13   meet and confer.  Disclose to counsel these additional

14   documents.  They may change their position on it.  And

15   if they do, then you will raise that with the Court.

16             And if they don't, if you wish to address it

17   further then I would let you address it.  But you can't

18   use them until the Court rules.

19             MS. KIM:  Will do, Your Honor.  Thank you.

20             THE COURT:  All right.  Anything further?

21             MR. FAY:  I don't think so, Your Honor.

22             THE COURT:  Time to go?  Yes?

23             I'm sorry.  So one of the law clerks who

24   isn't here, and this is important, so I'll ask you just

25   to be seated for a moment.  This will be quick.

1           So there is a deposition that's been offered

2    with objections thereto.  The subject came up earlier

3    today.  Both sides have designated parts of the

4    deposition, and I don't know if both sides are

5    objecting.  But just from experience in the past, what

6    would be most helpful to the Court is if the parties

7    provided the Court with a proposed order in Microsoft

8    Word format identifying the testimony that you want to

9    use; who is offering the testimony, whether it's

10   plaintiff or defendant; the objection thereto, and a

11   blank column for the Court's ruling.

12           So it's just to make it easier so when I get

13   ready to rule on it I have everything in one place and

14   then I can rule.

15           So if you could provide that to the Court.

16   I think neither side believes this will come up on

17   Tuesday, so we have time to do it.  But you can start

18   working on it now.

19           So is it clear?  Or do you want me to repeat

20   as to what I'm looking for?

21           MR. FAY:  I think it's clear, Your Honor.

22           THE COURT:  Okay.

23           MR. HUMMEL:  Seems reasonably clear to me.

24   Hopefully, we'll be able to work those objections out.

25           THE COURT:  All right.  Hopefully, if not

1    then if you use that format it's just easier for all of

2    us.

3              All right.  I think there's nothing -- yes?

4

5              MR. MILLER:  I had mentioned to the Court

6    that I have a problem a week from Friday, the 24th.  I

7    still have that conflict.  The -- the -- what I would

8    ask maybe, with some indulgence from counsel here, is

9    certainly I need to be here for Kim Brandi's testimony,

10   but it looks like we'll have that done for certain

11   before Friday.  I'm not too optimistic we'll be closing

12   on Friday.  Those are two things that I think honestly

13   through reasons if nothing else to brag to my kids, I'd

14   like to be here when Mr. Aykroyd testifies.

15             If Friday were made of say of Gilberto

16   Sanchez's testimony and the experts -- which it may well

17   be -- I wouldn't need to ask for the Court to be dark.

18   I just hate to have us lose momentum.  And I can send

19   somebody else, as long as not something that's crucial

20   to my involvement in the case.  And really, those are

21   the only three things I consider crucial at this point.

22             THE COURT:  Okay.  It's not likely that

23   we're going to be dark on Friday.  So it may be that

24   you've put me on notice that you have a conflict.  So I

25   don't know how you want to resolve that.

```
 1              So I think that you would see if you can

 2    resolve it either with the other court, or someone else

 3    could be here for you.  But if it's important that you

 4    be here for whatever is happening on Friday, the 24th, I

 5    do not plan to be dark that day.

 6              MR. MILLER:  Thank you, Your Honor.

 7              THE COURT:  All right.  Anything else?

 8              MS. KIM:  No, Your Honor.

 9              THE COURT:  Okay. We're in recess now.  So

10    I'll see you tomorrow morning.

11              MS. KIM:  Thank you, Your Honor.

12              MR. FAY:  Thank you, Your Honor.

13              THE CLERK:  Please rise.  This Court is in

14    recess.

15              (PROCEEDINGS ADJOURNED.)

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2

 3

 4                  CERTIFICATE OF REPORTER

 5

 6   COUNTY OF LOS ANGELES       )

 7                               )  SS.

 8   STATE OF CALIFORNIA         )

 9

10   I, SHERI S. KLEEGER, OFFICIAL COURT REPORTER, IN AND FOR

11   THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

12   DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

13   TO SECTION 753, TITLE 28, UNITED STATES CODE, THE

14   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

15   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

16   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE

17   FORMAT IS IN CONFORMANCE WITH THE REGULATIONS OF THE

18   JUDICIAL CONFERENCE OF THE UNITED STATES.

19

20

21   DATE: MARCH 16, 2017

22

23   _____

24   SHERI S. KLEEGER, CSR

25   FEDERAL OFFICIAL COURT REPORTER
```



## $

**$50** [4] - 160:4, 166:12, 166:13, 186:5

## '

**'70s** [3] - 75:8, 75:17, 120:1
**'78** [2] - 75:5
**'79** [5] - 75:5, 75:14, 77:18, 77:19
**'80** [1] - 75:14

## 1

**1** [2] - 64:14, 69:21
**10** [4] - 69:21, 164:25, 216:17, 226:16
**10-2034** [1] - 1:8
**10-2034-CBM** [2] - 5:6, 20:4
**100** [2] - 81:4, 163:8
**100,000** [1] - 185:5
**10019** [1] - 2:14
**1008** [3] - 290:9, 291:10, 293:23
**1009** [3] - 290:11, 291:13, 293:23
**10340** [1] - 1:21
**10:00** [1] - 188:22
**11-by-14** [1] - 127:4
**1100s** [1] - 244:16
**1115** [2] - 290:17, 290:20
**1129** [2] - 290:13, 290:16
**1130** [2] - 290:21, 290:24
**1140** [4] - 244:17, 244:18, 244:21, 245:1
**1141** [2] - 245:3, 245:10
**1142** [4] - 245:11, 245:16, 260:14, 260:15
**1143** [1] - 256:9
**1144** [2] - 256:11, 256:23
**1145** [2] - 256:11, 256:23
**1146** [2] - 256:11, 256:23
**1147** [2] - 256:11, 256:23
**1148** [2] - 256:12, 256:23

**115** [5] - 222:12, 222:13, 222:23, 223:12
**1151** [2] - 256:12, 256:24
**1152** [2] - 256:12, 256:24
**1155** [2] - 256:12, 256:24
**118** [1] - 191:19
**12** [1] - 256:15
**12,000** [1] - 165:1
**120** [1] - 191:19
**124** [8] - 112:11, 112:12, 112:13, 113:8, 113:16, 126:14, 126:17, 127:13
**1244** [2] - 241:16, 245:17
**1246** [4] - 252:4, 252:5, 252:10, 252:18
**125** [3] - 273:4, 275:14, 277:19
**1281** [11] - 252:12, 252:13, 252:14, 252:17, 253:8, 253:11, 253:20, 254:7, 256:13, 256:17, 256:24
**1281-1** [2] - 253:18, 254:13
**1281-16** [2] - 253:18, 254:13
**1283** [3] - 252:19, 252:20, 252:24
**13** [12] - 43:20, 44:1, 44:16, 44:19, 144:2, 144:11, 226:19, 226:23, 226:24, 226:25, 227:14, 227:23
**14** [2] - 25:11, 127:4
**15** [11] - 1:16, 5:1, 23:8, 23:11, 67:14, 67:21, 154:9, 161:25, 240:10, 240:18, 258:14
**15-MINUTE** [1] - 67:22
**16** [2] - 161:25, 301:21
**164** [2] - 288:6, 288:9
**167** [2] - 288:10, 288:13
**168** [3] - 288:14, 288:19, 288:20
**169** [3] - 288:16, 288:19, 288:20
**17** [4] - 156:20,

167:4, 248:10, 256:15
**174** [1] - 113:8
**18** [2] - 193:1, 256:15
**1875** [1] - 2:9
**18th** [1] - 234:11
**19** [2] - 73:13, 75:14
**1971** [1] - 72:8
**1977** [1] - 78:12
**1979** [2] - 72:9, 75:4
**1980** [2] - 75:13, 77:17
**1995** [1] - 161:24
**19th** [1] - 138:23
**1:00** [3] - 154:12, 154:14, 154:16

## 2

**2** [7] - 187:16, 212:24, 214:25, 256:15, 264:18, 264:19, 270:18
**20** [10] - 13:14, 13:18, 23:12, 35:13, 40:20, 78:5, 133:13, 133:14, 172:1, 172:2
**200** [1] - 184:5
**2005** [2] - 24:8, 25:4
**2006** [6] - 24:8, 25:5, 39:3, 105:7, 230:5, 293:15
**2007** [11] - 157:9, 157:11, 157:23, 158:7, 158:19, 167:16, 169:13, 173:4, 173:19, 174:1, 182:10
**2008** [17] - 24:4, 26:18, 27:14, 29:24, 162:8, 163:9, 182:23, 182:24, 182:25, 183:3, 183:5, 183:7, 183:13, 184:20, 199:24, 200:9
**2009** [7] - 27:23, 190:22, 191:16, 228:5, 232:7, 232:16, 248:7
**2010** [16] - 26:24, 27:14, 30:11, 34:20, 103:7, 204:20, 204:22, 205:9, 205:20, 206:10, 228:4, 231:11, 232:21, 234:4, 283:22, 292:24
**2011** [2] - 236:2, 236:6
**2012** [1] - 236:2

**2013** [3] - 222:15, 223:19, 247:3
**2016** [2] - 6:20, 248:10
**2017** [3] - 1:16, 5:1, 301:21
**21** [1] - 172:1
**213)894-6604** [1] - 1:23
**22** [1] - 177:3
**22nd** [1] - 234:15
**23** [1] - 183:13
**23RD** [1] - 2:10
**24** [8] - 11:3, 11:8, 14:4, 14:10, 14:16, 222:24, 223:14, 234:4
**24-hours'** [1] - 13:22, 14:8
**24th** [2] - 299:6, 300:4
**25** [3] - 87:9, 151:20, 191:17
**25th** [2] - 222:15, 223:19
**26** [2] - 16:13, 191:17
**28** [1] - 301:13
**29th** [2] - 187:3, 187:17
**2nd** [1] - 191:11

## 3

**3** [2] - 29:15, 200:12
**3,000** [2] - 193:1, 193:3
**30** [4] - 87:10, 154:10, 242:5, 264:2
**30,000** [2] - 182:22, 187:9
**300** [1] - 214:25
**3031** [1] - 278:25
**30th** [1] - 187:3
**312** [1] - 1:22
**32** [3] - 179:10, 181:2, 190:21
**32-bottle** [1] - 179:11
**33** [1] - 234:2
**35** [2] - 28:10
**352** [2] - 274:5, 274:8
**3704** [1] - 2:6
**38** [1] - 278:18
**38-page** [1] - 280:16
**3D** [1] - 93:21

## 4

**4** [2] - 196:18, 256:15
**4,000** [1] - 200:12

**40** [2] - 178:20, 180:4
**402** [1] - 1:22
**403** [2] - 246:1, 282:20
**42** [1] - 256:15
**42,000-case** [2] - 191:12, 191:13
**45** [18] - 92:17, 92:24, 92:25, 145:1, 145:4, 145:6, 145:12, 145:20, 174:17, 174:18, 174:19, 214:1, 258:14, 270:14, 270:18, 287:13, 287:14, 287:18
**46** [1] - 145:4
**463** [2] - 274:9, 274:12
**468** [1] - 277:25
**473** [3] - 288:24, 289:1, 289:3
**474** [2] - 289:4, 289:7
**475** [2] - 289:8, 289:11
**493** [4] - 288:21, 291:7, 291:10, 293:23
**499** [3] - 289:12, 291:13, 293:23
**4:40** [1] - 294:4

## 5

**5,000** [6] - 26:19, 26:21, 106:6, 187:9, 187:19, 196:19
**50** [4] - 164:12, 167:7, 186:5, 187:24
**51** [1] - 164:8
**517** [1] - 278:1
**520** [5] - 274:21, 274:24, 284:18, 284:19, 284:21
**544** [2] - 274:25, 275:3
**55** [9] - 145:1, 145:4, 145:6, 145:9, 145:11, 145:13, 145:20, 287:19, 288:4
**553** [2] - 274:13, 274:16
**56** [7] - 98:13, 137:24, 138:1, 145:1, 145:13, 145:20, 248:17
**562** [2] - 274:17, 274:20
**57** [7] - 98:13, 137:24, 138:2, 145:1,

145:4, 145:14, 145:20
**574** [2] - 272:17, 272:20
**574-A** [4] - 272:21, 272:24, 290:5, 290:8
**575** [2] - 272:25, 273:3
**578** [4] - 273:22, 278:14, 281:24, 296:16
**579** [2] - 273:24, 274:2
**58** [11] - 98:12, 103:21, 104:1, 104:4, 131:9, 145:1, 145:4, 145:15, 145:18, 145:20, 288:4
**593** [4] - 243:21, 244:8, 275:4, 275:7
**5:47** [1] - 294:5

## 6

**6** [2] - 256:15, 294:5
**60** [1] - 171:22
**615** [2] - 272:5, 272:8
**616** [3] - 271:10, 271:16, 271:21
**616-2** [3] - 271:10, 271:16, 271:21
**616-62** [2] - 271:17, 271:21
**6166-62** [1] - 271:11
**617** [2] - 272:13, 272:16
**618** [7] - 206:24, 244:10, 244:14, 273:9, 273:12, 289:22, 289:25
**618-28-30** [2] - 273:18, 273:21
**618-4-5** [4] - 273:13, 273:17, 278:3, 278:11
**620** [4] - 272:9, 272:12, 289:18, 289:21
**65** [4] - 191:17, 195:21, 196:8, 196:23
**66** [1] - 191:17
**68** [1] - 73:11

## 7

**7** [2] - 222:23, 223:13
**70** [2] - 118:16, 140:12
**700** [7] - 145:22, 145:24, 197:13, 201:4, 233:13, 235:8

**71** [1] - 150:18
**719** [2] - 289:14, 289:17
**75** [1] - 110:17
**750** [2] - 84:25, 87:6
**753** [1] - 301:13
**76** [1] - 150:19
**764** [3] - 269:4, 269:5, 269:9
**765** [3] - 269:4, 269:5, 269:9
**77** [1] - 282:25
**77002-9550** [1] - 2:7
**772** [10] - 98:12, 98:20, 98:23, 99:2, 99:4, 145:23, 145:24, 145:25, 146:2, 146:17
**773** [7] - 274:3, 282:10, 282:12, 282:25, 284:11, 284:17, 296:16
**7938** [1] - 127:23
**7:30** [1] - 188:18
**7th** [1] - 35:19

## 8

**8** [5] - 64:16, 200:22, 239:12, 239:23, 240:8
**8-by-12s** [1] - 127:3
**80** [1] - 179:20
**82-7** [3] - 242:25, 243:1, 243:18
**825** [1] - 2:13
**8th** [1] - 187:17

## 9

**90** [1] - 179:20
**900** [1] - 200:22
**90012** [1] - 1:23
**90067-2561** [1] - 2:10
**95** [2] - 171:19, 173:24
**98** [2] - 48:12, 179:24
**9:30** [1] - 188:21

## A

A-L-E-X-A-N-D-E-R [1] - 69:6
**A.M** [2] - 1:16, 5:2
**aback** [1] - 132:10
**ABC** [1] - 108:21
**ability** [4] - 54:19, 167:12, 176:11, 211:7
**able** [26] - 14:1, 22:1, 28:2, 47:12, 63:16,

105:18, 112:14, 112:15, 138:6, 175:20, 191:6, 194:11, 203:2, 222:8, 222:9, 238:7, 240:13, 267:21, 276:4, 277:5, 281:21, 285:9, 286:10, 286:16, 292:25, 298:24
**ABOVE** [1] - 301:16
**ABOVE-ENTITLED** [1] - 301:16
**absolutely** [12] - 25:25, 36:20, 41:14, 48:2, 105:23, 153:2, 163:1, 165:23, 261:23, 262:2, 269:3, 286:8
**abstract** - 89:18, 122:6
**academic** [1] - 70:19
**academician** [1] - 70:15
**accept** [4] - 50:22, 55:21, 103:7, 139:5
**acceptable** [2] - 169:15, 268:2
**access** [3] - 88:21, 192:14, 192:22
**accesses** [1] - 171:9
**accident** [1] - 33:20
**accommodate** [1] - 12:4
**accomodation** [1] - 86:10
**accompanied** [1] - 20:10
**accomplish** [2] - 150:6, 175:20
**accomplished** [1] - 238:15
**accordance** [1] - 270:2
**accordingly** [1] - 292:3
**account** [3] - 54:18, 59:18, 285:16
**accounts** [5] - 57:15, 59:15, 184:7, 197:11, 200:12
**accuracy** [2] - 58:19, 285:6
**accurate** [4] - 122:18, 123:15, 132:15, 136:10
**accustomed** [1] - 21:2
**achieved** [1] - 37:18
**acquired** [3] - 24:18, 78:13, 127:10

**acronym** [1] - 194:15
**acting** [1] - 292:23
**action** [9] - 156:3, 205:5, 276:3, 291:23, 291:25, 292:1, 292:5, 293:21, 295:6
**actions** [3] - 203:23, 204:2, 293:3
**activations** [1] - 177:22
**active** [4] - 151:21, 152:1, 198:14, 198:16
**actor** [1] - 24:12
**actual** [10] - 18:18, 144:21, 158:2, 178:3, 179:2, 198:2, 198:17, 206:17, 251:12, 284:24
**ad** [7] - 31:3, 31:15, 186:14, 193:7, 193:9, 193:10, 215:9
**add** [12] - 6:20, 47:20, 136:13, 168:6, 168:17, 168:20, 168:23, 170:15, 171:8, 220:10, 237:11, 283:12
**added** [6] - 7:22, 168:13, 171:12, 179:3, 179:4, 266:9
**adding** [2] - 7:10, 172:4
**addition** [2] - 52:1, 115:12
**additional** [9] - 8:5, 22:17, 85:9, 154:4, 207:24, 267:13, 296:19, 297:10, 297:13
**additive** [1] - 169:15
**additives** [6] - 168:5, 168:13, 169:11, 170:3, 170:9, 172:6
**address** [6] - 12:18, 205:5, 283:1, 288:3, 297:16, 297:17
**addressed** [2] - 11:2, 37:9
**addressing** [5] - 21:16, 29:3, 36:15, 64:11
**adequate** [1] - 161:17
**ADJOURNED** [1] - 300:15
**adjust** [2] - 21:10, 239:2
**administer** [2] - 68:3, 155:2
**admirer** [1] - 98:7

**admissions** [5] - 277:12, 279:6, 280:2, 282:1, 282:2
**admit** [1] - 285:14
**ADMITTED** [38] - 243:18, 244:8, 244:14, 245:1, 245:10, 245:16, 252:10, 252:17, 252:24, 256:24, 269:9, 271:21, 272:8, 272:12, 272:16, 272:20, 273:12, 273:17, 273:21, 274:2, 274:8, 274:12, 274:20, 274:24, 275:3, 275:7, 287:18, 288:9, 288:13, 288:20, 289:3, 289:7, 289:11, 289:17, 290:8, 290:16, 290:20, 290:24
**admitted** [69] - 18:2, 18:8, 50:20, 53:3, 68:13, 92:20, 92:22, 112:11, 243:6, 243:14, 244:3, 244:4, 244:5, 244:6, 244:11, 244:12, 244:19, 244:25, 245:9, 245:15, 247:2, 252:9, 252:16, 252:23, 254:11, 255:9, 256:3, 256:18, 256:22, 263:20, 269:8, 271:19, 272:7, 272:11, 272:15, 272:19, 272:23, 273:2, 273:11, 273:20, 274:1, 274:7, 274:11, 274:15, 274:19, 274:23, 275:2, 275:6, 278:9, 278:12, 286:11, 287:8, 287:17, 288:1, 288:2, 288:8, 288:12, 288:18, 289:2, 289:6, 289:10, 289:16, 289:20, 290:2, 290:7, 290:15, 290:19, 290:23, 295:15
**ADMITTED)** [4] - 272:24, 273:3, 274:16, 289:21
**admonished** [2] - 103:11, 202:22
**admonitions** [1] - 239:13
**ads** [6] - 167:7, 195:13, 214:22,

215:6, 215:10, 215:14
**adult** [2] - 98:9, 135:20
**advance** [4] - 13:5, 15:1, 47:21, 195:25
**advertise** [2] - 195:5, 237:9
**advertisement** [1] - 207:4, 207:6
**advertising** [3] - 104:14, 104:17, 214:15
**advice** [1] - 91:10
**advise** [7] - 8:13, 88:22, 128:22, 223:1, 265:10, 282:9, 282:21
**advised** [2] - 26:6, 265:11
**advocate** [1] - 62:4
**aesthetically** [2] - 90:20, 90:22
**affiliate** [1] - 249:8
**affiliated** [2] - 250:24, 283:25
**afford** [1] - 150:23
**afforded** [1] - 71:10
**afternoon** [7] - 80:1, 123:22, 148:18, 155:18, 214:8, 214:9, 235:18
**afternoons** [1] - 79:25
**agave** [3] - 39:9, 44:25, 216:3
**age** [3] - 136:15, 150:16, 152:1
**aged** [1] - 150:19
**agents** [1] - 277:12
**aggressively** [1] - 199:9
**ago** [12] - 13:14, 13:18, 44:1, 85:1, 89:4, 96:22, 197:17, 214:11, 214:13, 248:10, 248:12, 248:20
**agree** [12] - 29:12, 49:22, 162:22, 165:16, 254:15, 266:22, 267:17, 267:19, 281:14, 281:15, 282:7
**agreed** [5] - 14:5, 50:21, 241:15, 254:13, 254:25
**agreeing** [1] - 11:3
**agreement** [10] - 14:4, 267:2, 281:23, 282:8, 294:18, 294:19, 294:23,

295:20, 296:24, 297:4
**agrees** [1] - 281:22
**ahead** [3] - 107:20, 199:7, 232:19
**aid** [2] - 29:1, 86:1
**airport** [2] - 188:8, 209:7
**aisle** [1] - 45:15
**al** [2] - 5:8, 20:6
**alcohol** [17] - 24:2, 30:7, 47:5, 82:22, 110:2, 111:16, 128:18, 140:10, 143:21, 152:15, 152:17, 160:15, 171:11, 171:19, 188:9
**alcoholic** [13] - 23:21, 24:24, 27:5, 37:1, 80:12, 80:13, 136:3, 157:1, 201:21, 215:15, 219:7, 228:11, 234:1
**alert** [1] - 264:24
**ALEXANDER** [1] - 68:25
**Alexander** [27] - 20:11, 23:25, 42:2, 67:25, 69:5, 69:12, 69:14, 73:9, 74:18, 74:19, 77:17, 85:4, 92:17, 93:2, 99:4, 103:21, 107:13, 112:10, 119:11, 119:20, 119:25, 129:4, 138:4, 146:16, 149:25, 225:16, 226:8
**Alexander's** [1] - 44:5
**aliens** [1] - 43:25
**alike** [1] - 102:10
**alleged** [1] - 224:5
**allegedly** [4] - 44:11, 224:17, 228:15, 235:3
**alligator** [1] - 72:21
**allow** [4] - 16:25, 17:10, 262:4, 286:19
**allowed** [9] - 61:22, 73:6, 73:7, 73:16, 160:21, 164:14, 209:17, 212:10, 285:2
**allowing** [1] - 92:9
**allows** [3] - 169:3, 172:24, 296:7
**alluded** [1] - 246:25
**almost** [12] - 47:8, 91:11, 101:20, 102:7, 102:12, 102:15, 171:8, 195:19, 215:4, 225:14, 270:19, 285:3
**alone** [1] - 108:17

**alterations** [1] - 42:1
**alters** [1] - 97:4
**altogether** [1] - 122:20
**Amagansett** [4] - 135:16, 135:17, 151:9, 151:11
**amazing** [2] - 48:25, 76:12
**ambassadors** [4] - 166:1, 166:4, 197:10, 200:4
**ambulance** [1] - 152:5
**AMC** [1] - 197:7
**amend** [1] - 6:20
**Amendment** [1] - 35:20
**amendment** [1] - 7:8
**America** [5] - 118:18, 159:12, 169:24, 181:10, 187:9
**AMERICA** [1] - 1:1
**American** [2] - 38:16, 79:6
**amount** [4] - 7:14, 242:1, 242:4, 258:2
**amounts** [1] - 73:19
**Anaheim** [6] - 183:13, 185:10, 185:21, 185:25, 186:22, 190:13
**analysis** [2] - 159:16, 167:22
**anatomical** [1] - 49:1
**anatomically** [3] - 46:21, 91:24, 92:2
**ancient** [5] - 39:15, 41:19, 96:4, 227:8
**AND** [4] - 288:20, 301:10, 301:14, 301:16
**and..** [1] - 218:21
**Anderson** [1] - 38:14
**Andrew** [1] - 115:22
**ANDROPHY** [1] - 2:4
**Anejo** [10] - 98:13, 131:9, 145:14, 248:16, 248:18, 251:16
**Angeles** [6] - 24:19, 77:12, 78:3, 78:7, 78:20, 78:21
**ANGELES** [5] - 1:17, 1:23, 2:10, 5:1, 301:6
**angle** [12] - 90:23, 91:23, 111:16, 111:23, 112:5, 130:6, 130:7, 130:13, 130:14, 131:1, 131:4,

168:3
**angles** [1] - 130:16, 130:20
**animals** [1] - 120:20
**animated** [1] - 80:9
**announce** [1] - 17:5
**answer** [30] - 10:11, 26:13, 54:7, 61:18, 62:11, 62:14, 62:19, 62:23, 63:5, 63:15, 63:17, 103:11, 106:19, 112:16, 116:9, 117:8, 117:9, 128:24, 130:19, 141:8, 141:24, 142:18, 202:4, 202:21, 203:2, 203:18, 230:17, 230:24, 265:21, 284:8
**answered** [8] - 8:18, 54:2, 54:3, 63:3, 63:24, 192:19, 196:4, 203:17
**answers** [2] - 64:4, 203:10
**anticipate** [2] - 251:4, 268:21
**antiquity** [1] - 96:2
**anxious** [1] - 22:2
**anyway** [1] - 270:21
**anyways** [1] - 195:16
**apart** [1] - 101:3
**apologize** [2] - 105:9, 146:1
**appeal** [1] - 279:7
**appealing** [7] - 83:8, 83:24, 89:6, 91:7, 91:20, 121:13, 144:17
**appear** [3] - 32:7, 34:22, 217:16
**appearance** [1] - 133:6
**appearances** [2] - 5:9, 20:7
**APPEARANCES** [1] - 2:3
**appeared** [4] - 11:2, 95:1, 96:6, 196:16
**applicable** [3] - 293:13, 293:18, 293:20
**application** [4] - 6:18, 6:21, 56:21, 291:10
**applications** [1] - 292:4
**applied** [3] - 230:8, 230:9, 235:2
**applies** [4] - 56:10, 56:24, 57:1, 59:22

**apply** [3] - 49:20, 50:16, 239:18
**appreciate** [3] - 85:13, 154:2, 267:19
**approach** [5] - 118:21, 118:24, 126:15, 162:5, 223:11
**approached** [2] - 57:8, 162:7
**appropriate** [3] - 23:9, 267:14, 284:6
**appropriately** [1] - 166:25
**approve** [1] - 174:4
**approved** [1] - 262:13
**approximate** [1] - 127:1
**April** [5] - 79:9, 79:10, 182:21, 222:15, 223:19
**April-May** [1] - 182:21
**arbitrary** [1] - 87:24
**ARE** [1] - 256:24
**area** [6] - 78:18, 82:8, 152:8, 189:6, 199:10, 218:2
**areas** [6] - 52:11, 203:3, 217:20, 217:23, 217:24, 218:9
**argue** [3] - 62:1, 250:25, 251:5
**arguing** [1] - 212:11
**argument** [5] - 6:25, 246:24, 247:1, 293:10, 293:13
**arguments** [7] - 7:1, 49:10, 51:6, 51:12, 60:19, 66:25, 281:19
**Arizona** [1] - 109:18
**arose** [2] - 84:9, 90:4
**arrange** [1] - 161:1
**arrive** [2] - 84:5, 85:1
**arriving** [3] - 82:25, 83:18, 84:16
**art** [54] - 41:3, 47:10, 47:11, 47:12, 47:15, 47:16, 48:25, 70:8, 70:15, 70:22, 71:5, 73:5, 73:15, 77:23, 77:25, 78:2, 78:14, 83:11, 91:2, 92:3, 96:2, 96:3, 98:8, 116:21, 121:25, 124:24, 135:19, 138:11, 138:15, 138:16, 138:17, 138:19, 138:21, 138:23, 138:24,

139:7, 139:8, 139:10, 139:12, 139:15, 139:18, 139:22, 140:1, 140:7, 141:2, 141:6, 141:13, 141:18, 142:23, 147:3, 151:5
**ART** [1] - 138:21
**Art** [5] - 24:19, 78:18, 78:20, 78:21, 79:6
**Arthur** [1] - 71:3
**articles** [3] - 159:13, 192:3, 193:2
**articulate** [1] - 105:18
**artist** [17] - 24:17, 26:1, 26:2, 42:23, 91:9, 93:9, 97:8, 97:14, 136:13, 139:2, 139:12, 140:8, 140:14, 140:15, 141:12, 176:5, 246:6
**artist's** [1] - 42:22
**artistic** [2] - 96:8, 140:13
**artistically** [1] - 83:9
**artists** [1] - 40:22
**arts** [4] - 70:7, 71:17, 71:21, 138:13
**Asia** [1] - 162:2
**aside** [1] - 225:2
**aspect** [1] - 282:15
**aspects** [1] - 129:10
**assembly** [4] - 111:11, 111:13, 180:6, 180:16
**assist** [4] - 7:11, 61:3, 164:18, 165:21
**associate** [1] - 283:16
**associated** [5] - 39:22, 43:15, 138:21, 249:2
**associates** [1] - 119:8
**association** [1] - 282:4
**assume** [3] - 221:22, 243:8, 263:8
**assumed** [1] - 262:20
**assuming** [5] - 220:1, 221:19, 221:20, 248:24, 249:3
**assured** [1] - 95:16
**AT** [2] - 2:5, 2:6
**attached** [1] - 104:11
**attacking** [1] - 168:3
**attempt** [11] - 31:21, 31:22, 32:1, 32:4,

32:5, 32:7, 121:8, 121:15, 124:19, 262:12, 286:6
**attempting** [1] - 281:12
**attend** [3] - 61:6, 69:18, 153:20
**attended** [1] - 206:14
**attention** [12] - 52:23, 59:25, 60:25, 64:17, 139:8, 165:3, 169:1, 263:6, 264:7, 265:9, 266:16
**attorney** [2] - 7:14, 7:15
**ATTORNEY** [2] - 2:5, 2:6
**attorney's** [1] - 65:10
**attorneys** [7] - 51:9, 51:18, 52:12, 62:8, 64:23, 67:1, 212:14
**attracted** [1] - 75:23
**attractive** [1] - 138:20
**attributable** [1] - 280:10
**attributing** [1] - 249:3
**audience** [1] - 121:14
**authenticate** [2] - 283:2, 293:2
**authenticated** [2] - 282:17, 283:3
**authenticity** [1] - 285:5
**autographs** [2] - 108:7, 109:15
**automatic** [1] - 177:2
**available** [6] - 60:5, 63:15, 67:17, 206:11, 223:6, 271:5
**AVENUE** [1] - 2:13
**average** [3] - 164:25, 179:15, 229:13
**avid** [2] - 73:16, 73:21
**avoid** [5] - 65:6, 65:24, 82:15, 82:17, 118:24
**aware** [7] - 96:17, 98:8, 157:8, 166:5, 204:16, 211:25, 266:4
**awkward** [1] - 131:22
**Aykroyd** [20] - 20:12, 23:25, 34:14, 38:13, 42:3, 44:5, 75:16, 107:14, 123:3, 124:20, 125:18, 157:23, 165:6,

185:15, 192:13, 196:9, 196:13, 196:16, 196:21, 299:14
**AYKROYD** [1] - 26:12
**Aykroyd's** [2] - 81:2, 102:21

## B

**bachelor** [1] - 70:7
**backed** [1] - 48:3
**background** [1] - 296:22
**backgrounds** [2] - 25:9, 25:20
**backlog** [2] - 191:12, 191:13
**backup** [1] - 296:20
**bad** [2] - 181:5, 220:25
**badgering** [1] - 233:6
**balance** [1] - 172:23
**balancing** [1] - 7:7
**banquets** [1] - 74:24
**Bar** [3] - 30:4, 204:19, 206:10
**bar** [21] - 76:5, 76:7, 79:23, 100:19, 100:20, 102:14, 102:19, 102:20, 109:7, 131:3, 132:18, 147:22, 149:14, 149:15, 149:16, 166:19, 195:8, 200:11
**barbecue** [1] - 171:5
**bars** [12] - 100:19, 100:20, 104:23, 109:8, 131:17, 160:22, 165:18, 165:21, 166:22, 195:6, 197:6, 200:8
**bartender** [2] - 38:21, 198:11
**bartenders** [3] - 107:23, 166:23, 193:23
**base** [2] - 50:12, 178:18
**based** [15] - 21:17, 37:16, 43:18, 43:19, 56:9, 59:4, 122:8, 161:13, 167:24, 199:18, 251:24, 259:22, 267:17, 281:19, 291:23
**basic** [2] - 182:17,

184:20
**basis** [7] - 44:4, 96:9, 199:13, 221:20, 227:11, 227:16, 227:17
**batch** [1] - 181:13
**battle** [1] - 176:7
**bayou** [1] - 73:18
**bayous** [2] - 72:19, 72:20
**beach** [2] - 135:13, 135:14
**Beach** [2] - 40:10
**bear** [2] - 55:4, 261:12
**Beaumont** [6] - 69:16, 69:20, 69:22, 71:2, 71:3, 72:16
**beautiful** [3] - 36:4, 72:19, 176:2
**became** [18] - 76:12, 76:15, 76:21, 76:23, 77:4, 88:7, 91:7, 93:7, 93:20, 95:4, 96:10, 96:12, 108:23, 109:25, 110:1, 114:11, 117:13, 125:15
**become** [7] - 70:18, 73:16, 158:5, 204:16, 211:25, 249:7, 249:11
**becomes** [1] - 176:22
**becoming** [1] - 150:6
**beforehand** [1] - 180:24
**began** [3] - 25:4, 81:17, 95:2
**begin** [1] - 89:19
**beginning** [10] - 45:23, 83:20, 107:17, 123:19, 125:12, 129:13, 140:20, 144:5, 196:19, 199:5
**beginnings** [1] - 134:16
**behalf** [1] - 165:20
**BEHALF** [2] - 2:4, 2:11
**behind** [2] - 38:9, 100:19
**believability** [1] - 55:4
**believable** [1] - 55:25
**believer** [1] - 73:21
**believes** [4] - 21:16, 35:19, 210:18, 298:16
**belt** [2] - 94:25, 95:4
**Belvedere** [2] -

217:3, 217:22
**bench** [5] - 6:12, 52:17, 64:25, 240:13, 265:16
**beneficial** [1] - 267:8
**BERG** [92] - 2:4, 2:5, 5:10, 5:19, 19:3, 19:15, 19:21, 20:9, 22:21, 23:7, 23:11, 23:14, 23:17, 26:13, 28:25, 29:8, 34:7, 48:11, 67:25, 68:6, 68:9, 68:12, 68:14, 68:18, 68:23, 69:7, 69:11, 74:2, 74:3, 81:14, 82:14, 82:20, 84:10, 84:15, 85:4, 85:10, 85:19, 86:9, 86:13, 86:20, 91:17, 92:15, 92:25, 93:1, 98:16, 98:19, 99:3, 101:8, 101:9, 103:14, 103:24, 104:3, 106:15, 106:22, 106:23, 110:3, 110:7, 110:13, 110:17, 110:22, 110:24, 111:7, 112:9, 112:19, 113:8, 113:12, 113:17, 113:19, 114:17, 114:19, 117:2, 117:8, 117:11, 118:20, 119:1, 119:7, 119:10, 134:18, 134:24, 149:21, 149:24, 151:24, 152:7, 152:24, 153:3, 153:12, 153:18, 232:4, 232:17, 241:24, 260:8, 260:13
**Berg** [10] - 5:21, 10:17, 20:9, 36:18, 37:9, 37:16, 38:18, 41:6, 42:11, 43:20
**Berggruen** [1] - 79:12
**beside** [1] - 211:3
**best** [17] - 29:19, 118:20, 175:9, 178:13, 178:19, 179:22, 191:25, 192:2, 199:18, 235:23, 236:1, 236:2, 236:9, 236:10, 267:17, 280:11
**better** [12] - 13:20, 74:14, 89:9, 91:1, 106:7, 106:13, 131:24, 134:6, 172:6, 187:5, 225:19, 248:1

between [23] - 6:15, 27:14, 38:9, 43:9, 45:1, 53:16, 71:2, 73:14, 91:10, 101:12, 109:2, 121:19, 132:18, 173:25, 190:23, 193:2, 198:10, 228:14, 250:17, 254:25, 276:2, 292:14

Beverage [2] - 27:21, 30:16

beverage [10] - 28:7, 37:1, 38:19, 80:12, 80:13, 136:3, 157:1, 160:15, 192:5, 228:11

beverages [8] - 23:21, 24:25, 27:5, 47:5, 201:21, 215:15, 219:7, 234:2

Beverages [2] - 164:3, 165:13

beyond [3] - 101:5, 203:12, 209:12

bias [1] - 54:24

big [24] - 30:1, 40:13, 80:1, 89:18, 94:24, 107:25, 109:18, 124:1, 165:1, 167:25, 184:2, 185:16, 185:24, 188:14, 190:10, 191:1, 191:16, 197:6, 198:21, 198:25, 200:21, 214:22, 237:11, 255:3

bigger [7] - 76:9, 87:19, 89:23, 167:13, 192:10, 199:8, 211:5

biggest [4] - 30:5, 89:12, 170:18, 188:16

biker's [1] - 84:1

bill [1] - 282:18

billboard [1] - 167:7

bills [1] - 284:1

BIN [11] - 193:25, 194:15, 194:21, 195:5, 195:18, 195:19, 214:19, 214:21, 215:3, 215:4, 215:8

Binny's [1] - 165:12

BINs [2] - 214:25, 215:6

BIRD [1] - 2:8

bird [1] - 74:6

birds [1] - 74:7

bit [23] - 7:2, 17:24, 21:4, 24:17, 82:14, 89:2, 126:8, 127:15,

168:8, 169:2, 172:25, 174:7, 174:11, 178:7, 180:22, 199:23, 207:22, 214:14, 219:12, 225:15, 225:25, 242:3

bits [4] - 178:3, 178:8, 179:3, 220:10

Bivens [2] - 5:20, 20:10

BIVENS [79] - 2:5, 12:22, 13:8, 13:13, 13:19, 13:25, 14:14, 14:19, 15:3, 15:20, 17:1, 17:17, 241:10, 241:14, 241:22, 242:9, 242:15, 242:18, 242:21, 242:24, 243:5, 243:9, 243:21, 243:24, 244:7, 244:10, 244:16, 245:3, 245:11, 245:17, 246:25, 247:24, 248:3, 249:5, 249:18, 250:1, 251:9, 251:15, 251:19, 252:4, 252:12, 252:18, 253:2, 253:10, 253:15, 253:22, 253:25, 254:4, 254:6, 254:12, 255:13, 256:20, 257:4, 257:13, 258:7, 258:10, 258:12, 258:19, 259:16, 259:19, 260:6, 260:14, 260:19, 260:25, 261:3, 261:23, 262:2, 263:11, 263:14, 278:24, 279:3, 279:10, 279:14, 279:20, 280:1, 281:1, 281:4, 283:4, 283:22

bizarre [1] - 109:8

black [5] - 40:8, 107:1, 131:9, 145:14, 145:15

blackboard [3] - 84:11, 85:5, 85:14

blame [2] - 164:4, 177:19

Blanco [4] - 98:12, 145:7, 145:13, 146:18

blank [1] - 298:11

bleak [1] - 72:17

bless [1] - 179:9

blog [1] - 56:20

bloggers [1] - 193:3

Blossom [2] - 184:24, 185:3

blow [1] - 226:6

blown [1] - 140:25

blue [2] - 42:10, 152:17

Blues [11] - 76:1, 107:9, 107:10, 107:15, 107:25, 183:14, 185:11, 185:12, 185:13, 185:14, 185:15

board [4] - 85:25, 86:12, 126:10, 126:11

bonus [1] - 211:16

bonuses [1] - 211:14

book [6] - 62:13, 126:18, 126:20, 126:23, 193:3, 195:14

books [1] - 126:23

boom [1] - 42:10

border [1] - 69:15

born [4] - 69:13, 69:14, 72:24, 73:10

borrowing [1] - 35:9

Boston [1] - 78:8

bother [1] - 224:14

bottle [308] - 19:4, 23:19, 23:20, 24:1, 24:5, 25:3, 25:6, 25:22, 25:24, 26:6, 26:9, 26:24, 27:5, 27:9, 27:11, 27:17, 27:19, 27:23, 28:2, 29:6, 29:9, 29:15, 29:16, 29:20, 29:21, 29:24, 30:10, 30:13, 32:13, 32:19, 32:21, 32:23, 33:4, 33:5, 33:6, 33:13, 33:22, 34:9, 34:10, 34:21, 36:4, 36:19, 36:22, 36:23, 37:1, 39:25, 40:6, 40:7, 40:8, 40:24, 41:3, 41:24, 42:19, 46:11, 79:14, 80:17, 80:21, 82:21, 82:22, 83:1, 83:19, 87:12, 87:21, 87:22, 87:25, 90:12, 90:13, 93:3, 93:20, 93:22, 94:11, 94:12, 94:13, 94:19, 95:1, 96:14, 99:8, 99:10, 99:12, 99:15, 100:23, 103:15, 104:6, 105:25, 106:24, 109:21, 109:23, 110:2, 111:2, 111:12, 111:14, 111:17,

114:21, 121:24, 124:14, 125:9, 126:5, 127:6, 128:10, 128:20, 129:8, 129:18, 129:25, 130:1, 130:8, 130:13, 131:6, 131:7, 131:9, 132:3, 132:4, 132:5, 132:12, 132:19, 132:21, 133:1, 133:3, 133:15, 136:1, 136:7, 136:18, 137:19, 139:17, 139:21, 140:9, 140:14, 140:17, 141:2, 142:24, 142:25, 143:1, 145:6, 145:13, 146:18, 147:6, 147:12, 147:17, 148:1, 148:4, 148:24, 152:13, 152:14, 152:16, 152:18, 152:21, 153:1, 158:2, 158:16, 158:23, 159:1, 160:4, 165:10, 166:10, 166:19, 173:10, 173:12, 173:13, 173:21, 173:23, 174:2, 174:5, 174:13, 174:20, 175:4, 175:7, 175:10, 175:15, 175:17, 175:22, 176:9, 176:13, 176:16, 176:18, 177:15, 177:21, 178:4, 178:9, 178:12, 178:15, 179:7, 179:10, 179:11, 179:17, 179:18, 179:19, 179:21, 181:2, 181:3, 181:13, 181:19, 182:4, 182:10, 182:12, 182:25, 183:22, 186:12, 187:21, 189:8, 191:20, 192:12, 196:2, 197:3, 201:1, 201:22, 201:24, 203:7, 204:21, 204:24, 205:1, 205:2, 205:3, 205:6, 205:19, 205:25, 206:8, 206:18, 206:25, 208:3, 208:16, 208:17, 208:19, 210:16, 211:9, 211:21, 213:18, 216:7, 216:13, 216:15, 220:12, 220:15, 221:4,

221:10, 221:16, 221:17, 221:22, 221:23, 221:25, 222:2, 222:9, 225:8, 225:13, 227:2, 227:20, 228:9, 228:11, 228:15, 228:16, 228:20, 228:22, 228:24, 228:25, 229:1, 229:8, 229:21, 230:2, 230:7, 230:8, 230:10, 231:12, 232:1, 232:9, 232:16, 232:22, 232:25, 233:2, 235:4, 246:5, 246:6, 246:7, 246:9, 246:10, 246:14, 247:10, 248:15, 248:18, 248:22, 248:24, 248:25, 249:8, 249:12, 250:17, 250:19, 250:22, 250:24, 251:1, 251:16, 279:15, 280:11, 280:13, 285:21

bottle's [1] - 279:5

bottled [1] - 181:25

bottler [2] - 41:17, 282:14

bottles [117] - 18:12, 19:5, 26:25, 27:10, 28:17, 28:23, 29:3, 31:11, 31:15, 32:11, 33:1, 34:25, 35:5, 36:3, 41:7, 41:10, 41:11, 43:9, 45:20, 46:3, 46:6, 46:11, 46:13, 46:19, 47:3, 47:4, 80:15, 80:18, 87:11, 88:3, 92:16, 100:7, 100:13, 102:4, 102:25, 108:7, 109:16, 111:14, 111:19, 111:23, 112:4, 123:6, 127:11, 128:17, 129:15, 130:11, 133:4, 133:5, 136:8, 137:13, 137:25, 138:5, 138:9, 138:10, 141:18, 143:7, 143:12, 144:21, 144:23, 145:17, 146:11, 147:5, 147:14, 147:15, 148:4, 149:9, 149:12, 149:16, 158:22, 176:13, 178:5, 178:6, 178:14, 178:24, 179:8, 179:9,

179:15, 180:7, 182:20, 182:22, 186:11, 187:9, 188:24, 189:11, 190:17, 190:18, 190:22, 196:9, 196:12, 209:2, 209:4, 215:20, 216:16, 216:17, 218:23, 220:7, 224:25, 227:4, 229:2, 229:4, 229:6, 229:15, 247:8, 249:8, 250:9, 282:19, 283:8, 284:3, 284:7, 284:8, 287:21, 287:23, 292:1, 292:2, 293:21
**bottling** [1] - 177:2
**bottom** [4] - 101:19, 101:24, 127:18, 279:4
**bought** [8] - 40:25, 41:1, 41:24, 165:17, 169:16, 186:3, 187:25, 210:16
**bourbon** [1] - 35:2
**box** [15] - 6:13, 18:13, 20:23, 44:14, 46:10, 52:16, 64:15, 65:25, 68:3, 85:9, 98:11, 182:2, 182:4, 183:7
**BOXER** [1] - 2:8
**boy** [2] - 73:8, 94:23
**brag** [2] - 24:17, 299:13
**brainer** [2] - 218:25, 219:3
**brand** [21] - 37:23, 37:24, 38:24, 48:21, 109:25, 148:25, 157:1, 163:13, 165:25, 166:4, 166:5, 166:12, 192:24, 197:10, 197:19, 200:4, 213:4, 213:16, 213:19, 248:13, 292:22
**Brandi** [87] - 6:4, 20:17, 27:15, 28:1, 28:2, 30:9, 30:25, 31:4, 31:6, 32:18, 34:3, 34:8, 36:21, 37:14, 37:25, 38:2, 38:3, 38:7, 38:8, 38:15, 41:16, 41:24, 42:5, 42:17, 48:19, 48:20, 49:3, 133:22, 134:11, 134:15, 135:23, 135:24, 135:25, 137:2, 137:10, 148:21,

152:9, 207:21, 208:8, 208:13, 229:22, 230:4, 230:11, 231:23, 232:23, 233:1, 234:6, 235:3, 269:12, 269:21, 270:8, 270:21, 271:8, 275:20, 276:17, 278:20, 279:13, 280:10, 282:14, 283:7, 283:23, 284:2, 284:15, 284:23, 285:2, 285:4, 285:10, 285:13, 285:17, 285:23, 286:7, 286:18, 287:11, 292:17, 292:21, 293:8, 293:12, 294:13, 295:18, 296:18, 296:21, 297:1, 297:11
**BRANDI** [1] - 1:11
**brandi** [1] - 39:23
**brandi's** [1] - 282:3
**Brandi's** [7] - 6:20, 28:14, 31:19, 33:11, 287:5, 292:17, 299:9
**brands** [8] - 30:23, 43:13, 165:5, 198:19, 198:25, 199:8, 215:6, 217:5
**BREAK** [1] - 240:21
**break** [27] - 6:15, 16:3, 19:20, 22:9, 22:10, 22:13, 22:16, 22:18, 67:8, 67:12, 67:14, 75:9, 94:5, 99:17, 102:18, 110:3, 110:10, 110:12, 153:6, 154:8, 187:6, 189:8, 199:23, 214:4, 240:10, 254:8
**breaking** [2] - 9:11, 110:11
**brief** [3] - 74:22, 89:5, 110:3
**briefly** [4] - 125:22, 149:21, 236:14, 295:5
**brightly** [2] - 100:7, 132:25
**bring** [19] - 6:13, 25:5, 25:18, 27:17, 29:23, 38:10, 52:22, 58:10, 60:25, 75:10, 81:3, 98:11, 103:20, 134:2, 189:11, 213:3, 258:4, 263:6, 264:6
**bringing** [3] - 39:21, 114:20, 134:15
**broad** [2] - 37:3,

155:21
**broke** [1] - 255:3
**broken** [1] - 253:20
**Brothers** [1] - 76:1
**brought** [6] - 81:4, 126:6, 189:12, 189:13, 230:3
**brown** [1] - 242:12
**Brown** [16] - 13:17, 116:1, 116:2, 116:11, 241:12, 241:17, 241:20, 242:8, 242:10, 242:11, 242:13, 242:14, 257:7, 258:5, 258:6, 258:13
**Bruni** [8] - 26:10, 29:20, 94:12, 95:11, 175:8, 175:9, 175:18, 182:16
**bucks** [1] - 40:21
**budget** [1] - 156:13
**budgets** [1] - 167:5
**Buffet** [1] - 125:23
**buffet** [1] - 125:25
**build** [3] - 158:3, 189:23, 213:4
**building** [6] - 25:22, 74:21, 167:2, 167:3, 189:25, 265:14
**built** [2] - 25:17, 109:13
**bunch** [6] - 40:14, 45:20, 127:11, 176:5, 178:18, 280:18
**burden** [2] - 50:8, 151:7
**burn** [1] - 168:24
**burning** [1] - 46:15
**bus** [11] - 107:2, 107:3, 188:6, 190:4, 190:6, 190:11, 190:14, 191:18, 195:22
**buses** [2] - 188:10
**Business** [1] - 193:24
**business** [30] - 24:11, 24:14, 25:2, 26:5, 30:15, 34:16, 80:24, 81:3, 81:7, 88:12, 88:16, 88:20, 107:16, 109:13, 115:15, 115:16, 115:17, 115:21, 117:25, 126:4, 156:21, 158:1, 158:3, 163:8, 194:17, 194:18, 210:11, 211:18

**businessman** [1] - 24:12
**Busters** [1] - 189:12
**busy** [2] - 61:13, 199:5
**buy** [15] - 30:6, 33:3, 33:5, 147:19, 147:25, 163:2, 165:17, 184:16, 187:22, 194:11, 197:14, 216:8, 216:9, 216:13, 217:25
**buyers** [1] - 219:24
**buying** [7] - 33:4, 33:6, 166:13, 186:5, 198:3, 220:15, 221:16
**buys** [2] - 165:14, 166:18
**BY** [80] - 2:5, 2:9, 2:12, 69:11, 74:3, 81:14, 82:20, 84:15, 85:10, 86:20, 91:17, 93:1, 99:3, 101:9, 103:14, 104:3, 106:23, 110:24, 111:7, 112:19, 113:12, 113:19, 114:19, 117:2, 117:11, 119:10, 119:19, 120:12, 128:5, 129:3, 130:22, 132:2, 134:25, 135:12, 138:3, 141:14, 142:5, 146:15, 148:17, 149:24, 152:7, 152:24, 155:17, 156:1, 157:16, 157:21, 174:23, 192:21, 196:7, 201:10, 201:18, 202:6, 202:10, 202:14, 202:23, 203:4, 203:15, 203:22, 204:13, 205:17, 206:7, 206:20, 206:23, 207:13, 208:11, 209:23, 210:9, 210:24, 212:20, 213:2, 214:7, 221:1, 223:22, 231:8, 232:4, 232:17, 235:17, 236:16, 236:21, 236:25

**C**

**C-A-P-P-E-L-L-I-N-I** [1] - 242:21

**Cabo** [2] - 283:24, 283:25
**cakes** [1] - 40:20
**Cal** [1] - 199:10
**Calavaras** [1] - 250:10
**calaveras** [8] - 40:15, 40:19, 40:21, 40:22, 40:25, 41:21, 46:24
**calibrating** [1] - 179:23
**CALIFORNIA** [7] - 1:2, 1:17, 1:23, 2:10, 5:1, 301:8, 301:12
**California** [11] - 1:10, 77:12, 96:21, 156:19, 161:14, 184:5, 199:12, 199:18, 199:19, 199:20, 200:6
**camera** [3] - 295:10, 295:22, 296:10
**camp** [1] - 73:18
**campaign** [3] - 33:19, 44:9, 104:18
**Canada** [13] - 30:22, 44:18, 44:24, 77:1, 81:6, 88:18, 88:20, 109:3, 155:24, 156:16, 162:1, 171:4, 213:7
**Canadian** [4] - 1:7, 44:13, 88:19, 160:10
**candies** [1] - 97:16
**candles** [1] - 97:11
**candy** [1] - 97:6
**cannot** [5] - 54:3, 54:4, 141:24, 277:21, 281:5
**cap** [1] - 91:6
**capable** [3] - 94:7, 142:13, 152:2
**capacity** [1] - 248:6
**Cappellini** [13] - 13:15, 241:11, 241:16, 241:18, 242:19, 242:25, 248:4, 248:21, 257:3, 258:1, 258:14, 258:23, 261:14
**Cappellini's** [2] - 247:4, 249:6
**captain** [1] - 140:15
**card** [1] - 35:9
**care** [4] - 67:15, 95:14, 241:6, 263:9
**career** [17] - 70:12, 70:21, 71:12, 72:2, 73:5, 73:15, 77:20, 83:13, 95:22, 96:5, 98:4, 98:9, 116:16,

116:21, 116:25, 117:3, 136:16
**careful** [2] - 172:21, 265:4
**carefully** [2] - 147:18, 231:6
**caricature** [1] - 46:24
**caricatures** [1] - 40:15
**carried** [1] - 24:18
**carrier** [1] - 25:11
**carry** [1] - 161:9
**cartoons** [1] - 40:16
**Caruso** [1] - 204:19
**case** [81] - 8:10, 9:24, 10:13, 16:20, 20:25, 21:17, 33:2, 33:6, 33:8, 33:22, 36:1, 41:9, 43:24, 49:8, 49:17, 49:19, 49:25, 50:14, 52:8, 52:12, 52:20, 52:21, 54:11, 54:13, 54:23, 56:7, 56:8, 56:9, 56:11, 56:13, 56:16, 56:18, 56:25, 57:7, 57:9, 57:15, 57:18, 57:22, 57:24, 58:3, 58:8, 58:17, 59:3, 59:16, 59:18, 59:20, 59:22, 60:13, 60:19, 62:18, 63:25, 64:9, 65:13, 66:11, 67:4, 83:11, 106:18, 133:19, 141:10, 142:15, 180:20, 193:12, 193:13, 211:1, 222:5, 239:15, 239:17, 248:21, 249:2, 249:4, 249:14, 260:18, 261:4, 264:2, 270:14, 283:6, 285:22, 286:5, 294:20, 299:20
**cases** [11] - 14:9, 26:19, 26:21, 106:6, 165:7, 186:5, 187:9, 187:19, 187:22, 187:24, 211:13
**CASTORIA** [2] - 242:3, 242:6
**category** [7] - 159:15, 168:1, 217:7, 217:8, 217:9
**catering** [1] - 74:24
**Catholics** [1] - 39:17
**cattle** [1] - 171:5
**caught** [1] - 181:3
**caused** [2] - 21:20, 185:5

**Cavalli** [1] - 217:4
**cave** [1] - 96:4
**CBM** [1] - 1:8
**CBS** [1] - 108:22
**cease** [11] - 34:1, 34:7, 34:10, 42:11, 42:12, 134:9, 234:9, 234:10, 275:17, 276:24, 277:6
**celebrate** [2] - 39:17, 105:19
**celebrated** [3] - 39:16, 39:19, 39:20
**celebration** [13] - 39:13, 39:15, 39:18, 40:3, 40:23, 41:22, 43:17, 44:22, 96:18, 97:2, 97:19, 143:3
**celebrations** [1] - 40:17
**celebrity** [4] - 26:20, 108:2, 109:14, 192:13
**cell** [1] - 108:19
**cements** [1] - 25:7
**centerfold** [1] - 31:18
**centimeter** [1] - 99:18
**CENTRAL** [2] - 1:2, 301:11
**Century** [1] - 138:23
**CENTURY** [1] - 2:9
**CEO** [4] - 156:8, 283:11, 283:23, 285:18
**cereal** [1] - 171:8
**certain** [18] - 25:20, 39:22, 51:4, 52:3, 65:5, 81:25, 84:22, 84:23, 89:9, 104:23, 151:25, 163:22, 168:20, 209:18, 265:8, 285:3, 285:24, 299:10
**certainly** [15] - 114:12, 118:14, 120:24, 122:8, 124:3, 134:4, 134:5, 147:21, 213:25, 235:1, 246:13, 284:5, 292:25, 297:5, 299:9
**CERTIFICATE** [1] - 301:4
**certificates** [1] - 291:13
**certifications** [1] - 39:10
**CERTIFIED** [1] - 1:7
**CERTIFY** [1] - 301:12

**cetera** [1] - 97:6
**chain** [2] - 109:19, 165:12
**chains** [1] - 197:6
**challenges** [1] - 194:3
**chambers** [3] - 265:14, 265:21, 265:22
**chance** [2] - 183:19, 250:20
**change** [6] - 89:3, 89:24, 122:19, 122:23, 189:19, 297:14
**changed** [4] - 125:13, 152:21, 227:24, 227:25
**changer** [1] - 183:24
**changes** [2] - 172:4, 182:15
**changing** [1] - 26:22
**characterize** [1] - 205:15
**characters** [1] - 40:8
**charcoal** [1] - 93:14
**charge** [1] - 118:4
**charitable** [1] - 151:14
**Chatham** [1] - 215:22
**chatroom** [1] - 56:20
**cheap** [4] - 29:16, 47:11, 91:5, 177:25
**cheaper** [2] - 168:21, 205:2
**checking** [2] - 82:4, 180:20
**cheeks** [1] - 46:25
**chefs** [1] - 107:24
**Chicago** [2] - 78:8, 165:12
**chief** [4] - 28:1, 30:15, 207:8, 208:7
**children** [1] - 43:25
**chimney** [1] - 90:18
**chin** [1] - 101:20
**China** [2] - 29:17, 29:21
**Chinese** [1] - 282:13
**chip** [1] - 176:17
**chiseled** [2] - 225:22, 225:24
**chiselling** [1] - 226:9
**choose** [3] - 55:17, 161:6, 173:2
**chose** [10] - 37:12, 41:18, 161:5, 161:11, 167:24, 172:15, 177:25, 181:10,

181:16, 199:17
**chosen** [1] - 185:13
**Christina** [8] - 13:15, 241:11, 241:16, 241:18, 242:18, 242:24, 248:4, 257:3
**Christmas** [2] - 198:25, 199:7
**Christmastime** [1] - 198:21
**chunk** [1] - 124:1
**circulate** [3] - 28:20, 145:2, 145:21
**circulated** [1] - 146:6
**circulating** [1] - 145:16
**circumstances** [1] - 75:20
**circumstantial** [3] - 53:9, 53:13, 53:17
**Ciroc** [2] - 31:2, 217:3
**cities** [16] - 28:11, 78:25, 107:8, 107:9, 108:24, 186:17, 186:21, 188:2, 188:3, 190:12, 190:13, 190:16, 191:17, 195:21, 196:8, 196:23
**city** [18] - 28:9, 69:23, 107:11, 107:21, 107:22, 108:17, 108:20, 108:21, 108:23, 109:6, 109:17, 185:23, 190:5
**civic** [2] - 151:11, 151:12
**civil** [1] - 14:9
**claim** [2] - 50:9, 50:10
**claimed** [1] - 212:7
**claims** [1] - 16:19
**clarification** [1] - 296:16
**clarify** [3] - 15:21, 61:25, 253:7
**clarifying** [1] - 15:4
**clarity** [1] - 44:18
**Class** [1] - 234:2
**class** [3] - 25:9, 25:20, 93:13
**classes** [1] - 71:5
**clay** [1] - 124:15
**Clear** [1] - 152:16
**clear** [22] - 8:8, 36:20, 44:24, 46:10, 81:22, 100:5, 102:3, 116:7, 143:9, 168:6, 174:19, 178:4, 178:6,

178:9, 203:7, 215:18, 259:20, 261:22, 282:3, 298:19, 298:21, 298:23
**clearer** [3] - 95:4, 95:5, 178:5
**clearly** [4] - 32:5, 104:21, 115:18, 139:6
**CLERK** [20] - 5:6, 15:25, 19:24, 20:4, 67:11, 69:3, 145:9, 145:11, 145:18, 146:4, 146:9, 154:18, 155:3, 155:10, 239:24, 240:19, 240:22, 271:14, 278:10, 300:13
**clerk** [23] - 6:12, 15:23, 18:25, 19:10, 68:3, 68:19, 73:1, 74:11, 85:17, 92:15, 98:22, 103:22, 137:24, 138:1, 144:20, 145:2, 145:16, 146:11, 155:2, 174:16, 174:21, 238:9, 239:6
**clerks** [1] - 297:23
**client** [1] - 48:7
**clients** [2] - 23:25, 51:19
**climb** [1] - 150:16
**Clinton** [1] - 33:18
**clock** [1] - 23:15
**close** [12] - 59:25, 77:14, 85:17, 87:1, 88:9, 130:15, 137:18, 146:16, 184:1, 226:6, 257:8, 294:5
**closed** [1] - 78:6
**closely** [3] - 43:15, 99:1, 248:22
**closer** [2] - 75:10, 77:4
**closing** [5] - 35:16, 49:10, 51:12, 66:25, 299:11
**clouded** [1] - 249:22
**club** [1] - 131:3
**clubs** [1] - 189:23
**clumsy** [1] - 124:19
**co** [1] - 47:12
**co-exist** [1] - 47:12
**Coast** [2] - 69:15, 72:17
**coat** [1] - 181:13
**cocktail** [1] - 149:7
**cocktails** [1] - 166:22
**CODE** [1] - 301:13

**coffee** [1] - 67:16

**cofounder** [1] - 31:20

**cofounders** [1] - 185:15

**coincidence** [3] - 27:13, 34:12, 286:3

**coincidences** [2] - 33:21, 34:18

**collaborative** [2] - 91:9, 115:3

**colleague** [3] - 5:25, 31:6, 285:16

**colleagues** [1] - 20:10

**collect** [1] - 216:16

**collection** [1] - 126:17

**college** [1] - 69:25

**colors** [2] - 28:18, 44:21

**column** [1] - 298:11

**combination** [2] - 194:7, 198:8

**comfortable** [2] - 95:15, 173:8

**coming** [13] - 21:3, 31:13, 90:23, 94:25, 116:7, 127:25, 137:7, 170:15, 180:16, 218:4, 224:10, 237:19, 284:4

**commence** [1] - 22:19

**comment** [2] - 224:24, 280:7

**commentary** [3] - 57:15, 59:16, 59:18

**comments** [5] - 208:24, 208:25, 209:1, 224:9, 267:25

**commerce** [1] - 138:25

**commercial** [7] - 70:8, 138:25, 139:3, 139:14, 140:9, 158:2, 183:25

**commercials** [1] - 167:7

**commitment** [1] - 163:6

**committed** [1] - 106:5

**common** [11] - 43:6, 43:7, 45:9, 45:18, 45:22, 46:1, 52:10, 97:5, 219:4, 219:25, 220:1

**commonly** [2] - 61:16, 165:4

**communicate** [3] - 56:14, 56:15, 82:11

**communicating** [3] - 56:24, 57:1, 118:6

**communications** [1] - 58:23

**communitywise** [1] - 151:19

**companies** [2] - 37:18, 237:11

**company** [36] - 28:15, 29:19, 30:20, 31:25, 35:7, 94:11, 94:13, 99:23, 107:22, 112:1, 115:20, 115:24, 116:4, 117:12, 117:14, 117:19, 133:17, 144:5, 150:22, 151:17, 151:18, 156:9, 156:10, 161:23, 161:24, 167:13, 177:25, 179:3, 184:24, 188:11, 283:11, 283:24, 292:17, 293:17

**company's** [1] - 156:20

**compel** [1] - 294:7

**competes** [1] - 216:23

**competitor** [2] - 169:17, 237:12

**competitors** [3] - 159:14, 215:10, 217:6

**complete** [9] - 6:10, 128:23, 129:9, 154:7, 154:16, 238:14, 257:22, 269:22, 283:12

**completed** [3] - 56:6, 61:23, 153:5

**completely** [12] - 37:19, 37:20, 43:13, 43:18, 47:1, 75:12, 97:19, 202:2, 204:8, 211:10, 237:20, 237:21

**completes** [1] - 67:6

**complicated** [1] - 178:15

**component** [1] - 171:21

**computer** [2] - 87:3, 94:4

**computers** [1] - 87:2

**concede** [1] - 32:24

**conceivable** [1] - 29:20

**concept** [4] - 123:19, 125:14, 158:2, 193:15

**concepts** [1] - 191:22

**concern** [2] - 12:11, 281:10

**concerned** [5] - 11:15, 12:14, 93:2, 216:7, 219:15

**concerning** [2] - 13:12, 23:6

**concerns** [1] - 293:21

**conclude** [1] - 112:9

**concludes** [1] - 47:19

**conclusion** [2] - 36:2, 47:22

**conclusions** [2] - 37:11, 37:15

**condition** [1] - 102:17

**conditions** [1] - 81:20

**conduct** [3] - 56:3, 66:18, 85:8

**conducting** [2] - 269:16, 270:8

**CONFER** [1] - 118:25

**confer** [14] - 15:12, 118:23, 119:2, 240:11, 253:22, 255:20, 258:8, 267:1, 281:21, 282:6, 284:12, 296:19, 297:2, 297:13

**conference** [3] - 64:24, 65:11, 65:12

**CONFERENCE** [1] - 301:18

**conferences** [3] - 65:4, 65:9, 65:16

**conferred** [3] - 26:6, 255:21, 297:6

**confidential** [2] - 278:19, 296:4

**configuration** [1] - 101:23

**confirm** [1] - 137:11

**conflict** [2] - 299:7, 299:24

**CONFORMANCE** [1] - 301:17

**confuse** [1] - 32:2

**confused** [10] - 43:9, 45:14, 47:14, 136:8, 209:25, 231:3, 249:11, 250:6, 251:10, 251:11

**confusing** [2] -

100:24, 228:9

**confusingly** [2] - 32:22, 41:13

**confusion** [29] - 32:5, 32:21, 35:5, 41:15, 43:2, 43:4, 45:17, 52:24, 65:6, 100:18, 136:11, 211:6, 211:10, 212:9, 219:15, 224:5, 237:18, 246:9, 246:15, 248:13, 250:13, 250:17, 250:21, 251:12, 251:14, 251:22, 255:4, 262:12

**connection** [3] - 124:13, 227:13, 231:22

**conscious** [1] - 98:8

**consciousness** [2] - 96:15, 124:6

**consider** [23] - 7:20, 7:25, 16:8, 16:22, 22:12, 50:18, 51:2, 51:5, 52:3, 52:4, 52:25, 53:15, 54:11, 55:12, 57:13, 61:14, 65:11, 139:18, 141:2, 141:6, 152:13, 219:14, 299:21

**considered** [4] - 51:25, 184:22, 229:5, 266:10

**considering** [2] - 43:8, 54:17

**considers** [1] - 7:5

**consistent** [3] - 41:20, 55:6, 226:7

**consists** [1] - 50:18

**constant** [2] - 197:16, 200:3

**constantly** [5] - 89:25, 136:17, 167:3, 197:4, 197:11

**constitutes** [1] - 17:4

**construction** [3] - 72:24, 72:25, 74:16

**CONSUELO** [1] - 1:4

**consult** [4] - 57:19, 225:16, 226:8, 239:14

**consulted** [2] - 134:4, 134:5

**consumer** [15] - 32:2, 43:5, 47:5, 83:10, 83:23, 160:23, 166:18, 177:18, 194:7, 194:10, 194:13, 198:4, 198:6, 198:11

**consumers** [5] - 30:6, 45:22, 47:13, 83:12, 193:18

**consumption** [1] - 138:18

**contact** [1] - 57:11

**contacted** [9] - 199:25, 208:20, 209:24, 210:3, 212:2, 223:24, 224:2, 224:4, 224:17

**contain** [3] - 23:21, 139:7, 214:22

**contained** [1] - 277:11

**containers** [1] - 68:21

**contains** [1] - 279:5

**Contemporary** [2] - 78:18, 78:21

**contents** [1] - 295:13

**context** [5] - 100:11, 100:24, 102:13, 260:21, 261:5

**continue** [11] - 70:21, 77:20, 110:21, 113:11, 146:12, 190:24, 191:5, 197:2, 272:4, 273:8, 276:6

**continued** [4] - 66:2, 87:23, 191:3, 191:7

**continuing** [1] - 262:8

**contracting** [1] - 25:17

**contradicted** [1] - 54:25

**contrary** [1] - 14:3

**contrast** [1] - 292:14

**control** [4] - 53:20, 93:7, 209:20, 292:21

**controlled** [1] - 160:18

**controlling** [1] - 203:13

**controls** [1] - 51:16

**convenience** [1] - 18:25

**convenient** [1] - 239:4

**convention** [2] - 31:7, 34:14

**conventional** [3] - 87:13, 111:14, 130:1

**conversation** [2] - 13:6, 52:13

**convert** [2] - 94:6, 171:11

**conveyor** [2] - 94:25, 95:4

**cookies** [1] - 97:16
**cool** [4] - 171:17, 178:23, 180:18, 185:17
**cooled** [1] - 95:5
**cooling** [1] - 171:15
**cools** [1] - 178:17
**copied** [5] - 33:23, 36:21, 41:24, 133:8, 250:22
**copies** [2] - 201:2, 206:16
**copy** [4] - 26:2, 26:4, 27:17, 152:14
**COPY** [1] - 1:7
**Cordero** [1] - 98:5
**cork** [3] - 176:20, 176:24, 177:7
**corking** [2] - 176:21, 177:7
**corn** [10] - 171:2, 171:3, 171:5, 172:8, 215:21, 215:22, 215:24, 215:25, 216:1
**corner** [1] - 262:9
**corporation** [4] - 1:7, 1:10, 156:14, 160:10
**Corporation** [2] - 169:25, 181:9
**CORRECT** [1] - 301:14
**correct** [55] - 9:5, 9:6, 9:22, 46:21, 86:12, 91:24, 92:2, 105:14, 122:2, 145:4, 157:19, 162:11, 182:8, 183:2, 185:22, 196:21, 205:10, 207:5, 207:16, 207:18, 207:19, 213:7, 213:12, 214:20, 214:21, 214:24, 215:7, 215:11, 215:17, 218:16, 218:19, 218:22, 219:23, 220:13, 224:20, 225:10, 233:25, 234:3, 234:5, 235:5, 241:14, 243:15, 247:19, 255:12, 256:8, 269:18, 269:19, 270:16, 271:13, 275:15, 276:23, 278:15, 282:11, 284:20
**correctly** [1] - 115:25
**cost** [7] - 169:8, 170:16, 179:3, 182:18, 188:6, 211:13

**Costco** [3] - 109:1, 109:19, 164:2
**costs** [1] - 176:4
**couch** [1] - 107:1
**Counsel** [1] - 81:12, 106:20, 146:5, 201:5, 203:18, 204:10, 205:24, 209:13, 222:16, 222:25, 266:19
**counsel** [113] - 5:9, 7:9, 7:17, 12:10, 12:17, 13:1, 13:21, 14:18, 15:12, 18:10, 21:14, 22:20, 22:23, 29:1, 34:6, 47:7, 49:10, 65:21, 66:14, 68:11, 69:8, 82:11, 82:19, 85:23, 86:5, 86:17, 91:10, 101:6, 103:13, 110:12, 110:21, 112:16, 112:18, 117:10, 118:24, 118:25, 119:9, 128:2, 128:23, 129:1, 131:25, 134:22, 135:8, 142:3, 145:18, 146:12, 153:10, 154:6, 154:15, 155:14, 202:4, 203:13, 205:15, 212:24, 214:5, 230:16, 230:25, 231:4, 233:19, 236:17, 236:22, 238:17, 240:11, 246:18, 246:24, 247:19, 250:2, 251:6, 251:22, 253:10, 253:12, 254:11, 254:14, 254:17, 257:8, 258:15, 259:8, 259:25, 260:16, 261:21, 262:21, 263:3, 264:11, 264:12, 265:4, 265:24, 266:13, 273:8, 275:18, 277:22, 278:16, 278:22, 281:2, 281:7, 281:12, 281:14, 281:20, 281:22, 282:1, 282:5, 282:21, 282:24, 284:11, 284:13, 284:19, 285:7, 286:16, 287:10, 291:5, 292:15, 292:19, 297:13, 299:8

**COUNSEL** [1] - 2:3
**Counsel's** [1] - 141:6
**counsel's** [5] - 103:10, 222:21, 264:5, 292:23, 293:16
**count** [1] - 186:25
**counter** [1] - 15:9
**counting** [1] - 117:23
**countless** [1] - 28:10
**countries** [5] - 118:12, 118:13, 118:16, 140:12, 175:13
**country** [16] - 23:20, 34:24, 35:22, 37:4, 39:7, 72:21, 73:18, 96:20, 109:3, 120:7, 120:18, 121:5, 131:17, 135:3, 185:23, 199:10
**COUNTY** [1] - 301:6
**County** [3] - 24:19, 78:20, 186:14
**couple** [17] - 8:3, 43:11, 79:6, 85:12, 103:19, 124:17, 142:3, 148:22, 156:18, 161:7, 184:7, 191:22, 214:11, 214:13, 222:6, 237:6, 264:6
**couples** [1] - 77:2
**course** [21] - 5:16, 5:21, 20:11, 21:18, 49:11, 56:12, 65:8, 98:5, 101:8, 102:18, 106:16, 115:13, 179:7, 193:10, 196:8, 199:4, 270:10, 279:3, 286:10, 286:12, 286:14
**COURT** [430] - 1:1, 1:22, 5:14, 5:22, 6:2, 6:5, 8:23, 9:2, 9:12, 9:25, 10:9, 10:20, 10:22, 11:20, 12:16, 13:2, 13:9, 13:18, 13:20, 14:1, 14:17, 14:20, 15:5, 15:23, 16:1, 16:21, 17:3, 17:18, 18:17, 19:8, 19:16, 19:18, 19:23, 20:7, 20:15, 20:18, 23:1, 23:10, 23:13, 23:15, 28:22, 29:1, 34:6, 36:6, 47:7, 48:9, 49:5, 67:13, 67:23, 68:2, 68:7, 68:10, 68:13, 68:15, 68:21, 69:8, 73:25, 81:8,

81:11, 82:10, 82:16, 82:19, 84:12, 85:6, 85:15, 85:20, 86:4, 86:8, 86:11, 86:16, 91:15, 92:22, 98:14, 98:22, 101:4, 103:9, 103:22, 104:1, 106:10, 106:17, 110:5, 110:9, 110:15, 110:20, 111:5, 112:13, 113:6, 113:10, 113:16, 113:18, 117:1, 117:6, 117:9, 118:23, 119:3, 119:9, 119:14, 120:11, 127:18, 127:24, 128:2, 128:22, 129:1, 130:18, 131:20, 131:24, 134:20, 135:7, 138:1, 141:5, 141:8, 142:3, 144:22, 145:2, 145:16, 145:20, 145:24, 146:2, 146:5, 146:10, 148:11, 148:14, 149:19, 149:22, 151:23, 152:23, 153:5, 153:13, 153:21, 153:24, 154:3, 154:21, 155:1, 155:14, 155:20, 157:14, 157:20, 174:18, 174:21, 192:18, 196:4, 201:5, 201:9, 201:17, 202:3, 202:9, 202:12, 202:20, 203:1, 203:11, 203:17, 204:9, 205:14, 205:24, 206:3, 206:5, 206:19, 206:22, 207:9, 207:11, 208:10, 209:11, 209:17, 209:20, 210:8, 210:17, 210:20, 212:19, 212:23, 213:22, 213:25, 214:3, 220:18, 220:21, 222:13, 222:16, 222:19, 222:22, 222:25, 223:4, 223:6, 223:10, 223:13, 223:17, 230:13, 230:19, 230:22, 231:4, 232:2, 232:11, 233:7, 233:10, 233:12, 233:16, 234:20, 234:23, 235:7, 235:13,

235:15, 236:13, 236:19, 236:23, 237:24, 238:3, 238:5, 238:14, 238:23, 239:10, 240:1, 240:24, 241:3, 241:13, 241:20, 242:1, 242:4, 242:7, 242:12, 242:16, 242:20, 242:22, 243:1, 243:7, 243:10, 243:14, 243:17, 243:19, 243:22, 243:25, 244:2, 244:9, 244:12, 244:15, 244:18, 244:21, 244:23, 244:25, 245:2, 245:4, 245:8, 245:12, 245:15, 245:18, 245:23, 246:16, 247:11, 247:25, 249:1, 249:15, 249:24, 250:2, 251:4, 251:13, 251:17, 251:20, 252:5, 252:8, 252:11, 252:13, 252:16, 252:20, 252:23, 252:25, 253:6, 253:12, 253:19, 253:24, 254:1, 254:3, 254:5, 254:9, 254:14, 254:19, 254:22, 255:2, 255:6, 255:14, 255:19, 255:22, 255:25, 256:6, 256:10, 256:14, 256:16, 256:21, 257:1, 257:5, 257:14, 257:19, 258:9, 258:11, 258:15, 258:20, 258:25, 259:7, 259:14, 259:17, 259:24, 260:4, 260:7, 260:11, 260:15, 260:23, 261:1, 261:7, 261:21, 261:24, 262:3, 262:6, 262:14, 262:17, 262:20, 263:12, 263:15, 267:7, 268:6, 268:11, 268:14, 268:17, 268:20, 268:23, 269:2, 269:5, 269:8, 269:10, 269:13, 269:15, 269:23, 270:4, 270:7, 270:15, 270:23, 271:3, 271:7, 271:18, 271:22, 272:2, 272:7, 272:11, 272:15,

272:19, 272:23, 273:2, 273:7, 273:11, 273:16, 273:20, 274:1, 274:7, 274:11, 274:15, 274:19, 274:23, 275:2, 275:6, 275:10, 275:16, 275:23, 276:4, 276:9, 276:11, 276:19, 276:22, 277:3, 277:15, 278:2, 278:6, 278:8, 278:11, 278:16, 278:22, 279:1, 279:8, 279:12, 279:17, 279:23, 280:6, 281:2, 281:10, 282:21, 282:24, 283:14, 284:5, 285:7, 286:6, 286:9, 286:13, 286:15, 286:24, 287:6, 287:10, 287:14, 287:17, 287:25, 288:8, 288:12, 288:18, 289:1, 289:6, 289:10, 289:16, 289:20, 289:24, 290:3, 290:7, 290:15, 290:19, 290:23, 290:25, 291:4, 291:15, 292:9, 292:25, 293:4, 293:22, 294:4, 294:11, 294:15, 295:25, 297:2, 297:12, 297:20, 297:22, 298:22, 298:25, 299:22, 300:7, 300:9, 301:10, 301:11, 301:25

**Court** [95] - 6:25, 7:5, 7:6, 7:11, 7:12, 7:17, 7:19, 7:24, 8:11, 9:4, 11:10, 13:1, 13:5, 14:13, 15:17, 16:2, 16:22, 16:25, 17:7, 17:8, 17:9, 17:14, 19:19, 22:6, 23:7, 32:15, 48:2, 52:7, 53:5, 57:11, 59:14, 62:7, 62:21, 63:8, 63:18, 65:21, 65:22, 67:1, 82:9, 86:9, 105:9, 119:2, 209:18, 212:25, 223:1, 223:7, 223:18, 238:18, 240:8, 240:19, 240:23, 247:12, 248:4, 251:21, 252:8, 254:11, 255:9, 258:16, 262:13, 264:15, 264:16,

265:14, 265:15, 266:2, 266:13, 267:5, 267:22, 269:20, 277:19, 277:20, 277:21, 277:23, 281:7, 282:9, 283:16, 284:10, 285:8, 285:10, 285:17, 286:19, 291:16, 292:10, 294:25, 296:9, 297:5, 297:15, 297:18, 298:6, 298:7, 299:15, 299:5, 299:17, 300:13

**court** [10] - 5:15, 19:24, 58:18, 59:4, 131:2, 154:18, 266:21, 291:21, 300:2

**court's** [1] - 267:10

**Court's** [15] - 6:10, 6:19, 8:1, 8:13, 51:22, 60:25, 119:16, 223:8, 251:8, 253:19, 259:21, 263:6, 264:12, 297:4, 298:11

**courteously** [1] - 34:8

**courtesy** [1] - 154:2

**courthouse** [3] - 21:3, 52:11, 63:11

**courtroom** [2] - 18:19, 27:2, 28:19, 32:9, 35:18, 35:19, 38:1, 42:24, 48:6, 53:1, 58:13, 58:22, 60:15, 64:18, 64:25, 100:6, 102:16, 110:6, 110:8, 143:10, 239:19, 265:15, 265:17, 265:23, 265:25, 280:14

**COURTROOM** [1] - 239:25

**courtrooms** [1] - 100:14

**cover** [3] - 31:8, 161:17, 270:12

**covered** [2] - 12:9, 277:6

**covet** [1] - 35:13

**cracks** [1] - 178:17

**CRAVATH** [1] - 2:12

**crazy** [1] - 189:8

**cream** [5] - 171:3, 172:8, 215:21, 215:24, 216:1

**create** [17] - 32:5, 32:20, 38:24, 41:12, 47:4, 48:21, 93:9, 104:9, 123:5, 128:20,

140:8, 211:6, 211:10, 212:8, 237:18, 249:10, 262:12

**created** [6] - 30:13, 30:16, 101:25, 283:10, 292:23

**creates** [4] - 136:12, 171:9, 251:22, 292:18

**creating** [6] - 86:3, 94:7, 121:23, 133:15, 140:14, 279:21

**creation** [4] - 38:10, 48:23, 125:8, 292:22

**creative** [1] - 141:12

**creativity** [1] - 144:16

**credibility** [1] - 295:13

**credit** [2] - 35:9, 165:24

**crisscrossed** [1] - 109:3

**CROSS** [4] - 119:18, 148:16, 214:6, 235:16

**cross** [21] - 45:1, 45:3, 66:15, 119:15, 213:22, 234:21, 235:15, 241:21, 242:2, 253:3, 255:17, 256:1, 256:19, 257:11, 257:15, 257:23, 268:17, 269:16, 269:17, 270:11, 271:23

**cross-exam** [2] - 269:16, 269:17

**cross-examination** [5] - 119:15, 234:21, 253:3, 256:1, 256:19

**CROSS-EXAMINATION** [4] - 119:18, 148:16, 214:6, 235:16

**cross-examine** [1] - 66:15

**cross-over** [2] - 45:1, 45:3

**crossed** [1] - 82:8

**crow** [1] - 30:24

**crowd** [1] - 40:13

**crowded** [1] - 100:16

**crowds** [1] - 108:3

**Crown** [3] - 87:12, 87:22, 128:15

**crucial** [2] - 299:19, 299:21

**crystal** [41] - 26:10, 43:20, 44:1, 44:16, 44:19, 104:10, 104:16, 104:18,

104:19, 105:3, 105:5, 107:3, 132:5, 144:2, 144:11, 175:11, 177:25, 178:3, 178:7, 178:8, 179:2, 179:3, 220:8, 220:9, 220:10, 220:16, 221:4, 221:12, 221:17, 221:18, 221:23, 221:25, 222:2, 222:10, 226:20, 226:23, 226:24, 226:25, 227:14

**Crystal** [120] - 23:18, 31:3, 31:21, 32:6, 33:4, 33:5, 34:15, 35:6, 36:4, 36:17, 36:19, 36:24, 38:13, 40:24, 44:9, 45:2, 45:13, 46:8, 46:10, 46:11, 103:15, 105:6, 107:5, 108:3, 109:25, 118:8, 118:9, 118:12, 121:23, 124:13, 125:9, 127:6, 136:7, 139:16, 143:15, 143:22, 145:6, 145:12, 147:6, 147:9, 147:10, 148:4, 149:12, 149:15, 150:1, 156:23, 156:24, 157:24, 158:13, 159:2, 159:4, 160:12, 161:1, 162:6, 164:7, 164:19, 165:14, 165:21, 166:19, 167:9, 168:15, 169:9, 172:13, 174:1, 175:4, 182:2, 183:12, 186:3, 191:18, 196:17, 197:2, 199:9, 200:1, 200:18, 207:17, 210:1, 213:4, 215:9, 215:19, 216:7, 216:11, 216:19, 217:12, 219:24, 220:7, 220:14, 220:17, 221:3, 221:6, 221:10, 221:16, 225:8, 226:18, 227:4, 227:6, 227:12, 228:2, 228:6, 229:1, 229:7, 229:21, 230:2, 231:12, 231:25, 235:24, 243:3, 246:5, 247:9, 248:19, 248:24, 249:13, 249:22, 249:23, 250:18, 250:19, 251:11, 262:9, 286:3,

287:23, 291:22

**crystal-like** [2] - 104:10, 105:3

**crystals** [3] - 105:14, 131:13, 145:15

**CSR** [2] - 1:21, 301:24

**cuff** [1] - 208:25

**culminated** [1] - 276:16

**cure** [1] - 106:22

**curious** [1] - 62:18

**curvature** [1] - 101:19

**customer** [5] - 166:14, 189:20, 221:7, 221:15, 229:13

**customers** [3] - 220:14, 221:3, 222:8

**cut** [2] - 129:23, 171:20

**CV** [3] - 1:8, 5:6, 20:4

## D

**D.C** [5] - 78:23, 79:2, 79:5, 164:10, 164:12

**dad** [2] - 73:9, 73:12

**Dallas** [4] - 71:15, 71:25, 107:6, 149:3

**Dallas/Houston** [1] - 187:1

**dan** [1] - 200:5

**Dan** [54] - 24:25, 75:16, 75:24, 75:25, 76:4, 76:19, 77:17, 83:20, 88:11, 88:19, 90:1, 91:10, 93:24, 95:13, 96:16, 102:21, 105:24, 106:7, 107:4, 107:8, 108:4, 108:16, 112:2, 115:2, 115:13, 115:18, 116:19, 123:25, 140:22, 157:23, 165:6, 184:4, 184:12, 184:13, 185:14, 186:7, 186:10, 188:1, 188:18, 188:24, 189:13, 190:7, 190:9, 191:5, 192:4, 192:8, 192:12, 192:13, 194:12, 200:5, 227:3

**Dan's** [5] - 76:7, 83:6, 91:7, 108:2, 114:14

**Danny** [22] - 20:11, 23:25, 24:11, 24:12, 24:13, 25:11, 26:5,

26:8, 26:16, 28:8, 28:10, 29:18, 33:25, 34:14, 75:18, 79:16, 116:10, 116:25, 117:3, 197:17

**Danny's** [1] - 26:20

**dark** [6] - 100:10, 191:2, 271:2, 299:17, 299:23, 300:5

**DATE** [1] - 301:21

**date** [8] - 103:5, 158:8, 223:19, 231:22, 234:16, 244:6, 283:20, 284:24

**dated** [1] - 282:14

**dates** [4] - 123:10, 283:7, 285:24, 285:25

**Davey** [6] - 116:1, 116:2, 116:8, 116:11, 116:20, 117:12

**Davey's** [1] - 117:15

**David** [7] - 5:21, 13:17, 20:9, 241:12, 257:7, 258:4, 258:5

**DAVID** [1] - 2:5

**Davy** [1] - 258:13

**DAY** [1] - 1:15

**day-to-day** [1] - 156:9

**days** [14] - 123:21, 123:22, 125:4, 184:25, 185:5, 187:20, 188:5, 188:13, 191:21, 197:17, 214:11, 214:13, 234:14, 271:6

**Dead** [27] - 39:13, 39:14, 39:23, 40:2, 40:17, 40:23, 41:20, 41:21, 43:15, 43:16, 44:21, 96:18, 96:24, 97:2, 97:18, 105:19, 105:22, 143:3, 143:8, 143:11, 143:13, 143:16, 143:19, 143:24, 144:8, 291:11

**deal** [3] - 25:9, 184:2, 195:2

**dealt** [1] - 88:25

**death** [2] - 39:23, 41:5

**decades** [1] - 33:13

**decals** [1] - 191:18

**decanter** [2] - 80:17

**decanters** [2] - 80:16

**deceased** [2] - 39:18, 39:20

**December** [14] - 26:24, 30:11, 103:7, 157:7, 157:10,

157:11, 158:7, 158:19, 167:16, 169:13, 173:3, 173:19, 173:25, 182:9

**decide** [16] - 49:25, 50:14, 52:8, 53:18, 55:13, 55:15, 56:5, 56:8, 59:3, 60:12, 65:5, 159:24, 167:20, 237:1, 296:8, 296:25

**decided** [10] - 21:9, 30:9, 30:12, 58:17, 59:20, 167:17, 172:7, 188:6, 219:18, 219:22

**decides** [1] - 218:23

**deciding** [5] - 7:11, 50:18, 51:5, 54:11, 54:13

**decision** [9] - 27:9, 32:17, 35:25, 50:12, 134:2, 172:10, 173:5, 219:1, 225:17

**decisions** [1] - 134:8

**decorated** [5] - 46:13, 46:18, 97:11, 209:2, 209:4

**decoration** [3] - 46:12, 46:16, 228:19

**decorations** [1] - 46:17

**decorative** [1] - 211:9

**dedicated** [2] - 180:7, 198:17

**deducted** [1] - 7:15

**deem** [10] - 18:2, 243:14, 244:2, 244:12, 252:9, 255:9, 256:3, 263:20, 269:8, 287:8

**deemed** [48] - 18:7, 68:13, 92:20, 92:22, 244:4, 244:18, 244:25, 245:8, 245:15, 252:23, 254:11, 256:18, 256:21, 271:18, 272:7, 272:11, 272:15, 272:19, 272:23, 273:2, 273:11, 273:20, 274:1, 274:7, 274:11, 274:15, 274:19, 274:23, 275:2, 275:6, 278:8, 278:11, 287:17, 287:25, 288:2, 288:8, 288:12, 288:18, 289:1, 289:6, 289:10, 289:16, 289:20, 290:1, 290:7,

290:15, 290:19, 290:23

**deep** [2] - 98:7, 140:23

**deepened** [2] - 174:11, 225:11

**deeper** [1] - 226:3

**deeply** [1] - 136:1

**deer** [1] - 139:9

**defect** [5] - 178:12, 179:8, 179:20, 179:24, 190:20

**defects** [3] - 180:7, 181:3, 181:5

**defend** [1] - 32:10

**defendant** [11] - 50:15, 66:14, 66:16, 66:17, 208:8, 243:11, 256:2, 256:18, 266:24, 267:1, 298:10

**DEFENDANT** [1] - 2:11

**defendant's** [3] - 286:5, 291:23, 296:17

**defendants** [20] - 11:17, 14:15, 33:9, 253:2, 255:15, 255:16, 269:15, 270:19, 271:11, 271:24, 276:2, 277:12, 287:3, 291:3, 291:4, 291:12, 291:24, 292:6, 292:10, 294:17

**DEFENDANTS** [1] - 1:12

**defendants'** [2] - 15:9, 253:5

**defense** [20] - 12:10, 20:19, 36:6, 48:9, 238:1, 238:2, 251:22, 254:10, 254:14, 257:15, 262:21, 268:24, 275:12, 276:1, 280:6, 284:13, 284:19, 291:1, 291:4, 293:16

**defenses** [1] - 16:19

**defies** [1] - 45:18

**defined** [4] - 27:7, 33:17, 225:25, 226:2

**definitely** [2] - 217:15, 237:22

**definition** [1] - 174:12

**degree** [3] - 70:6, 70:7, 71:16

**delaminates** [1] - 176:11

**delayed** [2] - 42:18,

42:19

**deliberate** [2] - 60:18, 67:5

**deliberately** [1] - 55:16

**deliberation** [1] - 57:1

**deliberations** [6] - 56:7, 60:1, 61:15, 63:14, 99:1, 133:24

**delivering** [2] - 74:13, 74:14

**delivery** [1] - 74:12

**demean** [1] - 105:21

**demeanor** [1] - 61:9

**demonstrate** [6] - 47:25, 84:8, 85:5, 85:23, 86:5, 86:22

**demonstrative** [10] - 13:14, 258:24, 259:13, 259:15, 260:19, 260:24, 261:10, 261:24, 262:10, 263:10

**demonstratives** [2] - 241:19, 249:21

**denied** [1] - 59:5

**Denny's** [1] - 166:3

**dent** [1] - 153:25

**deny** [2] - 28:3, 31:4

**denying** [2] - 6:19, 65:11

**department** [3] - 152:4, 200:14, 200:15

**depended** [1] - 224:9

**deposed** [1] - 16:17

**deposition** [19] - 8:6, 8:9, 8:14, 8:15, 8:23, 8:25, 9:3, 9:19, 9:21, 10:4, 12:19, 12:20, 15:7, 15:8, 15:14, 134:1, 223:17, 298:1, 298:4

**depositions** [1] - 285:24

**depth** [2] - 76:18, 93:9

**deputy** [12] - 18:19, 19:6, 23:8, 27:2, 28:19, 53:1, 58:13, 64:18, 68:19, 92:15, 137:24, 144:20

**describe** [7] - 72:15, 76:17, 84:19, 112:25, 157:12, 157:22, 260:16

**described** [2] - 21:15, 108:16

**deserve** [1] - 211:15

**deserves** [3] - 32:15,

32:16, 56:2

**design** [11] - 41:2, 81:18, 86:3, 89:10, 115:3, 115:16, 115:17, 118:10, 137:20, 137:22, 184:23

**designate** [1] - 15:15

**designated** [6] - 8:12, 9:2, 9:21, 10:2, 13:4, 298:3

**designation** [5] - 8:7, 10:14, 15:9, 15:21, 16:9

**designations** [7] - 9:8, 12:20, 12:23, 12:24, 12:25, 15:7, 15:9

**designer** [1] - 38:22

**designing** [2] - 38:16, 40:5

**designs** [1] - 83:6

**desist** [11] - 34:2, 34:7, 34:11, 42:11, 42:12, 134:9, 234:9, 234:10, 275:18, 276:24, 277:7

**despite** [4] - 122:13, 134:16, 137:9, 286:3

**destroy** [1] - 60:23

**detail** [4] - 26:7, 100:2, 226:6, 285:16

**details** [1] - 46:6

**determine** [6] - 54:14, 62:8, 247:13, 247:14, 277:17

**determined** [4] - 25:25, 49:16, 162:17, 251:18

**develop** [7] - 89:20, 158:12, 158:14, 158:15, 163:15, 165:5, 165:11

**developed** [2] - 25:10, 48:24

**developing** [5] - 159:23, 166:22, 168:7, 168:15, 197:9

**development** [3] - 124:13, 285:21, 286:2

**devices** [1] - 58:1

**devil** [2] - 39:24, 41:5

**Diablito** [1] - 41:5

**diablito** [1] - 46:15

**Diablo** [1] - 98:13

**diamonds** [1] - 104:15

**dictionaries** [1] - 57:19

**died** [2] - 73:13,

115:10
**Diego** [1] - 78:18
**differ** [1] - 51:14
**difference** [4] - 102:12, 130:23, 131:3, 228:14
**differences** [13] - 29:9, 29:12, 29:13, 32:23, 55:12, 100:9, 121:2, 121:19, 228:14, 229:9, 229:10, 229:14, 240:12
**different** [47] - 14:13, 26:25, 28:17, 37:19, 37:20, 37:22, 43:13, 43:19, 44:20, 44:23, 45:6, 45:7, 46:20, 47:1, 47:3, 47:4, 47:16, 55:7, 61:6, 82:12, 88:3, 97:19, 120:23, 121:6, 121:17, 121:20, 125:6, 128:17, 130:16, 130:20, 130:21, 138:25, 140:3, 161:9, 168:15, 194:20, 198:10, 214:23, 219:6, 229:7, 229:16, 229:17, 229:19, 247:22
**differentiate** [1] - 197:14
**differently** [1] - 55:11
**differs** [1] - 55:14
**difficult** [11] - 83:14, 93:24, 94:1, 125:5, 151:6, 175:5, 175:6, 175:7, 175:15, 239:1, 249:12
**difficulties** [1] - 175:23
**dig** [1] - 226:3
**digital** [2] - 23:15, 237:17
**digitally** [1] - 83:7
**diligence** [2] - 82:1, 82:3
**dimensional** [11] - 93:8, 93:14, 93:15, 93:21, 94:4, 94:6, 101:22, 102:2, 114:24, 225:23, 280:13
**dimly** [1] - 100:19
**dinner** [2] - 149:7, 189:19
**DIRECT** [2] - 69:10, 155:16

**direct** [20] - 53:9, 53:10, 53:17, 122:11, 152:14, 164:3, 223:25, 241:21, 241:22, 257:3, 257:22, 268:15, 269:17, 269:22, 270:10, 270:11, 271:23, 297:1
**directly** [3] - 82:8, 160:12, 163:21
**director** [3] - 31:25, 248:5, 251:10
**disagree** [1] - 37:11
**disagreement** [1] - 253:16
**disappeared** [2] - 28:21, 32:11
**discern** [3] - 121:19, 229:10, 229:14
**discerned** [1] - 130:23
**disclose** [1] - 297:13
**disclosed** [4] - 14:23, 16:12, 294:23, 294:24
**disclosure** [1] - 16:17
**disclosures** [1] - 16:13
**discovered** [1] - 111:15
**discuss** [2] - 14:18, 17:15, 57:10, 58:12, 64:19, 65:21, 82:12, 240:4, 240:6, 281:13, 285:9, 290:4
**discussed** [7] - 17:23, 18:13, 57:23, 58:1, 92:23, 241:4, 287:1
**discussing** [4] - 56:18, 265:16, 265:25, 281:12
**discussion** [13] - 14:25, 17:11, 79:14, 79:16, 81:2, 119:6, 263:8, 263:21, 264:6, 266:1, 266:2, 266:13, 294:10
**discussions** [3] - 135:23, 267:12, 293:24
**disgorgement** [1] - 7:13
**dislikes** [1] - 49:23
**dismissed** [2] - 126:1, 126:6
**display** [2] - 45:23, 186:9

**displayed** [1] - 41:11
**displays** [2] - 97:5, 211:5
**dispute** [1] - 267:5
**disputes** [1] - 285:5
**disputing** [1] - 36:18
**disregard** [3] - 51:24, 54:9, 202:22
**dissimilarities** [1] - 33:7
**distance** [2] - 100:21, 101:2
**distill** [8] - 170:13, 170:14, 171:1, 171:13, 172:15, 172:17, 172:18
**distillate** [1] - 171:18
**distillation** [1] - 169:7
**distilled** [2] - 39:9, 172:14
**distilleries** [1] - 176:10
**distillery** [5] - 106:5, 111:16, 169:22, 169:23, 181:12
**distilling** [2] - 170:21, 171:14
**distinct** [1] - 285:19
**distinction** [1] - 53:16
**distinctive** [2] - 32:10, 32:13
**distract** [1] - 60:14
**distracting** [1] - 61:13
**distribute** [2] - 164:7, 164:19
**distribution** [2] - 161:23, 189:4
**distributor** [12] - 117:23, 160:21, 164:2, 164:16, 164:25, 166:2, 184:4, 188:21, 195:1, 195:15, 212:2
**distributors** [22] - 161:18, 163:13, 163:14, 163:17, 163:19, 163:24, 164:6, 164:18, 164:23, 164:24, 165:8, 165:15, 165:16, 166:7, 191:8, 193:25, 194:19, 194:22, 194:23, 197:5, 200:1, 215:16
**distributorship** [3] - 80:7, 81:5, 189:21
**DISTRICT** [5] - 1:1,

1:2, 1:4, 301:11, 301:12
**DIVISION** [1] - 1:2
**DO** [1] - 301:12
**docket** [3] - 277:8, 277:24, 277:25
**docks** [1] - 72:17
**doctor** [1] - 260:9
**document** [29] - 8:6, 12:18, 250:5, 279:4, 279:22, 280:16, 281:5, 283:2, 283:6, 283:17, 283:19, 283:20, 284:15, 284:22, 285:4, 285:6, 285:14, 285:19, 285:25, 286:7, 286:11, 286:17, 294:24, 295:16, 296:3, 296:7
**documents** [11] - 283:13, 286:4, 291:9, 294:8, 296:19, 296:20, 296:22, 297:8, 297:10, 297:11, 297:14
**dollar** [1] - 167:5
**dollars** [3] - 167:14, 172:4, 192:1
**Don** [1] - 128:15
**done** [36] - 10:13, 12:7, 14:2, 18:3, 18:18, 32:14, 33:16, 41:25, 42:1, 47:9, 61:21, 80:20, 83:13, 95:12, 111:13, 120:3, 126:12, 135:19, 139:4, 141:21, 141:22, 151:6, 151:13, 158:16, 165:4, 171:12, 181:1, 189:22, 197:1, 198:12, 219:8, 225:14, 232:21, 243:15, 299:10
**door** [2] - 95:25, 107:4
**dormant** [1] - 191:1
**down** [25] - 27:12, 60:3, 64:15, 69:15, 85:22, 95:4, 99:18, 102:18, 111:12, 114:18, 126:25, 137:4, 153:14, 168:25, 169:3, 176:15, 176:17, 178:17, 178:25, 179:14, 180:22, 185:1, 199:23, 238:8, 253:20

**dozen** [2] - 118:1, 184:6
**drafting** [1] - 296:21
**draftsman** [1] - 87:4
**drama** [1] - 97:21
**dramatic** [1] - 95:6
**Drambuie** [2] - 87:12, 87:23
**draw** [4] - 70:16, 91:1, 95:24, 95:25
**drawing** [25] - 44:6, 70:9, 71:19, 72:5, 72:7, 83:5, 85:8, 86:12, 86:14, 87:16, 89:16, 93:12, 108:10, 113:1, 120:1, 123:13, 124:25, 125:1, 125:2, 125:4, 125:6, 126:10, 126:16, 142:16
**drawings** [20] - 44:5, 81:18, 83:2, 84:17, 88:10, 93:20, 95:13, 112:23, 114:3, 114:22, 116:14, 123:5, 123:20, 125:8, 126:11, 126:12, 139:17, 139:20, 140:5, 140:7
**drawn** [1] - 37:16
**dream** [5] - 38:10, 42:8, 42:19, 42:24, 192:25
**dress** [12] - 27:18, 32:19, 33:24, 37:2, 37:5, 41:10, 41:12, 118:16, 136:4, 152:15, 235:4, 250:15
**drew** [2] - 25:24, 38:15
**drilling** [1] - 74:20
**drink** [1] - 166:19
**drinking** [1] - 32:12
**drive** [3] - 190:4, 190:7, 190:8
**driver** [1] - 190:7
**driver's** [1] - 190:10
**drivers** [1] - 190:8
**driving** [3] - 38:8, 190:6, 190:10
**DROOKS** [1] - 2:8
**drop** [1] - 166:9
**dropped** [1] - 31:2
**drug** [2] - 73:1, 74:12
**drunk** [1] - 39:6
**due** [3] - 63:23, 82:1, 82:3
**duly** [2] - 69:1, 155:7
**duplicate** [1] - 145:7
**during** [26] - 18:15, 40:17, 45:19, 49:11,

56:12, 58:1, 60:1, 61:14, 61:17, 63:14, 64:22, 67:15, 77:16, 78:13, 97:18, 98:25, 117:3, 131:17, 179:5, 195:15, 223:24, 240:10, 243:6, 247:3, 287:5, 296:25

**duties** [1] - 50:4
**duty** [4] - 49:18, 51:18, 56:12
**DVD's** [1] - 189:12

## E

**earliest** [3] - 10:18, 144:4, 190:21
**early** [29] - 24:8, 25:4, 74:11, 94:22, 96:12, 98:3, 98:4, 103:3, 104:13, 110:12, 112:25, 113:13, 113:20, 113:24, 115:21, 115:24, 116:8, 120:1, 129:14, 154:6, 157:7, 157:8, 157:10, 158:7, 188:14, 203:7, 227:24, 267:22
**easier** [3] - 27:11, 298:12, 299:1
**easiest** [1] - 90:11
**East** [2] - 72:20, 118:16
**EAST** [1] - 2:9
**Eastern** [1] - 175:13
**easy** [6] - 28:12, 100:18, 169:18, 170:1, 272:3, 276:8
**eat** [1] - 154:11
**eating** [1] - 80:1
**editor** [4] - 28:1, 30:15, 207:8, 208:6
**educated** [1] - 166:5
**educating** [1] - 197:11
**education** [4] - 69:18, 69:25, 70:1, 70:19
**educational** [1] - 197:16
**effect** [3] - 73:5, 73:14, 97:15
**effective** [1] - 19:10
**efficient** [2] - 159:21, 188:7
**effort** [2] - 91:9, 150:3
**efforts** [3] - 48:21,

48:22, 267:17
**egotistic** [1] - 141:16
**egotistical** [1] - 141:11
**egregiously** [1] - 16:16
**eight** [16] - 21:6, 21:10, 55:3, 179:8, 179:9, 179:12, 180:15, 190:21, 227:1, 238:25, 239:3, 239:8, 239:9, 239:11, 263:25
**EIGHTH** [1] - 2:13
**either** [27] - 6:10, 12:11, 13:10, 17:19, 24:8, 42:12, 53:17, 63:22, 64:24, 94:17, 113:9, 138:17, 145:10, 166:3, 166:18, 176:18, 188:19, 206:17, 236:2, 239:5, 264:15, 281:25, 284:15, 288:1, 295:16, 296:3, 300:2
**electronic** [2] - 56:19, 74:15
**elements** [1] - 139:3
**ELEMENTS** [1] - 1:10
**Elements** [36] - 5:7, 5:24, 8:20, 12:24, 16:6, 20:5, 20:13, 28:15, 28:16, 32:18, 36:13, 36:21, 38:4, 42:6, 48:7, 133:21, 137:2, 137:9, 208:13, 212:6, 229:22, 230:3, 230:11, 231:23, 234:7, 235:3, 270:6, 270:7, 275:19, 275:20, 276:17, 279:9, 282:15, 283:23, 285:18, 295:18
**Elements'** [1] - 13:1
**Elise** [2] - 16:14, 17:2
**Elit** [1] - 217:2
**elsewhere** [1] - 35:3
**Elvis** [1] - 80:17
**email** [2] - 56:19, 279:20
**emails** [2] - 11:1, 283:5
**embarrassing** [2] - 110:17, 211:17
**embedded** [1] - 131:14

**emotionally** [1] - 96:23
**employed** [1] - 162:10
**employee** [1] - 158:5
**employees** [4] - 117:13, 117:19, 117:21, 213:9
**employer** [2] - 57:3, 57:6
**employment** [2] - 158:9, 161:19
**empty** [1] - 31:1
**encountered** [1] - 111:10
**encyclopedia** [1] - 193:4
**end** [21] - 10:23, 30:14, 50:2, 56:7, 56:13, 60:19, 64:15, 75:8, 95:7, 95:8, 115:17, 125:4, 140:13, 158:2, 173:6, 190:15, 190:23, 212:21, 227:18, 237:19, 292:23
**ended** [5] - 72:7, 79:9, 187:2, 187:17
**ending** [1] - 127:23
**endorsement** [1] - 193:8
**energy** [2] - 31:23, 35:11
**engage** [1] - 165:10
**engineer** [1] - 73:1
**engineering** [1] - 193:19
**England** [1] - 118:17
**enormous** [1] - 73:18
**Enrico** [1] - 204:18
**ensure** [1] - 177:14
**entail** [1] - 188:4
**entailed** [1] - 277:1
**entails** [1] - 156:6
**enter** [3] - 159:20, 159:21, 159:25
**entered** [1] - 280:25
**entering** [1] - 216:19
**enthusiastic** [4] - 134:8, 135:22, 140:23, 140:24
**enticing** [1] - 109:14
**entire** [14] - 9:8, 59:11, 96:8, 97:9, 97:21, 98:9, 98:11, 138:5, 188:22, 199:21, 200:19, 253:11, 254:7, 280:25
**entirely** [1] - 81:10

**entirety** [1] - 97:3
**entitled** [3] - 37:5, 37:6, 59:2
**ENTITLED** [1] - 301:16
**environment** [2] - 74:7, 249:11
**equally** [1] - 46:18
**equipment** [1] - 25:18
**equivalent** [1] - 156:8
**error** [3] - 65:7, 125:10, 125:16
**Escarcega** [3] - 8:7, 8:21, 10:18
**especially** [9] - 104:23, 165:4, 166:11, 167:11, 174:6, 175:25, 190:18, 195:9, 237:17
**ESQUIRE** [4] - 2:5, 2:9, 2:12, 2:13
**essence** [5] - 99:17, 100:2, 101:1, 122:11, 122:14
**essentially** [6] - 16:13, 37:21, 40:18, 212:10, 228:20, 249:7
**establish** [3] - 280:20, 292:20, 293:12
**estimate** [10] - 114:10, 196:9, 196:13, 196:15, 200:16, 241:21, 257:12, 257:25, 268:14, 269:13
**estimated** [2] - 257:9, 258:2
**estimates** [2] - 263:17, 270:16
**et** [3] - 5:7, 20:5, 97:6
**ethic** [2] - 25:10, 25:21
**eureka** [1] - 40:18
**Europe** [2] - 156:20, 190:19
**European** [2] - 98:6, 175:13
**evaluate** [2] - 64:4, 64:5
**evening** [2] - 11:23, 24:9
**event** [1] - 26:17, 55:10, 137:12, 137:15, 148:23, 149:2, 149:4, 149:6, 183:15, 224:20, 224:24

**events** [3] - 108:22, 197:18, 285:20
**eventually** [1] - 171:10
**evidence** [111] - 11:6, 21:16, 21:19, 22:2, 23:4, 28:4, 30:18, 32:4, 32:17, 34:3, 35:4, 36:1, 37:12, 38:5, 38:7, 40:9, 41:14, 42:4, 43:2, 43:12, 45:8, 45:12, 47:18, 47:25, 48:2, 48:3, 48:20, 49:9, 49:12, 49:13, 49:19, 50:1, 50:7, 50:9, 50:10, 50:13, 50:17, 50:20, 50:24, 51:3, 51:4, 51:7, 51:9, 51:13, 51:18, 51:20, 51:25, 52:1, 52:3, 52:4, 52:7, 52:8, 52:13, 52:20, 52:25, 53:3, 53:6, 53:9, 53:10, 53:13, 53:15, 53:17, 53:19, 53:20, 53:21, 53:23, 53:24, 54:8, 54:10, 54:12, 55:3, 55:23, 56:9, 57:12, 58:17, 59:21, 60:10, 60:19, 61:2, 61:18, 63:23, 64:6, 65:5, 65:6, 66:4, 66:7, 66:9, 66:13, 66:19, 66:24, 67:10, 68:17, 98:24, 177:10, 210:21, 235:8, 239:21, 242:14, 247:3, 251:12, 262:10, 264:19, 276:1, 277:13, 280:14, 280:21, 280:25, 287:22, 290:3
**ex** [1] - 6:18
**exact** [6] - 88:6, 158:7, 205:23, 229:3, 234:16
**exactly** [10] - 24:9, 29:11, 75:11, 75:18, 94:15, 125:15, 130:14, 197:12, 229:2, 281:5
**exam** [3] - 269:16, 269:17
**EXAMINATION** [8] - 69:10, 119:18, 148:16, 149:23, 155:16, 214:6, 235:16, 236:15
**examination** [17] -

29:6, 66:18, 119:15, 146:13, 153:5, 154:7, 234:21, 240:4, 253:3, 256:1, 256:19, 257:3, 261:22, 268:15, 270:8, 270:24, 271:23

**examine** [6] - 18:23, 19:12, 28:24, 66:15, 99:1, 147:18

**examined** [3] - 69:2, 146:10, 155:8

**example** [8] - 28:18, 98:24, 137:14, 165:12, 166:1, 173:12, 209:7, 278:25

**examples** [1] - 197:24

**except** [1] - 241:16

**exception** [1] - 116:15

**exchange** [3] - 133:14, 150:4, 296:19

**exchanged** [1] - 258:25

**exchanges** [1] - 279:20

**excited** [2] - 80:6, 162:25

**exciting** [1] - 185:8

**exclude** [2] - 264:19, 276:1

**excluded** [5] - 51:23, 264:15, 264:25, 265:8, 275:21

**exclusively** [1] - 59:21

**excuse** [10] - 62:5, 91:15, 101:4, 105:24, 108:15, 111:5, 113:8, 151:23, 192:18, 238:16

**excused** [19] - 58:5, 60:24, 63:9, 63:14, 65:20, 153:11, 153:17, 153:22, 153:24, 154:3, 154:13, 154:15, 237:25, 238:11, 238:23, 239:22, 240:2, 260:10, 260:12

**excuses** [1] - 63:18

**excusing** [2] - 238:7, 238:19

**execute** [1] - 197:10

**execution** [1] - 166:8

**exercise** [2] - 12:5, 18:4

**exercising** [1] - 43:6

**EXHIBIT** [37] - 243:18, 244:8,

244:14, 245:1, 245:10, 245:16, 252:10, 252:17, 252:24, 272:8, 272:12, 272:16, 272:20, 272:24, 273:3, 273:12, 273:17, 273:21, 274:2, 274:8, 274:12, 274:16, 274:20, 274:24, 275:3, 275:7, 287:18, 288:9, 289:3, 289:7, 289:11, 289:17, 289:21, 290:8, 290:16, 290:20, 290:24

**Exhibit** [35] - 92:24, 92:25, 98:12, 98:23, 99:4, 104:1, 112:12, 126:14, 126:17, 127:13, 131:9, 138:1, 146:17, 174:17, 201:4, 206:24, 222:13, 235:8, 244:10, 244:17, 245:3, 245:11, 245:17, 248:17, 254:7, 256:13, 260:14, 267:3, 271:10, 271:16, 284:18, 284:19, 287:13, 287:19, 288:13

**exhibit** [73] - 6:20, 7:8, 7:10, 7:20, 7:21, 7:23, 7:24, 12:12, 16:12, 53:23, 54:2, 54:4, 85:25, 98:11, 112:11, 112:17, 112:20, 113:6, 146:2, 201:11, 206:9, 207:22, 233:8, 233:9, 233:17, 233:19, 233:23, 235:8, 240:17, 241:15, 241:19, 242:7, 243:2, 243:19, 245:5, 245:12, 245:19, 247:6, 253:5, 253:11, 253:13, 253:20, 254:10, 254:21, 255:3, 255:8, 262:10, 262:15, 263:1, 263:5, 271:14, 276:13, 277:20, 277:22, 278:10, 279:13, 279:19, 279:25, 280:25, 281:13, 281:16, 281:17, 281:19, 281:22, 282:4, 282:7, 282:10,

282:22, 283:12, 284:9, 284:18, 286:19, 287:7

**exhibits** [59] - 10:24, 11:9, 11:13, 11:19, 11:20, 11:25, 12:6, 12:15, 13:9, 13:15, 13:16, 13:23, 14:15, 17:22, 17:25, 18:2, 22:4, 50:20, 51:2, 68:5, 68:7, 68:20, 68:21, 92:23, 98:15, 98:23, 130:12, 145:1, 240:5, 240:16, 241:6, 242:13, 242:22, 246:18, 252:1, 252:2, 252:25, 253:3, 255:17, 256:2, 258:1, 258:24, 260:22, 263:17, 263:19, 267:3, 268:8, 268:22, 268:24, 271:7, 271:24, 277:1, 287:4, 287:11, 287:20, 290:25, 292:13, 296:17, 296:25

**EXHIBITS** [4] - 256:23, 269:9, 271:21, 288:20

**Exhibits** [2] - 137:24, 296:16

**exist** [2] - 47:12, 132:17

**existed** [1] - 82:2

**existence** [1] - 204:16

**exists** [1] - 295:16

**EXITS** [1] - 239:25

**Exodus** [1] - 35:13

**expand** [1] - 211:11

**expect** [14] - 8:18, 10:1, 10:16, 11:14, 12:7, 12:9, 57:7, 201:6, 219:9, 246:17, 257:10, 257:15, 263:23, 271:24

**expected** [3] - 63:24, 215:9, 215:14

**expecting** [2] - 257:17, 269:25

**expects** [3] - 66:9, 177:18, 258:13

**expensive** [6] - 27:9, 172:4, 176:23, 177:16, 177:17, 178:1

**experience** [6] - 38:19, 71:11, 161:20, 161:22, 219:25, 298:5

**experimental** [1] - 171:23

**expertise** [1] - 116:12

**experts** [1] - 299:16

**explain** [13] - 33:9, 33:14, 62:25, 95:19, 107:13, 150:12, 166:13, 170:23, 193:16, 237:7, 247:4, 249:20, 260:20

**exploit** [1] - 31:23

**exposed** [3] - 56:11, 59:13, 59:23

**exposure** [3] - 33:11, 143:19, 193:5

**express** [2] - 62:1, 110:22

**expressedly** [1] - 219:20

**extend** [1] - 211:8

**extensive** [2] - 38:18, 38:19

**extensively** [3] - 39:6, 42:25, 43:22

**extent** [6] - 10:12, 151:18, 246:11, 250:14, 265:11, 267:18

**Extra** [2] - 98:12, 131:9

**extra** [4] - 164:21, 178:4, 178:7, 199:4

**extremely** [6] - 100:24, 151:6, 181:11, 192:24, 201:25, 213:17

**eye** [3] - 46:23, 174:11, 225:11

**eyes** [6] - 43:5, 46:15, 89:22, 89:23, 100:9, 102:7

**eyesight** [1] - 100:22

**F**

**face** [1] - 180:22
**Facebook** [3] - 56:21, 243:3, 243:4
**fact** [35] - 10:14, 17:9, 37:15, 37:16, 37:17, 44:4, 53:10, 53:14, 55:23, 61:10, 62:3, 63:1, 65:17, 73:6, 76:22, 115:19, 116:16, 119:25, 120:17, 125:20, 127:13, 130:2, 131:13, 132:10, 136:1, 137:9, 144:1, 151:20, 157:17,

216:12, 239:17, 248:23, 249:6, 285:5

**fact-finding** [1] - 61:10

**factors** [1] - 55:3

**factory** [9] - 94:16, 175:11, 177:4, 178:1, 180:10, 180:11, 180:13, 220:10

**facts** [13] - 35:23, 35:25, 37:10, 49:16, 49:19, 49:20, 50:18, 50:21, 50:22, 51:5, 51:14, 53:14, 54:13

**fair** [3] - 59:2, 59:5, 186:18

**fairness** [1] - 59:10

**fall** [1] - 30:11

**falling** [1] - 203:2

**Fallon** [1] - 192:8

**faltered** [1] - 109:23

**familiar** [7] - 96:10, 96:13, 112:20, 163:22, 198:5, 198:24, 204:14

**families** [1] - 97:12

**family** [13] - 25:15, 32:8, 34:23, 57:2, 57:5, 72:15, 77:3, 77:4, 77:7, 150:10, 150:23, 151:3, 151:7

**fan** [1] - 138:19

**fancied** [1] - 75:23

**far** [4] - 105:23, 199:13, 251:9, 258:12

**Far** [1] - 118:16

**fascination** [1] - 98:3

**fashioned** [1] - 70:16

**fast** [2] - 178:17, 180:16

**father** [2] - 72:23, 73:4

**Father's** [1] - 199:3

**favorite** [1] - 45:13

**favors** [2] - 211:2, 211:4

**FAY** [54] - 2:6, 154:24, 155:17, 155:22, 156:1, 157:16, 157:21, 174:16, 174:19, 174:23, 192:21, 196:7, 201:4, 201:8, 201:10, 201:18, 202:6, 202:10, 202:14, 202:23, 203:4, 203:15, 203:20, 203:22, 204:12, 204:13, 205:17, 206:2, 206:7,

206:20, 206:23, 207:13, 208:11, 209:15, 209:19, 209:23, 210:9, 210:24, 212:20, 213:1, 213:2, 213:21, 233:5, 234:18, 236:14, 236:16, 236:21, 236:25, 237:23, 238:4, 238:22, 297:21, 298:21, 300:12

**Fay** [2] - 5:20, 20:11

**feature** [2] - 27:25, 166:22

**features** [3] - 27:7, 33:17

**February** [5] - 27:23, 162:14, 190:22, 190:24, 191:11

**February-March** [1] - 27:23

**FEDERAL** [2] - 1:22, 301:25

**Federico** [2] - 283:24, 283:25

**feed** [1] - 247:9

**feedback** [2] - 83:6, 123:23

**feeds** [1] - 249:22

**fees** [2] - 7:14, 7:15

**feet** [2] - 140:25, 164:21

**fellow** [2] - 56:6, 56:25

**felt** [5] - 46:19, 88:21, 95:12, 95:15, 237:8

**fence** [1] - 33:19

**Fenos** [1] - 283:24

**fermentation** [1] - 171:9

**Festival** [1] - 39:3

**festival** [2] - 96:23, 197:18

**festivals** [1] - 97:10

**few** [14] - 26:21, 42:1, 43:3, 46:8, 56:3, 156:19, 170:11, 172:3, 175:1, 186:11, 190:4, 213:11, 248:20, 265:3

**field** [1] - 75:1

**fields** [6] - 25:14, 25:15, 25:16, 74:16, 74:18, 74:19

**fiery** [2] - 94:24

**fight** [2] - 32:10, 110:14

**figure** [5] - 40:6,

41:3, 129:11, 221:7, 222:9

**file** [4] - 231:21, 232:9, 266:20, 267:2

**filed** [16] - 8:5, 9:20, 12:24, 21:21, 136:22, 137:2, 224:18, 231:9, 231:13, 231:18, 231:22, 234:4, 266:21, 267:17, 276:17, 291:12

**filing** [4] - 15:6, 204:3, 204:5, 230:6

**filings** [1] - 8:5

**fill** [6] - 111:11, 111:23, 129:8, 176:19, 176:24, 177:8

**filled** [3] - 111:18, 120:7, 176:14

**filler** [2] - 176:14, 176:15

**filling** [1] - 176:21

**filter** [1] - 104:17

**filtered** [1] - 104:15

**filtration** [3] - 104:18, 169:7, 170:13

**final** [10] - 50:3, 84:17, 123:20, 134:8, 171:21, 173:22, 174:4, 251:7, 294:19

**finalize** [2] - 158:15, 167:20

**finalized** [4] - 114:11, 167:18, 294:18, 296:5

**finally** [4] - 46:2, 90:20, 166:17, 172:7

**finances** [1] - 280:17

**financial** [6] - 133:18, 135:24, 163:6, 226:13, 280:17, 282:15

**financially** [2] - 71:8, 211:12

**finder** [1] - 62:3

**finders** [1] - 63:1

**findings** [1] - 239:17

**fine** [3] - 48:23, 71:17, 71:20, 84:12, 98:20, 101:15, 203:20, 239:9, 244:5, 258:16, 259:9, 265:23, 270:4, 270:25, 281:14

**finish** [6] - 41:16, 214:4, 232:19, 257:20, 270:23, 270:24

**finished** [3] - 93:4, 125:5, 285:2

**fired** [1] - 93:8

**fireman** [2] - 151:21, 151:24

**fires** [1] - 152:5

**firm** [2] - 74:15, 74:24

**first** [112] - 8:6, 8:15, 8:17, 8:19, 12:18, 16:24, 18:5, 20:19, 21:1, 22:7, 23:19, 23:20, 26:19, 26:21, 28:6, 28:11, 29:4, 31:9, 43:12, 56:4, 66:5, 66:14, 67:24, 69:1, 74:10, 76:4, 79:14, 79:16, 84:19, 84:21, 86:21, 88:17, 90:10, 95:1, 96:14, 99:20, 101:17, 103:4, 103:5, 105:24, 105:25, 106:4, 109:10, 109:11, 128:10, 132:12, 155:7, 157:9, 161:7, 162:5, 162:7, 169:16, 170:10, 172:3, 173:8, 174:4, 175:25, 176:7, 177:20, 177:24, 178:2, 178:10, 179:23, 183:18, 183:20, 183:21, 184:24, 185:9, 186:2, 186:16, 187:6, 194:5, 199:11, 204:16, 204:18, 204:21, 204:22, 205:18, 205:21, 205:25, 206:8, 206:17, 206:24, 211:25, 219:12, 222:21, 231:24, 232:7, 236:7, 237:8, 241:20, 247:1, 247:14, 248:14, 263:15, 266:6, 268:1, 275:14, 280:1, 283:15, 283:18, 286:16, 291:7, 293:14, 294:22, 296:2, 296:6, 297:3

**fish** [1] - 73:18

**fit** [1] - 167:23

**five** [21] - 20:23, 23:8, 23:10, 23:16, 34:6, 54:24, 109:21, 145:17, 150:19, 180:17, 186:17, 186:21, 190:12, 190:16, 191:2, 227:2, 257:17, 263:24, 268:16, 280:12,

295:17

**five-minute** [1] - 23:8

**flange** [1] - 174:10

**flat** [3] - 89:13, 93:14, 94:4

**flatter** [1] - 47:1

**flavor** [2] - 172:25, 195:3

**flavors** [2] - 172:19, 172:20

**FLOOR** [1] - 2:10

**floor** [1] - 177:4

**Florida** [3] - 78:22, 107:22, 197:17

**flowers** [2] - 97:6, 97:11

**flows** [1] - 144:2

**fluid** [1] - 111:24

**fly** [1] - 195:23

**focus** [3] - 71:18, 100:6, 194:11

**focused** [5] - 7:2, 131:1, 134:2, 161:11, 204:10

**folk** [7] - 48:25, 138:15, 138:19, 139:12, 139:15

**folks** [2] - 38:13, 169:14

**follow** [7] - 14:17, 49:13, 49:21, 53:7, 59:6, 59:7, 148:22

**follow-up** [1] - 148:22

**followed** [1] - 14:16

**following** [3] - 9:3, 65:22, 66:5

**follows** [2] - 69:2, 155:8

**food** [3] - 74:23, 108:4, 195:10

**footer** [1] - 262:18

**FOR** [2] - 301:10, 301:11

**Forbes.com** [1] - 192:6

**force** [5] - 38:8, 184:4, 230:11, 231:12, 231:15

**forecasting** [1] - 156:13

**FOREGOING** [1] - 301:14

**forget** [2] - 55:8, 264:15

**forgive** [1] - 77:19

**forgot** [1] - 103:6

**form** [11] - 56:23, 62:6, 66:4, 104:16, 114:24, 127:2,

171:15, 262:22, 263:4, 267:24

**format** [2] - 298:8, 299:1

**FORMAT** [1] - 301:17

**forms** [2] - 120:9, 120:20

**forth** [7] - 12:1, 89:21, 93:15, 97:17, 115:2, 123:18, 219:6

**fortunate** [1] - 175:16

**forty** [2] - 257:17, 268:16

**forty-five** [2] - 257:17, 268:16

**forward** [6] - 29:23, 68:2, 71:12, 79:13, 155:2, 248:19

**forwarded** [1] - 248:11

**foundation** [10] - 246:3, 246:16, 246:19, 246:21, 261:13, 284:22, 286:7, 286:15, 286:18, 286:21

**founded** [2] - 28:15, 42:6

**founder** [2] - 107:18, 283:11

**four** [24] - 44:20, 47:7, 50:21, 52:6, 54:23, 141:18, 162:9, 172:16, 173:1, 173:2, 178:13, 178:19, 180:17, 184:24, 185:4, 189:10, 189:15, 191:2, 191:14, 194:8, 230:5, 234:14, 291:9

**fourth** [2] - 158:23, 173:22

**Fox** [1] - 192:6

**frame** [1] - 113:22

**France** [1] - 118:17

**Francisco** [1] - 79:10

**free** [5] - 63:10, 206:16, 214:14, 214:15, 238:11

**frequently** [1] - 136:20

**Friday** [8] - 10:19, 11:22, 299:6, 299:11, 299:12, 299:15, 299:23, 300:4

**friend** [4] - 25:1, 80:23, 114:14, 125:23

**friendly** [3] - 76:22, 76:24, 137:18

**friends** [7] - 24:6, 76:15, 102:20, 125:21, 211:2, 261:17
**friendship** [4] - 25:8, 77:5, 140:22, 140:23
**front** [10] - 31:9, 76:7, 91:20, 107:4, 131:10, 146:17, 149:16, 232:6, 282:12, 286:18
**Fruticola** [1] - 98:6
**full** [7] - 10:12, 34:21, 75:15, 140:25, 200:3, 236:7, 270:19
**full-time** [1] - 200:3
**fun** [2] - 109:9, 109:12
**function** [1] - 61:11
**furnace** [3] - 94:24, 95:2, 178:25
**future** [3] - 44:3, 70:12, 227:9

## G

**gain** [1] - 58:22
**galleries** [2] - 77:24, 78:2
**gallery** [4] - 77:22, 78:5, 78:7, 79:11
**Gallery** [2] - 78:5, 79:12
**game** [3] - 26:22, 183:24, 195:11
**game-changing** [1] - 26:22
**garbage** [1] - 179:25
**gathered** [1] - 40:13
**geez** [1] - 168:8
**general** [4] - 155:21, 156:13, 208:25, 241:4
**generally** [5] - 14:9, 89:17, 159:10, 161:10, 261:15
**generate** [1] - 282:17
**gentleman** [1] - 204:18
**gentlemen** [4] - 23:18, 30:19, 31:19, 36:10
**Germany** [1] - 118:17
**Ghost** [1] - 189:12
**gift** [3] - 182:8, 198:22
**gifts** [1] - 39:21
**Gilberto** [2] - 8:7, 299:15
**Gin** [1] - 128:15

**girlfriend** [4] - 75:25, 76:2, 76:22, 76:23
**given** [21] - 16:16, 22:3, 49:13, 53:17, 55:7, 60:1, 60:20, 66:1, 67:4, 138:4, 138:9, 158:25, 203:19, 215:8, 221:2, 222:4, 222:15, 239:14, 239:19, 267:9, 295:13
**glance** [1] - 130:25
**glass** [20] - 29:19, 44:10, 123:5, 175:12, 175:14, 177:24, 178:1, 178:4, 180:8, 180:18, 183:25, 220:11, 220:12, 221:13, 221:14, 221:19, 221:21, 221:22, 222:10, 226:5
**Glass** [4] - 94:12, 175:8, 175:9, 175:18
**glass-making** [1] - 220:11
**globally** [3] - 118:14, 156:25, 167:4
**GLOBEFILL** [1] - 1:6
**Globefill** [68] - 5:6, 16:9, 16:19, 20:4, 20:9, 30:21, 42:3, 42:10, 42:15, 133:9, 133:12, 133:21, 147:5, 154:24, 155:25, 156:2, 156:21, 156:22, 157:2, 157:6, 157:18, 158:6, 158:10, 160:9, 160:12, 161:2, 161:19, 162:3, 163:19, 165:20, 166:17, 169:14, 171:24, 172:11, 173:3, 176:24, 177:14, 197:1, 198:14, 199:25, 200:10, 200:16, 200:25, 201:14, 203:23, 204:2, 208:12, 208:21, 210:4, 211:23, 212:12, 213:15, 216:12, 219:14, 225:9, 226:13, 226:16, 226:18, 228:16, 229:1, 229:20, 230:1, 230:12, 248:6, 248:9, 295:8
**Globefill's** [4] -

30:21, 201:23, 228:7, 246:5
**gloves** [1] - 180:18
**goal** [1] - 180:5
**God** [1] - 177:12
**goods** [2] - 212:3, 212:4
**Goose** [3] - 179:17, 217:2, 217:21
**govern** [1] - 50:4
**government** [4] - 169:22, 169:23, 181:9, 212:15
**grade** [1] - 134:7
**gradually** [1] - 72:11
**graduate** [5] - 69:25, 70:23, 70:24, 71:6, 71:14
**graduated** [4] - 69:23, 70:5, 70:25, 71:25
**graduating** [1] - 70:13
**graduation** [1] - 70:2
**grain** [5] - 44:17, 168:21, 169:6, 170:13, 171:2
**grains** [1] - 171:10
**grant** [1] - 65:10
**granted** [1] - 264:23
**granting** [1] - 65:11
**graphics** [2] - 87:3, 94:4
**gratitude** [1] - 110:22
**grave** [1] - 97:11
**graves** [2] - 39:19, 39:21
**gray** [2] - 95:3
**great** [27] - 19:2, 24:24, 25:9, 25:10, 29:25, 40:1, 73:20, 85:19, 97:12, 98:3, 98:5, 98:6, 165:10, 168:11, 169:5, 169:6, 173:14, 173:15, 175:13, 184:16, 185:16, 185:18, 185:20, 191:1, 193:10, 193:23, 195:5
**greatest** [1] - 100:22
**green** [2] - 88:22, 152:17
**Grey** [3] - 179:17, 217:1, 217:21
**grim** [1] - 39:24
**Grocery** [1] - 200:15
**grocery** [2] - 45:5, 200:18
**ground** [3] - 104:16,

167:6, 270:12
**grounds** [3] - 199:17, 246:1
**group** [3] - 107:7, 211:17, 216:16
**growing** [1] - 73:8
**grown** [1] - 76:21
**grows** [1] - 104:16
**guess** [9] - 54:6, 75:24, 76:1, 88:4, 88:5, 172:2, 186:16, 186:24, 259:4
**guests** [1] - 137:16
**guidance** [8] - 49:8, 50:25, 52:15, 61:20, 65:23, 227:9, 253:13, 295:23
**Gulf** [2] - 69:15, 72:17
**gun** [1] - 80:17
**guns** [1] - 29:25
**guy** [3] - 48:15, 177:5, 177:12
**guys** [6] - 25:8, 25:19, 26:18, 165:13, 193:20, 198:5

## H

**H-E-M-I** [1] - 155:13
**hairdryers** [1] - 177:9
**half** [6] - 11:11, 28:12, 116:24, 124:5, 179:19, 189:7
**Halloween** [3] - 45:19, 45:24, 199:5
**Halloween-themed** [1] - 45:24
**halls** [1] - 185:17
**Hamptons** [1] - 135:17
**hand** [28] - 18:14, 22:11, 22:12, 55:19, 111:17, 111:18, 128:10, 137:24, 141:22, 146:20, 146:22, 146:24, 147:1, 176:19, 176:20, 176:21, 176:22, 176:24, 177:7, 177:11, 186:10, 189:14, 250:19, 250:24, 262:9
**hand-filled** [1] - 111:18
**hand-painted** [1] - 250:19
**handed** [1] - 206:14

**handle** [2] - 18:15, 291:8
**handled** [1] - 78:2
**handpainted** [1] - 142:6
**hands** [1] - 35:25, 181:2, 229:1
**happenings** [1] - 108:23
**happy** [7] - 12:23, 77:13, 77:14, 77:15, 283:4, 283:13, 296:9
**hard** [18] - 25:5, 25:10, 28:12, 31:22, 35:10, 83:25, 89:11, 97:14, 100:4, 113:14, 161:9, 169:18, 170:9, 173:15, 174:8, 178:12, 211:16, 213:4
**harder** [2] - 150:15
**harm** [1] - 212:9
**HARRIS** [1] - 2:5
**hashtag** [1] - 249:22
**hashtags** [1] - 249:23
**hat** [1] - 190:10
**hate** [2] - 294:1, 299:18
**Head** [115] - 23:19, 31:3, 31:21, 32:6, 33:4, 33:5, 34:15, 35:7, 36:4, 36:17, 36:19, 38:13, 40:24, 44:10, 45:2, 45:14, 46:8, 46:10, 46:11, 103:15, 105:5, 105:6, 107:5, 108:3, 109:25, 118:8, 118:9, 118:12, 121:23, 124:14, 125:9, 127:6, 136:7, 139:17, 143:15, 143:22, 145:6, 145:12, 147:6, 147:9, 147:10, 148:4, 149:12, 149:15, 150:1, 156:23, 156:24, 157:25, 158:13, 159:2, 159:4, 160:12, 161:1, 162:6, 164:7, 164:19, 165:14, 165:21, 166:19, 167:9, 168:15, 169:9, 172:13, 174:1, 175:4, 182:2, 183:12, 186:3, 191:18, 196:17, 197:2, 199:9, 200:1, 200:18, 207:17, 210:1, 213:4, 215:9, 215:19, 216:7,

216:11, 216:19,
217:12, 219:24,
220:7, 220:14, 221:3,
221:6, 221:10,
221:16, 225:8,
226:18, 227:12,
229:1, 229:7, 229:21,
230:2, 231:12,
231:25, 235:24,
243:3, 246:5, 247:9,
248:19, 248:24,
249:13, 249:22,
249:23, 250:18,
250:19, 251:11,
262:9, 286:3, 287:23,
291:22
   **head** [7] - 33:16,
44:4, 83:19, 102:8,
102:9, 156:11, 163:23
   **Head's** [5] - 36:24,
227:5, 227:6, 228:2,
228:6
   **heading** [2] - 262:13,
262:14
   **heads** [1] - 107:3
   **healing** [2] - 227:7,
227:9
   **hear** [37] - 12:16,
14:2, 21:14, 22:2,
22:5, 36:25, 37:14,
37:15, 38:1, 42:18,
42:25, 43:2, 43:12,
43:14, 43:21, 46:2,
47:17, 52:7, 52:19,
54:20, 58:7, 66:11,
66:18, 66:22, 67:3,
87:14, 154:14,
243:10, 245:23,
259:15, 261:7,
265:14, 265:25,
266:2, 273:7, 275:10,
295:4
   **heard** [21] - 27:16,
33:18, 43:14, 47:24,
49:5, 51:8, 53:12,
66:7, 94:16, 103:6,
134:16, 204:22,
209:1, 209:15,
216:11, 248:12,
250:2, 278:23, 280:8,
280:18, 285:7
   **hearing** [3] - 64:24,
265:20
   **hearsay** [6] - 207:10,
209:9, 209:16,
209:17, 210:7, 282:16
   **heat** [4] - 95:2,
169:4, 177:9, 178:15
   **heated** [1] - 171:17
   **heating** [1] - 171:15

   **heavier** [1] - 178:18
   **heavy** [1] - 25:18
   **Hedges** [1] - 44:8
   **height** [1] - 91:23
   **held** [3] - 17:11,
96:24, 177:6
   **HELD** [1] - 301:15
   **help** [16] - 49:12,
51:13, 60:9, 66:8,
71:11, 106:24, 116:5,
128:18, 158:14,
161:17, 165:25,
166:23, 225:5,
255:19, 292:19
   **helped** [1] - 114:25
   **helpful** [3] - 92:19,
247:16, 298:6
   **helping** [3] - 118:9,
118:10, 283:25
   **helps** [1] - 50:25
   **HEMI** [1] - 155:6
   **Hemi** [27] - 31:24,
99:21, 99:22, 115:12,
115:19, 154:25,
155:12, 155:18,
155:23, 156:2,
157:12, 157:17,
174:17, 174:24,
200:25, 201:11,
202:7, 204:14,
207:24, 211:22,
213:3, 214:8, 222:15,
223:18, 223:23,
235:11, 248:12
   **hemi** [1] - 236:17
   **HEREBY** [1] - 301:12
   **herein** [2] - 69:1,
155:7
   **heritage** [1] - 38:16
   **Herkimer** [1] -
104:15
   **HERNAN** [1] - 2:9
   **Hernan** [1] - 5:21
   **Herradura** [1] -
128:15
   **herself** [2] - 135:24,
293:18
   **hexagon** [1] - 115:4
   **hexagonal** [1] -
174:8
   **hi** [2] - 148:19,
235:19
   **Hi** [1] - 186:1
   **Hi-Time** [1] - 186:1
   **hierarchy** [4] -
163:22, 164:5,
166:15, 200:3
   **high** [19] - 40:14,
69:18, 69:21, 70:2,
71:1, 74:23, 91:3,

167:1, 178:13, 179:8,
181:11, 184:22,
217:20, 217:23,
217:24, 218:8,
218:10, 218:11,
218:12
   **High** [2] - 71:2, 71:13
   **higher** [1] - 179:20
   **highlight** [1] - 31:9
   **highlights** [1] - 102:1
   **highly** [4] - 46:13,
139:5, 161:11, 251:2
   **hire** [1] - 178:22
   **hired** [4] - 157:7,
162:3, 197:10, 212:14
   **history** [5] - 23:20,
35:22, 96:2, 98:7,
133:16
   **hit** [13] - 26:22,
76:13, 136:24,
177:17, 188:14,
188:15, 189:23,
191:16, 194:5,
195:19, 215:3, 215:4
   **hits** [3] - 185:4,
185:5, 196:24
   **hold** [4] - 19:5, 48:5,
64:16, 90:12
   **holding** [1] - 192:12
   **hole** [2] - 90:14,
211:11
   **holiday** [4] - 40:3,
198:3, 198:10, 198:11
   **home** [8] - 63:12,
70:3, 75:10, 77:14,
135:1, 185:25, 186:9,
294:3
   **honestly** [3] -
293:10, 293:14,
299:12
   **honor** [3] - 13:24,
14:23, 149:8
   **Honor** [194] - 5:13,
5:19, 5:23, 6:3, 9:6,
9:9, 9:22, 10:12,
10:21, 11:19, 12:22,
13:13, 14:14, 15:3,
15:20, 16:5, 16:8,
17:1, 17:17, 18:11,
22:21, 23:7, 32:20,
35:24, 47:8, 67:25,
68:14, 81:9, 82:7,
82:15, 82:18, 84:10,
85:4, 86:7, 92:20,
103:25, 106:15,
110:4, 110:23,
112:10, 113:17,
117:5, 118:20, 119:1,
119:7, 127:16,
127:21, 128:1,

128:25, 129:2,
131:23, 134:18,
135:5, 137:23,
144:19, 144:25,
145:5, 146:1, 146:14,
148:10, 148:13,
152:22, 153:4,
153:20, 153:23,
174:19, 201:4, 201:8,
201:16, 202:1,
202:18, 203:9,
203:20, 204:6,
204:12, 208:9, 209:8,
209:15, 210:6,
212:17, 212:22,
213:1, 220:25, 223:3,
223:5, 223:12,
223:21, 233:5,
234:18, 235:9,
235:14, 236:14,
238:4, 238:22,
241:10, 241:25,
242:6, 243:5, 243:9,
243:13, 243:24,
244:1, 244:7, 245:7,
245:14, 245:22,
246:25, 248:3, 250:1,
250:4, 251:9, 253:15,
253:23, 254:4, 255:5,
255:24, 256:4, 256:9,
256:20, 256:25,
258:7, 258:10,
258:19, 258:22,
259:19, 260:3, 260:8,
261:9, 262:5, 262:16,
263:11, 263:14,
266:20, 268:4, 268:9,
268:19, 269:3,
269:12, 269:14,
269:19, 271:6, 271:9,
271:20, 272:1, 273:6,
273:15, 275:9,
275:15, 275:17,
275:20, 276:7, 276:8,
277:9, 278:5, 278:7,
278:15, 278:18,
278:24, 279:3, 281:1,
282:11, 282:13,
282:23, 283:4,
284:20, 285:15,
286:12, 286:14,
287:12, 287:20,
290:2, 291:8, 291:20,
292:11, 292:16,
293:6, 293:7, 293:19,
294:9, 294:14, 295:5,
295:9, 295:16,
295:23, 296:14,
296:15, 296:17,
297:19, 297:21,
298:21, 300:6, 300:8,

300:11, 300:12
   **Honor's** [3] - 270:3,
277:10, 277:25
   **HONORABLE** [1] -
1:4
   **honoring** [1] -
137:15
   **hop** [3] - 187:14,
190:3, 190:4
   **hope** [6] - 48:17,
139:6, 144:12, 150:6,
150:22, 220:3
   **hoped** [2] - 26:18,
88:7, 150:8, 151:8
   **hopefully** [8] - 64:17,
154:11, 249:21,
263:24, 270:16,
270:17, 298:24,
298:25
   **hoping** [3] - 154:16,
238:14, 281:14
   **hot** [3] - 40:20,
95:24, 180:19
   **hotel** [1] - 189:18
   **hotels** [2] - 165:18,
165:22
   **hour** [14] - 20:21,
20:22, 67:9, 189:8,
201:6, 257:4, 257:7,
257:10, 257:17,
257:22, 258:5, 258:6
   **hour's** [1] - 257:12
   **hours** [26] - 11:8,
14:4, 14:10, 14:16,
20:23, 22:9, 22:15,
22:17, 65:18, 67:20,
74:25, 105:1, 109:21,
189:9, 189:10,
189:15, 190:5, 190:8,
257:6, 263:24,
269:14, 270:1,
270:17, 270:18
   **hours'** [1] - 11:3
   **house** [2] - 72:1,
135:9, 149:8, 185:19
   **House** [10] - 107:9,
107:10, 107:14,
107:25, 183:14,
185:11, 185:12,
185:13, 185:14,
185:15
   **housekeeping** [1] -
18:12
   **HOUSTON** [1] - 2:7
   **Houston** [10] - 72:1,
72:2, 72:3, 72:5, 72:8,
75:4, 75:7, 75:8,
107:6
   **Howard** [1] - 192:7
   **huge** [11] - 26:21,

28:7, 107:3, 108:2, 138:19, 151:1, 183:16, 183:17, 184:18, 184:21, 196:20

**human** [7] - 89:14, 120:22, 122:8, 122:9, 228:11, 228:17, 229:5

**humans** [1] - 120:19

**humble** [1] - 134:16

**Hummel** [6] - 5:24, 8:20, 16:6, 20:13, 36:13, 91:25

**HUMMEL** [60] - 2:13, 5:23, 8:20, 8:25, 9:6, 9:22, 10:6, 10:11, 10:21, 11:19, 12:14, 16:5, 18:11, 19:2, 19:17, 19:22, 20:13, 36:8, 47:8, 238:21, 241:17, 243:12, 243:16, 244:1, 244:20, 244:22, 244:24, 245:6, 245:14, 245:21, 245:25, 250:4, 252:7, 252:15, 252:22, 253:7, 253:17, 254:18, 254:20, 254:24, 255:3, 255:18, 255:21, 255:24, 256:4, 256:8, 256:11, 256:15, 256:25, 257:16, 258:22, 259:3, 259:12, 260:2, 261:9, 268:18, 268:25, 269:3, 270:9, 298:23

**hundred** [8] - 30:23, 114:12, 172:17, 191:21, 196:11, 198:9, 198:12, 236:3

**hundreds** [10] - 103:1, 131:16, 132:13, 185:20, 196:18, 200:6, 200:7, 225:1

**hung** [2] - 120:18, 121:5

**Hyde** [1] - 114:13

---

**I**

---

**ice** [1] - 118:8

**iconic** [3] - 109:25, 144:17, 294:8

**idea** [37] - 24:16, 38:9, 38:24, 38:25, 39:1, 39:12, 40:1, 44:13, 72:14, 78:1,

80:11, 80:22, 80:25, 83:7, 90:20, 92:5, 93:12, 96:14, 103:18, 106:4, 117:21, 123:2, 125:13, 125:17, 126:4, 129:11, 129:12, 129:13, 136:3, 136:4, 142:25, 143:7, 143:18, 152:14, 186:11, 249:19

**ideas** [3] - 81:17, 83:5, 195:17

**identical** [3] - 101:20, 102:12, 102:15

**identified** [6] - 7:9, 16:18, 68:10, 68:12, 275:11, 287:4

**identifies** [1] - 147:9

**identify** [16] - 64:13, 119:5, 144:22, 147:14, 159:19, 241:8, 255:16, 255:23, 259:24, 268:7, 269:2, 277:5, 281:5, 281:21, 282:2, 287:10

**identifying** [1] - 298:8

**identity** [2] - 11:9, 35:8

**ignore** [4] - 54:6, 54:10, 55:22, 59:17

**illness** [2] - 78:6, 115:11

**illusion** [3] - 93:9, 101:25, 104:9

**image** [1] - 96:1

**imagery** [2] - 97:9, 120:4

**images** [3] - 39:22, 97:25, 249:20

**imagine** [4] - 165:2, 186:4, 192:16, 267:25

**imagined** [1] - 108:11

**Imbibe** [1] - 193:23

**immediately** [9] - 59:14, 59:24, 70:3, 70:23, 70:24, 71:7, 126:2, 138:22, 209:3

**impact** [1] - 129:12

**impacted** [2] - 210:11, 210:14

**impartial** [1] - 59:3

**impeach** [1] - 295:12

**impeachment** [1] - 277:14

**implies** [1] - 261:10

imply [1] - 261:16

**impolitely** [1] - 42:13

**importance** [1] - 35:21

**important** [23] - 5:18, 35:18, 35:21, 55:17, 55:25, 59:7, 61:10, 90:22, 166:11, 183:15, 192:22, 192:24, 193:4, 195:18, 201:24, 213:15, 213:17, 213:18, 240:4, 260:11, 260:18, 297:24, 300:3

**importer** [20] - 30:21, 30:23, 160:17, 160:19, 160:20, 161:2, 161:4, 162:6, 162:22, 162:25, 163:2, 163:9, 163:11, 163:12, 165:18, 174:14, 183:10, 197:5, 199:18, 212:3

**importers** [1] - 161:8

**impressed** [1] - 175:19

**impression** [9] - 41:12, 47:5, 121:9, 122:4, 122:7, 122:23, 183:18, 183:20, 204:25

**improper** [2] - 51:20, 58:23

**impurities** [5] - 44:12, 171:16, 172:24

**IN** [3] - 301:10, 301:15, 301:17

**inaccurate** [1] - 58:24

**inadvertent** [1] - 58:11

**INC** [1] - 1:10

**incentive** [5] - 164:22, 165:6, 166:23, 189:3, 197:16

**inclined** [2] - 7:19, 281:18

**include** [1] - 120:4

**included** [3] - 16:10, 224:17, 292:13

**includes** [2] - 56:18, 215:19

**including** [6] - 56:21, 57:2, 58:4, 59:12, 118:16, 257:12

**income** [1] - 151:3

**incomplete** [1] - 58:24

**INCORPORATED** [1]

- 1:6

**Incorporated** [7] - 5:7, 20:5, 155:25, 156:2, 156:22

**increase** [1] - 170:16

**increased** [1] - 174:10

**independent** [3] - 38:12, 186:2, 270:5

**independently** [1] - 270:2

**index** [1] - 15:8

**indicate** [4] - 14:13, 240:14, 279:18, 281:2

**indicated** [2] - 66:8, 254:17

**indicating** [3] - 22:11, 126:5, 279:21

**indication** [2] - 65:12, 267:21

**individual** [4] - 1:11, 5:10, 120:15, 139:13

**individually** [1] - 98:18

**individuals** [1] - 261:11

**indulgence** [1] - 299:8

**industrial** [1] - 72:17

**industries** [1] - 193:17

**industry** [19] - 28:8, 30:5, 33:12, 38:19, 38:22, 38:23, 72:25, 74:23, 82:6, 88:21, 140:16, 161:25, 175:24, 176:2, 179:16, 194:18, 198:6, 199:6, 209:25

**Industry** [4] - 27:21, 30:16, 193:24, 194:17

**Infinium** [15] - 30:21, 31:16, 161:5, 161:6, 162:5, 162:21, 162:22, 163:16, 163:25, 164:18, 165:23, 165:24, 173:7, 189:1, 200:2

**infinium** [1] - 30:21

**influenced** [5] - 49:22, 51:21, 58:24, 61:4, 98:2

**information** [13] - 56:11, 57:17, 58:22, 58:25, 59:4, 59:14, 59:24, 61:8, 65:4, 137:4, 159:12, 277:9, 277:11

**informed** [1] - 212:3

**infringe** [1] - 33:24

**infringed** [3] - 27:18, 32:19, 250:15

**infringes** [1] - 37:2

**infringing** [5] - 24:1, 212:8, 228:12, 228:15, 235:4

**ingratiate** [1] - 35:17

**ingredients** [1] - 168:22

**initial** [3] - 162:14, 162:19, 204:25

**innocently** [1] - 31:16

**input** [5] - 83:5, 83:6, 91:7, 115:2, 115:7

**inquire** [1] - 153:10

**inquiry** [2] - 106:13, 261:25

**insane** [1] - 186:4

**insert** [2] - 27:24, 44:15

**inside** [1] - 107:2

**inspection** [3] - 180:25, 295:11, 295:22

**inspections** [1] - 180:19

**inspectors** [1] - 178:22

**inspirations** [1] - 37:20

**inspiring** [1] - 70:10

**Instagram** [9] - 56:22, 244:23, 245:19, 246:4, 246:23, 247:9, 248:13, 248:14, 249:22

**instance** [3] - 77:22, 84:19, 250:13

**instances** [3] - 45:19, 66:16, 142:10

**instantaneously** [1] - 41:25

**instantly** [1] - 162:23

**instead** [6] - 33:4, 76:14, 189:16, 211:4, 280:16

**instilled** [2] - 70:20, 73:21

**instruct** [7] - 35:24, 49:18, 50:22, 52:2, 58:10, 67:1, 282:6

**instructed** [3] - 51:24, 277:22, 296:18

**instruction** [7] - 23:6, 50:25, 52:15, 53:5, 53:8, 61:20, 63:7

**instructions** [18] -

22:7, 49:7, 49:11, 49:12, 50:3, 50:4, 50:5, 50:16, 56:10, 57:13, 59:22, 60:20, 67:4, 67:7, 266:6, 266:7, 266:12, 266:21
**instructor** [1] - 72:5
**instrumental** [3] - 115:19, 117:18, 118:9
**integrity** [1] - 26:3
**intend** [5] - 30:19, 33:22, 160:6, 266:7, 268:10
**intended** [2] - 51:12, 85:17
**intense** [1] - 95:1
**intent** [2] - 33:23, 34:22
**intention** [2] - 88:17, 105:21
**intentional** [1] - 33:23
**intentionally** [2] - 32:1, 34:21
**interaction** [1] - 284:2
**interest** [6] - 54:23, 126:2, 133:9, 133:11, 150:1, 226:13
**interested** [1] - 97:8
**interesting** [4] - 24:22, 48:16, 49:1, 80:25
**interests** [1] - 201:23
**interim** [1] - 277:9
**Internet** [4] - 56:20, 57:20, 57:25, 250:23
**internet** [1] - 116:10
**interpret** [2] - 51:13, 132:1
**interpretation** [1] - 121:12
**interrupt** [1] - 73:3
**interviewing** [1] - 192:8
**interviews** [2] - 193:2, 194:12
**intricate** [1] - 46:6
**introduce** [6] - 69:12, 76:11, 155:18, 184:13, 185:20, 292:15
**introduced** [4] - 36:12, 157:10, 157:18, 224:6
**introduction** [1] - 42:18, 157:13, 157:22, 210:10
**invented** [1] - 136:3
**invention** [5] - 37:24,

84:4, 84:5, 142:25, 143:2
**inventory** [1] - 151:1
**invested** [2] - 111:21, 150:3
**investigate** [1] - 58:21
**investigation** [1] - 57:21
**investors** [1] - 279:11
**invite** [1] - 108:1
**invited** [1] - 107:23
**invoice** [5] - 282:13, 282:14, 283:10, 283:20, 283:21
**involve** [1] - 238:18
**involved** [4] - 15:18, 57:4, 58:4, 80:5, 105:14, 106:1, 107:16, 115:14, 115:23, 116:4, 116:8, 116:16, 117:12, 117:14, 117:17, 123:25, 151:14, 156:9, 156:12, 158:1, 188:11, 197:8, 249:4, 280:24
**involvement** [4] - 80:4, 80:6, 151:10, 299:20
**involves** [1] - 56:12
**irrelevant** [1] - 278:21
**irreparable** [1] - 212:9
**IS** [2] - 301:14, 301:17
**island** [1] - 135:16
**Island** [1] - 135:17
**issue** [25] - 12:11, 16:8, 18:12, 27:22, 43:1, 68:22, 84:20, 86:21, 88:25, 89:1, 106:18, 110:25, 119:4, 204:7, 208:12, 208:15, 208:16, 246:8, 246:15, 246:17, 246:22, 247:6, 250:16, 258:23, 263:5
**issued** [6] - 7:8, 230:2, 231:11, 231:16, 264:14, 291:14
**issues** [17] - 7:18, 21:5, 49:15, 56:12, 62:18, 83:18, 84:8, 181:14, 188:8, 204:11, 241:7,

241:18, 249:14, 283:3, 283:6, 285:22
**Italy** [3] - 26:10, 29:20, 94:13
**item** [1] - 216:8
**items** [1] - 37:14
**iterations** [2] - 225:8, 280:12
**itself** [16] - 27:8, 143:22, 143:23, 144:1, 147:9, 147:12, 159:15, 162:18, 167:16, 167:17, 182:12, 182:17, 228:16, 231:12, 233:2, 250:18

## J

**jacket** [1] - 84:1
**James** [1] - 35:12
**Jan** [1] - 78:4
**January** [2] - 75:13, 182:15
**Jean** [1] - 217:5
**Jean-Marc** [1] - 217:5
**Jenny** [3] - 5:20, 20:11, 268:9
**jeopardizes** [1] - 59:10
**jewels** [1] - 228:23
**Jimmy** [3] - 125:23, 192:8
**job** [16] - 74:10, 74:12, 74:14, 74:22, 75:1, 75:2, 75:6, 77:15, 95:12, 95:16, 156:23, 158:11, 159:4, 169:18, 248:7
**jobs** [1] - 74:8
**John** [14] - 6:4, 20:11, 20:17, 23:25, 26:16, 34:1, 48:19, 67:25, 69:5, 69:14, 76:8, 79:12, 137:20, 148:20
**JOHN** [2] - 68:25, 69:6
**Johnny** [8] - 24:16, 24:25, 25:14, 25:23, 26:3, 28:9, 149:25
**joint** [6] - 6:20, 16:10, 16:11, 253:19, 266:21, 267:3
**JONATHAN** [2] - 155:6, 155:13
**Jonathan** [16] - 31:24, 99:21, 99:22,

106:8, 112:2, 115:12, 115:19, 116:7, 116:10, 116:20, 154:25, 155:12, 155:23, 223:18, 248:12, 248:19
**journals** [1] - 192:5
**joys** [1] - 26:15
**JUDGE** [1] - 1:4
**Judge** [7] - 27:18, 52:16, 276:20, 294:20, 294:22, 296:2, 296:6
**judges** [1] - 35:23
**judgment** [3] - 122:15, 124:8, 124:23
**JUDICIAL** [1] - 301:18
**Julio** [1] - 128:15
**June** [1] - 283:22
**JUROR** [1] - 239:9
**juror** [11] - 16:3, 19:19, 29:4, 29:7, 57:6, 59:3, 59:9, 59:13, 59:23, 64:15, 261:4
**Juror** [3] - 29:15, 64:14, 64:16
**jurors** [31] - 6:9, 15:24, 21:11, 21:12, 22:25, 29:2, 49:5, 49:8, 56:4, 56:6, 56:25, 58:6, 58:12, 61:4, 61:17, 62:10, 65:16, 98:25, 112:14, 146:10, 153:7, 154:13, 202:21, 238:5, 239:4, 239:22, 240:2, 250:21
**JURY** [2] - 20:2, 239:25
**jury** [80] - 6:13, 6:16, 7:12, 7:16, 7:18, 7:22, 7:24, 7:25, 10:8, 12:21, 14:7, 18:15, 18:18, 18:23, 18:24, 19:4, 19:12, 19:14, 20:8, 20:23, 21:24, 22:7, 28:20, 28:23, 35:20, 36:11, 46:9, 49:16, 49:17, 53:6, 56:12, 57:8, 59:12, 60:5, 60:12, 60:24, 63:22, 64:15, 64:24, 64:25, 65:15, 65:20, 66:18, 67:5, 67:11, 67:17, 69:12, 71:18, 72:13, 74:8, 76:3, 79:8, 82:24, 85:24,

88:13, 94:10, 95:19, 98:25, 107:13, 137:11, 144:21, 145:3, 150:12, 154:22, 155:19, 156:6, 193:16, 204:8, 224:11, 235:7, 238:16, 238:19, 260:20, 264:1, 266:6, 266:12, 280:19, 292:20
**justice** [1] - 7:6

## K

**K-A-H** [1] - 37:24
**KAH** [107] - 26:24, 28:16, 29:15, 31:10, 31:11, 31:12, 32:6, 32:7, 33:3, 34:5, 34:22, 35:6, 36:2, 37:23, 37:24, 38:9, 41:19, 42:7, 43:14, 45:2, 45:10, 46:10, 46:12, 48:21, 98:12, 98:13, 99:8, 99:15, 103:4, 103:15, 105:16, 105:19, 112:5, 131:6, 132:4, 132:16, 132:19, 133:1, 133:3, 133:4, 133:5, 133:8, 134:12, 134:15, 136:1, 136:8, 138:5, 138:10, 139:16, 141:18, 142:24, 143:6, 147:14, 147:15, 148:1, 148:3, 148:24, 149:9, 152:9, 204:14, 204:17, 204:21, 204:25, 205:18, 206:18, 206:25, 208:3, 208:19, 208:22, 209:7, 209:25, 210:4, 210:10, 211:3, 211:18, 211:22, 212:6, 219:13, 229:2, 229:6, 232:22, 232:25, 236:7, 237:2, 237:8, 237:20, 246:6, 247:10, 248:15, 248:16, 248:18, 248:25, 250:7, 250:9, 250:17, 250:25, 251:15, 285:16, 285:18, 285:21, 286:1, 287:23, 291:11
**keep** [13] - 37:6, 43:3, 56:4, 60:11,

65:4, 65:8, 113:3, 126:20, 139:23, 152:12, 152:13, 204:10, 270:20
**KEITH** [1] - 2:13
**Keith** [5] - 5:24, 8:20, 16:6, 20:13, 36:12
**kept** [2] - 75:6, 191:14
**Ketel** [1] - 217:21
**key** [12] - 104:13, 165:9, 166:7, 171:20, 179:1, 179:2, 184:7, 189:6, 195:16, 195:18, 249:14, 284:3
**keynote** [1] - 34:13
**kidding** [1] - 170:7
**kids** [4] - 40:9, 77:3, 79:20, 299:13
**kiln** [2] - 93:8, 94:24
**Kim** [27] - 5:20, 6:4, 20:11, 20:17, 27:15, 28:1, 28:2, 30:9, 30:25, 31:19, 32:18, 36:21, 37:25, 38:1, 48:19, 48:20, 49:2, 148:21, 207:21, 208:8, 229:22, 231:23, 235:3, 268:9, 269:12, 299:9
**KIM** [78] - 1:11, 262:16, 262:18, 266:20, 268:4, 268:9, 268:13, 268:16, 268:21, 269:7, 269:11, 269:14, 271:9, 271:16, 271:20, 271:25, 272:5, 272:9, 272:13, 272:17, 272:21, 272:25, 273:4, 273:9, 273:13, 273:18, 273:22, 273:24, 274:3, 274:5, 274:9, 274:13, 274:17, 274:21, 274:25, 275:4, 275:8, 277:8, 277:24, 278:4, 285:15, 286:8, 286:12, 286:14, 287:3, 287:16, 287:20, 288:5, 288:7, 288:11, 288:15, 288:17, 288:22, 288:25, 289:5, 289:9, 289:13, 289:15, 289:19, 289:23, 290:1, 290:6, 290:10, 290:12, 290:14, 290:18, 290:22,

291:8, 291:18, 293:6, 294:1, 294:6, 294:13, 296:15, 297:9, 297:19, 300:8, 300:11
**Kimmel** [1] - 192:8
**Kimmy** [1] - 27:15
**kind** [44] - 32:11, 32:13, 35:8, 40:7, 73:24, 74:4, 74:6, 74:7, 76:12, 79:19, 80:25, 89:9, 89:18, 97:8, 104:20, 104:25, 109:8, 111:19, 116:12, 137:20, 138:22, 139:11, 149:4, 149:6, 152:2, 164:3, 168:14, 169:18, 170:4, 170:7, 171:7, 172:20, 182:6, 185:7, 196:2, 208:24, 221:8, 249:20, 251:22, 255:8, 261:5, 262:8, 266:23, 282:13
**kinds** [8] - 53:15, 104:23, 128:17, 139:11, 164:17, 215:15, 218:24, 219:6
**King** [1] - 35:12
**Kingston** [1] - 114:14
**kitchen** [2] - 41:2, 42:21
**KLEEGER** [3] - 1:21, 301:10, 301:24
**knocked** [1] - 185:1
**knockoff** [4] - 29:10, 29:16, 36:3, 47:11
**know..** [1] - 200:23
**knowing** [3] - 258:4, 261:20, 265:7
**knowledge** [8] - 16:19, 34:21, 94:8, 96:10, 106:12, 143:25, 212:5, 297:11
**knowledgeable** [1] - 265:6
**known** [4] - 24:7, 74:5, 185:19, 186:2
**knows** [4] - 68:11, 207:9, 207:11, 221:15
**Kosovo** [1] - 94:15

**L**

**L.A** [1] - 185:25
**lab** [1] - 181:15
**label** [1] - 176:25
**labeled** [1] - 221:10
**labeling** [1] - 177:5

**labelling** [1] - 176:22
**Labrador** [2] - 169:25, 181:8
**lack** [4] - 89:8, 134:6, 246:2, 246:16
**ladders** [1] - 150:16
**ladies** [4] - 23:18, 30:18, 31:18, 36:10
**lady** [2] - 75:21, 76:6
**laid** [4] - 246:21, 286:16, 286:19, 286:21
**lake** [1] - 139:9
**Lamar** [3] - 70:3, 70:6, 70:25
**land** [1] - 182:20
**landscape** [2] - 74:6, 96:6
**landscapes** [1] - 74:6
**large** [7] - 106:25, 107:1, 108:2, 127:5, 149:14, 165:12
**larger** [1] - 127:4
**largest** [3] - 161:14, 199:13, 199:14
**Las** [6] - 30:4, 33:25, 34:13, 107:6, 187:2, 187:23
**laser** [1] - 181:13
**last** [28] - 6:7, 6:25, 10:25, 11:2, 17:24, 18:17, 57:7, 66:2, 67:3, 68:15, 79:8, 79:9, 92:22, 126:6, 137:3, 152:8, 159:1, 169:23, 181:9, 189:9, 190:25, 235:25, 242:20, 243:6, 258:13, 258:14, 268:11, 288:1
**lasted** [1] - 189:10
**late** [12] - 8:5, 16:17, 20:21, 24:8, 25:4, 75:14, 75:17, 112:25, 113:13, 113:20, 113:24, 228:4
**laugh** [2] - 170:5, 170:6
**laughed** [2] - 170:4, 170:6
**launch** [17] - 107:10, 159:4, 160:6, 173:16, 174:1, 174:15, 183:11, 183:22, 184:3, 185:9, 185:10, 185:18, 187:10, 188:23, 199:24, 200:9, 219:13
**launched** [11] -

107:5, 107:11, 159:2, 161:25, 183:12, 183:13, 184:25, 185:21, 199:11, 216:19, 226:18
**launching** [1] - 188:3
**LAW** [2] - 2:5, 2:6
**law** [18] - 35:24, 49:11, 49:14, 49:18, 49:20, 49:21, 53:16, 56:10, 58:4, 59:22, 67:2, 67:4, 131:2, 164:14, 168:10, 239:18, 297:23
**lawsuit** [24] - 21:21, 42:20, 133:25, 134:3, 136:22, 137:1, 204:3, 204:5, 204:7, 212:21, 224:18, 230:3, 231:9, 231:22, 232:3, 232:5, 275:20, 276:2, 276:16, 276:19, 276:22, 277:11, 277:13, 277:14
**lawyer** [5] - 35:18, 53:22, 53:23, 53:25, 64:9
**lawyers** [15] - 5:10, 14:11, 21:19, 32:12, 34:1, 50:21, 51:7, 51:10, 51:15, 51:17, 52:17, 58:5, 61:23, 64:20, 65:24
**lay** [2] - 246:19, 286:6
**lead** [2] - 36:1, 82:14
**leading** [8] - 81:10, 81:11, 81:13, 82:16, 133:24, 202:2, 210:7, 210:8
**leaping** [1] - 280:19
**learn** [8] - 29:17, 49:3, 57:22, 169:19, 205:18, 239:15, 239:21, 248:5
**learned** [8] - 25:9, 39:8, 39:9, 39:10, 205:8, 219:13, 261:3
**learning** [2] - 39:4, 70:16
**learns** [3] - 194:2, 194:3
**least** [15] - 12:4, 20:23, 48:15, 79:21, 109:9, 116:13, 116:23, 117:18, 118:13, 120:1, 136:14, 163:13, 208:2, 240:14, 259:1
**leave** [10] - 21:6,

60:15, 63:11, 103:25, 106:13, 110:6, 110:7, 238:12, 258:18, 285:3
**leaves** [2] - 14:7, 64:20
**lecture** [1] - 61:7
**led** [2] - 125:8, 139:20
**Lee's** [1] - 187:24
**left** [15] - 6:7, 6:17, 8:2, 23:10, 23:16, 31:20, 48:9, 60:15, 63:17, 66:2, 116:14, 158:17, 187:24, 207:20, 257:11
**legal** [3] - 49:15, 57:13, 63:23
**legally** [2] - 62:9, 64:10, 152:15
**legend** [11] - 43:20, 43:23, 44:19, 144:2, 144:10, 144:14, 226:19, 226:22, 226:24, 227:13, 228:1
**length** [3] - 24:15, 65:9, 295:7
**less** [6] - 42:16, 114:9, 118:1, 124:24, 248:10, 257:9
**letter** [12] - 34:2, 34:7, 42:11, 42:12, 42:13, 134:10, 234:9, 234:10, 275:18, 276:24, 277:7
**level** [5] - 70:18, 158:18, 177:21, 183:25, 184:1
**levels** [1] - 160:25
**leverage** [1] - 167:13
**liaison** [2] - 116:11
**licensing** [1] - 160:19
**Lichtman** [2] - 16:14, 17:2
**lieu** [4] - 8:9, 8:16, 8:24, 9:1
**life** [8] - 25:21, 39:18, 41:19, 41:21, 41:22, 74:6, 96:8, 135:21
**Life** [2] - 192:11
**light** [5] - 55:2, 104:12, 104:22, 104:23, 180:20
**lighted** [1] - 102:14
**lighting** [1] - 100:19
**likable** [1] - 93:11
**likelihood** [2] - 43:1, 43:4
**likely** [3] - 270:20, 294:12, 299:22

**limine** [17] - 119:4, 212:24, 264:8, 264:10, 264:13, 264:18, 264:19, 275:22, 275:23, 276:1, 276:12, 276:25, 277:5, 277:25, 291:16, 291:19, 294:7
**limit** [2] - 125:6, 136:25
**limited** [6] - 52:2, 52:3, 53:4, 56:21, 187:21, 211:7
**limiting** [1] - 53:7
**limits** [1] - 21:25
**LINCENBERG** [1] - 2:8
**line** [15] - 87:17, 87:18, 109:20, 111:13, 176:14, 177:2, 177:3, 178:23, 180:6, 180:16, 211:8, 222:23, 222:24, 223:13, 224:6
**lines** [6] - 87:24, 88:1, 111:11, 176:9, 176:13, 280:13
**LinkedIn** [1] - 56:22
**Liquid** [10] - 30:17, 31:16, 34:5, 204:23, 206:9, 206:11, 207:14, 207:25, 208:7, 243:22
**liquid** [9] - 90:5, 93:8, 162:18, 171:18, 173:14, 173:15, 177:21
**liquids** [1] - 44:23
**Liquor** [3] - 169:25, 181:8, 187:24
**liquor** [38] - 27:12, 30:13, 33:3, 33:11, 34:25, 38:24, 45:5, 80:21, 80:24, 82:5, 87:8, 88:12, 88:21, 100:15, 100:16, 100:17, 102:14, 102:24, 107:24, 108:25, 109:1, 109:18, 115:22, 127:11, 128:16, 131:16, 132:18, 132:25, 165:22, 200:14, 200:17, 215:6, 218:13
**Liquors** [2] - 165:13, 186:1
**liquors** [2] - 45:6
**list** [17] - 6:20, 7:8,

7:11, 7:23, 8:22, 16:11, 16:12, 51:6, 195:19, 240:16, 242:9, 243:2, 253:17, 253:19, 253:20, 256:1
**listen** [7] - 16:4, 23:4, 57:14, 59:17, 231:6, 265:22, 275:12
**listened** [1] - 6:25
**listening** [3] - 20:24, 63:2, 65:25
**lit** [3] - 100:7, 100:19, 132:25
**literally** [6] - 107:11, 109:3, 109:16, 181:12, 184:18, 194:23
**litigation** [2] - 276:15, 294:8
**little..** [1] - 86:19
**live** [7] - 8:16, 8:23, 75:12, 77:11, 151:9, 155:22, 155:23
**Live** [1] - 75:22
**lived** [2] - 114:14, 265:7
**lives** [2] - 70:17, 200:5
**living** [4] - 75:15, 79:20, 135:20, 150:24
**Living** [10] - 30:17, 31:16, 34:5, 204:23, 206:9, 206:11, 207:15, 207:25, 208:7, 243:23
**LLP** [1] - 2:12
**local** [1] - 9:4
**locations** [1] - 45:7
**loft** [2] - 42:22, 135:2
**logical** [1] - 153:6
**logically** [1] - 45:9
**logistical** [1] - 116:5
**logo** [1] - 118:9
**look** [56] - 25:24, 26:7, 27:22, 32:17, 41:8, 46:6, 46:14, 83:3, 83:9, 83:21, 89:1, 89:2, 89:5, 89:6, 90:19, 90:21, 91:5, 91:19, 94:2, 100:1, 101:1, 101:18, 102:20, 102:21, 104:20, 113:21, 121:16, 121:18, 125:2, 125:15, 130:12, 133:3, 133:4, 141:19, 143:12, 143:15, 146:16, 147:1, 159:20, 195:12, 195:13,

195:16, 202:7, 207:23, 221:22, 223:7, 243:1, 246:10, 267:8, 278:2, 278:24, 279:2, 279:4, 291:6
**looked** [19] - 11:1, 36:3, 44:6, 44:7, 90:18, 90:22, 93:4, 93:19, 100:20, 129:18, 130:9, 131:6, 136:2, 193:3, 203:24, 205:2, 205:4, 248:21, 268:1
**looking** [15] - 11:24, 127:16, 130:17, 130:24, 136:7, 146:21, 147:17, 160:3, 160:4, 180:7, 180:20, 229:11, 229:14, 259:18, 298:20
**looks** [13] - 14:7, 15:11, 37:1, 47:1, 100:3, 113:14, 126:17, 140:19, 146:22, 176:2, 221:22, 299:10
**loop** [1] - 164:4
**LOS** [5] - 1:17, 1:23, 2:10, 5:1, 301:6
**Los** [6] - 24:19, 77:12, 78:3, 78:7, 78:20, 78:21
**lose** [2] - 226:6, 299:18
**loss** [1] - 176:7
**lost** [2] - 176:6, 210:15
**loudly** [1] - 85:11
**Louisiana** [2] - 69:15, 72:20
**Louisiana-Texas** [1] - 69:15
**love** [2] - 209:2, 224:24
**loved** [3] - 39:19, 73:17
**low** [1] - 167:1
**lower** [2] - 79:23, 262:9
**Lucille** [1] - 30:20
**luckily** [1] - 10:6
**lucky** [1] - 179:12
**lunch** [2] - 189:5, 189:7
**luxury** [10] - 160:1, 161:14, 199:14, 199:15, 216:22, 216:25, 217:9, 217:10, 217:11,

217:17

# M

**M-A-R-M-O-L** [1] - 268:13
**ma'am** [4] - 23:11, 23:14, 28:25, 68:6
**machine** [6] - 111:22, 142:7, 142:9, 142:11, 142:12, 146:21
**machinery** [1] - 27:13
**machines** [1] - 179:24
**magazine** [17] - 27:21, 27:25, 28:1, 30:14, 30:16, 31:1, 31:6, 31:8, 31:12, 34:10, 205:9, 206:21, 206:24, 207:3, 207:7, 208:3, 290:2
**Magazine** [12] - 31:17, 34:5, 186:14, 192:11, 193:23, 204:23, 206:9, 206:11, 207:15, 207:25, 208:7, 243:23
**magazines** [4] - 159:13, 193:25, 214:18, 214:22
**mail** [2] - 116:10
**main** [5] - 73:24, 74:4, 159:14, 212:15, 237:21
**maize** [1] - 171:6
**major** [6] - 70:8, 105:8, 107:23, 167:25, 292:14
**majority** [1] - 45:7
**maker** [2] - 26:9, 26:10
**makers** [2] - 156:22, 175:10
**man** [8] - 23:24, 72:14, 72:23, 72:24, 74:9, 77:7, 115:22
**manage** [2] - 22:14, 188:20
**manager** [2] - 195:8, 200:17
**managing** [5] - 31:24, 155:24, 156:5, 156:7, 208:21
**Manhattan** [4] - 79:24, 135:1, 135:2, 135:10
**manifest** [1] - 7:5

**mankind's** [1] - 227:1
**manner** [3] - 18:8, 54:22, 64:5
**manpower** [1] - 167:13
**manufacture** [4] - 156:24, 157:2, 157:4, 211:22
**manufactured** [1] - 35:7
**manufacturer** [1] - 168:17
**manufacturers** [2] - 215:12, 215:16
**manufacturing** [1] - 158:18
**map** [1] - 21:15
**Marc** [1] - 217:5
**MARCH** [3] - 1:16, 5:1, 301:21
**March** [13] - 27:23, 162:8, 163:9, 173:6, 204:20, 204:22, 205:8, 205:20, 206:10, 234:4, 234:11, 234:15
**MARELLA** [1] - 2:8
**mark** [6] - 292:4, 292:7, 293:11, 293:13, 293:14, 293:20
**marked** [3] - 18:7, 92:24, 92:25
**market** [52] - 24:4, 25:6, 26:18, 27:17, 27:24, 29:24, 30:7, 30:8, 31:13, 34:8, 37:7, 38:11, 42:7, 106:24, 114:21, 132:19, 132:20, 134:12, 134:15, 143:23, 144:6, 152:15, 156:25, 158:4, 159:6, 159:11, 159:20, 159:22, 159:24, 160:2, 160:15, 161:14, 161:20, 166:8, 168:12, 168:13, 177:18, 177:22, 191:13, 197:2, 197:13, 199:14, 199:15, 211:7, 216:18, 216:21, 216:23, 216:24, 216:25, 249:13, 284:4
**marketed** [2] - 44:21, 109:4, 227:12, 279:16
**marketing** [36] -

34:19, 43:13, 44:9, 100:12, 104:13, 105:13, 105:14, 105:16, 106:1, 108:15, 116:6, 117:17, 118:5, 118:11, 144:5, 144:7, 144:13, 158:12, 158:13, 159:10, 159:23, 162:16, 164:22, 167:9, 167:14, 167:22, 176:4, 183:5, 211:11, 227:16, 227:17, 227:22, 237:17, 248:5, 251:10, 279:7

**marketplace** [6] - 23:22, 136:24, 161:18, 167:23, 210:11, 212:10

**markets** [2] - 143:22, 144:1

**marking** [2] - 9:4, 18:5

**marks** [5] - 291:11, 291:14, 291:19, 291:22, 291:25

**Marmol** [2] - 268:10, 268:22

**married** [3] - 40:22, 77:3, 77:7

**marry** [1] - 40:2

**MARSHALL** [1] - 1:4

**Martha** [2] - 117:15, 118:3

**mash** [4] - 170:20, 170:25, 171:12, 171:15

**mashes** [2] - 171:23

**mask** [2] - 169:5, 169:6

**mass** [3] - 111:19, 138:18, 176:11

**massive** [1] - 164:25

**master** [1] - 71:17

**master's** [1] - 71:20

**mate** [2] - 102:20, 117:15

**material** [1] - 58:10

**materiality** [2] - 134:19, 135:6

**materials** [2] - 57:20, 239:14

**math** [5] - 105:8, 106:6, 113:9, 186:24, 187:5

**matter** [13] - 5:14, 6:6, 6:11, 6:17, 22:11, 35:12, 35:14, 57:10, 65:17, 153:20,

264:25, 276:18

**MATTER** [1] - 301:16

**matters** [3] - 16:1, 17:18, 240:3

**Mayan** [2] - 41:19, 227:8

**mean** [29] - 9:12, 27:20, 33:7, 34:4, 80:21, 82:3, 88:13, 89:7, 95:23, 99:25, 100:15, 100:23, 116:10, 123:13, 125:1, 136:14, 143:9, 148:5, 150:13, 150:24, 184:19, 200:15, 217:24, 219:3, 247:20, 260:17, 265:6, 280:1, 281:11

**meaning** [1] - 68:21

**means** [11] - 41:19, 49:25, 50:9, 52:16, 52:18, 54:10, 56:19, 63:10, 153:25, 170:20, 277:21

**meant** [2] - 46:20, 46:24

**mechanically** [3] - 18:16, 141:21, 141:25

**mechanics** [1] - 129:10

**media** [45] - 56:23, 57:3, 57:15, 58:8, 59:15, 59:18, 116:9, 184:3, 184:6, 191:5, 191:6, 191:23, 191:25, 192:3, 192:12, 192:14, 192:23, 193:2, 193:7, 193:15, 193:22, 194:6, 194:7, 194:9, 194:13, 195:19, 196:19, 196:20, 196:24, 198:14, 198:15, 198:16, 198:17, 214:15, 214:17, 214:18, 237:14, 239:15, 248:8, 248:9, 249:7, 260:20, 260:21, 261:5, 261:15

**medical** [1] - 92:3

**meet** [20] - 14:18, 14:21, 15:12, 49:2, 65:21, 75:20, 76:8, 76:10, 77:17, 79:21, 188:22, 240:7, 240:11, 260:9, 267:1, 282:6, 284:11, 296:19, 297:2, 297:13

**meeting** [2] - 162:19, 281:14

**Melrose** [1] - 78:4

**melt** [3] - 178:4, 178:8, 178:25

**members** [1] - 57:2

**memo** [2] - 278:25, 283:9

**memorandum** [1] - 278:20

**memory** [6] - 51:16, 54:21, 60:6, 61:2, 61:3, 81:3

**men** [2] - 31:23, 32:16

**Mendoza** [1] - 118:3

**mention** [2] - 43:21, 250:7

**mentioned** [22] - 74:9, 77:7, 80:23, 105:13, 111:1, 111:3, 115:12, 124:7, 126:1, 126:9, 131:13, 151:9, 157:13, 159:7, 167:15, 185:9, 191:22, 191:23, 193:15, 205:8, 276:25, 299:5

**mentioning** [1] - 237:8

**menu** [1] - 166:25

**merits** [1] - 56:16

**Mesopotamia** [1] - 227:9

**messaging** [1] - 56:20

**met** [16] - 36:13, 75:16, 75:18, 75:21, 76:2, 76:4, 96:16, 119:22, 126:8, 137:12, 148:20, 199:25, 200:17, 214:10, 214:13, 297:6

**metals** [1] - 170:18

**Methodist** [1] - 71:15

**Metropolitan** [1] - 79:4

**Mexican** [8] - 38:16, 39:15, 40:3, 41:21, 43:16, 98:4, 212:14, 264:20

**Mexican-American** [1] - 38:16

**Mexico** [13] - 39:3, 39:6, 40:4, 44:25, 96:24, 96:25, 97:3, 97:20, 97:22, 211:23, 212:2, 212:8, 213:4

**Miami** [1] - 107:6

**mic** [3] - 85:7, 85:16,

87:1

**MICHAEL** [1] - 2:6

**Mickey** [1] - 80:18

**Microsoft** [1] - 298:7

**mid** [2] - 157:8, 157:9

**mid-November** [2] - 157:8, 157:9

**middle** [7] - 87:18, 88:4, 88:6, 116:17, 173:6, 226:4

**might** [28] - 11:8, 17:23, 19:1, 23:4, 50:22, 54:7, 63:22, 69:18, 72:21, 73:3, 82:14, 92:14, 97:25, 106:13, 131:24, 144:19, 173:1, 192:14, 203:13, 216:8, 221:3, 238:18, 240:11, 241:8, 267:22, 270:14, 276:8, 294:13

**Mike** [2] - 5:20, 20:10

**mikes** [2] - 265:17, 265:18

**mILLER** [1] - 270:22

**MILLER** [83] - 6:3, 20:17, 48:10, 48:12, 148:13, 148:17, 149:18, 210:6, 235:14, 235:17, 236:11, 262:5, 262:7, 269:19, 269:25, 270:5, 271:1, 271:5, 271:13, 272:6, 272:10, 272:14, 272:18, 272:22, 273:1, 273:5, 273:10, 273:14, 273:19, 273:23, 273:25, 274:4, 274:6, 274:10, 274:14, 274:18, 274:22, 275:1, 275:5, 275:15, 275:17, 275:25, 276:7, 276:10, 276:14, 276:21, 276:23, 278:7, 278:15, 278:18, 280:8, 282:11, 282:23, 284:20, 286:23, 287:9, 287:12, 287:19, 288:4, 288:6, 288:10, 288:14, 288:16, 288:21, 288:23, 289:4, 289:8, 289:12, 289:14, 289:18, 289:22, 289:25, 290:5, 290:9,

290:11, 290:13, 290:17, 290:21, 291:2, 292:11, 293:2, 299:5, 300:6

**Miller** [9] - 6:4, 20:17, 47:20, 48:19, 148:12, 148:20, 235:10, 235:13, 286:1

**milliliters** [2] - 84:25, 87:6

**million** [2] - 196:14, 216:17

**mind** [8] - 43:3, 56:4, 86:4, 150:9, 192:1, 234:24, 236:20, 270:20

**Mind** [2] - 184:24, 185:3

**minds** [1] - 43:5

**mine** [1] - 129:10

**minimize** [1] - 65:16

**minimum** [2] - 65:9, 214:2

**minute** [5] - 23:8, 73:4, 89:4, 233:16, 254:21

**minutes** [26] - 13:14, 13:18, 23:8, 23:10, 23:16, 34:6, 47:7, 48:9, 67:14, 67:21, 125:1, 154:9, 154:10, 201:8, 214:1, 240:10, 240:18, 241:22, 241:25, 242:5, 257:17, 258:14, 264:2, 268:16, 270:14, 270:18

**mischaracterizes** [2] - 205:12, 234:19

**misleading** [2] - 58:24, 204:8

**missing** [4] - 15:25, 16:3, 19:19, 227:2

**mission** [1] - 165:13

**mistakes** [1] - 55:9

**mistrial** [1] - 59:11

**Mitchell** [1] - 44:8

**Mitchell-Hedges** [1] - 44:8

**mix** [2] - 161:11, 171:7

**mixing** [1] - 181:23

**Mobile** [1] - 107:5

**MOCA** [1] - 78:20

**model** [2] - 92:2, 93:25

**models** [1] - 70:16

**Modern** [1] - 24:19

**modifications** [1] - 182:13

**modified** [2] - 263:2, 263:4

**mold** [8] - 92:4, 93:8, 93:25, 174:5, 174:6, 179:11, 182:17, 226:6

**molds** [2] - 123:5, 174:5

**mom** [1] - 108:25

**moment** [18] - 40:18, 73:3, 101:4, 106:10, 111:3, 111:5, 130:18, 131:20, 138:11, 141:5, 192:18, 206:3, 209:11, 210:20, 241:1, 255:7, 258:7, 297:25

**momentum** [2] - 191:3, 299:18

**Monarch** [1] - 212:3

**money** [9] - 31:23, 35:11, 71:9, 111:22, 112:1, 150:8, 179:4, 179:13, 211:1

**monitor** [1] - 248:8

**monitors** [1] - 112:13

**month** [5] - 79:21, 137:3, 195:2, 199:8, 205:23

**months** [15] - 27:24, 41:23, 123:12, 162:9, 182:22, 191:2, 191:14, 193:1, 194:8, 204:24, 205:22, 248:10

**MOORE** [1] - 2:12

**morning** [24] - 5:22, 5:23, 6:2, 6:3, 6:5, 6:8, 14:15, 20:15, 20:20, 22:22, 22:23, 36:10, 67:8, 67:13, 85:16, 108:6, 119:20, 119:21, 150:19, 188:18, 188:21, 239:23, 300:10

**morphed** [1] - 125:12

**most** [27] - 6:9, 19:10, 40:16, 76:12, 89:1, 96:25, 109:12, 151:20, 159:21, 166:10, 175:15, 177:16, 177:17, 182:18, 188:7, 193:17, 198:23, 198:25, 239:7, 241:25, 249:5, 267:12, 275:21, 292:18, 298:6

**mostly** [1] - 33:12

**mother** [3] - 73:1, 74:10, 74:11

**motion** [32] - 6:19, 6:22, 7:4, 8:1, 70:14, 82:9, 119:5, 212:24, 212:25, 264:8, 264:10, 264:17, 264:18, 264:23, 275:22, 275:23, 276:1, 276:12, 276:18, 276:25, 277:2, 277:5, 277:6, 277:10, 277:17, 277:24, 291:16, 291:18, 294:7, 294:21, 296:6

**motions** [5] - 6:23, 119:3, 264:13, 265:10

**motive** [2] - 27:16, 28:15

**mounds** [1] - 97:11

**Mouse** [1] - 80:18

**mouth** [1] - 131:13

**mouths** [2] - 46:4, 102:4

**move** [12] - 16:15, 48:17, 70:18, 75:3, 75:11, 167:15, 188:7, 194:6, 203:21, 204:12, 265:17, 287:24

**moved** [6] - 71:12, 71:25, 72:3, 75:10, 75:12, 194:13

**movie** [3] - 76:1, 116:25, 117:3

**moving** [2] - 96:23, 188:12

**MR** [368] - 5:10, 5:19, 5:23, 6:3, 8:20, 8:25, 9:6, 9:22, 10:6, 10:11, 10:21, 11:19, 12:14, 16:5, 18:11, 19:2, 19:3, 19:15, 19:17, 19:21, 19:22, 20:9, 20:13, 20:17, 22:21, 23:7, 23:11, 23:14, 23:17, 26:12, 26:13, 28:25, 29:8, 34:7, 36:8, 47:8, 48:10, 48:11, 48:12, 67:25, 68:6, 68:9, 68:12, 68:14, 68:18, 68:23, 69:7, 69:11, 74:2, 74:3, 81:9, 81:14, 82:7, 82:14, 82:17, 82:20, 84:10, 84:15, 85:4, 85:10, 85:19, 86:9, 86:13, 86:20, 91:17, 92:15, 92:25,

93:1, 98:16, 98:19, 99:3, 101:8, 101:9, 103:8, 103:14, 103:24, 104:3, 106:15, 106:22, 106:23, 110:3, 110:7, 110:13, 110:17, 110:22, 110:24, 111:7, 112:9, 112:19, 113:8, 113:12, 113:17, 113:19, 114:17, 114:19, 117:2, 117:5, 117:8, 117:11, 118:20, 119:1, 119:7, 119:10, 119:16, 119:19, 120:12, 127:16, 127:20, 127:25, 128:5, 129:2, 129:3, 130:22, 131:22, 132:2, 134:18, 134:24, 134:25, 135:5, 135:9, 135:12, 137:23, 138:3, 141:7, 141:14, 142:5, 144:19, 144:24, 145:5, 145:10, 145:12, 145:19, 145:21, 145:25, 146:7, 146:14, 146:15, 148:9, 148:13, 148:17, 148:18, 149:21, 149:24, 151:24, 152:7, 152:22, 152:24, 153:3, 153:12, 153:18, 153:23, 154:24, 155:17, 155:22, 156:1, 157:16, 157:21, 174:16, 174:19, 174:23, 192:21, 196:7, 201:4, 201:8, 201:10, 201:16, 201:18, 202:1, 202:6, 202:10, 202:14, 202:18, 202:23, 203:4, 203:9, 203:15, 203:20, 203:22, 204:6, 204:12, 204:13, 205:12, 205:17, 206:2, 206:7, 206:20, 206:23, 207:10, 207:13, 208:9, 208:11, 209:8, 209:15, 209:19, 209:23, 210:6, 210:9, 210:24, 212:17, 212:20, 212:22, 213:1, 213:2, 213:21,

213:23, 214:1, 214:7, 220:19, 220:24, 221:1, 222:12, 222:14, 222:18, 222:20, 222:23, 223:3, 223:5, 223:8, 223:11, 223:14, 223:21, 223:22, 231:8, 232:4, 232:17, 233:5, 233:9, 233:11, 233:13, 233:21, 234:18, 235:1, 235:9, 235:14, 235:17, 236:11, 236:14, 236:16, 236:21, 236:25, 237:23, 238:2, 238:4, 238:21, 238:22, 241:17, 241:24, 242:3, 242:6, 243:12, 243:16, 244:1, 244:20, 244:22, 244:24, 245:6, 245:14, 245:21, 245:25, 250:4, 252:7, 252:15, 252:22, 253:7, 253:17, 254:18, 254:20, 254:24, 255:3, 255:18, 255:21, 255:24, 256:4, 256:8, 256:11, 256:15, 256:25, 257:16, 258:22, 259:3, 259:12, 260:2, 260:8, 260:13, 261:9, 262:5, 262:7, 268:18, 268:25, 269:3, 269:19, 269:25, 270:5, 270:9, 270:22, 271:1, 271:5, 271:13, 272:6, 272:10, 272:14, 272:18, 272:22, 273:1, 273:5, 273:10, 273:14, 273:19, 273:23, 273:25, 274:4, 274:6, 274:10, 274:14, 274:18, 274:22, 275:1, 275:5, 275:15, 275:17, 275:25, 276:7, 276:10, 276:14, 276:21, 276:23, 278:7, 278:15, 278:18, 280:8, 282:11, 282:23, 284:20, 286:23, 287:9, 287:12, 287:19, 288:4, 288:6, 288:10, 288:14, 288:16, 288:21, 288:23,

289:4, 289:8, 289:12, 289:14, 289:18, 289:22, 289:25, 290:5, 290:9, 290:11, 290:13, 290:17, 290:21, 291:2, 292:11, 293:2, 295:5, 296:14, 297:21, 298:21, 298:23, 299:5, 300:6, 300:12

**MS** [154] - 12:22, 13:8, 13:13, 13:19, 13:25, 14:14, 14:19, 15:3, 15:20, 17:1, 17:17, 241:10, 241:14, 241:22, 242:9, 242:15, 242:18, 242:21, 242:24, 243:5, 243:9, 243:21, 243:24, 244:7, 244:10, 244:16, 245:3, 245:11, 245:17, 246:25, 247:24, 248:3, 249:5, 249:18, 250:1, 251:9, 251:15, 251:19, 252:4, 252:12, 252:18, 253:2, 253:10, 253:15, 253:22, 253:25, 254:4, 254:6, 254:12, 255:13, 256:20, 257:4, 257:13, 258:7, 258:10, 258:12, 258:19, 259:16, 259:19, 260:6, 260:14, 260:19, 260:25, 261:3, 261:23, 262:2, 262:16, 262:18, 263:11, 263:14, 266:20, 268:4, 268:9, 268:13, 268:16, 268:21, 269:7, 269:11, 269:14, 271:9, 271:16, 271:20, 271:25, 272:5, 272:9, 272:13, 272:17, 272:21, 272:25, 273:4, 273:9, 273:13, 273:18, 273:22, 273:24, 274:3, 274:5, 274:9, 274:13, 274:17, 274:21, 274:25, 275:4, 275:8, 277:8, 277:24, 278:4, 278:24, 279:3, 279:10, 279:14, 279:20, 280:1, 281:1,

281:4, 283:4, 283:22, 285:15, 286:8, 286:12, 286:14, 287:3, 287:16, 287:20, 288:5, 288:7, 288:11, 288:15, 288:17, 288:22, 288:25, 289:5, 289:9, 289:13, 289:15, 289:19, 289:23, 290:6, 290:10, 290:12, 290:14, 290:18, 290:22, 291:8, 291:18, 293:6, 294:1, 294:6, 294:13, 296:15, 297:9, 297:19, 300:8, 300:11

**multimillion** [1] - 167:5

**multiple** [2] - 120:10, 120:15

**muralists** [1] - 98:4

**Museum** [7] - 24:18, 24:19, 78:19, 78:20, 78:21, 79:4, 79:5

**museum** [3] - 79:1, 79:3, 79:5

**museums** [10] - 78:13, 78:16, 78:17, 78:22, 79:7, 120:7, 120:11, 120:13, 120:18, 121:5

**music** [3] - 97:10, 185:16, 185:18

**must** [19] - 49:21, 49:22, 49:25, 50:10, 50:14, 51:25, 52:4, 53:7, 54:6, 54:11, 56:8, 56:10, 57:9, 59:17, 59:20, 140:19, 220:24

---

### N

**name** [26] - 13:23, 16:15, 30:20, 41:18, 41:19, 64:14, 69:4, 69:5, 69:14, 78:24, 79:1, 92:10, 105:4, 115:22, 118:13, 155:11, 155:12, 198:12, 204:18, 214:10, 225:3, 242:17, 242:18, 242:20, 268:12, 283:19

**namely** [1] - 234:2

**names** [11] - 5:10, 5:16, 5:17, 5:19, 11:13, 128:16, 224:2,

---

224:15, 224:19, 224:21, 237:12

**nasty** [1] - 76:14

**native** [1] - 171:3

**natural** [1] - 74:7

**naturalist** [2] - 73:17, 73:20

**nature** [3] - 73:20, 81:21, 110:1

**NBC** [2] - 108:21, 192:6

**near** [4] - 69:14, 87:8, 135:14, 136:17

**nearly** [1] - 113:21

**necessarily** [3] - 55:24, 217:18, 280:9

**necessary** [7] - 53:2, 58:15, 64:23, 65:23, 82:12, 239:20, 276:5

**Neches** [1] - 71:13

**Neches–Groves** [1] - 71:2

**neck** [9] - 115:2, 115:7, 129:5, 147:15, 174:7, 174:8, 174:10, 176:18

**need** [68] - 11:7, 13:7, 13:21, 13:24, 14:24, 15:18, 15:19, 17:15, 22:12, 23:2, 39:10, 60:25, 88:7, 111:20, 119:1, 160:17, 160:18, 173:13, 173:14, 173:15, 173:16, 176:18, 194:10, 195:13, 197:14, 197:15, 202:17, 214:4, 239:1, 239:16, 240:3, 240:6, 243:10, 247:14, 247:21, 254:22, 257:15, 258:1, 258:18, 259:14, 261:4, 263:6, 263:16, 264:2, 264:13, 264:24, 265:1, 265:11, 265:17, 266:10, 266:17, 267:15, 277:16, 277:17, 279:23, 282:2, 283:12, 283:16, 286:13, 288:3, 290:4, 293:25, 299:9, 299:17

**needed** [8] - 158:18, 170:12, 177:12, 185:6, 187:14, 226:4, 246:23, 264:4

**needs** [8] - 8:11, 22:10, 67:15, 110:12,

---

265:4, 280:17, 284:16, 287:1

**negative** [1] - 193:11

**neglect** [2] - 116:21, 117:3

**neighbor's** [1] - 35:14

**nervous** [1] - 81:23

**NESSIM** [1] - 2:8

**neutral** [1] - 62:3

**never** [27] - 16:17, 23:23, 27:4, 32:13, 33:15, 35:21, 36:21, 36:22, 46:25, 81:1, 83:13, 86:18, 100:8, 104:24, 109:23, 132:7, 132:14, 139:4, 162:23, 189:9, 216:9, 216:11, 221:23, 225:4, 229:3

**New** [14] - 75:6, 75:10, 75:11, 76:6, 78:10, 78:11, 78:23, 79:1, 79:4, 79:20, 79:21, 107:6, 135:4, 187:1

**new** [18] - 6:24, 7:3, 16:14, 24:11, 27:25, 30:7, 83:14, 183:25, 195:7, 195:9, 195:12, 195:17, 209:1, 209:2, 224:6, 224:24, 224:25, 265:13

**NEW** [1] - 2:14

**Newfoundland** [6] - 30:22, 30:23, 44:17, 169:24, 181:8, 182:21

**news** [5] - 57:15, 57:18, 59:15, 59:18, 194:18

**News** [4] - 27:21, 30:16, 193:24, 194:17

**newspapers** [1] - 108:22

**next** [52] - 9:25, 10:17, 10:19, 10:20, 10:24, 20:18, 29:7, 31:19, 31:20, 41:11, 60:17, 66:21, 70:18, 71:23, 71:24, 81:15, 81:16, 88:25, 113:3, 113:20, 113:23, 118:21, 129:17, 154:14, 154:23, 163:10, 163:11, 163:15, 183:9, 185:23, 190:5, 209:22, 211:6, 217:21, 218:10, 231:14, 243:19,

---

244:9, 252:11, 255:15, 264:3, 266:14, 267:22, 268:20, 269:10, 269:11, 271:4, 278:3, 278:13, 282:10, 284:18, 286:22

**Next** [1] - 113:13

**nicer** [1] - 225:15

**night** [16] - 6:7, 6:25, 10:25, 11:2, 11:11, 17:24, 18:17, 66:2, 68:15, 80:8, 92:22, 97:12, 108:4, 109:7, 189:23, 288:1

**Night** [1] - 75:22

**nightclub** [1] - 195:9

**Nightclub** [2] - 204:19, 206:10

**nine** [4] - 177:1, 177:12, 187:20, 213:14

**NLLC** [5] - 169:25, 181:1, 181:7, 181:17, 182:4

**no-brainer** [2] - 218:25, 219:3

**nobody** [3] - 29:25, 108:11, 211:16

**non** [2] - 81:13, 198:11

**non-holiday** [1] - 198:11

**non-leading** [1] - 81:13

**none** [7] - 37:15, 54:17, 62:11, 137:10, 167:25, 184:20, 184:21

**normal** [1] - 178:1

**normally** [5] - 18:6, 141:1, 154:9, 219:9, 248:11

**North** [4] - 159:11, 169:24, 181:10, 187:8

**NORTH** [1] - 1:22

**nose** [2] - 102:5, 102:6

**note** [4] - 23:1, 60:9, 60:21, 137:6

**notebooks** [1] - 60:23

**notes** [15] - 23:2, 23:5, 60:7, 60:8, 60:11, 60:15, 60:22, 60:24, 61:1, 61:2, 61:4, 61:5, 61:8, 61:13, 294:10

**notetaking** [2] - 60:14, 61:5

---

**nothing** [22] - 7:3, 13:4, 19:17, 19:18, 19:21, 19:22, 62:17, 144:7, 144:14, 168:10, 184:1, 191:14, 219:16, 219:21, 228:6, 238:20, 238:21, 238:22, 250:5, 250:16, 299:3, 299:13

**notice** [10] - 11:4, 13:22, 14:9, 64:18, 85:15, 91:4, 104:6, 131:4, 133:1, 299:24

**noticed** [3] - 132:7, 132:24, 150:15

**notify** [1] - 57:5, 59:14, 59:24

**novelty** [2] - 216:7, 216:17

**November** [7] - 26:23, 30:11, 34:20, 103:7, 157:8, 157:9, 157:23

**November-December** [1] - 30:11

**novice** [1] - 129:9

**number** [26] - 51:6, 54:18, 55:3, 55:24, 65:9, 77:24, 87:10, 113:6, 114:7, 118:15, 145:25, 173:16, 199:20, 222:5, 225:3, 233:8, 233:18, 254:8, 260:4, 260:7, 275:24, 275:25, 277:8, 277:24, 278:10, 289:24

**Number** [8] - 51:23, 52:6, 54:21, 54:22, 54:24, 54:25, 55:1

**numbers** [7] - 127:18, 127:19, 253:21, 256:6, 256:17, 271:15, 287:7

**nurse** [1] - 73:2

**NY** [1] - 2:14

---

### O

**o'clock** [1] - 21:6, 21:10, 154:12, 154:14, 154:16, 188:22, 239:12, 239:23, 240:8, 263:25, 294:5

**oath** [10] - 21:23, 50:2, 58:19, 59:6, 68:4, 69:2, 155:2, 155:8, 220:4, 222:4

**Oaxaca** [3] - 96:23, 97:1, 97:7
**object** [13] - 51:19, 53:25, 117:5, 139:13, 201:16, 202:1, 204:6, 210:7, 212:17, 212:22, 223:4, 245:25, 261:19
**objected** [1] - 278:13
**objecting** [2] - 239:11, 298:5
**Objection** [4] - 134:18, 135:5, 233:5, 234:18
**objection** [123] - 51:22, 54:1, 54:3, 54:5, 81:12, 82:16, 103:8, 103:9, 134:22, 135:6, 135:7, 152:21, 152:22, 153:21, 153:23, 203:11, 207:12, 209:13, 212:19, 222:20, 223:2, 223:20, 238:1, 238:2, 243:11, 243:12, 243:25, 244:19, 244:22, 244:24, 245:5, 245:6, 245:13, 245:14, 245:20, 245:21, 245:24, 251:20, 251:25, 252:6, 252:7, 252:14, 252:15, 252:21, 252:22, 253:4, 256:3, 256:5, 256:17, 259:2, 259:11, 259:15, 259:25, 260:3, 261:8, 262:3, 263:18, 269:1, 269:6, 269:7, 271:12, 271:18, 272:6, 272:10, 272:14, 272:18, 272:22, 273:1, 273:5, 273:7, 273:10, 273:14, 273:19, 273:23, 273:25, 274:4, 274:6, 274:10, 274:14, 274:18, 274:22, 275:1, 275:5, 278:5, 278:6, 278:17, 281:16, 281:25, 282:5, 282:16, 284:11, 284:17, 284:19, 287:8, 287:15, 287:16, 287:22, 288:7, 288:11, 288:15, 288:17, 288:22, 288:25, 289:5, 289:9,

289:13, 289:15, 289:19, 289:23, 290:6, 290:10, 290:12, 290:14, 290:18, 290:22, 291:7, 291:9, 291:23, 292:6, 292:7, 293:22, 296:17, 298:10
**objection's** [1] - 204:9
**objectionable** [4] - 64:10, 203:3, 262:24, 281:8
**objections** [24] - 8:12, 9:19, 9:20, 10:3, 13:3, 15:10, 15:12, 15:16, 15:17, 15:22, 17:23, 18:1, 18:7, 51:17, 223:15, 253:4, 259:9, 259:12, 263:19, 275:11, 275:12, 298:2, 298:24
**objects** [1] - 104:11
**observation** [1] - 61:14
**observing** [2] - 61:9, 61:12
**obtain** [2] - 202:15, 203:5
**obtained** [2] - 202:16, 203:6
**obvious** [2] - 46:9, 180:21
**obviously** [9] - 8:11, 13:6, 15:1, 34:9, 194:8, 246:11, 250:25, 270:10, 270:12
**occasion** [1] - 143:4
**occasionally** [1] - 96:5
**occur** [2] - 33:14, 53:5
**occurred** [1] - 62:12
**October** [6] - 186:17, 187:3, 187:17, 190:16, 190:23, 248:10
**odd** [3] - 27:13, 87:13, 107:7
**OF** [13] - 1:1, 1:2, 1:15, 2:3, 2:4, 2:11, 301:4, 301:6, 301:8, 301:12, 301:14, 301:17, 301:18
**OFF** [2] - 241:2, 254:2
**off-the-cuff** [1] - 208:25
**offensive** [1] - 136:2

**offer** [4] - 62:5, 254:16, 255:1, 280:9
**offered** [9] - 66:19, 66:20, 115:2, 125:20, 246:15, 253:2, 290:25, 292:15, 298:1
**offering** [9] - 8:19, 18:5, 249:18, 278:19, 278:25, 279:9, 283:9, 284:14, 298:9
**offers** [1] - 53:22
**office** [3] - 116:6, 117:24, 156:11
**OFFICIAL** [3] - 1:22, 301:10, 301:25
**official** [2] - 10:14, 191:18
**officially** [2] - 70:7, 158:5
**often** [10] - 21:15, 28:9, 55:8, 64:9, 77:2, 79:22, 97:22, 98:6, 100:18, 136:20
**oil** [9] - 25:14, 25:15, 25:16, 72:25, 74:16, 74:18, 74:19, 75:1, 169:3
**oils** [2] - 168:23, 169:9
**old** [8] - 30:8, 70:16, 72:1, 73:9, 73:13, 138:22, 150:17, 152:3
**old-fashioned** [1] - 70:16
**older** [3] - 72:23, 73:6, 74:15
**ON** [2] - 2:4, 2:11
**once** [23] - 79:21, 86:13, 87:11, 93:7, 95:12, 111:15, 158:9, 159:19, 162:15, 165:8, 165:16, 166:1, 169:21, 171:12, 174:13, 182:9, 211:20, 216:8, 216:13, 228:5, 281:21, 291:9
**One** [2] - 32:11, 217:22
**one** [204] - 7:10, 8:4, 9:10, 9:15, 11:16, 12:4, 13:10, 14:21, 15:5, 15:7, 15:8, 15:25, 16:3, 18:24, 19:19, 25:7, 26:15, 27:1, 27:6, 30:5, 32:11, 32:13, 32:24, 33:7, 34:12, 35:1, 36:18, 39:5, 40:9, 42:15, 42:23, 44:6,

44:7, 48:24, 48:25, 50:19, 51:6, 53:13, 54:18, 60:16, 65:18, 73:25, 79:2, 80:3, 89:12, 89:15, 90:3, 91:15, 92:19, 93:23, 96:25, 97:7, 98:20, 99:19, 103:23, 104:13, 104:21, 108:5, 109:10, 109:12, 109:24, 110:25, 111:10, 111:25, 112:23, 113:3, 113:14, 114:9, 115:3, 115:4, 119:3, 120:25, 122:23, 123:21, 123:22, 125:20, 126:20, 127:9, 128:9, 128:13, 129:6, 129:15, 137:14, 137:18, 139:25, 142:4, 144:23, 145:13, 145:14, 145:15, 146:7, 146:22, 152:8, 154:4, 156:19, 157:25, 161:11, 164:9, 164:15, 164:16, 164:20, 165:4, 166:3, 168:2, 171:24, 175:9, 177:17, 183:19, 183:22, 184:17, 185:15, 185:23, 186:1, 186:5, 186:25, 187:21, 188:16, 188:17, 189:2, 189:13, 199:17, 199:20, 201:13, 201:14, 201:15, 202:24, 208:2, 214:18, 225:21, 226:4, 227:4, 232:7, 234:13, 239:10, 240:15, 241:18, 243:8, 243:13, 243:25, 244:2, 244:9, 244:12, 244:18, 244:20, 245:5, 245:8, 245:22, 247:11, 247:16, 247:21, 247:22, 248:2, 249:25, 250:9, 252:6, 252:18, 253:7, 257:7, 258:6, 258:22, 259:4, 259:21, 259:23, 259:25, 260:3, 264:9, 264:16, 264:17, 265:3, 268:1, 269:21, 271:9, 273:6, 273:23, 274:4, 274:14,

275:14, 276:25, 277:16, 278:3, 278:13, 285:21, 286:4, 286:22, 291:7, 292:14, 294:16, 295:16, 296:15, 297:23, 298:13
**one's** [1] - 99:18
**one-of-a-kind** [2] - 32:11, 32:13
**ones** [7] - 39:19, 125:12, 126:14, 266:22, 267:4, 267:13, 291:6
**online** [1] - 249:20
**Ontario** [6] - 114:15, 155:24, 171:4, 215:22, 215:23
**oops** [1] - 273:5
**opaque** [1] - 46:11
**open** [1] - 56:4
**opening** [14] - 21:14, 22:5, 22:20, 23:3, 29:2, 36:7, 41:6, 43:21, 49:6, 51:8, 51:11, 66:6, 66:7, 66:10
**openings** [1] - 18:15
**operations** [1] - 156:9
**operative** [1] - 295:19
**opinion** [10] - 50:6, 62:1, 65:12, 143:2, 193:13, 228:10, 228:25, 229:4, 264:12
**opinions** [1] - 49:23
**opportunities** [1] - 159:17
**opportunity** [11] - 27:16, 54:19, 62:6, 64:7, 71:10, 72:4, 73:19, 168:11, 199:7, 240:7, 285:11
**opposed** [1] - 97:3
**opposing** [1] - 11:7
**opposition** [1] - 295:15
**optimistic** [1] - 299:11
**option** [2] - 130:3, 130:4
**orange** [1] - 95:3
**Orange** [1] - 186:14
**orchards** [1] - 80:1
**order** [24] - 6:19, 7:7, 15:12, 16:9, 34:11, 54:8, 61:25, 123:5, 170:8, 193:5, 194:25, 195:4, 239:17,

240:22, 264:22, 277:10, 277:16, 277:25, 288:23, 292:13, 293:25, 294:9, 295:7, 298:7
**ordered** [1] - 57:10
**ordering** [5] - 118:5, 283:7, 284:3, 284:6, 284:8
**orders** [1] - 264:13
**ordinary** [2] - 32:2, 43:5
**organic** [1] - 123:24
**organize** [1] - 36:8
**origin** [1] - 43:10
**original** [6] - 8:22, 26:1, 92:5, 127:2, 142:2, 158:13
**originally** [4] - 106:7, 139:6, 158:11, 158:12
**Orlando** [2] - 107:6, 186:23
**Orlando/Miami** [2] - 186:25
**Orleans** [2] - 107:6, 187:1
**otherwise** [7] - 20:24, 50:15, 56:14, 94:18, 192:14, 235:10, 263:7
**ourselves** [3] - 167:6, 187:15, 200:5
**outcome** [2] - 54:23, 133:18
**outdoors** [2] - 73:17, 73:21
**outline** [2] - 21:15, 66:8
**outlined** [1] - 225:18
**outside** [8] - 7:18, 58:22, 59:13, 59:23, 135:3, 135:9, 182:7, 239:20
**outstanding** [3] - 6:11, 6:17, 8:2
**overcome** [1] - 280:23
**overestimating** [1] - 270:17
**overhear** [2] - 52:12, 52:23
**overlap** [1] - 286:3
**overly** [1] - 61:3
**overrule** [1] - 54:1
**overruled** [5] - 135:7, 204:9, 233:7, 234:21, 262:3
**overseas** [1] - 213:11
**overwhelmingly** [1] -

140:18
**own** [19] - 30:16, 36:8, 38:24, 41:12, 45:16, 57:22, 61:2, 81:2, 84:4, 84:5, 106:12, 124:8, 161:23, 164:10, 165:25, 179:5, 198:7, 199:18, 292:18
**owned** [5] - 109:1, 161:24, 169:23, 181:9, 283:24
**owner** [6] - 133:22, 150:7, 185:19, 189:20, 200:17, 226:16
**owner's** [1] - 192:25
**owners** [2] - 107:23, 175:18
**ownership** [4] - 133:9, 133:11, 150:1, 150:4
**owns** [2] - 28:16, 87:9
**oyster** [1] - 79:23

# P

**P.C** [1] - 2:8
**package** [3] - 217:14, 218:13, 218:24
**packaging** [4] - 181:24, 279:6, 279:15
**packed** [1] - 177:11
**packing** [1] - 279:7
**page** [15] - 31:9, 31:10, 31:11, 31:14, 127:22, 129:16, 129:17, 207:2, 214:22, 243:4, 254:8, 278:19, 278:25
**PAGE** [1] - 301:16
**pages** [20] - 126:17, 126:23, 207:14, 207:23, 207:24, 214:25, 215:1, 253:8, 253:14, 254:9, 254:13, 254:15, 254:25, 255:12, 255:14, 256:14, 256:17, 281:3, 282:7
**paid** [2] - 193:11, 282:19
**painstaking** [1] - 48:22
**paint** [7] - 120:25, 121:1, 121:10, 121:11, 228:20,

228:23
**painted** [35] - 29:9, 32:24, 32:25, 33:7, 40:21, 46:16, 100:10, 101:25, 104:21, 106:25, 107:3, 141:20, 142:7, 142:8, 142:10, 146:20, 146:21, 146:23, 146:24, 147:1, 147:2, 152:17, 205:3, 246:6, 246:9, 246:10, 246:14, 247:9, 248:25, 250:8, 250:10, 250:19, 250:24
**painter** [1] - 121:10
**painters** [3] - 97:25, 98:2, 98:6
**painting** [14] - 70:9, 71:19, 72:7, 73:23, 73:24, 74:4, 77:20, 98:9, 104:8, 116:16, 119:25, 122:13, 141:22, 150:24
**paintings** [13] - 72:10, 72:12, 95:21, 96:4, 120:4, 120:17, 121:4, 121:14, 121:15, 122:10, 122:22, 122:24, 150:16
**paints** [1] - 74:5
**pallet** [1] - 186:4
**panel** [2] - 20:16, 20:20
**paper** [6] - 64:16, 87:14, 87:16, 87:18, 126:24
**papers** [1] - 7:3
**parades** [1] - 97:10
**pardon** [5] - 68:6, 101:10, 114:17, 115:4, 134:5
**PARK** [1] - 2:9
**part** [28] - 13:4, 32:7, 34:23, 54:17, 55:21, 84:3, 89:20, 104:17, 105:13, 113:16, 120:3, 124:3, 124:4, 125:16, 135:17, 152:4, 160:7, 167:22, 180:21, 184:9, 189:24, 213:18, 217:16, 227:11, 248:7, 275:21, 279:21, 281:21
**parte** [1] - 6:18
**participate** [2] - 133:24, 199:1

**participated** [1] - 296:21
**particular** [12] - 25:23, 66:20, 83:18, 84:16, 101:10, 109:6, 122:3, 151:10, 175:22, 233:25, 261:10, 295:20
**particularly** [4] - 70:10, 97:7, 124:8, 131:5
**particulars** [1] - 147:6
**parties** [19] - 8:13, 9:8, 11:3, 50:16, 52:11, 58:4, 59:2, 59:5, 62:21, 107:11, 107:25, 241:14, 254:6, 295:7, 295:17, 295:18, 295:19, 296:7, 298:6
**partner** [7] - 5:25, 116:3, 155:24, 156:5, 156:7, 208:21, 226:11
**partners** [4] - 119:8, 162:16, 184:21, 195:24
**partnership** [5] - 158:14, 184:22, 226:10, 226:11, 226:14
**parts** [13] - 8:11, 8:12, 15:14, 37:9, 74:15, 96:20, 118:18, 146:25, 162:2, 281:6, 281:8, 284:12, 298:3
**party** [12] - 9:15, 50:8, 50:13, 66:9, 66:10, 149:7, 149:8, 193:8, 280:2, 282:1, 295:8, 295:12
**party's** [1] - 58:16
**pass** [13] - 6:23, 27:2, 29:7, 63:4, 64:15, 68:20, 92:16, 119:13, 144:20, 144:24, 153:4, 213:21, 235:9
**passed** [3] - 29:4, 29:15, 31:6
**passing** [4] - 22:24, 80:10, 111:4, 148:7
**past** [3] - 79:10, 202:19, 298:5
**patents** [1] - 82:4
**path** [2] - 42:2, 162:17
**paths** [1] - 37:22
**Patron** [5] - 80:4, 80:7, 81:7, 87:25,

88:20, 128:11
**pay** [11] - 59:25, 134:7, 169:1, 186:15, 192:1, 192:5, 193:6, 265:9, 282:17, 283:25
**paying** [6] - 40:20, 64:17, 74:14, 75:1, 193:8, 266:16
**payment** [1] - 283:5
**peaches** [4] - 171:3, 172:7, 215:24, 216:1
**peeled** [1] - 74:23
**pencil** [1] - 88:1
**pending** [1] - 294:7
**People** [1] - 192:10
**people** [84] - 14:21, 30:6, 32:3, 38:23, 40:11, 40:20, 55:8, 55:10, 57:3, 58:4, 88:12, 88:22, 89:6, 94:23, 95:14, 107:24, 108:21, 109:14, 109:20, 118:6, 123:4, 126:13, 136:7, 137:7, 137:10, 137:12, 137:15, 137:16, 137:17, 137:19, 142:13, 144:17, 156:18, 156:20, 157:25, 166:3, 166:5, 167:4, 168:5, 177:3, 178:23, 180:6, 180:12, 180:17, 181:1, 183:19, 184:5, 185:20, 186:3, 187:11, 187:21, 189:11, 196:2, 197:9, 197:15, 200:3, 206:14, 208:21, 209:6, 209:24, 210:3, 212:7, 214:13, 215:5, 216:8, 216:13, 216:16, 217:25, 218:1, 221:5, 221:25, 223:23, 224:1, 224:4, 224:7, 224:10, 225:1, 237:19, 247:7, 249:7, 249:11, 294:2
**people's** [2] - 169:19, 224:21
**per** [1] - 199:13
**per-state** [1] - 199:13
**percent** [15] - 81:4, 114:9, 133:13, 133:14, 163:8, 171:19, 171:22, 173:24, 178:20, 179:19, 179:24, 180:4, 226:15, 226:16, 236:3

**percentage** [3] - 114:3, 226:14, 226:15
**percentage-wise** [1] - 226:14
**perfect** [1] - 177:23
**perfection** [1] - 177:18
**perhaps** [3] - 91:22, 98:11, 140:2
**period** [9] - 11:8, 72:11, 77:16, 78:13, 83:3, 109:4, 124:2, 132:16, 187:4
**permission** [4] - 7:19, 119:16, 213:24, 260:8
**permit** [4] - 7:8, 63:21, 281:20, 282:5
**permits** [1] - 294:24
**permitted** [8] - 16:16, 23:5, 53:24, 61:17, 61:19, 63:4, 264:16, 265:2
**person** [22] - 16:18, 35:19, 42:23, 42:24, 43:8, 56:18, 74:5, 94:17, 101:25, 109:24, 115:18, 115:23, 117:13, 137:4, 166:18, 189:1, 189:2, 195:15, 198:17, 210:16, 248:8, 250:5
**person's** [2] - 42:24, 120:25
**personal** [5] - 21:5, 49:23, 67:15, 106:12, 153:20
**personally** [5] - 53:12, 102:22, 106:1, 108:18, 109:15
**perspective** [3] - 38:6, 167:8, 177:24
**persuaded** [1] - 50:10
**PH** [1] - 1:23
**Philadelphia** [1] - 78:9
**Phoenix** [1] - 109:18
**phone** [2] - 56:19, 108:19
**phonetic** [1] - 120:19
**photo** [1] - 261:10
**photographed** [1] - 140:3
**photographic** [1] - 121:16
**photographically** [1] - 121:9
**photographs** [1] -

108:7
**photography** [1] - 122:1
**phrased** [2] - 134:20, 230:20
**physical** [4] - 141:13, 144:15, 287:21, 287:23
**physically** [2] - 152:2, 165:17
**pick** [8] - 28:23, 45:15, 85:12, 100:9, 109:17, 111:2, 178:23, 237:15
**picked** [5] - 147:19, 147:25, 180:23, 194:9, 237:13
**picking** [1] - 101:2
**picture** [11] - 31:19, 31:21, 192:11, 206:1, 206:8, 206:18, 206:25, 207:20, 246:5, 247:9, 261:17
**pictures** [7] - 41:1, 150:25, 188:25, 189:14, 208:2, 249:8, 249:10
**piece** [5] - 48:25, 78:20, 87:13, 87:16, 147:2
**pieces** [7] - 78:19, 120:13, 120:15, 126:24, 138:11, 139:5, 255:4
**piggyback** [1] - 31:22
**pile** [1] - 41:1
**piled** [1] - 40:14
**pirate** [1] - 83:22
**pitch** [1] - 163:16
**place** [16] - 18:14, 45:19, 57:23, 58:1, 75:12, 75:13, 98:22, 107:10, 129:6, 135:3, 138:1, 174:21, 198:24, 199:11, 297:7, 298:13
**placed** [13] - 21:25, 44:1, 45:10, 45:11, 85:25, 98:15, 104:1, 146:2, 211:3, 217:13, 218:23, 226:25, 286:18
**placement** [1] - 118:11
**places** [3] - 45:8, 77:2, 109:14
**placing** [2] - 128:2, 129:5
**PLAINTIFF** [2] - 1:8,

2:4
**plaintiff** [16] - 5:12, 66:13, 66:14, 66:16, 112:12, 154:24, 156:2, 238:3, 241:11, 247:7, 252:2, 258:13, 264:11, 268:10, 282:25, 298:10
**plaintiff's** [10] - 254:16, 261:21, 264:10, 264:18, 264:19, 278:22, 282:1, 282:24, 285:7, 291:21
**plaintiffs** [13] - 10:13, 11:16, 12:22, 16:24, 17:5, 253:3, 255:11, 269:6, 270:18, 271:8, 275:8, 277:3, 293:5
**plaintiffs'** [5] - 6:18, 8:22, 12:16, 15:8, 22:20
**plan** [15] - 16:24, 17:25, 144:6, 158:13, 159:6, 159:11, 159:23, 162:16, 163:16, 165:6, 183:5, 241:11, 255:17, 287:4, 300:5
**planned** [1] - 255:11
**planning** [2] - 66:17, 187:13
**plans** [5] - 164:22, 186:16, 256:2, 264:3
**plant** [3] - 39:9, 44:25, 178:2
**plastic** [1] - 92:4
**platforms** [1] - 74:21
**play** [3] - 10:8, 62:13, 95:21
**played** [1] - 9:24
**players** [1] - 167:25
**playing** [2] - 44:19, 168:12
**pleasant** [2] - 83:9, 139:8
**pleased** [2] - 93:16, 95:9
**plus** [2] - 164:12, 270:1
**podium** [2] - 36:15, 47:23
**point** [37] - 15:11, 17:12, 17:16, 22:19, 24:7, 25:21, 29:1, 46:8, 48:16, 68:20, 72:10, 76:11, 79:13, 86:12, 90:9, 93:23, 101:14, 117:16,

118:5, 160:3, 167:18, 174:2, 194:24, 194:25, 209:16, 225:11, 247:7, 251:1, 253:7, 282:5, 284:10, 293:17, 295:2, 296:12, 296:15, 299:21
**pointed** [2] - 148:24, 293:7
**points** [1] - 223:24
**politely** [1] - 42:12
**poor** [2] - 169:5, 169:7
**pop** [2] - 108:25, 188:17
**popular** [2] - 80:22, 96:25
**population** [1] - 168:4
**Port** [3] - 71:1, 71:3, 71:13
**portfolio** [1] - 211:11
**portions** [4] - 9:3, 9:20, 10:2, 255:8
**portrait** [1] - 121:11
**posed** [3] - 136:22, 136:23, 137:1
**position** [6] - 9:23, 36:24, 135:24, 228:8, 295:2, 297:14
**positive** [3] - 140:18, 193:13, 193:14
**possession** [1] - 227:2
**possibility** [4] - 41:14, 45:17, 216:13, 219:14
**possible** [5] - 48:18, 58:9, 70:21, 85:11, 156:25
**possibly** [3] - 12:4, 108:11, 240:15
**post** [5] - 33:19, 246:4, 247:8, 248:13, 248:14
**postal** [1] - 25:11
**posted** [4] - 248:24, 249:17, 249:19, 250:6
**poster** [1] - 250:18
**posting** [7] - 244:23, 245:19, 247:18, 249:3, 249:10, 252:20, 260:20
**postings** [4] - 243:3, 246:23, 247:2, 247:20
**postman** [1] - 116:4
**potential** [1] - 279:11
**pour** [1] - 90:13
**poured** [2] - 25:21,

27:12
**power** [1] - 97:13
**powerful** [2] - 96:1, 97:7
**PR** [1] - 188:11
**practical** [2] - 129:24, 130:2
**preclude** [1] - 276:12
**prefer** [1] - 217:20
**preference** [3] - 9:14, 9:17, 217:12
**prefers** [1] - 9:9
**Pregerson** [5] - 276:20, 294:21, 294:22, 296:2, 296:6
**prejudice** [2] - 54:24, 280:24
**prejudices** [1] - 49:23
**prejudicial** [7] - 246:2, 246:11, 246:14, 250:14, 251:2, 277:1, 282:20
**preliminary** [3] - 22:7, 49:7, 67:6
**premarked** [1] - 292:12
**premature** [4] - 294:16, 294:19, 295:3, 296:11
**premium** [11] - 41:18, 161:8, 161:12, 166:12, 199:14, 216:21, 216:22, 216:25, 217:11, 217:17, 218:11
**premiums** [1] - 160:1
**preparation** [2] - 21:17, 112:24
**prepare** [3] - 15:2, 259:8, 267:9
**prepared** [14] - 10:3, 14:8, 40:16, 238:16, 240:9, 259:5, 265:7, 267:16, 275:12, 278:20, 284:23, 284:24, 285:4, 294:9
**preparing** [2] - 39:20, 248:20
**preponderance** [2] - 28:4, 50:9
**prescriptions** [1] - 74:13
**presence** [3] - 6:16, 7:18, 75:7
**PRESENT** [1] - 20:2
**present** [4] - 64:25, 173:7, 184:12, 241:11
**presentation** [6] - 6:16, 49:11, 61:18,

67:10, 108:5, 162:20
**presentations** [2] - 197:6, 197:8
**presented** [10] - 7:22, 9:19, 12:21, 20:25, 49:9, 58:18, 59:4, 66:4, 66:24, 184:11
**presenting** [2] - 11:6, 163:13
**presents** [2] - 50:13, 66:13
**president** [2] - 156:8, 158:11
**PRESIDING** [1] - 1:4
**presiding** [1] - 294:21
**press** [8] - 26:20, 26:22, 28:7, 57:3, 108:15, 237:9, 237:12, 237:16
**pressure** [1] - 126:13
**pretrial** [1] - 292:13
**pretty** [16] - 108:9, 108:10, 158:16, 170:9, 170:17, 177:4, 181:4, 182:13, 185:7, 185:17, 185:24, 188:13, 211:17, 225:13, 267:22, 269:25
**previous** [1] - 7:7
**previously** [3] - 112:11, 285:17, 285:23
**price** [8] - 159:15, 160:3, 166:6, 166:25, 194:24, 194:25, 195:3, 195:14
**primarily** [2] - 72:25, 96:7
**primary** [4] - 74:5, 79:3, 115:18, 285:22
**principals** [1] - 172:11
**print** [1] - 58:9
**private** [2] - 278:19, 279:9
**probative** [3] - 280:15, 280:22, 282:20
**problem** [24] - 82:15, 82:17, 90:4, 90:17, 90:24, 91:12, 91:18, 92:2, 112:3, 115:8, 129:4, 136:12, 176:6, 176:8, 176:16, 205:14, 208:18, 226:5, 233:21, 243:7, 261:16, 262:8,

295:21, 299:6
**problematic** [5] - 89:1, 111:18, 111:24, 116:19, 124:19
**problems** [5] - 84:16, 89:12, 111:8, 111:10, 116:20
**proceed** [7] - 66:5, 69:7, 69:8, 112:18, 119:9, 155:14, 214:5
**PROCEEDINGS** [3] - 1:15, 300:15, 301:15
**proceedings** [3] - 59:10, 60:2, 265:23
**process** [18] - 58:20, 59:1, 59:12, 82:24, 82:25, 83:2, 85:1, 85:5, 123:4, 123:11, 123:13, 123:24, 125:16, 170:21, 171:9, 172:15, 179:4, 220:11
**processes** [2] - 169:7, 169:8
**produce** [2] - 156:23, 237:15
**produced** [1] - 138:18
**producer** [2] - 41:17, 45:25
**producers** [1] - 214:23
**producing** [3] - 111:19, 158:22, 172:5
**product** [66] - 26:17, 29:11, 34:19, 36:22, 38:11, 38:17, 39:5, 40:4, 44:13, 48:23, 83:4, 83:12, 95:7, 102:21, 104:15, 107:5, 108:9, 108:13, 118:5, 118:10, 139:14, 139:24, 140:9, 143:23, 158:4, 160:7, 163:3, 163:7, 163:17, 165:17, 165:20, 166:2, 166:24, 167:9, 173:5, 188:23, 189:25, 190:1, 190:15, 191:4, 191:10, 192:7, 194:9, 194:11, 194:24, 195:2, 195:12, 196:17, 196:21, 197:12, 200:11, 207:4, 210:4, 211:8, 212:7, 212:9, 212:13, 217:13, 225:19, 228:8, 228:12, 237:10, 249:13, 279:7

**production** [8] - 94:19, 139:21, 176:3, 176:12, 178:13, 182:11, 187:8, 295:10
**productive** [1] - 159:21
**products** [24] - 27:25, 32:8, 34:23, 37:7, 37:19, 37:21, 45:1, 45:20, 45:24, 45:25, 48:24, 100:18, 138:18, 139:1, 161:9, 162:1, 165:1, 168:25, 169:17, 195:7, 195:17, 211:8, 237:12, 262:11
**professionally** [1] - 120:3
**professor** [2] - 70:10, 70:14
**proffer** [6] - 17:7, 17:13, 247:17, 248:1, 251:24, 279:25
**proficient** [1] - 70:18
**profitable** [1] - 151:8
**profits** [3] - 7:13, 7:14, 7:15
**profound** [1] - 97:15
**program** [2] - 165:6
**programmers** [1] - 193:21
**programs** [8] - 57:25, 166:23, 189:3, 197:9, 197:16, 198:3, 198:10, 198:20
**progression** [1] - 292:22
**project** [4] - 83:21, 126:21, 151:15, 157:24
**Project** [1] - 151:16
**promote** [4] - 197:2, 200:11, 200:18, 215:6
**promoted** [1] - 199:9
**promoting** [2] - 31:12, 116:22
**promotion** [2] - 75:25, 133:17
**pronounced** [1] - 102:4
**proof** [5] - 33:22, 53:10, 53:13, 177:10, 280:9
**proper** [4] - 16:7, 16:21, 62:9, 160:19
**properly** [5] - 57:13, 166:6, 237:14, 282:17, 295:12
**properties** [2] - 227:7

**property** [1] - 35:14
**proportion** [7] - 86:23, 90:25, 91:6, 101:23, 126:9, 127:9, 127:10
**proportionate** [1] - 88:10
**proportions** [3] - 84:21, 88:7, 102:6
**propose** [5] - 61:22, 61:24, 62:2, 64:4, 64:7
**proposed** [3] - 63:20, 64:1, 298:7
**props** [1] - 36:9
**protect** [6] - 58:16, 201:1, 203:6, 203:23, 204:2, 213:15
**protecting** [1] - 201:23
**protection** [2] - 32:15, 32:16
**protective** [1] - 295:7
**prototype** [5] - 158:23, 159:1, 173:21, 173:23, 182:15
**prototypes** [1] - 158:24
**proud** [6] - 78:17, 92:7, 140:15, 140:18, 151:20, 175:20
**prove** [2] - 30:19, 33:22
**proved** [1] - 50:23
**proves** [1] - 251:1
**provide** [5] - 38:4, 267:16, 283:5, 284:12, 298:15
**provided** [5] - 62:7, 112:17, 181:22, 212:14, 298:7
**provides** [1] - 295:20
**province** [1] - 39:5
**proving** [1] - 50:8
**provisions** [1] - 295:20
**proximately** [1] - 22:9
**public** [8] - 69:20, 194:2, 194:4, 219:16, 219:21, 237:1, 294:24, 296:5
**publication** [1] - 33:12
**publications** [3] - 159:13, 193:20, 214:19
**publish** [5] - 18:4, 144:20, 194:21,

246:20, 286:17
**published** [2] - 222:17, 223:2
**publisher** [2] - 38:22, 208:7
**publishes** [1] - 194:23
**publishing** [1] - 30:14
**pull** [3] - 159:12, 225:2, 253:13
**purchase** [2] - 165:16, 198:22
**pure** [6] - 25:3, 44:10, 44:11, 44:16, 167:24, 171:18
**purities** [1] - 172:19
**purity** [6] - 44:10, 44:18, 168:3, 168:13
**purpose** [9] - 52:2, 52:3, 52:5, 53:4, 53:6, 54:12, 65:3, 201:19, 279:13
**purposes** [8] - 7:10, 7:20, 7:23, 7:25, 119:5, 209:18, 267:11, 277:14
**PURSUANT** [1] - 301:12
**put** [56] - 27:9, 31:25, 34:10, 35:10, 39:25, 40:7, 41:4, 42:17, 63:4, 64:14, 85:17, 87:17, 87:18, 87:21, 88:15, 88:17, 90:12, 105:3, 107:1, 111:16, 116:19, 125:25, 129:7, 131:12, 142:12, 149:16, 159:6, 162:14, 164:22, 168:5, 168:9, 175:19, 176:16, 178:3, 182:4, 190:10, 192:17, 193:5, 193:11, 201:12, 205:11, 211:6, 211:18, 222:12, 222:19, 223:8, 228:23, 233:14, 254:6, 267:13, 268:1, 279:1, 280:5, 285:11, 299:24
**puts** [5] - 181:19, 211:10, 215:6, 215:8, 219:4
**putting** [4] - 88:15, 116:17, 219:20, 222:14

# Q

qualify [1] - 147:2
qualities [1] - 169:6
quality [8] - 104:24, 139:7, 168:21, 170:16, 171:21, 172:6, 177:15, 177:20
quantity [2] - 111:20, 210:15
quarter [3] - 179:12, 196:14, 199:22
quarters [1] - 124:5
quartz [2] - 104:19
question's [1] - 220:23
questioning [4] - 6:11, 61:24, 152:8, 284:1
questions [42] - 7:11, 7:16, 7:17, 51:17, 61:17, 61:19, 61:23, 61:24, 62:2, 62:16, 63:13, 63:20, 64:3, 64:5, 64:8, 73:25, 85:7, 85:9, 85:12, 91:15, 119:11, 126:9, 136:21, 142:3, 148:9, 148:23, 153:7, 153:12, 153:14, 153:16, 204:10, 205:16, 208:22, 223:16, 235:10, 236:11, 238:5, 238:8, 238:10, 265:5, 269:21, 284:6
quick [4] - 180:19, 182:13, 225:17, 297:25
quickly [9] - 48:17, 49:3, 111:11, 171:1, 187:12, 188:8, 194:13, 227:17, 227:24
quietly [1] - 81:10
quite [7] - 26:8, 76:24, 134:17, 135:19, 138:20, 168:8, 210:8

# R

radio [9] - 108:19, 108:20, 188:15, 188:16, 188:17, 192:4, 192:7, 193:2, 196:16
RAFFERTY [78] - 2:12, 81:9, 82:7,

82:17, 103:8, 117:5, 119:16, 119:19, 120:12, 127:16, 127:20, 127:25, 128:5, 129:2, 129:3, 130:22, 131:22, 132:2, 134:25, 135:5, 135:9, 135:12, 137:23, 138:3, 141:7, 141:14, 142:5, 144:19, 144:24, 145:5, 145:10, 145:12, 145:19, 145:21, 145:25, 146:7, 146:14, 146:15, 148:9, 152:22, 153:23, 201:16, 202:1, 202:18, 203:9, 204:6, 205:12, 207:10, 208:9, 209:8, 212:17, 212:22, 213:23, 214:1, 214:7, 220:19, 220:24, 221:1, 222:12, 222:14, 222:18, 222:20, 222:23, 223:3, 223:5, 223:8, 223:11, 223:14, 223:21, 223:22, 231:8, 233:9, 233:11, 233:13, 233:21, 235:1, 235:9, 238:2
Rafferty [4] - 5:25, 20:14, 119:22, 214:10
raided [1] - 212:4
railway [1] - 25:12
raise [22] - 8:3, 12:8, 16:2, 17:20, 211:15, 238:18, 262:25, 264:16, 265:2, 265:9, 265:12, 266:3, 266:5, 266:11, 266:18, 267:5, 282:5, 296:25, 297:5, 297:15
raised [7] - 12:11, 22:13, 257:20, 263:22, 264:11, 265:19, 296:13
raises [1] - 211:14
raising [3] - 22:11, 264:14, 294:2
ran [2] - 117:15, 190:15
random [1] - 87:11
randomly [1] - 137:19
rate [5] - 178:20, 179:8, 179:15, 179:20, 179:24

rates [2] - 178:12, 190:20
rather [6] - 9:10, 9:15, 77:5, 95:6, 140:18, 235:21
rationed [1] - 188:1
rattling [1] - 100:1
Raul [1] - 268:10
re [1] - 6:23
reach [2] - 166:17, 297:3
reached [1] - 151:25
reaches [1] - 37:11
reaching [1] - 51:1
react [1] - 259:5
reaction [4] - 95:7, 99:9, 140:17, 205:6
read [32] - 8:11, 8:14, 8:18, 9:5, 10:2, 10:4, 10:5, 13:5, 13:7, 15:15, 49:10, 49:12, 50:5, 57:14, 58:7, 58:11, 59:17, 60:16, 64:19, 67:6, 98:11, 128:8, 128:9, 128:13, 193:20, 193:21, 193:25, 194:19, 222:25, 223:20, 276:8
readily [1] - 32:24
reading [1] - 49:6
ready [18] - 5:12, 10:4, 21:13, 154:22, 162:15, 173:7, 182:11, 182:20, 191:10, 191:12, 196:3, 251:8, 255:22, 263:12, 264:5, 268:6, 293:25, 298:13
real [5] - 42:5, 62:12, 92:2, 115:3, 211:16
realist [1] - 121:10
realistic [1] - 121:16
reality [2] - 37:16, 261:12
realize [4] - 21:2, 84:22, 168:4, 267:18
realized [7] - 42:9, 114:23, 168:4, 168:8, 170:12, 187:12, 248:22
realizes [1] - 209:18
really [41] - 17:4, 25:5, 29:19, 30:1, 35:17, 35:18, 90:10, 90:15, 91:9, 100:1, 105:9, 118:2, 122:3, 128:9, 139:2, 166:7, 166:11, 167:18, 170:9, 172:23, 175:13, 176:6,

178:13, 179:1, 180:4, 184:21, 194:10, 195:13, 195:16, 210:21, 213:4, 217:20, 221:23, 226:4, 227:19, 227:23, 259:23, 293:16, 299:20
reaper [1] - 39:24
reason [16] - 107:7, 154:8, 161:13, 161:16, 162:3, 164:24, 170:8, 185:1, 212:15, 212:16, 219:23, 237:4, 237:8, 237:13, 262:12, 293:9
reasonable [3] - 32:16, 202:19, 225:3
reasonableness [1] - 55:2
reasonably [1] - 298:23
reasons [9] - 25:1, 63:23, 64:3, 65:18, 161:7, 237:6, 237:21, 265:3, 299:13
Rebecca [2] - 5:25, 20:14
rebuttal [6] - 17:2, 17:4, 17:6, 17:8, 17:9, 17:12
receive [2] - 57:12, 71:16
received [17] - 14:14, 16:8, 22:4, 51:2, 52:1, 52:9, 53:7, 53:21, 54:2, 54:4, 56:9, 59:21, 119:7, 208:24, 248:2, 286:20, 296:21
recently [2] - 137:3, 148:23
RECESS [4] - 20:1, 67:22, 110:19, 154:20
recess [12] - 19:25, 65:1, 67:20, 154:5, 154:17, 154:19, 240:9, 240:18, 240:20, 263:25, 300:9, 300:14
recipe [2] - 181:20, 181:21
recognizable [1] - 89:21
recognize [3] - 99:4, 174:24, 201:11
recognizing [1] - 148:3
recommend [1] - 166:24
reconsideration [3] -

6:19, 6:22, 6:23
record [22] - 5:15, 13:11, 54:9, 69:4, 110:5, 110:20, 113:7, 118:24, 154:21, 155:11, 223:12, 223:16, 240:25, 241:4, 254:1, 254:3, 254:7, 255:20, 258:11, 268:12, 285:12, 297:7
RECORD [2] - 241:2, 254:2
red [2] - 94:24, 152:17
redact [1] - 281:7
redacted [3] - 262:22, 263:1, 263:4
redirect [3] - 148:11, 149:20, 236:13
REDIRECT [2] - 149:23, 236:15
REDIRECT-EXAMINATION [1] - 149:23
redo [1] - 228:5
reduce [1] - 257:24
reevaluate [1] - 185:6
refer [2] - 18:21, 233:19
reference [6] - 57:20, 96:13, 222:22, 226:19, 243:22, 260:5
referenced [1] - 12:19
referencing [1] - 233:18
referred [1] - 157:17
referring [3] - 7:13, 81:5, 233:23
refers [1] - 206:19
refill [1] - 216:14
refineries [2] - 72:18, 72:22
reflect [1] - 104:11
reflective [1] - 131:14
reflects [1] - 104:22
refute [1] - 286:5
refutes [1] - 285:25
regarding [5] - 50:7, 224:3, 276:2, 293:10, 293:17
regardless [2] - 11:6, 50:13
region [1] - 107:24
register [1] - 201:1
registered [3] - 231:15, 231:17,

234:13
**registration** [2] - 234:17, 292:8
**registrations** [1] - 292:4
**REGULATIONS** [1] - 301:17
**rejection** [2] - 178:20, 179:15
**relate** [3] - 15:6, 247:8, 283:6
**related** [5] - 25:1, 52:21, 249:10, 249:23, 275:19
**relating** [2] - 277:14, 283:5
**relation** [1] - 261:12
**relationship** [13] - 25:1, 73:4, 76:17, 76:18, 76:19, 77:17, 107:14, 161:2, 165:11, 167:2, 167:11, 189:24, 284:16
**relationships** [4] - 167:3, 167:10, 173:17, 189:24
**relay** [1] - 53:1
**release** [4] - 30:10, 237:9, 237:12, 237:16
**relevance** [11] - 246:1, 246:8, 246:22, 247:13, 250:12, 276:14, 281:25, 282:18, 283:1, 293:10, 296:9
**relevant** [15] - 62:17, 62:19, 65:4, 239:18, 247:3, 247:5, 249:1, 251:3, 251:21, 291:22, 291:25, 292:5, 295:1, 295:17, 296:8
**rely** [3] - 38:3, 38:4, 61:2
**relying** [1] - 60:6
**remained** [1] - 91:13
**remaining** [1] - 267:4
**remarks** [1] - 47:19
**remember** [31] - 21:19, 24:3, 24:8, 28:7, 51:14, 55:9, 55:10, 59:6, 60:9, 61:8, 62:2, 75:18, 76:5, 87:10, 96:22, 103:5, 105:6, 109:11, 115:25, 124:2, 124:18, 127:7, 149:10, 186:7, 216:20, 220:6,

222:11, 236:17, 239:13, 257:5, 264:9
**remembers** [1] - 236:20
**reminded** [1] - 227:3
**remove** [4] - 103:22, 171:16, 172:24, 259:22
**removed** [2] - 259:21, 262:23
**removing** [2] - 172:18, 172:19
**render** [1] - 48:7
**rendering** [2] - 104:8, 127:5
**renowned** [1] - 42:22
**rent** [2] - 135:2, 188:10
**repeat** [2] - 271:14, 298:19
**rephrase** [4] - 64:2, 230:16, 230:18, 230:25
**replica** [1] - 122:9
**replicated** [1] - 127:15
**report** [2] - 57:11, 58:8
**REPORTED** [1] - 301:15
**reporter** [1] - 60:3
**REPORTER** [4] - 1:22, 301:4, 301:10, 301:25
**reporter's** [1] - 5:15
**REPORTER'S** [1] - 1:15
**reports** [1] - 57:18
**represent** [4] - 36:13, 48:19, 114:4, 148:21
**representation** [1] - 279:10
**representations** [3] - 279:14, 279:19, 280:4
**represented** [2] - 285:17, 294:17
**representing** [2] - 26:16, 269:23
**represents** [3] - 195:1, 262:1, 285:13
**reputation** [1] - 136:14
**request** [2] - 65:10, 65:12
**requesting** [1] - 64:8
**require** [4] - 17:7, 17:13, 59:11, 180:23
**required** [1] - 66:10
**requires** [1] - 49:14

**rescue** [1] - 152:5
**research** [5] - 57:19, 58:3, 58:21, 159:11, 239:14
**reselection** [2] - 179:5, 181:4
**resell** [2] - 163:5, 165:18
**resemble** [1] - 246:6
**reserve** [5] - 268:18, 270:13, 277:15, 285:8, 286:20
**reserved** [1] - 7:12
**reserves** [1] - 277:20
**reserving** [1] - 277:19
**reside** [1] - 156:12
**resolve** [7] - 15:13, 91:12, 91:18, 240:12, 241:7, 299:25, 300:2
**respect** [4] - 164:5, 258:23, 285:20, 291:19
**respecting** [1] - 166:15
**respond** [4] - 14:8, 57:9, 63:19, 64:21
**response** [5] - 63:7, 187:11, 212:12, 264:20, 270:1
**responsibilities** [1] - 248:7
**responsibility** [1] - 263:3
**responsible** [3] - 14:20, 248:9, 282:15
**Resposado** [3] - 46:14, 145:14
**rest** [3] - 55:22, 169:14, 228:18
**restaurant** [6] - 79:22, 102:14, 107:23, 147:22, 166:20, 200:11
**Restaurant** [1] - 30:4
**restaurants** [8] - 100:25, 160:22, 165:19, 165:22, 195:6, 197:7, 200:8
**rested** [1] - 66:25
**restrictions** [1] - 59:9
**result** [2] - 37:22, 59:11
**resulted** [1] - 275:19
**results** [1] - 143:22
**resume** [1] - 154:15
**resumed** [1] - 116:14
**retail** [7] - 160:5, 160:22, 165:19,

184:7, 197:6, 211:2, 218:24
**retailer** [6] - 164:1, 187:25, 189:6, 195:10, 200:21, 219:2
**retailers** [9] - 35:6, 163:24, 164:23, 165:9, 166:21, 187:11, 194:22, 194:25, 195:6
**retire** [1] - 67:5
**retired** [4] - 72:23, 72:24, 73:7, 152:3
**retrieve** [1] - 146:11
**retrospective** [1] - 116:18
**Rettig** [3] - 6:1, 20:14, 223:11
**return** [7] - 57:14, 85:8, 154:12, 239:13, 240:13, 254:22, 258:17
**returned** [1] - 60:16
**reverential** [1] - 143:4
**review** [8] - 58:14, 62:8, 223:18, 264:13, 267:21, 276:5, 296:8, 296:10
**revisit** [1] - 110:25
**RHOW** [1] - 2:8
**ridiculous** [1] - 91:5
**right-hand** [2] - 128:10, 262:9
**rights** [6] - 36:19, 37:5, 37:6, 127:10, 203:6, 203:7
**rip** [2] - 142:24, 143:1
**rip-off** [2] - 142:24, 143:1
**ripped** [1] - 99:11
**rise** [6] - 19:24, 154:18, 239:24, 240:19, 240:22, 300:13
**road** [3] - 21:15, 188:19, 191:20
**roads** [2] - 25:17, 74:21
**Roberto** [1] - 217:4
**Robertson** [1] - 78:7
**rock** [2] - 188:16, 188:17
**rocking** [1] - 180:3
**rode** [1] - 173:18
**rods** [1] - 95:24
**role** [9] - 35:22, 62:3, 95:19, 95:21, 114:16, 114:20, 115:6, 134:3,

208:20
**roll** [2] - 188:16, 188:17
**rolling** [1] - 180:4
**romanticized** [1] - 74:6
**room** [7] - 17:10, 60:12, 67:17, 98:25, 100:5, 103:24, 266:24
**ROOM** [1] - 1:22
**round** [2] - 89:14, 115:4
**row** [1] - 123:21
**Royal** [3] - 87:12, 87:23, 128:15
**ruing** [1] - 277:20
**rule** [14] - 6:7, 6:23, 9:4, 10:3, 15:19, 16:22, 17:14, 65:23, 251:8, 281:18, 285:11, 296:9, 298:13, 298:14
**Rule** [1] - 16:13
**ruled** [1] - 212:18, 212:25, 275:21, 277:23, 291:17, 291:20, 293:20
**rules** [1] - 17:10, 51:20, 53:20, 53:24, 58:16, 59:7, 59:8, 63:23, 65:6, 292:10, 297:18
**ruling** [16] - 6:11, 8:1, 8:13, 51:22, 119:7, 259:21, 265:10, 276:7, 276:11, 277:15, 277:20, 285:8, 286:20, 296:12, 297:4, 298:11
**rum** [1] - 183:23
**run** [2] - 83:18, 192:1
**running** [3] - 156:13, 158:1, 158:4
**runs** [2] - 99:23, 115:20

**S**

**sailing** [1] - 235:21
**Saints** [1] - 39:17
**sale** [5] - 34:19, 117:16, 118:5, 135:19, 208:12
**sales** [21] - 29:25, 158:11, 161:17, 163:16, 184:4, 184:5, 186:16, 186:19, 188:22, 188:23,

195:15, 197:9, 199:19, 199:21, 210:15, 235:23, 235:24, 235:25, 236:1, 236:2, 236:10
**sample** [1] - 173:8
**San** [2] - 78:18, 79:10
**Sanchez** [2] - 8:7, 8:21
**Sanchez's** [1] - 299:16
**sand** [1] - 178:3
**sat** [2] - 74:25, 130:25
**satisfaction** [1] - 212:21
**satisfied** [2] - 203:18, 262:22
**satisfy** [1] - 284:13
**Saturday** [1] - 75:22
**saw** [22] - 44:5, 53:12, 65:14, 95:5, 95:6, 99:20, 99:21, 102:24, 103:2, 131:5, 132:12, 132:14, 132:24, 186:9, 206:17, 206:25, 208:3, 224:25, 232:22, 232:24, 248:14
**Scandinavia** [1] - 118:17
**scary** [2] - 83:22, 184:23
**scattered** [1] - 118:18
**scenes** [1] - 96:6
**schematic** [5] - 88:2, 94:5, 139:23, 139:24
**schematics** [5] - 94:7, 95:17, 114:25, 123:4, 142:16
**school** [12] - 69:19, 69:20, 69:21, 70:2, 70:24, 71:1, 71:7, 71:14, 74:23, 79:20, 138:22
**School** [2] - 71:2, 71:13
**scope** [3] - 101:5, 212:25, 277:18
**scotch** [1] - 35:2, 218:20
**scraped** [1] - 80:25
**screen** [8] - 128:1, 128:3, 201:12, 222:21, 223:9, 233:14, 259:18, 279:2
**screens** [1] - 27:22

**sculpted** [1] - 27:7
**sculpting** [3] - 124:8, 124:9, 124:10
**sculptor** [2] - 93:10, 124:12
**sculpture** [5] - 124:11, 124:14, 124:15, 124:16, 124:25
**seafood** [1] - 79:23
**seafood-oyster** [1] - 79:23
**seal** [2] - 177:10, 296:4
**search** [1] - 58:1
**searching** [1] - 57:19
**season** [1] - 199:6
**seat** [5] - 69:3, 91:22, 92:8, 92:12, 155:10
**seated** [6] - 29:5, 57:6, 67:23, 240:1, 240:24, 297:25
**second** [2] - 8:17, 11:17, 56:8, 128:9, 128:13, 136:23, 154:17, 161:13, 178:11, 180:1, 237:13, 240:15, 253:22, 257:23, 271:9
**secondary** [1] - 180:25
**seconds** [1] - 48:12
**secretary** [1] - 33:18
**SECTION** [1] - 301:13
**section** [10] - 45:10, 45:11, 195:12, 218:15, 218:17, 218:20, 219:5, 219:10, 223:1
**sections** [2] - 9:11, 217:13
**see** [98] - 9:12, 14:9, 15:13, 25:3, 27:2, 28:2, 28:18, 29:3, 30:7, 31:8, 33:19, 34:2, 34:25, 35:1, 35:3, 38:15, 41:1, 44:2, 44:14, 46:5, 46:25, 47:17, 52:6, 52:11, 52:19, 52:23, 54:19, 55:10, 77:1, 80:15, 80:17, 80:18, 84:1, 94:10, 94:21, 96:19, 97:2, 97:4, 97:5, 97:9, 97:15, 97:18, 97:20, 99:10, 99:12, 100:18, 100:25, 101:12, 101:17, 112:14,

112:15, 127:24, 128:7, 130:16, 132:3, 138:16, 147:17, 147:19, 147:25, 158:25, 160:24, 164:2, 164:11, 173:24, 178:5, 195:1, 195:9, 195:18, 198:24, 204:21, 204:24, 205:21, 205:25, 206:8, 215:9, 215:14, 219:10, 237:16, 239:22, 240:11, 259:3, 259:14, 259:17, 260:17, 262:22, 277:16, 277:17, 279:24, 281:25, 282:6, 286:22, 287:7, 295:21, 300:1, 300:10
**seeing** [5] - 28:3, 82:4, 97:3, 97:20, 102:13
**seek** [1] - 285:14
**seeking** [1] - 281:3
**seem** [1] - 15:6
**seized** [3] - 212:4, 212:5, 212:6
**seizure** [3] - 212:12, 264:20, 264:22
**selecting** [1] - 65:15
**selection** [1] - 59:13
**sell** [15] - 24:24, 24:25, 26:19, 30:7, 77:25, 82:22, 91:2, 92:10, 156:24, 160:12, 160:20, 160:22, 166:14, 187:18, 190:1
**selling** [15] - 24:1, 27:5, 40:11, 40:20, 72:10, 134:11, 151:5, 152:9, 153:1, 163:12, 173:10, 208:18, 218:10, 218:11
**sells** [2] - 37:1, 45:6
**seminars** [1] - 197:16
**send** [6] - 31:3, 34:1, 114:22, 153:15, 166:3, 299:18
**sends** [1] - 42:11
**sense** [12] - 43:6, 43:7, 45:9, 45:18, 45:22, 46:1, 71:8, 129:25, 209:1, 219:4, 219:25, 220:1
**sensory** [1] - 181:15
**sent** [14] - 13:13, 13:16, 31:16, 34:7,

88:11, 88:14, 94:22, 94:23, 123:20, 234:9, 234:10, 234:12, 275:18
**separate** [3] - 218:17, 218:20, 266:21
**separated** [1] - 35:3
**separately** [1] - 50:15
**September** [6] - 24:4, 26:18, 183:13, 199:24, 200:9
**series** [3] - 33:21, 83:2, 89:25
**serve** [2] - 49:8, 108:4
**service** [2] - 48:13, 57:9
**serviced** [1] - 74:24
**session** [10] - 12:3, 52:7, 52:14, 52:16, 52:18, 52:20, 67:20, 240:8, 240:23, 265:24
**SESSION** [2] - 1:16, 5:2
**set** [11] - 9:8, 70:14, 72:1, 116:9, 125:5, 162:18, 195:25, 265:21, 267:10, 292:17
**sets** [4] - 127:19, 182:8, 198:22, 266:23
**settle** [1] - 66:3
**settled** [1] - 91:21
**settlement** [5] - 267:11, 294:8, 294:18, 294:19, 294:23
**settling** [1] - 259:10
**setup** [1] - 196:1
**seven** [1] - 55:1
**several** [8] - 125:19, 151:12, 158:24, 205:22, 210:14, 225:7, 247:2, 271:25
**shadows** [1] - 102:1
**shaker** [3] - 118:7, 118:8, 198:23
**shall** [3] - 35:13, 262:21
**shamans** [1] - 44:2
**shape** [20] - 33:15, 87:22, 94:6, 99:19, 102:8, 144:15, 174:8, 179:19, 201:22, 220:15, 220:16, 228:17, 228:21, 229:2, 279:6, 280:11, 280:12, 280:21,

292:1, 293:21
**shaped** [21] - 23:20, 27:5, 27:6, 27:19, 79:14, 80:21, 82:21, 83:1, 87:13, 88:3, 110:2, 126:5, 140:9, 152:16, 152:18, 201:1, 201:24, 208:17, 213:18, 227:19, 228:11
**shapes** [1] - 280:13
**shelf** [3] - 100:19, 100:21, 131:3
**SHERI** [3] - 1:21, 301:10, 301:24
**shift** [1] - 126:8
**shimmer** [2] - 104:25, 105:2
**shiny** [1] - 104:11, 132:22
**ship** [1] - 123:23
**shipbuilding** [2] - 72:18, 72:22
**shirts** [1] - 117:16
**shocking** [1] - 100:8
**shockingly** [2] - 102:6, 102:9
**shook** [2] - 186:10, 189:14
**shop** [1] - 45:13
**shopped** [1] - 26:8
**short** [6] - 12:3, 19:20, 22:16, 86:15, 238:24, 240:9
**shorter** [3] - 47:2, 242:3, 270:14
**shortly** [3] - 72:3, 81:17, 115:10
**show** [42] - 5:16, 27:1, 27:20, 28:3, 30:12, 31:5, 32:3, 32:5, 33:25, 34:4, 35:4, 37:12, 38:5, 38:8, 40:10, 41:14, 42:4, 45:8, 45:12, 48:21, 58:11, 66:10, 75:22, 79:8, 79:9, 86:24, 109:8, 116:17, 162:15, 174:8, 196:2, 206:12, 206:15, 222:21, 250:13, 254:10, 259:8, 259:16, 263:3, 284:14, 296:20, 297:10
**Show** [4] - 30:4, 192:9, 204:19, 206:10
**showed** [6] - 41:7, 88:1, 99:21, 167:16, 173:19, 186:13

**showing** [2] - 78:11, 248:23

**shown** [7] - 78:3, 78:6, 78:8, 232:21, 233:4, 233:17

**shows** [19] - 32:3, 136:15, 191:9, 197:21, 197:22, 197:23, 197:24, 198:1, 198:2, 198:4, 198:6, 198:7, 198:9, 198:11, 262:10, 285:19, 292:20, 292:22

**shrimp** [2] - 74:24, 75:1

**shrinker** [1] - 177:10

**sic** [3] - 193:24, 194:17, 220:17

**side** [29] - 9:16, 11:7, 11:12, 13:22, 14:3, 14:21, 15:14, 15:21, 17:19, 20:19, 21:16, 22:6, 24:21, 34:25, 35:1, 35:5, 46:16, 53:23, 66:6, 90:21, 91:20, 128:10, 207:17, 207:20, 226:5, 263:4, 298:16

**sidebar** [1] - 65:15

**sidebars** [3] - 19:9, 65:17, 65:24

**sides** [13] - 9:13, 11:5, 49:6, 66:12, 66:25, 107:3, 255:9, 257:8, 259:1, 264:12, 268:3, 298:3, 298:4

**sideways** [1] - 130:12

**sign** [7] - 62:7, 92:10, 109:15, 109:16, 109:21, 188:1, 188:24

**signed** [12] - 93:17, 93:18, 109:23, 140:2, 162:16, 186:10, 189:13, 196:10, 196:13, 295:17, 295:18, 295:19

**significant** [2] - 32:17, 280:15

**signing** [6] - 108:6, 108:7, 109:18, 186:12, 189:9, 196:2

**signings** [3] - 165:10, 191:20, 197:3

**simeons** [1] - 120:19

**similar** [20] - 32:22, 39:24, 41:13, 101:10, 101:12, 101:17,

102:6, 139:12, 162:20, 165:9, 229:4, 229:7, 242:1, 245:4, 245:18, 249:9, 249:16, 250:9, 250:10, 268:18

**similarities** [2] - 33:8, 33:14

**similarity** [1] - 104:9

**simple** [4] - 19:14, 35:12, 35:14, 179:18

**simplest** [1] - 171:14

**simply** [10] - 11:12, 21:23, 41:24, 66:8, 83:5, 83:7, 115:6, 121:25, 143:17, 295:11

**simultaneously** [1] - 48:24

**single** [6] - 181:13, 181:15, 189:13, 194:24, 195:19, 195:20

**singular** [1] - 139:5

**sit** [3] - 22:17, 123:16, 222:7

**site** [2] - 184:25, 195:3

**sitting** [9] - 10:16, 22:15, 37:25, 46:9, 67:19, 81:9, 101:2, 126:25, 232:5

**situation** [1] - 62:12

**situations** [1] - 250:11

**six** [9] - 27:24, 54:25, 123:12, 186:23, 187:5, 190:12, 197:17, 280:12, 295:17

**size** [11] - 33:17, 84:23, 84:24, 85:2, 91:6, 102:8, 107:2, 127:1, 133:11, 161:17, 167:11

**skeleton** [1] - 41:4

**skeletons** [3] - 39:24, 45:21, 70:17

**sketch** [8] - 25:24, 25:25, 126:18, 126:20, 126:23, 142:16

**sketches** [5] - 114:4, 114:10, 114:12, 127:14, 128:6

**sketching** [1] - 129:17

**skillful** [1] - 87:2

**skinnier** [1] - 115:5

**skinny** [1] - 91:3

**skipper** [2] - 98:10, 103:20

**Skull** [1] - 220:17

**skull** [69] - 23:20, 24:24, 27:5, 27:6, 27:19, 32:19, 33:15, 37:2, 40:16, 43:18, 44:8, 46:21, 46:25, 79:14, 80:12, 80:21, 82:21, 83:1, 83:19, 83:21, 84:2, 89:12, 89:13, 89:14, 90:21, 92:4, 95:21, 96:3, 110:2, 112:24, 114:11, 120:22, 120:25, 121:1, 121:6, 121:24, 122:3, 122:4, 122:8, 122:9, 122:11, 122:12, 122:14, 126:5, 129:7, 140:9, 143:18, 143:20, 152:16, 152:18, 201:1, 201:22, 201:24, 208:17, 211:21, 213:18, 220:15, 220:16, 227:19, 228:9, 228:11, 228:17, 228:21, 228:24, 228:25, 279:6

**skull's** [1] - 96:1

**skull-shaped** [18] - 23:20, 27:5, 27:19, 79:14, 80:21, 82:21, 83:1, 110:2, 126:5, 140:9, 152:16, 152:18, 201:1, 201:24, 208:17, 213:18, 227:19, 228:11

**skulls** [40] - 43:20, 44:1, 44:7, 44:16, 44:19, 70:17, 91:24, 95:25, 96:5, 96:10, 96:17, 97:6, 97:16, 98:7, 98:8, 120:1, 120:4, 120:7, 120:9, 120:10, 120:15, 120:17, 120:18, 121:4, 121:6, 121:14, 121:16, 121:20, 122:10, 122:13, 122:22, 144:2, 226:20, 226:23, 226:24, 226:25, 227:14, 227:23, 229:5

**skyrocketing** [1] - 30:1

**sleep** [2] - 138:6, 190:4

**slid** [1] - 180:22

**slide** [6] - 169:3, 259:4, 259:21, 259:23, 259:25, 260:2

**slight** [2] - 102:12, 130:23

**slightly** [2] - 130:21, 178:9

**slip** [1] - 180:13

**slippery** [1] - 168:24

**Slovenia** [7] - 26:11, 26:12, 26:14, 175:11, 175:12, 177:25, 179:2

**Slovenian** [3] - 178:2, 220:8, 220:9

**slower** [1] - 176:23

**slows** [1] - 179:14

**small** [8] - 70:3, 95:23, 107:2, 108:24, 109:1, 117:19, 211:12, 219:11

**smaller** [3] - 78:25, 89:23, 165:5

**smidge** [1] - 148:13

**Smithsonian** [3] - 24:20, 79:5, 116:18

**smoke** [1] - 95:3

**smooth** [1] - 170:10

**smoothness** [1] - 168:1

**SMU** [1] - 71:14

**Snapchat** [1] - 56:22

**snippets** [1] - 237:15

**snowy** [1] - 24:9

**so..** [1] - 181:5

**social** [14] - 56:23, 116:9, 198:14, 198:15, 198:16, 198:17, 239:15, 248:8, 248:9, 249:7, 260:20, 260:21, 261:5, 261:15

**socially** [1] - 76:24

**sockets** [4] - 46:23, 102:7, 174:11, 225:12

**software** [3] - 193:19, 193:20

**sold** [15] - 23:21, 26:20, 35:5, 36:22, 45:7, 72:11, 77:23, 118:12, 118:14, 152:21, 187:20, 187:23, 228:8, 228:11, 236:8

**sole** [1] - 35:23

**solely** [4] - 50:1, 52:8, 59:20, 248:9

**solid** [1] - 270:17

**solve** [1] - 115:7

**someone** [29] - 24:1,

26:2, 26:4, 28:22, 29:10, 33:2, 33:5, 45:12, 61:7, 62:13, 72:4, 75:14, 80:20, 87:9, 106:12, 109:1, 141:20, 193:6, 200:10, 200:16, 246:9, 246:14, 249:4, 249:15, 250:14, 250:23, 300:2

**sometime** [2] - 16:23, 266:14

**sometimes** [13] - 54:8, 55:5, 55:7, 62:10, 63:9, 79:22, 89:22, 89:23, 89:24, 125:3, 190:9, 195:25, 237:14

**somewhat** [1] - 136:14

**somewhere** [1] - 94:15

**son** [1] - 77:9

**soon** [3] - 58:9, 70:25, 71:25

**sooner** [1] - 22:10

**sorry** [17] - 16:6, 20:16, 48:11, 74:2, 91:1, 101:7, 116:2, 128:25, 129:22, 139:19, 147:24, 148:11, 149:5, 255:4, 260:6, 262:6, 297:23

**sort** [4] - 108:14, 108:15, 126:11, 169:11

**sorts** [3] - 40:11, 46:17, 127:11

**sought** [1] - 91:10

**Souls** [1] - 39:17

**sounds** [3] - 169:17, 257:6, 260:11

**source** [5] - 32:6, 32:20, 32:21, 43:10, 151:3

**south** [1] - 25:14

**South** [1] - 118:17

**Southern** [8] - 71:14, 96:21, 156:19, 199:10, 199:12, 199:18, 199:19, 200:5

**sparked** [1] - 39:1

**sparkle** [4] - 104:22, 132:5, 221:23, 222:2

**sparkles** [1] - 132:11

**sparkly** [2] - 104:24, 132:22

**speaker** [1] - 34:13

**speaking** [2] - 90:8, 236:4

speaks [2] - 85:11, 249:6

special [3] - 111:22, 177:6, 198:22

specialized [2] - 161:7, 197:9

specials [1] - 198:18

specialty [2] - 175:12, 175:14

specific [3] - 150:9, 198:20, 291:19

specifically [8] - 160:8, 236:4, 241:5, 248:16, 276:15, 276:24, 276:25, 291:20

spectacular [1] - 26:22

speculate [2] - 64:2, 210:18

speeches [1] - 203:10

spell [4] - 69:3, 155:11, 242:20, 268:11

spend [4] - 11:11, 47:18, 73:7, 73:19

spending [1] - 75:5

spent [4] - 73:18, 112:1, 123:17, 123:18

spirit [4] - 157:2, 162:1, 199:15, 228:8

SPIRITS [1] - 1:10

spirits [8] - 24:14, 161:8, 161:10, 161:12, 161:20, 161:24, 179:16, 209:24

Spirits [10] - 5:7, 5:24, 20:5, 20:14, 36:13, 36:21, 39:3, 48:7, 161:5, 161:6

spiritual [3] - 139:7, 143:4, 227:7

spirituality [1] - 97:13

splash [1] - 191:1

spot [3] - 31:1, 131:22

spout [17] - 27:8, 27:9, 90:8, 91:12, 91:13, 111:3, 111:8, 111:12, 112:4, 112:5, 129:5, 129:7, 129:18, 130:9, 175:21, 175:22, 176:1

spouts [2] - 27:10, 130:13

spread [1] - 31:12

SPRING [1] - 1:22

SS [1] - 301:7

staff [9] - 28:23, 156:11, 156:12, 156:15, 156:17, 166:24, 265:20, 266:2, 276:4

stage [5] - 163:15, 184:11, 184:13, 184:14, 231:14

stages [4] - 96:12, 116:8, 129:14, 144:4

stake [1] - 133:18

stand [11] - 38:2, 61:9, 66:23, 67:9, 68:1, 85:16, 103:23, 155:4, 194:15, 264:3, 264:21

standard [4] - 48:6, 177:2, 179:10, 179:17, 179:21, 262:18

standards [1] - 181:11

standing [2] - 36:15, 47:23

standpoint [4] - 49:1, 129:24, 130:2, 151:15

stands [1] - 297:4

star [1] - 43:25

start [32] - 6:15, 21:6, 21:10, 21:13, 29:4, 36:18, 42:22, 59:12, 67:10, 89:17, 92:18, 98:19, 128:23, 157:6, 158:4, 159:12, 163:12, 166:22, 168:12, 172:18, 172:19, 178:25, 187:13, 188:13, 188:14, 188:18, 191:2, 238:25, 241:9, 259:19, 263:25, 298:17

started [34] - 38:21, 39:4, 40:5, 40:23, 42:21, 43:24, 72:2, 75:2, 75:5, 80:3, 106:4, 106:19, 107:12, 108:8, 136:23, 157:11, 158:9, 158:19, 159:22, 168:7, 168:14, 170:15, 172:3, 173:3, 178:23, 182:9, 184:14, 187:16, 193:1, 209:3, 228:1, 228:5, 230:6, 293:17

starting [7] - 20:21,

107:22, 180:1, 230:5, 232:16, 239:11, 271:10

starts [3] - 86:14, 91:5, 177:20

STATE [1] - 301:8

state [18] - 5:9, 5:17, 69:3, 131:25, 143:9, 155:10, 160:20, 164:1, 164:9, 164:16, 194:17, 195:20, 199:13, 199:20, 215:3, 221:18, 231:4, 278:16

state's [1] - 164:9

statement [19] - 13:11, 21:14, 21:18, 21:23, 22:1, 22:5, 22:20, 29:2, 36:7, 37:3, 66:6, 66:7, 66:11, 219:16, 219:21, 237:1, 237:5, 280:3, 280:9

statements [5] - 23:3, 49:6, 51:7, 51:8, 51:11

States [13] - 156:19, 160:8, 160:13, 160:16, 160:20, 162:1, 163:14, 163:18, 163:20, 164:6, 199:16, 199:21, 236:8

states [8] - 28:10, 164:12, 164:15, 167:7, 191:17, 194:20, 198:10

STATES [6] - 1:1, 1:1, 1:4, 301:11, 301:13, 301:18

stations [3] - 108:20, 188:15, 188:16

stay [7] - 6:12, 12:5, 108:6, 146:7, 153:19, 153:25, 237:22

steal [2] - 35:13, 143:7

stealing [2] - 35:9, 143:3

steel [1] - 177:5

STENOGRAPHICALLY [1] - 301:15

step [7] - 28:6, 85:22, 91:11, 110:15, 155:3, 170:25, 194:5

steps [2] - 18:6, 167:20

sterile [1] - 102:17

Stern [1] - 192:7

stick [2] - 139:16,

178:24

sticking [2] - 46:12, 130:1

still [32] - 19:19, 70:17, 75:6, 115:9, 130:5, 136:15, 136:16, 142:1, 146:17, 151:22, 151:23, 152:4, 158:17, 169:24, 180:18, 181:9, 190:1, 191:8, 191:9, 197:3, 228:21, 228:24, 239:4, 263:5, 265:24, 267:4, 281:16, 281:20, 296:11, 299:7

Stoddard [1] - 115:22

stole [1] - 76:2

Stoli [1] - 217:2

stones [1] - 144:11

stop [15] - 42:13, 108:24, 134:9, 134:11, 134:14, 152:9, 152:18, 152:20, 152:25, 190:24, 196:24, 196:25, 197:19, 211:21, 232:18

stopped [4] - 152:1, 152:5, 227:16, 227:17

stopper [4] - 147:6, 147:11, 147:12, 147:15

stopping [1] - 195:15

stops [1] - 197:20

store [29] - 33:3, 34:25, 41:11, 45:5, 45:19, 45:24, 73:1, 74:12, 87:8, 87:11, 92:3, 92:4, 102:14, 132:18, 132:25, 186:1, 186:2, 186:5, 200:17, 200:18, 217:14, 218:4, 218:13, 218:14, 219:4, 219:9, 219:11

stores [7] - 82:5, 97:4, 100:15, 102:24, 108:25, 109:1, 131:17, 160:22, 165:19, 165:22, 200:14, 200:15, 200:22, 218:24

stories [1] - 48:1

story [5] - 27:8, 27:25, 44:15, 265:7

straight [7] - 27:12, 111:12, 130:1, 176:15, 176:17,

176:19, 247:7

straighten [1] - 255:8

strangers [1] - 100:6

strawberry [1] - 197:18

street [1] - 164:21

STREET [2] - 1:22, 2:6

Street [1] - 78:7

strengths [1] - 159:17

stretch [1] - 67:9

stricken [6] - 16:15, 51:24, 54:9, 54:11, 103:10, 202:21

strike [1] - 95:19

stripping [2] - 172:20, 172:25

struck [1] - 104:10

struggle [1] - 121:12

studies [1] - 139:24

studio [4] - 72:1, 80:8, 81:16, 90:1

stuff [23] - 40:12, 74:21, 80:2, 87:3, 97:9, 116:5, 116:6, 117:16, 118:11, 123:23, 151:5, 152:2, 168:9, 171:4, 178:15, 180:21, 188:9, 193:22, 199:3, 199:4, 209:5, 280:18

stumble [1] - 21:2

style [1] - 70:19

stylized [3] - 121:8, 122:4, 122:7

subject [14] - 62:22, 62:23, 63:7, 64:11, 82:8, 232:2, 232:5, 264:11, 264:14, 264:25, 266:15, 276:18, 277:4, 298:2

sublet [1] - 75:13

subliminal [1] - 262:11

submit [1] - 238:9

submitted [2] - 9:7, 63:22

substance [1] - 160:18

subtle [1] - 101:19

suburb [1] - 71:2

succeed [2] - 140:11, 140:14

success [5] - 28:13, 32:1, 34:16, 144:13, 150:22

successful [4] - 34:17, 141:12,

198:19, 286:9
**sue** [2] - 42:14,
211:23
**sued** [10] - 42:16,
133:21, 137:2,
229:22, 230:12,
232:23, 233:1, 234:6,
234:14, 235:3
**sufficient** [1] -
154:10
**sugar** [1] - 40:17
**sugars** [1] - 171:10
**suggest** [8] - 13:2,
23:2, 36:2, 129:15,
246:12, 246:13,
250:5, 295:9
**suggested** [1] -
202:4
**suggesting** [2] -
64:8, 251:23
**suing** [2] - 135:22,
137:9
**suit** [3] - 14:16,
14:17, 86:18
**summary** [1] - 38:4
**sunset** [1] - 139:9
**super** [8] - 160:1,
193:4, 216:21,
216:22, 216:25,
217:11, 217:17,
218:11
**supervise** [1] - 248:8
**supply** [2] - 92:3
**support** [2] - 196:16,
297:7
**supposed** [5] -
60:23, 189:9, 260:9,
261:18, 261:19
**surface** [2] - 93:14,
93:15
**surprise** [3] - 16:14,
37:10, 265:13
**surprised** [2] -
29:17, 295:25
**surprises** [1] - 256:7
**surrounded** [1] -
72:18
**surrounding** [1] -
283:13
**sustain** [9] - 54:2,
54:5, 81:12, 203:11,
209:13, 251:24,
281:24, 282:4, 284:10
**sustained** [20] -
103:9, 117:6, 134:20,
134:21, 134:22,
152:23, 201:17,
202:3, 202:20,
207:11, 207:12,
208:10, 210:8,

212:19, 212:23,
223:20, 251:20,
284:17, 293:23,
296:17
**SWAINE** [1] - 2:12
**swamps** [1] - 72:19
**sweet** [2] - 171:3,
215:20
**sworn** [3] - 50:19,
69:2, 155:8
**SWOT** [1] - 159:16
**symbolism** [1] -
143:19
**sympathy** [1] - 49:24
**system** [1] - 160:16

## T

**T-shirts** [1] - 117:16
**table** [6] - 41:2,
42:21, 137:13,
148:24, 149:12, 232:6
**tables** [4] - 40:14,
52:17, 177:5
**tablets** [3] - 23:1,
60:9, 60:21
**tagged** [1] - 248:19
**tail** [1] - 187:12
**tainted** [1] - 249:7
**TAKEN** [2] - 20:1,
240:21
**talent** [1] - 140:8
**talks** [1] - 44:16
**tamper** [1] - 177:10
**tape** [1] - 10:7
**taste** [7] - 168:16,
169:18, 172:21,
197:15, 198:5, 216:4
**tasted** [1] - 169:17
**tasteless** [1] - 168:6
**tasting** [1] - 170:10
**tastings** [1] - 197:15
**taught** [3] - 70:15,
71:1, 71:5
**teach** [2] - 71:4,
71:10
**teaching** [1] - 72:8
**team** [10] - 36:13,
161:17, 163:16,
163:25, 181:4,
188:22, 188:23,
189:2, 211:12, 213:7
**teams** [4] - 178:22,
179:5, 180:14, 211:14
**tech** [1] - 184:22
**technical** [2] -
129:10, 142:13
**technically** [1] -
86:25, 87:2

**technology** [1] -
233:22
**tedious** [1] - 109:11
**teenager** [2] - 74:11,
95:23
**teens** [1] - 74:11
**teeth** [8] - 46:15,
46:22, 101:21,
101:22, 102:2,
174:12, 225:22, 226:9
**television** [1] - 75:22
**temples** [1] - 46:23
**ten** [5] - 178:14,
178:20, 201:8,
226:15, 258:18
**tend** [1] - 85:6
**tends** [1] - 203:12
**tens** [1] - 109:16
**Tequila** [66] - 26:24,
28:16, 29:15, 31:10,
31:11, 31:12, 32:6,
32:7, 33:3, 34:5,
34:22, 36:3, 37:23,
37:24, 38:9, 42:7,
45:11, 46:10, 46:12,
48:21, 80:4, 105:17,
105:19, 112:5,
132:16, 134:12,
134:15, 136:1, 136:8,
139:16, 142:24,
143:6, 147:9, 147:14,
148:1, 148:4, 152:10,
204:14, 204:17,
204:21, 205:1,
205:19, 206:18,
206:25, 208:3,
208:22, 210:1, 210:4,
210:10, 211:18,
211:22, 212:7, 229:2,
229:6, 237:2, 237:20,
246:7, 250:7, 250:9,
250:17, 250:25,
285:16, 285:18,
286:2, 287:23
**tequila** [42] - 24:25,
25:2, 33:6, 35:1, 39:4,
39:5, 39:11, 39:13,
39:25, 40:3, 41:18,
41:21, 42:19, 44:20,
44:24, 45:2, 45:11,
45:15, 99:8, 100:13,
125:25, 126:4,
152:21, 153:1,
183:23, 208:13,
208:18, 209:2, 209:4,
216:2, 216:4, 219:1,
219:5, 219:10,
219:13, 219:16,
219:21, 224:6, 224:25
**tequilas** [1] - 218:18

**term** [3] - 138:16,
138:21, 170:20
**terms** [9] - 93:7,
95:11, 111:18,
117:19, 129:9,
129:12, 138:23,
142:23, 235:23
**tested** [2] - 58:20,
58:25
**testified** [9] - 54:20,
55:16, 55:20, 69:2,
123:3, 155:8, 219:12,
224:5, 285:23
**testifies** [2] - 24:15,
299:14
**testify** [9] - 55:25,
62:22, 63:6, 137:7,
224:11, 248:12,
261:14, 293:1, 293:8
**testifying** [6] - 21:22,
22:3, 54:22, 86:17,
106:11, 123:11
**testimony** [46] -
8:16, 9:10, 9:15, 9:18,
9:24, 16:16, 20:24,
30:24, 46:22, 50:19,
51:2, 51:23, 53:11,
54:14, 54:15, 54:17,
55:1, 55:2, 55:13,
55:14, 56:2, 58:20,
60:1, 61:25, 62:1,
63:2, 63:10, 66:1,
86:2, 120:22, 122:11,
136:6, 175:21, 222:4,
222:14, 234:19,
238:6, 247:4, 249:6,
259:22, 276:2, 287:5,
298:8, 298:9, 299:9,
299:16
**testing** [3] - 181:11,
181:15, 181:22
**tests** [1] - 181:12
**Texas** [12] - 25:15,
69:15, 69:16, 69:20,
69:22, 71:15, 72:1,
72:20, 78:8, 78:22,
96:19, 149:3
**TEXAS** [1] - 2:7
**text** [1] - 56:20
**texture** [1] - 46:19
**THAT** [2] - 301:12,
301:16
**THE** [485] - 5:6, 5:14,
5:22, 6:2, 6:5, 8:23,
9:2, 9:12, 9:25, 10:9,
10:20, 10:22, 11:20,
12:16, 13:2, 13:9,
13:18, 13:20, 14:1,
14:17, 14:20, 15:5,
15:23, 15:25, 16:1,

16:21, 17:3, 17:18,
18:17, 19:8, 19:16,
19:18, 19:23, 19:24,
20:4, 20:7, 20:15,
20:18, 23:1, 23:10,
23:13, 23:15, 28:22,
29:1, 34:6, 36:6, 47:7,
48:9, 49:5, 67:11,
67:13, 67:23, 68:2,
68:7, 68:10, 68:13,
68:15, 68:21, 69:3,
69:5, 69:8, 73:25,
81:8, 81:11, 82:10,
82:16, 82:19, 84:12,
85:6, 85:15, 85:20,
86:4, 86:6, 86:8,
86:11, 86:15, 86:16,
86:18, 91:15, 92:22,
98:14, 98:22, 101:4,
101:7, 103:9, 103:22,
104:1, 106:10,
106:17, 110:5, 110:9,
110:15, 110:20,
111:5, 112:13, 113:6,
113:10, 113:16,
113:18, 117:1, 117:6,
117:7, 117:9, 118:23,
119:3, 119:9, 119:14,
120:11, 127:18,
127:24, 128:2, 128:4,
128:22, 128:25,
129:1, 130:18,
130:21, 131:20,
131:24, 134:20,
135:7, 135:11, 138:1,
141:5, 141:8, 141:10,
142:3, 144:22, 145:2,
145:9, 145:11,
145:16, 145:18,
145:20, 145:24,
146:2, 146:4, 146:5,
146:9, 146:10,
148:11, 148:14,
149:19, 149:22,
151:23, 151:25,
152:23, 153:5,
153:13, 153:21,
153:24, 154:1, 154:3,
154:18, 154:21,
155:1, 155:3, 155:9,
155:10, 155:12,
155:14, 155:20,
155:23, 157:14,
157:20, 174:18,
174:21, 192:18,
196:4, 201:5, 201:9,
201:17, 202:3, 202:9,
202:12, 202:20,
203:1, 203:11,
203:17, 204:9,
205:14, 205:24,

206:3, 206:4, 206:5, 206:19, 206:22, 207:9, 207:11, 208:10, 209:10, 209:11, 209:17, 209:20, 210:8, 210:17, 210:19, 210:20, 212:19, 212:23, 213:22, 213:25, 214:3, 220:18, 220:21, 222:13, 222:16, 222:19, 222:22, 222:25, 223:4, 223:6, 223:10, 223:13, 223:17, 230:13, 230:18, 230:19, 230:21, 230:22, 231:1, 231:4, 231:7, 232:2, 232:11, 232:14, 233:7, 233:10, 233:12, 233:16, 234:20, 234:22, 234:23, 234:25, 235:7, 235:12, 235:13, 235:15, 236:13, 236:19, 236:23, 237:24, 238:3, 238:5, 238:13, 238:14, 238:23, 239:10, 239:24, 239:25, 240:1, 240:19, 240:22, 240:24, 241:2, 241:3, 241:13, 241:20, 242:1, 242:4, 242:7, 242:12, 242:16, 242:20, 242:22, 243:1, 243:7, 243:10, 243:14, 243:17, 243:19, 243:22, 243:25, 244:2, 244:9, 244:12, 244:15, 244:18, 244:21, 244:23, 244:25, 245:2, 245:4, 245:8, 245:12, 245:15, 245:18, 245:23, 246:16, 247:11, 247:25, 249:1, 249:15, 249:24, 250:2, 251:4, 251:13, 251:17, 251:20, 252:5, 252:8, 252:11, 252:13, 252:16, 252:20, 252:23, 252:25, 253:6, 253:12, 253:19, 253:24, 254:1, 254:2, 254:3, 254:5, 254:9, 254:14,

254:19, 254:22, 255:2, 255:6, 255:14, 255:19, 255:22, 255:25, 256:6, 256:10, 256:14, 256:16, 256:21, 257:1, 257:5, 257:14, 257:19, 258:9, 258:11, 258:15, 258:20, 258:25, 259:7, 259:14, 259:17, 259:24, 260:4, 260:7, 260:11, 260:15, 260:23, 261:1, 261:7, 261:21, 261:24, 262:3, 262:6, 262:14, 262:17, 262:20, 263:12, 263:15, 267:7, 268:6, 268:11, 268:14, 268:17, 268:20, 268:23, 269:2, 269:5, 269:8, 269:10, 269:13, 269:15, 269:23, 270:4, 270:7, 270:15, 270:23, 271:3, 271:7, 271:14, 271:18, 271:22, 272:2, 272:7, 272:11, 272:15, 272:19, 272:23, 273:2, 273:7, 273:11, 273:16, 273:20, 274:1, 274:7, 274:11, 274:15, 274:19, 274:23, 275:2, 275:6, 275:10, 275:16, 275:23, 276:4, 276:9, 276:11, 276:19, 276:22, 277:3, 277:15, 278:2, 278:6, 278:8, 278:10, 278:11, 278:16, 278:22, 279:1, 279:8, 279:12, 279:17, 279:23, 280:6, 281:2, 281:10, 282:21, 282:24, 283:14, 284:5, 285:7, 286:6, 286:9, 286:13, 286:15, 286:24, 287:6, 287:10, 287:14, 287:17, 287:25, 288:8, 288:12, 288:18, 289:1, 289:6, 289:10, 289:16, 289:20, 289:24, 290:3, 290:7, 290:15, 290:19, 290:23, 290:25, 291:4, 291:15, 292:9, 292:25, 293:4,

293:22, 294:4, 294:11, 294:15, 295:25, 297:2, 297:12, 297:20, 297:22, 298:22, 298:25, 299:22, 300:7, 300:9, 300:13, 301:11, 301:13, 301:14, 301:15, 301:16, 301:17, 301:18

**Theaters** [1] - 197:7
**theft** [1] - 35:8
**theme** [4] - 41:20, 43:19, 46:12, 250:22
**themed** [1] - 45:24
**themes** [2] - 39:13, 43:13
**themselves** [2] - 147:5, 147:14
**theory** [1] - 286:5
**thereof** [2] - 8:24, 9:1
**thereto** [4] - 15:10, 15:16, 298:2, 298:10
**they've** [8] - 24:7, 32:25, 148:6, 181:3, 254:12, 287:4, 287:21, 295:15
**thick** [1] - 214:22
**thief** [2] - 48:20, 49:3
**thin** [2] - 88:1, 89:13
**thinking** [7] - 21:8, 80:23, 176:3, 176:4, 176:5, 258:3
**thinks** [4] - 17:19, 41:8, 53:24, 239:5
**third** [3] - 161:16, 180:3, 193:8
**third-party** [1] - 193:8
**thirty** [2] - 241:22, 241:25
**THOMAS** [1] - 2:12
**Thomas** [1] - 20:14
**thou** [2] - 35:13
**thoughts** [1] - 266:16
**thousand** [2] - 109:20, 196:11
**thousands** [3] - 44:1, 109:16, 174:2
**threat** [1] - 276:16
**threatening** [1] - 83:22
**threats** [1] - 159:18
**three** [27] - 26:25, 28:16, 31:10, 31:11, 31:14, 32:25, 50:20, 51:23, 54:22, 93:15, 94:6, 101:22, 102:2,

114:24, 123:21, 124:5, 124:18, 130:11, 149:11, 160:16, 160:25, 179:1, 182:22, 189:23, 280:13, 299:21
**three-dimensional** [4] - 93:15, 94:6, 114:24, 280:13
**three-page** [1] - 31:11
**three-tier** [1] - 160:16
**throughout** [13] - 36:14, 36:25, 37:13, 48:4, 56:4, 95:22, 96:2, 96:5, 96:7, 98:9, 133:16, 191:7, 236:8
**throw** [2] - 43:7, 138:23
**thrust** [1] - 70:8
**Thursday** [1] - 271:4
**thy** [1] - 35:14
**tier** [1] - 160:16
**tiger** [1] - 187:12
**tight** [1] - 211:17
**tilt** [1] - 90:13
**tilted** [2] - 27:7, 33:16
**timeline** [4] - 285:20, 292:16, 292:19, 293:12
**timely** [1] - 292:13
**timing** [7] - 257:2, 258:12, 283:7, 284:2, 284:3, 286:1, 286:2
**TipseyBride** [1] - 248:24
**TITLE** [1] - 301:13
**title** [1] - 163:4
**titled** [2] - 27:9, 27:10
**TO** [1] - 301:13
**today** [40] - 14:6, 17:19, 17:22, 18:1, 20:22, 21:5, 36:2, 36:14, 38:1, 38:3, 66:4, 123:16, 132:9, 132:12, 132:20, 132:21, 148:7, 150:20, 154:5, 158:25, 163:19, 196:12, 222:7, 227:15, 238:15, 257:8, 259:4, 259:10, 259:22, 263:24, 264:8, 265:4, 265:19, 285:2, 288:2, 291:24, 296:12, 298:3

**Today** [1] - 192:9
**today's** [1] - 244:6
**together** [15] - 35:10, 68:12, 71:9, 77:4, 83:17, 88:16, 88:17, 116:18, 159:6, 164:22, 170:15, 187:15, 213:3, 249:9, 268:2
**Tom** [3] - 5:25, 119:22, 214:10
**tomorrow** [22] - 10:15, 10:17, 11:16, 11:23, 12:3, 12:13, 12:15, 13:11, 116:3, 238:24, 239:12, 239:23, 240:4, 240:14, 241:10, 248:5, 249:21, 256:7, 257:6, 258:6, 258:18, 300:10
**tomorrow's** [1] - 241:5
**tongue** [1] - 169:2
**tonight** [2] - 11:23, 138:7
**took** [21] - 25:5, 26:8, 35:10, 40:9, 41:23, 42:3, 42:4, 42:5, 48:22, 50:2, 88:5, 88:9, 123:12, 124:17, 182:21, 183:25, 189:14, 189:15, 195:23, 246:9, 250:23
**top** [10] - 33:19, 101:24, 102:11, 129:19, 129:25, 130:5, 130:8, 130:9, 130:10, 195:10
**topic** [2] - 265:2, 265:12
**Toronto** [11] - 88:11, 88:14, 88:20, 94:23, 95:14, 99:24, 114:23, 115:23, 116:4, 155:24, 156:11
**total** [2] - 114:7, 156:20
**totality** [1] - 97:9
**totally** [2] - 136:8, 136:10
**touch** [1] - 46:5
**touching** [3] - 58:8, 181:2
**tough** [2] - 48:14, 172:3
**toughed** [1] - 48:15
**tour** [4] - 108:9, 109:9, 116:15, 131:17
**town** [6] - 69:16,

70:3, 72:17, 109:1, 135:15, 215:23

**Toyota** [1] - 185:4

**traced** [2] - 87:24, 87:25

**track** [1] - 181:14

**Trade** [1] - 30:4

**trade** [40] - 27:18, 32:19, 33:24, 33:25, 37:2, 37:5, 41:10, 41:12, 118:15, 136:4, 152:14, 159:12, 184:3, 184:6, 193:15, 193:18, 193:22, 193:24, 194:2, 194:5, 194:6, 194:9, 194:12, 197:21, 197:23, 197:24, 198:1, 198:2, 198:6, 198:7, 198:9, 198:11, 206:12, 206:15, 209:6, 235:4, 250:15, 292:12

**trademark** [40] - 6:21, 201:20, 201:21, 202:7, 202:11, 202:15, 202:16, 203:5, 203:6, 203:16, 203:24, 204:3, 204:7, 212:16, 228:18, 229:21, 230:1, 230:7, 230:10, 231:11, 231:12, 231:18, 231:20, 231:21, 231:24, 231:25, 232:8, 232:21, 233:2, 233:4, 233:25, 234:1, 235:2, 291:10, 291:13, 292:4, 292:7, 293:13, 293:15

**trademarks** [10] - 82:4, 201:13, 201:15, 230:5, 230:8, 232:15, 291:21, 293:9, 293:11, 293:20

**traditional** [1] - 72:20

**traditionally** [1] - 237:11

**traffic** [7] - 21:4, 185:2, 217:20, 217:23, 217:24, 218:8, 218:12

**tragedy** [1] - 139:11

**tragically** [1] - 115:10

**training** [1] - 87:3

**trajectory** [1] - 70:13

**transaction** [1] - 285:15

**transcribed** [1] -

60:4

**transcript** [4] - 5:16, 10:7, 60:2, 60:5

**TRANSCRIPT** [3] - 1:15, 301:14, 301:16

**translate** [2] - 73:23, 93:12

**travel** [1] - 21:4

**traveled** [2] - 77:4, 97:22

**traveling** [1] - 173:18

**TRAVIS** [1] - 2:6

**treated** [1] - 65:5

**tremendous** [2] - 140:20, 250:20

**trepidation** [1] - 140:20

**trespassing** [1] - 118:22

**trial** [35] - 8:10, 22:14, 24:15, 35:20, 36:14, 36:25, 37:7, 37:13, 43:12, 47:22, 48:4, 50:2, 52:9, 56:4, 57:4, 57:7, 58:2, 58:20, 58:25, 59:3, 59:5, 59:12, 60:1, 60:2, 64:22, 125:10, 125:16, 243:6, 243:15, 247:3, 248:21, 266:6, 266:8, 268:1, 285:24

**TRIAL** [1] - 1:15

**trials** [2] - 53:4, 66:5

**tribes** [1] - 44:3

**tried** [7] - 83:25, 88:5, 89:5, 90:15, 90:16, 94:1, 288:23

**tries** [1] - 205:15

**trips** [1] - 77:1

**trouble** [2] - 148:3, 148:6

**troubled** [1] - 139:2

**troubling** [4] - 102:5, 131:5, 136:16, 140:6

**truck** [5] - 74:13, 106:25, 109:4, 131:18

**TRUE** [1] - 301:14

**true** [7] - 11:15, 48:3, 50:11, 55:22, 96:20, 141:17

**truly** [1] - 43:4

**trusted** [1] - 95:13

**truth** [4] - 55:21, 58:19, 99:20, 249:19

**try** [27] - 20:21, 28:12, 31:4, 57:22, 64:20, 65:16, 65:17, 66:3, 83:3, 84:2, 89:5, 89:17, 121:13, 140:7,

141:8, 144:25, 159:24, 176:16, 187:14, 199:23, 204:10, 220:19, 220:25, 239:2, 239:15, 239:21, 251:4

**trying** [22] - 20:22, 21:12, 22:14, 34:16, 35:17, 40:6, 83:11, 83:12, 88:15, 91:2, 116:9, 121:25, 125:9, 129:11, 131:25, 136:25, 140:8, 152:9, 152:12, 152:13, 215:5, 267:19

**TUESDAY** [1] - 1:16

**Tuesday** [25] - 10:17, 11:25, 12:2, 240:6, 240:8, 240:17, 241:9, 258:21, 263:13, 263:15, 263:23, 264:3, 267:6, 267:20, 268:7, 268:10, 270:24, 281:11, 281:13, 285:1, 287:2, 293:25, 294:12, 297:1, 298:17

**Tuesday's** [1] - 12:8

**turmoil** [1] - 42:17

**turn** [7] - 58:8, 88:8, 95:3, 127:13, 130:11, 171:17, 265:17

**turned** [2] - 88:9, 93:16

**Turner** [1] - 78:4

**turtle** [1] - 33:19

**TV** [5] - 167:7, 192:4, 193:2, 194:14, 196:16

**tweak** [2] - 174:7, 225:14

**tweaking** [1] - 95:10

**tweaks** [1] - 158:17

**Twitter** [1] - 56:22

**two** [89] - 9:11, 9:17, 11:17, 12:4, 13:10, 14:21, 19:4, 22:9, 22:15, 22:17, 24:6, 24:9, 26:23, 31:23, 33:10, 33:12, 34:25, 37:18, 37:19, 37:20, 37:21, 37:22, 43:9, 43:12, 44:23, 46:20, 48:9, 50:19, 51:17, 54:21, 55:9, 67:20, 71:1, 73:25, 78:19, 91:15, 93:8, 93:14, 93:21, 94:4, 98:19, 101:12, 101:18, 102:11, 103:23, 123:21, 127:19,

137:25, 138:8, 149:10, 164:9, 177:2, 179:1, 187:14, 187:16, 188:15, 189:9, 189:10, 189:16, 189:23, 197:18, 198:1, 199:8, 200:3, 207:14, 207:23, 207:24, 237:21, 238:15, 247:8, 249:14, 253:8, 254:13, 254:15, 254:16, 254:25, 255:12, 257:6, 259:22, 264:1, 268:25, 269:14, 270:1, 270:17, 270:18, 299:12

**TWO** [1] - 1:15

**two-dimensional** [4] - 93:8, 93:14, 93:21, 94:4

**type** [11] - 38:24, 123:24, 165:5, 165:6, 191:25, 209:5, 216:16, 228:8, 245:4, 245:12, 245:18

**types** [5] - 117:23, 118:11, 121:17, 198:1, 217:5

**typical** [2] - 190:3, 215:5

**typically** [2] - 63:12, 217:6

# U

**U.S** [3] - 200:19, 213:9, 236:4

**ultimate** [2] - 139:21, 166:18

**ultimately** [4] - 49:15, 125:8, 164:19, 219:1

**unable** [1] - 295:12

**unanimous** [1] - 172:10

**uncertain** [1] - 8:4

**unclear** [1] - 265:1

**under** [11] - 21:23, 44:21, 51:20, 65:6, 75:20, 118:1, 126:12, 195:7, 220:4, 222:4, 296:3

**underscore** [1] - 35:21

**understood** [2] - 120:22, 220:22

**undue** [1] - 64:3

**unduly** [1] - 246:2

**uneasy** [1] - 295:10

**unfortunate** [1] - 284:25

**unfortunately** [4] - 46:3, 123:9, 179:13, 224:13

**unique** [5] - 37:6, 39:4, 77:5, 216:15, 247:22

**uniquely** [3] - 40:3, 40:4, 43:16

**uniqueness** [1] - 110:1

**United** [13] - 156:18, 160:8, 160:13, 160:16, 160:19, 162:1, 163:14, 163:17, 163:20, 164:6, 199:16, 199:21, 236:8

**UNITED** [6] - 1:1, 1:1, 1:4, 301:11, 301:13, 301:18

**universe** [1] - 138:5

**university** [2] - 70:3, 70:14

**University** [6] - 70:4, 70:25, 71:15, 72:5, 72:8, 75:6

**unless** [8] - 50:15, 56:13, 210:16, 219:11, 238:17, 244:3, 257:11, 257:24

**unnamed** [1] - 261:11

**Unpaid** [1] - 214:18

**unpaid** [10] - 191:5, 191:6, 191:23, 192:12, 192:14, 192:23, 193:1, 193:7, 196:19, 214:17

**untrue** [1] - 55:13

**untruthfully** [2] - 55:16, 55:20

**unusual** [1] - 21:1

**up** [87] - 9:11, 10:17, 17:19, 19:13, 20:22, 28:23, 38:21, 41:2, 45:15, 47:23, 48:3, 63:5, 64:16, 65:22, 70:18, 72:1, 72:8, 73:8, 75:3, 76:7, 80:11, 81:17, 81:18, 83:7, 83:15, 84:3, 85:13, 100:9, 102:11, 102:20, 103:20, 108:4, 109:8, 111:2, 111:12, 116:9, 123:19, 126:7,

127:25, 130:1, 133:25, 136:20, 147:19, 147:25, 148:22, 150:16, 155:3, 162:18, 167:6, 167:16, 173:19, 176:15, 176:17, 178:24, 180:20, 180:23, 181:20, 184:11, 184:12, 184:13, 189:18, 190:9, 195:25, 196:3, 196:12, 201:12, 215:18, 222:12, 222:14, 222:19, 226:6, 233:14, 237:14, 237:15, 237:19, 246:18, 253:13, 255:4, 261:22, 265:21, 287:1, 292:18, 294:11, 294:12, 294:13, 298:2, 298:16
**upgrade** [1] - 170:12
**urge** [1] - 59:25
**user** [1] - 248:22

**V**

**vacancy** [1] - 30:25
**value** [4] - 192:17, 193:5, 280:15, 280:23
**vapors** [2] - 171:16, 171:17
**variation** [2] - 89:2, 122:14
**variations** [2] - 122:19, 122:22
**variety** [1] - 215:22
**various** [7] - 120:6, 120:9, 136:8, 163:17, 172:10, 219:6, 223:24
**vary** [1] - 194:20
**varying** [1] - 127:11
**vast** [1] - 45:7
**Vegas** [6] - 30:4, 33:25, 34:13, 107:6, 187:2, 187:23
**vehicle** [1] - 143:20
**vendors** [1] - 30:6
**Venice** [2] - 40:10
**venture** [2] - 81:20, 151:8
**venue** [3] - 108:6, 185:16, 185:18
**VERA** [3] - 2:9, 295:5, 296:14
**Vera** [1] - 5:21
**verdict** [8] - 48:7,

50:7, 51:1, 56:5, 57:14, 58:23, 65:13, 267:24
**versa** [1] - 34:23
**version** [2] - 194:18, 205:2
**versions** [4] - 55:8, 168:15, 170:11, 172:1
**versus** [5] - 5:7, 20:5, 148:4, 190:21, 275:20
**vessel** [6] - 24:24, 80:12, 90:6, 110:2, 136:3, 140:10
**via** [1] - 56:19
**vice** [2] - 34:23, 158:11
**video** [6] - 10:6, 94:18, 94:20, 94:21, 94:22, 94:23
**videotape** [1] - 10:8
**view** [5] - 57:23, 58:1, 138:11, 141:18, 228:14
**violates** [1] - 59:9
**violation** [1] - 264:22
**viral** [4] - 184:18, 184:19, 187:10
**vis-à-vis** [1] - 286:2
**visible** [1] - 218:2
**visit** [2] - 57:23, 196:8
**visited** [6] - 102:24, 131:16, 190:13, 191:8, 195:22, 200:22
**visiting** [1] - 39:19
**visits** [3] - 132:3, 132:7, 132:13
**visual** [2] - 129:12, 139:7
**visualize** [1] - 100:4
**visually** [2] - 125:15, 225:15
**vividly** [1] - 76:5
**Vodka** [77] - 23:19, 31:3, 31:21, 32:6, 33:4, 33:5, 34:15, 36:4, 36:17, 36:19, 38:13, 40:25, 46:10, 103:16, 109:25, 121:23, 124:14, 125:9, 127:6, 136:7, 139:17, 143:15, 143:22, 147:10, 148:4, 156:23, 156:24, 157:25, 158:13, 159:2, 159:4, 160:12, 161:1, 162:6, 164:7, 164:19, 165:14, 165:21,

166:19, 167:9, 169:9, 172:13, 174:1, 175:4, 182:2, 183:12, 196:17, 197:2, 199:9, 200:1, 200:18, 207:18, 210:1, 213:5, 215:9, 216:7, 216:19, 217:12, 219:24, 220:7, 220:14, 220:17, 221:3, 221:7, 221:10, 221:16, 225:9, 226:19, 227:12, 229:8, 229:21, 230:2, 246:5, 248:19, 249:23, 250:19, 251:11
**vodka** [73] - 25:3, 31:2, 35:2, 44:11, 44:18, 44:24, 45:3, 45:9, 45:10, 45:13, 45:16, 96:13, 105:4, 111:16, 157:4, 158:15, 158:20, 158:22, 159:24, 160:1, 161:14, 162:18, 166:12, 167:16, 167:17, 167:21, 167:24, 168:5, 168:7, 168:13, 168:17, 168:18, 168:20, 169:15, 170:10, 170:19, 171:21, 171:25, 172:6, 173:5, 173:10, 174:14, 175:5, 179:21, 181:13, 181:17, 181:19, 181:20, 182:11, 183:3, 183:23, 184:12, 184:14, 184:15, 184:17, 185:19, 186:5, 199:14, 212:16, 215:12, 215:19, 216:4, 216:25, 217:8, 217:10, 218:15, 218:25, 219:4, 219:10, 234:2
**Vodka's** [1] - 243:4
**vodkas** [9] - 30:2, 169:19, 171:5, 177:17, 197:13, 217:17, 217:25, 218:11, 218:25
**voice** [2] - 85:13, 145:1
**volume** [2] - 218:11, 235:24
**volunteer** [2] - 151:21, 151:24

**VS** [1] - 1:9

**W**

**wait** [20] - 22:25, 63:13, 63:18, 81:8, 92:14, 106:10, 130:18, 131:20, 141:5, 166:24, 206:3, 206:5, 209:11, 210:20, 233:10, 233:12, 233:16
**waited** [1] - 42:15
**waiting** [4] - 21:11, 65:3, 109:20
**walk** [4] - 19:8, 19:13, 101:15, 112:10
**walking** [2] - 33:2, 102:19
**wall** [2] - 126:24, 141:1
**Walmart** [1] - 109:19
**Walmarts** [1] - 109:2
**Walter** [5] - 114:13, 114:25, 115:1, 115:9, 115:10
**Walter's** [1] - 115:6
**wander** [1] - 45:15
**wants** [5] - 106:20, 209:20, 263:3, 282:25, 292:19
**warehouse** [2] - 163:5, 212:4
**warehouseman** [1] - 25:12
**warning** [1] - 23:8
**Warrior** [1] - 151:15
**wash** [1] - 189:18
**Washington** [4] - 78:23, 79:5, 79:7, 164:10
**waste** [1] - 280:24
**watch** [2] - 57:14, 59:17
**watching** [1] - 126:13
**water** [6] - 101:11, 171:7, 171:20, 171:22, 172:22
**Waterford** [1] - 221:12
**waters** [1] - 44:17
**ways** [6] - 37:19, 127:9, 139:11, 151:12, 165:4, 210:14
**weaknesses** [1] - 159:17
**web** [2] - 88:2, 184:23

**Website** [5] - 56:20, 175:19, 184:20, 184:23, 185:6
**website** [5] - 185:4, 227:25, 228:5, 228:6
**Wednesday** [3] - 270:25, 271:2, 271:3
**WEDNESDAY** [1] - 5:1
**week** [10] - 10:19, 10:20, 42:15, 42:16, 66:21, 185:3, 195:15, 266:14, 267:23, 299:6
**weeks** [8] - 26:21, 124:17, 124:18, 187:5, 187:14, 187:16, 248:20
**weight** [5] - 53:16, 53:18, 55:23, 56:1, 64:3
**well-known** [1] - 186:2
**West** [1] - 72:20
**WESTERN** [1] - 1:2
**whatsoever** [5] - 44:12, 94:9, 126:2, 144:14, 228:9
**whereas** [1] - 179:10
**whiskey** [1] - 218:20
**white** [1] - 145:13
**Whoa** [1] - 99:25
**whole** [15] - 44:13, 127:10, 173:16, 176:5, 178:18, 179:4, 186:4, 187:8, 188:23, 213:7, 214:22, 226:10, 237:15, 250:22, 280:18
**wholesale** [1] - 194:24
**wholesalers** [1] - 194:1
**wide** [1] - 91:3
**width** [1] - 91:23
**wife** [1] - 117:15
**willing** [5] - 225:5, 281:8, 292:5, 292:6, 292:12
**wine** [4] - 24:13, 161:10, 161:24, 179:11
**wire** [1] - 237:14
**wise** [1] - 226:14
**wish** [21] - 12:18, 16:2, 17:5, 18:9, 28:23, 60:8, 110:16, 142:18, 146:5, 153:2, 153:25, 233:20, 238:18, 242:22, 250:2, 254:16, 266:1,

278:23, 280:6, 297:7,
297:16
  **wishes** [2] - 86:5,
270:3
  **wishing** [1] - 92:13
  **WITH** [1] - 301:17
  **withdraw** [4] - 12:23,
220:19, 292:6, 292:7
  **withdrawn** [2] -
220:23, 253:4
  **WITNESS** [28] - 69:5,
86:6, 86:15, 86:18,
101:7, 117:7, 128:4,
128:25, 130:21,
135:11, 141:10,
151:25, 154:1, 155:9,
155:12, 155:23,
206:4, 209:10,
210:19, 230:18,
230:21, 231:1, 231:7,
232:14, 234:22,
234:25, 235:12,
238:13
  **witness** [162] - 7:23,
8:9, 8:10, 8:16, 8:21,
8:22, 8:23, 9:10, 9:13,
9:15, 9:16, 9:23, 10:1,
11:9, 11:18, 12:4,
12:13, 12:20, 13:23,
16:10, 16:11, 16:12,
16:14, 16:18, 16:23,
16:25, 17:2, 17:6,
17:10, 17:14, 22:8,
38:2, 50:19, 53:11,
54:16, 54:18, 54:19,
55:5, 55:15, 55:18,
55:19, 61:9, 61:12,
61:24, 62:2, 62:5,
62:22, 62:24, 62:25,
63:6, 63:14, 63:15,
63:17, 63:18, 64:11,
64:20, 66:15, 66:17,
66:20, 66:21, 66:22,
67:24, 68:2, 68:3,
68:5, 68:8, 68:20,
69:1, 84:13, 85:9,
85:22, 86:1, 86:4,
86:11, 98:15, 98:17,
98:23, 99:2, 101:5,
103:11, 104:2,
106:11, 112:14,
119:13, 128:22,
130:19, 131:23,
132:1, 137:24, 138:2,
145:22, 146:3, 146:4,
146:8, 153:4, 153:6,
153:8, 153:11,
153:17, 153:18,
153:21, 153:24,
154:3, 154:4, 154:7,

154:14, 154:17,
154:23, 155:1, 155:3,
155:7, 174:22,
192:19, 196:4, 201:7,
203:2, 203:12,
203:17, 205:15,
209:21, 210:17,
213:21, 220:22,
230:13, 233:15,
233:17, 233:20,
235:10, 237:24,
238:7, 238:11,
240:15, 242:8,
242:17, 243:20,
246:19, 247:12,
247:14, 252:2, 252:3,
253:1, 256:19,
257:20, 257:21,
257:23, 258:1,
260:23, 262:1,
263:10, 264:21,
265:5, 269:10,
269:11, 283:3, 285:1,
285:13, 294:12
  **witness'** [9] - 9:14,
54:21, 54:22, 54:23,
54:24, 55:1, 55:2,
61:9, 238:6
  **witnessed** [1] -
102:22
  **witnesses** [35] -
10:15, 10:23, 11:16,
11:24, 11:25, 12:6,
12:8, 13:10, 16:9,
21:20, 22:3, 36:16,
43:3, 46:3, 51:10,
54:25, 55:7, 55:24,
56:1, 58:5, 58:18,
63:9, 66:1, 210:22,
238:15, 240:5,
240:14, 240:16,
241:5, 263:16,
263:21, 264:24,
265:1, 265:11, 268:7
  **WOLPERT** [1] - 2:8
  **woman** [2] - 30:19,
32:16
  **won** [1] - 170:18
  **wonder** [1] - 260:9
  **wonderful** [2] -
24:17, 71:9
  **wondering** [1] -
18:14
  **wood** [1] - 25:17
  **Word** [1] - 298:8
  **word** [19] - 37:23,
39:2, 60:4, 89:9,
128:10, 134:6,
136:10, 139:23,
251:7, 291:11,

291:14, 291:19,
291:22, 292:3, 292:7,
293:11, 293:13,
293:14, 293:20
  **worded** [1] - 42:13
  **wording** [1] - 63:21
  **words** [5] - 56:3,
86:1, 131:12, 262:9,
296:4
  **worker** [1] - 75:2
  **works** [17] - 14:25,
24:18, 27:13, 47:10,
47:11, 47:12, 47:15,
47:16, 99:23, 120:6,
138:11, 138:13,
139:6, 139:18,
139:21, 140:7, 260:20
  **world** [15] - 26:9,
29:18, 30:13, 42:22,
44:2, 84:3, 94:8,
100:7, 118:19, 160:7,
161:15, 175:10,
199:16, 227:1
  **worried** [1] - 93:11
  **worry** [4] - 86:16,
100:12, 140:20, 151:4
  **worse** [1] - 75:1
  **Wounded** [1] -
151:15
  **wrapping** [1] - 182:6
  **write** [5] - 62:6,
137:4, 153:8, 153:14,
238:8
  **writer** [1] - 75:22
  **writing** [2] - 56:19,
63:4
  **written** [5] - 61:22,
62:13, 62:14, 72:16,
136:5

## X

**XO** [1] - 217:5

## Y

**Yacrow** [1] - 30:20
**yards** [1] - 97:11
**year** [25] - 26:19,
28:11, 30:5, 34:20,
96:25, 109:12,
115:24, 116:23,
123:7, 124:3, 124:4,
124:5, 191:16,
198:18, 198:21,
199:21, 211:15,
227:25, 235:23,
236:1, 236:2, 236:7,
236:9, 236:10

**year's** [2] - 187:8,
235:25
**years** [28] - 26:23,
33:10, 44:1, 71:1,
73:12, 73:13, 76:21,
76:25, 77:6, 78:4,
78:5, 80:10, 80:11,
81:1, 96:15, 96:22,
103:19, 109:10,
125:17, 125:19,
150:20, 151:20,
175:16, 175:17,
199:2, 213:13, 213:14
**yeast** [1] - 171:8,
171:13
**yellow** [1] - 145:14
**yesterday** [11] - 8:6,
14:15, 18:13, 19:9,
27:19, 32:20, 48:14,
65:14, 119:23,
257:20, 291:21
**Yolanda** [1] - 92:16
**York** [12] - 75:6,
75:10, 75:11, 76:6,
78:10, 78:11, 78:23,
79:1, 79:4, 79:20,
79:21, 135:4
**YORK** [1] - 2:14
**young** [6] - 72:14,
74:9, 75:2, 75:21,
76:5, 95:23
**younger** [3] - 76:10,
97:18, 150:14
**yourself** [5] - 64:13,
69:12, 155:19,
197:15, 198:6
**yourselves** [1] -
60:12
**YouTube** [1] - 56:22

## Z

**ZENOBIA** [1] - 2:5
**Zenobia** [2] - 5:20,
20:10